## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
                                                             :
In re                                                        :      Chapter 11
                                                             :
EXIDE HOLDINGS, INC., et al.,                                :      Case No. 20– _____ (     )
                                                             :
                              Debtors.¹                      :      (Joint Administration Requested)
                                                             :
------------------------------------------------------------ x
```

### DECLARATION OF ROY MESSING IN SUPPORT OF
### DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Roy Messing, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer of Exide Holdings, Inc. ("**Holdings**") and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and, together with their non-Debtor affiliates, "**Exide**," or the "**Company**").  I am a Senior Managing Director at Ankura Consulting Group, LLC ("**Ankura**"), a business advisory and expert services firm whose professionals have significant experience providing bankruptcy crisis management, consulting, and financial advisory services.  Prior to my involvement with Exide, I served as a president, chief restructuring officer, liquidating trustee, turnaround advisor, and strategic consultant to numerous companies across various industries, including manufacturing and distribution, chemicals, energy, building materials, commercial real estate, financial services, professional services, medical devices and services, pharmaceuticals, technology, media, telecom, and entertainment.

---

¹       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

2.      On April 8, 2020, the Debtors retained Ankura to assist them with their financial and operational restructuring.  Since that time, I have been overseeing the Ankura team engaged by the Debtors.  Subsequently, on May 18, 2020, I was appointed as the Debtors' Chief Restructuring Officer. In my role as Chief Restructuring Officer, I am responsible for an oversee all matters related to these chapter 11 cases and report directly to the Special Committee (as defined and described more fully below).

3.      On the date hereof (the "**Commencement Date**"), each of the Debtors commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with Exide's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases.

4.      I submit this declaration (this "**Declaration**") to assist the Court and parties in interest in understanding the events and circumstances that led to the commencement of these chapter 11 cases and in support of the motions and applications that the Debtors have filed with the Court, including the first day pleadings filed concurrently herewith (the "**First Day Pleadings**").  I am authorized to submit this Declaration on behalf of the Debtors.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Exide's employees, advisors, or attorneys, or based upon my experience, knowledge, and information concerning Exide's operations and  the battery manufacturing and distribution industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      The Debtors have requested a variety of relief in the First Day Pleadings to minimize the adverse effects of the commencement of these chapter 11 cases.  I am familiar

with the contents of each First Day Pleading and I believe the relief sought therein is necessary for the Debtors to transition into chapter 11. I further believe that the relief requested in the First Day Pleadings will preserve the value of the Debtors' estates.

6.      This Declaration is divided into five (5) sections:

- Section I provides an overview of the Debtors and these chapter 11 cases;

- Section II describes the Company's business, its history and its current operations;

- Section III summarizes the Company's organizational and capital structure;

- Section IV describes the circumstances that led to the commencement of these chapter 11 cases; and

- Section V provides a summary of the First Day Pleadings, the factual bases for the relief requested therein, and other information related to these chapter 11 cases.

## I.
## Overview

7.      Exide is a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid and lithium-ion batteries, with operations in more than twenty (20) countries. The Company is headquartered in Milton, Georgia and through its four global business groups – Transportation Americas, Transportation Europe and Rest of World ("**ROW**"), Industrial Energy Americas, and Industrial Energy Europe and ROW – the Company provides a comprehensive range of stored electrical energy products and services for industrial and transportation applications. The Company manufactures and distributes transportation and industrial batteries in North America, Europe, Asia, the Middle East, India, Australia, and New Zealand.

8.      This is the Company's second chapter 11 filing in seven (7) years and the third in the Company's history.  In June 2013, Debtor Exide Technologies, LLC (which was a corporation at that time) ("**Exide Technologies**") commenced a chapter 11 case in the Delaware bankruptcy court – *In re Exide Technologies*, Case No. 13-11482 (MWF) (the "**2013 Chapter 11 Case**").   In March 2015, the Delaware bankruptcy court confirmed the Company's plan of reorganization after nearly two (2) years of complex and extensive negotiations.[2]

9.      Notwithstanding the Company's efforts to implement its business plan following its emergence from the 2013 Chapter 11 Case and the support of its new owners and lenders, the Company continued to face liquidity, performance, and operational challenges that were more persistent and widespread than anticipated.  Coupled with adverse industry and market factors as well as substantial environmental costs, these challenges have resulted in reduced liquidity.

10.      Beginning in early 2019, the Company commenced an M&A process to identify buyers or investors for its businesses.  In addition, in an effort to address immediate liquidity constraints, the Company obtained the June 2019 Financing (as defined in <u>Section IV</u> below) to infuse approximately $150 million into its business operations.  In December 2019, the Company completed the Optimization (as defined in <u>Section IV</u> below), under advice of prior counsel, to align the Company's legal structure with its operational structure and to facilitate a potential sale or financing of the Europe/ROW business.  Given their proximity to these chapter 11 cases, the June 2019 Financing and the Optimization are currently under review by the independent Subcommittee, under advisement by Weil (each as defined below).

---

[2]      *See In re Exide Technologies*, Case No. 13-11482 (MWF) [D.I. 3423]

RLF1 23448521v.1

11.      Despite these efforts, the Company continued to face significant liquidity and operational headwinds in 2019 and 2020, which were recently exacerbated and accelerated by the unprecedented health and economic impact of the COVID-19 global pandemic.  As explained in more detail in <u>Section IV</u> of this Declaration, the Company was not able to consummate an out-of-court transaction with a third party purchaser for the sale of its North American and European assets.  Accordingly, facing growing uncertainty with respect to its ability to continue as a going concern, severe liquidity constraints and upcoming interest and maturity payments, the Company began negotiating with an ad hoc group of its noteholders (the "**Ad Hoc Group**") that holds, in the aggregate, approximately (i) 90.11% of the Superpriority Notes, (ii) 87.94% of the Exchange Priority Notes, (iii) 76.40% of the First Lien Notes, and (iv) over 80% of the equity interests in Holdings (each as defined below), and their advisors on the terms and implementation of strategy strategic transaction.  Those discussions culminated in a restructuring support agreement (the "**RSA**") executed on May 18, 2020.  A copy of the RSA is attached hereto as **<u>Exhibit C</u>**.

### A.      Restructuring Support Agreement

12.      As reflected in the RSA, the Debtors have commenced these chapter 11 cases with a clear strategy for the benefit of all stakeholders including their thousands of employees that depend on Exide to earn a living for their families—the sale of all or substantially all of their assets through the continuation of the Debtors' Prepetition Marketing Process (as defined below), at the conclusion of which any and all bids for the Debtors' assets will be evaluated by the Debtors and pursued in accordance with proposed bidding procedures (the "**Marketing Process**").  Importantly, the Debtors intend to pursue this strategy to confirm a chapter 11 plan and pay administrative expenses in these cases.

13.     The Marketing Process will provide a transparent and comprehensive avenue through which the Debtors will seek bids or proposals for sale transactions that provide for the following:  (i) a sale of substantially all of the Debtors' assets (the "**Company Sale Transaction**"), (ii) a sale of the Debtors' Exide Americas (as defined below) business segments and/or the assets related thereto, in whole or in parts (the "**Americas Sale Transaction**"), (iii) a sale of the Debtors' Exide Europe/ROW (as defined below) business segments and/or the assets related thereto, in whole or in parts (the "**Europe/ROW Sale Transaction**"), or (iv) the liquidation or winding up of any assets or businesses of the Debtors in a manner other than as described in (i) through (iii) above.

14.     Importantly, pursuant to the RSA, the Ad Hoc Group has submitted a binding credit bid for the Exide Europe/ROW business segment (the "**Europe/ROW Credit Bid**").  The Europe/ROW Credit Bid, which is described further in <u>Section IV</u> below, will serve as the stalking horse for a Europe/ROW Sale Transaction and will be subject to higher or better bids.  In connection with the Credit Bid, the Debtors and the Ad Hoc Group have also negotiated a term sheet contemplating the Interim Financing Facility (as defined below) provided by the Ad Hoc Group to certain of the Debtors' non-Debtor affiliates in Europe to support the Company's Europe/ROW operations during the execution of the Marketing Process.

15.     Accordingly, upon completion of the Marketing Process, the Debtors will have fully market tested the value of their assets and the Debtors will be in the best position to select the transaction or series of transactions to maximize the value of their assets and preserve as many jobs as possible.  In addition, the RSA incorporates a plan term sheet pursuant to which the Ad Hoc Group has agreed to support the pursuit and confirmation of a chapter 11 plan that complies with the absolute priority rule and other requirements of the Bankruptcy Code.

6

B.    **DIP Financing**

16.    As the Debtors continued their review of strategic alternatives, and it became apparent that the commencement of chapter 11 cases would be necessary, the Debtors focused on obtaining debtor in possession financing and the use of Cash Collateral (as defined in the DIP Motion) that would be sufficient to sustain their Exide Americas business during the pendency of a chapter 11 case and would provide sufficient liquidity for completion of the Marketing Process.  In that connection, as described in greater detail in the DIP Declaration,[3] the Debtors, through their investment banker, Houlihan Lokey Capital, Inc. ("**Houlihan**"), solicited offers for debtor-in-possession financing from thirty-eight (38) parties, including the Debtors' existing noteholders and the Prepetition ABL Lenders (as defined below).  Only three (3) offers for financing were received, none of which, standing alone, were adequate to fund the Marketing Process.  Ultimately, the Debtors were able to combine sources and secure postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $40 million (the "**DIP Facility**"), to be provided by BTC Holdings Fund I, LLC and certain of the Debtors' prepetition secured lenders (solely in such capacity, the "**DIP Lenders**") and agented by Blue Torch Finance LLC (together with BTC Holdings Fund I, LLC and its affiliates, "**Blue Torch**"; and solely in such capacity as the agent under the DIP Facility, the "**DIP Agent**"), with a draw of $40 million under the proposed DIP Financing.  A copy of the term sheet (the "**DIP Term Sheet**") containing certain key terms of the DIP Facility is annexed to the RSA.  The Debtors and the DIP Lenders are in the process of

---

[3]    *See Declaration of Jason Feintuch in Support Of Debtors' Motion For (I) Authority To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens And Provide Superpriority Administrative Expense Status, (D) Grant adequate Protection, (E) Modify The Automatic Stay, And (F) Schedule A Final Hearing And (Ii) Related Relief* (the "**DIP Declaration**"), filed contemporaneously herewith.

negotiating a final form credit agreement with respect to the DIP Facility (the "**DIP Credit Agreement**") which will be filed with the Court prior to the hearing on the First Day Pleadings.

17.     In addition to the DIP Financing, the Debtors are in the process of negotiating the terms for the consensual use of the Cash Collateral of the Prepetition ABL Lenders, the Exchange Priority Noteholders, and the First Lien Noteholders for the duration of these chapter 11 cases in exchange for adequate protection.  If the Debtors cannot reach a resolution with the Prepetition ABL Lenders on the consensual use of Cash Collateral, the Debtors will file a motion seeking authority for the use of nonconsensual use of Cash Collateral.

### C.     Case Timeline

18.     Time is of the essence in these chapter 11 cases.  It cannot be stressed enough that the Debtors must proceed at a targeted and deliberate pace.  As stated, given the challenges in raising financing for these chapter 11 cases, the Debtors options were to (i) accept the proposed amount of financing, which together with the use of Cash Collateral, is projected to allow the Debtors to operate until mid-August and thereafter use sale proceeds resulting from the Marketing Process, or (ii) liquidate all operations immediately at the outset of the cases.  Despite these challenges, the Debtors have designed a case strategy and secured adequate funding that allows operations to continue during the implementation of a well-designed Marketing Process.  Thereafter, the Debtors expect to have sufficient sale proceeds to repay the DIP Facility and fund the wind-down and repayment of the Debtors' prepetition debt pursuant to the RSA and related term sheets.

19.    Accordingly, the DIP Term Sheet and the RSA set forth milestones (the

"**Milestones**") by which the Debtors must accomplish various objectives.  The Debtors have

targeted the following dates to satisfy the Milestones:[4]

| Sale Timeline | | |
|---|---|---|
| **Event** | **Target Date** | **Milestone Date** |
| Entry of order approving the Bidding Procedures Motion | June 8, 2020 | June 18, 2020 |
| Auction to be held if the Debtors receive more than one Qualified Bid | July 7, 2020 | July 18, 2020 |
| Entry of Sale Order | July 20, 2020 | August 2, 2020 |
| Closing of Americas Sale Transaction | August 7, 2020 | August 27, 2020 |
| Closing of Europe/ROW Sale Transaction | To be determined | September 16, 2020 |

| Case Timeline | | |
|---|---|---|
| **Event** | **Target Date** | **Milestone Date** |
| Entry of an order approving DIP Financing on an interim basis | May 20, 2020 | May 22, 2020 |
| File Plan and Disclosure Statement | June 15, 2020 | June 18, 2020 |
| Entry of an order approving DIP Financing on a final basis | June 17, 2020 | June 23, 2020 |
| Confirmation Hearing | August 24, 2020 | September 16, 2020 |
| Plan Effective Date | August 31, 2020 | October 1, 2020 |

20.    The Debtors and the Ad Hoc Group are aligned in their support of an

expeditious timeline that minimizes the adverse impact on the Debtors' operations, vendors, and

employees, but provides adequate opportunity to secure executable bids for the Debtors' U.S.

and European/ROW operations for the highest or best value.  The proposed timeline outlined

---

[4]    The foregoing is only a summary of certain Milestones.  The Milestones described herein are qualified in their entirety by the Milestones described in the DIP Credit Agreement and the milestones described in the RSA.

above appropriately balances the Debtors' need to effectuate their sale strategy quickly with their need to adequately market test the value of their businesses. The amount of work done by the Debtors and their professionals in connection with the Prepetition Marketing Process enhances their ability to complete the Marketing Process on the time frame proposed. The Debtors believe that proceeding with the Marketing Process is preferable to any of their other alternatives and will inure to the benefit of all constituents, including their employees. Accordingly, moving forward on the basis of the Milestones is necessary to maximize value for all stakeholders.

## II.
## Overview of the Company's Operations

### A.    History and Current Business Operations

21.    Founded in 1888 and headquartered in Milton, Georgia, Exide has grown to become a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid batteries. Across the globe, Exide batteries power cars, boats, heavy duty vehicles, golf carts, powersports, and lawn and garden applications. Its network power solutions deliver energy to vast telecommunication networks in need of uninterrupted power supply.

22.    More specifically, Exide provides its customers with a comprehensive range of stored electrical energy products and services for industrial and transportation applications in North America, Europe, Asia, the Middle East, India, Australia, and New Zealand. The Company's operations consist of its (i) North American operations ("**Exide Americas**") and (ii) European and ROW operations ("**Exide Europe/ROW**").

23.    <u>Transportation</u>. In its transportation segments, the Company manufactures, distributes, and markets lead-acid and lithium ion batteries for automotive, heavy duty, and recreational applications for a diversified customer base of blue-chip original

10

equipment manufacturers ("**OEM**"), aftermarket retailers, and installers.  Exide's proprietary and private label products include starting, lighting, and ignition batteries for cars, trucks, off-road vehicles, agricultural and construction vehicles, motorcycles, recreational vehicles, marine, and other applications.  Exide Americas works with channel partners to deliver its products to customers, while Exide Europe/ROW maintains its own distribution network.

24.    <u>Industrial Energy</u>.  The Company's industrial batteries consist of motive power cells and network power applications.  Motive power cells are used in the material handling industry for equipment such as electric fork-lift trucks as well as in other machinery, including floor cleaning machinery, powered wheelchairs, railroad locomotives, mining equipment, and electric road vehicles.  Network power batteries provide energy storage solutions for critical systems that require uninterrupted power supply and are used to power, among other things, telecommunications systems, computer installations and data centers, hospitals, air traffic control systems, security systems, electric utilities, railways, and various military applications. The Company has a diverse customer base that includes a number of major end-user customers, retailers and OEMs, utilities, and government and military agencies.

**i.    Exide Americas**

25.    <u>Manufacturing</u>.    Exide Americas produces batteries and battery components out of seven U.S. manufacturing facilities, five of which are dedicated to its transportation business segment (the "**Transportation Americas Facilities**") and two of which are dedicated to its industrial business segment (the "**Industrial Energy Americas Facilities**"). As part of its operational initiatives (described in more detail in <u>Section IV</u>), the Company is focused on transitioning from mixed product plants to plants that produce fewer SKUs and, thus, are able to operate more efficiently.  To that end, the Transportation Americas Facilities are composed of two dedicated battery manufacturing plants and two dedicated battery component

11

manufacturing plants.[5]  Likewise, both of the Industrial Energy Americas Facilities are dedicated to cell manufacturing.  The Company uses the battery component facilities to strategically supply the battery and cell manufacturing plants, which enables the Company to control the cost, quality and reliability of its products.  In fiscal year 2020, the Company produced approximately 11.7 million batteries in its Transportation Americas Facilities and approximately 714,000 cells in its Industrial Energy Americas Facilities.

26.     As described in detail in the Employee Wages Motion (as defined below), the Debtors are party to certain collective bargaining agreements with local and international unions, which cover approximate 350 employees across its facilities.

27.     Recycling.  The Company has two smelters in the U.S., both of which are currently active battery collection and recycling facilities.  These facilities reclaim lead by recycling spent lead-acid batteries, which are obtained for recycling from Exide's customers (who exchange spent battery cores for credit on purchases) and third party spent-battery collectors.  Recycling keeps batteries from being disposed of improperly or shipped to regions where regulations governing battery disposal are lacking.  In fiscal year 2020, approximately 170,000 tons of batteries, plant scrap, and range lead were recycled at Exide Americas' smelters or by a third party at Exide's request.  Exide's recycling efforts enabled it to better control the cost of lead -- the principal raw material used in making its products.

**ii.   Exide Europe/ROW**

28.     Manufacturing.   Exide Europe/ROW produces batteries and battery components out of nine European manufacturing facilities, four of which are dedicated to its transportation business segment (the "**Transportation Europe/ROW Facilities**") and five of

---

[5]     The fifth Transportation Americas Facility, located in Reading, Pennsylvania, operates as a plastics recycling facility.

which are dedicated to its industrial business segment (the "**Industrial Energy Europe/ROW Facilities**").  Similar to the limited SKU strategy employed at Exide Americas, all of the Exide Europe/ROW facilities are focused on battery production, however, Exide Europe/ROW purchases components from third party suppliers.  In fiscal year 2020, the Company produced approximately 12.7 million batteries in its Transportation Exide Europe/ROW Facilities and approximately 5.8 million cells in its Industrial Energy Europe/ROW Facilities.

29.    <u>Recycling</u>.  Exide Europe/ROW also has two active smelters located in Europe, which process spent batteries and supply the Exide Europe/ROW facilities with reclaimed lead for use in battery production.  In fiscal year 2020, approximately 120,000 tons of batteries, plant scrap, and range lead were recycled at Exide Europe/ROW's smelters or by a third party at Exide's request.

**B.    Events Since the 2013 Chapter 11 Case**

30.    Since emerging from the 2013 Chapter 11 Case (as defined below) in 2015, the Company has experienced significant drains on its liquidity and cash flows, including (i) mounting costs for environmental remediation and related litigation with its Vernon Facility (as defined below) and other closed operating sites, (ii) rising production costs, exacerbated by the closure of two (2) of its recycling facilities, which have exposed the Company to price fluctuations in raw material inputs, (iii) operational inefficiencies caused by its legacy mixed-use manufacturing facilities, and (iv) the recent impact of the global COVID-19 pandemic on consumer demand for the Company's products and the functionality of the Company's supply chain, in each case as described in more detail below.

31.    In the past two (2) fiscal years, the Company has taken several measures to attempt to alleviate pressure on its liquidity and ability to operate as a going concern.  More

13

specifically, the Company (i) enacted certain operational initiatives, including (a) the divestment of its inefficient branch distribution network, (b) closed multiple mixed-use manufacturing facilities, and (c) unfortunately, had to resort to reducing its headcount in order to manage overhead as a significant input into its cost model, and (ii) delevered its balance sheet and addressed near term debt maturities through the June 2019 Financing (as defined below).  In December 2019, the Company also completed the Optimization (as defined below) to reorganize its corporate structure in order to better facilitate potential sales or financings of its Exide Americas and Exide Europe/ROW business segments as separate entities.  As stated, the June 2019 Financing and the Optimization are under review by the independent Subcommittee.

32.    Notwithstanding its efforts to address liquidity issues, as of the Commencement Date, the Company still faces significant operational and environmental challenges that prompted the Debtors filing of these chapter 11 cases.

## III.
## Corporate and Capital Structure

### A.    Corporate Structure

33.    As the Debtors are privately-held, none of the Debtors' equity securities have been publicly-traded since the Debtors emerged from the 2013 Chapter 11 Case.  All of the Debtors are direct or indirect subsidiaries of Holdings.  Most of the Debtors' North American operations are owned, directly or indirectly by Debtor Exide Technologies, a Delaware limited liability company that is wholly owned by Holdings.  The Debtors' Europe/ROW operations are primarily held through non-Debtor Exide International Holdings, LP ("**Exide International**"), a limited partnership formed under the laws of the Cayman Islands that is wholly owned by Holdings.  An organizational chart illustrating the corporate and capital structure of the Debtors is annexed hereto as **Exhibit A**.

14

34.     As of the Commencement Date, Holdings' board of directors (the "**Board of Directors**") is comprised of the following six (6) members, including four (4) independent directors:

| Name | Director Since | Position/Affiliation |
|------|----------------|----------------------|
| Timothy D. Vargo | April 2017 | Chairman of the Board of Directors, President, CEO |
| Andrew Axelrod | August 2019 | Director, Axar Capital |
| Mark G. Barberio | April 2015 | Independent Director |
| Alan Carr | April 2019 | Independent Director |
| William Transier | April 2019 | Independent Director |
| Harvey Tepner | April 2020 | Independent Director |

35.     To the best of my knowledge, none of the independent members of the Board of Directors are affiliated with or employed by any of the Company's shareholders, lenders, or noteholders.

36.     As of the Commencement Date, the Debtors' senior executive team is comprised of the following individuals:

| Name | Position |
|------|----------|
| Timothy D. Vargo | CEO and President |
| Mike Judd | Executive Vice President, COO and President, North America |
| Lou Martinez | Executive Vice President and CFO |

37.     To the best of my knowledge, none of the members of the Company's executive management are affiliated with or employed by any of the Company's shareholders, lenders, or noteholders.

38.     Prior to commencing these chapter 11 cases, the Company took measures to ensure a seamless transition into chapter 11 and provide for robust and independent corporate governance procedures. First, the Company appointed a new independent director to its Board of Directors. Harvey Tepner, an independent corporate director, was appointed to the Board of Directors in April 2020. The Company now has four (4) independent directors: Mr. Tepner,

Mark. G. Barberio, Alan Carr, and William Transier.  These individuals bring decades of restructuring and operational turnaround and transformation experience to the Company.  Second, the Board of Directors formed a special committee (the "**Special Committee**"), composed solely of its four (4) independent directors to direct and oversee all aspects of the Company's restructuring process and chapter 11 cases.  Third, as described further below, a sub-committee of the Special Committee (the "**Subcommittee**") was established, with Mr. Tepner as the sole member, to investigate, evaluate and control the disposition or resolution of any claims associated with certain prepetition affiliate transactions, including the June 2019 Financing and the Optimization.  Working with the assistance of Weil, Gotshal & Manges LLP ("**Weil**"), the Subcommittee, in its sole discretion, is evaluating the Debtors' prepetition transactions.  Finally, contemporaneously with the filing of these chapter 11 cases, I was appointed as the Chief Restructuring Officer reporting directly to the Special Committee on all aspects of the restructuring and chapter 11 cases.

### B.    Capital Structure

39.    As of the Commencement Date, the Debtors, together with their non-Debtor affiliates, have outstanding funded debt obligations in the amount of approximately $817.4 million in the aggregate, summarized in the following chart:

| Instrument / Facility | Principal Outstanding |
|---|---|
| ABL Credit Agreement | $101,200,000 |
| 10.75% Superpriority Lien Senior Secured Notes due 2021 | $152,513,000 |
| 11.0% Exchange Priority Notes due 2024 | $390,000,000 |
| 11.0% First Lien Senior Secured Notes due 2024 | $161,023,000 |
| **Total Secured Debt** | **$804,736,000** |
| 3.79% Deferred Payment Notes due 2022 | $2,700,000 |
| 11.0% Unsecured Notes due 2020 | $9,000,000 |
| 11.0% Unsecured Notes due 2022 | $1,000,000 |
| **Total Unsecured Funded Debt** | **$12,700,000** |
| **Total** | **$817,436,000** |

    **i.    ABL Facility (Secured)**

        40.    As of the Commencement Date, there is approximately $101.2 million in aggregate outstanding unpaid principal under that certain ABL Credit Agreement, dated as of April 30, 2015 (as amended, modified, or otherwise supplemented from time to time, the "**ABL Credit Agreement**"), by and among, inter alia, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, and Exide Holding Netherlands B.V. (each a direct or indirect subsidiary of Holdings and a "**Prepetition ABL Borrower**" and, collectively, the "**Prepetition ABL Borrowers**"), Bank of America, N.A., as administrative agent (the "**Prepetition Admin Agent**"), Bank of America, N.A., PNC Bank, National Association, and Bank of Montreal, as co-collateral agents (collectively, the "**Prepetition Collateral Agents**" and, together with the Prepetition Admin Agent, the "**Prepetition ABL Agents**"), the lenders from time to time party thereto (each a "**Prepetition ABL Lender**" and, collectively, the "**Prepetition ABL Lenders**").  The Debtors' obligations under the ABL Credit Agreement mature on July 31, 2021.

41. The revolving credit commitments under the ABL Credit Agreement are divided into United States, Canadian, United Kingdom, and Dutch revolving credit commitments, in each case, committed to the Prepetition ABL Borrowers organized in that jurisdiction. Pursuant to the ABL Credit Agreement and the Foreign General Continuing Guaranty, dated as of April 30, 2015 (as amended or supplemented from time to time, the "**Foreign ABL Guaranty**"), obligations under the ABL Credit Agreement of the Canadian, United Kingdom, and Dutch Prepetition ABL Borrowers are guaranteed by Holdings, the Prepetition ABL Borrowers and certain subsidiaries of Holdings organized both in and outside of the United States. Pursuant to the ABL Credit Agreement and the U.S. General Continuing Guaranty, dated as of April 30, 2015, obligations under the ABL Credit Agreement of the United States Prepetition ABL Borrowers are guaranteed by Holdings, Exide Technologies, and certain indirect subsidiaries of Holdings organized in the United States and not by any of the European affiliates.

42. The total amount borrowed on U.S. line under the ABL Credit Agreement is approximately $95 million. Certain Debtors and certain U.S. non-Debtor affiliates are obligors or guarantors of this obligation. The Debtors' European affiliates do not guarantee this obligation. Separately, $6.4 million is drawn and outstanding on the UK line under the ABL Credit Agreement. The UK obligations are guaranteed by the Debtors and certain non-Debtor affiliates in Europe.

43. The outstanding obligations under the ABL Credit Agreement are secured in accordance with the terms of the US Security Agreement, dated as of April 30, 2015 (as amended, supplemented, or modified from time to time, the "**ABL Security Agreement**"), and the other United States and foreign security documents specified in the ABL Credit Agreement.

18

Pursuant to the terms of the ABL Security Agreement and the Amended and Restated Intercreditor Agreement, dated as of June 17, 2019 (as amended, supplemented or modified from time to time, the "**Intercreditor Agreement**"), the Prepetition ABL Lenders were granted first-priority liens on certain assets (with certain specified exceptions) including, but not limited to, all accounts, chattel paper, cash and deposit accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter of credit rights, and commercial tort claims (the "**ABL Priority Collateral**"), and a third-priority lien on the Notes Priority Collateral (as defined below).[6]

### ii.    10.75% Superpriority Lien Senior Secured Notes due 2021 (Secured)

44.    As of the Commencement Date, Debtors Holdings and Exide Technologies are guarantors of secured note obligations consisting of $152.5 million in aggregate outstanding principal of 10.75% Superpriority Lien Senior Secured Notes due 2021 (the "**Superpriority Notes**" and the holders thereof, the "**Superpriority Noteholders**") issued pursuant to that certain Indenture (as amended or otherwise modified from time to time, the "**Superpriority Notes Indenture**") by and between non-Debtor Exide International, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee and collateral agent and Bank of America National Association, as successor trustee and collateral agent, dated as of June 17, 2019.  The Superpriority Notes mature on October 31, 2021 with the ability to extend to October 31, 2022 at the Company's option in exchange for a 1.0% cash fee payable to the Superpriority Noteholders.  The Superpriority Notes were issued in connection with the June 2019 Financing.

---

[6]    An organizational chart illustrating the priority of liens over the assets of the Debtors and their non-Debtor affiliates is attached hereto as **Exhibit B**.

45.    The obligations under the Superpriority Notes Indenture are guaranteed by Holdings and certain subsidiaries of Holdings and are secured, in each case, in accordance with the terms of a Superpriority Lien Security Agreement, dated as of June 17, 2019 (as amended or otherwise modified from time to time, the "**Superpriority Security Agreement**").  Pursuant to the terms of the Superpriority Security Agreement and the Intercreditor Agreement, Holdings and certain subsidiaries of Holdings each granted, to the Superpriority Noteholders, first-priority liens on all equipment, inventory, real property, intellectual property, the stock of Exide Technologies and certain subsidiaries of Holdings, and substantially all of the other assets of Exide Technologies, Holdings, and certain subsidiaries of Holdings, other than the ABL Priority Collateral (the "**Notes Priority Collateral**") and a second-priority lien on the ABL Priority Collateral.

### iii.    11% First Lien Secured Notes due 2024 (Secured)

46.    <u>11% Exchange Priority Notes</u>.    As of the Commencement Date, the Debtors have outstanding secured note obligations consisting of $390.0 million in aggregate outstanding principal of 11% Exchange Priority Notes due 2024 (the "**Exchange Priority Notes**" and the holders thereof, the "**Exchange Priority Noteholders**"), issued pursuant to that certain Indenture by and between Exide Technologies, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee and collateral agent, dated as of June 25, 2019 (as amended or otherwise modified from time to time, the "**Exchange Priority and First Lien Notes Indenture**").  The Exchange Priority Notes mature on October 31, 2024.  The Exchange Priority Notes were issued under an exchange offer in connection with the June 2019 Financing, pursuant to which certain 2022 Legacy First Lien Noteholders exchanged their 2022 Legacy First Lien Notes (each as defined below) for Exchange Priority Notes at an agreed-upon exchange rate.

20

47. <u>First Lien Notes</u>. As of the Commencement Date, the Debtors have outstanding secured note obligations consisting of $161.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes due 2024 (the "**First Lien Notes**" and the holders thereof, the "**First Lien Noteholders**") issued pursuant to Exchange Priority and First Lien Notes Indenture. The 2024 First Lien Notes mature on October 31, 2024.

48. The obligations under the First Lien Notes Indenture are guaranteed by Holdings and certain subsidiaries of Holdings and are secured, in each case, in accordance with the terms of an Amended and Restated First Lien Security Agreement, dated as of June 25, 2019 (as amended or otherwise modified from time to time, the "**1L Security Agreement**"). Pursuant to the terms of the 1L Security Agreement and the Intercreditor Agreement, Holdings and certain of its subsidiaries granted to the Exchange Priority Noteholders and the First Lien Noteholders second-priority liens on the Notes Priority Collateral and third-priority liens on the ABL Priority Collateral. Pursuant to the Exchange Priority and First Lien Notes Indenture, the First Lien Notes are subordinated in contractual right of payment to the Exchange Priority Notes.

### iv.    3.79% Deferred Payment Notes due 2022 (Unsecured)

49. As of the Commencement Date, Holdings has outstanding unsecured note obligations consisting of $2.7 million in aggregate outstanding principal of 3.79% Second Lien Deferred Payment Notes due 2022 (the "**Legacy Second Lien Notes**") issued pursuant to that certain indenture by and between Holdings, as issuer, and U.S. Bank National Association, as trustee, dated as of June 30, 2015. The Legacy Second Lien Notes mature on April 30, 2022.

50. In connection with the June 2019 Financing, the liens on certain assets of Holdings securing the Legacy Notes were released.

21

### v.    Legacy First Lien Notes (Unsecured)

51.    <u>11% Legacy First Lien Notes Due 2020</u>.  As of the Commencement Date, the Debtors have outstanding unsecured note obligations consisting of $9.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes Due 2020 (the "**2020 Legacy First Lien Notes**" and the holders thereof, the "**2020 Legacy First Lien Noteholders**"), issued pursuant to that certain indenture by and between Exide Technologies, as issuer, and U.S. Bank National Association, as trustee, dated as of April 30, 2015 (as amended or otherwise modified from time to time, the "**2020 Legacy First Lien Notes Indenture**").  The 2020 Legacy First Lien Notes matured on April 30, 2020 and the Debtors did not make the maturity payment.

52.    In May 2017, in connection with an exchange offer (the "**2017 Exchange Offer**"), (i) certain 2020 Legacy First Lien Noteholders exchanged their 2020 Legacy First Lien Notes for 2022 Legacy First Lien Notes at an agreed-upon exchange rate, and (ii) the covenants in the 2020 Legacy First Lien Notes Indenture were amended to, among other matters, allow the release of the first priority lien on certain assets of Holdings that previously secured such notes. The current 2020 Legacy First Lien Noteholders are holders of such notes who did not participate in the 2017 Exchange Offer.

53.    <u>11% Legacy First Lien Notes Due 2022</u>.  As of the Commencement Date, the Debtors have outstanding unsecured note obligations consisting of $1.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes Due 2022 (the "**2022 Legacy First Lien Notes**" and the holders thereof, the "**2022 Legacy First Lien Noteholders**") issued pursuant to that certain Indenture by and between Holdings, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee, dated as of May 24, 2017  (as amended or otherwise modified from time to time, the "**2022 Legacy First Lien Notes Indenture**").  The

22

2022 Legacy First Lien Notes were issued in connection with the 2017 Exchange Offer and mature on April 30, 2022.

54.     In connection with the June 2019 Financing, the covenants in the 2022 Legacy First Lien Notes Indenture were amended to, among other matters, allow the release of the first priority lien on certain assets of Holdings that previously secured such notes.  The current 2022 Legacy First Lien Noteholders are holders of such notes who did not participate in the June 2019 Financing.

### vi.    Other Financing Arrangements

55.     As of the Commencement Date, the Debtors have $11.1 million in aggregate outstanding capital lease financing obligations, pursuant to that certain (i) Master Lease Agreement, dated June 29, 2017, by and between Exide Technologies, as lessee, and Stonebriar Commercial Finance LLC, as lessor, for certain battery component manufacturing equipment located at its Kansas City, Missouri facility, and (ii) Master Lease of Personal Property, Finance Lease, dated September 19, 2016, by and between Exide Technologies, as lessee, and BMO Harris Equipment Finance Company, as lessor, for certain battery manufacturing equipment located at its Kansas City, Kansas facility.

### vii.   General Unsecured Claims

56.     In the ordinary course of business, the Debtors incur trade credit on varying terms.  As of the Commencement Date, the Debtors estimate that they have approximately $97.5 million in general unsecured claims, excluding any lease rejection claims.

### viii.  Intercompany Claims

57.     In the ordinary course of business, the Debtors engage in intercompany transactions (collectively, "**Intercompany Transactions**") with each other and with certain of their non-Debtor affiliates (each a "**Non-Debtor Affiliate**", and collectively, the "**Non-Debtor**

23

**Affiliates**") that give rise to intercompany receivables and payables (collectively, the "**Intercompany Claims**").  The Debtors maintain records of all Intercompany Transactions (including those with Non-Debtor Affiliates) and can ascertain, trace, and account for all Intercompany Claims.  The Intercompany Transactions are ordinary course transactions that are integral to the Company's business and the function of the Cash Management System.

58.    The primary Intercompany Transactions giving rise to Intercompany Claims are (i) intercompany cash transfers for working capital purposes, which are not entered into in the ordinary course and historically have been documented through intercompany notes, (ii) Management Fee transactions, relating to annual fees charged by Exide Technologies to other Debtors and its Non-Debtor affiliates on account of allocated shared expenses, (iii) centrally-billed Expense allocations, which are recorded on intercompany accounts and are generally not cash settled, and (iv) Intercompany Trade Transactions (each as defined in the Cash Management Motion) pursuant to which the Company engages in the purchase and sale of goods among the Debtors and Non-Debtor Affiliates.

59.    Notwithstanding the Company's historical treatment of the settlement of Intercompany Transactions, as described in further detail in the Postpetition Intercompany Protocols in the Cash Management Motion, the Debtors seek to cash settle all Postpetition Intercompany Transactions between Debtors and Non-Debtor Affiliates on a monthly basis.  All Postpetition Intercompany Transactions among the Debtors will be recorded as an Intercompany Claim and treated in the same manner as they were prior to the Commencement Date.

### ix.    Equity Ownership

60.    As of the Commencement Date, the outstanding shares of common stock, par value $0.01 per share (the "**Holdings Common Stock**") are currently held (either directly and/or through subsidiaries or affiliates) as follows:

24

| Holder | Percentage of Outstanding Holdings Common Stock |
|---|---|
| MacKay Shields LLC | 39.83% |
| Alliance Bernstein L.P. | 19.12% |
| D.E. Shaw Galvanic Portfolios, L.L.C. | 10.76% |
| Neuberger Berman | 6.38% |
| Axar Capital Management, L.P. | 4.03% |
| Less than 5% holders | 19.88% |
| **Total** | **100%** |

61.     Holdings does not have any other classes of stock outstanding.

**IV.**
**Need for Chapter 11 Relief and the**
**Circumstances Leading to Commencement of These Chapter 11 Cases**

62.     The Debtors are filing these chapter 11 cases to implement and complete the Marketing Process.  The Marketing Process is critical to achieving the Debtors' goals of maximizing creditor recoveries, providing for an equitable distribution to their stakeholders, and, to the greatest extent possible, protecting the interests of their approximately 2,400 employees.[7] Absent the commencement of these cases, and the DIP Financing and Cash Collateral use, the Company would not have the money necessary to sustain its operations during the Marketing Process.

**A.     Prior Chapter 11 Cases**

63.     Under the  plan of reorganization confirmed in the 2013 Chapter 11 Case, Exide deleveraged its balance sheet by approximately $600 million, raised approximately $165 million in new capital, and secured a $200 million exit ABL financing facility.  The Company

---

[7]     The Company employs approximately 7,621 people globally.  Of this number, 5,183 are located throughout Canada, Europe and Asia and are not directly employed by the Debtors.

emerged from the 2013 Chapter 11 Case as a going-concern, continued its operations across virtually all of its existing world-wide business segments, and preserved nearly 10,000 jobs.

64.     The Company emerged from the 2013 Chapter 11 Case in April 2015 and consummated the transactions contemplated in its confirmed plan of reorganization, including the formation of (i) the Exide Creditors' Liquidating Trust (the "**2013 Case GUC Trust**"), for the purpose of liquidating and distributing assets allocated to the general unsecured creditors, and (ii) the Vernon Tort Claims Trust (the "**2013 Case Vernon Trust**") for the purpose of pursuing litigation claims on behalf of tort claimants in connection with environmental obligations of the Company on account of its closed Vernon, California facility (the "**Vernon Facility**"), and distributing any litigation proceeds therefrom.  The 2013 Case GUC Trust is still in existence (and will continue through April 2023) for the purpose of remitting proceeds of preference actions from the Company to the beneficiaries of the 2013 Case GUC Trust.  Under the current applicable timeline, the final distributions under the 2013 Case GUC Trusts will be made during the first calendar quarter of 2022. As of the Commencement Date, the 2013 Case Vernon Trust continues to pursue litigation and mediation claims in connection with the Company's Vernon Facility.

65.     Although the 2013 Chapter 11 Case remains open as of the Commencement Date, administration of the 2013 Case GUC Trust and the 2013 Case Vernon Trust should not interfere with, and will remain separate from, these chapter 11 cases.

**B.      Circumstances Leading to the Chapter 11 Cases**

66.     Even after its emergence from bankruptcy in April 2015, the Company's business continued to face significant operational challenges, substantial environmental costs, and industry trends that severely constrained its liquidity.

26

### i.   Operational Challenges

67.   <u>Rising Production Costs</u>.   The cost of lead currently represents approximately 37% of the Debtors' cost of goods sold. The Company has generally managed this key cost driver through use of its recycling facilities; however, the closure of the Company's recycling facilities in Frisco, Texas and Vernon, California caused the Company to become more dependent on third party recycled lead tolling.   As a result, the Company has had increase third party tolling contracts to fill shortfalls in its customer battery recycling program, which increased the Company's production costs.   Open market junk battery purchases impact the Company's raw lead cost and expose the Company to fluctuations in the commodity price, which cannot always be passed on to customers.

68.   <u>Operational Inefficiencies</u>. After emerging from the 2013 Chapter 11 Case, the Company continued suffer from operational inefficiencies.   Specifically, the operation of the Company's mixed-use facilities, which produced multiple products at the same time, led to product inefficiencies and reduced margins.   Furthermore, the Company used its own aftermarket store delivery network that proved inefficient, such that the incremental revenue gained from maintain the branch store network was outweighed by the costs of operating the stores.

69.   <u>COVID-19 Impact</u>. Over the past two months, the Company's operations have been significantly impacted by the global COVID-19 pandemic.   Cash receipts have been adversely affected due to lower consumer demand and customers attempting to conserve cash.   Additionally, the Company's supply chains have been impacted by plant shut downs and government enforced lock downs.   In Europe, the Company has been forced to fully suspend operations at a number of its facilities and production has been slowed down in the Americas as well.

RLF1 23448521v.1

### ii.    The Debtors are Highly Levered

70.    Despite a significant increase in capital expenditures and the modernization of its production processes following its emergence from the 2013 Chapter 11 Case, the Company fell short of its operating and margin improvement objectives.  As a result, cash flows are insufficient to service the level of debt with which it emerged from the 2013 Chapter 11 Case and which was incurred during the subsequent five (5) years to fund expenditures on facility remediation costs and capital investments.  As of March 31, 2020, the Company's indebtedness was approximately 9.2x EBITDA; prior to the June 2019 Financing, it was levered to approximately 9.6x EBITDA.[8]  Over the last three years, the Debtors' cash interest expense has averaged approximately $26.8 million per year.  The costs of such debt service has, of course, impacted the Debtors' ability to invest in product and growth initiatives. Despite the full equitization of the Convertible PIK Notes (as defined below) in connection with the Optimization, the Debtors' current balance sheet is not sustainable over the long term.

### iii.    Environmental Liabilities

71.    As a result of its multinational manufacturing, distribution, and recycling operations, the Company is subject to numerous U.S. federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which it operates (collectively, "**EH&S Laws**").  The Company is exposed to obligations and liabilities under such EH&S laws arising from its current and past manufacturing or recycling/recovery operations and from the handling, release, treatment, storage, and disposal of materials designated as hazardous substances or hazardous wastes (collectively, the "**Environmental Liabilities**").

---

[8]    EBITDA measured as the last-twelve-months EBITDA for each of March, 31, 2020 and June 30, 2019, respectively.

28

72.     While the Company has spent hundreds of millions of dollars to address Environmental Liabilities attributed to its historic operations, it nonetheless estimates that Environmental Liabilities associated with its closed sites could cost an additional $200 million or more to address over the next five (5) years.

73.     The Company owns or leases twenty-three (23) non-performing properties across the United States and one (1) non-performing property in Canada in which its activities are limited to environmental remediation and/or maintenance efforts (collectively, the "**NPPs**") of which (i) eight (8) NPPs have been remediated and/or are not known to require remediation and (ii) sixteen (16) NPPs are properties that are subject to ongoing environmental remediation efforts.  The remediation efforts undertaken by the Company in connection with the NPPs vary in scope and stage across the various sites.  For example, the Company has completed remediation at its Kankakee, Illinois site pursuant to a voluntary agreement with Illinois state authorities.  With respect to the Vernon Facility, the Company has entered into a series of agreements with federal and state authorities that required the Company to ultimately close the Vernon Facility, conduct significant decommissioning and remediation measures and remit substantial payments in connection with environmental conditions at the site.

74.     Since emerging from the 2013 Chapter 11 Case, the Company has spent approximately $166 million on operating and remediation costs at the Vernon Facility alone and expect to spend approximately $254 million in total.

75.     In 2018 and 2019, the Company spent approximately $35.6 million and $29.5 million, respectively, in environmental remediation costs.  Given the Company's operational headwinds and financial position, as further described herein, payment of remediation costs associated with the Environmental Liabilities continue to cause significant

RLF1 23448521v.1

strains on the Company's liquidity and ability to operate as a going concern and are no longer feasible.

76.     Unlike their predecessors, however, the Debtors do not intend to pursue a recapitalization transaction to emerge from the instant proceedings as a reorganized business. With respect to any assets that the Debtors are unable to sell to third party purchasers through the Marketing Process, the Debtors intend to liquidate or abandon such assets.  At the end of these chapter 11 cases, the Debtors will not be in business, and as such, they will no longer be able to retain and support the ongoing maintenance and remediation of the NPPs.  As such, the Debtors seek to commence good faith negotiations at the outset of these chapter 11 cases with various governmental regulatory agencies concerning the orderly transfer of the NPPs pursuant to the Settlement Procedures (as defined in the Settlement Procedures Motion).[9]

77.     The overarching goal of establishing and implementing the Settlement Procedures is to implement the orderly transfer of the NPPs from the Debtors' liquidating estates in an efficient manner that minimizes the risk of harm to public health and safety but recognizes the Debtors' challenged financial circumstances.  Importantly, the Settlement Procedures do not require agencies to reach a settlement with the Debtors.  Rather, the Settlement Procedures are designed to foster open communications among the parties and facilitate the efficient administration of these chapter 11 cases while significantly reducing the incurrence of unnecessary costs associated with litigating abandonment issues under section 554(a) of the Bankruptcy Code before the Court, which will only be pursued by the Debtors as a last resort.

---

[9] *See the Motion of Debtors for Authorization to (I) Implement Settlement Procedures for Non-Performing Properties and (II) Abandon such Properties, if Necessary* (the "**Settlement Procedures Motion**").

### iv.    Liquidity Constraints

78.    Despite significant investment and operational improvements, Exide Americas continues to experience significant operational strains on its liquidity due to high working capital and capital expenditure requirements, legacy environmental costs, and industry and other pressures, including a mild winter which reduced battery demand and, most recently, COVID-19.  In addition to the foregoing operational challenges, the Company's high leverage, and costs associated with its debt service and maturities, have exacerbated its already-negative free cash flow generation.

### C.    Debtors' Prepetition Restructuring Efforts

### i.    Operational Initiatives

79.    <u>Distribution</u>.  In March 2019, in an effort to address inefficiencies in its distribution model, Exide sold its Transportation Americas branch network business to Battery Systems, Inc. ("**BSI**" and such transaction, the "**Branch Network Sale**").  Prior to the Branch Network Sale, Exide operated approximately 42 branches throughout North America, which sold and distributed batteries and other products to customers, battery specialists, retail stores, and OEM dealers.  Exide now sells its aftermarket Transportation Americas products through the BSI-owned branch network and other aftermarket retailers.  By transitioning to a "truck load" delivery model and relying on channel partners for distribution of its products, Exide is able to focus on large, direct-ship customers for its in-house distribution network, which has significantly improved delivery and cost efficiency.

80.    <u>Facility Closure</u>. In March 2019, as part of its plan to consolidate product lines and move away from mixed product manufacturing plants, Exide announced the closure of its facility located in Columbus, Georgia.  The facility, which closed its primary smelting operations in prior to the Commencement Date and is in the process of closing its remain

31

smelting and manufacturing operations, was one reason for shrinking margins and was a drain on the Company's working capital.

81.    SG&A.  In an effort to reduce its operating expenses, the Company began an extensive review of its overhead expenses, which resulted in the Company undertaking certain cost-cutting measures, including (i) the Branch Network Sale, (ii) the closure of its Columbus, Georgia plant, and (iii) the reduction of its headcount by approximately 800 positions over the past two (2) fiscal years.

### ii.    June 2019 Financing Transactions

82.    In June 2019, as part of its effort to deal with continuing liquidity issues, the Company obtained a new money investment and exchange of existing debt from its lender group (the "**June 2019 Financing**").  The June 2019 Financing consisted of (i) the exchange of 2022 Legacy First Lien Notes (which at the time were secured by a first priority lien on Notes Collateral) for (A) the Exchange Priority Notes and (B) the First Lien Notes, (ii) the amendment of the 2022 Legacy First Lien Notes Indenture to, among other things, eliminate substantially all of the restrictive covenants and certain events of default, and release the collateral thereunder, (iii) the issuance by Exide International of $150.0 million aggregate principal amount of Superpriority Notes, and (iv) the issuance by Exide Technologies of an intercompany note in favor of non-Debtor Exide International, to effect the transfer of approximately $131.1 million of the proceeds of the Superpriority Notes issuance to Exide Technologies for funding short term working capital needs in the Exide Americas business segment.  The June 2019 Financing effectively reduced the Company's indebtedness by approximately $25 million.

### iii.    December 2019 Optimization Transactions

83.    In December 2019, Exide Technologies was a corporation and the ultimate parent of the Company group.  To align the Company's legal structure with its operational

structure and to facilitate a sale or financing of the Europe/ROW business, Exide Technologies completed an internal reorganization (the "**Optimization**"), pursuant to which it converted to a limited liability company.  In connection with the Optimization, the Ad Hoc Group equitized the full amount of approximately $291.0 million of outstanding 7.25% 1.5 Lien Senior Secured Convertible PIK Notes due 2027 (the "**Convertible PIK Notes**") issued pursuant to the Indenture dated as of June 25, 2019.

84.    As a result of the Optimization, the legal entities comprising Exide Americas and the Exide Europe/ROW business segments were shifted to separate sides of the corporate structure and the equitization of the Convertible PIK Notes substantially de-levered the Debtors' capital structure.  More specifically, (i) Holdings was created and became the sole member of Exide Technologies and the new ultimate parent of the business,   (ii) Exide Technologies became the parent of substantially all of the Exide Americas business, and (iii) non-Debtor Exide International, became the parent of substantially all of the Exide Europe/ROW business.

### iv.    Prepetition Marketing Process

85.    In December 2018, the Company initiated a process to evaluate strategic alternatives to enhance value and engaged CMD Global Advisors, LLC (formerly part of XMS Capital Partners) ("**CMD**") as its investment banker.  CMD contacted over 150 potential bidders, sixty (60) of whom signed confidentiality agreements in connection with the process. Ultimately, however, in the Spring of 2020, the Company engaged Weil, Ankura and Houlihan,[10] as legal, financial and investment banking advisors, respectively, to assist and advise in its contingency planning process.

---

[10]    Houlihan was previously engaged by the Company in March 2019 for investment banking services that ultimately culminated in the consummation of the June 2019 Financing.

86.     The Board of Directors delegated decision-making authority over the marketing and sale process (the "**Prepetition Marketing Process**") to the Special Committee, which had been formed for the purpose of evaluating potential strategic alternatives. The Special Committee, with the assistance of Weil, Houlihan, and Ankura, has reviewed a number of potential transactions, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) the continuation of the Company as a standalone entity.

87.     The Company undertook an extensive marketing effort and solicited indications of interest from seventy-five (75) strategic and financial buyers with the financial and operational wherewithal to complete a transaction. Twenty-nine (29) of the parties contacted executed confidentiality agreements, after which the Company provided them with a Confidential Information Memorandum, financial projections, and access to a data room.

88.     The deadline for interested parties to submit initial bids was May 6, 2020. The Company received seven (7) indications of interest ("**IOIs**"). Five (5) of the bids were for certain business segments of the Company and two (2) were bids for substantially all of the Company's assets as a going concern, or a combination of assets in the Exide Americas and Exide Europe/ROW business segments (the "**All-Company Bids**"). Following extensive discussions with the Special Committee and its legal and financial advisors, the Company selected twenty-one (21) parties to submit updated IOIs and participate in further negotiations and diligence, including telephonic management presentations that were held during the weeks of May 4 and May 11, 2020. Following the management presentations, the Company and its advisors continued to provide due diligence to the remaining bidders in advance of the second round of IOIs. The Company expects to receive second round IOIs on or about May 18, 2020.

In the meantime, the Company and its advisors have continued to engage in discussions with the all bidders.

89.     Although the commencement of the chapter 11 cases ensued before the Prepetition Marketing Process was completed, the Prepetition Marketing Process provided both the Debtors and potential bidders with a valuable head start on the sale process.  The prepetition process enabled the Debtors to solicit IOIs and gain more insight into asset values and market conditions.  The Debtors were also able to populate a data room that has virtually all the information that any potential bidder might be interested in.  The Prepetition Marketing Process also provided potential bidders with time to commence their diligence and internal approval processes.  Very shortly after the commencement of these cases, the Debtors intend to file a motion for approval of a sale and bidding procedures related thereto (the "**Bidding Procedures**"), pursuant to which the Debtors will seek authorization to continue the Marketing Process and effectuate a sale of substantially all of their assets.

### v.    Negotiations with Stakeholders

90.     Given the Company's impending liquidity needs, the Company decided to engage with the Ad Hoc Group to explore the Company's strategic alternatives and solicit input with respect to the Prepetition Marking Process and the availability of short term financing. Beginning during the week of April 13, 2020, the members of the Ad Hoc Group signed confidentiality agreements with the Company.  Since then, the Company continued to have discussions and negotiations with the Ad Hoc Group regarding sale options and financing scenarios.  The Ad Hoc Group retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") to assist with its analysis of the potential strategic alternatives.

91.     The Debtors' engagement with the Ad Hoc Group increased in advance of the April 30, 2020 maturity of the 2020 Legacy First Lien Notes and the Company's impending

liquidity crisis.  Accordingly, the Company's financial and legal advisors engaged with Paul Weiss to develop the RSA and discuss the terms of the DIP Financing.  To that end, during the week of May 4, 2020, the parties began discussing, among other things, (i) ongoing diligence regarding Exide, its operations, and prospects, (ii) the terms of the Ad Hoc Group's Europe/ROW Credit Bid, and (iii) the completion of the Marketing Process in chapter 11.

        92.    In connection with the execution of, and pursuant to its obligations under the RSA, the Ad Hoc Group submitted a binding term sheet, a copy of which is annexed to the RSA, containing certain key terms of the Europe/ROW Credit Bid.  The Europe/ROW Credit Bid reflects a purchase price of $430 million, comprised of (i) $70 million, representing a discharge and release of the aggregate principal amount of Exchange Priority Notes and First Lien Notes held by the Ad Hoc Group on account of the Exchange Priority Notes, (ii) $25 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under the Interim Financing Facility, (iii) $161 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under the Superpriority Notes Indenture, and (iv) $174 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under existing Exide Europe/ROW financing arrangements.  In connection with the Europe/ROW Credit Bid, the Ad Hoc Group has also committed to (x) provide an initial $25 million in interim financing to Exide International be used for working capital and general corporate purposes within the Exide Europe/ROW business segment, and up to $50 million of new money exit financing in their discretion (collectively, the "**Interim Financing Facility**") and (y) refinance all amounts owed by non-Debtor Exide Technologies (Transportation) Limited under the ABL Credit Agreement, or otherwise bifurcate the facility provided under the ABL Credit Agreement.

93.      Among other customary conditions to closing typical of sale transactoions, as a condition to the closing (the "**Credit Bid Closing**") of any sale transaction pursuant to the Europe/ROW Credit Bid, (i) the sale order shall provide general releases for any claims against the Ad Hoc Group up to the Credit Bid Closing and related to the Europe/ROW Credit Bid, subject to the determination by the Subcommittee that such releases are reasonable and in the best interest of the Debtors and (ii) the Ad Hoc Group and the Debtors must structure the Europe/ROW Credit Bid in a tax efficient manner acceptable to the Ad Hoc Group.

94.      The Debtors, after consultation with their advisors, have determined that selection of the Europe/ROW Credit Bid as the stalking horse for a Europe/ROW Transaction is in the best interests of the Debtors' estates.  Specifically, the Europe/ROW Credit Bid will serve as the stalking horse bid (the "**Europe/ROW Stalking Horse Bid**") for the purchase of the Debtors' equity interests in Exide International and certain other non-Debtor foreign affiliates, all of which equity interests constitute property of Debtor Holdings' estate.[11]  The Europe/ROW Stalking Horse Bid will be subject to better or higher offers, as further described in the Bidding Procedures.  The Marketing Process for the Europe/ROW Sale Transaction will take place on the same Bid Deadline as the Debtors' other sale transactions contemplated by the Bidding Procedures, however, after the Bid Deadline, the timeline of the various sales transactions may diverge.  In the event the Europe/ROW Stalking Horse Bid is not selected as the Successful Bid (as defined in the Bidding Procedures) at the auction, the Europe/ROW Credit Bid shall serve as the Back-up Bid (as defined in the Bidding Procedures) for the relevant assets.

95.      While the Bidding Procedures contemplate that a stalking horse for the Debtors' other assets might be paid a termination fee, the Europe/ROW Credit Bid does not

---

[11]    For the avoidance of doubt, the sale of non-Debtor assets will not be subject to the approval of the Bankruptcy Court or entitled to the protection afforded by section 363 of the Bankruptcy Code.

include a termination fee.  The only protection afforded to the Ad Hoc Group in the event that it

is outbid for the Europe/ROW Assets is the Debtors' agreement to pay the Ad Hoc Group's

reasonable and documented professional fees (and in any event, solely to the extent such fees are

not otherwise paid by the Debtors pursuant to the DIP Financing or the RSA).

### vi.    Key Employee Incentive and Key Employee Retention Programs

96.    The Company has been extremely concerned about possible key employee

attrition and alignment of incentives given the enormous additional burden that has been placed

upon the Company's senior management team and other key employees leading up to the chapter

11 filing, and the likely continued demand on such key employees during these chapter 11 cases.

In response, the Company implemented (i) an employee incentive plan for four key employees,

including certain insiders, and (ii) a retention program for seventeen (17) key employees, in each

case, to ensure that such employees remain with the Company and align their interests with the

Company to execute the Marketing Process in these chapter 11 cases to maximize value.

97.    Specifically, the Special Committee adopted an employee incentive plan

for four key employees (the "**KEIP Participants**") that collectively provides for the payment of

up to approximately $2.0 million in the aggregate, subject to satisfaction of certain criteria.  One-

third of each individual's total eligible amount (aggregating approximately $679,000) was paid

to the KEIP Participants on May 15, 2020.  The remaining two-thirds (aggregating up to

approximately $1.36 million) is payable upon satisfaction of certain incentive-based performance

criteria related to the Marketing Process, subject to Bankruptcy Court approval.  Importantly,

these payments are subject to claw-back, should an employee voluntarily terminate their

employment prior to 45 days after consummation of a sale transaction.

98.    Furthermore, the Company implemented an employee retention program

for seventeen (17) key employees (the "**KERP Participants**") that collectively provides for the

payment of approximately $1.65 million in the aggregate.  For the KERP Participants, fifty percent (50%) of each individual's total eligible amount (aggregating approximately $834,000) was paid to the key employees on May 15, 2020.  The remaining fifty percent (50%) for the KERP Participants is payable, subject to Bankruptcy Court approval.  Importantly, these payments are subject to claw-back, should an employee voluntarily terminate their employment prior to thirty (30) days after consummation of a sale transaction.  The Debtors intend to seek approval of a key employee retention program that is broader than the initial seventeen (17) KERP Participants.

## V.
## First Day Pleadings[12]

99.    Contemporaneously herewith, the Debtors have filed with the Court certain First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite the Marketing Process.

100.    The First Day Pleadings seek authority to, among other things, obtain postpetition financing, honor wage and benefit obligations to the Company's employees, pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with minimal disruption.  I believe that the relief requested in the First Day Pleadings is necessary to give the Debtors an opportunity to work toward a successful restructuring that will inure to the benefit of all of their stakeholders.

---

[12]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Pleadings.

101.    Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtors.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 case, except to the extent relief is necessary to avoid immediate and irreparable harm.  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking other relief to subsequent hearings before the Court.

102.    I am familiar with the content and substance of each of the First Day Pleadings.  I believe approval of the relief sought in each of the First Day Pleadings is critical to the Debtors' ability to implement their chapter 11 strategy successfully, with minimal disruption to their business operations so as to preserve the value of the assets to be sold in connection with the Marketing Process.  Obtaining the relief sought in the First Day Pleadings will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.  The First Day Pleadings include the following:

A.    **Administrative Motions**

i.    **Joint Administration Motion**

103.    Pursuant to the *Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases* (the "**Joint Administration Motion**"), the Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Exide Holdings, Inc.

40

104.    Joint administration of the chapter 11 cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in the chapter 11 cases will affect each of the Debtors.  The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.  The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### ii.    Prime Clerk Retention Application

105.    Pursuant to the *Application of Debtors Pursuant to 11 U.S.C. § 105(a) and 28 U.S.C. § 156(c) for Appointment of Prime Clerk LLC as Claims and Noticing Agent Effective as of the Commencement Date* (the "**Prime Clerk Retention Application**"), the Debtors request entry of an order appointing Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent  for the Debtors and their chapter 11 cases.  Prime Clerk's responsibilities will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  The terms of Prime Clerk's retention are set forth in that certain engagement agreement by and between Exide Technologies and Prime Clerk (the "**Prime Clerk Engagement Agreement**").

106.    I understand that Prime Clerk is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases.  I have been advised that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  Moreover, I understand that Prime Clerk's role as claims and noticing agent for Exide Technologies in the 2013 Chapter 11 Case makes Prime Clerk uniquely well suited to perform the responsibilities outlined in the

41

Prime Clerk Engagement Agreement.  I have been further advised that, in light of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.  Based on the foregoing, I believe that the relief requested in the Prime Clerk Retention Application should be approved.

**B.      Operational Motions Requesting Immediate Relief**

**i.      DIP Motion**

107.    Pursuant to the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Utilize Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing, and (V) Grant Related Relief* (the "**DIP Motion**"), the Debtors request (i) authority to enter into the DIP Credit Agreement consisting of a $25 million first-out loan provided by Blue Torch (the "**First-Out Loan**") and a $15 million last-out loan provided by members of the Ad Hoc Group (the "**Last-Out Loan**", and together with the First-Out Loan, the "**New Money DIP Loans**"), (ii) authority to pay interest and fees pursuant to the Fee Letter, (iii) authority to grant a super-priority administrative claim over the DIP Collateral and superpriority claims over all other administrative expenses, (iv) authority to use Cash Collateral, (v) approval of the form and manner of adequate protection to be provided to the Prepetition Secured Parties, (vi) modification of the automatic stay to the extent necessary to implement the terms of the DIP Documents and the DIP Orders, and (vi) waiver of any applicable stay to provide for immediate effectiveness of the interim DIP Order.

108.    I am familiar with and am involved in the negotiation of the terms of the DIP Credit Agreement and the adequate protection proposed to be provided by the Debtors in exchange for access to Cash Collateral and the DIP Financing. Based on my general experience

in the restructuring industry and my experience with the Debtors' businesses, interim approval of the DIP Facility and access to Cash Collateral is necessary and appropriate to allow the Debtors immediate access to liquidity.  Ankura worked closely with the Debtors' management team to determine the amount of interim funding required to meet the Debtors' short-term liquidity needs pending approval of the Motion on a final basis.  Interim DIP funding in the amount of $40 million and immediate access to Cash Collateral will provide the Debtors with sufficient liquidity to assure their employees, customers, vendors, and suppliers that the Company has the working capital necessary to continue its operations in the ordinary course of business.  It is critical that the Debtors be able to demonstrate adequate liquidity to their vendors at the onset of these chapter 11 cases, as each day of terms lost to vendors reflects approximately $7.0 to $8.0 million in liquidity.

109.    The Debtors anticipate that the commencement of these chapter 11 cases will increase the demands on their free cash due to one-time chapter 11 filing related expenses and possible increases in demands by key constituents. As described below, the Debtors are already experiencing liquidity constraints caused by reduced free cash flow and exacerbated by the costs associated with the NPPs and the economic impact of the COVID-19 global pandemic, among other factors, resulting in a negative impact to revenue of approximately $20 million during April 2020, resulting in a cash position of approximately $7.5 million as of the Commencement Date.  Furthermore, COVID-19 is expected to have an additional $10 million negative impact on revenue through the first half of fiscal year 2020.  Given these challenges, the Debtors' ability to continue to use the Cash Collateral is essential to sustain the Company's operations in bankruptcy and to preserve value for the Debtors' estates.  Access to the Cash Collateral, moreover, is a condition precedent to the DIP Financing.

110.    Minimizing disruption to the Debtors' business and operations is especially critical in light of the sale strategy described herein. The Debtors ability to continue the Marketing Process and ultimately effectuate a sale of substantially all of their assets is heavily dependent on their ability to continue to operate the Company as a going concern.  If the Debtors are unable to obtain DIP Financing and immediate access to the Cash Collateral, the Debtors likely will be forced into an immediate fire-sale liquidation, which would significantly reduce the expected proceeds from the Marketing Process and reduce recoveries for all stakeholders.

111.    As reflected in the DIP Milestones, the first few weeks of these chapter 11 cases are absolutely critical.  As such, it is imperative that the Debtors have immediate access to sufficient liquidity.  Based on the foregoing, I submit that the Court should grant the Motion on an interim basis and allow the Debtors to access the Cash Collateral and $40 million under the DIP Facility.

ii.    **Cash Management Motion**

112.    Pursuant to the *Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, and (V) Extend Time to Comply with, or Seek Waiver of, 11 U.S.C. § 345(b)* (the "**Cash Management Motion**"), the Debtors request (i) authority to (a) continue using their existing Cash Management System, Debtor Bank Accounts (as defined below), and Business Forms, (b) implement changes to their Cash Management System in the ordinary course of business, including, without limitation, opening new or closing existing Bank Accounts, and (c) honor certain prepetition obligations related to the Cash Management System;

44

(ii) a waiver of certain U.S. Trustee Guidelines; (iii) authority to continue to perform under and honor intercompany transactions in the ordinary course of business, transfer and utilize funds to collateralize prepetition letters of credit of the Debtors, and make certain payments on behalf of Non-Debtor Affiliates; (iv) administrative expense priority for postpetition Intercompany Claims; and (v) a waiver or an extension of time to comply with certain requirements of section 345(b) of the Bankruptcy Code.

113.    In the ordinary course of business, the Debtors utilize an integrated, centralized Cash Management System to collect, transfer, and disburse funds generated by their operations.  The Cash Management System enables the Debtors to collect and disburse cash generated by their business effectively and efficiently, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and obtain accurate account balances and other financial data.  I thus believe that it is critical for the Cash Management System to remain intact during these chapter 11 cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.

114.    I also understand that, in light of the Debtors' corporate structure, the Cash Management System relies in part on the Debtors' ability to engage in various Intercompany Transactions in the ordinary course of business.  I believe the ability of the Debtors to continue engaging in such Intercompany Transactions is crucial to their continued operations.

115.    If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, I believe their operations would experience severe disruptions, which ultimately would frustrate the Debtors' ability to effectuate their restructuring strategy and maximize the value of their estates.  Based on the foregoing, I

45

believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### iii.   Employee Wages Motion

116.   Pursuant to the *Motion of Debtors for Authorization to Continue to Honor and Pay Employee Obligations* (the "**Employee Wages Motion**"), the Debtors request authority to pay and honor certain prepetition claims and obligations, continue programs, and maintain funding, in the exercise of their discretion, relating to, among other things: (i) Unpaid Compensation; (ii) Payroll Taxes; (iii) Deductions; (iv) Payroll Processing Fees; (v) the Staffing Providers; (vi) the Supplemental Workforce; (vii) Reimbursable Expenses; (viii) the Employee Benefit Programs; (ix) the Non-Insider Severance Program; (x) Retirement Benefits; (xi) Other Employee Programs; and (xii) the Non-Insider Incentive Programs.

117.   The majority of the Debtors' Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses. These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses. Similarly, if the Court does not authorize the Debtors to honor their various obligations under the Health Insurance Plans, many Employees will lose access to health coverage.

118.   The Supplemental Workforce is another important component of the Debtors' operations, and ensures that key operational initiatives that are critical to the Debtors' reorganizational prospects continue. The Supplemental Workforce consists of individuals across a number of the Debtors' departments, including human resources, finance, performance marketing, product, and technology. Failure to timely pay the obligations related to their

46

Supplemental Workforce would endanger the Debtors' prospects of a successful sale effort and would cause widespread negative effects throughout the Debtors' businesses.

119.    I believe that payment of the amounts requested in the Employee Wages Motion is necessary to effect an orderly transition into chapter 11 and to maximize the value of the Debtors' assets.

### iv.    Critical Vendors Motion

120.    Pursuant to the *Motion of Debtors for Order (I) Authorizing Payment of Certain Prepetition Obligations to Critical Vendors and (II) Granting Related Relief* (the "**Critical Vendors Motion**"), the Debtors request entry of an order authorizing the Debtors to (i) pay non-priority, prepetition claims held by vendors whose goods and services are essential to the Debtors' operations (collectively, the "**Critical Vendors**" and such claims, the "**Critical Vendor Claims**") in an amount not to exceed $10,000,000 on an interim basis (the "**Interim Critical Vendor Cap**") and $15,000,000 on a final basis (inclusive of the interim amount) (the "**Final Critical Vendor Cap**" and, together with the Interim Critical Vendor Cap, the "**Critical Vendor Cap**"), and (ii) related relief.

121.    To keep their business running efficiently and seamlessly, the Debtors rely on a network of Critical Vendors that provide the materials and services necessary to facilitate their operations efficiently and seamlessly.  Due to the interdependent nature of its production and distribution branches, the Debtors' business is highly sensitive and is easily disrupted by any single Critical Vendor refusing to provide the Debtors with essential materials and services for even a short period of time.  Any such disruption could jeopardize the Debtors' ability to continue their manufacturing processes, deliver their products to customers, preserve the value of their business, and ensure stability during these chapter 11 cases.

47

122.    The Debtors and their advisors have identified those vendors, suppliers and/or service-providers that may be "critical" to the Debtors' businesses (the "**Potential Critical Vendors**") and (ii) developed the Critical Vendor Cap based on an estimate of the aggregate amount of outstanding Critical Vendor Claims as of the Commencement Date.  The Debtors will use commercially reasonable efforts to require all Critical Vendors to continue to provide trade terms in line with historical practice as the *quid pro quo* for payment of Critical Vendor Claims.  Where appropriate, the Debtors will require as a condition to payment of a Critical Vendor Claim that the applicable Critical Vendor enter into a vendor agreement that, among other things, requires the Critical Vendor to provide the Debtors with Customary Trade Terms.  I believe that allowing the Debtors to continue paying certain Critical Vendors, subject to the conditions outlined in the Critical Vendors Motion, is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### v.    Shippers, Warehousemen and Other Lien Claimants Motion

123.    Pursuant to the Motion of Debtors for Order (I) Authorizing Payment of Prepetition Claims Of Shippers, Warehousemen, Import/Export Providers and Other Lien Claimants and (II) Confirming Administrative Expense Priority of Undisputed Commencement Date Orders and Authorizing Payment of Such Obligations in the Ordinary Course of Business ("**Shippers and Lien Claimants Motion**"), the Debtors request entry of an order authorizing, but not directing, the Debtors to pay (i) Shipping and Warehousing Charges, (ii) Import/Export Charges, (iii) Other Lien Claims, and (iv) certain amounts in connection with the Commencement Date Orders to suppliers which will enable the Debtors to (a) secure the delivery, distribution, and sale of the Debtors' goods to customers throughout the United States and abroad, (b) ensure the delivery of goods and raw materials to the Debtors' facilities or (c) satisfy the liens, if any, in respect of amounts owed to such parties.  The Debtors may condition,

48

in their sole discretion, any payments made to the Shippers, Warehousemen, and Customs on the agreement of such parties to continue supplying services to the Debtors on the same trade terms given to them prior to the Commencement Date or upon new trade terms

124.    I understand that approximately $12,000,000 in Liens relating to the prepetition period will become due and payable after the Commencement Date, with approximately $7,350,000 coming due within the thirty (30) days following the Commencement Date. I believe the relief requested in the Shippers and Lien Claimants Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

vi.    **Taxes Motion**

125.    Pursuant to the *Motion of Debtors for Authority to Pay Certain Prepetition Taxes and Fees* (the "**Taxes Motion**"), the Debtors request authority to satisfy, in the Debtors' sole discretion, all Taxes and Fees due and owing to various local, state, and federal Taxing Authorities that arose prior to the Commencement Date, including all Taxes and Fees subsequently determined by audit or otherwise to be owed for periods prior to the Commencement Date.

126.    In the ordinary course of business, the Debtors are obligated to pay certain taxes and governmental fees, which generally fall into the following categories: (i) Sales and Use Taxes, (ii) Franchise Taxes, (iii) Property Taxes, and (iv) Fees.  I understand that approximately $5,270,000 of the Taxes and Fees relating to the prepetition period will become due and payable after the Commencement Date, with approximately $1,370,000 coming due within the thirty (30) days following the Commencement Date.  Additionally, I understand that the Debtors incurred a real estate transfer tax liability owed to certain German taxing authorities, which the Debtors estimate to be approximately $3,000,000.

49

127.    I believe that failure to pay the aforementioned Taxes and Fees may cause the Taxing Authorities to take actions that would interfere with the Debtors' continued operations and potentially impose significant costs on the Debtors' estates.  Additionally, I understand that failure to satisfy the prepetition Taxes and Fees may jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they do business. Moreover, to the extent any prepetition Taxes and Fees remain unpaid by the Debtors, I understand that the Debtors' officers and directors may be subject to lawsuits or criminal prosecution.  Based on the foregoing, and as more fully described in the Taxes Motion, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### vii.    NOL Motion

128.    Pursuant to the *Motion of Debtors for Entry of Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests In and Claims Against the Debtors* (the "**NOL Motion**"), the Debtors seek entry of interim and final orders authorizing the debtors to establish procedures (the "**NOL Procedures**") to protect the potential value of the Debtors' net operating loss carryforwards ("**NOLs**") and other tax benefits (collectively, the "**Tax Attributes**").  The NOL Procedures apply to (i) direct and indirect ownership of Holdings Common Stock and any options or similar rights (within the meaning of applicable treasury regulations) to acquire such stock (the "**Options**") and (ii) the direct and indirect ownership of prepetition claims against one or more of the Debtors (the "**Claims**").  The NOL Procedures relating to Claims will only become effective upon issuance of a final order and are not included in the requested interim order.

129.    The Debtors' Tax Attributes, as of the Commencement Date, include estimated consolidated NOLs of approximately $141.7 million, approximately $148.5 million in

consolidated federal disallowed business interest expense carryforwards under section 163(j) of the Tax Code, and certain other favorable Tax Attributes, including net unrealized built-in losses.

130.    The Tax Attributes are valuable assets.  The Debtors' ability to utilize the Tax Attributes to reduce future tax liability is subject to certain potential statutory limitations arising from an Ownership Change.  The proposed NOL Procedures seek authority to restrict trading of Holdings Common Stock that could result in an Ownership Change occurring before the effective date of a chapter 11 plan or any applicable bankruptcy court order.  Likewise, the proposed NOL Procedures would monitor acquisitions, dispositions, and trading of prepetition claims against one or more of the Debtors.  Such restrictions would protect the Debtors' ability to use the Tax Attributes during the pendency of these chapter 11 cases and possibly thereafter.

131.    The NOL Procedures are necessary to preserve the Debtors' ability to use the Tax Attributes, while providing certain latitude for trading.  The Debtors' ability to preserve the Tax Attributes may be seriously jeopardized unless procedures are established immediately. As a result, I believe that the relief requested in the NOL Motion should be granted.

### viii.    Utilities Motion

132.    Pursuant to the *Motion of Debtors for Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Authorizing the Debtors to Honor Obligations to Payment Processors* (the "**Utilities Motion**"), the Debtors request an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies, (ii) establishing procedures for resolving objections by the Utility Companies relating to the adequacy of the proposed adequate assurance, (iii) prohibiting the Utility

51

Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, and (iv) authorizing payment of certain Payment Processors.  The Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $978,487.

133.    I believe that preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and restructuring process.  I believe that any interruption in Utility Services – even for a brief period – would seriously disrupt the Debtors' ability to continue manufacturing and selling their products and services.  This interruption would adversely impact customer relationships and would result in a decline in the Debtors' revenues.  Such a result could seriously jeopardize the Debtors' restructuring efforts to the detriment of all parties in interest.  Therefore, I believe it is critical that Utility Services continue uninterrupted during these chapter 11 cases.

134.    I believe the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.  Moreover, I believe the proposed Adequate Assurance Procedures are reasonable because they will ensure that the Utility Services continue while providing a streamlined process for Utility Companies to challenge the adequacy of the Proposed Adequate Assurance or seek an alternative form of adequate assurance.  As a result, I believe that the relief requested in the Utilities Motion should be granted.

ix. **Insurance Motion**

135.    Pursuant to the *Motion of Debtors for Order (I) Authorizing Debtors to (A) Continue to Maintain Their Insurance Policies and Programs and Surety Bond Program and (B) Honor All Obligations with Respect Thereto and (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program* (the "**Insurance Motion**"), the Debtors request (i)

52

authority, but not direction, to (a) maintain and renew, in their sole discretion, the Insurance Policies and Programs and the Surety Bond Program, (b) continue honoring their Insurance and Surety Obligations, including posting any collateral in connection therewith, on a postpetition basis in the ordinary course of business, and (c) pay accrued and outstanding prepetition amounts due in connection with the Insurance and Surety Obligations; and (ii) modification of the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program.

136.    In connection with the operation of the Debtors' business and the management of their properties, the Debtors maintain various insurance policies and programs through several different insurance carriers. The Debtors also maintain workers' compensation insurance as required by law in each of the states in which the Debtors operate and provide coverage to employees for claims arising from or related to their employment by the Debtors. Additionally, in the ordinary course of business, the Debtors are required to provide various types of surety bonds to secure obligations owed to various third parties, including municipalities, state and federal governmental units, and public agencies, relating to their operations. Based on the foregoing, and as more fully described in the Insurance Motion, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved

### x.    Customer Programs Motion

137.    Pursuant to the *Motion of Debtors for Authority to (i) Honor Certain Prepetition Obligations to Customers, and (ii) Continue and Maintain Related Customer Programs in the Ordinary Course of Business*, the Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) to maintain and administer prepetition customer programs and promotions and (ii) to pay and otherwise honor their obligations to

customers relating thereto, whether arising prior to or after the Commencement Date, as necessary and appropriate in the Debtors' business judgment.

138.    To maximize customer loyalty, the Debtors have maintained and followed, in the ordinary course of business, various practices and programs (collectively, the "**Customer Programs**") to reward and provide incentives to existing customers and to attract new customers to the Debtors' businesses.  To maintain the Debtors' reputation for reliability and to maintain the loyalty, goodwill and support of their customers, the Debtors must maintain their Customer Programs and honor their obligations thereunder.  Failure to continue the Customer Programs will place the Debtors at a significant—and potentially insurmountable—comparative disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from these chapter 11 filings, and as such, I believe that the relief requested in the Utilities Motion should be granted.

## Conclusion

139.    This Declaration illustrates the factors that have precipitated the commencement of these chapter 11 cases and the Debtors' critical need for the protections and tools provided to debtors under chapter 11 of the Bankruptcy Code.

140.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 19th day of May, 2020

/s/ Roy Messing
Roy Messing
Chief Restructuring Officer

Exide Holdings, Inc. and
its Affiliated Debtors

54

**<u>Exhibit A</u>**

**Capital and Corporate Organization Chart**

# Organizational/Entity Structure Chart



**<u>Exhibit B</u>**

**Lien Priority Chart**



(1) The 11.0% First Lien Notes due 2020 and 2022 and the 3.79% Deferred Payment Notes have been stripped of all liens, covenants, and collateral. They were assumed to be issued by Exide Holdings, Inc. during the December 2019 corporate structure reorganization

**Exhibit C**

**Restructuring Support Agreement**

EXECUTION VERSION

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, and including any exhibits or schedules hereto, this "***Agreement***"), dated as of May 18, 2020, is entered into by and between:

(i)      Exide Holdings, Inc. ("***Holdings***"); Exide Technologies, LLC; Exide Delaware LLC; Dixie Metals Company; and Refined Metals Corporation (collectively, with Holdings, the "***Company***" and, each, a "***Company Entity***"); and

(ii)     each undersigned entity, in each such entity's respective capacity as a holder of, or as nominee, investment adviser, sub-adviser, or investment manager, as applicable, to certain funds, accounts, and other entities (including subsidiaries and affiliates of such funds, accounts, and entities) that is a holder of:

    a.   10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to that certain Indenture, dated as of June 17, 2019 (as amended, supplemented or otherwise modified from time to time, the "***Superpriority Senior Secured Notes Indenture***" and the notes issued thereunder, the "***Superpriority Senior Secured Notes***") (in its respective capacity as such, each, a "***Superpriority Senior Secured Noteholder***" and, collectively, the "***Superpriority Senior Secured Noteholders***");

    b.   11% Exchange Priority Notes due 2024 issued pursuant to that certain Indenture, dated as of June 25, 2019 (as amended, supplemented or otherwise modified from time to time, the "***Exchange Priority and First Lien Notes Indenture***" and the notes issued thereunder, the "***Exchange Priority Notes***") (in its respective capacity as such, each, an "***Exchange Priority Noteholder***" and, collectively, the "***Exchange Priority Noteholders***"); and

    c.   11% First Lien Senior Secured Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture (the "***2024 First Lien Notes***" and together with the Superpriority Senior Secured Notes and the Exchange Priority Notes, the "***Notes***") (in its respective capacity as such, each, a "***2024 First Lien Noteholder***" and, collectively, the "***2024 First Lien Noteholders***" and, together with the Superpriority Senior Secured Noteholders and the Exchange Priority Noteholders and their respective successors and permitted assigns and any subsequent Person that becomes party hereto in accordance with the terms hereof, each, a "***Consenting Creditor***" and, collectively, the "***Consenting Creditors***").

The Company, each Consenting Creditor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***."

**WHEREAS**, the Parties have agreed to enter into certain transactions in furtherance of a financial restructuring of the Company, which is anticipated to be effectuated, in part, by the Company Entities commencing voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court to (a) pursue one or more of the following: (i) the Americas Sale Transaction, (ii) the Europe/ROW Sale Transaction, (iii) the Company Sale Transaction (each as defined herein) and (iv) the liquidation or winding up of any assets or businesses of the Company in a manner other than as described in clauses (i) through (iii) above, in each case, consistent with this Agreement, and (b) confirm the Plan (as defined herein) on the terms set forth in this Agreement (any and all such transactions, collectively, the "***Restructuring***");

**WHEREAS**, the Parties have agreed to the Restructuring consistent with the terms and subject to the conditions set forth herein, including in the Term Sheet, which are the product of arm's-length, good faith discussions between the Parties and their respective professionals;

**WHEREAS**, as of the date hereof, the Consenting Creditors in the aggregate hold, or act as the nominee, investment adviser, sub-adviser, or investment manager to entities that hold, as of the date hereof, more than two-thirds of the aggregate outstanding principal amount of each series of the Notes;

**WHEREAS**, Mackay Shields and Axar Capital Management (each a "***Commitment Party***") have hereby committed to (i) provide the  DIP Facility and the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), in accordance with and subject to the terms and conditions set forth in the DIP Term Sheet, the Financing Orders, and the DIP Credit Agreement, and (ii) implement the Credit Bid in accordance with and subject to the terms and conditions set forth in the Credit Bid Term Sheet; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    **Certain Definitions.**

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the chapter 11 term sheet attached hereto as **<u>Exhibit B</u>** (together with all schedules,

exhibits, and annexes attached thereto, and as may be modified in accordance with <u>Section 11</u> hereof, the "***Term Sheet***"), or as the context otherwise requires.

As used in this Agreement, the following terms have the following meanings:

(a)    "***2024 First Lien Notes***" has the meaning set forth in the Preamble of this Agreement.

(b)    "***2024 First Lien Noteholder(s)***" has the meaning set forth in the Preamble of this Agreement.

(c)    "***ABL Credit Agreement***" means that certain ABL Credit Agreement, dated as of April 30, 2015, (as amended, supplemented or otherwise modified from time to time), by and among Exide Technologies and the other borrowers from time to time party thereto, each of the guarantors named therein, the lenders party thereto, and Bank of America, N.A., as administrative and collateral agent.

(d)    "***Alternative Transaction***" means any plan, dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of any Company Entity or any of their respective subsidiaries or assets, in each case, other than the Restructuring, as set forth herein, including in the Term Sheet;

(e)    "***Americas Sale Transaction***" means a sale of any or all of (i) the Industrial Energy Americas business segment of the Company; (ii) the Transportation Americas business segment of the Company; (iii) any operating facilities, assets or equipment located therein of the Company; or (iv) any combination of the items listed in sections (i) through (iii) hereof, in each case, whether by way of sale of assets, merger, consolidation, sale of interests or other transaction structure, as contemplated by one or more Successful Bids.

(f)    "***Asset Purchase Agreement(s)***" means any purchase agreement governing any sale of assets to effect the Americas Sale Transaction, the Europe/ROW Sale Transaction, the Company Sale Transaction, or a liquidation, including the Credit Bid APA.

(g)    "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time.

(h)    "***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, pursuant to 28 U.S.C. § 151, the United States District Court for the District of Delaware.

(i)    "***Bidding Procedures***" means the bidding procedures approved by the Bidding Procedures Order for the Restructuring, including the Americas Sale Transaction, the Europe/ROW Sale Transaction, the Company Sale Transaction, and any liquidations.

3

(j)    "**Bidding Procedures Motion**" means a motion filed by the Debtors with the Bankruptcy Court for entry of a Bidding Procedures Order.

(k)    "**Bidding Procedures Order**" means any order (i) approving Bidding Procedures for the Restructuring, (ii) setting dates for the submission of bids and the auction or auctions (if any) related thereto, and (iii) granting related relief.

(l)    "**Cash Management Order**" means an order entered by the Bankruptcy Court authorizing the Debtors to implement cash management protocols.

(m)    "**Chapter 11 Cases**" has the meaning in the Preamble of this Agreement. The Chapter 11 Cases shall be filed in the Bankruptcy Court.

(n)    "**CMD**" means CMD Global Advisors, LLC, as investment banking advisor to Paul, Weiss.

(o)    "**Commencement Date**" means the date on which the Debtors commence the Chapter 11 Cases.

(p)    "**Company**" has the meaning set forth in the Preamble of this Agreement.

(q)    "**Company Entity**" has the meaning set forth in the Preamble of this Agreement.

(r)    "**Company Sale Transaction**" means a sale of all or substantially all of the Company's assets or Interests to a Successful Bidder, in each case, whether by way of sale of assets, merger, consolidation, sale of interests or other transaction structure.

(s)    "**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan.

(t)    "**Consenting Creditor Professional Fees and Expenses**" means all reasonable documented fees and expenses of, collectively,  Paul, Weiss, Young Conaway, and CMD.

(u)    "**Consenting Creditor(s)**" has the meaning set forth in the Preamble of this Agreement.

(v)    "**Credit Bid**" means the credit bid submitted by the Requisite Exchange Priority Noteholders in accordance with the terms set forth in the Credit Bid Term Sheet for the consummation of the Europe/ROW Sale Transaction.

(w)    "**Credit Bid APA**" means the stock and asset purchase agreement governing the Credit Bid.

(x)    "**Credit Bid Sale Order**" means the Sale Order approving the Debtors' entry into, and consummation of, the Credit Bid APA.

4

(y)    "*Credit Bid Term Sheet*" means the term sheet setting forth the material terms of the Credit Bid attached hereto as **Exhibit C**.

(z)    "*Credit Bid Transaction*" has the meaning set forth in the Credit Bid Term Sheet.

(aa)    "*Debt Documents*" means (i) the Indentures and each of that certain (ii) Superpriority Lien Security Agreement, dated as of June 17, 2019, (iii) Amended and Restated First Lien Security Agreement, dated as of June 25, 2019, (iv) Security Agreement Supplement and Amendment No. 1 to Security Agreements, dated as of December 31, 2019, (v) Amended and Restated Intercreditor Agreement, dated as of June 17, 2019, and (vi) Intercreditor Agreement Joinder No. 1, dated as of June 25, 2019, and all other documents and instruments executed and delivered in connection with each of the foregoing, in each case, as amended, supplemented or otherwise modified from time to time.

(bb)    "*Debtors*" means Holdings, Exide Technologies, LLC, Exide Delaware LLC, Dixie Metals Company, and Refined Metals Corporation, in each case, solely in its capacity as a debtor in possession under the Bankruptcy Code.

(cc)    "*Definitive Documents*" means the documents that are contemplated by the Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to, the Restructuring, including:  (i) the Plan; (ii) the First Day Pleadings; (iii) the Bidding Procedures;  (iv) the Bidding Procedures Motion; (v) the Bidding Procedures Order; (vi) each of the documents comprising the Plan Supplement; (vii) the Disclosure Statement; (viii) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (ix) the Confirmation Order; (x) any Financing Orders; (xi) the DIP Credit Agreement; (xii) the Credit Bid APA; (xiii) the Credit Bid Sale Order; (xiv) the KEIP Motion; (xv) the KEIP Order; (xvi) the KERP Motion; (xvii) the KERP Order; and (xviii) all other material documents necessary or customarily required to consummate the Restructuring. Each of the Definitive Documents shall contain terms and conditions consistent in all material respects with this Agreement, including the Term Sheet, and shall otherwise be reasonably acceptable in all material respects to the Required Parties, including with respect to any modifications, amendments, or supplements to such Definitive Documents at any time during the Support Period.

(dd)    "*DIP Budget*" means the budget providing for the use of cash collateral and proceeds of the DIP Facility.

(ee)    "*DIP Credit Agreement*" means the credit agreement evidencing the DIP Facility.

(ff)    "*DIP Documents*" means, collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

5

(gg)    "***DIP Facility***" means the debtor-in-possession facility to be provided to the Company Entities consistent with the terms set forth in the DIP Term Sheet and in accordance with the terms, and subject in all respects to the conditions, as set forth in the DIP Credit Agreement and pursuant to the terms and conditions of the Financing Orders.

(hh)    "***DIP Obligations***" means the obligations of the Debtors to the DIP Credit Agreement.

(ii)    "***DIP Order***" means an order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement.

(jj)    "***DIP Term Sheet***" means the term sheet setting forth the material terms of the DIP Facility attached hereto as **Exhibit D**.

(kk)    "***Disclosure Statement***" means the disclosure statement with respect to the Plan.

(ll)    "***Effective Date***" means the date on which the Plan is consummated.

(mm)    "***Environmental Law***" means any federal, state, local or foreign law, rule, regulation, requirement, decision, order, or other legal requirement relating to the protection of the environment, pollution, natural resources, or human health or safety as it relates to exposure to hazardous substances or materials or hazardous or toxic substances or wastes, pollutants, or contaminants.

(nn)    "***Europe/ROW Assets***" means (i) the Transportation EMEA business segment of the Company; (ii) the Industrial EMEA business segment of the Company; (iii) the Industrial APAC business segment of the Company; (iv) the Recycling EMEA/ROW segment of the Company; (v) any operating facilities, assets, or equipment located therein of the Company; and (vi) any combination of the items listed in sections (i) through (v) hereof, in each case, whether by way of sale of assets, merger, consolidation, sale of interests or other transaction structure, as contemplated by one or more Successful Bids.

(oo)    "***Europe/ROW Sale Transaction***" means a sale of any or all of the Europe/ROW Assets, in each case, whether by way of sale of assets, merger, consolidation, sale of equity interests or other transaction structure, as contemplated by one or more Successful Bids.

(pp)    "***European Bridge Documents***" means the notes purchase agreement and indenture evidencing the European Bridge Notes.

(qq)    "***European Bridge Notes***" means the notes issued by Exide International Holdings LP, consistent with the terms set forth in the European Bridge Term Sheet and in accordance with the terms, and subject in all respects to the conditions, as set forth in the European Bridge Documents.

WEIL:\97486621\1\44362.0003

(rr)    "**_European Bridge Term Sheet_**" means the term sheet setting forth the material terms of the European Bridge Notes attached hereto as **<u>Exhibit E</u>**.

(ss)    "**_Exchange Priority and First Lien Notes Indenture_**" has the meaning set forth in the Preamble of this Agreement.

(tt)    "**_Exchange Priority Noteholder(s)_**" has the meaning set forth in the Preamble of this Agreement.

(uu)    "**_Exchange Priority Notes_**" has the meaning set forth in the Preamble of this Agreement.

(vv)    "**_First Day Pleadings_**" means the motions, petitions, pleadings, and draft orders that the Company Parties file at the commencement of the Chapter 11 Cases.  First Day Pleadings include orders as entered by the Bankruptcy Court.

(ww)    "**_Financing Commitment_**" means the commitment of a Commitment Party to provide the DIP Facility, in accordance with the terms set forth in this Agreement, including the Term Sheet.

(xx)    "**_Financing Orders_**" means any interim or final orders authorizing the Debtors to continue to access cash collateral and incur any postpetition financing on an interim basis or final basis consistent with the Term Sheet.

(yy)    "**_Financing Motion_**" means the motion for use of cash collateral and to incur postpetition financing and enter into any credit agreement with respect thereto.

(zz)    "**_Holdings_**" has the meaning set forth in the Preamble of this Agreement.

(aaa)    "**_Holdings Equity_**" means the common stock, par value $0.01 per share, of Holdings or any other equity securities of Holdings into which such stock is reclassified or reconstituted.

(bbb)    "**_Indentures_**" means collectively, the Superpriority Senior Secured Notes Indenture and the Exchange Priority and First Lien Notes Indenture.

(ccc)    "**_Intercompany Note_**" means a note executed by the Debtors and a Europe/ROW entity pursuant to which a Debtor can demand payment of intercompany payables that have accrued through the date of the Intercompany Note.

(ddd)    "**_Intercompany Transaction_**" means an intercompany transaction entered into by the Debtors with one or more of the Debtors' non-debtor affiliates, other than any transaction executed before December 31, 2019.

(eee)    "**_KEIP Motion_**" means a motion filed by the Debtors with the Bankruptcy Court for entry of a KEIP Order.

WEIL:\97486621\1\44362.0003

(fff)    "*KEIP Order*" means an order entered by the Bankruptcy Court authorizing the implementation of a key employee incentive plan.

(ggg)    "*KERP Motion*" means a motion filed by the Debtors with the Bankruptcy Court for entry of a KERP Order.

(hhh)    "*KERP Order*" means an order entered by the Bankruptcy Court authorizing the implementation of a key employee retention plan.

(iii)    "*Netted Intercompany Amount*" means the final netted amount for the relevant period owed to a Debtor or non-Debtor entity, as applicable, on account of, but not limited to, shared service charges (including professional fees of the Company and Consenting Creditors), management fees, and invoices related to products purchased and sold among a Debtor and non-Debtor entity.

(jjj)    "*Non-Performing Properties Motion*" means a motion filed by the Debtors with the Bankruptcy Court for entry of the Non-Performing Properties Order.

(kkk)    "*Non-Performing Properties Order*" means an order entered by the Bankruptcy Court authorizing the Debtors to implement settlement procedures in connection with any of the Debtors' non-performing properties.

(lll)    *Notes*" has the meaning set forth in the Preamble of this Agreement.

(mmm)   "*Party*" has the meaning set forth in the Preamble of this Agreement.

(nnn)    "*Paul, Weiss*" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Consenting Creditors.

(ooo)    "*Person*" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(ppp)    "*Plan*" means the chapter 11 plan for the Debtors, filed in the Chapter 11 Cases, as it may be amended, restated, or supplemented from time to time, consistent with this Agreement, in form and substance consistent with this Agreement, including the Term Sheet, pursuant to which the Restructuring shall be implemented.

(qqq)    "*Plan Supplement*" means the supplement to the Plan comprised of documents, forms of documents, schedules, and/or exhibits necessary or advisable to effect the Restructuring and otherwise to be filed by the Company with the Bankruptcy Court.

(rrr)    "*Postpetition Intercompany Transaction*" means any transaction with an affiliate entered into by the Debtors after the commencement of the Chapter 11 Cases.

8

(sss)    "***Proceeds Waterfall***" has the meaning set forth in the Term Sheet.

(ttt)    "***Releases***" means the releases set forth in the Credit Bid Term Sheet and the Term Sheet.

(uuu)    "***Restructuring***" has the meaning set forth in the Preamble of this Agreement.

(vvv)    "***Required Parties***" means each of (i) the Company and (ii) the Requisite Noteholders.

(www)    "***Requisite 2024 First Lien Noteholders***" means, as of any date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of the 2024 First Lien Notes held by all Consenting Creditors at such time; <u>provided</u>, that for purposes of this definition, the term "Consenting Creditors" excludes any Noteholder that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

(xxx)    "***Requisite Exchange Priority Noteholders***" means, as of any date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of the Exchange Priority Notes held by all Consenting Creditors at such time; <u>provided</u>, that for purposes of this definition, the term "Consenting Creditors" excludes any Noteholder that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

(yyy)    "***Requisite Noteholders***" means, collectively, the Requisite 2024 First Lien Noteholders, the Requisite Exchange Priority Noteholders, and the Requisite Superpriority Senior Secured Noteholders; provided, that for the avoidance of doubt, the term "Requisite Noteholders," or any of the terms of which it is comprised, as used herein shall not hold the same meaning as the same, or similar, terms contained in any of the Indentures.

(zzz)    "***Requisite Superpriority Senior Secured Noteholders***" means, as of any date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of the Superpriority Senior Secured Notes held by all Consenting Creditors at such time; <u>provided</u>, that for purposes of this definition, the term "Consenting Creditors" excludes any Noteholder that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

(aaaa)    "***Sale Order(s)***" means any order entered by the Bankruptcy Court approving the Debtors' entry into, and consummation of, an Asset Purchase Agreement. Sale Order(s) include the Credit Bid Sale Order.

(bbbb)    "***SEC***" means the Securities & Exchange Commission.

(cccc)    "***Securities Act***" means the Securities Act of 1933, as amended.

9

(dddd) "***Specified Defaults***" means collectively, (i) the Default (as defined in the Superpriority Notes Indenture) under the Superpriority Notes Indenture as a result of the Company's failure to pay interest on the Superpriority Notes on April 30, 2020, and the Event of Default (as defined in the Superpriority Notes Indenture) arising from such Default continuing for a period of thirty (30) days; (ii) any defaults under the Indentures as a result of cross-defaults caused by the foregoing; and (iii) any Events of Default or defaults under the Indentures as a result of the solicitation in connection with the Plan, the commencement of the Chapter 11 Cases, the entry into this Agreement or the Definitive Documents, or the implementation of the Restructuring, in each case, including any actions or transactions contemplated or required by the foregoing documents, agreements, or items to the extent in compliance therewith.

(eeee)    "***Successful Bid(s)***" has the meaning set forth in the Bidding Procedures.

(ffff)    "***Superpriority Senior Secured Notes***" has the meaning set forth in the Preamble of this Agreement.

(gggg) "***Superpriority Senior Secured Noteholder(s)***" has the meaning set forth in the Preamble of this Agreement.

(hhhh) "***Superpriority Senior Secured Notes Indenture***" has the meaning set forth in the Preamble of this Agreement.

(iiii)    "***Support Effective Date***" means the date on which the conditions set forth in <u>Section 2</u> of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

(jjjj)    "***Support Period***" means the period commencing on the Support Effective Date and ending on the earlier of the (A) date on which this Agreement is terminated in accordance with <u>Section 7</u> hereof and (B) the Effective Date.

(kkkk) "***Term Sheet***" has the meaning set forth in the lead-in to <u>Section 1</u> of this Agreement.

(llll)    "***Trustees***" means, collectively, (A) U.S. Bank National Association, solely in its capacity as trustee and collateral agent under the Superpriority Senior Secured Notes Indenture; and (B) U.S. Bank National Association, solely in its capacity as trustee and collateral agent under the Exchange Priority and First Lien Notes Indenture.

(mmmm)    "***Weil***" means Weil, Gotshal & Manges LLP, as counsel to the Company.

(nnnn) "***Young Conaway***" means Young Conaway Stargatt & Taylor LLP, as Delaware counsel to the Consenting Creditors.

When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this

10

Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## 2.  Support Effective Date.

This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Support Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)  the counterpart signature pages to this Agreement shall have been executed and delivered by the (i) Company and (ii) the Consenting Creditors holding at least two-thirds in aggregate principal amount outstanding of each of the (x) Superpriority Senior Secured Notes, (y) Exchange Priority Notes and (z) 2024 First Lien Notes;

(b)  the Company has received a binding Credit Bid Term Sheet from the Buyer (as defined in the Credit Bid Term Sheet) at the direction of the Requisite Exchange Priority Noteholders; and

(c)  the Company shall have paid (or caused to be paid) in cash to the Consenting Creditors all Consenting Creditor Professional Fees and Expenses invoiced as of May 15, 2020.

## 3.  Term Sheet and Plan.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring. Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between the terms of this Agreement (excluding the Term Sheet) and the terms of the Term Sheet, the Term Sheet shall control.

## 4.  Definitive Documents.

Each Definitive Document not executed or in a form attached to this Agreement as of the Support Effective Date shall be in form and substance reasonably acceptable to the Required Parties.  The Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date remain subject to negotiation and completion. Upon completion, the Definitive Documents shall contain terms and conditions consistent in all material respects with the terms of this Agreement, unless otherwise consented to by the Required Parties.

11

5. **Agreements of the Consenting Creditors.**

(a)    <u>Agreement to Support</u>.  During the Support Period, subject to the terms and conditions hereof, each of the Consenting Creditors agrees, severally and not jointly, that it shall:

(i)    use its commercially reasonable efforts to support the Restructuring, and to act in good faith and take any and all reasonable actions necessary to consummate the Restructuring, in a manner consistent with this Agreement (including the Term Sheet), including, without limitation, to effect amendments to and other actions required under the Indentures;

(ii)    refrain from initiating (or directing or encouraging the Trustees or any other party to initiate) any actions, including legal proceedings, that are inconsistent with the Restructuring;

(iii)    if solicited to do so, timely vote (pursuant to the Plan) or cause to be voted all of its Claims and Interests, as applicable, to accept the Plan by delivering its duly executed and completed ballot or ballots accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code;

(iv)    negotiate in good faith with the Company the forms of the Definitive Documents (to the extent such Consenting Creditor is a party thereto) and, subject to the consent thresholds specified herein, execute the Definitive Documents to the extent the Consenting Creditors are a party thereto;

(v)    not directly or indirectly, through any Person (including any administrative agent, collateral agent or trustee), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, financing, consummation, or prosecution of any Alternative Transaction;

(vi)    not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn); <u>provided</u>, however, that such vote shall, without any further action by the applicable Consenting Creditor, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Creditor at any time following the expiration of the Support Period applicable to such Consenting Creditor;

(vii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment; and

(viii)    support and take all reasonable actions necessary or reasonably requested by the Company to confirm such Consenting Creditor's support for the Restructuring.

WEIL:\97486621\1\44362.0003

(b)  Credit Bid.  The Requisite Exchange Priority Noteholders acknowledge and agree that (i) the Credit Bid APA shall constitute a binding and irrevocable offer to consummate the transactions specified therein, which offer shall remain open in accordance with and subject to the Bidding Procedures, and (ii) simultaneously with the consummation of the transactions specified in the Credit Bid APA, the Exchange Priority Notes Claims shall be credit bid for the obligations due and owing to the Company under that *Intercompany Note*, dated as of July 1, 2015.

(c)  Transfers.

(i)  Each Consenting Creditor agrees that, for the duration of the Support Period, such Consenting Creditor shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims or Interests, including any beneficial ownership in any such Claims or Interests,[1] or any option thereon or any right or interest therein (including grant any proxies, deposit any Claims or Interests into a voting trust, or entry into a voting agreement with respect thereto), unless the transferee thereof either (A) is a Consenting Creditor  or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims or Interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit A** (a "***Joinder Agreement***"), and delivering an executed copy thereof within two (2) business days of such execution, to (1) Weil and (2) Paul, Weiss, in which event (x) the transferee shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred Claims or Interests, and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred Claims or Interests (such transfer, a "***Permitted Transfer***" and such party to such Permitted Transfer, a "***Permitted Transferee***").  Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(ii)  Notwithstanding anything to the contrary herein, (A) a Qualified Marketmaker[2] that acquires any Claims or Interests subject to this Agreement held by a

---

[1]  As used herein, the term "***beneficial ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims or Interests subject to this Agreement or the right to acquire such Claims or Interests.

[2]  As used herein, the term "***Qualified Marketmaker***" means an entity that (a) holds itself out to the public, the syndicated loan market, and/or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against, and/or equity interests in, the Company, or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term, loans, and/or debt or equity securities).

13

Consenting Creditor with the purpose and intent of acting as a Qualified Marketmaker for such Claims or Interests, shall not be required to become a party to this Agreement as a Consenting Creditor, if (x) such Qualified Marketmaker transfers such Claims or Interests (by purchase, sale, assignment, or other similar means) within the earlier of ten (10) business days of its acquisition and the plan voting deadline to a Permitted Transferee and the transfer otherwise is a Permitted Transfer and (y) such Consenting Creditor shall be solely responsible for the Qualified Marketmaker's failure to comply with this <u>Section 5(b)</u> and (B) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any Claims or Interests that it acquires from a holder of Claims or Interests that is not a Consenting Creditor to a transferee that is not a Consenting Creditor at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Joinder Agreement.

(iii)     This <u>Section 5(b)</u> shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any Claims or Interests.  Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate confidentiality or other agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality or other agreement shall continue to apply and remain in full force and effect according to its terms.

(d)     <u>Additional Claims or Interests</u>.  This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Claims or Interests; <u>provided</u>, that to the extent any Consenting Creditor (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan, or (iii) holds or acquires any interests entitled to vote on the Plan, then, in each case, each such Consenting Creditor shall promptly notify Weil, and each such Consenting Creditor agrees that all such Claims and Interests shall be subject to this Agreement, and agrees that, for the duration of the Support Period and subject to the terms of this Agreement, it shall vote in favor of the Plan (or cause to be voted) any such additional Claims and/or Interests entitled to vote on the Plan (to the extent still held by it on or on its behalf at the time of such vote), in a manner consistent with <u>Section 5(a)</u> hereof.  For the avoidance of any doubt, any obligation to vote for the Plan or any other plan of reorganization shall be subject to sections 1125 and 1126 of the Bankruptcy Code.

(e)     <u>Preservation of Rights</u>.  Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Creditor, nor the acceptance of the Plan by any Consenting Creditor, shall:  (i) be construed to limit consent and approval rights provided in this Agreement (including the Term Sheet) and the Definitive Documents; (ii) be construed to prohibit any Consenting Creditor from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or exercising rights or remedies specifically reserved herein; (iii) be construed to prohibit any Consenting Creditor from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for

14

the purpose of (or could not reasonably be expected to) hindering, delaying, or preventing the consummation of the Restructuring; (iv) impair or waive the rights of any Consenting Creditor to assert or raise any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Plan; or (v) subject to <u>Section 5(f)</u>, limit the ability of any Consenting Creditor to assert any rights, claims, and/or defenses under the Indentures and any related documents or agreements.

(f)    <u>Negative Covenants</u>.  The Consenting Creditors agree that, for the duration of the Support Period, each Consenting Creditor shall not take any action inconsistent with, or omit to take any action required by the Indentures, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Plan, or any of the other Definitive Documents.

(g)    <u>Forbearance</u>.  Each Consenting Creditor agrees that, solely for the duration of the Support Period applicable to such Consenting Creditor, and without prejudice to any right such Consenting Creditor has or may have under the Debt Documents (all of which are expressly reserved subject to the terms of this Agreement and the Definitive Documents), each Consenting Creditor agrees to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the Debt Documents and any agreement contemplated thereby, and to defer any claims that have become automatically due and payable thereunder as a result of the commencement of the Chapter 11 Cases, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to the Specified Defaults.  Each Consenting Creditor further agrees that if any applicable trustee or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor shall use commercially reasonable efforts to direct such administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action; <u>provided</u>, that in no instance shall any Consenting Creditor be required to provide an indemnity to any administrative agent or collateral agent, as applicable, in connection with such efforts.   Notwithstanding anything to the contrary in this Agreement, the Consenting Creditors are not required to forbear from (x) taking any enforcement action with respect to an Event of Default under the European Bridge Documents (as defined therein) that has not been cured or waived by the applicable percentage of the lenders thereto, in each case, in accordance with the terms of the European Bridge Documents, or (y) the enforcement of any remedies with respect to any European collateral granted by Exide International Holdings LP or any of its European subsidiaries that are permitted to be taken upon a default under any applicable financing arrangement or agreement, including the European Bridge Documents, other than the Specified Defaults or a default or "Event of Default" resulting from the Specified Defaults.  For the avoidance of doubt, the Company's affiliates that serve as borrowers or guarantors pursuant to the Superpriority Senior Secured Notes Indenture serve as express beneficiaries of this <u>Section 5(g)</u>.

(h)    <u>Financing Commitments</u>.  Subject to the conditions set forth in the DIP Term Sheet, each Commitment Party, severally and not jointly, agrees to provide (or cause any of its designees to provide) its allocable share of the Financing Commitments as set

15

forth in the DIP Term Sheet on terms and conditions substantially consistent with the DIP Term Sheet. For the avoidance of doubt, upon termination or expiration of this Agreement in accordance with its terms, the commitment of the Commitment Parties made pursuant to this Section 5(h) to enter into the DIP Credit Agreement and provide their allocable share of the Financing Commitment as set forth in the DIP Term Sheet shall terminate; provided, however, that upon the closing of the DIP Credit Agreement, the DIP Credit Agreement shall govern the Financing Commitments and any termination thereof.

> **6.** **Agreements of the Company.**

(a)    Covenants.  The Company agrees that, for the duration of the Support Period, the Company shall:

(i)    use its commercially reasonable efforts to support the Restructuring, and to act in good faith and take any and all reasonable actions necessary to consummate the Restructuring, in a manner consistent with this Agreement (including the Term Sheet);

(ii)    use its reasonable best efforts to consummate the Americas Sale Transaction, the Europe/ROW Sale Transaction, and/or the Company Sale Transaction, and to apply a portion of the proceeds of any such transaction to repayment of the Notes (net of any repayment of DIP Obligations in accordance with the DIP Order) in an amount to be agreed upon by the Required Parties upon consummation of each such transaction, and to seek entry of Sale Order(s) authorizing such relief upon consummation of any such transaction;

(iii)    pursue in good faith, and in consultation with the Consenting Creditors, sales for individual interests and assets, in addition to a sale of the entire business segment, and pursue the transactions that provide the greatest recovery for creditors and are otherwise in the best interests of the Company, on terms and conditions reasonably acceptable to the Consenting Creditors;

(iv)    cause its subsidiaries to comply with the terms of this Agreement (to the extent possible without violating any applicable law or regulation, any fiduciary duties of directors and/or officers and/or the terms of any governance documents);

(v)    (i) not directly or indirectly access any cash of the Europe/ROW entities (including by exercise of set-off rights, cancellation of intercompany indebtedness, or otherwise) for the use or disposition of, or by, the Company outside of the ordinary course of business; (ii) as soon as reasonably practicable, take all reasonable actions necessary to ensure that no cash or funds are paid, credited or otherwise transferred from any Europe/ROW entity to the Company outside of the ordinary course of business (for the avoidance of doubt, the Company may charge the Europe/ROW entities for all shared services and expenses that are incurred or paid by the Company on behalf of any Europe/ROW entity); and (iii) as soon as reasonably practicable, develop a comprehensive plan (a "Separation Plan") in consultation with the Requisite Noteholders to effectuate an

16

operational and financial separation from its non-debtor EMEA affiliates and to implement such Separation Plan in connection with the Credit Bid Transaction;

(vi)    subject to the conclusion of the investigation conducted by the sub-committee of the special committee of the board of directors of Holdings, not commence an avoidance action or other legal proceeding that challenges (a) the Consenting Creditors' ability to implement the Credit Bid or (b) the validity, enforceability, or priority of the Notes or obligations under each of the Indentures;

(vii)    if the Company receives an unsolicited proposal or expression of interest in undertaking an Alternative Transaction, the Company will within 24 hours of the receipt of such proposal or expression of interest, notify Paul, Weiss of the receipt thereof, with such notice to include the material terms thereof, including the identity of the Person or group of Persons involved;

(viii)    designate the Consenting Creditors as consultation parties in the Bidding Procedures and provide the proposals received by the Company to the Consenting Creditors in accordance with the terms of the Bidding Procedures;

(ix)    provide draft copies of all material motions or applications and other documents (including the First Day Pleadings and all "second day" motions and orders, any Bidding Procedures Motion, any Bidding Procedures Order, any Financing Motion, any Financing Order, the Plan, the Disclosure Statement, the ballots and other solicitation materials in respect of the Plan, and the Confirmation Order, as applicable) the Debtors intend to file with the Bankruptcy Court to Paul, Weiss, if reasonably practical, at least three (3) business days prior to the date when the Company intends to file any such pleading or other document (provided, that if delivery of such motions, orders or materials at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(x)    file the First Day Pleadings reasonably determined by the Company, in form and substance acceptable to the Requisite Noteholders, to be necessary, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Requisite Noteholders, from the Bankruptcy Court approving the relief requested in such First Day Pleadings;

(xi)    use its commercially reasonable efforts to obtain any required regulatory and/or third-party approvals to consummate the Restructuring;

(xii)    if the Company receives any notice of violation of or non-compliance with any Environmental Law, provide the Consenting Creditors with notice of such violation or non-compliance as soon as practicably possible, but in no event more than 24 hours after receipt thereof;

17

(xiii)    conduct business during the Chapter 11 Cases to the best of the Company's ability and exercise good faith efforts to not increase the Company's liabilities under applicable Environmental Laws, unless such liabilities are being resolved pursuant to the Non-Performing Properties Order;

(xiv)    provide the Consenting Creditors with copies of all Asset Purchase Agreements, Sale Orders, and other documents effecting any Restructuring, and consult with the Consenting Creditors regarding negotiations related to any such transaction, including the Settlement Procedures as defined in the Non-Performing Properties Motion;

(xv)    promptly pay all Consenting Creditor Professional Fees and Expenses, as required, in each case, in accordance with the terms of their respective engagement letters, and, in each case, without further order of, or application to, the Bankruptcy Court by such professional;

(xvi)    not take, nor encourage any other person or entity to take, any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, confirmation, or consummation of the Plan or implementation of the Restructuring;

(xvii)    provide prompt written notice to the Requisite Noteholders between the date hereof and the Effective Date of receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, which seeks to prohibit or enjoin the Restructuring;

(xviii)  (i) retain Roy Messing as chief restructuring officer (ii) provide the Consenting Creditors with any agreements relating to such retention, including the engagement letter detailing the scope of the chief restructuring officer's authority in form and substance acceptable to the Consenting Creditors, (iii) not terminate the chief restructuring officer or modify or reduce the scope of the chief restructuring officer's authority, provided, however, that the chief restructuring officer can be terminated from office for cause and, if so removed, a replacement chief restructuring officer with the same rights and powers that is reasonably acceptable to the Consenting Creditors shall be appointed, and (iv) grant the chief restructuring officer ordinary and customary rights, powers, and authority for chief restructuring officers of companies with over $500 million of funded debt, including the ability to oversee the Restructuring and direct the Company's employees in furtherance of the Restructuring, the obligation to regularly consult with the Consenting Creditors, the ability to attend and observe meetings of the board of directors, and full and unfettered access to the Company's books and records;

(xix)    conduct weekly teleconferences between representatives of the Consenting Creditors, Paul, Weiss, Weil, Ankura, and the EMEA President regarding the Credit Bid Transaction or any other proposed Europe/ROW Sale Transaction;

18

(xx)     provide to the Consenting Creditors (i) access during normal business hours to the Company's books, records, and facilities; (ii) access to the respective management and advisors of the Company during normal business hours for the purposes of evaluating the Company's finances and operations and participating in the Company's planning process with respect to the Restructuring; and (iii) a summary of all Intercompany Transactions eight (8) business days following the end of any given month during the pendency of the Chapter 11 Cases.  The Company shall consult with the Requisite Noteholders regarding any Intercompany Transaction outside the ordinary course of business no less than two (2) days prior to engaging in such transaction;

(xxi)    no later than eight (8) business days following the last day of any given month during the pendency of the Chapter 11 Cases, the Company shall provide the calculations underlying the Netted Intercompany Amount to the EMEA and APAC President prior to the satisfaction of such Netted Intercompany Amount in cash;

(xxii)   not satisfy the Netted Intercompany Amount in cash without the consent of the EMEA and APAC President.  In the event the Netted Intercompany Amount results in any non-Debtor being a payor, such non-Debtor entity shall satisfy the Netted Intercompany Amount in cash no later than five (5) business days following delivery of the calculations underlying the Netted Intercompany Amount in accordance with Section 6(a)(xxi) hereof.  In the event the Netted Intercompany Amount results in any Debtor being a payor, such Debtor shall satisfy the Netted Intercompany Amount in cash no later than thirty (30) calendar days following the end of any given month in accordance with Section 6(a)(xxi) hereof; provided, that to the extent any amounts are owed by a Debtor to a non-Debtor North American affiliate, the Netted Intercompany Amount shall be recorded on the Company's intercompany accounts and shall not be settled in cash;

(xxiii)  not engage in a transaction providing for amounts owed by the Debtors to any Europe/ROW entity on account of any Postpetition Intercompany Transaction to be set off against, netted against, or charged against an Intercompany Note or otherwise fail to comply with the Postpetition Intercompany Protocols, as that term is defined in the Cash Management Order.  The Company agrees and shall take such reasonable actions (if any) as are necessary to ensure that no further borrowings, charges, payments or other transactions shall be effected thereunder;

(xxiv)  cooperate with the Requisite Noteholders to develop a DIP Budget that is reasonably acceptable in form and substance to the Requisite Noteholders; and

(xxv)   commence the Chapter 11 Cases in the Bankruptcy Court.

(b)     Automatic Stay.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, (i) the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); provided, that nothing herein shall prejudice any Party's rights to argue that the

19

giving of notice of default or termination was not proper under the terms of this Agreement; and (ii) an enforcement action that is otherwise consistent with the terms of this Agreement and the applicable terms of the applicable Debt Documents with respect to any European collateral owned by Exide International Holdings LP's European subsidiaries shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay in connection therewith).

## 7.    Termination of Agreement.

(a)    This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with Section 21 hereof, from (i) the Requisite Noteholders at any time after and during the continuance of any Creditor Termination Event or (ii) the Company at any time after and during the continuance of any Company Termination Event, as applicable.

(b)    A "*Creditor Termination Event*" shall mean any of the following:

(i)    the breach by the Company of (A) any covenant contained in this Agreement or (B) any other obligations of the Company set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured for a period of four (4) business days following the Company's receipt of written notice pursuant to Sections 7(a) and 21 hereof (as applicable);

(ii)    any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following the Company's receipt of notice pursuant to Sections 7(a) and 21 hereof (as applicable);

(iii)    a Definitive Document alters the treatment of the Consenting Creditors specified in the Term Sheet without complying with Section 11 hereof and the Requisite Noteholders have not otherwise consented to such Definitive Document;

(iv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(v)    the Support Effective Date shall not have occurred on or before the Commencement Date;

(vi)    the Commencement Date shall not have occurred on or before May 19, 2020;

20

(vii)    the Debtors shall not have complied with Milestones set forth in the Term Sheet;

(viii)    the Bankruptcy Court enters an order that is not stayed (A) directing the appointment of a trustee in the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein (or otherwise as is reasonably acceptable to the Company and the Requisite Noteholders), or (E) granting relief that is inconsistent with this Agreement in any materially adverse respect to the Consenting Creditors, and which order is not reversed, vacated or addressed by a consensual amendment to this Agreement within fifteen (15) business days;

(ix)    if either (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (x) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation, or subordination of, the obligations or Claims under the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid, or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Consenting Creditors with respect to any of the foregoing causes of action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid;

(x)    the Company (unless the Company is acting with the consent of the Requisite Noteholders) files or seeks approval of, or supports (or fails to timely object to) another party in filing or seeking approval of an Alternative Transaction;

(xi)    the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(xii)    if the Company (A) withdraws the Plan or (B) publicly announces its intention not to support the Restructuring;

(xiii)    the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan;

(xiv)    the occurrence of an Event of Default (other than the Specified Defaults) by a Europe/ROW entity under the Debt Documents that has not been cured (if susceptible to cure) or waived by the applicable percentage of the lenders thereto in accordance with the terms thereunder;

21

(xv)    the occurrence of any Event of Default under the DIP Facility (as defined therein) that has not been cured (if susceptible to cure) or waived by the applicable percentage of the lenders thereto in accordance with the terms of the DIP Credit Agreement;

(xvi)    the occurrence of any Event of Default under the European Bridge Documents (as defined therein) that has not been cured (if susceptible to cure) or waived by the applicable percentage of the lenders thereto in accordance with the terms of the European Bridge Documents;

(xvii)    the Company fails to comply with the Postpetition Intercompany Protocols, as that term is defined in the Cash Management Order, or otherwise breaches the provisions of this Agreement with respect to Postpetition Intercompany Transactions, without the reasonable consent of the Requisite Exchange Priority Noteholders;

(xviii)    the Credit Bid Sale Order does not approve the releases provided for in the Credit Bid Term Sheet;

(xix)    the Company files any motion or pleading with the Bankruptcy Court seeking enforcement of the automatic stay arising under section 362 of the Bankruptcy Code that is inconsistent in any material respect with this Agreement;

(xx)    the Consenting Creditors do not receive the Releases or the Bankruptcy Court does not approve the Releases in connection with consideration of approval of the Credit Bid Transaction or the Plan;

(xxi)    the Company receives cash proceeds in connection with any Restructuring, including the Americas Sale Transaction, the Europe/ROW Sale Transaction, and the Company Sale Transaction and (i) fails to use such proceeds to redeem or otherwise satisfy in full all obligations relating to the Notes in accordance with the terms of any of the Indentures, (ii) fails to distribute such proceeds in accordance with the Proceeds Waterfall, or (iii) seeks entry of a Sale Order(s) that does not provide for the repayment or satisfaction of such obligations or that is otherwise not reasonably satisfactory to the Requisite Noteholders, regardless of whether the Plan has been confirmed by the Bankruptcy Court;

(xxii)    the Company obtains entry of a Sale Order(s) (other than the Credit Bid Sale Order) that does not generate cash proceeds sufficient to satisfy the outstanding obligations owed under the ABL Credit Agreement or the Sale Order(s) (other than the Credit Bid Sale Order) does not authorize the repayment of such obligations;

(xxiii)    the Confirmation Order is reversed or vacated;

(xxiv)    any court of competent jurisdiction enters an order declaring this Agreement unenforceable, or null and void;

22

(xxv)   the Company fails to comply with the Plan Milestones (as such term is defined in the Term Sheet);

(xxvi)  the Company fails to pay any fees or expenses the Company is required to pay in connection with or under the DIP Credit Agreement, the European Bridge Financing Credit Agreement, or this Agreement;

(xxvii) the Company fails to pay any fees or expenses that it is required to pay to any consultants or local counsel in Canada as may be necessary and appropriate;

(xxviii) the Company fails to engage Roy Messing as provided pursuant to this Agreement on the date hereof;

(xxix)  the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement (i) in a manner that is adverse to the Consenting Creditors and (ii) remains uncured for five (5) Business Days after the Requisite Noteholders transmit a written notice in accordance with Section 15 of this Agreement describing any such breach;

(xxx)   the Company files a Bidding Procedures Motion requesting authorization to enter into a stalking horse purchase agreement with a purchaser for assets of the Debtors (other than the EU/ROW Assets) that is not reasonably acceptable to the Requisite Noteholders, unless such stalking horse bid would satisfy the Notes in full;

(xxxi)  the Bankruptcy Court enters a Bidding Procedures Order authorizing the Company to enter into a stalking horse purchase agreement with a purchaser for assets of the Debtors (other than the EU/ROW Assets) that is not reasonably acceptable to the Requisite Noteholders;

(xxxii)  the Bankruptcy Court enters a KEIP Order in form and substance not reasonably acceptable to the Requisite Noteholders;

(xxxiii) the Bankruptcy Court enters a KERP Order in form and substance not reasonably acceptable to the Requisite Noteholders;

(xxxiv) the Debtors or their estates fail to comply with an applicable Environmental Law during the Chapter 11 Cases that poses an immediate and identifiable threat of harm to public health or safety and results in an allowed claim representing a material administrative expense obligation that renders the Restructuring unfeasible, as determined by the Requisite Noteholders in their reasonable discretion; provided, however, that the mere filing of an objection, pleading, or claim by a party in interest in the Chapter 11 Cases on its own shall not give rise to a termination right hereunder;

(xxxv)  any action or inaction by a Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) or the Company or a court of competent jurisdiction, under or relating to any Environmental Law, materially and adversely affects the rights of the Consenting Creditors in the Chapter 11 Cases or in connection with the Restructuring,

23

or renders the Restructuring unfeasible, as determined by the Requisite Noteholders in their reasonable discretion; provided, however, that the mere filing of an objection, pleading, or claim by a party in interest in the Chapter 11 Cases, on its own, shall not give rise to a termination right hereunder; or

(xxxvi) the Company commences, consents to, facilitates, allows, or fails to oppose the commencement of any action that challenges (a) the Consenting Creditors' ability to implement the Credit Bid or (b) the validity, enforceability, or priority of the Notes, the liens securing the Notes, or obligations under each of the Indentures.

(c)      A "*Company Termination Event*" shall mean any of the following:

(i)      the breach by one or more of the Consenting Creditors of (A) any covenant contained in this Agreement and (B) any other obligations of the Consenting Creditors set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable), but only if the non-breaching Consenting Creditors own less than two-thirds of the Claims;

(ii)      any representation or warranty in this Agreement made by the Consenting Creditors shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following receipt of notice pursuant to Sections 7(a) and 21 hereof (as applicable), but only if the non-breaching Consenting Creditors own less than two-thirds of the Claims;

(iii)      the board of directors, members, or managers (as applicable) of any Company Entity, including the special committee of the board of directors of Holdings, reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law, including as a result of the investigation being conducted by the sub-committee of the special committee of the board of directors of Holdings; provided, that the Company shall provide notice of such determination to Paul, Weiss via email within one (1) business day after the date thereof;

(iv)      the Company shall not have obtained votes accepting the Plan from holders of the Notes sufficient to satisfy the conditions for acceptance set forth in section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the solicitation materials distributed in connection with the Plan;

(v)      the Support Effective Date shall not have occurred on or before the Commencement Date; or

(vi)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such

24

ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance.

(d)    Mutual Termination.  This Agreement may be terminated by mutual agreement of the Company and the Requisite Noteholders upon the receipt of written notice delivered in accordance with Section 21 hereof.

(e)    Automatic Termination.  This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Effective Date.

(f)    Effect of Termination.  Upon the termination of this Agreement in accordance with this Section 7 (other than pursuant to Section 7(e)) if the Restructuring has not been consummated, and except as provided in Section 15 hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Debt Documents, and any ancillary documents or agreements thereto; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon any such termination of this Agreement, each vote or any consents given by any Consenting Creditor prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, in each case, without further confirmation or other action by such Consenting Creditor.  If this Agreement has been terminated as to any Consenting Creditor in accordance with this Section 7 (other than pursuant to Section 7(e)) at a time when permission of the Bankruptcy Court shall be required for a Consenting Creditor to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall support and not oppose any attempt by such Consenting Creditor to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in Section 14 hereof.  The Consenting Creditor shall have no liability to the Company or to each other in respect of any termination of this Agreement in accordance with the terms of this Section 7 and Section 21 hereof.

(g)    If the Restructuring has not been consummated prior to the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

25

## 8.    Definitive Documents; Good Faith Cooperation; Further Assurances.

Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents.  Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; provided, that no Consenting Creditor shall be required to incur any material cost, expense, or liability in connection therewith.

## 9.    Representations and Warranties.

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Creditor that becomes a party hereto after the date hereof, as of the date such Consenting Creditor becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws

26

relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Creditor severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor:

(i)    is the beneficial owner of the aggregate principal amount of the Notes, and the aggregate number of shares of Holdings Equity, set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other Notes or Holdings Equity, as applicable, and/or (ii) has, with respect to the beneficial owners of such Notes and Holdings Equity (A) sole investment or voting discretion with respect to such Notes and Holdings Equity, (B) full power and authority to vote on and consent to matters concerning such Notes and Holdings Equity or to exchange, assign and transfer such Notes and Holdings Equity and (C) full power and authority to bind or act on the behalf of, such beneficial owners; and

(ii)    (A) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act; (B) is an institutional accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act); (C) understands that to, the extent any securities are purchased by, or issued to it (if any) pursuant to the Restructuring, such securities have not been and will not be registered under the Securities Act and that such securities will, be offered and sold, as applicable, pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available; (D) is a sophisticated investor with respect to the transactions described herein and has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to Restructuring and understands and is able to bear any economic risks with such investment; and (E) if such Consenting Creditor is a Requisite Exchange Priority Noteholder (1) the Transferred Equity Interests (as defined in the Credit Bid Term Sheet) are being acquired by such Requisite Exchange Priority Noteholder, through its buyer vehicle, for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Transferred Equity Interests or any interest in them; and (2) such Requisite Exchange Priority Noteholder acknowledges that the Transferred Equity Interests have not been registered under the Securities Act, or any state securities Laws, and understands and agrees that it may not sell or dispose of any of the Transferred Equity Interests except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable state, foreign or federal securities Laws.

27

(c)    Each Consenting Creditor severally (and not jointly) makes the representations and warranties set forth in this <u>Section 9</u>, in each case, to the other Parties.

## 10.    Disclosure; Publicity.

The Company shall submit drafts to Paul, Weiss of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, or any other matter relating to the Notes, at least one (1) business day prior to making any such disclosure, and any such press releases and public documents shall be reasonably acceptable in all material respects to the Requisite Noteholders.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Company, the principal amount of the Notes or the amount of Holdings Equity, held by the Consenting Creditor, without such Consenting Creditor's prior written consent; <u>provided</u>, <u>however</u>, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Notes or the aggregate amount of Holdings Equity, held by all the Consenting Creditor collectively.

## 11.    Amendments and Waivers.

(a)    This Agreement (including any exhibits or schedules hereto), and the substance and consent rights in the Definitive Documents, may not be waived, modified, amended or supplemented except in accordance with this <u>Section 11</u>.

(b)    This Agreement may be waived, modified, amended or supplemented with the written consent of the Company and the Requisite Noteholders (such consent not to be unreasonably withheld, conditioned, or delayed); <u>provided</u>, <u>however</u>, that:

(i)    any waiver, modification, amendment or supplement to this <u>Section 11</u> shall require the written consent of all of the Parties;

(ii)    any modification, amendment or change to the definition of Requisite Noteholders shall require the written consent of each Consenting Creditor;

(iii)    any change, modification or amendment to this Agreement (including the Term Sheet), any of the Definitive Documents, or the Plan that treats or affects any Consenting Creditor in a manner that is disproportionately adverse, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors of the same class are treated (after taking into account each of the Consenting Creditor's respective holdings and interests in the Company and the recoveries

28

contemplated by the Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor; and

(iv)    any change, modification or amendment to this Agreement (including the Term Sheet) or the Plan does not materially, adversely affect the rights of a Consenting Creditor, the consent of such Consenting Creditor shall not be required.

(c)    In the event that an adversely affected Consenting Creditor ("Non-Consenting Creditor") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least two-thirds of the aggregate outstanding principal amount of each of the Notes, respectively, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors who have so consented, in a way consistent with (or otherwise reasonably acceptable to the Requisite Noteholders) this Agreement and the Term Sheet as waived, changed, modified, or amended, as applicable.

## 12.    Effectiveness.

This Agreement shall become effective and binding on the Parties on the Support Effective Date, and not before such date; provided, that signature pages executed by Consenting Creditors shall be delivered to (a) the other Consenting Creditors in a redacted form that removes such Consenting Creditor's holdings of the Notes, Holdings Equity or any other Claims against or Interests in the Company and any schedules to such Consenting Creditors' holdings (if applicable) and (b) the Company, Weil and Paul, Weiss in an unredacted form (and to be kept confidential by the Company, Weil and Paul, Weiss).

## 13.    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in (i) any federal or state court in the Borough of Manhattan in the State of New York, or (ii) the Bankruptcy Court, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is

WEIL:\97486621\1\44362.0003

insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the courts as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(b) shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 14.    Specific Performance/Remedies.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

## 15.    Survival.

Notwithstanding the termination of this Agreement pursuant to Section 7 hereof, the agreements and obligations of the Parties in this Section 15, and Sections 6(b), 7(f), 10, 12, 13, 14, 16, 17, 18, 19, 20, 21, and 22 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

WEIL:\97486621\1\44362.0003

16.    **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.    **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit Transfers of Claims or Interests other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

19.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect.

20.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile or by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

21.    **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)    If to the Company or Debtors, to:

Exide Holdings, Inc.
13000 Deerfield Parkway
Building 200
Milton, GA 30004
Attn:  Roy Messing, Chief Restructuring Officer
Email:  Roy.Messing@ankura.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Ray C. Schrock, P.C.
Email:  Ray.Schrock@weil.com
Attn:  Jacqueline Marcus, Esq.
Email:  Jacqueline.Marcus@weil.com
Attn:  Sunny Singh, Esq.
Email:  Sunny.Singh@weil.com

(2)    If to a Consenting Creditor, or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:  Alice Eaton, Esq.
Email:  aeaton@paulweiss.com
Attn:  Robert Britton, Esq.
Email:  rbritton@paulweiss.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

32

22.     **Reservation of Rights.**

Except as provided in this Agreement, nothing contained herein shall: (i) limit the rights of any Consenting Creditors under the Debt Documents; or (ii) constitute a waiver or amendment of any provision of the Debt Documents or any agreements executed in connection with the Debt Documents.

23.     **Relationship Among Consenting Creditors.**

It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments among or between them. No prior history, pattern, or practice of sharing confidences among or between the Consenting Creditor shall in any way affect or negate this understanding and agreement.

24.     **No Solicitation; Representation by Counsel; Adequate Information.**

(a)     This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Consenting Creditors or a solicitation to tender or exchange any of the Notes. The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditors has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)     Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

33

## EXHIBIT A

## FORM OF JOINDER AGREEMENT FOR CONSENTING STAKEHOLDERS

This Joinder Agreement to the Restructuring Support Agreement, dated as of [●] (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), by and among the Company, the holders of Claims and Interests (together with their respective successors and permitted assigns, the "***Consenting Creditors***" and each, a "***Consenting Creditor***") is executed and delivered by _____ (the "***Joining Party***") as of _____ __, 2020.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims and Interests held by such Joining Party.

2.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of the Notes, and with respect to the aggregate number of shares of Holdings Equity, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in <u>Section 9</u> of the Agreement to each other Party to the Agreement.

3.  <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING CREDITOR**

By: _____

Name:

Title:

Principal Amount of Superpriority Senior Secured Notes:    $_____

Principal Amount of Exchange Priority Notes:    $_____

Principal Amount of 2024 First Lien Notes:    $_____

Shares of Holdings Equity:    _____

Notice Address:

Fax: _____

Attention:

Email:

SIGNATURE PAGE TO JOINDER AGREEMENT

Acknowledged:

**EXIDE HOLDINGS, INC.**


By:_____
    Name:
    Title:


**EXIDE TECHNOLOGIES, LLC**


By:_____
    Name:
    Title:


**DIXIE METALS COMPANY**


By:_____
    Name:
    Title:


**REFINED METALS CORPORATION**


By:_____
    Name:
    Title:


SIGNATURE PAGE TO JOINDER AGREEMENT

**EXIDE DELAWARE LLC**


By: _____
    Name:
    Title:

SIGNATURE PAGE TO JOINDER AGREEMENT

## **EXHIBIT B**

## **CHAPTER 11 TERM SHEET**

**Chapter 11 Term Sheet**
**May 18, 2020**

This term sheet (including all exhibits and schedules hereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Term Sheet**") sets forth the principal terms of a proposed liquidation of Exide Holdings, Inc. ("**Holdings**") and certain of its direct and indirect subsidiaries (collectively, the "**Company Entities**"); to be effectuated, in part, by certain of the Company Entities commencing voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to pursue the Restructuring (as defined in the RSA) or such other transaction acceptable to the Company Entities and the Requisite Noteholders.

This is the Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of May 18, 2020, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "**RSA**"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in **Annex 1** attached hereto or, if not defined therein, in the RSA.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO ADDITIONAL TAX STRUCTURING AND DILIGENCE AND THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET.

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY, EXCEPT AS REQUIRED BY LAW, OR AS PERMITTED UNDER AN EXISTING CONFIDENTIALITY AGREEMENT WITH THE COMPANY.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THE TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| Overview | |
|---|---|
| **Company Entities to Commence Chapter 11 Cases** | Holdings; Exide Technologies, LLC ("**Exide Technologies**"); Exide Delaware LLC; Dixie Metals Company; and Refined Metals Corporation (collectively, the "**Debtors**"). |
| **Chapter 11 Overview** | |
| **Claims to be Restructured:** | **ABL Claims**:  Claims in the aggregate principal amount of not less than approximately $101.2 million issued under that certain ABL Credit Agreement, dated as of April 30, 2015, among Holdings, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, and Exide Holding Netherlands B.V., as borrowers, Bank of America, N.A., as administrative agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**ABL Credit Agreement**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the ABL Credit Agreement solely to the extent permitted by the Bankruptcy Code (the "**ABL Claims**"). |
| | Superpriority Notes Guarantee Claims:  Claims in the aggregate principal amount of not less than approximately $152.5 million on account of the 10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to that certain Indenture, dated as of June 17, 2019, among Exide International Holdings LP, as issuer, the guarantors party thereto, U.S. Bank N.A., as trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**Superpriority Notes Indenture**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the Superpriority Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**Superpriority Notes Guarantee Claims**"). |
| | Exchange Priority Notes Claims: Claims in the aggregate principal amount of not less than approximately $390 million on account of the 11% Exchange Priority Notes due 2024 issued pursuant to that certain Indenture, dated as of June 15, 2019, among Exide Technologies, as issuer, U.S. Bank N.A., as trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**Exchange Priority and First Lien Notes Indenture**") plus interest, fees, expenses and other amounts arising and payable under and in accordance with the Exchange Priority and First Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**Exchange Priority Notes Claims**"). |
| | First Lien Notes Claims: Claims in the aggregate principal amount of not less than approximately $161 million on account of the 11% First Lien Senior Secured Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture, plus interest, fees, expenses and other amounts arising and payable under and in accordance with the Exchange |

2

| Overview |
|---|

Priority and First Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**First Lien Notes Claims**", and together with the Superpriority Notes Guarantee Claims and Exchange Priority Notes Claims, the "**Secured Notes Claims**").

2020 Legacy First Lien Notes Claims: Claims in the aggregate principal amount of not less than approximately $9 million on account of the 11% First Lien Senior Secured Notes Due 2020 issued pursuant to that certain Indenture, dated as of April 30, 2015, among Exide Technologies, as issuer, U.S. Bank N.A., as trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**2020 Legacy First Lien Notes Indenture**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the 2020 Legacy First Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**2020 Legacy First Lien Notes Claims**").

2022 Legacy First Lien Notes Claims: Claims in the aggregate principal amount of not less than approximately $1 million on account of the 11% First Lien Senior Secured Notes Due 2022 issued pursuant to that certain Indenture, dated as of May 24, 2017, among Exide Technologies, as issuer, U.S. Bank N.A., as trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**2022 Legacy First Lien Notes Indenture**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the 2022 Legacy First Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**2022 Legacy First Lien Notes Claims**," and with the 2020 Legacy First Lien Notes Claims, the "**Legacy First Lien Notes Claims**").

Legacy Second Lien Notes Claims: Claims in the aggregate principal amount of not less than approximately $2.7 million on account of the 3.79% Second Lien Deferred Payment Notes due 2022 issued pursuant to that certain Indenture, dated as of June 30, 2015, among Exide Technologies, as issuer, Bank of America, N.A., as successor trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**Second Lien Notes Indenture**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the Second Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**Legacy Second Lien Notes Claims**" and together with the Legacy First Lien Notes Claims, the "**Legacy Secured Claims**").

General Unsecured Claims: Consisting of any Claim against the Debtors (other than any Intercompany Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any final order of the Bankruptcy Court, including

3

| Overview | |
|---|---|
| | any deficiency claims under section 506(a) of the Bankruptcy Code (the "**General Unsecured Claims**"). |
| **Sale and Marketing Process** | Following the Commencement Date, the Debtors shall continue their prepetition sale and marketing process (the "**Sale Process**") and solicit bids for one or more of the following: (i) the Americas Sale Transaction, (ii) the Europe/ROW Sale Transaction, or (iii) the Company Sale Transaction (each a "**Sale Transaction**"). The Debtors shall solicit bids for any form of sale, investment, acquisition, or similar transaction and shall market and consider bids for each segment of the Company in whole or in part. The Sale Process shall provide that the Debtors may solicit bids to sell certain assets, including, without limitation, the equity interests in or assets of the Debtors' non-U.S. subsidiaries, independently of other assets pursuant to a separate sales and marketing process. |
| | The Sale Process shall be conducted in accordance with the procedures and timeline set forth in the Bidding Procedures Order (the "**Bidding Procedures**"), subject to approval of the Bankruptcy Court. The Bidding Procedures shall be in form and substance reasonably acceptable to the Consenting Creditors. In accordance with the Bidding Procedures, the Debtors shall conduct an auction in which any bid designated as the "stalking horse" under the Bidding Procedures Order (if any) will be subject to an overbid process in accordance with the Bidding Procedures Order (the highest or otherwise best bid pursuant to the Bidding Procedures Order, the "**Successful Bid**" and the purchaser thereunder, the "**Successful Bidder**"). |
| | The special committee of Holdings' Board of Directors (the "**Special Committee**") shall have the exclusive right to exercise the Company's authority to oversee and direct the sale process relating to any potential Sale Transaction. Any references to acts to be performed or determinations to be made by the Company prior to the Effective Date with respect to any Sale Transaction will be deemed to refer to the acts to be performed or determinations to be made by the Special Committee. |
| | The Debtors shall consult with the Consenting Creditors with respect to all material actions taken in connection with any Sale Transaction, including any negotiations, conversations and correspondence related thereto. All rights of the Consenting Creditors with respect to any Sale Transaction, including to Credit Bid in connection with an Americas Sale Transaction, are reserved. |
| **Milestones** | The Consenting Creditors' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "**Milestones**"), which may be extended with the prior written reasonable consent of the Requisite Noteholders: |
| | 1.  File the Bidding Procedures Motion not later than three business days after the Commencement Date [May 22, 2020]; |

4

| Overview |
|---|
| 2. Entry of interim order approving the DIP Facility not later than three business days after the Commencement Date [May 22, 2020]; <br><br> 3. File the Plan and Disclosure Statement not later than 30 days after the Commencement Date [June 18, 2020]; <br><br> 4. Entry of Order approving the Bidding Procedures not later than 30 days after the Commencement Date [June 18, 2020]; <br><br> 5. Entry of a final order approving the DIP Facility not later than 35 days after the Commencement Date [June 23, 2020]; <br><br> 6. Deadline to commence the Auction: not later than 60 days after the Commencement Date [July 18, 2020]; <br><br> 7. Entry of Order approving the Disclosure Statement not later than 75 days after the Commencement Date [August 2, 2020]; <br><br> 8. Entry of a sale order approving the Sale Transaction not later than 75 days after the Commencement Date [August 2, 2020]; <br><br> 9. Deadline to consummate Americas Sale Transaction: not later than 100 days after the Commencement Date [August 27, 2020]; <br><br> 10. Deadline to consummate Europe/ROW Sale Transaction: not later than 120 days after the Commencement Date [September 16, 2020]; <br><br> 11. Deadline to commence the Confirmation Hearing:  not later than 120 days after the Commencement Date [September 16, 2020]; and <br><br> 12. Deadline for Effective Date under the Plan to Occur: not later than 135 days from the Commencement Date [October 1, 2020]. |

| | |
|---|---|
| **Credit Bid** | The Consenting Creditors shall submit an executed purchase agreement to effectuate the Europe/ROW Sale Transaction as set forth in the Credit Bid Term Sheet annexed hereto as **Exhibit 1** in accordance with the terms and deadlines set forth in the Bidding Procedures (the "**Credit Bid Transaction**"). |
| **DIP Facility** | Upon the Commencement Date, the Debtors shall seek authority to obtain debtor-in-possession financing in the aggregate principal amount and on the terms and conditions set forth in the DIP Term Sheet (the "**DIP Facility**" and the Claims arising thereunder, the "**DIP Claims**"). |
| **Sources of Consideration for Distributions** | The Plan shall contemplate Distributions of Cash as assets are monetized, including from: <br><br> (i)      cash on hand; and |

5

| Overview | |
|---|---|
| | (ii)    Sale Transaction Proceeds. |
| **Sale Proceeds Waterfall** | With respect to any Sale Transaction Proceeds from the sale or transfer of Notes Priority Collateral: |

a. On or promptly after the closing date of any Sale Transaction (a "**Closing Date**"), any Initial Notes Priority Collateral Proceeds shall be distributed on a pro rata basis:

i. *first*, to each holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed Superpriority Notes Guarantee Claims in full; *provided* that, solely in the case of any Sale Transaction that results in Initial Notes Priority Collateral Proceeds from the sale or transfer of the Debtors' assets that are subject to liens securing the DIP Facility, any such Initial Notes Priority Collateral Proceeds shall be distributed to each holder of an Allowed DIP Claim prior to any distribution to any holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed DIP Claims; *provided further* that in the event that the Credit Bid Transaction has been approved by the Bankruptcy Court but has not closed or, alternatively, the approval of the Credit Bid Transaction is pending before the Bankruptcy Court, any Notes Priority Collateral Proceeds shall be (A) segregated and held pending the closing of the Credit Bid Transaction and (B) distributed to each holder of Allowed Secured Notes Claims pursuant to the Proceeds Waterfall (as defined below) one (1) business day following (x) the entry of an order by the Bankruptcy Court denying approval of the Credit Bid Transaction, entry of an order by the Bankruptcy Court approving a "higher or better bid" with respect to a Europe/ROW Sale Transaction, or the signing of an alternative bid in connection with a Europe/ROW Sale Transaction that is not subject to approval by the Bankruptcy Court; *provided* that, if the Credit Bid is selected as the "back-up" bid at the Auction, then such distribution shall be delayed pending the closing of an alternative Europe/ROW Sale Transaction or (y) the closing of the Credit Bid Transaction after applying any applicable reductions to such Allowed Secured Notes Claims on account of any Allowed Secured Claims that are assumed or applied as consideration in connection with the Credit Bid Transaction (this second proviso of clause (a)(i), the "**Notes Proceeds Credit Bid Reserve**" and together with

6

| Overview |
|---|

|  |  | the ABL Proceeds Credit Bid Reserve (as defined below), the "**Credit Bid Reserve**"); |
|  | ii. | *second*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed Exchange Priority Notes Claims up to an amount necessary to satisfy the Allowed Exchange Priority Notes Claims in full; |
|  | iii. | *third*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims and Allowed Exchange Priority Notes Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed First Lien Notes Claims up to an amount necessary to satisfy the Allowed First Lien Notes Claims in full; and |
|  | iv. | *fourth*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims, Allowed Exchange Priority Notes Claims, Allowed First Lien Notes Claims have been satisfied in full, to each holder of an Allowed ABL Claim up to an amount necessary to satisfy the Allowed ABL Claims in full. |
| b. | | On or after the Effective Date, any Excess Notes Priority Collateral proceeds shall be distributed on a pro rata basis: |
|  | i. | *first*, subject to the Credit Bid Reserve, to each holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed Superpriority Notes Guarantee Claims in full; *provided* that, solely in the case of any Sale Transaction that results in Excess Notes Priority Collateral Proceeds from the sale or transfer of the Debtors' assets that are subject to liens securing the DIP Facility, any such Excess Notes Priority Collateral Proceeds shall be distributed to each holder of an Allowed DIP Claim prior to any distribution to any holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed DIP Claims; |
|  | ii. | *second*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed Exchange Priority Notes Claims up to an amount necessary to satisfy the Allowed Exchange Priority Notes Claims in full; |
|  | iii. | *third*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims and Allowed Exchange Priority Notes Claims have been satisfied in full and subject to the |

7

| Overview |
|---|

|  |  | Credit Bid Reserve, to each holder of an Allowed First Lien Notes Claims up to an amount necessary to satisfy the Allowed First Lien Notes Claims in full; and |
|---|---|---|

iv. *fourth*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims, Allowed Exchange Priority Notes Claims, Allowed First Lien Notes Claims have been satisfied in full, to each holder of an Allowed ABL Claim up to an amount necessary to satisfy the Allowed ABL Claims in full (clauses (a) and (b) above, the "**Notes Priority Proceeds Waterfall**").

With respect to any sale proceeds from the sale or transfer of ABL Priority Collateral:

a. On or promptly after any Closing Date, any Initial ABL Priority Collateral Proceeds shall be distributed on a pro rata basis:

i. *first*, to each holder of an Allowed ABL Claim up to an amount necessary to satisfy the Allowed ABL Claims in full;

ii. *second*, solely to the extent that the Allowed ABL Claims have been paid in full and subject to the Credit Bid Reserve, to each holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed Superpriority Notes Guarantee Claims in full; *provided* that, solely in the case of any Sale Transaction that results in Initial ABL Priority Collateral Proceeds from the sale or transfer of the Debtors' assets that are subject to liens securing the DIP Facility, any such Initial ABL Priority Collateral Proceeds shall be distributed to each holder of an Allowed DIP Claim prior to any distribution to any holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed DIP Claims; *provided further* that in the event that the Credit Bid Transaction has been approved by the Bankruptcy Court but has not closed or, alternatively, the approval of the Credit Bid Transaction is pending before the Bankruptcy Court, any ABL Priority Collateral Proceeds shall be (A) segregated and held pending the closing of the Credit Bid Transaction and (B) distributed to each holder of Allowed Secured Notes Claims pursuant to the Proceeds Waterfall one (1) business day following (x) the entry of an order by the Bankruptcy Court denying approval of the Credit Bid Transaction, entry of an order by the Bankruptcy Court approving a "higher or better bid" with respect to a Europe/ROW Sale Transaction, or the signing of an alternative bid in connection with a

8

| Overview |
|---|

|  |  | Europe/ROW Sale Transaction that is not subject to approval by the Bankruptcy Court; *provided* that, if the Credit Bid is selected as the "back-up" bid at the Auction, then such distribution shall be delayed pending the closing of an alternative Europe/ROW Sale Transaction or (y) the closing of the Credit Bid Transaction after applying any applicable reductions to such Allowed Secured Notes Claims on account of any Allowed Secured Claims that are assumed or applied as consideration in connection with the Credit Bid Transaction (this second proviso of clause (a)(ii), the "**ABL Proceeds Credit Bid Reserve**"); |
|  | iii. | *third*, solely to the extent that the Allowed ABL Claims and Allowed Superpriority Notes Guarantee Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed Exchange Priority Notes Claims up to an amount necessary to satisfy the Allowed Exchange Priority Notes Claims in full; and |
|  | iv. | *fourth*, solely to the extent that the Allowed ABL Claims, Allowed Superpriority Notes Guarantee Claims and Allowed Exchange Priority Notes Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed First Lien Notes Claims up to an amount necessary to satisfy the Allowed First Lien Notes Claims in full. |
| b. | | On or after the Effective Date, any Excess ABL Priority Collateral proceeds shall be distributed on a pro rata basis: |
|  | i. | *first*, to each holder of an Allowed ABL Claim up to an amount necessary to satisfy the Allowed ABL Claims in full; |
|  | ii. | *second*, solely to the extent that the Allowed ABL Claims have been paid in full and subject to the Credit Bid Reserve, to each holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed Superpriority Notes Guarantee Claims in full; *provided* that, solely in the case of any Sale Transaction that results in Excess ABL Priority Collateral Proceeds from the sale or transfer of the Debtors' assets that are subject to liens securing the DIP Facility, any such Excess ABL Priority Collateral Proceeds shall be distributed to each holder of an Allowed DIP Claim prior to any distribution to any holder of an Allowed Superpriority Notes Guarantee Claim up |

9

| Overview | | |
|---|---|---|
| | | to an amount necessary to satisfy the Allowed DIP Claims; |
| | iii. | *third*, solely to the extent that the Allowed ABL Claims and Allowed Superpriority Notes Guarantee Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed Exchange Priority Notes Claims up to an amount necessary to satisfy the Allowed Exchange Priority Notes Claims in full; and |
| | iv. | *fourth*, solely to the extent that the Allowed ABL Claims, Allowed Superpriority Notes Guarantee Claims and Allowed Exchange Priority Notes Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed First Lien Notes Claims up to an amount necessary to satisfy the Allowed First Lien Notes Claims in full (clauses (a) and (b) above, the "**ABL Priority Proceeds Waterfall**" and together with the Notes Priority Proceeds Waterfall, the "**Proceeds Waterfall**"). |
| **Post-Effective Date Corporate Structure** | The Debtor entities shall continue in current corporate form but shall be controlled by the Plan Administrator, reporting to the Post-Confirmation Board as set forth in the Plan Administrator Agreement. | |
| **Treatment of Claims and Interests** | | |
| **DIP Claims** | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each allowed DIP Claim, each holder thereof shall be paid in full in Cash. | |
| **Administrative, Priority Tax, and Priority Non-Tax Claims** | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Administrative Expense Claim, Allowed Priority Tax Claim, and Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | |
| **Other Secured Claims**<br><br>Unimpaired, Presumed to Accept | On or as soon as practicable after the Effective Date, to the extent any other secured claims exist (exclusive of the ABL Claims, Superpriority Notes Guarantee Claims, Exchange Priority Notes Claims, and First Lien Notes Claims, the "**Other Secured Claims**"), except to the extent that a holder of an Other Secured Claim agrees to less favorable treatment, each holder thereof shall be satisfied by either (a) payment in full in Cash or (b) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | |

10

| Overview | |
|---|---|
| **ABL Claims**<br><br>Unimpaired, Presumed to Accept | Except to the extent that a holder of an Allowed ABL Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed ABL Claim, each holder thereof shall receive its pro rata share of any ABL Priority Collateral Proceeds and Notes Priority Collateral Proceeds pursuant to the Proceeds Waterfall. |
| **Superpriority Notes Guarantee Claims**<br><br>Impaired, Entitled to Vote | Except to the extent that a holder of an Allowed Superpriority Notes Guarantee Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Superpriority Notes Guarantee Claim, each holder thereof shall receive its pro rata share of any ABL Priority Collateral Proceeds and Notes Priority Collateral Proceeds pursuant to the Proceeds Waterfall.<br><br>For the avoidance of doubt, the Allowed amount of any Superpriority Notes Guarantee Claim shall be reduced for any Superpriority Notes Claims assumed in accordance with the Credit Bid Term Sheet. |
| **Exchange Priority Notes Claims**<br><br>Impaired, Entitled to Vote | Except to the extent that a holder of an Allowed Exchange Priority Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Exchange Priority Notes Claim, each holder thereof shall receive its pro rata share of any ABL Priority Collateral Proceeds and Notes Priority Collateral Proceeds pursuant to the Proceeds Waterfall.<br><br>For the avoidance of doubt, the Allowed amount of any Exchange Priority Notes Claim shall be reduced for any Exchange Priority Notes Claims applied as consideration in accordance with the Credit Bid Term Sheet. |
| **First Lien Notes Claims**<br><br>Impaired, Entitled to Vote | Except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed First Lien Notes Claim, each holder thereof shall receive its pro rata share of any ABL Priority Collateral Proceeds and Notes Priority Collateral Proceeds pursuant to the Proceeds Waterfall.<br><br>For the avoidance of doubt, the Allowed amount of any First Lien Notes Claim shall be reduced for any First Lien Notes Claims applied as consideration in accordance with the Credit Bid Term Sheet. |
| **General Unsecured Claims**<br><br>Impaired, Deemed to Reject | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each holder thereof shall receive its pro rata share of the Net Cash Proceeds available to the applicable Debtor against which the Allowed General Unsecured |

11

| Overview | |
|---|---|
| | Claim is asserted until all Allowed General Unsecured Claims are satisfied in full after the ABL Claims, Superpriority Notes Guarantee Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in Cash or assumed in accordance with the Credit Bid Term Sheet and the Proceeds Waterfall.  For the avoidance of doubt, the Legacy Secured Claims shall constitute General Unsecured Claims against each Debtor, as applicable. |
| **Intercompany Claims**<br><br>Impaired and Deemed to Reject / Unimpaired and Presumed to Accept | All Intercompany Claims shall be adjusted, continued, acquired, settled, reinstated, discharged, eliminated, or treated in accordance with the Credit Bid Term Sheet and otherwise determined by the Debtors in consultation with the Consenting Creditors. |
| **Intercompany Interests**<br><br>Impaired and Deemed to Reject / Unimpaired and Presumed to Accept | All Intercompany Interests shall be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors. |
| **Holdings Equity Interests**<br><br>Impaired, Deemed to Reject | On the Effective Date, all Holdings Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |
| **Subordinated Securities Claims**<br><br>Impaired, Deemed to Reject | Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |
| **Plan Administrator Provisions** | |
| **Plan Administrator** | [●] shall serve as plan administrator (the "**Plan Administrator**") for each of the Debtors after the Effective Date in accordance with an agreement setting forth the powers, authority, responsibilities and duties of the Plan Administrator (such agreement, the "**Plan Administrator Agreement**") in form and substance acceptable to the Debtors and Requisite Noteholders.<br><br>The Plan Administrator shall be responsible for all decisions and duties with respect to the wind-down, subject to the authority granted to it under the Plan, the Confirmation Order, the Plan Administrator Agreement.<br><br>After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind-down, sell, abandon and otherwise liquidate assets of the Debtors in accordance with the Plan. |

12

| Overview | |
|---|---|
| **General Provisions** | |
| **Compromise and Settlement** | The Plan will contain customary provisions for the compromise and settlement of Claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. |
| **Treatment of Executory Contracts and Unexpired Leases** | On the Effective Date, except as otherwise determined by the Debtors, each of the Debtors' executory contracts and unexpired leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected in accordance with the provisions of Bankruptcy Code sections 365 and 1123. |
| **Conditions Precedent to Confirmation** | Confirmation of the Plan will be subject to the satisfaction of customary conditions, including, without limitation, the following:<br><br>a.  The Definitive Documents (as defined in the RSA) shall be consistent with the RSA and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in Section 4 of the RSA.<br><br>b.  The RSA shall not have been terminated and the RSA shall remain in full force and effect in accordance with its terms.<br><br>c.  The Company shall have paid or caused to be paid in cash all Consenting Creditor Professional Fees and Expenses pursuant to the RSA.<br><br>d.  The Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance consistent with this Term Sheet and the RSA and reasonably acceptable to the Requisite Noteholders.<br><br>e.  The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with this Term Sheet and the RSA and reasonably acceptable to the Requisite Noteholders, which order shall be in full force and effect and no stay thereof shall be in effect.<br><br>f.  The Debtors shall not be in default under the DIP Facility or the DIP Order.<br><br>g.  The DIP Order shall not have been reversed, stayed, dismissed, or vacated. |

13

| Overview | |
|---|---|
| | h. (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (x) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the obligations or Claims under the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid, or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) shall not have entered an order providing relief against the interests of the Consenting Creditors with respect to any of the foregoing causes of action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid. <br><br> The conditions to confirmation of the Plan may be waived, in whole or in part, by the Debtors and the Requisite Noteholders, as applicable. |
| **Conditions Precedent to Effective Date** | Effectiveness of the Plan will be subject to the satisfaction of customary conditions, including, without limitation, the following (as applicable): <br><br> a. The Definitive Documents (as defined in the RSA) shall be consistent with the RSA and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in Section 4 of the RSA. <br><br> b. The RSA shall not have been terminated and shall remain in full force and effect in accordance with its terms. <br><br> c. The Confirmation Order shall have been entered and shall be in full force and effect and no stay thereof shall be in effect. <br><br> d. The Debtors shall not be in default under the DIP Facility or the DIP Order. <br><br> e. The DIP Order shall not have been reversed, stayed, dismissed, or vacated. <br><br> f. The Debtors shall not have (i) filed, supported or consented to any motion, application, adversary proceeding, or cause of action (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Exchange Priority Notes Claims, the Superpriority Notes Guarantee Claims or DIP Claims, (B) otherwise seeking to impose liability upon or enjoin the Consenting Creditors or DIP Lenders; or (ii) supported |

14

| Overview | |
|---|---|
| | any third party seeking standing to bring such application, adversary proceeding or cause of action. |
| | g. All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed. |
| | h. The Company shall have paid or caused to be paid in cash all Consenting Creditor Professional Fees and Expenses invoiced no later than one business day prior to the Effective Date. |
| | i. All governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring shall have been obtained or otherwise waived. |
| | j. (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (x) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the obligations or Claims under the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid, or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) shall not have entered an order providing relief against the interests of the Consenting Creditors with respect to any of the foregoing causes of action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid. |
| | The conditions to effectiveness may be waived, in whole or in part, by the Debtors and the Requisite Noteholders, as applicable. |
| **Releases by Debtors:** | Subject to the conclusion of the investigation conducted by the sub-committee of the special committee of the board of directors of Holdings, as of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Liquidating Debtors, and the Estates, in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by or through the |

15

| Overview | |
|---|---|
| | foregoing persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Liquidating Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Liquidating Debtors, or the Estates, or their affiliates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the Sale Transaction, the Credit Bid, the DIP Facility, the European Bridge Financing Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Liquidating Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the RSA, the Definitive Documents, the Sale Transaction, the Credit Bid, the DIP Facility, the European Bridge Financing Facility, and the documents in the Plan Supplement or any related agreements, instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan. |
| **Releases by Third-Parties:** | As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:<br><br>a.   the Consenting Creditors; |

16

| Overview | |
|---|---|
| | b.   the Trustees;<br><br>c.   the DIP Agent and the DIP Lenders;<br><br>d.   the lenders under the European Bridge Financing Facility;<br><br>e.   all holders of unimpaired Claims who do not file a timely objection to the third party releases provided herein;<br><br>f.   all holders of Claims who vote to accept the Plan; and<br><br>g.   with respect to any entity in the foregoing clauses (a) through (f), such entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such entity and (z) all persons entitled to assert Claims through or on behalf of such entities with respect to the matters for which the releasing entities are providing releases.<br><br>in each case, from any and all Claims, Interests, or Causes of Action whatsoever (including any derivative Claims, asserted or assertable on behalf of the Debtors, the Liquidating Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law, equity, or otherwise, that entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Liquidating Debtors, their Estates, the Chapter 11 Cases, the Restructuring, the Sale Transaction, the Credit Bid, the DIP Facility, the European Bridge Financing Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Liquidating Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the RSA, the Definitive Documents, the Sale Transaction, the Credit Bid, the DIP Facility, the European Bridge Financing Facility, and the documents in the Plan Supplement or any related agreements, instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing herein shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order. |
| **Exculpation** | The Plan will contain standard and customary exculpation provisions mutually acceptable to the Debtors and the Requisite Noteholders. |

17

| Overview | |
|---|---|
| **Injunction** | The Plan will contain standard and customary injunction provisions mutually acceptable to the Debtors and the Requisite Noteholders. |
| **Definitive Documentation** | This Term Sheet is indicative, and any final agreement shall be subject to the Definitive Documents.  The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet and the RSA. |
| **Tax Structure** | The terms of the Plan and the transactions contemplated therein shall, to the extent reasonably practicable, be structured in a tax efficient manner as determined by the Company and the Requisite Noteholders; provided, that the obligations of the Requisite Noteholders under the Credit Bid Term Sheet shall be subject to the completion of tax diligence and structuring satisfactory to the Requisite Noteholders. |
| **Corporate Actions** | On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Liquidating Debtors, as applicable, subject to the reasonable consent of the Requisite Noteholders, may take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring under and in connection with the Plan. |
| **Amendments** | This Term Sheet may be amended only as permitted pursuant to the RSA. |
| **Consent Rights of Consenting Creditors** | Notwithstanding anything to the contrary herein or in the Plan, any and all consent rights of the Consenting Creditors set forth in the RSA with respect to the Sale Transaction or the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, will be incorporated into the Plan by reference and fully enforceable as if stated in full in the Plan. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters in the Chapter 11 Cases, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |

18

**ANNEX 1**

| Defined Terms | |
|---|---|
| **Administrative Expense Claim** | Any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; and (c) DIP Claims. |
| **ABL Priority Collateral Proceeds** | Initial ABL Priority Collateral Proceeds and Excess ABL Priority Collateral Proceeds. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075, and the general, local and chambers rules of the Bankruptcy Court. |
| **Cash** | Legal tender of the United States of America. |
| **Cause of Action** | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any claims under any state law or foreign law, including, without limitation, any fraudulent transfer or similar claims. |
| **Claim** | Has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| **Confirmation Order** | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. |
| **Distribution** | Any initial or subsequent payment or transfer made under the Plan. |
| **Effective Date** | The date that is the first business day on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof. |
| **Estate(s)** | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |

| Defined Terms | |
|---|---|
| **Excess ABL Priority Collateral Proceeds** | Any Net Cash Proceeds arising from the ABL Priority Collateral remaining after the distribution of the Initial ABL Priority Collateral pursuant to the Proceeds Waterfall. |
| **Excess Notes Priority Collateral Proceeds** | Any Net Cash Proceeds arising from the Notes Priority Collateral remaining after the distribution of the Initial Notes Priority Collateral pursuant to the Proceeds Waterfall. |
| **Excluded Party** | Any holder of Interests in or Claims against the Debtors, or any other Person, that (a) seeks any relief materially adverse to the Restructuring, (b) opts out of any third party releases sought in connection with the Plan, (c) is entitled to vote on the Plan and does not vote to accept the Plan, or (d) objects to the Plan or supports an objection to the Plan. |
| **Final Order** | An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and is in full force and effect, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| **Holdings Equity Interest** | Any Interest in Holdings. |
| **Initial ABL Priority Collateral Proceeds** | Any Initial Cash Proceeds arising from the ABL Priority Collateral. |
| **Initial Cash Proceeds** | Initial Cash Proceeds means (a) all Cash of the Debtors realized from the Sale Transaction Proceeds less (b) the amount of Cash estimated and reserved, on a pro rata basis with respect to Sale Transaction Proceeds generated by the sale or transfer of Notes Priority Collateral and ABL Priority Collateral, as applicable, in an amount to be agreed by the Debtors and the Requisite Noteholders to adequately fund the wind-down process (including any accrued and unpaid amount of the carve-out). |
| **Initial Notes Priority Collateral Proceeds** | Any Initial Cash Proceeds arising from the Notes Priority Collateral. |
| **Intercompany Claim** | Any pre- or postpetition Claim held against a Debtor held by another Debtor. |
| **Intercompany Interest** | An Interest in a Debtor held by another Debtor.  For the avoidance of doubt, an Intercompany Interest shall exclude a Holdings Equity Interest. |

2

| **Defined Terms** | |
|---|---|
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date. |
| **Lien** | Has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| **Liquidating Debtors** | The Debtors, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date. |
| **Net Cash Proceeds** | Net Cash Proceeds means (a) any remaining Initial Cash Proceeds and all Cash of the Debtors realized from their business operations less (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) estimated and reserved, on a pro rata basis with respect to Sale Transaction Proceeds generated by the sale or transfer of ABL Priority Collateral or Notes Priority Collateral, as applicable, by the Debtors or the Plan Administrator with the reasonable consent of the Requisite Noteholders to adequately fund the wind-down process and incremental to any amounts reserved to fund the wind-down process from the Initial Cash Proceeds; and (iii) necessary to satisfy any fees required to be paid in accordance with any order of the Bankruptcy Court. |
| **Notes Priority Collateral Proceeds** | Initial Notes Priority Collateral Proceeds and Excess Notes Priority Collateral Proceeds. |
| **Priority Non-Tax Claim** | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| **Priority Tax Claim** | Any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| **Related Parties** | With respect to (i) any Released Party, such Entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, (ii) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which releases are provided in the Plan, and (iii) such persons' respective heirs, executors, estates, servants and nominees. |

3

| Defined Terms | |
|---|---|
| **Released Parties** | Collectively, (i) the Debtors, (ii) the Liquidating Debtors, (iii) each of the Consenting Creditors, (iv) the Trustees, (v) the arrangers, agents and lenders under the European Bridge Financing Facility, (vi) the DIP Agents and DIP Lenders, and (vii) the Related Parties for each of the foregoing. |
| **Sale Transaction Proceeds** | The net cash proceeds received by the Debtors (or post-effective Debtors, as applicable) pursuant to one or more of: (i) the Americas Sale Transaction, (ii) the Europe/ROW Sale Transaction, (iii) the Company Sale Transaction, and (iv) the liquidation or winding up of any assets or businesses of the Company Entities in a manner other than as described in clauses (i) through (iii) above. |
| **Secured Claim** | A Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| **Subordinated Securities Claim** | A Claim subject to subordination under section 510(b) of the Bankruptcy Code. |

**<u>EXHIBIT C</u>**

**CREDIT BID TERM SHEET**

## Credit Bid Term Sheet[1]
## May 18, 2020

This term sheet (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Credit Bid Term Sheet**") sets forth the principal terms for a definitive transaction agreement (the "**Purchase Agreement**") for the Credit Bid for the purchase and sale of the Acquired Assets (as defined herein) (the transaction contemplated hereby, the "**Credit Bid Transaction**").

This is the Credit Bid Term Sheet (i) referred to in the Restructuring Support Agreement dated as of May 18, 2020, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "**RSA**") and (ii) appended to the Restructuring Term Sheet (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "**Restructuring Term Sheet**") dated as of May 18, 2020.  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the RSA or the Restructuring Term Sheet, as applicable.

| Overview of Credit Bid Terms | |
|---|---|
| **Debtors** | Exide Holdings, Inc. ("**Holdings**"), Exide Technologies, LLC, Dixie Metals Company, Refined Metals Corporation, and Exide Delaware LLC. |
| **Buyer** | A new entity formed by the Requisite Exchange Priority Noteholders for the purpose of effecting the Credit Bid Transaction. |
| **Transferred Equity Interests** | The equity interests of the Debtors in Exide International Holdings LP; Exide International Holdings GP LLC; Exide Holding Europe SAS;[2] and Exide Technologies (Shanghai) Company Limited (collectively, the "**Transferred Equity Interests**"). |
| **Acquired Assets** | a.  Transferred Equity Interests;<br><br>b.  All Claims of the Debtors arising under that certain *Intercompany Note*, dated as of July 1, 2015 issued by Exide Global Holding Netherlands C.V.; and<br><br>c.  such other specified assets of the Debtors (including certain intercompany receivables and Claims), as may be mutually agreed by the Debtors and the Requisite Exchange Priority Noteholders and specified in the Purchase Agreement, if any ((a) through (c), collectively, the "**Acquired Assets**"). |
| **Assumed Liabilities** | Limited to specified liabilities related to the Europe/ROW business being acquired, as may be mutually agreed among the Requisite Exchange Priority Noteholders and the Debtors and specified in the Purchase Agreement. |
| **Stalking Horse** | The Credit Bid Transaction shall serve as the "stalking horse" for the Acquired Assets in accordance with the Bidding Procedures and shall be subject to the consideration of higher or better bids. |
| **Bankruptcy Court Approval** | To the extent the Purchase Agreement includes the sale of any of the Debtors' assets or equity interests, the Credit Bid Transaction shall be subject to approval by the Bankruptcy Court. |

---

[1]    The terms herein are subject to review by tax counsel.

[2]    Works Council information and/or consultation requirements with respect to all or part of the European companies and its possible impact on the Credit Bid Transaction or its timing to be discussed in due course with Buyer based on the Credit Bid Transaction terms and structure (including purchase price) ultimately agreed to.

| Overview of Credit Bid Terms | |
|---|---|
| **Consideration** | The aggregate consideration to be paid by the Buyer for the sale of all of the Acquired Assets and the obligations of the Sellers set forth in the Purchase Agreement shall be comprised of an amount equal to $430 million (the "**Purchase Price**") comprised of the following:<br><br>a. a discharge and release of Claims under the Exchange Priority and First Lien Notes Indenture (the "**Exchange Priority Notes Claims**") on account of the Exchange Priority Notes in the amount of $70 million;[3]<br><br>b. the assumption of all Claims outstanding under the Interim Financing Facility (as defined herein) in the amount of $25 million;<br><br>c. the assumption of all Claims outstanding under the Superpriority Senior Secured Notes Indenture (the "**Superpriority Notes Claims**") in the amount of $161 million;<br><br>d. the assumption of all Claims outstanding under the Existing EU/ROW Financings in the amount of $174 million; and<br><br>e. the assumption of certain non-debt liabilities set forth in the Purchase Agreement. |
| **DIP Facility** | The commitments and obligations of the Requisite Exchange Priority Noteholders with respect to the Credit Bid and Interim Financing Facility shall be conditioned on the entry of a final order by the Bankruptcy Court approving the DIP Facility. |
| **Interim Financing Facility** | The Requisite Exchange Priority Noteholders (i) shall commit up to $25 million and (ii) may provide an additional $50 million at the request of Exide International Holdings LP but purchased in the discretion of the Lenders, prior to the closing of the Credit Bid Transaction (the "**Closing Date**"), in each case, in accordance with the term sheet attached as <u>Exhibit E</u> to the RSA, which shall be used for working capital and general corporate purposes (the "**Interim Financing Facility**" and the agreement executed in connection therewith, the "**Interim Financing Agreement**"). The Interim Financing Facility shall rank senior to the Superpriority Notes Claims in terms of liens and payment priority. |
| **Definitive Documents** | The Required Parties shall use commercially reasonable efforts to negotiate in good faith and finalize the Purchase Agreement during the marketing process contemplated by the Bidding Procedures and prior to the bid deadline established by the Bidding Procedures, including, but not limited to, the drafting and negotiation of the Purchase Agreement and the ancillary agreements, schedules, documents, and instruments contemplated thereby, each of which shall be in form and substance reasonably acceptable to the Requisite Exchange Priority Noteholders. |
| **ABL Facility** | The Requisite Exchange Priority Noteholders shall commit to (i) refinancing all amounts owed by Exide Technologies (Transportation) Limited under the ABL Credit Agreement or (ii) otherwise bifurcating the facility provided |

---

[3]    Subject to adjustment and purchase price allocation pending the outcome of Works Council with respect to Exide France.

| Overview of Credit Bid Terms | |
|---|---|
| | under the ABL Credit Agreement, in each case, not later than the Closing Date. |
| **Existing EU/ROW Financings** | The Requisite Exchange Priority Noteholders agree that all existing European Union financing arrangements, including, but not limited to, local guarantees, performance bonds, lines of credit, overdraft facilities, factoring arrangements (recourse and non-recourse), and capital leases issued by Exide International Holdings LP and its subsidiaries (collectively, the "**Existing EU/ROW Financings**") shall remain in place under the existing terms and conditions or be replaced or refinanced in connection with the consummation of the Credit Bid Transaction. |
| **Go-Shop Provision** | The Credit Bid Transaction shall be subject to higher and better offers, as determined by the Debtors in their reasonable business judgment in accordance with the Bidding Procedures or otherwise. The Buyer shall not be entitled to a break-up fee in connection with the sale contemplated herein, but shall be entitled to Expense Reimbursement. |
| **Expense Reimbursement** | The Bidding Procedures Order shall provide that in the event that the Debtors consummate a sale or restructuring transaction with respect to substantially all of the assets or equity interests to be acquired pursuant to the Credit Bid Transaction, other than the Credit Bid Transaction (an "**Alternative Europe/ROW Transaction**") or the Debtors terminate the Purchase Agreement pursuant to the Fiduciary Out, the Debtors shall pay in cash all reasonable and documented fees and expenses of the Buyer and the Requisite Exchange Priority Noteholders in connection with the Credit Bid Transaction, including the fees and expenses of Paul, Weiss, as counsel, Young Conaway Stargatt & Taylor, LLP, as Delaware counsel, Walkers, as Cayman counsel, Freshfields Bruckhaus Deringer LLP, as European counsel, De Brauw Blackstone Westbroek N.V., as Dutch counsel, and CMD Global Advisors, LLC, as financial advisor (such payment and reimbursement obligations, the "**Expense Reimbursement**"). The claim of the Buyer in respect of the Expense Reimbursement shall constitute an allowed superpriority administrative expense claim against each of the Debtors under sections 503 and 507(b)(2) of the Bankruptcy Code, senior in respect of lien priority and right to payment of all other administrative expense claims of the Debtors, but subject to a customary carve-out to be provided by an order of the Bankruptcy Court approving the DIP Facility on an interim or final basis (such order, the "**DIP Order**"). For the avoidance of doubt, the Expense Reimbursement shall not be duplicative of any expenses paid to the advisors of the Consenting Creditors in accordance with the DIP Order.<br><br>The Debtors shall pay the Expense Reimbursement by wire transfer of immediately available funds to an account designated by the Buyer within one (1) business day of the consummation of an Alternative Europe/ROW Transaction. |
| **Bidding Procedures** | The Bidding Procedures shall be in form and substance reasonably acceptable to the Requisite Exchange Priority Noteholders. |
| **Government Approvals** | The Buyer and the Requisite Exchange Priority Noteholders shall take any and all actions reasonably necessary to obtain all requisite governmental approvals required to effect the Credit Bid Transaction. |

3

| Overview of Credit Bid Terms | |
|---|---|
| **Conditions to Closing** | The closing of the Credit Bid Transaction shall be conditioned upon the satisfaction of customary closing conditions, including (i) the accuracy of representations and warranties made by the parties, (ii) the receipt of requisite approvals, including, but not limited to, approvals required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, (iii) the absence of any order of a court of competent jurisdiction prohibiting the consummation of the Credit Bid Transaction, (iv) the execution and delivery of the related agreements, (v) the entry by the Bankruptcy Court of an order approving the Credit Bid Transaction (the "**Credit Bid Sale Order**") in form and substance reasonably acceptable to the Requisite Exchange Priority Noteholders, and (vi) the payment of the Debtors' professional fees (including any transaction fees) incurred in connection with consummating the Credit Bid Transaction. |
| **Holdings Termination Rights** | Holdings shall have the right to terminate the Purchase Agreement in the event that (i) there are ongoing breaches of representations, warranties or covenants by the Buyer that cause any closing condition to not be satisfied (subject to a ten (10) business day cure period), (ii) the Credit Bid Transaction has not closed by September 16, 2020 (subject to extension for receipt of required approvals), (iii) any government authority has enjoined the consummation of the Credit Bid Transaction, (iv) (A) Holdings enters into a definitive agreement with respect to an Alternative Europe/ROW Transaction or (B) the Bankruptcy Court enters an order approving an Alternative Europe/ROW Transaction, or (v) the special committee of the board of directors (or equivalent organizational body) of any of the Debtors determines in good faith after consultation with outside counsel that the Debtors' continued performance under the Purchase Agreement would be inconsistent with the board's or such governing body's fiduciary duties under applicable law (this clause (v), the "**Fiduciary Out**"). |
| **Buyer Termination Rights** | Buyer shall have the right to terminate the Purchase Agreement in the event that (i) there are ongoing breaches of representations, warranties or covenants by the Debtors that cause any closing condition to not be satisfied (subject to a ten (10) business day cure period), (ii) the Credit Bid Transaction has not closed by September 16, 2020 (subject to extension for receipt of required approvals), (iii) any government authority has enjoined the consummation of the Credit Bid Transaction, (iv) if the bidding procedures order is not entered into by June 18, 2020, (v) if the Credit Bid Sale Order is not entered by August 2, 2020, (vi) if, prior to the Closing Date, the Debtors' bankruptcy cases are converted to cases under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee is appointed in the Debtors' bankruptcy cases, (vii) occurrence of a "Creditor Termination Event" (as defined in the RSA) pursuant to the RSA, or (viii) the occurrence of other termination events under the Purchase Agreement to be agreed. |
| **Securities Laws** | To the extent applicable, the Transferred Equity Interests shall be exchanged and sold pursuant to a private placement exception under the Securities Act of 1933, as amended. |
| **Release of Obligations** | Upon the Closing Date:<br><br>a. each of the Exchange Priority Noteholders shall release each of the borrowers and guarantors under the Exchange Priority and First Lien |

4

| Overview of Credit Bid Terms | |
|---|---|
| | Indenture for any Exchange Priority Notes Claims and related obligations thereunder, including, without limitation, each non-debtor affiliate of the Debtors and up to the amount provided as consideration for the Credit Bid Transaction; and |
| | b. each of the Superpriority Senior Secured Noteholders shall release each of the U.S. obligors under the Superpriority Senior Secured Notes Indenture for any obligations and Claims arising thereunder. |
| **Releases** | Subject to the conclusion of the investigation conducted by the sub-committee of the special committee of the board of directors of Holdings, the Purchase Agreement and Credit Bid Sale Order shall contain full mutual general releases (the "**Releases**") effective on the Closing Date between and among the Debtors, the Buyer, the Consenting Creditors, the lenders under the DIP Facility, the agent under the DIP Facility, the DIP Lenders, the trustee under each of the Superpriority Senior Secured Notes Indenture and the Exchange Priority and First Lien Notes Indenture, and such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, for any claims up to the Closing Date except as preserved in the Purchase Agreement and related documentation implementing the Credit Bid Transaction other than claims to the extent conveyed to (and released by) Buyer. The terms of the Credit Bid Sale Order or other definitive documentation implementing the Releases set forth herein shall be reasonably acceptable to each of the Debtors, the Buyer and the Requisite Exchange Priority Noteholders.<br><br>It shall be a condition precedent to the Closing Date that the Releases are approved in the Credit Bid Sale Order.<br><br>All other debt obligations of the Debtors not assumed, refinanced, or released in connection with the Credit Bid Transaction shall be excluded from the Releases. |
| **Back-Up Bid** | In the event that the Credit Bid is not selected as the successful bid but is otherwise the next highest or best alternative bid, the Purchase Agreement shall serve as the "back-up bid" for the Acquired Assets and shall be binding and irrevocable until an Alternative Europe/ROW Transaction is consummated. |
| **Credit Bid Direction Letter** | The Buyer shall provide to the Debtors a true and correct copy of a direction letter signed by the Requisite Exchange Priority Noteholders and the administrative and collateral agents under the Exchange Priority and First Lien Notes Indenture and the Interim Financing Agreement (collectively, the "**Agents**"), pursuant to which the Requisite Exchange Priority Noteholders have authorized the Agents to, among other things, (i) cause the Credit Bid to be made in the name of the Buyer; and (ii) cause the Buyer to acquire and |

5

| Overview of Credit Bid Terms | |
|---|---|
| | assume from the Debtors all of the acquired assets and equity interests specified in, and in accordance with, the Purchase Agreement. |
| **Transition Services** | The Purchase Agreement shall provide that, upon the Closing Date, the Debtors and the Buyer shall enter into a mutual transition services agreement, in form and substance reasonably acceptable to the Required Parties, which agreement will provide that the Debtors, on one hand, and the Buyer, on the other hand, shall provide such support services to the other party to facilitate the separation of the businesses of the Debtors, in each case, as is mutually agreed upon by the Debtors and the Requisite Exchange Priority Noteholders. Subject to the consent rights of the Requisite Exchange Priority Noteholders in the Bidding Procedures, the Debtors may assign their rights and obligations under any such transition services agreement, in whole or in part, at or following the Closing Date to any third party who acquires the Debtors' applicable assets. |
| **Implementation** | The Consenting Creditors and the Company hereby agree and acknowledge that the transactions contemplated by this Credit Bid Term Sheet, including the conversion or exchange of certain debt instruments for other debt instruments, remains subject in all respects to tax, securities laws, contract, and other due diligence, structuring and definitive documentation. If the parties determine that the proposed transactions cannot be implemented as set forth in this Credit Bid Term Sheet (or it would be unduly burdensome to do so), the parties agree to negotiate in good faith such alternative transaction steps (and to modify this Credit Bid Term Sheet) in such a manner so as to provide the Company and the Requisite Exchange Priority Noteholders with substantially the same economic and legal rights and obligations (including as to consideration) as originally intended to the greatest extent possible; *provided* that any modifications to the terms or structure of the transactions contemplated by this Credit Bid Term Sheet and any definitive documentation relating thereto shall be in form and substance reasonably acceptable to the Requisite Exchange Priority Noteholders and the Company. |

6

# **EXHIBIT D**

## **DIP TERM SHEET**

**Indicative Term Sheet**
May 18, 2020

| | |
|---|---|
| **Borrower:** | Exide Technologies, LLC (the "Borrower"); provided that, the Borrower shall not be an indirect or direct subsidiary of Exide Holdings, Inc. that is not incorporated or otherwise organized or existing under the laws of the United States. |
| **Guarantors** | Exide Holdings, Inc. ("Holdings"), Dixie Metals Company, Refined Metals Corporation and Exide Delaware LLC (collectively, the "Guarantors" together with the Borrower, the "Debtors"); provided that, that no Guarantor shall be an indirect or direct subsidiary of Exide Holdings, Inc. that is not incorporated or otherwise organized or existing under the laws of the United States. |
| **Credit Facility:** | $40 million Super Priority DIP Term Loans comprised of:<br>▪ A $25 million First-Out Loan (the "First-Out") provided by Blue Torch ("BTC" or "First-Out Lender")<br>▪ A $15 million Last-Out Loan (the "Last-Out") provided by existing noteholders (the "Second-Out Lenders" and together with the First-Out Lender, the "DIP Lenders")<br><br>The DIP Term Loans shall be drawn in a single drawing at closing, and the proceeds shall be deposited into an escrow account from which the Borrower may request disbursements on one or more withdrawal dates upon satisfaction of agreed conditions, including (a) compliance with DIP Budget described below and (b) approval by the DIP Lenders and the bankruptcy court of any key employee retention or incentive plans proposed by the Debtors. The cash held in such escrow account shall not be subject to any liens or claims of the existing secured parties of the ABL Revolver referenced below, including any prepetition or adequate protection liens or claims, but shall subject to the DIP Liens. |
| **Interest Rate:** | L+1,000 comprised of a blended rate of:<br>▪ L+900 for the First-Out<br>▪ L+1,167 for the Last-Out |
| **LIBOR Floor:** | 2.0% |
| **Upfront Fee:** | 3.5% of the Credit Facility initial amount comprised of a blended rate of:<br>▪ 2.5% for the First-Out<br>▪ 5.167% for the Last-Out |
| **Amortization:** | None |
| **Exit Fee:** | 3.5% of the Credit Facility initial amount if, prior to the Maturity, the DIP Term Loans are prepaid, repaid, refinanced or replaced or accelerated (including the acceleration of the DIP Loans after an event of default (an "Event of Default")), comprised of a blended rate of:<br>▪ 1.5% for the First-Out<br>▪ 6.833% for the Last-Out |
| **Agency Fee:** | $100,000 per year |
| **Maturity:** | Upon the earliest of: (a) six months from closing; (b) conversion of any of the Debtor's chapter 11 cases to a case under chapter 7; (c) dismissal of the Debtors' chapter 11 cases; (d) appointment of a chapter 11 trustee, or other fiduciary with decision making authority; (e) the effective date of the Debtor's chapter 11 plan; (f) the closing date of a Section 363 sale of all or substantially all of the Borrower's assets (a "Sale Transaction"); (g) failure to timely satisfy milestones with respect to the Sale Transaction (including, but not limited to, approval of sale procedures, designation of a stalking horse bidder, entry of a sale order and closing); (h) upon the election of the Required Lenders after an Event of Default; (i) any action by the Debtors to challenge, support or encourage a challenge of, or fail to oppose a challenge of (A) any payments made to the DIP Lenders or to the Prepetition Secured Noteholders[1] or (B) the validity or enforceability of any of the DIP Loan Documents, the legality, validity or enforceability of any of the DIP Term Loans or the obligations to the Prepetition Secured Noteholders; and (j) other maturity date triggers as are customary for debtor-in-possession financings and satisfactory to BTC. |

---

[1] "**Prepetition Secured Noteholders**" means holders of the (i) 10.75% Superpriority Lien Senior Secured Notes due 2021,

| | |
|---|---|
| **Use of Proceeds:** | General corporate purposes, and to pay related transaction fees and expenses, including the Carve-Out. |
| **Budget:** | Use of cash collateral and proceeds of the Credit Facility subject to an agreed budget satisfactory to BTC (the "DIP Budget") consisting of forecasted receipts and disbursements of the Debtors (including payment of estate professionals) on a consolidated basis for the rolling 13 weeks commencing on the Credit Facility closing date, and updated every two weeks thereafter, subject to customary permitted variances to be agreed. |
| **Milestones:** | The following milestones, which may be extended or modified with the prior written consent of Required DIP Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed:<br><br>i.  File the Bidding Procedures Motion not later than three business days after the Commencement Date [May 22, 2020];<br><br>ii.  Entry of interim order approving the DIP Facility not later than three business days after the Commencement Date [May 22, 2020] (the "DIP Order");<br><br>iii.  File the Plan and Disclosure Statement not later than 30 days after the Commencement Date [June 18, 2020];<br><br>iv.  Entry of Order approving the Bidding Procedures not later than 30 days after the Commencement Date [June 18, 2020];<br><br>v.  Entry of a final order approving the DIP Facility not later than 35 days after the Commencement Date [June 23, 2020];<br><br>vi.  Deadline to commence the Auction: not later than 60 days after the Commencement Date [July 18, 2020];<br><br>vii.  Entry of Order approving the Disclosure Statement not later than 75 days after the Commencement Date [August 2, 2020];<br><br>viii.  Entry of a sale order approving the Sale Transaction not later than 75 days after the Commencement Date [August 2, 2020];<br><br>ix.  Deadline to consummate Americas Sale Transaction: not later than 100 days after the Commencement Date [August 27, 2020];<br><br>x.  Deadline to consummate Europe/ROW Sale Transaction: not later than 120 days after the Commencement Date [September 16, 2020];<br><br>xi.  Deadline to commence the Confirmation Hearing: not later than 120 days after the Commencement Date [September 16, 2020]; and<br><br>xii.  Deadline for Effective Date under the Plan to Occur: not later than 135 days from the Commencement Date [October 1, 2020]. |

---

(ii) 11% Exchange Priority Notes due 2024, and (iii) 11% First Lien Senior Secured Notes due 2024.

| | |
|---|---|
| **Collateral:** | Super-priority administrative claim and first-priority priming security interest (the "DIP Liens") on all property and assets (tangible and intangible, and including all outstanding capital stock of the Borrower and each of its and the Guarantors' material and direct U.S. subsidiaries) that shall be senior to any other liens and security interests, including the adequate protection liens on account of prepetition indebtedness and the liens securing prepetition indebtedness, other than (i) an ABL Revolver of up to $97 million that will be secured by first-priority liens on inventory and accounts receivables assets and subject to a borrowing base customary for facilities of this type, (ii) the Carve-out (as described below) and (iii) other perfected and unavoidable liens on the petition date, including, for the avoidance of doubt, any liens on any property or assets of any indirect or direct subsidiary of Exide Holdings, Inc. that is not incorporated or otherwise organized or existing under the laws of the United States. |
| **Adequate Protection** | In exchange for the Debtors' use of their cash collateral during the chapter 11 cases, among other things, the Prepetition Secured Noteholders shall receive adequate protection, to the extent of any diminution in value of the Prepetition Secured Noteholders' interest in their prepetition collateral (including cash collateral and ABL collateral), in the form of replacement liens (the "AP Liens") and superpriority claims (the "AP Claims"), which shall rank in the same right and priority as their respective liens and claims immediately prior to the commencement of the chapter 11 cases. Such AP Liens and AP Claims shall be junior to the DIP Liens. The Debtors shall also pay the fees and expenses of the Second-Out Lenders' attorneys and financial advisors. |
| **Mandatory Prepayments:** | Customary for facilities of this type and satisfactory to the DIP Lenders, including:<br>▪ 100% of proceeds from certain asset sales and sales of subsidiaries<br>▪ 100% of proceeds from incurrence of indebtedness<br>▪ 100% of insurance proceeds, tax refunds, and other extraordinary receipts |
| **Affirmative Covenants:** | Customary for facilities of this type and satisfactory to the DIP Lenders. |
| **Negative Covenants:** | Customary for facilities of this type and satisfactory to the DIP Lenders, including limitations on indebtedness, liens, asset sales, restricted payments and transactions with affiliates |
| **Financial Covenants:** | ▪ Maximum Permitted Variance against DIP Budget<br>▪ Minimum Liquidity |
| **Carve-Out** | An amount equal to the sum of i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or any Official Committee (as defined in the DIP Order) (collectively, the "Allowed Professional Fees") incurred by Estate Professionals (as defined in the DIP Order) at any time before or on the date of delivery by the DIP Agent (or the Prepetition Secured Parties (as defined in the DIP Order) after the indefeasible repayment of the DIP Obligations (as defined in the DIP Order) in full ) of a Carve Out Trigger Notice (as defined in the DIP Order) (the "Termination Declaration Date"), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $750,000 incurred following the Termination Declaration Date, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; provided, that under no circumstances shall any success, completion, or similar fees be paid from the Carve Out following delivery of a Carve Out Trigger Notice (as defined in the DIP Order) unless such fee was earned and payable prior to the Termination Declaration Date; provided, further that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any other grounds. |
| **Events of Default** | Customary for facilities of this type and satisfactory to the DIP Lenders. |
| **Indemnification and Expenses** | Customary indemnity and expense reimbursement provisions satisfactory to the DIP Lenders for the administrative agent, the lenders, their designated advisors and related persons. |

| Additional Diligence: | ▪ Call with management<br>▪ Review of COVID-19 Impact<br>▪ Review of Ankura liquidation analysis and smelter valuation<br>▪ Third party financial diligence<br>▪ Satisfactory review of bids and sale process<br>▪ Customary business and industry diligence<br>▪ Satisfactory legal diligence and documentation |
|---|---|
| Expense Deposit: | Yes |
| Target Close: | May 22, 2020 |
| Term Sheet Expiration Date: | May 20, 2020 |

**<u>EXHIBIT E</u>**

**EUROPEAN BRIDGE TERM SHEET**

**Exide Technologies – European Bridge Financing**

**Preliminary Summary of Terms and Conditions**

*This Preliminary Summary of Terms and Conditions ("Term Sheet") outlines certain indicative material terms and conditions with respect to the proposed financing described herein for Exide International Holdings LP and its subsidiaries (the "Company").*

**Implementation**

**The Consenting Creditors and the Company hereby agree and acknowledge that the transactions contemplated by this European Notes Term Sheet, remains subject in all respects to tax, securities laws, contract, and other due diligence and, structuring and definitive documentation. If the parties determine that the proposed transactions cannot be implemented as set forth in this Term Sheet (or it would be unduly burdensome to do so), the parties agree to negotiate in good faith such alternative transaction steps (and to modify this Term Sheet) in such a manner so as to provide the Company and the Lenders with substantially the same economic and legal rights and obligations (including as to consideration) as originally intended to the greatest extent possible; provided that any modifications to the transactions contemplated by this Term Sheet and any definitive documentation relating thereto shall be in form and substance reasonably acceptable to the Lenders.**

| Indicative Term: | Description: |
|---|---|
| **Notes Issuances** | **Initial Notes Issuance**: Up to $25 million (which shall be denominated in US Dollars) (the "**Initial Notes**") to be issued by Exide International Holdings LP (the "**European Issuer**"), all of which shall be issued and purchased on a date to be selected by the European Issuer in consultation with the Lenders on or around prior to [_____], 2020 (the "**Closing Date**"). <br><br> **Discretionary Notes Issuance**: Subject to the consent of the Lenders, at any time, up to $50 million (which shall be denominated in US Dollars) (the "**Discretionary Notes**", and together with the Initial Notes, the "**Notes**") may be issued by the European Issuer at the request of the European Issuer, but purchased in the discretion of the Lenders, all of which shall be issued and purchased on a closing date to be determined by the Lenders in consultation with the European Issuer (subject to satisfaction or waiver of the applicable conditions to purchase) (the "**Notes Delayed Draw Date**"). The European Issuer may not issue the Discretionary Notes to any purchaser other than the Lenders without the Lenders' prior consent. <br><br> Each holder of the Superpriority Lien Notes (as defined below) may participate in the Initial Notes Issuance and the Discretionary Notes Issuance for at least their pro rata amounts based on their respective holdings of the Superpriority Lien Notes. <br><br> The Notes will be purchased pursuant to a notes purchase agreement with terms and conditions customary to notes purchase agreements in connection with a Section 4(a)(2) offering and will be issued pursuant to an indenture subject to guarantees and security as described below. |
| **Guarantors** | Each non-U.S. domiciled subsidiary of the European Issuer that is a guarantor under the existing 10.75% Superpriority Lien Senior Secured Notes due 2021 (the "**Superpriority Lien Notes**") shall guarantee the Notes (collectively, the "**Guarantors**"). |
| **Lenders** | [_____] (collectively, the "**Lenders**"). |
| **Fees** | [TBD] |
| **Use of Proceeds** | For working capital and general corporate purposes of the European Issuer and its subsidiaries, in accordance with the Budget (as defined below). |
| **Maturity Date** | The aggregate outstanding principal amount of the Notes will be due and payable on the earlier to occur of (i) June 30, 2024 (the "**Maturity Date**") and (ii) acceleration of the Notes in accordance with the terms thereof (which shall not include an event of default triggered by the acceleration of any notes issued by an Exide U.S. entity as a result of the filing for |

Chapter 11 by the Company (the "**Chapter 11 Filing**"), so long as the European Issuer is not included in the Chapter 11 Filing.

Immediate automatic acceleration of the Notes if (i) the European Issuer and its subsidiaries are not separated from Exide U.S. entities within 6 months of the Closing Date and (ii) the European Issuer is not majority owned by a permitted holder group comprised of Mackay Shields LLC, D.E. Shaw & Co., L.P., AllianceBernstein Holding L.P., and Axar Capital Management L.P. and their affiliates (the "**Permitted Holders**") within 6 months of the Closing Date.

There will be no amortization of the Notes prior to the Maturity Date.

| | |
|---|---|
| **Interest Rate** | [TBD] |
| **Security Interest** | The Notes shall be secured exclusively by assets of the European Issuer and the Guarantors that constitute collateral for the existing Superpriority Lien Notes in the following order of payment (i) a first priority perfected lien on the Notes Priority Collateral (as defined in the Intercreditor Agreement), which lien shall rank, subject to the exceptions set forth in the Intercreditor Agreement, senior to each of the liens on the Notes Priority Collateral securing the Superpriority Lien Notes, the ABL Debt, and the First Lien Debt and (ii) a second priority perfected lien on the ABL Priority Collateral (as defined in the Intercreditor Agreement) (but senior to each of the Superpriority Lien Notes and the First Lien Debt), or, subject to the termination of the ABL Facility with respect to the European borrowers thereto, a first priority perfected lien on the ABL Collateral. <br><br> The existing intercreditor agreement dated June 17, 2019 (the "**Intercreditor Agreement**") among U.S. Bank National Association in each of its capacities as Superpriority Agent and Notes Control Agent, First Lien Agent, Second Lien Agent and Bank of America, N.A. as ABL Agent and ABL Control Agent, will be amended to include the Notes as having the priority set forth above. <br><br> The Company and the Lenders shall discuss alternative options to achieve a "first-out" senior lien with respect to the Notes without executing new security agreements – for example: amendment to the existing Superpriority Lien Notes security documents to include the Notes as "Secured Obligations" (or equivalent term) and subject to a collateral sharing agreement pursuant to which the Notes will be subject to a first-out priority in respect of proceeds of collateral. |
| **Conditions to Purchase** | Conditions to purchase will comprise (i) no Default or Event of Default under the Notes, (ii) each of the representations being true and correct in all material respects, (iii) customary deliverables, (iv) with respect to the Notes Delayed Draw Date, the European Issuer having not more than $[__] million in available cash.[1] |
| **Mandatory Redemption** | Mandatory redemption of the Notes plus accrued interest and fees will be required (to be applied ratably among the Notes) with: <br> • 100% of the net cash proceeds from any non-ordinary course sales and casualty events relating to the Notes Priority Collateral (as defined in the Intercreditor Agreement) (subject to thresholds and reinvestment rights to be agreed); and <br> • 100% of the net cash proceeds from issuances or incurrences of debt by the European Issuer and its subsidiaries (other than permitted indebtedness). |
| **Optional Redemption** | The Notes may be redeemed, in whole or in part, at the option of the Issuer at any time, at a redemption price equal to the greater of 100% of the principal amount to be redeemed and a "make-whole" redemption price, in either case, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. The indenture shall provide that the "make whole" premium applies if the Notes are accelerated (including as a result of automatic acceleration) as a result of bankruptcy or other events of default. |

---

[1] The maximum available cash condition to the delayed draw takes into account the potential for (i) COVID relief financing in certain jurisdictions and (ii) the refinancing of the existing ABL Facility solely with respect to European borrowers, each of which may reduce the requirement for further funding.

| | |
|---|---|
| **Budget** | The Company will deliver a budget for the period through the 6 month anniversary of the Closing Date (a "**Budget**"), which shall be reasonably satisfactory to the Lenders. Thereafter, the Company will deliver a Budget for each year for the life of the Notes, beginning with the Budget for the year ending December 31, 2021. |
| **Milestones** | The Company and the Lenders shall agree to certain milestones with respect to the Company's strategic review (the "**Milestones Covenant**"). |
| **Representations and Affirmative Covenants** | Representations, affirmative and financial reporting covenants and information rights to be substantially identical to those in the indenture governing the Superpriority Lien Notes (the "Existing Superpriority Lien Notes Indenture") and additionally, will include the Milestones Covenant. |
| **Negative Covenants** | Negative covenants to be substantially identical to those in the Existing Superpriority Lien Notes Indenture, subject to modifications to be agreed. The following covenant to be added: |
| | The Debtors shall (i) not directly or indirectly access, or attempt to access, any cash of the Europe/ROW Entities (including by exercise of set-off rights, cancellation of intercompany indebtedness, or otherwise) for the use or disposition of, or by, the Debtors and (ii) take all actions necessary to ensure that no cash or funds are paid, credited or otherwise transferred from any Europe/ROW Entity to the Debtors outside the ordinary course of business. |
| | "**Debtors**" means Exide Technologies, LLC (or any other entity that is the borrower under the DIP Term Loan), Exide Holdings, Inc., Dixie Metals Company, Refined Metals Corporation and Exide Delaware LLC. |
| | "**Europe/ROW Entities**" means non-Debtor entities that operate the Company's (i) the Transportation EMEA/ROW business segment, (ii) the Industrial EMEA/ROW business segment, (iii) Recycling EMEA/ROW segment and (iv) any combination of the items listed in sections (i) through (v) hereof. |
| **Events of Default** | Events of Default to be substantially identical to those in the Superpriority Lien Notes Indenture, subject to (i) modification to include events of default triggered by a failure to comply with the Milestones Covenant (subject to a cure period to be agreed); (ii) the Notes Purchase Agreement for the Notes will not include an event of default caused by the Chapter 11 Filing of the Company and its subsidiaries so long as the European Issuer is not included in such Chapter 11 Filing or for any Specified Default (as defined in the Restructuring Support Agreement) or any Event of Default arising as a result of any Specified Default; and (iii) any action by the Debtors to challenge, support or encourage a challenge of, or fail to oppose a challenge of (A) any payments made to the DIP Lenders (as defined below) or to the Prepetition Secured Noteholders (as defined below) or any liens granted in favor of the DIP Lenders or the Prepetition Secured Noteholders or (B) the validity or enforceability of any of the DIP Loan Documents, the legality, validity or enforceability of any of the DIP Term Loans (as defined below) or the obligations to the Prepetition Secured Noteholders being an event of default, except, in the case of both (A) and (B), any payments made pursuant to the DIP Order and any asset sales contemplated by the DIP Order. |
| | "**DIP Lenders**" means Blue Torch and other lenders under the $15 million last-out loan portion of the DIP Term Loans. |
| | "**DIP Term Loans**" means the $40 million super priority credit facility to the Debtors. |
| | "**Prepetition Secured Noteholders**" means holders of the (i) the Superpriority Lien Notes, (ii) 11% Exchange Priority Notes due 2024, and (iii) 11% First Lien Senior Secured Notes due 2024. |

| | |
|---|---|
| **Form** | The Notes will be issued and purchased pursuant to an indenture and will be issued pursuant to the exemption from the registration requirements of the U.S. Securities Act of 1933, as amended, pursuant to Section 4(a)(2) thereof.<br><br>The Notes will not be registered in any jurisdiction. |
| **Required Consents** | The consent of the requisite holders of the ABL Debt, the Superpriority Lien Notes and the First Lien Debt (in each case as defined in the Intercreditor Agreement) will be required in order to issue the Notes. |
| **Closing Date** | On or prior to [       ], 2020. |
| **Expense Reimbursement** | The Company shall reimburse the Lenders for their reasonable and customary out-of-pocket due diligence and legal expenses in accordance with the terms of that certain [reimbursement] letter agreement dated [_], 2020. |
| **Governing Law** | New York. |