# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:

EXIDE HOLDINGS, INC., *et al.*,

Debtors.[1]

: Chapter 11
:
: Case No. 20-11157 (CSS)
:
: (Jointly Administered)
:
: **Re: Docket Nos. 871**
:
: **Objection Deadline: October 7, 2020 at 4:00 p.m.**
:
: **Hearing Date: October 15, 2020 at 11:00 a.m.**

------------------------------------------------------------ x

## CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL'S PRELIMINARY OBJECTION TO CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS [DOCKET NO. 871][2]

The California Department of Toxic Substances Control ("DTSC") hereby files this preliminary objection (the "Objection") to confirmation of the *Second Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 871] or any subsequently amended version thereof (the "Plan")[3] as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] DTSC is required by the schedule to file this Objection before the Debtors have filed any evidence in support of confirmation of the Plan or any motion or other pleading setting forth their case for abandoning the Vernon Plant. In addition, discovery is ongoing and DTSC has had no opportunity to take any depositions. As a result, DTSC is filing this as a preliminary objection and reserves all of its rights to supplement this Objection.

[3] Capitalized terms used but not otherwise herein shall have the meanings ascribed to such terms in the respective First Day Pleadings.

## SUMMARY OF OBJECTIONS

1.      The Debtors' long-standing indifference to the environmental impact of their operations in California—and the catastrophic effect of that disregard on the surrounding communities—is a matter of public record. Exide's facility in Vernon, CA (the "Vernon Plant") spewed lead and other powerful neurotoxins throughout six southeast Los Angeles communities for years, including onto schools, parks and thousands of homes in working-class, primarily Latino neighborhoods. Although the Vernon Plant is closed, it remains highly contaminated and an ongoing daily risk to those same neighborhoods. *See Declaration of Grant Cope in Support of the California Department of Toxic Substances Control's Objections to Debtors' Second Amended Joint Chapter 11 Plan*, filed contemporaneously herewith ("Cope Decl.") ¶¶ 5–6. DTSC believes the remaining contamination at the Vernon Plant—in particular loose lead dust—poses an imminent and substantial danger to public health and the environment because the site requires daily lead-containment maintenance to protect surrounding communities, and will require such daily maintenance indefinitely unless and until the contamination is removed. *Id.* at ¶¶ 19, 29-39.

2.      Despite extensive negotiations, aided by skillful mediators, the Debtors (and the well-heeled entities controlling the Debtors' capital structure and acquiring the Debtors' most profitable assets) refused to address or provide any meaningful reconciliation for the Debtors' decades of wanton environmental damage. Worse, they now propose a potential outcome wherein the Vernon Plant could be abandoned—effectively orphaned onto the backs of the very same surrounding residents that have already suffered from the Plant—with insufficient funding to even make the site safe, while the Consenting Creditors hive off the Debtors' valuable assets and reap the benefit of non-consensual releases that believe make them untouchable for the damage.

3.      The Debtors' responsibility for the damage to California is inarguable. On March

11, 2015, the United States Attorney's Office for the Central District of California ("USAO") and

Exide Technologies entered into a Non-Prosecution Agreement (the "Non-Prosecution

Agreement") that required the Exide Technologies to immediately and forever close the Vernon

Plant and to pay $50 million to clean up the site and surrounding neighborhoods.[4] Exide admitted

committing felony violations of the hazardous waste laws and acknowledged responsibility for its

criminal conduct. Exide also admitted that the Vernon Plant produced a host of hazardous wastes,

including lead, cadmium, arsenic and volatile organic compounds. The Non-Prosecution

Agreement required Exide to immediately stop operations and begin the closure process for the

Vernon Plant, including demolition and cleanup of the site. The Debtors failed to meet their

obligations under the Non-Prosecution Agreement.

4.      In late 2017, the Debtors began a Phase 1 Closure of the Vernon Plant. To facilitate

the Phase 1 Closure, a temporary structure called the Full Enclosure Unit (the "FEU"), consisting

of scaffolding, trusses, and a polyethylene barrier, was erected around the Debtors' main operation

building to allow the safe decontamination and deconstruction of that building. The FEU is a

structure built specifically to be deconstructed and reconstructed so systematic demolition can

occur for different portions of that building. *See* Cope Decl. ¶ 30. Without the FEU and its

associated air pollution control devices and monitoring equipment, there would be releases and

migration of dust containing extremely high levels of lead and other metals. *Id*. The FEU system

is not a permanent solution to the danger posed by the Vernon Plant. It reportedly costs hundreds

of thousands of dollars per month to rent and requires daily operation, maintenance, inspections,

---

[4] A copy of the Non-Prosecution Agreement is available at https://documents.latimes.com/exide-non-prosecution-agreement/ *See also* https://www.justice.gov/usao-cdca/pr/exide-technologies-admits-role-major-hazardous-waste-case-and-agrees-permanently-close.

and monitoring to ensure hazardous materials do not escape the Vernon Plant and further contaminate the surrounding communities.

5.      The Debtors have not advanced this Phase 1 Closure plan sufficiently to avoid the ongoing need for the transitional solution of installing the FEU, therefore, the ongoing daily risk of release or discharge of lead remains. *Id*. at ¶29. Instead, on March 21, 2020, the Debtors cited the COVID-19 pandemic as a reason to discontinue all active closure work, claiming a *force majeure. Id*. at ¶24. Thereafter, Exide continued only the minimum tasks required to prevent additional releases at the Vernon Plant. *Id*. Meanwhile, the FEU and other equipment at the Vernon Plant continue to degrade. On April 20, 2020, DTSC directed the Debtors to resume their closure activities but on April 22, 2020, the Debtors reasserted their position that COVID-19 constituted a *force majeure*. On July 3, 2020, DTSC again directed the Debtors to restart their closure work, refuted the *force majeure* claim, and described in detail why neither the COVID-19 pandemic nor these Chapter 11 Cases constituted sufficient cause to halt the closure and corrective action at the Vernon Plant. The Debtors again ignored DTSC's direction, choosing instead to allow the imminent and identifiable harm to the citizens that live and work in the surrounding areas to continue. *Id*.

6.      The Debtors' position is particularly egregious because they know that the FEU is a temporary structure not designed to be the sole barrier between the highly contaminated areas inside the FEU and the local communities. Large amounts of highly noxious dirt and debris remain precariously protected by the FEU. *See* Cope Decl. at ¶¶ 17, 19, 21-23, 29-39.  As each day passes, the likelihood that the FEU fails increases—with the risk of failure exacerbated by both high summer temperatures and the extreme Santa Ana winds that typically occur in the fall. *Id*. at ¶30. The FEU has already torn and ripped on a number of occasions, resulting in violations cited by

DTSC and other regulatory authorities. *Id.* at ¶¶ 21-22. A catastrophic failure of the FEU would cause high levels of contaminated dust to escape, further harming the communities near the Vernon Plant. *Id.* at ¶ 31.

7.     Against that backdrop, the Debtors have proposed a patently unconfirmable plan that (i) does not address or relieve the imminent and identifiable harm to the communities surrounding the Vernon Plant; (ii) includes provisions that, if not satisfied, improperly and impermissibly cause the Vernon property to be deemed abandoned to Exide Technologies, LLC; (iii) inappropriately conditions the Plan's woefully insufficient distribution to California on the Bankruptcy Court's approval of impermissible non-consensual third-party releases; (iv) transfers the Debtors' profitable operations to their secured creditors (and major equity holders) in what amounts to a foreclosure sale; (v) provides for extensive unwarranted releases, injunctions, and exculpations; and (vi) fails to satisfy numerous provisions of section 1129 of the Bankruptcy Code.

8.     The Plan effectively foists all of the risk and costs of the Vernon Plant onto the shoulders of Californians and would allow the parties most responsible to walk away from an imminent and substantial public health risk with broad and full releases. Incredibly, the Plan seeks to "death trap" the Bankruptcy Court by conditioning DTSC's releases on whether the Debtors can meet their legal burden for the granting of non-consensual third party releases. The Plan is not confirmable by this Bankruptcy Court.

## BACKGROUND

### A.    Overview of Plan Process.

9.     It was clear from the outset of these Chapter 11 Cases that the Debtors would not emerge as a reorganized business and would instead liquidate their estates. Disclosure Statement at 4. The Debtors' estates include a number of highly contaminated properties and, on the

Commencement Date, the Debtors filed the *Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, if Necessary* [Docket No. 37] (the "<u>Settlement Procedures Motion</u>"). On June 9, 2020, the Bankruptcy Court entered an order (the "<u>Settlement Procedures Order</u>") granting the Settlement Procedures Motion. *Id.*

10. Pursuant to the Settlement Procedures Order, the Debtors, the Settling Governmental Authorities, DTSC, the Frisco Governmental Authorities, the Environmental Sureties, the Creditors Committee, and the Consenting Creditors engaged in good-faith and arm's-length negotiations to resolve the issues related to the Chapter 11 Cases. In early July 2020, the Debtors, the Settling Governmental Authorities, and DTSC engaged in a global mediation process that involved the participation of the Global Settlement Parties. *Id.* at 4-5.

11. On July 28, 2020, the mediators filed the *Mediators' Final Certificate of Completion File Pursuant to Order Granting Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, If Necessary* [Docket No. 622], and on July 29, 2020, the Mediators filed the *Clarification to Mediators' Final Certificate of Completion Filed Pursuant to Order Granting Motion of Debtors For Authorization To (I) Implement Mandatory Settlement Procedures For Non-Performing Properties and (II) Abandon Such Properties, If Necessary* [Docket No. 636] (the "<u>Mediators' Revised Certificate of Completion</u>"). *Id*. at 5. In the Mediators' Revised Certificate of Completion, the mediators announced the Global Settlement Parties and DTSC had accepted the Mediators' Proposal (as defined therein) and agreed to "recommend [the Mediators' Proposal] and commit to pursuing approvals [from those with authority] pursuant to applicable law expeditiously and in good faith, and subject to public comment where applicable." Mediators' Revised

Certificate of Completion at ¶4.

12.     All of the parties involved in the mediation understood that the Mediators' Proposal was subject to agreement on definitive documentation and approval of the parties with authority for certain of the Settling Governmental Authorities. The Debtors understood that, in the case of DTSC, the proposed settlement required the approval the Secretary of the California Environmental Protection Agency among others. Rather than wait for the approvals from those with authority, the Debtors instead filed the *Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* [Docket No. 742] (the "Initial Plan") and the Disclosure Statement on August 14, 2020. Absent the Global Settlement, the Initial Plan was not confirmable.

13.     DTSC understood that that Debtors would only proceed with the Initial Plan if all of the Settling Governmental Authorities (including DTSC) obtained approval of the proposed settled and negotiated specific provisions of the Initial Plan evidencing that understanding. DTSC and the other Settling Governmental Authorities also took steps to assure that their rights were preserved in the event the settlement was not completed as evidenced by the negotiation of a clawback in the Americas Sale Order and the multiple extensions of the Challenge Period. See Docket Nos. 789, 808, 840, 878, and 900.

14.     DTSC, the Debtors, and other Global Settlement Parties engaged in significant negotiation and discussion of the settlement documents. Those negotiations, and the subsequent approval process, lasted for approximately a month and a half. Ultimately, DTSC rejected the settlement on September 18, 2020.

15.     The Debtors, hastily converted the Initial Plan into the Plan, and requested the Bankruptcy Court expeditiously confirm the Plan. The Debtors did not (i) file a motion seeking abandonment or present their case in support of abandonment, (ii) provide any evidence in support

of confirmation of the Plan, (iii) provide DTSC with a meaningful opportunity to challenge the Plan, (iv) modify their Disclosure Statement to reflect the terms the Plan or (v) otherwise follow even basic procedure. Instead, the Debtors—and their controlling Consenting Creditors—clearly intend to try to use the confirmation process to deprive DTSC of basic procedural fairness and force through an unconfirmable Plan.  And, they are asking the Court to be complicit in that plan.

**B.**     **Summary of Provisions of Plan Applicable to DTSC.**

16.     The Plan classifies Environmental NPP Claims in Class 8. Environmental NPP Claims include both DTSC's claims (referred to as Vernon NPP Claims) and all other Environmental NPP Claims (those of the Settling Governmental Agencies). Section 4.8(b)(i)(A) of the Plan provides that a holder of Environmental NPP Claim (other than DTSC) receives beneficial interests in the Environmental Response Trust. The Environmental Response Trust is established in accordance with the Environmental Settlement Documents and vested with: (a) $7,412,477 in Cash, (b) the contributions by Westchester in accordance with the terms of the Environmental Trust Agreements, with respect to the Transferred Non-Performing Properties, (c) the Transferred Non-Performing Properties or any proceeds thereof to the extent a Transferred Non-Performing Property is sold prior to the Effective Date, and (d) the Environmental Trust Causes of Action related to the Transferred Non-Performing Properties. The Environmental Settlement Documents provide that, in certain circumstances, holders of Environmental NPP Claims (other than DTSC) can share in the residual value of any of the Transferred Non-Performing Properties after cleanup obligations are satisfied.

17.     By contrast, Section 4.8(b)(i) of the Plan enumerates three alternative treatments of Environmental NPP Claims held by parties that are not Global Settlement Parties, which is only DTSC. The treatment of DTSC's claims is dependent upon the satisfaction of two conditions: (i)

the Payment Condition (which requires the Bankruptcy Court to impose a non-consensual

discharge and release of the Debtors and numerous third parties, as set forth in Section 10.6 of the

Plan, on all California state agencies, including DTSC, that have jurisdiction regarding the

enforcement of Environmental Laws) and (ii) the Vernon Trust Condition (which requires DTSC

to reach an agreement with the Vernon Environmental Trustee that contains, among other things

covenants not to sue in favor of the Transferred Entities). The satisfaction (or not) of these two

conditions dictates the treatment provided on account of Environmental NPP Claims held by

DTSC.

18.     Specifically, the Plan provides for three alternate scenarios:

i.    Scenario 1: If the Payment Condition and the Vernon Trust Condition are both
satisfied, DTSC will receive beneficial interests in the Vernon Environmental
Trust. The Vernon Environmental Trust is established in accordance with the
Environmental Settlement Documents and vested with (a) $2,587,523 in Cash, (b)
the Vernon Non-Performing Property or any proceeds thereof to the extent the
Vernon Non-Performing Property is sold prior to the Effective Date, and (c) the
Vernon Environmental Trust Causes of Action;

ii.   Scenario 2: If the Payment Condition is satisfied but the Vernon Trust Condition is
not satisfied, then the Vernon Plant is abandoned to Exide Technologies, LLC on
the Effective Date, free and clear of all Liens and the Vernon Global Settlement
Payment is paid to the Vernon Standby Trust; or

iii.  Scenario 3: If the Payment Condition is not satisfied, then the Vernon Global
Settlement Payment is not paid and the Vernon Plant is abandoned to Exide
Technologies, LLC on the Effective Date subject to a first priority lien in favor of
DTSC.

19.     The Plan also provides that any Vernon NPP Claims against the Debtors shall be

Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a

Priority Non-Tax Claim, or an Other Secured Claim. Plan at §5.2(e).

20.     Finally, the Plan includes releases applicable to DTSC in Sections 10.5 and 10.6

that are far broader and more burdensome than those agreed to by the Settling Governmental

Authorities in the Environmental Settlement Agreement. The chart below (the "Release Chart")

summarizes the disparity in the various release sections:

| Issue | Plan (DTSC only) | Environmental Settlement Agreement (Environmental Agencies Outside California) |
|---|---|---|
| Identity of Releasing Parties | Releasing Parties under the Plan are broad and include:<br><br>▪ "all California state governmental agencies, including [DTSC], that have jurisdiction regarding the enforcement of Environmental Laws" Plan §10.6(f).<br><br>▪ "such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Person or Entity solely with respect to the matters for which the Releasing Parties are providing releases . . ." Plan §10.6(g). | Releasing Parties under Environmental Settlement Agreement are limited to:<br><br>▪ the Department of Justice on behalf of the U.S. Environmental Protection Agency (and any successor department or agencies of the United States).<br><br>▪ only the specified Settling Governmental Authorities. |
| Identity of Released Parties | The scope of the parties being released pursuant to the Plan is broad and includes parties not listed in the Environmental Settlement Agreement, including:<br><br>▪ DIP Lenders<br>▪ DIP Agent<br>▪ Creditors' Committee and its members<br>▪ A broader definition of "Related Parties" (discussed below) Plan §§1.172, 10.5, 10.6 | The scope of the Governmental Releases and Covenants Not to Sue is narrower, and the Environmental Settlement Agreement excludes a number of parties included as Released Parties in the Plan. |
| Debtors' Related Parties | The Plan includes a number of Debtor "Related Parties" that benefit from the releases in the Plan but do not benefit from the releases and covenants not to sue in the Environmental Settlement Agreement. Those parties included in the Plan (but not in the Environmental Settlement Agreement) include:<br><br>▪ subsidiaries<br>▪ Affiliates<br>▪ managed accounts or funds<br>▪ fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors<br>▪ agents<br>▪ advisory board members<br>▪ financial advisors, attorneys, accountants, investment bankers, consultants, and representatives<br>▪ management companies<br>▪ fund advisors and other professionals, solely to the | The scope of the "Related Parties" is far narrower in the Environmental Settlement Agreement. The Environmental Settlement Agreement excludes a number of parties included in the Plan as Debtors' "Related Parties" and includes only one party not listed in the Plan:<br><br>▪ trustees |

| Issue | Plan (DTSC only) | Environmental Settlement Agreement (Environmental Agencies Outside California) |
|---|---|---|
| | extent such person and entities acted on behalf of the Released Parties<br>▪ Persons' respective heirs, executors, estates, servants and nominees. Plan §1.171 | |
| Related Parties for Consenting Creditors, Trustees, Europe/ROW Purchaser and Transferred Entities | The Plan includes a number of parties related to the Consenting Creditors, Trustees, Europe/ROW Purchaser and Transferred Entities which benefit from the releases in the Plan, but do not benefit from the releases and covenants not to sue in the Environmental Settlement Agreement. Those parties included in the Plan (but not in the Environmental Settlement Agreement) include:<br><br>▪ subsidiaries<br>▪ Affiliates<br>▪ managed accounts or funds<br>▪ agents<br>▪ advisory board members<br>▪ financial advisors, attorneys, accountants, investment bankers, consultants, and representatives<br>▪ management companies<br>▪ fund advisors and other professionals, solely to the extent such person and entities acted on behalf of the Released Parties<br>▪ Persons' respective heirs, executors, estates, servants and nominees Plan §1.171 | The scope of the parties related to the Consenting Creditors, Trustees, Europe/ROW Purchaser and Transferred Entities that benefit from the Governmental Releases and Covenants Not to Sue is far narrower. The Environmental Settlement Agreement excludes a number of parties included in the Plan as "Related Parties" and includes only one party not listed in the Plan:<br><br>▪ trustees |
| Scope of Debtor Releases | The scope of the releases of the Debtors and Related Parties is broader in the Plan than in the Environmental Settlement Agreement. The releases in the Plan include:<br><br>▪ All Claims and Causes of Action (including injunctive relief)<br>▪ Claims and Causes of Action under the broadly defined term Environmental Law<br>▪ Releases are not limited to the Vernon Plant<br><br>In addition, the Debtors' releases under the Plan include Claims or Causes of Action relating to:<br><br>▪ Chapter 11 Cases<br>▪ pre-and post-petition marketing process<br>▪ Europe/ROW Sale Transaction<br>▪ DIP Facility<br>▪ European Bridge Notes<br>▪ Pension Plan | The DOJ and Global Settlement Parties are only providing covenants not to file a civil action or take any administrative or other civil action against the Debtors pursuant to CERCLA and RCRA, or any similar state laws with respect to each of the Included NPPs. |

| Issue | Plan (DTSC only) | Environmental Settlement Agreement (Environmental Agencies Outside California) |
|---|---|---|
| | <ul><li>Optimization</li><li>June 2019 Financing</li><li>Global Settlement</li><li>Purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Estate</li><li>Subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan</li><li>Business or contractual arrangements between any Debtor and any Released Party</li><li>Restructuring of Claims and Interests before or during the Chapter 11 Cases</li><li>Disclosure Statement</li><li>RSA</li><li>Plan (including nay Plan Supplement)</li><li>DIP Loan Documents or any related agreements (including the Definitive Documents)</li><li>instruments, and other documents relating thereto</li><li>solicitation of votes with respect to the Plan</li><li>any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. Plan §10.6</li></ul> | |
| Scope of Releases for Consenting Creditors, Trustees, Europe/ROW Purchaser and Transferred Entities | The scope of the releases for the Consenting Creditors, Trustees, Europe/ROW Purchaser, and Transferred Entities under the Plan is substantially similar to the Scope of Debtor Releases described above, including releasing all Claims and Causes of Action under Environmental Law. Plan §10.6 | The scope of the Governmental Releases and Covenants Not to Sue as to the Consenting Creditors, Trustees, Europe/ROW Purchaser, and Transferred Entities is similar to the releases provided in the Plan but are more narrowly tailored and do not apply to as many parties and are limited to civil action or administrative or other civil action pursuant to CERCLA and RCRA or any similar state laws with respect to each of the Included NPPs. |

## ARGUMENT

### A.    The Plan Impermissibly Deems the Vernon Plant Abandoned.

21.     The Plan seeks to strong arm both DTSC and the Court by proposing that if either the Payment Condition or the Vernon Trust Condition fails, the Vernon Plant shall be "deemed" abandoned to Exide Technologies, LLC.  The Debtors have not provided any evidence that such abandonment is permitted by law and have not provided a process for the required full and fair hearing of those issues. Nor does DTSC believe that abandonment is appropriate where, as here, the contaminated property requires active monitoring to avoid actual danger to the surrounding area.

22.     Section 554(a) of the Bankruptcy Code provides, after *notice and a hearing*, the trustee *may* abandon any property of the estate that is *burdensome* to the estate or that is of *inconsequential value and benefit* to the estate. 11 U.S.C. § 554(a) (emphasis added). The Bankruptcy Code is clear, "after notice and a hearing [] means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). Further, Local Rule 9006-1 provides that "[n]o motion will be scheduled on less notice than [fourteen (14) days prior to the hearing date] except by order of the Court on written notice specifying the exigencies justifying shortened notice.

23.     The Debtors have never filed a motion seeking to abandon the Vernon Plant. The only "notice" the Debtors provided that the Vernon Plant might be abandoned was in their modified Plan, which provides that, upon the non-occurrence of certain conditions and "pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the [Vernon Plant] shall be deemed abandoned." The Debtors have not presented a *prima facie* case (or any case) that the Vernon Plant may be abandoned and instead seem to assume that this Court will simply ignore the necessary

procedural safeguards to achieve confirmation.

24.     But this Bankruptcy Court already recognized the need to carefully evaluate any request by the Debtors to abandon a Non-Performing Property in the *Order Governing Settlement Procedures With Governmental Agencies Relating to Non-Performing Properties* [Docket No. 242] (the "Settlement Procedures Order"). The Settlement Procedures Order provides that if the participants to the mediation are unable to reach an agreement, the Debtors and the governmental agency must present the Bankruptcy Court with a scheduling order setting forth applicable deadlines for adjudicating any request by the Debtors to abandon a Non-Performing Property under section 554(a) of the Bankruptcy Code and any conditions to meet the requirements of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986). Settlement Procedures Order at 10-11. The Settlement Procedures Order further provided that any such proposed scheduling order must include deadlines related to fact discovery, including depositions, a deadline for the Debtors to file a motion seeking to abandon the relevant Non-Performing Property, and a deadline for the governmental agency to file a response to the Debtors' motion seeking to abandon the Non-Performing Property. *Id.* at 11.

25.     The failure to follow the appropriate procedures for abandoning the Vernon Plant is particularly egregious because the burden of proof is initially on the party seeking to abandon, in this instance, the Debtor, to establish that the property is burdensome or of inconsequential value or benefit to the estate. *In re Dewsnup*, 908 F.2d 588, 590 (10th Cir. 1990), *aff'd sub. Nom. Dewsnup v. Timm*, 502 U.S. 410 (1992). If that party meets their burden, the burden then shifts to the party opposing abandonment to apply an exception to the trustee's abandonment power. *Id.*

26.     In *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986), the Supreme Court ruled that when Congress enacted section 544

of the Bankruptcy Code, there were "well-recognized restrictions on a trustee's abandonment power." *Id*. at 501. The Court further found, "One cannot assume that [in enacting section 554(a)] Congress . . . intended to discard a well-established judicial restriction on the abandonment power" and "also presumably included the established corollary that a trustee could not exercise [its] abandonment power in violation of certain state and federal laws." *Id*. at 501-502.

27.     In short, the Debtors may not simply "deem" the Vernon Plant abandoned because the following four considerations render abandonment impermissible (i) an identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety, (ii) abandonment of the property violates California law and regulations, (iii) the statutes and regulations being violated are reasonably designed to protect the public health and safety from the imminent and identifiable harm caused by the hazards identified at the Vernon Plant, and (iv) compliance with the statute or regulation would not be so onerous as to interfere with the bankruptcy administration itself.

i.      ***An identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety.***

28.     *Midlantic* bars a specific abandonment of property if an identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety. In *Midlantic*, the existence of an identified hazard was not in dispute as the debtors' property contained 470,000 gallons of highly toxic and carcinogenic waste oil in unguarded, deteriorating containers "present[ing] risks of explosion, fire, contamination of water supplies, destruction of natural resources, and injury, genetic damage, or death through personal contact." *Midlantic*, 474 U.S. at 499 n. 3. Similar to *Midlantic*, the existence of an identified hazard at the Vernon Plant is not in dispute. *See* Messing Decl. ¶ 71-73; *see also* Non-Prosecution Agreement, Appendix 1 at 1-2 ("[The Vernon Plant] generates hazardous wastes, including corrosive fluids and waste containing

metals such as lead, cadmium, arsenic, antimony, zinc and chromium.").

29.     The Non-Prosecution Agreement required the Debtors to immediately and permanently cease recycling operations at the Vernon Plant, close the facilities at the Vernon Plant, demolish, deconstruct, and remove all facility structures, equipment, and appurtenances, and correct and remediate any surface, subsurface, and groundwater contamination, in accordance with the terms of the Closure and Clean-Up Agreements and Closure/Post-Closure Plan (each as defined in the Non-Prosecution Agreement). In late 2017, the Debtors commenced the first phase of the closure, which included the decontamination, deconstruction, and disposal of nearly all of the equipment and buildings that were previously used to handle hazardous waste, primarily spent lead acid batteries, at the Vernon Plant. *See* Cope Decl. ¶¶ 12, 17.

30.     To undertake that closure, the FEU was erected to temporarily allow the safe decontamination and deconstruction of the building previously used for production work (the "Containment Building"). The FEU incorporates numerous air pollution control devices, including air scrubbers and baghouses, as well as monitoring equipment, which are critical components to prevent off-site migration of dust. As the FEU is a temporary structure, it requires daily operations, maintenance, inspections, and monitoring and active operation and maintenance is necessary to maintain a negative pressure environment to prevent the release of lead dust into the surrounding community. *Id*. at ¶¶ 17, 19-20.

31.     Large amounts of dust remains inside the Containment Building, and that dust is extremely high in contents of lead and other metals—orders of magnitude greater than dust located outside the FEU. *Id*. at ¶ 31. The levels of concentration of lead in the dust at the site (10,500 mg/kg to 58,000 mg/kg) are at least 100 to 1,000 times higher than the CalEPA/DTSC commercial/industrial and residential soil/dust screening level (320 mg/kg and 80/kg) for lead. *Id*.

at ¶35. DTSC testing at the Vernon Plant also indicates that significant levels of arsenic, and other dangerous materials, are present in the dust and soil at the Vernon Plant. *Id*. at ¶ 5. In addition, the wastewater treatment plant, surface impoundment, and storm water conveyance system are critical infrastructure to prevent the release of lead contaminated water to local surface water bodies. *Id*. at ¶¶ 38-39. These systems are critical, and require ongoing operations and maintenance to prevent and mitigate the risk of noxious material from reaching groundwater and surface waters. *Id*. Failure to monitor and repair liners and other leak prevention systems are paramount to preventing lead and other carcinogens from reaching important aquifers and other water sources. *Id*. Yet following the commencement of these Chapter 11 Cases, the Debtors ceased the required maintenance and repair of these systems.

32.    To date, only one of the three distinct segments of the Containment Building has been demolished. The FEU is currently located over the portion of the Containment Building that previously operated as the Smelter Building, with only the FEU preventing further dispersion of lead. Inside of the FEU is essentially an active demolition project, but one that was abruptly halted without appropriate or safe mothballing, only the FEU.

33.    The FEU is a temporary structure, it was not designed to remain in place for an indefinite amount of time, rather it was designed to act only as a short-term safeguard between the highly contaminated environment inside the FEU and the surrounding community. *Id*. at ¶ 30. Simply stated, the likelihood of failure of the FEU increases as time passes and that risk is further exacerbated by the high summer temperatures and the Santa Ana winds (most common in the fall and spring). *Id*. Despite regular ongoing inspections and maintenance, there have been several large tears in the approximate two years of the FEU's operation. *Id*. at ¶¶ 21-23, 30.

34.    There remains a significant potential for near future harms associated with the

abandonment of the Vernon Plant. Those harms include: (i) on-site exposure to surface dust with high lead concentrations; (ii) off-site dust and dirt exposure (i.e., lead-dust on neighboring properties); and (iii) exposure to contaminated surface water (e.g., related to failure of the water treatment plant, overflow of the storm water conveyance system, and the surface impoundment, etc.). *Id*. at ¶¶ 29-39.

35.     Therefore, an identified hazard exists at the Vernon Plant and that hazard—the massive amounts of dust and material laden with lead and other hazardous materials that require constant monitoring to assure they are even temporarily contained—poses a risk of imminent and identifiable harm to the public health and safety.

## ii.    *The abandonment of the property will violate a state statute or regulation.*

36.     As the owner and operator of the Vernon Plant, Debtor Exide Technology is required by California's Hazardous Waste Control Law ("HWCL") and its implementing regulations to maintain the safety of the Plant and to conduct specific cleanup activities. Cal. Health and Safety Code §§ 25100-25259; Cal Code Regs, Title 22, Div. 4.5, 66360.1 *et seq.* ("Title 22"). As the owner and operator of the property, the Debtors are required to "manage and operate [the Vernon Plant] according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b). If Debtors are allowed to abandon the Vernon Plant, the Vernon Plant will be left in a condition that does and will violate numerous provisions of the HWCL.

37.     Three sets of requirements will be violated by abandonment of the Vernon Plant. First, the Vernon Plant will be out of compliance with its fundamental obligation to prevent releases, its obligations to conduct closure, and its obligation to conduct corrective action. The latter two are required not only by the statutes and regulations, but also by enforceable orders that

DTSC issued at various times throughout the Debtors' ownership of the Vernon Plant. These orders are aimed at remediating the Plant and surrounding contaminated areas and protecting the health and safety of nearby residents. *See* Cope Decl. ¶¶ 7-16; *see also Jalbert v. XL Insurance America, Inc.*, No. CV 17-7167-GW, 2018 WL 4850403, at *3 (C.D. Cal., June 7, 2018) (discussing undisputed facts regarding Exide's operation and DTSC's regulation of the Vernon Plant).

38.     The HWCL's overarching safety requirement is specified at Title 22, section 66265.31. The Vernon Plant must be "operated to minimize the possibility of . . . any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment."  *See* Cope Decl. ¶¶ 7-16. There are also specific requirements applicable to the Containment Building. For example, the owner and operator must "use controls and practices to ensure containment of the hazardous waste within the unit." *Id.* § 66265.1101(c).

39.     As discussed above, diligent maintenance of the FEU is required to prevent releases of highly toxic lead dust into the air and the surrounding community. If the Vernon Plant is abandoned, Debtors' funding for, and therefore maintenance of the FEU will stop and the plant will immediately be in violation of Title 22, sections 66265.31 & 66265.1101(c) and numerous other HWCL requirements.

40. As noted above, Debtors have ongoing obligations under two separate HWCL protocols for investigating or removing contamination: "closure" and "corrective action."

41.     The *closure* process applies to any hazardous waste management unit, for example a surface impoundment or containment building that the facility used to treat, store, or dispose of hazardous waste. In accordance with a DTSC-approved closure plan, the owner or operator of the

facility must close each hazardous waste management unit in a manner that "[m]inimizes the need for further maintenance" and that "minimizes or eliminates . . . post-closure escape of hazardous wastes [or] hazardous constituents." Cal. Code of Regulations, Title 22, § 66265.111. The owner and operator of a facility "for which closure and postclosure plans have been approved *shall carry out the plans during the closure and postclosure period required by law*." Cal. Health & Safety Code § 25248 (emphasis added).

42.     Abandonment will prevent Debtors from completing closure work at the Vernon Plant in violation of the HWCL requirements and DTSC's Orders. Pursuant to Section 25248 of the HWCL, on November 20, 2014, during Exide's prior bankruptcy proceedings, this Court authorized Exide to enter into the 2014 Stipulation and Order, docket HWCA No. 2014-6489. The 2014 Stipulation and Order was intended, among other things, to resolve disputes regarding the Closure/Post Closure Plan and the cost of implementing it. Exide has completed some of the steps required in Phase 1 of the final Closure Plan, but numerous steps remain.  Indeed, even before Exide claimed a *force majeure* as an excuse to halt the closure work in early 2020, Exide was not scheduled to finish the Phase 1 work until December 2021.  DTSC estimates that completing that work, as is required to stabilize the property and mitigate the risk of imminent harm, will cost approximately $72 million, which far exceeds the financial assurance provided by Exide under the 2014 Stipulation and Order, as amended. *See Declaration of Perry Myers in Support of the California Department of Toxic Substances Control's Objections to Debtors' Second Amended Joint Chapter 11 Plan*, filed contemporaneously herewith, ¶ 2; Cope Decl. ¶ 41. Further, two additional closure/post-closure phases need to be completed. By abandoning the property, Exide will leave the property with entire phases of closure unfinished; Cope Decl. ¶ 12.

43.     The *corrective action* process applies to releases of hazardous waste or constituents

that occurred outside the hazardous waste management units. Whenever DTSC "determines that there is or has been a release . . . of hazardous waste or constituents into the environment from a hazardous waste facility," Health and Safety Code section 25187(b) authorizes DTSC to issue an "order for corrective action." DTSC has issued such orders to Exide.

44.    Abandonment would violate Exide's corrective action obligations. Pursuant to Section 25187 of the HWCL, in February 2002, DTSC issued a Corrective Action Consent Order (the "CACO") to Exide. Under the CACO, Exide is required to, *inter alia*, undertake corrective action of and investigate releases at and from the Vernon Plant. For example, in July 2020 DTSC ordered Exide to undertake corrective action work after further investigation of the Vernon Plant found high levels of metals in dust and dirt onsite. Cope Decl. ¶ 16. If Exide is allowed to abandon the Vernon Plant without undertaking such corrective action work, there is risk of imminent harm posed by such high metal concentrations will be great. *Id*. at ¶¶ 35-37.

iii.    ***The statutes and regulations being violated are reasonably designed to protect the public health and safety from imminent and identifiable harm caused by identified hazards.***

45.    The HWCL, and the numerous provisions that abandonment would violate, are specifically designed to protect the public health and safety from imminent and identifiable harms caused by the release and disposal of hazardous waste. *See* Cal. Health and Safety Code §§ 25100, 25101; *Dep't of Toxic Substances Control v. Superior Court*, 44 Cal. App. 4th 1418, 1424 (Cal. Ct. App. 1996) ("Our Legislature enacted the HWCL to protect California's citizens and its environment from the unreasonable threat posed by the improper treatment, storage and disposal of hazardous waste."); *see also People v. Taylor*, 7 Cal. App. 4th 677, 688 (Cal. Ct. App. 1992). The HWCL establishes comprehensive "cradle to grave" standards for the generation, storage, transportation, treatment, and disposal of hazardous waste in California. Cal. Health and Safety Code §§ 25189.1, 25352.

46.    In enacting the HWCL, the California Legislature found that there were long-term threats to public health, air, and water quality posed "by the inappropriate handling, storage, use, and disposal of hazardous wastes" and declared that "[i]n order to protect the public health and the environment . . . , it is in the public interest to establish regulations and incentives which ensure that the generators of hazardous waste employ technology and management practices for the safe handling, treatment, recycling, and destruction of their hazardous wastes prior to disposal." Cal. Health and Safety Code §§ 25100(b), 25101(a).

47.    The HWCL includes numerous provisions specifically targeted to prevent, address, and ameliorate imminent harms to public health and the environment. *See, e.g.*, Cal. Health and Safety Code §§ 25186.2 ("The department may temporarily suspend any permit, registration, or certificate issued pursuant to this chapter prior to any hearing if the department determines that conditions may present an imminent and substantial endangerment to the public health or safety or the environment."); 25187(h) ("Any provision of an order issued under this section . . . effect upon issuance by the department . . . if the department . . . finds that the violation or violations of law associated with that provision may pose an imminent and substantial endangerment to the public health or safety or the environment . . . ."); 25187.5 ("If corrective action is not taken on or before the date specified in an order issued pursuant to Section 25187, or if in the judgment of the department immediate corrective action is necessary to remedy or prevent an imminent substantial danger to the public health, domestic livestock, wildlife, or the environment, the department may take, or contract for the taking of, that corrective action and recover the cost thereof as provided in subdivision (c).").

48.    Further, California administers the HWCL in lieu of federal administration of the federal Resource Conservation and Recovery Act ("RCRA"), which was likewise enacted to

protect public and safety from environmental harm. 42 U.S.C. § 6926; Cal. Health & Safety Code §§ 25101(d); 25159; *California ex rel. Ingenito v. U.S. Army*, 91 F. Supp. 3d 1185, 1186 (E.D. Cal. 2015) ("California enacted the HWCL as the analogue to RCRA, finding it was in the best interest of Californians for the state to administer its own program."); *see also United States v. Humphries*, 728 F.3d 1028, 1032 (9th Cir. 2013) (describing the purpose of RCRA which is "to subject hazardous waste to 'cradle-to-grave' regulation in order to protect public health and the environment.") (quoting *Am. Chemistry Council v. EPA*, 337 F.3d 1060, 1065 (D.C. Cir. 2003); *West Virginia State Univ. Bd. of Governors for and on behalf of West Virginia State Univ. v. The Dow Chemical Co.*, No. 2:17-cv-3558, 2020 WL 2842057, at *14 (S.D. W.Va., June 1, 2020) ("RCRA seeks to achieve its goals by assuring that hazardous waste management practices are conducted in a manner which protects human health and the environment, and requiring that hazardous waste be properly managed in the first instance thereby reducing the need for corrective action at a future date.") (citing and quoting 42 U.S.C. 6902(a)(4)–(5)) (internal quotations omitted).

49.     Accordingly, it is beyond argument that the HWCL and its implementing regulations were specifically designed and intended to protect the public health and safety from imminent and identifiable harms caused by the release and disposal of hazardous waste. *Dep't of Toxic Substances Control*, 44 Cal. App. 4th at 1424.

### iv.     *Compliance with the statutes and regulations would not be so onerous as to interfere with the bankruptcy administration itself.*

50.     Compliance with the applicable California laws and regulations is not so onerous as to interfere with the bankruptcy process itself. *Midlantic*, 474 U.S. at 507. Nor would compliance with the applicable state laws—designed to protect the public health and safety— obstruct or prevent distribution of estate assets. *See, e.g. In re Guterl Special Steel Corp.*, 316 B.R.

843, 860 (Bankr. W.D. Pa. 2004) ("Supreme Court appeared to leave open the possibility that abandonment is permissible where rigid adherence to a state law or regulation designed to protect public health and safety was so 'onerous' as to interfere with the bankruptcy process itself...[one] which, if enforced, would obstruct or prevent expeditious distribution of estate assets.").

51.    Compliance with the HWCL and DTSC's Orders will not interfere with the bankruptcy process nor obstruct or prevent the expeditious distribution of estate assets. Of course, compliance with the HWCL and DTSC's Orders requires funding and the Debtors have valuable assets, which could be tapped for such funding. Instead, the Debtors (and their controlling Consenting Creditors) seek to run what amounts to a foreclosure sale through a Chapter 11 plan rendering those assets unavailable to fund environmental cleanup. Worse still, those same parties seek extremely broad releases that if imposed would prevent DTSC from seeking funding from or asserting claims against those parties.  It is important to note that the test is not whether compliance with environmental protection laws and orders will interfere with a debtor's *particular scheme* of bankruptcy. The test is whether there is *any* bankruptcy process and expeditious distribution available that still allows compliance with environmental protection laws and orders.  Here there is: a Chapter 11 plan that (i) actually funds the work necessary (even if done by others) to remediate the imminent and identifiable harm and leave the property in a safe state and (ii) does not release parties so that DTSC retains claims. The Debtors and the Consenting Creditors simply have failed to propose such a plan. If the Debtor are unwilling to propose a Chapter 11 plan that allows compliance with their obligations under applicable state law, they should not be permitted to continue the Chapter 11 Cases or receive the benefits afforded by the confirmation of a Chapter 11 plan that amounts to a foreclosure sale with releases.

**B.**     **The Plan Does Not Meet the Requirements of Section 1129.**

52.     The Debtors bear the burden of proving, by a preponderance of the evidence, that each of the requirements of section 1129(a) of the Bankruptcy Code is satisfied with respect to the Plan. *See In re Paragon Offshore PLC*, No. 16-10386 (CSS), 2016 WL 6699318, at *1 (Bankr. D. Del. Nov. 15, 2016); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("For the court to confirm a plan, the plan proponents must establish by a preponderance of the evidence that the plan satisfies each of the requirements of 11 U.S.C. § 1129"). The Plan fails a number of the requirements of section 1129(a) of the Bankruptcy Code, including sections 1129(a)(1), (3), (5), (7), (8), (9), (10), and (11); therefore, the Plan cannot be confirmed.

*i.*     ***The Plan does not comply with Section 1129(a)(1) of the Bankruptcy Code as the Plan fails to provide the same treatment for each Claim or Interest within a particular Class.***

53.     Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[t]he plan complies with the applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(1). The phrase "applicable provisions" includes sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the contents of a plan of reorganization. *See, e.g., Kane v. Johns-Mansville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988); *In re S&W Enterprise*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [Section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123.") (internal citations omitted).

54.     The Plan fails to satisfy the requirements of Section 1123(a)(4), which mandates that a chapter 11 plan:

> provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

11 U.S.C. §1124(a)(4). The tenet of equality of treatment codified in Section 1124(a)(4) is a critical component of the Bankruptcy Code. *See In re Combustion Eng'g, Inc.* 391 F.3d 190, 239 (3d Cir. 2004) ("Equality of distribution among distribution among creditors is a central policy of the Bankruptcy Code.") (citations omitted). While section 1123(a)(4) does not require precise equality—only approximate equality—differences in the distributions and other procedural variations that produce a substantive difference in the opportunity to recover violate section 1123(a)(4). *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013); *In re Dow Corning Corp.*, 280 F.3d 648, 660 (6th Cir. 2002) (holding that a difference in the procedural protections offered to certain claimants violated section 1123(a)(4) because some claimants were "accorded far more effective recovery rights" than others).

55.     The Plan clearly—and purposefully—fails to satisfy section 1123(a)(4). The Plan provides different and less favorable treatment to members of Class 8 based on whether such claim holder is a Global Settlement Party. The Plan appears designed to impose that disparate treatment to punish DTSC for not agreeing to the terms of the Environmental Settlement Documents. DTSC has not consented to such less favorable treatment and the Debtors cannot force DTSC to accept such treatment without DTSC's consent.

56.     As discussed above, the Plan provides three different treatment options depending on whether or not two different conditions are satisfied. Subsections (a), (b), and (c) below explain why, regardless of which treatment option applies, the Plan fails to satisfy section 1123(a)(4).

**a.   If the Payment Condition and the Vernon Trust Condition are both satisfied, the Treatment Provided to DTSC under the Plan does not, and cannot, comply with Bankruptcy Code Section 1123(a)(4).**

57.     In the circumstances where both the Payment Condition and the Vernon Trust Condition are met, the Plan treatment for DTSC still differs materially from other holders of Environmental NPP Claims in the following respects:  (i) DTSC receives its treatment only if

certain conditions outside its control are met, (ii) DTSC receives less than its pro rata share of the economic consideration being provided to Class 8 holders, and (iii) as set forth in the Release Chart above, DTSC is forced to provide releases that are broader than those voluntarily granted by other holders of Environmental NPP Claims.

58.     DTSC receives its most favorable treatment only if both the (i) Payment Condition and (ii) the Vernon Trust Condition are met. Those two conditions are not imposed on other holders of Environmental NPP Claims presumably because those holders voluntarily agreed to provide less expansive releases. The difference between the voluntary agreement to certain conditions and the imposition of facially similar, but materially different, conditions is a substantive, not a procedural, difference in these Chapter 11 Cases. Significantly, at least one of the conditions is not within DTSC's control. Specifically, the Payment Condition conditions DTSC's treatment on whether or not the Bankruptcy Court imposes broad non-consensual third-party releases on DTSC and other California agencies. As discussed below and in the Release Chart, those releases are broader than those required from holders of other Environmental NPP Claims. Even if the releases were the same, however, the Bankruptcy Court's ability to impose nonconsensual, third-party releases is limited by applicable law and requires the Debtors to make a factual showing supporting such releases. *See supra Objection C(ii); see also*, *In re Continental Airlines, Inc*. 203 F.3d 203, 214 (3d Cir. 2000) ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and *specific factual findings to support these conclusions*[.]") (emphasis added). DTSC does not have any control over whether the Debtors are successful in carrying their burden on releases and thus DTSC's recovery may not be the same as other holders based on factors outside of DTSC's control.

59.     The Plan also fails to provide the same economic treatment to each of the

Environmental NPP Claims in Class 8 even if both the Payment Condition and Vernon Trust Condition are met.[5]

60. The Plan proposes to allocate $10,000,000 in Cash to the various Non-Performing Properties overseen by the agencies in Class 8. The Vernon Plant, the only Non-Performing Property regulated by a non-Global Settlement Party, would receive and allocation of $2,587,523. Other holders of Environmental NPP Claims that are Global Settlement Parties receive an aggregate allocation of $7,412,477 in Cash through their collective beneficial interests in the Environmental Response Trust. Such holders also have the opportunity, in certain circumstances, to receive residual value from other properties within the Environmental Response Trust—a benefit not available for the Vernon Plant.

61. The Plan, therefore, allocates approximately 25.8 percent of the total consideration provided to the benefit of holders of Environmental NPP Claims to the Vernon Plant and 74.2 percent to the other Non-Performing Properties. This allocation provides DTSC with significantly less than its proportionate share of the consideration allocated to Class 8. By the Debtors' own calculation—which DTSC believes vastly underestimates the costs of remediation required at the Vernon Plant—the cost to remediate the Vernon Plant amounts to approximately 44 percent of the total liabilities associated with all Non-Performing Properties.[6] DTSC expects the actual percentage of Cash distributions to which the Vernon Plant would be entitled in Class 8 is substantially higher but, even on the basis of the Debtors' numbers, the Plan diverts 18.2 percent of the total consideration to Environmental NPP Claims from DTSC to other members of Class 8,

---

[5] As discussed, linking DTSC's treatment of its Environmental NPP Claim to the approval of third-party releases is inappropriate.

[6] At filing, the Debtors estimated they would spend a total of $200 million on remediation at the Non-Performing Properties over the next five (5) years, including $88 million (or 44 percent) at the Vernon Facility. *See* Messing Decl. at ¶¶ 72, 74.

without DTSC's consent. And that is before allocation of any residual value is distributed. This inequality in treatment of Environmental NPP Claims is inappropriate and in direct contravention of section 1123(a)(4).

62.    The Plan's failure to provide the same treatment to each Environmental NPP Claim is also apparent when comparing the non-economic terms of the proposed treatments provided to DTSC and the Global Settlement Parties. As set forth in the Environmental Settlement Agreement, the Global Settlement Parties agree to consensually provide certain Governmental Releases and Covenants Not to Sue. However, in the Plan, releases, injunctions and exculpations are imposed on California state agencies, including DTSC, without their consent.

63.    As summarized in the Release Chart, the releases set forth in Section 10.6 of the Plan are broader, and more burdensome, than those agreed to by the Settling Governmental Authorities. The Plan seeks to impose releases on all California state governmental agencies that have jurisdiction regarding the enforcement of Environmental Laws, including but not limited to DTSC. However, the Plan expressly provides that other Governmental Units, including the Global Settlement Parties, are not Releasing Parties. *See* Plan 10.6 (Notwithstanding anything to the contrary in this Section 10.6, *Governmental Units (other than any California state governmental agency, including the [DTSC], that has jurisdiction regarding the enforcement of Environmental Laws) are not Releasing Parties under the Plan*) (emphasis added).

64.    Instead, the Settling Governmental Authorities agreed to provide the Governmental Releases and Covenants Not to Sue, which are far narrower than the non-consensual releases the Debtors seek to impose on California agencies through the Plan. The Governmental Releases and Covenants Not to Sue in favor of the Debtors are limited to covenants "not to file a civil action or take administrative or other civil action against the Debtors pursuant to CERCLA and RCRA, or

any similar state laws with respect to each of the Included NPPS." Environmental Settlement Agreement at 45(a). However, with respect to the Debtors, the releases set forth in Section 10.6 of the Plan are far more extensive, as they purport to release all Claims and Causes of Action related to Environmental Law, a broadly-defined term. Additionally, as set forth in more detail in the Release Chart, not only are the releases in the Plan broader in scope, but they also purport to release additional "Related Parties."

65.     Similarly, and as summarized in the Release Chart, the Governmental Releases and Covenants Not to Sue in favor of the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser and the Trustees are narrower than the scope of the release contained in Section 10.6 of the Plan. *See* Release Chart; *cf.* Environmental Settlement Agreement at 45(b) and Plan at §10.6. As an example, the Settling Governmental Authorities reserve certain rights, including *claims for any location other than the Non-Performing Property*. Environmental Settlement Agreement at 48(a). However, the releases in Section 10.6 force DTSC (and other California agencies) to release Claims and Causes under Environmental Law against the Released Parties for locations other than the Vernon Plant, including off-site liability arising from the Debtors' operation of the Vernon Plant. *See, e.g.*, Non-Prosecution Agreement, Appendix 1, at 2 ("Exide admits it knowingly caused the transportation of hazardous waste contaminated with corrosive acid to Bakersfield, California" and caused that location to "receive corrosive hazardous wastes . . . a significant number of times over the past two decades, in violation of federal law."). Additionally, the Claims and Causes of Action released pursuant to the Plan relate to Environmental Law, a much broader release than provided by the Environmental Settlement Agreement, which is limited to covenants not to file civil action or take administrative action civil causes of action pursuant to CERCLA and RCRA, or similar state laws.

66.     These are not mere procedural differences but rather substantive and material differences in the treatment of Environmental NPP Claims and as such violates Section 1123(a)(4).

67.     Therefore, even if the Payment Condition and the Vernon Condition are satisfied, the Plan does not comply with Section 1123(a)(4) and cannot be confirmed.

**b.   If the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied, then the treatment provided to DTSC does not, and cannot, comply with Bankruptcy Code Section 1123(a)(4).**

68.     In the event the Vernon Trust Condition is not satisfied but the Payment Condition is satisfied, the treatment provided to DTSC similarly fails to satisfy Section 1123(a)(4) of the Bankruptcy Code. For the reasons set forth in Section B(i)(a) of this Objection, treatment pursuant to Plan Section 4.8(b)(i)(B) discriminates against California, as it imposes overly broad and burdensome third-party releases that exceed the scope of the Governmental Releases and Covenants Not to Sue. Further, for the reasons set forth in the prior section of this Objection, treatment pursuant to Plan Section 4.8(b)(i)(B) fails to provide the same economic treatment to each of the Environmental NPP Claims in Class 8. Finally, treatment pursuant to Plan Section 4.8(b)(i)(B) of the Plan purports to abandon the Vernon Plant to Exide Technologies, LLC. The Plan does not purport to deem any other Non-Performing Property abandoned. For the reasons set forth in Section A of this Objection, the Plan cannot deem the Vernon Plant abandoned. For the foregoing reasons, treatment of DTSC's Environmental NPP Claims pursuant to Plan Section 4.8(b)(i)(B) violates Section 1123(a)(4) of the Bankruptcy Code.

**c.   If the Payment Condition is not satisfied the treatment provided to DTSC does not, and cannot, comply with Bankruptcy Code Section 1123(a)(4).**

69.     In the event the Payment Condition is not satisfied, the treatment provided to DTSC likewise fails to satisfy Section 1123(a)(4) of the Bankruptcy Code. If the Payment Condition is not satisfied, the Plan deprives DTSC of any cash consideration. Such treatment fails to provide

the same economic treatment to each holder of Environmental NPP Claims and, for the reasons

set forth in Section (B)(i)(a) of this Objection, violates Section 1123(a)(4) of the Bankruptcy Code.

Further, upon the failure of the Payment Condition, the Plan deems the Vernon Plant abandoned

to Exide Technologies, LLC. The Plan does not purport to deem any other Non-Performing

Property abandoned. For the reasons set forth in Section A of this Objection, the Plan cannot deem

the Vernon Plant abandoned, and the purported abandonment of the Vernon Plant violates Section

1123(a)(4) of the Bankruptcy Code.

ii.      ***The Plan does not comply with Section 1129(a)(1) of the Bankruptcy Code because the Plan fails to provide adequate means for the plan's implementation.***

70.      Section 1129(a)(1) of the Bankruptcy Code further requires a plan to comply with

section 1123(a)(5), which mandates that a plan "provide adequate means for the plan's

implementation" and then provides an illustrative list of appropriate means of implementation,

such as transferring property, merging with other businesses, or curing a prior default. 11 U.S.C.

§ 1123(a)(5). The Plan fails to provide or articulate adequate means for its implementation, and

therefore cannot be confirmed.

a.   **The Plan fails to provide adequate means for its implementation, as the Debtors cannot abandon the Vernon Plant.**

71.      In the event either the Payment Condition or the Vernon Trust Condition is not

satisfied, the Plan provides "pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the

Vernon Non-Performing Property shall be deemed abandoned to Exide Technologies, LLC on the

Effective Date." Plan at §5.2(e)(ii)(A), (iii)(A). Therefore, the Plan can only be confirmed if the

Bankruptcy Court determines that the Vernon Plant can be abandoned. Notably, the satisfaction of

the Payment Condition is beyond DTSC's control, and the Vernon Trust Condition cannot be

imposed on DTSC.

72.      Section 1123(a)(5) is an empowering section meant to enhance the ability of the

trustee or debtor in possession to deal with property of the estate. Nonetheless, under well-established principles its scope is not unbounded. *See In re Fed-Mogul Glob. Inc.*, 684 F.3d 355, 381 (3d Cir. 2012). One important restriction is the long-standing presumption against preemption of state police power laws and regulations, a presumption that is rooted in federalism concerns and the historic primacy of state regulation of matters of health and safety. *Id.* (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

73.     For the reasons set forth in Section A of this Objection, the Debtors cannot abandon the Vernon Plant.

**b.  Even if the Debtors are permitted to abandon the Vernon Plant, the Plan fails to provide adequate means for its implementation.**

74.     Even if the Debtors were able to deem the Vernon Plant abandoned to Exide Technologies, LLC, the Plan fails to provide adequate means for its implementation because the Debtors have not identified a Plan Administrator or New Board. While identification of such parties is often administrative, it is unclear that the Debtors will be able to find a Plan Administrator or members of a New Board that will serve given the potential liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 U.S.C. § 9601.

75.     Absent agreements with (i) a Plan Administrator, and (ii) individuals to serve on the New Board, the Plan fails to provide adequate means for its implementation, does not comply with Section 1123(a)(5) of the Bankruptcy Code, and cannot be confirmed.

*iii.     The Plan was not proposed in good faith and therefore does not comply with section 1129(a)(3) of the Bankruptcy Code.*

76.     Section 1129(a)(3) of the Bankruptcy Code requires the Debtors must show that the plan has been proposed in good faith and not by any means forbidden by law. As discussed below, the Debtors cannot meet that burden. First, the Plan discriminates against, and is intentionally punitive to, DTSC solely due to the fact that California rejected a Global Settlement. Second, the

Debtors' lack of good faith in proposing the Plan is further evidenced by their efforts to deem the Vernon Plant abandoned in contravention of binding Supreme Court precedent. Third, the Debtors cannot demonstrate the Plan was proposed in good faith as the Plan's primary purpose is to distribute the estates' remaining valuable assets to insiders while also securing valuable releases for those same insiders. Lastly, the Plan fails to satisfy 1129(a)(3) as the Plan impermissibly seeks to cramdown the Plan on dissenting impaired creditors.

77.    Although the term "good faith" as used in section 1129(a)(3) is not defined, in considering this factor, courts have considered whether a plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984). It must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan and "[a]mong other things, good faith provides a check on the debtor's intentional impairment of claims." *In re Quigley Co., Inc.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) (internal citations omitted)*; In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D. N.J. 2000) ("The classification and treatment of classes of claims is always subject to the good faith requirements under section 1129(a)(3)").

78.    After extensive mediation, the Settling Governmental Authorities and DTSC agreed to recommend—subject to ongoing negotiation, documentation, and final approval—the terms of a settlement. Fully aware the proposed settlement remained subject to negotiation and approval by the necessary authorities, the Debtors nevertheless filed the Initial Plan and proceeded towards confirmation along an expedited timeframe. The Initial Plan presumed the settlement would be approved by each of the Settling Governmental Authorities, including DTSC. Despite extensive negotiations, however, DTSC did not approve the terms of the proposed settlement nor

the terms of the Initial Plan.

79.    Following DTSC's determination not to settle, the Debtors filed the Plan. As discussed in more detail in Section B(i) of this Objection, the Plan (i) openly discriminates against California in terms of the treatment of Environmental NPP Claims, and (ii) conditions the treatment of Environmental NPP Claims on the approval of third-party releases that, if approved, are more extensive than those imposed on other parties. The Plan also improperly seeks to Disallow Administrative Expense Claims asserted by DTSC. These provisions exist solely to punish California and are not the product of good faith.

80.    Second, even if the Debtors followed the proper procedural requirements, the Debtors, as set forth in additional detail in Section A of this Objection, cannot abandon (or deem abandoned) the Vernon Plant.

81.    Third, the Plan seeks to strip the remaining value from the Debtors' estates and divert those assets to the Consenting Creditors yet provides little—or no—consideration to address or remediate identified hazards that pose imminent and identifiable harm to the public health and safety. This construct is in direct contravention of Supreme Court precedent. The fact that the Consenting Creditors control the Debtors' capital structure—and are the only impaired class that accepted the Plan—further evidences the Debtors' lack of good faith in pursuing confirmation of the Plan.

82.    In addition, the Plan fails to satisfy the good faith requirement of section 1129(a)(3) because the Plan is in direct contravention of the Settlement Procedures Order. The Debtors, in a transparent effort to secure releases for their insider-creditors, disregarded the requirements of the Settlement Procedures Order or general procedural safeguards—which places affirmative requirements on the Debtor with respect to the abandonment of a Non-Performing Property—and

instead seek to deem the Vernon Plant abandoned on the Effective Date. Because the Debtors know they are not following those procedures, they are not proceeding in good faith.

83.     In addition, a plan proponent's motives and methods for achieving compliance with the voting requirement of section 1129(a)(10) must be scrutinized under the rubric of section 1129(a)(3). *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013). As set forth in more detail in Section B(viii) of this Objection, the only classes of claims that voted to accept the Plan are controlled by insiders. In fact, the Debtors did not even solicit votes to accept or reject the Plan from holders of Environmental NPP Claims or General Unsecured Claims, instead the Debtors deemed those Classes to reject the Plan. The Debtors' willful solicitation of votes from only those classes of Claims controlled by insiders constitutes bad faith and does not comply with the requirements of section 1129(a)(10).

84.     Finally, for the reasons discussed in Section C of this Objection the Plan violates section 1129(a)(3) of the Bankruptcy Code because it impermissibly seeks to secure extensive— and impermissible—releases for third-parties.

iv.     *The Plan does not disclose the identities of the Plan Administrator or the New Board and therefore fails to comply with Section 1129(a)(5)(A)(i) of the Bankruptcy Code.*

85.     Section 1129(a)(5)(A)(i) requires the proponent of the plan to disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or successor to the debtor under the plan. The Plan fails to identify the Plan Administrator or the members of the New Board.

86.     DTSC believes that the members of the New Board and/or the Plan Administrator may be subject to liability under CERCLA and related California state law. Therefore, the Debtors must identify the Plan Administrator and members of the New Board as expeditiously as possible and demonstrate by a preponderance of the evidence that such individuals intend to serve in such

capacity following the Effective Date.

v.     ***The Plan fails to satisfy the best interests test and as a result does not comply with Section 1129(a)(7).***

87.     Section 1129(a)(7) of the Bankruptcy Code—the "best interests test"—requires that, with respect to each class, each holder of a claim or an equity interest in such class either (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtors liquidated under Chapter 7 of the Bankruptcy Code on such date. 11 U.S.C. § 1129(a)(7).

88.     Section 1129(a)(7) is clear, the liquidation analysis applies to *individual* holders of impaired claims or interest that do not accept the plan. *See Bank of Am. Nat'l Trust,* 526 U.S. 434, 441 n. 13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."). Section 1129(a)(7)(A) requires a determination whether a "prompt chapter 7 liquidation would provide a better return to *particular creditors* or interest holders than a chapter 11 reorganization." *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) (internal quotation marks and citation omitted) (emphasis added). The measuring date for such a comparative recovery is the effective date of the proposed bankruptcy plan. Thus, a bankruptcy court must contrive a hypothetical Chapter 7 liquidation on the effective date of the plan to determine each creditor's treatment. *See Lason*, 200 B.R. at 232 (citing *In re Sierra-Cal*, 210 B.R. 168, 171-72 (Bankr. E.D. Cal. 1997)).

89.     The liquidation analysis attached to the Disclosure Statement as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>") is of no assistance to the Court and is therefore improper, even recognizing that all liquidation analyses are inherently speculative. The Liquidation Analysis relates to the Initial Plan and does not accurately reflect the terms of the Plan. The classification

of Claims and Interests analyzed in the Liquidation Analysis is inconsistent with the Classification of Claims and Interests in the Plan. The Liquidation Analysis does not provide any analysis of Environmental NPP Claims, instead it "[e]xcludes consideration provided on account of Environmental NPP Claims pursuant to the Global Settlement." By failing to provide the Bankruptcy Court with any evidence that the treatment of impaired creditors (and specifically DTSC) is at least as favorable as under a prompt chapter 7 liquidation, the Debtors have failed to even attempt to meet their burden of proving that the Plan is in the best interests of creditors in satisfaction of section 1129(a)(7) of the Bankruptcy Code.

90.     Further, DTSC believes that a prompt liquidation would provide at least as favorable a return to DTSC than under the current Plan. Under the current Plan, the Vernon Plant could receive a minimum of nothing and a maximum of $2.5 million and would lose any right to pursue those parties responsible for the Debtors' past acts. In a prompt liquidation, the Vernon Plant might not receive an allocation of $2.5 million, but DTSC would retain claims against all parties and the Vernon Plant would not be immediately abandoned. In that scenario, DTSC could work with the Chapter 7 trustee to pursue litigation against those parties responsible for the Debtors' past actions. DTSC believes, and the Debtors have not demonstrated to the contrary, that a Chapter 7 liquidation would result in a better recovery for California than the treatment provided by the Plan.

*vi.*     ***By its terms the Plan fails to satisfy Section 1129(a)(8) of the Bankruptcy Code. As the Plan unfairly discriminates against certain Environmental NPP Claims and is not fair and equitable with respect to Class 8 Claims, the Plan does not satisfy Section 1129(b) of the Bankruptcy Code.***

91.     Section 1129(a)(8) of the Bankruptcy Code requires that, with respect to each class of claims or interests, such class has accepted the plan or is not impaired by the plan. 11 U.S.C. § 1129(a)(8). The plan fails to satisfy this section because Classes 7, 8, 9, 10, 11, and 12 are impaired

and are deemed to reject. Instead, the Debtors seek confirmation of the Plan pursuant to 1129(b)
with respect to the rejecting Class of Claims or Interests.

92.    Section 1129(b) of the Bankruptcy Code provides that if a plan otherwise meets all
of the other applicable requirements of section 1129(a) (except those in subsection (a)(8)), then a
court may confirm a plan over the dissenting vote of an impaired class of claims so long as the
plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting
class or classes. 11. U.S.C. § 1129(b)(1). As the Plan fails to satisfy a number of other requirements
of 1129(a), an analysis of whether the Plan satisfies 1129(b) is unwarranted; nevertheless, the Plan
is not fair and equitable with respect to Environmental NPP Claims and discriminates unfairly
against certain Environmental NPP Claims.

93.    The weight of judicial authority holds that a plan unfairly discriminates in violation
of section 1129(b) of the Bankruptcy Code if similar claims are treated differently without a
reasonable basis for the disparate treatment. *See Exide* 303 B.R. 48,78 (Bankr. D. Del. 2003); *In
re Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993); *In re Buttonwood Partners, Ltd*., 111 B.R.
57, 63 (Bankr. S.D.N.Y. 1990). The unfair discrimination standard of section 1129(b) "ensures
that a dissenting class will receive relative value equal to the value given to all other similarly
situated classes." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (citing *In
re Johns-Manville Corp*., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)). Delaware courts have held
that "[t]he hallmarks of the various tests [of unfair discrimination under section 1129(b)(1)] have
been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm
and consummate a plan without the proposed discrimination." *In re Lernout & Hauspie Speech
Products, N.V*., 301 B.R. 651, 660 (Bankr. D. Del. 2003) (citations omitted); *In re Tribune Media
Company*, 587 B.R. 606 (D. Del. 2018); *aff'd In re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020)

(analyzing principles framing the "unfair-discrimination" standard).

94.   "In considering whether a plan unfairly discriminates, courts apply a rebuttable presumption that unfair discrimination exists if there [is]: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of net present value of all payments) or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *Armstrong,* 348 B.R. 111 at 121 and *In re Dow Corning Corp.*, 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999); *see also In re Lernout & Hauspie Speech Prods, N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (explaining rebuttable presumption); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (adopting rebuttable presumption test). When assessing unfair discrimination, "the analysis for determining whether the discriminatory treatment is unfair should be viewed by its effect on the dissenting class." *In re Nuverra Envtl. Solutions, Inc.*, 590 B.R. 75, 89 (D. Del. 2018) (citing *In re Tribune Co.*, 472 B.R. 223, 244 (Bankr. D. Del. 2012)).

**a. The Plan may unfairly discriminate between General Unsecured Claims and Environmental NPP Claims.**

95.   The Plan treats holders of Allowed General Claims differently than Environmental NPP Claims.

96.   The Plan provides that a holder of an Allowed General Unsecured Claim receives (a) the GUC Trust Beneficial A Interests and (b) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan. The GUC Trust Beneficial A Interests are allocated their Pro Rata share of $2,400,000 that is funded to the GUC Trust. The treatment of Allowed General Unsecured Claims

is not subject to any conditions.

97.     The Plan provides that a holder of an Allowed Environmental NPP Claim receives either (i) beneficial interests in the Environmental Response Trust if the holder is a Global Settlement Party, or (ii) if the holder is not a Global Settlement Party: (a) beneficial interest in the Vernon Environmental Trust, (b) the abandonment of the Non-Performing Property and $2,587,523, or (c) the abandonment of the Non-Performing Property and a Lien against such Non-Performing Property. All holders of Allowed NPP Claims also receive their Pro Rata share of GUC Trust Beneficial B Interests; and Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan. The GUC Beneficial B Interests effectively provide holder the right to receive their Pro Rata share of the GUC Trust Assets after the GUC Trust has distributed $2,400,000 to holders of GUC Trust Beneficial A Interests.

98.     Because the Plan provides different recoveries for similarly situated classes, a rebuttable presumption exists as to unfair discrimination. At this point, DTSC does not have sufficient information to determine whether such different treatment results in unfair discrimination. The Debtors have also failed to demonstrate that the Plan does not unfairly discriminate between General Unsecured Claims and Environmental NPP Claims.  In order to confirm the Plan, the Debtors must make that showing.

**b.   The Plan also unfairly discriminates among Environmental NPP Claims.**

99.     While the Plan *may* unfairly discriminate between General Unsecured Claims and Environmental NPP Claims, the plan unambiguously and unfairly discriminates among holders of Environmental NPP Claims. Such discrimination is in direct contravention of Section 1129(a) and Section 1129(b) of the Bankruptcy Code.

100.    The Plan effectively attempts to create two subclasses within Class 8: (i)

Environmental NPP Claims held by Global Settlement Parties and (ii) Environmental NPP Claims held by non-Global Settlement Parties (i.e. DTSC). An application of the rebuttable presumption test evidences the Plan's unfair treatment and discrimination against Environmental NPP Claims held by DTSC. First, the Environmental NPP Claims are a dissenting class under the Plan. Second, the claims held by holders of General Unsecured Claims, Environmental NPP Claims held by Global Settlement Parties, and Environmental NPP Claims held by DTSC are all entitled to the same priority. Finally, the Plan provides for different treatment to holders of Environmental NPP Claims on the basis of whether such holder is a Global Settlement Party; treatment that results in both (a) a materially lower percentage recovery for DTSC, and (b) an allocation of materially greater risk to DTSC. There is no reasonable basis for this discrimination; in fact, the disparate treatment is specifically designed to punish DTSC in a misguided effort to compel DTSC to accept the subpar settlement reflected in the Global Settlement.

101.    Therefore, the Plan unfairly, without any rational basis, discriminates between two classes of the same priority, and the Plan cannot be confirmed as it fails to satisfy section 1129(b)(1) of the Bankruptcy Code.

c.    **The Plan is not fair and equitable.**

102.    Section 1129(b)(2) sets forth the standards for determining whether a plan is fair and equitable with respect to impaired dissenting claims or interest. A plan is "fair and equitable" within the meaning of section 1129(b)(2) if it provides that the holder of any claim or interest in a class junior to the claims or interests of such class will not receive or retain under the plan on account of such junior claim or interest any property. 11 U.S.C. §§ 1129(b)(2)(B)(ii) and (C)(ii); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (stating that absolute priority rule "provides that dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property.") (citation omitted).

103.     The Plan is not fair and equitable because it improperly Disallows any Vernon NPP Claims against the Debtors to the extent that such Vernon NPP Claims are asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. Other holders of Claims are free to compromise Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims, or Other Secured Claims; however, the Plan may not simply Disallow DTSC's claims.

104.     Therefore the Plan fails to satisfy section 1129(b)(2) of the Bankruptcy Code and cannot be confirmed.

### vii.     *The Plan fails to provide for the payment of Allowed Priority Claims and therefore does not satisfy Section 1129(a)(9) of the Bankruptcy Code.*

105.     Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive full compensation absent agreement to differing treatment. 11 U.S.C. § 1129(a)(9). Despite the fact that the Governmental Bar Date is November 16, 2020, the Plan purports to Disallow Vernon NPP Claims against the Debtors to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. Plan at §§ 5.2(e)(i)(A), 5.2(e)(ii)(D), 5.2(e)(iii)(E). Those provisions of the Plan only apply to DTSC. To the extent DTSC has any Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims or Other Secured Claims, such Claims must be satisfied in full, in Cash under the Plan.

### viii.     *Excluding the votes of insiders, no class of impaired claims voted to accept the Plan and therefore, the Plan does not satisfy Section 1129(a)(10) of the Bankruptcy Code.*

106.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of at least one impaired class of claims, excluding the votes of any insider. 11 U.S.C. § 1129(a)(10). The prohibition against insider voting protects creditors from having to fight a cramdown plan premised on the acceptance by a class of creditors holding insider claims. *In re 266 Washington*

*Assocs.,* 141 B.R. 275, 287 (Bankr. E.D.N.Y. 1992); *see also, In re Anderson Oaks (Phase 1) Ltd. P'ship*, 77 B.R. 108, 112-13 (Bankr. W.D. Tex. 1987) ("In short, [] there must be some one other than the debtor, other than the insiders, and other than the target of the cram down, who cares enough about the reorganization and whose rights must also be considered to invoke the equitable grounds that justify resort to cram down.").

107.    Pursuant to section 3.3 of the Plan, the only Classes of Claims Impaired by the Plan that are entitled to vote to accept or reject the Plan are (i) Class 4 Superpriority Notes Guarantee Claims, (ii) Class 5 Exchange Priority Notes, and (iii) Class 6 First Lien Notes Claims. Each of these Classes of Claims is controlled by insiders, and therefore, absent the affirmative vote of another class, the Debtors cannot satisfy Section 1129(a)(10) of the Bankruptcy Code.

108.    Class 4 consists of Superpriority Notes Guarantee Claims against the Debtors. Superpriority Notes Guarantee Claims are Secured Claims arising under the Superpriority Notes Indenture against Debtors Holdings and Exide Technologies, as guarantors. The Superpriority Notes are the 10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to the Superpriority Notes Indenture. The Plan provides that the Superpriority Notes Guarantee Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $152,512,500 (plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Superpriority Notes Indenture. The Superpriority Noteholders hold first-priority liens on all equipment, inventory, real property, intellectual property, the stock of Exide Technologies and certain subsidiaries of Holdings, and substantially all of the other assets of Exide Technologies, Holdings and certain subsidiaries of Holdings, other than certain collateral pledged to secure ABL Claims, and a hold second-priority lien on the collateral pledged to secure ABL Claims. Messing Decl. ¶ 45.

109.    The Consenting Creditors hold at least 90 percent (and may hold 100 percent) of the Superpriority Notes. Messing Decl. ¶ 11 ("[The Ad Hoc Group] holds, in the aggregate, approximately (i) 90.11% of the Superpriority Notes); *see also Verified Statement of the Ad Hoc Group Pursuant to Bankruptcy Rule 2019* [Docket No. 140] (the "2019 Statement") (stating that the Consenting Creditors hold in excess of $154 million in outstanding principal of Superpriority Notes).

110.    Class 5 consists of Exchange Priority Notes Claims against the Debtors. Exchange Priority Notes Claims are Claims arising under the Exchange Priority and First Lien Notes Indenture relating to the Exchange Priority Notes issued thereunder. The Exchange Priority Notes are the 11% Exchange Priority Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture. The Plan provides the Exchange Priority Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $390 million (plus all accrued but unpaid interest, costs, fees and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture).

111.    The Consenting Creditors hold at least 87.9 percent (and may hold 98 percent) of the Exchange Priority Notes. Messing Decl. ¶ 11 ("[The Ad Hoc Group] holds, in the aggregate, approximately [] (ii) 87.94% of the Exchange Priority Notes); *see also* 2019 Statement (providing that the Consenting Creditors hold in excess of $381.7 million in outstanding principal of Exchange Priority Notes).

112.    Class 6 consists of First Lien Notes Claims against the Debtors. First Lien Notes Claims are Claims arising under the Exchange Priority and First Lien Notes Indenture relating to the First Lien Notes issued thereunder. The First Lien Notes are the 11% First Lien Senior Secured Notes due in 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture. The

Plan provides that First Lien Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $161,023,000 (plus all accrued but unpaid interest, costs, fees and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture).

113.    The Consenting Creditors hold at least 76.4 percent (and may hold 85 percent) of the First Lien Notes. Messing Decl. ¶ 11 ("[The Ad Hoc Group] holds, in the aggregate, approximately [] (iii) 76.4% of the First Lien Notes); see also the 2019 Statement which provides the Consenting Creditors hold in excess of $137.05 million in outstanding principal of Exchange Priority Notes.

114.    The Consenting Creditors also hold in excess of 80 percent of the equity interests in Holdings. Messing Decl. ¶ 11 ("[The Ad Hoc Group] holds, in the aggregate, approximately [] (iv) 80% of the equity interests in Holdings); *see also* 2019 Statement.

115.    Section 101(31)(B) defines "insider" to include persons in control of the debtor. The Consenting Creditors control Class 4, Class 5 and Class 6 and control a super-majority of Interests in the Debtors. The Consenting Creditors are "insiders" as contemplated by the Bankruptcy Code. Further, even if the Consenting Creditors did not exercise actual day-to-day control of the Debtors, the Consenting Creditors are, nevertheless, insiders. *See, In re S. Beach Sec., Inc.* 376 B.R. 881, 889 (Bankr. N.D. Ill. 2007) ("To be an insider of the debtor [as a person in control], a person need not have legal or absolute control of the debtor.") (quotation omitted). Congress' use of the word "includes" in section 101(31) evinces its "expansive view of the insider class, suggesting that the statutory definition is not limiting and must be applied on a case by case basis." *In re Holly Knoll P'ship*, 167 B.R. 381 (Bankr. E.D. Pa. 1994) (citations omitted); see also *In re Oakwood Homes Corp.* 340 B.R. 510, 523 (Bankr. D. Del. 2006) ("[From the legislative

history] courts have applied insider status flexibility to include a broad range of parties who have a close relationship with the debtor.") (citations omitted).

116.    The Plan seeks to accomplish what Section 1129(a)(10) forbids: cramdown of a plan using an insider-dominated class without any indicia of support for the plan by non-insider affected parties. The Debtors have not—and cannot—satisfy their burden under Section 1129(a)(10), and the Bankruptcy Court should not allow the Debtors to utilize the votes of classes of Claims controlled by insiders to confirm a Plan that strips any remaining value from the Debtors' estates, compels the imposition of burdensome, onerous overbroad releases on non-consenting creditors, and threatens to improperly abandon contaminated property.

**C.    The Injunctions, Releases, and Exculpation Provisions in the Plan are Impermissible.**

117.    The Plan contains overbroad injunctions, releases, exculpation, and discharge provisions that should not be approved by the Bankruptcy Court. The Plan purports to provide various third parties with releases from (i) claims held by other third parties, and (ii) claims held by the Debtors. Both are impermissible and warrant denial of confirmation of the Plan. Further, the injunctions and exculpations are overly broad and act as a *de facto* discharge of liability, in direct contravention of section 1141 of the Bankruptcy Code.

*i.    The Release of Third-Party Claims are inappropriate.*

118.    Section 524(e) of the Bankruptcy Code provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Accordingly, the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their liabilities. *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000).

119.    Although the Third Circuit has not established a blanket rule permitting or proscribing non-debtor releases, it has stated that "our precedents regarding nonconsensual third-

party releases and injunctions in the bankruptcy plan context set forth *exacting standards that must be satisfied* if such releases and injunctions are to be permitted, and *suggest that courts considering such releases do so with caution*." *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) (emphasis added); *see also In re Cont'l Airlines*, 203 F.3d at 214 ("The hallmarks of permissible non-consensual releases [are] *fairness, necessity to the reorganization, and specific factual findings to support these conclusions*[.]") (emphasis added).

120.    Further, "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied…the broader context of the *Continental* discussion" provides that such releases should only be approved in the "context of extraordinary cases." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001), *appeal dismissed by*, 280 B.R. 339 (D. Del. 2002); *see also, Was. Mut.*, 442 B.R. at 351 ("While the Third Circuit has not barred third party releases, it has recognized that they are the exception, not the rule.") (citing *In re Cont'l Airlines*, 203 F.3d 203). These Chapter 11 Cases are not an extraordinary case.

121.    In the Debtors' previous Chapter 11 proceedings, the Court ruled that "non-consensual releases may be approved only in an 'extraordinary' case if *all* of the following four factors are present: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution the Debtor's plan, (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release." *In re Exide Techs.*, 303 B.R. 48 at 75 (emphasis added). This Court has also noted a permanent injunction limiting the liability of nondebtor parties is a rare thing and warned against the exercise of "unfettered discretion to discharge nondebtors from

liability." *See In re Genesis Health*, 266 B.R. at 608 (discussing *In re Cont'l Airlines*, 203 F.3d at 212, 213, n.9) (quotations omitted).

### a. The non-consensual release is not necessary to the success of the Debtors' reorganization.

122.    To determine whether non-debtor releases are necessary to the reorganization, the plan proponent must demonstrate that there is a relationship between the debtor's successful reorganization and the non-consensual parties' release, and that the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability. *In re Genesis Health*, 266 B.R. at 607. Where the debtors are liquidating, as here, the non-consensual, third-party releases can never be necessary to the reorganization because the liquidation can be successfully accomplished with or without the releases. *See In re In re Wash. Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) citing *In re Nickels Midway Pier, LLC*, WL 20345442, at *13 (Bankr. D.N.J. May 21, 2010); *see also* Disclosure Statement at 24 ("the Debtors did not commence these Chapter 11 Cases with the intent to pursue a recapitalization transaction and emerge from the Chapter 11 Cases as a reorganized business. On the contrary . . . the Debtors' intent was to liquidate")

### b. The Released Parties—the releases—have not provided a sufficient financial contribution to the Debtors' plan.

123.    The Plan provides the Transferred Entities provide certain *de minimis* consideration to holders of General Unsecured Creditors and Global Settlement Parties that hold Environmental NPP Claims and, if this Court imposes the third-party releases set forth in Section 10.6 on DTSC (and purportedly on other California state governmental agencies), the Transferred Entities contribute a token amount for the benefit of DTSC. The financial contribution provided by the Transferred Entities is insufficient to allow this Bankruptcy Court to sanction the permissibility of the extensive, burdensome, and onerous releases in favor of the Transferred Entities.

124.    The exacting standards that must be satisfied if such releases are to be permitted require specific factual findings to support the non-consensual releases. Absent the *de minimis* consideration provided by the Transferred Entities, the Plan is otherwise devoid of financial contributions from the other Released Parties. Therefore, as to all of the other Released Parties, the releases proposed in section 10.6 of the Plan are inappropriate and cannot be approved.

125.    Further, even though the Plan provides that the Transferred Entities provide small financial considerations for the benefit of holders of General Unsecured Claims and Environmental NPP Claims, the Transferred Entities are affiliates of the Debtors. The Plan provides that all Intercompany Claims, which include Claims between the Debtors and non-Debtor Affiliates, will be cancelled and not entitled to a distribution or recovery under the Plan. Plan at §4.9. The Disclosure Statement and Plan are devoid of any information related to the outstanding balances of Intercompany Claims between the Debtors and the Transferred Entities. Therefore, the contribution provided by the Transferred Entities may be illusory. Regardless, the contribution provided by the Transferred Entities is far from critical to the Plan, as the token contribution inures to the benefit of classes of Claims that are deemed to reject the Plan.

c.    **The Plan is not feasible, and therefore the releases set forth in Section 10.6 cannot be <u>approved.</u>**

126.    Given the Debtors may not be able to implement the Plan and that the abandonment of the Vernon Plant may require a subsequent liquidation of Exide Technologies, the Plan is not feasible. Further, the only financial consideration provided by a Released Party is the consideration provided by the Transferred Entities. That financial consideration does not make the Plan feasible. Instead, it provides miniscule distributions to holders of General Unsecured Claims and certain Environmental NPP Claims. That consideration is insufficient to warrant the proposed releases. Finally, as the other Released Parties are not providing financial contributions, the Debtors are

therefore unable to demonstrate their contributions are necessary to make the plan feasible.

### d. The releases proposed in Section 10.6 are not fair to the non-consenting creditors and therefore cannot be approved.

127.    DTSC is a non-consenting creditor; DTSC is also a party to and has participated in the administration of the Chapter 11 Cases. Other state governmental agencies have not similarly participated in the Chapter 11 Cases. Nevertheless, the Plan however seeks to impose a release upon "all California state governmental agencies, including the [DTSC], that have jurisdiction regarding the enforcement of Environmental Laws." Plan at §10.6. This release is unfair and unnecessarily broad; it is also contrary to California law because it improperly presumes that all California state agencies may be bound by these Chapter 11 Cases. Finally, the Bankruptcy Court does not have jurisdiction over the other agencies, who have not appeared in the Chapter 11 Cases.

128.    The State of California does not have a unitary system of government, but instead a system of divided executive power. *Marine Forests Soc. v. California Coastal Comm'n*, 36 Cal.4th 1, 31 (Cal. 2005). Accordingly, each individual state agency is considered a separate legal entity. *People ex re. Lockyer v. Superior Court (Cole National Corp.)*, 122 Cal. App. 4th 1060, 1078 (Ct. App. 2004). For purposes of exercising their statutory functions, agencies of the State of California are generally held to be separate legal entities that do not represent each other and cannot bind each other in litigation. *See, e.g.*, *Redevelopment Agency of the City of San Marcos* v. *Com. on State Mandates*, 43 Cal. App. 4th 1188, 1194-1195 (1996) (Department of Finance permitted to intervene in action against the Commission on the ground that the Department and the Commission serve distinct statutory purposes and the Department "is more like an adversary party . . . than it is an equivalent to the Commission itself."); *Riddell v. State of Cal.*, 50 Cal. App. 4th 1607, 1611-1612 (1996) (The fact that two state agencies are both part of the same executive state government does not deprive them of lien rights against each other); *State Water Resources*

*Control Bd.* v. *Office of Admin. Law*, 12 Cal. App. 4th 697, 699-700 (1993) (Water Resources Control Board sought writ of mandate to vacate Office of Administrative Law's ruling that the Board's amendment to water quality control plan violated state Administrative Procedure Act).

129.    Furthermore, all of the other individual federal and state environmental regulatory agencies involved in these Chapter 11 Cases agreed to the Governmental Releases and Covenants Not to Sue, which are limited to only their respective agencies. The Debtors and Settling Governmental Agencies did not seek to impose the Governmental Releases and Covenants Not to Sue on all other federal or state agencies with jurisdiction regarding the enforcement of Environmental Laws. Similarly, there is no need to impose the releases in the Plan upon all California state agencies and doing so discriminates against the State of California. The Debtors cannot demonstrate sufficient support to warrant the unfair releases proposed in Section 10.6 of the Plan

130.    The releases set forth in Section 10.6 of the Plan must be proscribed or the Bankruptcy Court must deny confirmation of the Plan.

## ii.    *The Releases by the Debtors are inappropriate.*

131.    Under Section 10.5 of the Plan entitled "Releases by the Debtors," the Debtors on behalf of the Debtors, the Estates, and the Wind-Down Estates and their respective successors (including the Frisco CDC, the Environmental Response Trust, the Vernon Environmental Response Trust and the GUC Trust) purport to grant extremely broad releases to, among other entities, (i) the Debtors, (ii) each of the Consenting Creditors, (iii) the Europe/ROW Purchaser, (vi) the Transferred Entities, each of the DIP Lenders and the DIP Agent and (v) the Creditors' Committee. Specifically, Section 10.5 of the Plan provides:

> the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Estates, and the

Wind-Down Estates, in each case, on behalf of themselves and their respective successors (including the Frisco CDC, the Environmental Response Trust, the Vernon Environmental Response Trust and the GUC Trust), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Estates, or the Wind-Down Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the Pension Plan, the European Bridge Notes, the Optimization, the June 2019 Financing, any Environmental Law, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date…"

Plan at §10.5. Section 10.5 of the Plan further purports to extend these releases to the Related Parties, which include each of the Released Parties Affiliates, current and former officers, directors, principals, stockholders, members, partners, employees, agents, advisory board members, professionals and other representatives. Plan at §§ 1.159 and 10.5.

132.    "Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case." *In re Wash. Mut., Inc.*, 442 B.R. 314, 345 (Bankr. D. Del. 2011) (citation omitted). In considering the specific facts in these Chapter 11 Cases, the Releases by the Debtors provided in Section 10.5 are unfair and unwarranted. Courts in the Third Circuit consider five

factors in determining whether a debtor's release of a non-debtor is appropriate under a plan:

    i.    an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;

    ii.    a substantial contribution to the plan by the non-debtor;

    iii.    the necessity of the release to the reorganization;

    iv.    the overwhelming acceptance of the plan and release by creditors and interest holders;

    v.    the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*Was. Mut.*, 442 BR. at 346; *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Exide Techs.*, 303 B.R. 48, 71-72 (Bankr. D. Del. 2003).

133.    The foregoing factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *In re Wash. Mut., Inc.* 442 B.R. at 346. However, these factors "form the foundation for such an analysis, with due consideration of other factors that may be relevant to [the] case." *Id*. at 347. Furthermore, the proponents of a plan bear the burden of proving that the plan complies with all the requirements of the Bankruptcy Code for confirmation.

134.    In considering the facts and circumstances of these Chapter 11 Cases and the breadth of the proposed releases, the release of the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, and their Related Parties are impermissible and unfair; the Debtors cannot demonstrate that the releases satisfy even one of the factors utilized to evaluate the appropriateness of a release, nor can the Debtors offer any credible evidence in support of the factors. Actions pursuing the Released Parties for many of the claims the Debtors seek to release would not deplete the estate's resources. Further, none of the parties proposed to be released by the Debtors provided a "substantial contribution" to the Plan.  Instead, certain of the Released

Parties provided *de minimis* consideration in a transparent attempt to purchase releases—releases that serve to shield such parties from liability well in excess of their contributions. And many of the other Released Parties provided no consideration or contribution at all. The releases by the Debtors are not necessary for the reorganization because the Debtors are not reorganizing. Further, the only classes that voted to accept the Plan are controlled by the Consenting Creditors. All other classes, including the Environmental NPP Claims and the General Unsecured Claims, were deemed to reject the Plan. Finally, the Plan's meager distribution to General Unsecured Claims and Environmental NPP Claims is well shy of payment of all or substantially all of the claims of the creditors and interest holders.

135.    In light of the foregoing, the Bankruptcy Court should proscribe the Releases by the Debtors included in Section 10.5 or deny confirmation of the Plan.

iii.    ***The Plan's injunction is overly broad and impermissibly operates as a discharge of the Debtors and third-parties.***

136.    Section 1141(d)(3) of the Bankruptcy Code bars the Chapter 11 discharge of a debtor that liquidates substantially all property of its estate, that does not engage in business after consummation of a Chapter 11 plan, and that would be denied a discharge under section 727(a) of the Bankruptcy Code. Here, the Debtors are corporate entities that sold (or seek to sell through the Plan) substantially all of their assets, proposed a liquidating Chapter 11 plan, and will not continue in business post-Effective Date. The Debtors are not allowed a discharge.

137.    The Debtors improperly attempt to effect a discharge through the Plan's overly broad injunction provisions in sections 10.3(b)-(d). An injunction such as the one set forth in sections 10.3 of the Plan is "inappropriate as applied to the Debtors because a liquidating Chapter 11 plan may not provide for a discharge of the debtor." *In re Bigler LP*, 442 B.R. 537, 545-46 (Bankr. S.D. Tex. 2010); *see also In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir.

2011) (*en banc*) (explaining that suit injunctions must be "both necessary to the reorganization and fair").

138.    If approved, the injunction in Section 10.6 provides:

> *all Entities who have held, hold or may hold Claims against or Interests in the Debtors [] and other parties in interest*, along with their respective present or former employees, agents, officers, directors, principals, and affiliates *are permanently enjoined*, on and after the Effective Date, solely *with respect to any Claims, Interests and Causes of Action that will be or are treated by the Plan* from (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind … against or affecting the *Debtors, the Wind-Down Estates*, the GUC Trust, the *Consenting Creditors*, the *Transferred Entities*, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the Frisco CDC, as applicable, [or the property of any such entity]; (ii) enforcing, levying, attaching…collecting, or otherwise recovering by any means, whether directly or indirectly, any judgment, award, decree, or order against the *Debtors, the Wind-Down Estates*, the Trustees, the *Consenting Creditors, the Europe/ROW Purchaser, and the Transferred Entities*, [or the property of such entity]; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind-Down Estates, and the GUC Trust or the property of any of the Debtors, the Wind-Down Estates, the Trustees, the *Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities*, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable, or against property or interests in property of any of the Debtors, the Wind-Down Estates, and the GUC Trust except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Plan at §10.3 (emphasis added).

139.    The provisions of this injunction would result in the discharge of the Debtors, the Wind-Down Estates, the Trustees, Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC from any Claim, Interest, or Cause of Action that will be or are treated

by the Plan. The scope of the injunction is far too broad and not only impermissibly operates as a discharge of the Debtors, but also impermissibly seeks to insulate third-parties that are not entitled to such protection. The proposed injunctions are neither necessary to the reorganization of the Debtor nor fair and therefore, must be denied.

140.    Further, the releases set forth in Section 10.5 and 10.6 and the injunctions set forth in Section 10.3 impermissibly act as a discharge of any and all Claims and Causes of Action based on or relating to, or in any manner *arising prior to the Effective Date* in contravention of the Bankruptcy Code. *See* Plan 10.5 and 10.6 (emphasis added). Bankruptcy Code section 1141(d)(1) provides that a discharge extends only to debts that arose *before the date of confirmation* of a Chapter 11 plan; therefore, even if the proposed releases were warranted—and they are not—the Plan must use the Confirmation Date, not the Effective Date. 11 U.S.C. § 1141(d)(1)(A).

141.    The injunctions set forth in Section 10.3 must be appropriately revised or the Bankruptcy Court should deny confirmation of the Plan.

*iv.    The exculpation provision of the Plan is impermissible and must be denied.*

142.    The exculpation provision is overly broad as it essentially absolves the Exculpated Parties from any Claim or Cause of Action, arising on or after the Commencement Date through the Effective Date. The Plan defines Exculpated Parties as:

> (a) the Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) each of the DIP Lenders and the DIP Agent, (e) the Creditors' Committee and each of its members in their capacity as such, (f) the GUC Trust, (g) the GUC Trustee, (h) the Trustees, (i) the Consenting Creditors, and (j) with respect to each of the foregoing Persons or Entities in clauses (a) through (i), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided [therein].

143.    Simply stated, the universe of potential claims being released is too broad to be permissible. The exculpation clause must be limited to the fiduciaries who have served during the Chapter 11 Cases: estate professionals, the Creditors' Committee and its members, and the

Debtors' directors and officers. *See In re Wash. Mut., Inc.*, 442 B.R. at 350-351. The exculpation provision of the Plan must be revised or confirmation of the Plan must be denied.

**C.    Other Objections to Confirmation of the Plan.**

**i.    *The Plan cannot be confirmed at it is an improper amendment of the Initial Plan.***

144.    In Section 12.4 of both the Initial Plan and the Plan the Debtors reserved the right to amend or modify the Plan prior to entry of the Confirmation Order; however, the right to amend certain provisions of the Initial Plan required the consent of certain parties, including DTSC. Absent DTSC's consent, the Debtors were not permitted to amend or modify the "definition of Settling Governmental Authorities or Schedule 1 to the [Initial Plan]." Initial Plan at §12.4(a). Despite this clear and unambiguous provision, the Debtors amended the Plan, including modifying the definition of Settling Governmental Authorities, without the consent of DTSC. Therefore, the Plan is invalid and cannot be confirmed.

**ii.    *The Releases by Holders of Claims and Interests in Section 10.6 are incomprehensible.***

145.    The Releases by Holders of Claims and Interests in Section 10.6 are impermissible and should not be approved. However, even if the Bankruptcy Court finds the Releases by Holders of Claims and Interests meet the requirements under Third Circuit precedent—and they do not— the Plan cannot be confirmed as the releases are unclear and incomprehensible.

146.    Section 10.6 provides:

"As of the Effective Date…the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following…(f) solely with respect to (i) the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors, all holders of General Unsecured Claims and Environmental NPP Claims and (ii) the Trustees, all California state governmental agencies, including the California DTSC, that have jurisdiction regarding the enforcement of Environmental Laws…in each case, from any and all Claims and Causes of Action . . . ."

147.    A plain reading of the release provision is difficult, if not impossible. Although the

language is unclear, seemingly (A) the release being imposed on DTSC pursuant to 10.6(f)(i) is a release of only the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors (and no other party, including any Related Party), and (B) the release being imposed on California state governmental agencies, including DTSC, pursuant to 10.6(f)(ii) is limited to the Trustees. The expansive language in subsection (g) further complicates Section 10.6 as it applies to "any Person or Entity in the foregoing clauses." The provisions of the Releases by Holders of Claims and Interests is further confused by the final provision of Section 10.6. As the language is ambiguous at best, the Plan may not be confirmed.

*iii.*      ***The Disclosure Statement should not be approved.***

148.      The Debtors elected to pursue a combined hearing on approval of the Disclosure Statement and confirmation of the Initial Plan. However, the Global Settlement which served as the basis for the Initial Plan was not approved; instead, the Debtors filed the Plan, which differs dramatically in key provisions from the Initial Plan. The Disclosure Statement fails to satisfy section 1125 of the Bankruptcy Code as it does not contain adequate information related to the abandonment of Non-Performing Properties, the treatment of Environmental NPP Claims, or the means for the implementation of the Plan, including the identification of the Plan Administrator and the New Board. Therefore, the Disclosure Statement should not be approved by the Court at the Combined Hearing.

## CONCLUSION

WHEREFORE, DTSC respectfully request that this Court sustain the Objection and require the Debtors to modify the Plan accordingly or deny confirmation of the Plan.

Dated: October 7, 2020

Respectfully Submitted,

/s/ Matthew L. Hinker
NANCY A. MITCHELL
nmitchell@omm.com
MATTHEW L. HINKER
mhinker@omm.com
O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
Telephone:    (212) 326-2000
Facsimile:    (213) 326-2061

PETER FRIEDMAN
pfriedman@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006
Telephone:    (202) 383-5300
Facsimile:    (202) 383-5414

-and-

JAMES R. POTTER
james.potter@doj.ca.gov
California Department of Justice
Office of the Attorney General
Public Rights Division
Environment Section
300 S. Spring Street
Los Angeles, CA 90013

ANTHONY A. AUSTIN
anthony.austin@doj.ca.gov
HEATHER C. LESLIE
heather.leslie@doj.ca.gov
California Department of Justice
Office of the Attorney General
Public Rights Division
Environment Section
1300 I Street, Suite 125
Sacramento, CA 95814
Tel.: 213-369-6326

XAVIER BECERRA
Attorney General of California
EDWARD H. OCHOA
Senior Assistant Attorney General

*Counsel to the California Department of*
*Toxic Substances Control*