# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x
                                               :

**In re**                                  :            **Chapter 11**
                                                 :

**EXIDE HOLDINGS, INC.,** *et al.,*       :            **Case No. 20–11157 (CSS)**
                                                 :

                      **Debtors.**[1]            :            **(Jointly Administered)**
                                                 :

---------------------------------------------------------- x

## DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS AND (II) OMNIBUS REPLY TO OBJECTIONS THERETO

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi
Zachary I. Shapiro
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for Debtors
and Debtors in Possession*

Dated: October 12, 2020
        Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

PLEADINGS AND EVIDENCE IN SUPPORT OF CONFIRMATION .......................................6

FACTS ......................................................................................................................................7

    **A.**    General Background ......................................................................................7

    **B.**    The Global Settlement. ................................................................................8

    **C.**    Marketing Process for Europe/ROW Business.....................................14

    **D.**    Plan Solicitation ........................................................................................16

ARGUMENT ...........................................................................................................................18

I.    THE AMENDED PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY
CODE AND SHOULD BE APPROVED.............................................................................18

    **A.**    Amended Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code...................19

    **B.**    Classification of Claims and Interests Complies with Section 1122 of the
Bankruptcy Code. ................................................................................20

    **C.**    Amended Plan Complies with Section 1123(a) of the Bankruptcy Code.............23

    **D.**    Amended Plan Complies with Section 1123(b) of the Bankruptcy Code. ............24

        **1.**    Plan Permissive Provisions. ........................................................ 24

        **2.**    The Global Settlement Is An Integral Component of the Amended
Plan and Should Be Approved Pursuant to Bankruptcy Rule 9019.......... 25

        **3.**    Columbus NPP Termination Documents Should Be Approved............... 36

        **4.**    Plan Releases Should Be Approved......................................... 38

        **5.**    Europe/ROW Sale Transaction Maximizes Stakeholder Recoveries
and is a Sound Exercise of the Debtors' Business Judgment. ................. 65

    **E.**    Amended Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code...................67

    **F.**    Amended Plan Has Been Proposed in Good Faith in Compliance with
Section 1129(a)(3) of the Bankruptcy Code. .........................................70

    **G.**    Amended Plan Complies with Section 1129(a)(4) of the Bankruptcy Code. ........71

    **H.**    Debtors Have Complied With the Requirements of Section 1129(a)(5) of
the Bankruptcy Code............................................................................72

    **I.**    Amended Plan is in Best Interests of All Creditors of, and Equity Interest
Holders in, Each Debtor.......................................................................74

    **J.**    Amended Plan Has Been Accepted by or Is Presumed to Have Been
Accepted by All Impaired Classes Entitled to Vote on Amended Plan.................77

    **K.**    Amended Plan Provides for Payment in Full of All Allowed Priority
Claims. ................................................................................................78

**L.**  Amended Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code...............79

**M.**  Amended Plan Is Feasible.................................................................................80

**N.**  Amended Plan Complies with Section 1129(a)(12) of the Bankruptcy Code.......................................................................................................84

**O.**  Amended Plan Satisfies Section 1129(a)(13) of the Bankruptcy Code...............85

**P.**  Amended Plan Satisfies "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes. ...........................87

    **1.**  Amended Plan Does Not Discriminate Unfairly. .................................... 87

    **2.**  Amended Plan Is Fair and Equitable. ...................................................... 89

**II.**  THE OBJECTIONS TO THE AMENDED PLAN SHOULD BE OVERRULED AND AMENDED PLAN CONFIRMED. ..........................................................90

  **A.**  Objection by California DTSC Should be Overruled. ..........................................90

    **1.**  Abandonment of the Vernon Non-Performing Property, if Required Pursuant to the Amended Plan, Should Be Approved. ............. 90

    **2.**  Amended Plan Satisfies Section 1129 of the Bankruptcy Code. .............. 91

    **3.**  The Injunction, Releases, and Exculpation Provided for in the Amended Plan are Appropriate and Should be Approved..................... 119

    **4.**  All Other Objections by California DTSC Should be Overruled. .......... 119

  **B.**  The Americas Buyer's Objection Should Be Overruled.....................................121

    **1.**  The Americas Purchase Agreement Sets Forth Clear Transaction Accounting Principles for the Working Capital Adjustment.................. 122

    **2.**  The Debtors Will Be Able to Pay Any Amounts Owed in Connection with the Post-Closing Adjustment...................................... 123

**III.**  DISCLOSURE STATEMENT, SOLICITATION PROCEDURES, AND VOTING PROCEDURES SHOULD BE APPROVED On a Final Basis. ...................128

  **A.**  The Disclosure Statement Contains Adequate Information................................128

**IV.**  CAUSE EXISTS TO WAIVE STAY OF PROPOSED CONFIRMATION ORDER....................................................................................................................131

CONCLUSION.................................................................................................................133

**Exhibits**

Exhibit A: Objections Chart
Exhibit B: California DTSC Plan Releases
Exhibit C: *JRV Group* Confirmation Hearing Transcript

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 710 Long Ridge Rd. Operating Co.*,
    Case No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ..................46, 51

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986)...................................................................................67

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ......................27, 71

*In re Affiliated Foods, Inc.*,
    249 B.R. 770 (Bankr. W.D. Mo. 2000).................................................................71

*In re Aleris Int'l, Inc.*,
    Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010).....................40

*In re Am. Capital Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012)...................................................................................76

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) ............................................................................19

*In re Armstrong World Indus., Inc.*,
    *348 B.R. 111 (D. Del. 2006)* ...........................................................................18, 83

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)............................................................................................70

*In re Bildisco*,
    682 F.2d 72 (3d Cir. 1982), *aff'd* 465 U.S. 513 (1984) ...........................................37

*In re Bush Indus., Inc.*,
    315 B.R. 292 (Bankr. W.D.N.Y. 2004) ................................................................67

*In re Capmark Fin. Grp. Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) ........................................................27, 28, 29

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
    860 F.2d 94 (3d Cir. 1988).................................................................................121

*In re Charter Commc'ns*,
    419 B.R. ...............................................................................................28, 73, 103

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010) ....................................................................67

*In re Coastal Broad. Sys., Inc.*,
   570 F. App'x 188 (3d Cir. 2014) ...................................................................19, 98

*In re Continental Airlines*,
   203 F.3d 203 (3d Cir. 2000)...........................................................50, 54, 56, 57

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) .................................................27, 28, 58, 67

*In re Dana Corp.*,
   412 B.R. 53 (S.D.N.Y. 2008).................................................................................91

*Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future*
   *Holding Corp.)*,
   527 B.R. 157 (D. Del. 2015) ....................................................................23, 91, 98

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. .....................................................................................................64, 71, 84

In *re Emerge Energy Services LP*,
   2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019)...................................50, 77, 118

*In re Energy Future Holdings Corp.*,
   Case No. 14-10979 (CSS)....................................................................................51

*In re Enron Corp.*,
   No. 01 B 16034 ....................................................................................................105

*Estes & Hoyt v. Crake (In re Riverside–Linden Inv. Co.)*,
   925 F.2d 320 (9th Cir.1991) ...............................................................................106

*In re EV Energy Partners, L.P.*,
   Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) ............................60, 66

*In re Evergreen Energy, Inc.*,
   546 B.R. 549 (Bkrtcy. D. Del. 2016) .................................................................109

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ................................................................42, 58

*In re Ferretti*,
   128 B.R. 16 (Bankr. D.N.H. 1991) .....................................................................122

*In re Fidelis, Inc.*
   481 B.R. 503 (Bankr. E.D. Mo. 2012) .................................................................51

*In re Filene's Basement, LLC*,
    Case No. 11-13511 (KJC), 2014 WL 1713416 (Bankr. D. Del. Apr. 29, 2014) ...................32

*In re Finlay Enterprises, Inc.*,
    No. 09-14873 JMP, 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) ......................77, 86

*Fletcher v. Atex, Inc*,
    68 F.3d 1451 (2d Cir. 1995)..............................................................................105

*In re Freedom Rings, LLC*,
    Case No. 05-14268 (CSS) (Bankr. D. Del. Apr. 20, 2006) .....................................51

*In re Gen. Wireless Operations, Inc.*,
    Case No. 17-10506 (BLS) (Bankr. D. Del. Oct. 26, 2017).....................................58

*Geyer v. Ingersoll Publ'ns Co.*,
    621 A.2d 784 (Del. Ch. 1992).........................................................................105

*In re Glob. Indus. Techs., Inc.*,
    No. 02-21626-JKF, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013)................28

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. ...........................................................................................................18

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ...................................................................94

*Grp. of Inst. Inv'rs, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*,
    318 U.S. 523 (1943)..........................................................................................37

*Harco Nat'l Ins. Co. v. Green Farms, Inc.*,
    No. CIV.A. 1331, 1989 WL 110537 (Del. Ch. Sept. 19, 1989) ...........................105

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del. 2016) ..................................................................56

*In re Heritage Highgate, Inc.*,
    679 F.3d 132 (3d Cir. 2012)......................................................................76, 118

*In re Hibbard Brown & Co.*,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998)..................................................................29

*In re HQ Global Holdings, Inc.*,
    290 B.R. 507 (Bankr. D. Del. 2003) ..................................................................37

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009)..........................................................19, 98

*In re Indianapolis Downs, LLC,*
486 B.R. 286 (Bankr. D. Del. 2013) ............................................................41, 42, 58

*In re Indu Craft Inc.,*
2012 WL 3070387 (S.D.N.Y., July 27, 2012) .....................................................112

*In re Insys Therapeutics, Inc.,*
Case No.19-11292 (JTD) (Bankr. D. Del. Jan. 16, 2020).......................................58

*In the Matter of Jersey City Med. Ctr.,*
817 F.2d 1055(3d Cir. 1987).....................................................................................20

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,*
987 F.2d 154 (3d Cir. 1993).......................................................................................20

*In re Johns-Manville Corp.,*
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part,* 78 B.R. 407 (S.D.N.Y.
1987), *aff'd,* 843 F.2d 636 (2d Cir. 1998).................................................................84

*In re Key3Media Grp.,*
336 B.R. 87 (Bankr. D. Del. 2005), *aff'd,* 2006 WL 2842462 (D. Del. Oct. 2,
2006) ..........................................................................................................................48

*In re KiOR, Inc.,*
Case No. 14-12514 (CSS) (Bankr. D. Del. June 8, 2015) ......................................22

*L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.),*
209 F.3d. 291 (3d Cir. 2000)....................................................................................37

*In re LBI Media, Inc.,*
Case No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) ....................................60

*In re Lernout & Hauspie Speech Prods., N.V.,*
301 B.R. 651 (Bankr. D. Del. 2003) ........................................................................84

*Lisanti v. Lubektin (In re Lisanti Foods, Inc.),*
329 B.R. 491 (D.N.J. 2005) ......................................................................................69

*In re Louise's, Inc.,*
211 B.R. 798 (D. Del. 1997) .....................................................................................27

*In re Marvel Ent. Grp., Inc.,*
222 B.R. 243 (D. Del. 1998)......................................................................................27

*In re Marvel Entm't Grp.,*
273 B.R. 58 (D. Del. 2002)........................................................................................41

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)..............................................................40, 48

*In re Maxus Energy Corp.*,
    Case No. 16-11501 (CSS) (Bankr. D. Del. May 22, 2017) .....................................60

*In re Medford Crossings North, LLC*,
    No. 07-25115, 2011 WL 182815 (Bankr. D.N.J. Jan. 20, 2011) ...........................50

*In re Microfab, Inc.*,
    105 B.R. 161 (Bankr. D. Mass. 1989) .................................................................108

*Midlantic Nat'l Bank v. New Jersey Dep't of Envt'l Prot.*,
    474 U.S. 494 ...........................................................................................................21

*In re Model Reorg Acquisition, LLC*,
    Case No. 17-11794 (CSS) (Bankr. D. Del. Oct. 6, 2017) .......................................60

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996)........................................................................28, 32, 35

*N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp.*,
    515 F. App'x 176 (3d Cir. 2013) .........................................................................104

*In re Nailite Int'l*,
    No. 09-10526 (MFW), 2009 Bankr. LEXIS 4878 (Bankr. D. Del. Dec. 8,
    2009) ......................................................................................................................77

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994).................................................................................32

*In re New Gulf Res., LLC*,
    Case No. 15-12566 (BLS) (Bankr. D. Del. Apr. 20, 2016) .....................................58

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015)........................................................................29

*In re Nutritional Sourcing Corp.*,
    *398 B.R. 816 (Bankr. D. Del. 2008)*......................................................................18

*In re Nuverra Envtl. Sols., Inc.*,
    Case No. 17-10949 (KJC) (Bankr. D. Del. July 25, 2017) ...............................66, 95

*In re Oldco M Corp.*,
    438 B.R. 775 (Bankr. S.D.N.Y. 2010)..........................................................107, 108

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006).......................................................................60

*In re PPI Enters. (U.S.), Inc.*,
    228 B.R. 339 (Bankr. D. Del. 1998) ................................................................67

*In re Penn Cent. Transp. Co.*,
    596 F.2d 1127 (3d Cir. 1979) ..........................................................................27

*In re Phoenix Petroleum, Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) .............................................................121

*Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*),
    761 F.2d 1374 (9th Cir. 1985) ..........................................................................76

*In re PNG Ventures, Inc.*,
    Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) .....................................53, 56

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ..........................................................................................27

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) .........................................................41, 60, 64, 67

*In re Pyxus Int'l, Inc.*,
    Case No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020) ...............................66

*In re Rock & Republic Enterprises*,
    2011 WL 4756571 (Bankr. S.D.N.Y. 2011) ....................................................107

*RRX Indus., Inc., v. Lab-Con, Inc.*,
    772 F.2d 543 (9th Cir. 1985) ..........................................................................105

*In re Superior Air Charter, LLC*,
    Case No. 20-11007 (CSS) (Bankr. D. Del. Sept. 4, 2020) ................................60

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ..................................................................69

*In re Tidewater Inc.*,
    Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017) ...............................66

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ................................................................67

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *aff'd*, 587 B.R. 606 (D. Del. 2018), *aff'd*,
    972 F.3d 228 (3d Cir. 2020) ......................................................................77, 118

*In re Tribune Co.*,
   476 B.R. 843 (Bankr. D. Del. 2012) *aff'd as modified*, Case No. 12-CV-1072
   GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*,
   799 F.3d 272 (3d Cir. 2015)........................................................................... *passim*

*In re Tribune Company*,
   Case No. 18-2909, 2020 WL 5035797 (3d Cir. Aug. 26, 2020)..................................94, 95, 97

*U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*,
   426 B.R. 114 (Bankr. D. Del. 2010) ............................................................... *passim*

*In re U.S. Truck Co.*,
   47 B.R. 932 (E.D. Mich. 1985), *aff'd sub nom. Teamsters Nat'l Freight Indus.
   Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581
   (6th Cir. 1986)........................................................................................................77

*In re United Artists Theatre Co. v. Walton*,
   315 F.3d 217 (3d Cir. 2003)....................................................................................56

*United States v. Bestfoods*,
   524 U.S. 51 (1998)................................................................................................105

*United States v. Energy Res. Co.*,
   495 U.S. 545 (1990)..........................................................................................49, 76

*In re W.R. Grace & Co.*,
   *475 B.R. 34 (D. Del. 2012)* ................................................................... *passim*

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d Cir. 2013)..................................................................23, 76, 91, 98

*In re W.R. Grace*,
   446 B.R. ..............................................................................................................56

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ....................................................29, 42, 60, 90

*In re Western Management, Inc.*,
   6 B.R. 438 (W.D. Kentucky, August 1, 1980)....................................................113

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
   434 F.3d 639 (3d Cir. 2006)....................................................................................29

*In re Winstar Communications, Inc.*,
   554 F.3d 382 (3d Cir. 2009)..................................................................................109

*In re Woodbridge Grp. of Cos., LLC*,
   592 B.R. 761 (Bankr. D. Del. 2018) ................................................................31, 33

*In re WorldCom Inc.*,
 Case No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .................................................................................................................84

*In re WR Grace & Co.*,
 729 F.3d 332 (3d Cir. 2013).....................................................................76, 89, 90

*Yadkin Valley Bank & Trust v. Linda McGee, Trustee (n re Hutchinson)*,
 5 F.3d 750 (4th Cir.1993) ..............................................................................106

*In re Zenith Elecs. Corp.*,
 241 B.R. 92 (Bank D. Del. 1999) ............................................... *passim*

**Statutes**

11 U.S.C. 1129(a)(7)(A)(ii) .........................................................................101

11 U.S.C. § 507(a)(2)......................................................................................81

11 U.S.C. § 1125(a)(1).....................................................................................121

11 U.S.C. § 1126(g) ..........................................................................65, 66, 74

11 U.S.C. § 1129(a)(9)(A) .......................................................................119, 120

11 U.S.C. § 1129(a)(14)..................................................................................17

42 U.S.C. § .....................................................................................................70

42 U.S.C. § 9601 ..........................................................................................104

42 U.S.C. § 9601(20)(F) ...............................................................................104

42 U.S.C. § 9601(20)(G)(ii)..........................................................................104

42 U.S.C. § 9601(20)(G)(iv).........................................................................104

United States Code title 31 section 3717 .....................................................81

Bankruptcy Code ................................................................................. *passim*

Cal. Health & Safety Code § 25323.5............................................................104

CERCLA.................................................................................................100, 104

COBRA.............................................................................................................82

Environmental Laws .............................................................................21, 22, 39, 93

Comprehensive Environmental Response, Compensation, and Liability Act ..............................70

**Other Authorities**

72 Am. Bankr. L.J. 227, 228, 249 (1998) .......................................................................95

Bankruptcy Rules ................................................................................................... *passim*

H.R. Rep. 95-595 ...............................................................................................................18

H.R. Rep. No. 95-595 (1977) .................................................................................18, 63

reprinted in 1978 U.S.C.C.A.N. 5787 ...........................................................................109

S.Rep. No. 95–989 (1978) ..............................................................................................109

S. Rep. No. 95-989 (1978) ................................................................................................18

Exide Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[2] submit this Memorandum of Law and omnibus reply to the Confirmation Objections[3] (the "**Memorandum**") in support of the Debtors' request for confirmation of the *Third Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors*, filed contemporaneously herewith (as the same has been or may be amended, modified, supplemented, or restated, the "**Amended Plan**").

## PRELIMINARY STATEMENT

1.     The Amended Plan is a remarkable achievement to attain a consensual resolution of these chapter 11 cases that will preserve over 5,000 jobs, maximize recoveries to creditors and effectuate the safe and orderly transition of the Debtors' Non-Performing Properties.  A consensual chapter 11 plan supported by almost 100% of the Debtors' secured noteholders, the Creditors' Committee, the PBGC, and all but one of the Debtors' fourteen (14) environmental regulators (all such thirteen (14) regulators, including California Department of Toxic Substances Control ("**California DTSC**"), collectively, the "**Participating Governmental Authorities**") seemed unimaginable at the commencement of these chapter 11 cases just five (5) months ago.  The limited liquidity available to the Debtors, the uncertainties and challenges caused by the global pandemic outbreak, and the number of highly complex and difficult issues that had to be addressed presented the potential for years of extended, complex and expensive litigation among competing parties and interests.  But, with the assistance of five (5) Court-approved mediators (collectively, the "**Mediators**"), including four (4) retired bankruptcy or district court judges, and the good faith efforts of the Debtors, the Creditors'

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan or the Disclosure Statement (each as defined herein).

[3]     Objections to confirmation of the Amended Plan (collectively, the "**Confirmation Objections**") are listed on the Objections Chart attached hereto as **Exhibit A** or addressed herein.

Committee, the Consenting Creditors, and the Settling Governmental Authorities—who banded together to address the issues in recognition of the economic and practical realities—the Debtors and their stakeholders have achieved the impossible.  The confirmation of the Amended Plan represents the final step in the administration of these highly successful chapter 11 cases.  For the reasons set forth herein and in the supporting evidence and pleadings submitted in support of confirmation, the Amended Plan satisfies the requirements of section 1129 of the Bankruptcy Code, is in the best interests of creditors and should be confirmed.

2.      The Amended Plan is premised upon a hard-fought Global Settlement that entails a fully integrated compromise and settlement of potential claims that could be brought by the Debtors, the Participating Governmental Authorities, Creditors' Committee, and Environmental Sureties.  Importantly, the Global Settlement provides full payment of administrative and priority claims, a guaranteed recovery for general unsecured creditors that otherwise was highly uncertain, and resolves significant and contentious issues regarding the Non-Performing Properties and the Debtors' prepetition attempts to recapitalize and reorganize their businesses through the June 2019 Financing and the Optimization.  The Amended Plan also incorporates the Europe/ROW Sale Transaction pursuant to which the Debtors' secured noteholders will consummate their market-tested credit bid to purchase the equity interests of the Debtors' European and Rest-of-World businesses which, together with the financing to those businesses being provided by the Ad Hoc Group, will enable such businesses to continue as a going concern.  In addition, following extensive negotiations, the Amended Plan now also includes a settlement with the PBGC pursuant to which the Transferred Entities will make a settlement payment of $6.0 million to the PBGC in exchange for the PBGC's release of the PBGC Claims against the Transferred Entities, Consenting Creditors and certain of their Related

2

Parties.  The Debtors have also resolved the objection to the Amended Plan filed by Westchester

Fire Insurance Company ("**Westchester**").

3.      The benefits of the Amended Plan are obvious and cannot be overstated.

The alternative is also clear:  endless and costly litigation that will harm all parties in interest and

benefit no one.  The reality that all parties in interest have accepted (except the state of

California) is that the Debtors have limited funds and no means to orderly transition the Non-

Performing Properties absent the Global Settlement and the financial support offered by the

Consenting Creditors and Transferred Entities.  There is no escaping the reality that the Non-

Performing Properties must be immediately transitioned or abandoned.  The Debtors are simply

unable to maintain them.  In addition, if the Plan is not confirmed, administrative and priority

claims will not be satisfied and general unsecured creditors will likely recover nothing.  The

ongoing operations of the Debtors' European and Rest-of-World businesses will also be put in

jeopardy and thousands of jobs unnecessarily put at risk.

4.      In light of the above, California DTSC's opposition to the Amended Plan

is inexplicable and puzzling.  The Debtors have been completely transparent with California

DTSC (as they have been with all parties in these cases) and provided voluminous information

and access to records so that California DTSC can confirm for itself the fundamental fairness of

the Global Settlement and the stark realities of the alternative.  To that end, California DTSC

participated in the global case mediation that lasted approximately two (2) months and involved

extensive and open exchange of information.  Indeed, California DTSC participated in the

negotiation of the mediation procedures and even selected one (1) of the Mediators.  After the

Mediators' proposal was accepted by all parties and agreed to be recommended by the

Participating Governmental Authorities, including California DTSC, despite a consensual freeze

on discovery and litigation that was agreed by all parties, in response to informal discovery requests from California DTSC, the Debtors provided California DTSC with nearly 20,000 documents and access to the Debtors' professionals and the Creditors' Committee's professionals to address California DTSC's discovery requests regarding the independent investigations conducted by the Subcommittee (as defined below) and the Creditors' Committee. California DTSC, along with the United States Department of Justice on behalf of the Environmental Protection Agency (the "**DOJ**" or the "**EPA**", as applicable), also led the negotiations of the Amended Plan and the Environmental Settlement Agreement on behalf of the Participating Governmental Authorities, including provisions that California DTSC insisted on or accepted but now complains are unfair.

5.       Unfortunately, after investing months of time and resources, the Debtors and other Global Settlement Parties learned at the last minute that California DTSC would not proceed with the settlement recommended by the Mediators and accepted by all other parties. No good reason has been offered for California DTSC's abrupt about-face.  Instead, California DTSC appears to have decided that it must try to blow up the Amended Plan and Global Settlement so that it can claim a hollow victory with its citizens.[4]  There is no alternative to the Global Settlement and the Amended Plan.  As stated above, no matter what, the Non-Performing Properties must be abandoned or transitioned.  The Debtors are not continuing their operations and have no ability to maintain any Non-Performing Properties.  It is quite telling that the other Participating Governmental Authorities, including the EPA who has concurrent jurisdiction over the Vernon Non-Performing Property, reacted to California DTSC's withdrawal by working collaboratively with the other Global Settlement Parties on a short timeline to save the Global

---

[4]     *See* Jared Blumenfeld & Meredith Williams, Op-Ed: Exide's latest bid to avoid additional liability for poisoning L.A. County communities, LA. Times (Oct. 4, 2020),  https://www.latimes.com/opinion/story/2020-10-04/op-ed-exides-latest-bid-to-avoid-additional-liability-for-poisoning-l-a-county-communities.

Settlement and mitigate the unnecessary disruption caused by California DTSC's last minute reversal.  The continued support of the Settling Governmental Authorities speaks volumes as to the fairness of the Global Settlement and demonstrates that it is the best (and only) option for the safe and orderly transition of the Non-Performing Properties.

6.    Notwithstanding California DTSC's actions, the Debtors and the other Global Settlement Parties have continued to offer California DTSC the opportunity to still participate in the Global Settlement.  California DTSC can either consent and participate willingly in the Global Settlement that California DTSC agreed to recommend less than four (4) weeks ago or, if the Third Party Releases contained in Section 10.6 of the Amended Plan are approved as to California DTSC so that the Consenting Creditors receive the benefit of their bargain in exchange for making the approximately $2.6 million settlement payment allocable to the Vernon Non-Performing Property, California DTSC will receive the key benefits of the Global Settlement.  Absent California DTSC's consent or approval by the Court of the Third Party Releases as to California DTSC, the Debtors have no choice but to abandon the Vernon Non-Performing Property.

7.    The Amended Plan is supported by all of the Debtors' key stakeholders: the Consenting Creditors; the Settling Governmental Authorities; the Creditors' Committee; the Environmental Sureties; the PBGC; and various other significant secured and unsecured creditors.  In addition, of the more than 25,000 parties in interest who were served with notice of the Confirmation Hearing, only eight (8) objections to the Amended Plan were filed—of which six (6) relate to the Amended Plan itself and two (2) relate to cure and adequate assurance issues that are now moot.  The Debtors have also been advised by Prime Clerk LLC ("**Prime Clerk**"), the Debtors' claims and balloting agent, that the Plan has been accepted by 100% of the

members of every class of impaired creditors that voted on the Amended Plan.  *See* the Voting Certification.

8.      It bears emphasis that, in less than five (5) months, the Debtors have accomplished all of their objectives in these chapter 11 cases against all odds.  The Amended Plan ensures the ongoing long-term viability of the Debtors' Europe/ROW business operations and the related preservation of thousands of jobs.  The Global Settlement ensures that the Debtors will transition their Non-Performing Properties in an orderly manner, allows the Debtors to satisfy their administrative and priority creditors in full, and guarantees a distribution to general unsecured creditors that would not have been available without litigation and with no guarantee of any recovery.

9.      For these reasons, as stated more fully below, and those set forth in the supporting pleadings, the Debtors respectfully request that the Court approve the Amended Plan, including the Global Settlement and the Europe/ROW Sale Transaction.

## PLEADINGS AND EVIDENCE IN SUPPORT OF CONFIRMATION

10.      In further support of the Amended Plan, the Debtors submit the following declarations:

      i.    Declaration of Roy Messing, the Debtors' Chief Restructuring Officer, in Support of Confirmation of the Amended Plan (the "**Messing Confirmation Declaration**");

     ii.    Declaration of Christopher Robinson, a Managing Director of Ankura Consulting Group, LLC ("**Ankura**"), the Debtors' financial advisor, in Support of Confirmation of the Amended Plan (the **"Robinson Declaration**");

   iii.    Declaration of Harvey Tepner, member of the Debtors' Subcommittee, in Support of the Debtor Releases and Confirmation of the Amended Plan (the "**Tepner Declaration**");

iv.    Declaration of William G. Peluchiwski, a Managing Director of Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), the Debtors' investment banker, in Support of the Europe/ROW Sale Transaction and Confirmation of the Amended Plan (the "**Peluchiwski Declaration**"); and

v.    Declaration of Craig E. Johnson of Prime Clerk LLC With Respect to the Tabulation of Votes on the Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors (the "**Voting Certification**").

11.    In addition, the Debtors have filed contemporaneously herewith *Debtors' Memorandum of Law in Support of Abandonment of the Vernon Non-Performing Property Pursuant to the Amended Plan* (the "**Abandonment Memorandum**") and the following declarations in support thereof:

i.    Declaration of Roy Messing, the Debtors' Chief Restructuring Officer, in Support of Abandonment of the Vernon Non-Performing Property (the "**Messing Abandonment Declaration**"); and

ii.    Declaration of Eric Fraske, a Senior Consultant and Engineer of Alta Environmental, Inc. and Resident Engineer on site at the Vernon Non-Performing Property, the Debtors' environmental consultant, in Support of Abandonment of the Vernon Non-Performing Property (the "**Fraske Abandonment Declaration**");

12.    The Debtors will file a proposed order confirming the Amended Plan (the "**Proposed Confirmation Order**") as soon as practicable after the filing of this Memorandum and, in any event, prior to the Confirmation Hearing.

## FACTS

### A.    General Background

13.    Set forth below is a general summary of the pertinent facts and circumstances of these chapter 11 cases.  The Debtors also respectfully refer the Court to the

7

First Day Declaration;[5] the Disclosure Statement;[6] the Messing Confirmation Declaration; the Robinson Declaration; the Tepner Declaration; the Peluchiwski Declaration; the Messing Abandonment Declaration; the Fraske Abandonment Declaration; the Affidavit of Service of Solicitation Materials [Docket No. 793] (the "**Solicitation Affidavit**"); the *Affidavit of Publication* [Docket No. 798] (the "**Publication Affidavit**"); the Voting Certification; the *Affidavit of Service* [Docket No. 847] (the "**Plan Supplement Affidavit**" and collectively with the items listed in this paragraph, the "**Supporting Declarations**"), and the record of these chapter 11 cases for facts that bear on confirmation of the Amended Plan. The Supporting Declarations and any testimony and other declarations that may be adduced or submitted at or in connection with the Confirmation Hearing (as defined herein) are incorporated herein.

B.    **The Global Settlement.**

14.    At the outset of these chapter 11 cases, the Debtors requested approval of global settlement procedures (the "**Settlement Procedures**") in connection with their twenty-two (22) non-performing properties subject to the Global Settlement (collectively, the "**Non-Performing Properties**"), to attempt to reach a consensual agreement for the orderly transfer of the Non-Performing Properties from the Debtors' liquidating estates. A critical objective of the Settlement Procedures was to preserve the Debtors' limited resources and reduce the incurrence of unnecessary costs associated with litigating abandonment issues. If settlements could not be reached, the Debtors advised parties and the Court that they would have no choice but to seek to abandon the Non-Performing Properties. Following negotiations with the Participating Governmental Agencies, including California DTSC, on June 9, 2020, the Court entered an order

---

[5]    The "**First Day Declaration**" means the *Declaration of Roy Messing in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 14], filed on the Commencement Date.

[6]    The "**Disclosure Statement**" means the *Amended Disclosure Statement for Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 743].

approving the Settlement Procedures on a fully consensual basis.[7]  Following the initial global

settlement conference with the Participating Governmental Agencies, the Debtors and the

Participating Governmental Agencies engaged in site-specific settlement conferences throughout

the month of June.

15.     By early July, the Debtors and the Participating Governmental Agencies

had not made meaningful progress in negotiation.  As such, the Debtors and the Participating

Governmental Agencies consensually agreed to proceed to the second stage of the Settlement

Procedures with the participation of the Consenting Creditors and the Creditors' Committee, and

thereafter engaged in a global mediation process.  The Mediators presided over multiple global

mediation sessions and sessions with individual groups of participants commencing on July 7,

2020 and continuing through July 27, 2020.

16.     Discussions expanded to larger case issues as it became clear to all parties

and the Mediators that a comprehensive resolution was needed.  The Creditors' Committee got

more involved as they were conducting a parallel investigation of claims related to prepetition

transactions that would need to be addressed for complete resolution.  Because estate releases

and validity of noteholder liens, among other things, were conditions to the Europe/ROW

Stalking Horse Credit Bid, the potential objections to that transaction were also brought into the

mediation.

17.     On July 20, 2020, the Mediators made a "mediators' proposal" to all

parties in the mediation that proposed to comprehensively resolve all case issues among the

parties.  The Mediators set a deadline by which all parties would have to advise the Mediators if

they accepted or rejected (or, in the case of the Participating Governmental Authorities, agreed to

---

[7]     *See Order Governing Settlement Procedures With Governmental Agencies Relating to Non-Performing Properties* [Docket No. 242] (the "**Settlement Procedures Order**")

recommend) the Mediators' proposal.  If all parties accepted (or agreed to recommend) the Mediators' proposal, the Mediators would advise the parties that the proposal was accepted or recommended, as applicable.  If the proposal was rejected by any party, the Mediators would advise the parties that the settlement was rejected without disclosing the rejecting party or parties.  Follow certain clarifications, the Mediators circulated a final mediators' proposal to the parties.

18.     On July 28, 2020, the Mediators filed the *Mediators' Final Certificate of Completion File Pursuant to Order Granting Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (Docket No. 622), and on July 29, 2020, the Mediators filed the *Clarification to Mediators' Final Certificate of Completion Filed Pursuant to Order Granting Motion of Debtors For Authorization To (I) Implement Mandatory Settlement Procedures For Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (Docket No. 636) (the "**Mediators' Revised Certificate of Completion**"), in which the Mediators announced that the Global Settlement Parties had accepted the Mediators' Proposal (as defined therein), and that representatives for the Participating Governmental Authorities had agreed "to recommend [the Mediators' Proposal] and commit to pursuing approvals [from those with authority] pursuant to applicable law expeditiously and in good faith, and subject to public comment where applicable."  *See* Mediators' Revised Certificate of Completion at ¶4.

19.     The initial draft of the Environmental Settlement Documents, which were intended to implement the Mediators' Proposal, included the following terms:

> i.   **Environmental Response Trust**.  An environmental response trust (the "**Environmental Response Trust**") would be established.  The Environmental Response Trust will receive (i) a $10 million cash contribution to be paid by the Consenting Creditors or Transferred

Entities; (ii) payment of the full amount of any surety bonds in accordance with the terms of the surety bond agreements (or as otherwise provided by applicable state law); (iii) title to the Debtors' owned Non-Performing Properties (other than the Frisco Non-Performing Property) free and clear of all claims, liens, and interests; and (iv) environmental causes of action assigned by the Debtors, including any insurance coverage for environmental liabilities relating to the Non-Performing Properties. Moreover, the Debtors, Creditors' Committee, and the Consenting Creditors agreed to waive all rights relating to sale proceeds from the future sale of any Non-Performing Properties.

ii.    **General Unsecured Creditors' Trust**.  A general unsecured creditors' trust (the "**GUC Trust**") would also be established.  The GUC Trust will receive a cash contribution in the amount of $2.4 million from the Consenting Creditors or Transferred Entities (the "**GUC Global Settlement Payment**").  The Settling Governmental Authorities would be entitled to receive distributions from the GUC Trust in accordance with the following:

   a.    The Participating Governmental Authorities may receive distributions from the GUC Global Settlement Payment solely on account of non-environmental claims;

   b.    The Participating Governmental Authorities will waive distributions from the GUC Global Settlement Payment solely on account of environmental claims; and

   c.    To the extent the GUC Trust receives proceeds in excess of the GUC Global Settlement Payment, the Participating Governmental Authorities may receive distributions from such excess proceeds on account of both environmental and non-environmental claims.

iii.    **Frisco Trust**.  An environmental trust (the "**Frisco Trust**") will be established for the Frisco Non-Performing Property.  The Frisco Trust will receive (i) a $100,000 to be paid by the Transferred Entities; (ii) payment of the full amount of any surety bonds, up to the full cost of remediation, in accordance with the terms of the surety bond agreements (or as otherwise provided by applicable state law); (iii) title to the Frisco Non-Performing Property free and clear of all claims, liens, and interests; and (iv) environmental causes of action related to the Frisco Non-Performing Property assigned by the Debtors. Moreover, the Debtors, Creditors' Committee, and the Consenting Creditors agreed to waive all rights relating to sale proceeds from the future sale of the Frisco Non-Performing Property.

iv.   **Mutual Releases**.  The proposed Global Settlement includes mutual releases among the parties and covenants not to sue by the Participating Governmental Authorities consistent with the Global Settlement, which would be included in the Environmental Settlement Agreement and incorporated into the Amended Plan.

v.   **Commitments to Support the Plan**.  The Global Settlement Parties agreed to support or not oppose a plan consistent with the foregoing terms and to work together to document the agreement.

20.    Following acceptance (or recommendation) of the Mediators' Proposal by each of the Global Settlement Parties, as outlined in the Mediators' Revised Certificate of Completion, the parties proceeded to document the settlement.   Accordingly, the Debtors drafted a chapter 11 plan in consultation with the other Global Settlement Parties.  The Participating Governmental Agencies, including California DTSC, provided substantial input on the plan, in particular the sections related to implementation of the Global Settlement and treatment of their claims.  Ultimately, the Debtors filed the *Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 706] (the "**Initial Plan**"), on August 11, 2020 after receiving explicit sign-off from each of the other Global Settlement Parties.  Three days later, on August 14, 2020, the Debtors filed the *Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 742] (the "**First Amended Plan**") to make certain clarifications to the Initial Plan.  Again, the First Amended Plan was filed with approval of each of the Global Settlement Parties, including California DTSC.

21.    Likewise, the DOJ, in conjunction with the other Participating Governmental Authorities (including California DTSC), formulated drafts of the Environmental Settlement Documents, including the Environmental Settlement Agreement.  Included in the Environmental Settlement Documents were releases, covenants not to sue, and allocations of the Global Settlement Payments among the Participating Governmental Authorities—each of which were in accordance with the Mediators' Proposal and were drafted with the participation of

California DTSC.  As the Participating Governmental Authorities were putting the final touches on the version of the Environmental Settlement Agreement to be filed with the Court during the week of September 7, 2020, California DTSC notified the Debtors and the other Participating Governmental Authorities that it would be seeking (for the first time) the input of the Governor of California in his capacity as the individual with authority to approve California DTSC's participation in the Global Settlement.  Notwithstanding the fact that the Debtors and the Participating Governmental Authorities had openly discussed the intention to file a draft of the Environmental Settlement Agreement by September 9, 2020, California DTSC informed others that they would be meeting with the Governor on September 14, 2020.  Given the approaching deadline (contained in the First Amended Plan) to file a draft of the Environmental Settlement Agreement with the Plan Supplement, the Debtors and the Settling Governmental Authorities prepared the draft in accordance with the terms already discussed with California DTSC and filed a draft of the Environmental Settlement Agreement with the Plan Supplement [Docket No. 821] on September 12, 2020.

22.    On September 15, 2020, California DTSC notified the Debtors and the other Participating Governmental Authorities that, notwithstanding their participation in the Global Settlement negotiations, they would be withdrawing from the Global Settlement.  In the days and weeks that followed California DTSC's puzzling withdrawal, the Debtors and the Settling Governmental Authorities banded together to salvage the deal.

23.    To the credit of the Debtors, the Settling Governmental Authorities, the Consenting Creditors, and the Environmental Sureties, the Amended Plan currently in front of the Court represents the parties' successful effort at "putting the pieces back together" despite California DTSC's withdrawal.  In order to avoid rendering all of the parties' respective efforts

wasted, and to avoid widespread abandonment of the Non-Performing Properties, the Global Settlement Parties re-constructed the Environmental Settlement Documents and the Amended Plan in such a way that would achieve the same results, just without requiring the participation of California DTSC.

### C.    Marketing Process for Europe/ROW Business.

24.    The Debtors' postpetition marketing process conducted pursuant to the Court-approved bidding procedures (the "**Postpetition Marketing Process**"), which was led by Houlihan Lokey, was extensive and involved solicitations of interest from a diverse set of potential strategic and financial parties. Peluchiwski Decl. ¶ 9. In accordance with the Bidding Procedures approved by the Court on June 19, 2020,[8] the Debtors solicited bids for the Company's Europe/ROW business in addition to the Europe/ROW Stalking Horse Credit Bid. Peluchiwski Decl. ¶ 9. The Bidding Procedures provided maximum flexibility and incentives for bidders to participate. *Id.* ¶ 13. Among other things, bidders could submit bids for some or all of the Debtors' assets and there was no break-up fee payable to the Europe/ROW Stalking Horse. *Id.* All parties in interest, including potential bidders, were provided notice of the Bidding Procedures, which notice was also published in the national editions of The New York Times and USA Today. *See Affidavit of Service* [Docket No. 361] and *Affidavit of Publication* [Docket No. 421].

25.    Prior to and following the Commencement Date, Houlihan Lokey contacted over seventy-eight (78) potential third party bidders, approximately thirty-two (32) of which executed nondisclosure agreements allowing them to receive confidential information

---

[8]    *See Order (I) Approving (A) Bidding Procedures for Sales of Debtors' Assets, (B) Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auction for and Hearing to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief* [Docket No. 344].

with respect to the Debtors' assets.  Peluchiwski Decl. ¶ 9.  The diligence conducted in connection with the Debtors' assets was extensive and included, among other things, (i) access to over 6,500 documents in an electronic data room; (ii) discussions between potential bidders and the Debtors' management team; and (iii) numerous on-site visits hosted by the Debtors.  *Id.* ¶ 10.

26.    On June 18, 2020, the Debtors filed the *Notice of Europe/ROW Stalking Horse Agreement* [Docket No. 324], which included the material terms of the Europe/ROW Stalking Horse Credit Bid and a copy of the Stock and Asset Purchase Agreement dated as of June 17, 2020 (the "**Europe/ROW Stalking Horse Agreement**) by and among Exide Holdings, Inc., EIH Europe Acquisition LLC, and the other parties thereto.

27.    Despite the extensive efforts of the Debtors and their advisors, the Debtors did not receive any Qualified Bids by the bid deadline set forth in the Bidding Procedures (other than the Europe/ROW Stalking Horse Credit Bid). Peluchiwski Decl. ¶ 17.  Accordingly, on July 23, 2020, the Debtors filed the *Notice of Successful Bidders for Americas Assets and Europe/ROW Assets* [Docket No. 591], pursuant to which the Debtors designated the Europe/ROW Stalking Horse Credit Bid as the Successful Bid and the Europe/ROW Purchaser as the Successful Bidder.  As stated in the Notice of Successful Bid, the Debtors now seek to consummate the Europe/ROW Sale Transaction with the Europe/ROW Purchaser pursuant to the Amended Plan.

28.    As set forth in the Peluchiwski Sale Declaration, Houlihan Lokey and the Debtors apprised the Special Committee throughout the entire Postpetition Marketing Process, in addition to consistently updating and coordinating with other key stakeholders, such as the DIP Lenders, the Ad Hoc Group and Indenture Trustee (on an arms-length basis), the ABL Agent, and the Creditors' Committee.  Peluchiwski Decl. ¶ 20.  Furthermore, the Postpetition Marketing

Process was supervised by the Court and all parties in interest have been on notice of the Debtors' sale efforts since the Commencement Date.

29.    At bottom, there are no alternative Qualified Bids for a going concern sale of the Debtors' Europe/ROW business.  Peluchiwski Decl. ¶ 17.

**D.    Plan Solicitation**

30.    In light of their limited liquidity position following the closing of the Americas Sale Transaction, the Debtors sought an expedited process to obtain conditional approval of the Disclosure Statement.  At the hearing held on August 14, 2020 (the "**Conditional Disclosure Statement Hearing**"), the Court conditionally approved the Disclosure Statement,[9] subject to final notice and a hearing, in accordance with section 1125 of the Bankruptcy Code. Further, the Court scheduled the Combined Hearing, and approved certain solicitation and confirmation materials and procedures, including the Solicitation Packages, the Solicitation and Tabulation Procedures, the forms of Ballots, the Publication Notice, and the Combined Hearing Notice (each as defined herein), among other related relief.

31.    As set forth in the Voting Certification and as further described below, the Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and plan solicitation, as well as the Disclosure Statement Order.

32.    On August 14, 2020, the Court entered the *Order (I) Conditionally Approving the Disclosure Statement, (II) Establishing Solicitation, Voting, and Tabulation Procedures, (III) Scheduling a Combined Hearing, (IV) Establishing Notice and Objection*

---

[9]    The "**Conditional Disclosure Statement Order**" means the *Order (I) Conditionally Approving the Disclosure Statement, (II) Establishing Solicitation, Voting, and Tabulation Procedures, (III) Scheduling a Combined Hearing, (IV) Establishing Notice and Objection Procedures For Final Approval of Disclosure Statement and Confirmation of Plan, and (V) Granting Related Relief* (Docket No. 745).

*Procedures for Final Approval of Disclosure Statement and Confirmation of Plan, and (V) Granting Related Relief* [Docket No. 745] (together with any schedules and exhibits thereto, the "**Disclosure Statement Order**").  Following the Court's entry of the Disclosure Statement Order, the Debtors caused Prime Clerk to distribute copies of the Disclosure Statement Order, the Combined Hearing Notice,[10] and a form of ballot with voting instructions (the "**Ballot**" and, collectively, the "**Solicitation Package**") to each holder of a claim in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims).  *See* Solicitation Affidavit.  Furthermore, the Debtors caused Prime Clerk to publish a summary version of the Combined Hearing Notice (the "**Publication Notice**") substantially in the form attached to the Disclosure Statement Order at Exhibit 2 in the national editions of *The New York Times* and *USA Today* on August 20, 2020.  *See* Publication Affidavit.

33.    On September 12, 2020, the Debtors filed the Plan Supplement, consisting of the Assumption Schedule for the Europe/ROW Sale Transaction, a substantially final form of the GUC Trust Agreement, the proposed Environmental Settlement Agreement, the proposed Frisco Settlement Agreement, the Alternative Transaction Structure Summary, and the Columbus NPP Termination Documents.  The Debtors caused the Plan Supplement to be served on the Master Service List and holders of Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims).  *See* Plan Supplement Affidavit.[11]

---

[10]    The "**Combined Hearing Notice**" means the *Notice of (I) Hearing to Approve (A) Disclosure Statement on a Final Basis, (B) Plan, and (C) Europe/Row Sale Transaction; (II) Confirmation Objection Procedures; (III) Establishment of Voting Record Date, and (IV) Procedures and Deadline for Voting on the Plan* [Docket No. 747].

[11]    In an effort to limit substantial service costs, the Debtors caused Prime Clerk to mail or e-mail the notice of the Plan Supplement on (i) parties who filed proofs of claim in these chapter 11 cases, and (ii) parties listed on the Debtors' schedules of assets and liabilities.

34.    The deadline to vote on the Plan was September 17, 2020 at 5:00 p.m. (prevailing Eastern Time).    Prime Clerk's analysis of the ballots indicates that Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims)—the only classes of Claims entitled to vote on the Plan—voted to accept the Plan in accordance with the requirements of section 1126 of the Bankruptcy Code (as set forth below).    *See* Voting Certification.

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|
| Class 4 (Superpriority Notes Guarantee Claims) | 100% | 100% | 0% | 0% |
| Class 5 (Exchange Priority Notes Claims) | 100% | 100% | 0% | 0% |
| Class 6 (First Lien Notes Claims) | 100% | 100% | 0% | 0% |

## ARGUMENT

35.    This Memorandum is divided into four (4) parts.    Part I addresses the applicable requirements for confirmation of the Amended Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each such requirement and achievement of the objectives of chapter 11.    Part II responds to certain objections to confirmation of the Amended Plan.    Part III addresses the Disclosure Statement and Solicitation Procedures and their satisfaction of the requirements of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules. Part IV requests a waiver of any stay of the Proposed Confirmation Order.

## I.    THE AMENDED PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED.

36.    To achieve confirmation of the Amended Plan, the Debtors must demonstrate that the Amended Plan satisfies section 1129(a) of the Bankruptcy Code by a

preponderance of the evidence.[12]   As the United States Court of Appeals for the Fifth Circuit

stated in *Heartland Federal Savings & Loan Ass'n. v. Briscoe Enterprises, Ltd. II* (*In re Briscoe*

*Enterprises, Ltd. II*):  "The combination of legislative silence, Supreme Court holdings, and the

structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the

evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."

994 F.2d 1160, 1165 (5th Cir. 1993); *see also See In re W.R. Grace & Co.,* 475 B.R. 34, 114 (D.

Del. 2012), *aff'd*, 729 F.3d 311, 729 F.3d 332, 532 F. App'x 264 (3d Cir. 2013); *In re Nutritional*

*Sourcing Corp.,* 398 B.R. 816, 824 (Bankr. D. Del. 2008) (*citing In re Armstrong World Indus.,*

*Inc.*, 348 B.R. 111, 120 (D. Del. 2006).  The Debtors will demonstrate, by a preponderance of the

evidence, that all of the subsections of section 1129 of the Bankruptcy Code have been satisfied

with respect to the Amended Plan.

A.    **Amended Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code.**

37.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply

with the applicable provisions of the Bankruptcy Code.   The legislative history of section

1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123

of the Bankruptcy Code governing classification of claims and contents of the plan, respectively.

*See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re*

*Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000) ("The legislative

history reflects that 'the applicable provisions of chapter 11 [includes sections] such as section

---

[12]    Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code are inapplicable to the Debtors.  Section 1129(a)(14) relates to the payment of domestic support obligations.  *See* 11 U.S.C. § 1129(a)(14).  The Debtors are not subject to any domestic support obligations and, as such, this section of the Bankruptcy Code is inapplicable.  Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  *See* 11 U.S.C. § 1129(a)(15).  None of the Debtors is an "individual," and, accordingly, section 1129(a)(15) is inapplicable.  Finally, section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of nonbankruptcy law.  *See* 11 U.S.C. § 1129(a)(16).  Each Debtor is a moneyed, business, or commercial corporation; accordingly, section 1129(a)(16) is inapplicable.

1122 and 1123, governing classification and contents of plan." (alteration in original) (quoting H.R. Rep. 95-595, at 412)).   The Amended Plan fully complies with the requirements of the Bankruptcy Code.

**B.      Classification of Claims and Interests Complies with Section 1122 of the Bankruptcy Code.**

38.      Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Under this section, a plan may provide for multiple classes of claims or interests as long as each claim or interest within a class is substantially similar to the other claims or interests in that class.  A plan proponent has significant flexibility in classifying claims and interests into multiple classes, provided that there is a reasonable basis to do so and that all claims or interests within a given class are "substantially similar." *See Coastal Broad. Sys.*, 570 F. App'x at 193; *see also Idearc*, 423 B.R. at 160 ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class."), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011). To determine whether claims are "substantially similar," courts have held that the proper focus is on "the legal character of the claim as it relates to the *assets of the debtor*."  *AOV Indus.*, 792 F.2d at 1150-51 (emphasis in original); *see also Tribune Co.*, 476 B.R. at 855 (concluding that phrase "substantially similar" reflects "the legal attributes of the claims, not who holds them" (internal quotation marks omitted)), *aff'd as modified*, Case No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015).

39.      Though claims classified together must be sufficiently similar, the Bankruptcy Code does not forbid "the presence of similar claims in different classes. Although

20

the legislative history behind section 1122 is inconclusive regarding the significance (if any) of this omission, it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case." *Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987).   The Third Circuit has held that separate classification of similar claims is impermissible where the sole purpose of the classification scheme is to gerrymander votes and create an artificial impaired consenting class. S*ee John Hancock Mut. Life Ins. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993).

40.   In total, there are eleven (11) Classes of Claims against and Interests in the Debtors as follows:

i.   Class 1 includes Priority Non-Tax Claims, which are Claims entitled to priority in payment under section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

ii.   Class 2 includes Other Secured Claims, which are Secured Claims, other than ABL Claims, Superpriority Notes Guarantee Claims, Exchange Priority Notes Claims, or First Lien Notes Claims.

iii.   Class 3 includes ABL Claims, which are Claims arising under the ABL Credit Agreement.

iv.   Class 4 includes Superpriority Notes Guarantee Claims, which are Claims arising under the Superpriority Notes Indenture against Debtors Holdings and Exide Technologies, as guarantors.

v.   Class 5 includes Exchange Priority Notes Claims, which are Claims arising under the Exchange Priority and First Lien Notes Indenture relating to the Exchange Priority Notes issued thereunder.

vi.   Class 6 includes First Lien Notes Claims, which are Claims arising under the Exchange Priority and First Lien Notes Indenture relating to the First Lien Notes issued thereunder.

vii.   Class 7 includes General Unsecured Claims, which are Claims against the Debtors (other than Intercompany Claims and Environmental NPP Claims) that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Court.

viii.   Class 8 includes Environmental NPP Claims, which includes unsecured claims of the Participating Governmental Agencies against the Debtors under Environmental Laws with respect to the Non-Performing Properties.

ix.   Class 9 includes Intercompany Claims, which are prepetition Claims against a Debtor held by another Debtor or non-Debtor Affiliate.

x.   Class 10 includes Intercompany Interests, which are Interests in a Debtor other than Holdings Equity Interests.

xi.   Class 11 includes Holdings Equity Interests, which are Interests in Exide Holdings, Inc.

xii.   Class 12 includes Subordinated Securities Claims, which are Claims subject to subordination under section 510(b) of the Bankruptcy Code.

41.    The classification scheme of the Amended Plan is rational and complies with the Bankruptcy Code.  Generally, the Amended Plan incorporates a "waterfall" classification and distribution scheme that strictly follows the statutory priorities prescribed by the Bankruptcy Code except as provided by the Global Settlement.  All Claims and Interests within a Class have the same or similar rights against the Debtors.  The Amended Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the differences in legal nature and/or priority of such Claims and Interests.

42.    In particular, the separate classification of General Unsecured Claims in Class 7 and Environmental NPP Claims in Class 8 manifestly complies with the requirements of section 1122.  Environmental NPP Claims have different legal rights against the Debtors than General Unsecured Claims because of the overlay of Environmental Laws.  For example, in connection with abandonment of the Non-Performing Properties, the Debtors may be required to expend additional funds to satisfy *Midlantic Nat'l Bank v. New Jersey Dep't of Envt'l Prot.*, 474 U.S. 494 (1986).  For this and other reasons, Environmental NPP Claims were always considered separately during these chapter 11 cases from the outset, including in the Mediators' Proposal

that was accepted by all parties and forms the foundation of the classification scheme in the Amended Plan.

43.     Further, the classification of claims in the Amended Plan poses no risk whatsoever of gerrymandering votes and manufacturing artificial support for the plan, the primary concern of courts that have heard challenges to classification schemes in chapter 11 plans.  *See*, *e.g.* June 8, 2015 Hr'g Tr. at 182:1-18, *In re KiOR, Inc.*, Case No. 14-12514 (CSS) (Bankr. D. Del. June 8, 2015) [Docket No. 644] ("you can't [classify similar claims in different classes] for some sort of illegitimate purpose, and of course, that's gerrymandering.").  Class 7 and Class 8 are each deemed conclusively to reject the plan, so neither the bifurcation into two classes nor the classification of California DTSC within Class 8 could possibly manipulate even a single vote with respect to the Amended Plan

44.     Accordingly, the classification scheme of the Amended Plan complies with section 1122 of the Bankruptcy Code and should be approved.

## C.      Amended Plan Complies with Section 1123(a) of the Bankruptcy Code.

45.     Section 1123(a) of the Bankruptcy Code sets forth five applicable requirements that the proponent of a chapter 11 plan must satisfy.[13]  *See* 11 U.S.C. § 1123(a). The Amended Plan fully complies with each such requirement:

> i.     The Amended Plan designates Classes of Claims and Classes of Interests as required by section 1123(a)(1).  *See* Amended Plan, § 3.
>
> ii.    The Amended Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Amended Plan and the treatment of each such Impaired Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively.  *See* Amended Plan, §§ 3 and 4.

---

[13]     The requirements set forth in sections 1123(a)(6), 1123(a)(7), and 1123(a)(8) of the Bankruptcy Code do not apply.  Sections 1123(a)(6) and 1123(a)(7) do not apply because the Plan provides for the wind down of the Debtors.  Section 1123(a)(8) only applies in a case in which the debtor is an individual and thus, is inapplicable to these chapter 11 cases.

iii.      Except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4).  *See* Amended Plan, § 4. As explained below, California DTSC's objection on the basis of section 1123(a)(4) should be overruled.  Fundamentally, California DTSC fails to recognize that the Amended Plan offers the same opportunity to all holders of Environmental NPP Claims—settlement or abandonment.  That is all that is required to comply with section 1123(a)(4) of the Bankruptcy Code.  *See Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." (quoting *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)), aff'd, 648 F. App'x 277 (3d Cir. 2016).

iv.      The Amended Plan provides adequate means for its implementation as required by section 1123(a)(5) through, among other things:  (a) the Global Settlement, *see* Plan § 5.2; (b) the Europe/ROW Sale Transaction, *see* Amended Plan, § 5.1; (c) the provisions governing distributions under the Amended Plan, *see* Amended Plan, § 6; (d) the creation and governance of the GUC Trust, *see* Amended Plan, § 5.3; (e) the creation and governance of the Environmental Response Trust, *see* Amended Plan, § 5.4; (f) subject to satisfaction of certain conditions, the creation and governance of the Vernon Response Trust, or the abandonment of the Vernon Non-Performing Property, *see* Amended Plan, §§ 5.5, 5.2; and (g) the wind down of the Debtors with respect to assets that are not sold in the Americas Sale Transaction, the Europe/ROW Sale Transaction, or contributed to the GUC Trust, the Environmental Response Trust, the Vernon Response Trust (or abandoned, if applicable), or the Frisco CDC, *see* Amended Plan, § 5.7.

**D.      Amended Plan Complies with Section 1123(b) of the Bankruptcy Code.**

**1.      Plan Permissive Provisions.**

46.      Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan.  Each provision of the Amended Plan is consistent with section 1123(b):

i.      As contemplated by section 1123(b)(1) of the Bankruptcy Code and pursuant to section 1124 of the Bankruptcy Code, Section IV of the

Amended Plan describes the treatment for Unimpaired Classes and Impaired Classes.

ii. With respect to the Debtors' executory contracts or unexpired leases, the Amended Plan provides for the assumption or rejection by the Debtors or the Wind Down Estates or the assumption and assignment thereof to the Transferred Entities in accordance with the Europe/ROW Purchase Agreement, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ), in accordance with the Environmental Settlement Agreement or the Frisco Settlement Agreement, as applicable, and all as contemplated by section 1123(b)(2) of the Bankruptcy Code.  *See* Amended Plan, § 8.

iii. As permitted by section 1123(b)(3)(A) of the Bankruptcy Code and explained in greater detail below, (a) the Global Settlement embodied in Section 5.2 of the Amended Plan represents a fair compromise and settlement of claims among the Global Settlement Parties; and (b) Section 10.5 of the Amended Plan provides for a release of Claims and Causes of Action owned by the Debtors' estates.

iv. As permitted by section 1123(b)(4) of the Bankruptcy Code, the Amended Plan provides for (A) the sale of the Debtors' Europe/ROW business to the Europe/ROW Purchaser, and (B) the transfer of the Non-Performing Properties to the Environmental Response Trust, the Frisco CDC, and, if applicable, the Vernon Response Trust.  This provision is addressed in further detail below.

v. As permitted by section 1123(b)(6) of the Bankruptcy Code, a plan "may include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."   11 U.S.C. § 1123(b)(6).  In accordance with section 1123(b)(6) of the Bankruptcy Code, the Amended Plan (a) contains certain release and exculpation provisions consistent with the applicable provisions of the Bankruptcy Code and Third Circuit law, as described in greater detail herein and (b) provides that the Court will retain jurisdiction over all matters arising in and related to these chapter 11 cases.

**2.      The Global Settlement Is An Integral Component of the Amended Plan and Should Be Approved Pursuant to Bankruptcy Rule 9019.**

47.      The Amended Plan incorporates the Global Settlement among the Debtors, the Settling Governmental Authorities, the Environmental Sureties, the Creditors' Committee, and the Consenting Creditors, which collectively hold more than ninety-five percent (95%) of

Claims entitled to vote.  Approval of the Global Settlement is a condition precedent to the confirmation of the Amended Plan.  The approval of the Global Settlement and confirmation of the Amended Plan will maximize and expedite recoveries to creditors and provide certainty and finality to the Debtors and all parties in interest.  The Amended Plan and the Global Settlement are the result of intense, good-faith, arm's-length negotiations with parties in interest and economic stakeholders, all of which was conducted pursuant to Court-approved Settlement Procedures and guided by the Mediators. The Global Settlement is the foundation of the Amended Plan.  It is overwhelmingly supported by the Debtors' economic stakeholders and should be approved.

48.    The Global Settlement is in the best interests of the Debtors and their Estates because without it, the Debtors would incur significant delay and expense engaging in what would certainly be lengthy and protracted litigation with the Participating Governmental Agencies and the Creditors' Committee.  The Global Settlement entails a fully integrated compromise and settlement of potential claims related to (i) environmental remediation or abandonment of the Debtors' Non-Performing Properties, and (ii) prepetition transactions, including the June 2019 Financing and the Optimization.  *See* Disclosure Statement, p. 4-7.

49.    The Global Settlement, as amended following California DTSC's withdrawal, includes the following key terms:[14]

i.    the establishment of a trust for the benefit of holders of Transferred NPP Claims and the appointment of a trustee recommended by the Settling Governmental Authorities.  The Environmental Response Trust shall receive (A) title to the Transferred Non-Performing Properties from the Debtors free and clear of all liens, (B) certain causes of action of the Debtors related to the Transferred Non-Performing Properties, and (C) a

---

[14]    The overview of the Global Settlement provided herein is qualified in its entirety by reference to the Amended Plan.

$7,412,477 settlement payment from the Transferred Entities (to be funded by a loan from the Consenting Creditors to such entities);

ii.    the Frisco Governmental Authorities shall receive (A) title to the Frisco Non-Performing Property from the Debtors free and clear of all liens, (B) certain causes of action of the Debtors related to the Frisco Non-Performing Property, and (C) a $100,000 settlement payment from the Transferred Entities (to be funded by a loan from the Consenting Creditors to such entities);

iii.   the establishment of a trust for the benefit of holders of Allowed General Unsecured Claims and the appointment of a trustee chosen by the Creditors' Committee.  The GUC Trust shall receive (A) certain causes of action of the Debtors, and (B) a $2,400,000 settlement payment from the Transferred Entities (to be funded by a loan from the Consenting Creditors to such entities);

iv.    the release or covenant not to sue, as applicable, of each of the Global Settlement Parties pursuant to the terms of the Environmental Settlement Agreement and the Frisco Settlement Agreement, as applicable; and

v.     the support of the Settling Governmental Authorities, the Environmental Sureties, and the Creditors' Committee for the Disclosure Statement, the Amended Plan, and the Europe/ROW Sale Transaction.

50.    Moreover, the Global Settlement, as implemented through the Amended Plan, provides for the transition or abandonment, as applicable, of the Vernon Non-Performing Property based upon whether California DTSC becomes a Global Settlement Party or, in the absence of such an election, the occurrence of the Payment Condition and the Vernon Trust Condition, meaning (1) the Bankruptcy Court approves the release by the California state governmental agencies, including California DTSC, in favor of the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors and the Vernon Environmental Trustee and (2) California DTSC reach an agreement providing covenants substantively identical to those being granted by the Settling Governmental Authorities.  The treatment based upon these conditions is as follows:

i.     If California DTSC becomes a Global Settlement Party, a beneficial interest in the Vernon Non-Performing Property will be transferred to California DTSC by way of the Vernon Environmental Trust Beneficial

Interests and a settlement payment of approximately $2.6 million will be made by the Transferred Entities (*See* Amended Plan, § 4.8(b).);

ii.    If California DTSC does not become a Global Settlement Party but the Payment Condition and the Vernon Trust Condition are satisfied, then the Vernon Non-Performing Property and approximately $2.6 million settlement payment will be transferred to the newly created Vernon Environmental Response Trust, in which California DTSC will receive a beneficial interest (*See* Amended Plan, §§ 4.8(b), 5.2(e)(i).);

iii.    If the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied, the Vernon Non-Performing Property will be abandoned and a settlement payment of approximately $2.6 million will be made by the Transferred Entities (*See* Amended Plan, §§ 4.8(b), 5.2(e)(ii).); and

iv.    If the Payment Condition is not satisfied, the Vernon Non-Performing Property will be abandoned and California DTSC will receive a first priority lien against such property.  *See* Amended Plan, §§ 4.8(b), 5.2(e)(iii).

51.    Each aspect of the Global Settlement is interdependent and relied upon by creditors who made material concessions as to their respective positions to enable the expeditious confirmation of the Amended Plan.  A modification to any aspect of the Global Settlement or the failure to approve the Global Settlement *in toto* almost certainly will result in unravelling of the Global Settlement, the Amended Plan and the Europe/ROW Transaction. Such an occurrence would set back the administration of the chapter 11 cases for an extended period as the Debtors and their stakeholders get bogged down in the maze of frenzied litigation.

52.    For the reasons set forth below, the Debtors respectfully submit that the Court should approve the Global Settlement.

a.    **Applicable Legal Standard**

53.    Section 1123(b)(3) of the Bankruptcy Code provides that a "plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).    As part of the restructuring process, the Court "may

approve a compromise or settlement" under Bankruptcy Rule 9019(a), and "[t]he standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019[.]" *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004). To be approved, a settlement need only be "fair and equitable." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also In re Marvel Ent. Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). Namely, a settlement must be "fair and equitable." *TMT Trailer Ferry,* 390 U.S. at 424.

54.     In making this determination, it is not necessary for a court to conduct a "mini-trial" of the facts or the merits of the underlying disputes to be settled or "decide the numerous questions of law or fact raised by litigation." *Capmark*, 438 B.R. at 515 ("[T]he Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise."); *see also In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979) (explaining that a court need only consider those facts that are necessary to enable it to evaluate the settlement and to make an informed and independent judgment about the settlement). Instead, the court "should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *Capmark*, 438 B.R. at 515; *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 242 (Bankr. S.D.N.Y. 2007) ("[A] bankruptcy court need not be aware of or decide the particulars of each individual claim resolved by the settlement agreement, or assess the minutia of each and every claim; rather, the court need only canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.") (internal

quotation marks omitted), *appeal dismissed*, 371 B.R. 660  (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420

(2d Cir. 2008).

55.    In the Third Circuit, when evaluating whether the settlement is fair and

equitable and above the lowest point in the range of reasonableness, courts consider the

following four factors:

    i.    the probability of success in litigation;

    ii.    the likely difficulties in collection;

    iii.    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

    iv.    the paramount interest of the creditors.

*See Capmark*, 438 B.R. at 515 (quoting *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d

Cir. 1996)).

56.    In addition to the *Martin* factors, a court should defer to the debtor's

business judgment "so long as there is a legitimate business justification for [its] action." *Coram

Healthcare*, 315 B.R. at 330 (citing *Martin*, 91 F.3d at 395); *see also JPMorgan Chase Bank,

N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252

(Bankr. S.D.N.Y. 2009) (explaining that while the "approval of a settlement rests in the Court's

sound discretion, the debtor's business judgment should not be ignored"), *appeal dismissed sub

nom. R2 Invs. LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 449 B.R. 14

(S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012); *see e.g., In re Glob. Indus. Techs., Inc.*, No.

02-21626-JKF, 2013 WL 587366, at *11 (Bankr. W.D. Pa. Feb. 13, 2013) ("The Settlements are

fair and equitable and a proper exercise of the Debtors' business judgment because they enable

the Debtors to consummate the [plan] and to reorganize their business operations, while at the

same time avoiding complex, expensive and protracted litigation with uncertain outcomes that

could cripple the Debtors' ability to reorganize."). In considering whether to approve a settlement, courts should exercise their discretion "in light of the general public policy favoring settlements." *Capmark*, 438 B.R. at 515 (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."). Finally, when evaluating the settlement, courts look to "whether the settlement as a whole is reasonable." *In re Wash. Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable. This is not to say, however, that this is a mere math exercise comparing the sum of the parts to the whole. Rather, the Court recognizes that there are benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately."); *see also In re NII Holdings, Inc.*, 536 B.R. 61, 105 (Bankr. S.D.N.Y. 2015) ("[A]s mandated by precedent, the Court will undertake its own analysis of each component of the Settlement . . . and of the Settlement as a whole . . . .").

57. For the reasons stated below, the Global Settlement is fair and equitable and falls above the lowest point in the range of reasonableness.

### b. Balance Between Possibility of Success in Litigation and Future Benefits of Global Settlement Weighs in Favor of Global Settlement.

58. It is indisputable that if the Global Settlement is not implemented under the Amended Plan, the Debtors would incur significant delay and expense engaging in lengthy and protracted litigation. Litigating the claims resolved by the Global Settlement would unnecessarily prolong these chapter 11 cases and substantially delay or preclude the Debtors' ability to successfully consummate Amended Plan and the Europe/ROW Sale Transaction. Given

31

the Debtors' limited resources, extensive litigation over all of the issues resolved by the Global Settlement could result in the Debtors' inability to satisfy administrative and priority claims, the possibility that all or some of the twenty-two (22) Non-Performing Properties subject to the Global Settlement are unable to be orderly transitioned and unnecessary risk to the Debtors' European/ROW operations to continue as a going concern.  Indeed, the Debtors and their estates have already avoided significant costs by virtue of securing the recommendation of the Global Settlement by the Global Settlement Parties nearly two (2) months ago.

59.    The Global Settlement is the result of extensive analysis by the Debtors and their advisors and is entered into on a fully informed basis by the Global Settlement Parties, including the Debtors, the Creditors' Committee, and the Settling Governmental Authorities, with respect to potential claims against the Consenting Creditors, Transferred Entities and their related parties.  As explained below, the Debtors and Creditors' Committee each undertook an extensive and independent evaluation of potential estate causes of action arising from various prepetition transactions involving the Consenting Creditors.  The Debtors and the Creditors' Committee each independently came to the same conclusion that such claims would be difficult to succeed on and would require extensive litigation.  Accordingly, the Debtors concluded that the value and benefits offered by the Global Settlement—*e.g.*, full payment of administrative and priority claims, $2.4 million for General Unsecured Claims, resolution of environmental disputes, and preservation of the Debtors' foreign businesses on a going concern basis—far outweighed the alternative of extended and expensive litigation with no certainty of recovery, let alone the recovery and benefits offered by the Global Settlement. *See, e.g., In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 774 (Bankr. D. Del. 2018) (finding factor favored approval of

settlement because "lengthy and expensive litigation on a variety of fronts . . . would eat up the successful litigants' ability to recover on their claims").

### c. Difficulties in Collection.

60.    As explained above, the claims resolved by the Global Settlement have been fully investigated by the Subcommittee and the Creditors' Committee, with both estate fiduciaries concluding that successfully litigating the claims on the merits would be very challenging and is outweighed by the certainty and value offered to Debtors and their estates by the Global Settlement.    Moreover, as a practical matter, any recovery to creditors, which is highly uncertain, would take years to achieve.    The potential claims have not yet been litigated; while they have been analyzed, no complaint has been filed, let alone has litigation progressed. As a result, the potential claims are nowhere close to the collection stage. Moreover, even assuming eventual success in litigation, a judgment by any court likely would be subject to multiple layers of appellate review.    Such review could, of course, delay not only the Debtors' ability to collect on a judgment, but also the Debtors' more basic need to resolve these cases and require expenditure of valuable (and finite) estate assets.

61.    Were the Debtors to litigate any of the claims or causes of action subject to the Global Settlement, they would face difficulty in collecting and distributing the proceeds of such claims or causes of action to creditors.    As set forth herein, the claims and causes of action are complex and would likely take substantial time to resolve. Litigating these claims would certainly involve lengthy discovery, trials, and appeals, all at the expense and delay of creditor recoveries. The Global Settlement represents a source of funds, available on the Effective Date.

### d. Complexity of Litigation.

62.    In general, settlements are favored in bankruptcy. *In re Filene's Basement, LLC*, Case No. 11-13511 (KJC), 2014 WL 1713416, at *5 (Bankr. D. Del. Apr. 29, 2014).    This

policy preference reflects the reality that the delays, complexity, and cost associated with litigation can erode and potentially eliminate stakeholder recoveries—separate and apart from the risk generally inherent in litigation. *See Nellis v. Shugrue*, 165 B.R. 115, 124 (S.D.N.Y. 1994).  In this regard, the Third Circuit has recognized that compromises are favored precisely to "minimize litigation and expedite the administration of a bankruptcy estate." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

63.    This convention is particularly relevant in these chapter 11 cases, not only because of the limited resources available to the Debtors' Estates, but also in large part due to the expansive set of disputes that are resolved by the Global Settlement and the complexity of the issues at play.  Each of the Participating Governmental Authorities (including California DTSC) and the Creditors' Committee could seek to assert Claims that, absent the comprehensive and efficient resolution achieved by the Global Settlement, would require extensive, costly, and complicated litigation that would inevitably bleed the Estates' dry of the little remaining liquidity they currently have.

64.    The environmental legal issues related to remediation and transitioning of the Non-Performing Property are vast.  In a preview of what litigation related to even a single Non-Performing Property might look like, California DTSC served the Debtors with discovery requests related to the Vernon Non-Performing Property dating back to 1922.  In response, the Debtors produced nearly 20,000 documents and records.  Extrapolated over an additional twenty-one (21) Non-Performing Properties—each of which is subject to jurisdictional enforcement of environmental laws by separate state agencies—the complexity and breadth of this potential litigation is difficult to fathom for any company, let alone a bankrupt debtor with extremely

limited capital resources and a long line of creditors awaiting distribution of their share of those resources.

65.     If the weight of environmental litigation were not enough, absent the Global Settlement the Debtors would also be faced with litigation of estate claims that could be brought.  The June 2019 Financing and the Optimization involve numerous issues of detailed fact and law, some of which would present litigation challenges for the Debtors. The complexity of these facts is evidenced by the substantial volume of documents and information that the Subcommittee and the Creditors' Committee each collected and reviewed in connection with their respective investigations. Notwithstanding the investigations, litigation on these issues would require extensive discovery and pretrial proceedings, and a lengthy trial.  This necessarily would require significant expense to prosecute.

66.     As noted above, the Debtors do not have the resources to pay these litigation expenses.  Moreover, lengthy litigation would delay any recoveries to the Debtors' creditors, without any assurance of eventual collection on the potential claims. *See Woodbridge*, 592 B.R. at 774 (benefits of plan settlement "heavily outweighs the lengthy and costly litigation that lies in wait if the settlements are not approved").

**e.   The Global Settlement Is In the Paramount Interests of Creditors.**

67.     The Global Settlement is in the best interests of the Debtors' creditors because it maximizes creditors' recoveries under the Amended Plan and resolves significant issues without litigation that would otherwise significantly prolong these chapter 11 cases.  Two of the Debtors' primary stakeholders—the Settling Governmental Authorities and the Creditors' Committee—both participated in the Global Settlement negotiations and ultimately decided that the method in which the Mediator's Proposal, as implemented by Global Settlement contained in the Amended Plan, fairly addressed their respective claims and was in their best interests.

68.     In addition, the Creditors' Committee undertook an independent analysis with respect to the potential value of claims and causes of action by the Debtors on account of the June 2019 Financing and the Optimization and based on such diligence, ultimately determined that the value derived from entering into the Global Settlement—namely, the establishment of the GUC Trust and the value of the GUC Trust Assets—outweighed the risk associated with litigating any potential claims.     Notably, the PBGC—the largest non-environmental unsecured creditor of the Debtors—now also supports the Global Settlement and the Amended Plan.

69.     For the reasons stated herein, the Debtors submit that the Global Settlement was the result of arm's length and good faith negotiations and represents the best path forward to avoid protracted and costly litigation to the detriment of all creditors and parties in interest.  Accordingly, the Global Settlement falls well within the range of reasonableness,  is fair and equitable under the *Martin* factors, and should be approved.

### 3.     Columbus NPP Termination Documents Should Be Approved.

70.     As of the Commencement Date, the Debtors were party to a partnership with a public body, the Development Authority of Columbus, Georgia (the "**Columbus Development Authority**"), pursuant to which the Columbus Development Authority issued to Exide Technologies LLC ("**Exide Technologies**") taxable revenue bonds (the "**Bonds**"), which the Debtors used to finance the development of the Debtors' property located in Columbus, Muscogee County, Georgia (the "**Columbus Non-Performing Property**").  In accordance with the issuance of the Bonds, the Debtors conveyed title to a portion of the Columbus Non-Performing Property site to the Columbus Development Authority.  In turn, Exide Technologies and the Columbus Development Authority entered into a lease-back agreement pursuant to which the Columbus Development Authority became the lessor and the Debtors became the

lessee of the Columbus Non-Performing Property.    Lease payments made by Exide Technologies, as the lessee, were made directly to Exide Technologies, as holder of the Bonds, through accounting book entries, rather than to the Columbus Development Authority, as lessor, since Exide Technologies was the ultimate economic beneficiary of the lease payments.    This series of transactions was captured in a lease financing agreement and a bond purchase agreement, each dated as of July 1, 2011 (the "**Lease and Bond Purchase Agreements**").

71.    Pursuant to the Amended Plan, the Debtors have agreed to transfer the Columbus Non-Performing Property to the Environmental Response Trust as part of the Environmental Settlement Agreement.    To facilitate this transfer, the Debtors seek authority pursuant to the Amended Plan to take the following actions in accordance with the Columbus NPP Termination Documents:

   i.    enter into the Columbus Non-Performing Property Termination Documents appended as Exhibit 6 to the Plan Supplement, including the Agreement Regarding Termination Documents, dated September 9, 2020 (the "Bond Termination Agreement");

   ii.    terminate the Lease and Bond Purchase Agreements, including any security documentation related thereto;

   iii.    abandon the Bonds issued in connection with the development of the Columbus Non-Performing Property; and

   iv.    take all other actions necessary to consummate the transactions contemplated by the Columbus NPP Termination Documents.

72.    To facilitate the transfer of the Columbus Non-Performing Property to the Environmental Response Trust "free of all liens, charges, encumbrances, and Interests," the Debtors request that the Court approve the rejection of the Lease as a sound exercise of the Debtors' business judgment in accordance with section 365(a) the Bankruptcy Code,[15] and

---

[15]    *See, e.g., Grp. of Inst. Inv'rs, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) (noting "the question whether a lease should be rejected . . . is one of business

further request authority to abandon the Bonds in accordance with sections 105(a) and 554(a) of the Bankruptcy Code.  The Debtors, in their discretion, have determined that the Lease is no longer necessary for, or beneficial to, the Estates and imposes unnecessary expenses on the Estates.  Further, the value of the Bonds was solely derived from the series of transactions contained in the Lease and Bond Purchase Agreements, which enabled the Debtors to generate funds to finance the development of the Columbus Non-Performing Property.  The Bonds do not represent any inherent value to any third party purchaser, since no such purchaser could become a lessee on the Columbus Non-Performing Property.  As such, the Bonds do not hold any market value, cannot realistically be sold, and are of inconsequential value to the Estates, and as such their abandonment should be approved.

### 4.    Plan Releases Should Be Approved.

73.    The Amended Plan, Europe/ROW Purchase Agreement, Environmental Settlement Agreement, and Frisco Settlement Agreement provide for four (4) categories of releases:

> i.    The Amended Plan provides for releases of claims held by: (a) the Debtors and their Estates, including those that the Creditors' Committee could seek to assert, against the Released Parties and their Related Parties,[16] (the

---

judgment."); *Nat'l Lab. Rels. Bd. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."); *see also L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003). In applying the business judgment standard, bankruptcy courts give deference to a debtor's decision to assume or reject leases.

[16]    As defined in Section 1.137 of the Amended Plan, "**Released Parties**" means "collectively: (a) the Debtors, (b) each of the Consenting Creditors, (c) the Trustees, (d) the Europe/ROW Purchaser, (e) the Transferred Entities, (f) each of the DIP Lenders and the DIP Agent, (g) the Creditors' Committee and each of its members in their capacity as such, and with respect to each of the foregoing entities in clauses (a) through (g), such Entities' respective Related Parties."

As defined in Section 1.167 of the Amended Plan, "**Related Parties**" means "with respect to any Exculpated Party or Released Party: (a) such Entities' successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (b) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors), members,

"**Estate Releases**"), *see* Amended Plan, § 10.5, (b) the Seller Parties, as such term is defined in, and pursuant to, the Europe/ROW Purchase Agreement (the "**Debtor Seller Parties Releases**"), (c) the Debtors and their Estates pursuant to the Environmental Settlement Agreement and the Frisco Settlement Agreement (the "**Global Settlement Releases**" and, together with the Estate Release and the Debtor Seller Parties Releases, the "**Debtor Releases**"));

ii.    consensual releases of the Released Parties by the holders of Claims who (a) are deemed to have accepted the Amended Plan, (b) were entitled to vote and either (1) accepted the Amended Plan or (2) rejected the Amended Plan or abstained from voting but did not opt out of the release (the "**Consensual Third Party Releases**").  Notably, no parties entitled to vote rejected the Amended Plan.  Creditors holding 20.72% of the debt in the Voting Classes abstained from voting on the Amended Plan and opted out of the Third Party Releases and therefore are not subject thereto.[17]

iii.   non-consensual releases by holders of General Unsecured Claims and California state environmental agencies, including California DTSC (as the only government agency that has not executed the Environmental Settlement Agreement) (collectively, the "**California Environmental Agencies**") *solely in favor* of the Europe/ROW Purchaser, the Transferred Entities, the Consenting Creditors and the Trustees (the "**Non-Consensual Third Party Releases**", together with the Consensual Third Party Releases, the "**Third Party Releases**", and both together with the Debtor Releases, the "**Plan Releases**"), *see* Amended Plan, § 10.6; and

iv.    consensual releases and covenants not to sue among the parties to the Environmental Settlement Documents.  *See* Environmental Settlement Agreement, Art. IX; Frisco Settlement Agreement, Art. VIII.

    a.    **California's Misunderstanding of the Plan Releases.**

74.    As an initial matter, the Debtors must correct California DTSC's complete misunderstanding of the releases provided for by the Amended Plan and the Environmental Settlement Agreement.  For the convenience of the Court, attached hereto as Exhibit B is a

---

partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which exculpation or releases are provided in the Plan, and (c) such persons' respective heirs, executors, estates, servants and nominees; provided, that the Former Officers and Directors of the Debtors shall not be "Related Parties."."

[17]    *See* Voting Certification at ¶ [11].

correct summary of the releases actually applicable to the California Environmental Agencies pursuant to the Amended Plan and a comparison to the Environmental Settlement Agreement. First and foremost, the Nonconsensual Third Party Release applicable to the California Environmental Agencies (and General Unsecured Creditors) *only* apply to claims against the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser, and the Trustees. Period. Full stop. *See* Amended Plan § 10.6(f):

> As of the Effective Date…the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following:… ***solely with respect to (i) the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors***, all holders of General Unsecured Claims and Environmental NPP Claims, and (ii) the Trustees, all California state governmental agencies, including the California DTSC, that have jurisdiction regarding the enforcement of Environmental Laws).

(emphasis added).

75.     In fact, unlike the Settling Governmental Authorities—who are providing covenants not to sue not only to the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors, but also to the Debtors, their related parties and the related parties of the Consenting Creditors—the release applicable to the California Enforcement Agencies in Section 10.6(f) of the Amended Plan does *not* extend to such parties.  California DTSC also argues that, in light of various carve-outs, the Settling Governmental Authorities' covenants not to sue the Debtors in the Environmental Settlement Agreement are narrower than the Plan Releases applicable to the California Environmental Agencies.  *See* California DTSC Objection ¶ 64.  But exactly the opposite is true:  the Amended Plan does not even provide for releases of the Debtors or their Related Parties (or the Related Parties of the Consenting Creditors) by the California Environmental Agencies.

40

76.     Moreover, the scope of the releases that the Settling Governmental Authorities are providing to the Consenting Creditors, Transferred Entities, Europe/ROW Purchaser, and Trustees are substantively the same as the scope of the nonconsensual releases applicable to the California Environmental Agencies.  For the avoidance of any doubt, the Debtors have included the following language in the Amended Plan:

> For the avoidance of doubt, the scope of any releases provided by any California Environmental Agency that has jurisdiction regarding the enforcement of Environmental Laws, including the California DTSC, pursuant to this Section 10.6 of the Plan shall not be construed or deemed to be any broader than the scope of the covenants not to sue set forth in paragraph 45(b) of the Environmental Settlement Agreement provided by the Settling Governmental Authorities.

77.     California DTSC also takes issue with the Debtor releases provided in Section 10.5 of the Amended Plan, alleging specifically that "the Plan includes releases applicable to DTSC in Sections 10.5 and 10.6 that are far broader and more burdensome than those agreed to by the Settling Governmental Authorities in the Environmental Settlement Agreement."  *See* California DTSC Objection ¶ 20.  This evinces a complete misunderstanding of the difference between debtor releases and third-party releases.  The releases contained in Section 10.5 of the Amended Plan pertain only to claims held *by* the Debtors, not *against* the Debtors.  The California Enforcement Agencies are not releasing the Debtors pursuant to Section 10.5 of the Amended Plan.

78.     Needless to say, despite California DTSC's blatantly incorrect complaints to the contrary, the releases applicable to the California Enforcement Agencies are substantively the same in scope and cover only a subset of the parties benefitting from covenants not to sue by the Settling Governmental Authorities.  Accordingly, the California Enforcement Agencies are actually treated better—not worse—under the Amended Plan.

b.       **Debtor Releases Are Appropriate and Should Be Approved.**

79.     The Debtor Releases are an integral component of the Amended Plan and comply with the Bankruptcy Code and applicable law.   The overwhelming support for the Amended Plan, including the Debtor Releases, by the Creditors' Committee and the Settling Governmental Authorities—following their own due diligence and independent analysis—are compelling evidence that the Debtor Releases should be approved.  All creditors received notice of the Plan Releases and their right to object to such releases.  Only California DTSC has raised a concern with respect to the Debtor Releases.  This is a significant endorsement of the Debtor Releases that the Court should not overlook.  In particular, it reinforces and affirms the Debtors' determination—led by their independent subcommittee—that the Debtor Releases are in the best interests of the Debtors' estates.  *See In re Master Mortg. Inv. Fund, Inc*., 168 B.R. 930, 938 (Bankr. W.D. Mo. 1994) (stating that creditor approval of a release is "the single most important factor" to determine whether a release is appropriate).  Accordingly, for these reasons and for the reasons set forth below, the Debtor Releases should be approved.

i.       *Applicable Legal Standard.*

80.     Pursuant to section 1123(b)(3)(A), a debtor may release claims under a Chapter 11 plan "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."  *U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010), *appeal dismissed,* 2011 WL 3420441 (D. Del. Aug. 4, 2011); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (finding that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's

business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan").

81.    As an exercise of its business judgment, a debtor's decision to release claims against third parties under a plan is afforded deference. *See, e.g., Spansion,* 426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors . . . ."); *In re Marvel Ent. Grp., Inc.,* 273 B.R. 58, 78 (D. Del. 2002) ("[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.  Thus, under the business judgment rule, a board's decisions will not be disturbed if they can be attributed to any rational purpose and a court will not substitute its own notions of what is or is not sound business judgment.") (internal quotation marks and citations omitted).  Additionally, under Third Circuit precedent, a release by a debtor is appropriate if, in the debtor's judgment, any claims of the estate being released are of only marginal viability. *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (approving release by debtor of potential avoidance claims in connection with a prepetition leveraged recapitalization because the claims were "of only marginal viability" and not worth pursuing).

82.    When evaluating a debtor's release of claims, some courts in this district also have considered the following non-exclusive and disjunctive list of factors set forth in *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bank D. Del. 1999) (the "***Zenith* Factors**"), which were first articulated as the standard for a third party release: (i) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) substantial contribution by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization to the extent that,

without the injunction, there is little likelihood of success; (iv) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (v) [a] provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. *Id.* at 110; *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 303–04 (Bankr. D. Del. 2013) ("These factors are neither exclusive nor are they a list of conjunctive requirements."); *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (stating that the *Zenith* Factors "simply provide guidance in the [c]ourt's determination of fairness"); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* Factors are not exclusive or conjunctive requirements). As a list of non-conjunctive factors, these factors provide a way of "weighing the equities of the particular case after a fact-specific review." *Indianapolis Downs*, 486 B.R. at 303.

83.     Here, because approval of the Debtor Releases was both a valid exercise of the Debtors' business judgment and appropriate under the *Zenith* Factors, the Debtor Releases should be approved.

ii.     *Approval of the Debtor Releases Is a Valid Exercise of the Debtors' Business Judgment.*

84.     The Special Committee approved the Debtor Releases in conjunction with the Global Settlement after an extensive and thorough investigation conducted by an independent subcommittee of the Special Committee (the "**Subcommittee**") in close coordination with the Creditors' Committee.

85.     The Subcommittee Investigation and its Coordination with the Creditors' Committee.  The Subcommittee was created to investigate, evaluate, and control the disposition or resolution of any claims associated with prepetition affiliate transactions including the June 2019 Financing and the Optimization (the "**Prepetition Transactions**").  Tepner Decl.  ¶ 8.

44

Harvey Tepner, the sole member of the Subcommittee since its formation on April 3, 2020, is a highly qualified and experienced independent director. *Id.* ¶¶ 3, 4, 5, 8. He has served as an independent director, restructuring expert, strategic advisor, and private investor in a variety of situations. *Id.* ¶ 3. In addition to sitting on the Board of Exide Holdings, Inc., he has served as an independent director on numerous other boards, including the board of Core-Mark Holding Company (NASDAQ: CORE), one of the largest consumer merchandise distributors in North America, and Village Roadshow Entertainment Group (BVI) Limited, a producer and co-financier of film and TV entertainment. *Id.* ¶ 4. His experience also includes working as a senior executive of WL Ross & Co. LLC, an alternative asset manager and private equity firm. *Id.* ¶ 5. Prior to joining the board of Holdings (the "**Board**"), Mr. Tepner had no business or personal relationship with Exide or its management. *Id.* ¶ 6. Mr. Tepner had met some of the Consenting Creditors through the years on other occasions in meetings with large groups of creditors for companies in which he was involved or at conferences or social events. *Id*.

86.     The Subcommittee oversaw the investigation and engaged and directed Weil to lead the investigation in evaluating the viability of any potential claims and causes of action related to the Prepetition Transactions. Tepner Decl. ¶ 10. The Subcommittee's investigation took place over approximately four months (from April through July 2020) and included extensive factual and legal analysis. *Id.* On behalf of the Subcommittee, Weil first requested and received pertinent information and documents from the Company and its legal and financial advisors, and subsequently reviewed thousands of documents. *Id.* Weil next conducted interviews necessary to understand the Prepetition Transactions and to evaluate potential claims in connection with them. *Id.* Weil conducted twenty-four (24) interviews in total. *Id.* Interviewees included all board members at the time the Prepetition Transactions were approved,

relevant current and former management of the Company, the Company's legal and financial advisors in connection with the Prepetition Transactions, and the Company's third party auditor. *Id.* The Subcommittee also engaged independent financial advisors Ankura and Houlihan Lokey to assist with the investigation of the June 2019 Financing and Optimization, respectively. *Id.*[18]

87.    Significantly, the Subcommittee conducted its investigation in close coordination with the Creditors' Committee, which conducted its own contemporaneous investigation of the Prepetition Transactions.    Tepner Decl. ¶ 12.    As a result, the Subcommittee's investigation was fully transparent to counsel for the Creditors' Committee, Lowenstein Sandler LLP ("**Lowenstein**").    *Id.*    Thousands of documents were shared with the Creditors' Committee's advisors pursuant to a Confidentiality Agreement as well as a Common Interest Agreement.    *Id.*    Lowenstein and its financial advisor, AlixPartners LLP, actively participated in most of the interviews and were provided with detailed verbal summaries and updates of interviews that preceded their involvement or were with the Company's legal advisors at the time of the Prepetition Transactions.  *Id.* ¶ 13.  Weil, on behalf of the Subcommittee, and Lowenstein, on behalf of the Creditors' Committee, also engaged in periodic and open discussions in connection with the investigation of the Prepetition Transactions.    *Id.* ¶ 14. Towards the end of their respective investigations, Weil, on behalf of the Subcommittee, and Lowenstein, on behalf of the Creditors' Committee, exchanged their preliminary conclusions, which were consistent in all material respects. *Id.* ¶ 15.

---

[18]    Before the investigation began, the Subcommittee analyzed whether there were any conflicts of interest with respect to the engagements of Weil, Houlihan Lokey, and Ankura and determined there were none. *Id.* ¶ 9. Weil did not represent the Company in connection with any of the Prepetition Transactions. *Id.* Houlihan Lokey was able to assist with the evaluation of the Optimization since it did not serve as the financial advisor on that transaction. *Id.* For purposes of evaluating the June 2019 Financing (which Houlihan Lokey had worked on), Ankura was used to analyze that transaction utilizing a team that was separate from Chief Restructuring Officer Roy Messing and his team. *Id.* Ankura did not serve as the financial advisor on either the June 2019 Financing or the Optimization. *Id.*

88.    After its nearly four month investigation, the Subcommittee did not identify any valuable, colorable claims or causes of action belonging to the Debtors related to the Prepetition Transactions or to the conduct of the Company's directors and officers in connection with the Prepetition Transactions.  *Id.* ¶ 16.  The Subcommittee's investigation analyzed the viability of potential claims including for actual fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary duty, and equitable subordination with respect to the June 2019 Financing, as well as for actual fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary duty, and unlawful distribution with respect to the Optimization.  *Id.*  The Subcommittee determined that the Debtors' unsecured creditors, including environmental creditors, suffered no damages as a result of the Prepetition Transactions.  *Id.*  Moreover, as to any potential claims for breach of fiduciary duty with respect to the Prepetition Transactions, the Subcommittee determined that the business judgment standard would apply and was satisfied. *Id.*  Additionally, the Subcommittee concluded that the time and expense associated with pursuing any claims or causes of action likely would exceed any potential value that could be recovered from such claims or causes of action and that the value of any potential recovery also did not exceed the benefits of the Global Settlement and the sale of the Europe/ROW Assets.  *Id.* ¶ 17.

89.    <u>Subcommittee's Consideration of the Global Settlement</u>.    In recommending that the Special Committee approve the Global Settlement, including the Debtor Releases, the Subcommittee considered the value of the potential claims and causes of action being released, which the Subcommittee determined to have little likelihood of success, in relation to the value provided to the Debtors pursuant to the Global Settlement, including: (i) settlement of claims by the Settling Governmental Authorities, Creditors' Committee, and

Environmental Sureties, (ii) the number of employee jobs that would be preserved as a result of the Europe/ROW Sale, and (iii) avoiding a free fall insolvency in Europe, which could have involved the Debtors in protracted litigation.    Tepner Decl. ¶ 18.    The Subcommittee also considered the fact that its conclusions regarding the strength and value of the potential claims being released (or the lack thereof) were consistent with the conclusions of the Creditors' Committee and that the Creditors' Committee was supportive of the Global Settlement.  *Id.* ¶ 19.

90.    Considered against this backdrop, it was certainly within the business judgment of the Subcommittee to determine that the Debtor Releases are appropriate and to recommend that the Special Committee approve the Global Settlement, which provided significant value to all stakeholders.

iii.    *The Debtor Releases are Appropriate under the Zenith Factors*.

91.    Application of the *Zenith* factors here also demonstrates that the balance of equities weighs in favor of approving the Debtor Releases.  First, an identity of interests is shared between the Debtors and the Released Parties because each shares a common goal of having the Plan confirmed and consummating the transactions thereunder.  *See, e.g.*, *Zenith*, 241 B.R. at 110 (finding an identity of interest with debtor where certain released parties who "were instrumental in formulating the Plan" shared an identity of interest with debtor "in seeing that the Plan succeed and the company reorganize"); *In re 710 Long Ridge Rd. Operating Co.*, Case No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding identity of interest where both debtor and non-debtor released parties shared a common goal of "confirming [a plan] and implementing the transactions contemplated thereunder").

92.    Second, the Released Parties have provided significant value to the Debtors' Estates throughout these Chapter 11 Cases.  The Debtors, Consenting Creditors, and

Creditors' Committee are all parties to the Global Settlement embodied in the Amended Plan, which resulted in a consensual outcome to these chapter 11 cases that avoids potentially costly and protracted litigation and provides for the establishment of the Environmental Response Trust and General GUC Trust for the benefit of multiple constituencies.  Messing Confirmation Decl. ¶ 30.  The Debtors' advisors and directors guided the Debtors through these challenging times and were crucial in negotiating the terms of the Global Settlement.  Messing Confirmation Decl. ¶ 30.  The Consenting Creditors also submitted a binding credit bid for the Exide Europe/ROW business segment, which further supported the Debtors by agreeing that there would be no break-up fee in connection with the credit bid and provided for the assumption of obligations under the Superpriority Notes Indenture by the Transferred Entities.  Peluchiwski Decl. ¶ 14.  After an extensive marketing process, the Debtors did not receive any other Qualified Bids for the Europe/ROW Assets, and the Europe/ROW Purchaser will serve as the buyer for the Europe/ROW Assets under the Europe/ROW Purchase Agreement.  *Id.* ¶ 17, 19.  Additionally, the consent of the Consenting Creditors to the use of cash collateral and the support of the DIP Lenders, which includes certain Consenting Creditors, crucially provided the Debtors a means by which to pay their ordinary-course operating expenses, finance these Chapter 11 cases, and pursue a going concern sale process for their assets to maximize recoveries for all stakeholders. *See* First Day Declaration ¶¶ 16-17, 109-11.

93.     Finally, certain Released Parties will provide value to the Debtors through the Amended Plan itself.  The Amended Plan contemplates that the Transferred Entities will pay the Global Settlement Payments in cash through loan proceeds that will be provided by the Consenting Creditors for these purposes.  The Consenting Creditors are also parties to a settlement with the PBGC, pursuant to which the Transferred Entities (through a loan from the

Consenting Creditors) will fund a $6.0 million settlement payment to the PBGC.  In total, the Consenting Creditors and Transferred Entities will provide $18.5 million in settlement payments under the Plan to the Debtors' creditors and will forgo their deficiency and prepetition intercompany claims to enhance unsecured creditor recoveries.

94.    Third, the Debtor Releases are essential to the success of the Amended Plan.  Messing Confirmation Decl. ¶ 29; Tepner Decl. ¶ 21.  The Debtor Releases contained in the Europe/ROW Purchase Agreement served as a crucial inducement for the Europe/ROW Purchaser to participate in the Europe/ROW Sale.  Peluchiwski Decl. ¶ 14; Tepner Decl. ¶ 21. Moreover, the Global Settlement Release encompasses the releases that were exchanged among the Global Settlement Parties as part of the Global Settlement.  Tepner Decl. ¶ 21.  Acceptance of the Global Settlement, including the releases therein, allowed the Debtors to move forward with the consensual Amended Plan and avoid lengthy, complex, and value-destructive litigation with creditors.  Messing Confirmation Decl. ¶ 25; Tepner Decl. ¶ 21.  Had the Debtor Releases not been provided, that would have destroyed the Debtors' ability to secure the valuable consideration provided under the Global Settlement and Amended Plan.  Messing Confirmation Decl. ¶ 30; Tepner Decl. ¶ 21.

95.    Finally, an overwhelming majority of the Debtors' creditors are supportive of the Amended Plan.  Indeed, other than California DTSC, not a single party has questioned the Debtor Releases.  The Debtor Releases are also supported by the Creditors' Committee, the Settling Governmental Authorities, and the PBGC following their own independent analysis. When a debtor's creditors (who are most affected by a debtor's release of claims or causes of action) are supportive of a chapter 11 plan, that provides strong evidence that supports finding the release to be appropriate.  *See Master Mortg.*, 168 B.R. at 938 (stating that creditor approval

of a release is "the single most important factor" to determine whether a release is appropriate); *see also In re Key3Media Grp.*, 336 B.R. 87, 97-98 (Bankr. D. Del. 2005) (granting a settlement of estate causes of action over a creditor's objection because, among other things, a majority of creditors approved of the settlement), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006).[19]

> c.    **Third Party Releases Are Appropriate and Should Be Approved.**

96.    The Third Party Releases are essential components of the Amended Plan and Global Settlement and should be approved.

> i.    *The Court Should Approve the Non-consensual Third Party Releases.*

97.    As explained above, the Non-consensual Releases by holders of General Unsecured Claims and the California Environmental Agencies (as the only parties in Class 8 who have not voluntarily accepted the Global Settlement) ***only extend to the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser and the Trustees*** (for purposes of the Non-consensual Third Party Releases, the "**Non-consensual Released Parties**"). *See* Plan § 10.6(f).

98.    The Non-consensual Third Party Releases satisfy the standard for permissible non-consensual releases and should be approved.  Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The authority granted under section 105(a) is "consistent with the traditional understanding that bankruptcy courts, as

---

[19]    The only *Zenith* Factor not present here is that there is no provision in the Amended Plan that provides for payment of all or substantially all of the claims of affected classes.  Given the Debtors' financial condition, it would not be realistic to expect the impaired classes to receive full recoveries.  Additionally, case law is clear that not each factor is relevant in every case, and releases may be approved where only one or two factors are present.  *See, e.g., Spansion*, 426 B.R. at 143 (approving release where the released parties were actively involved in negotiating the plan and four of five creditor classes voted overwhelmingly in favor).

courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990). This Circuit has utilized section 105(a) to extend the protections of the Bankruptcy Code to non-debtors in the third party release context. *See*, *e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) ("In order for a reorganization plan that includes an injunction barring third-party claims against non-debtors to be approved, the injunction must be 'both necessary to the reorganization and fair' under 11 U.S.C. § 105(a).") (citing *In re Global Indus. Techs., Inc.,* 645 F.3d 201, 206 (3d Cir. 2011).

99. The Third Circuit recognizes that non-consensual releases of third-party claims against non-debtors are permissible where such releases meet "[t]he hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions. . . ." *Skirnick Harwood Halebian & Feffer v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 215 (3d Cir. 2000). "[I]f there is an appropriate bankruptcy justification for the releases in the absence of affirmative consent, a debtor may proceed under *Continental*." *In re Emerge Energy Servs. LP*, Case No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019).

100. In applying *Continental*'s hallmarks and determining whether the circumstances of a case justify the approval of third-party releases, this Court considers four factors: "whether: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, *i.e.*, whether the non-consenting creditors received reasonable compensation in exchange for the release." *In re Spansion,* 426 B.R. at 144 (citing *In*

re *Genesis Health Ventures, Inc.* 266 B.R. 591, 607-08 (Bankr. D. Del. 2001), *appeal dismissed*, 280 B.R. 339 (D. Del. 2002)).

101.    Although courts often examine releases in the context of reorganization cases, reorganization of a going concern business is not a mandatory precondition and liquidation plans also qualify for such relief.  *See e.g., In re Medford Crossings North, LLC*, No. 07-25115, 2011 WL 182815, at *18 (Bankr. D.N.J. Jan. 20, 2011) (denying third party release and injunction on other grounds, but rejecting argument that a liquidating plan is *per se* ineligible for such relief); *In re Fidelis, Inc*. 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012) ("[E]ven though this Case is a liquidation, the same principal applies as in a reorganization. A release of a non-debtor is appropriate only if, without it, there would be little likelihood of accomplishing of the goal of a chapter 11: the confirmation of a successful plan of liquidation that benefits the creditors, including the unsecured creditors."); *see also Hr'g Tr.* 115-17, *In re Freedom Rings, LLC*, Case No. 05-14268 (CSS) (Bankr. D. Del. Apr. 20, 2006) [Docket No. 385] (approving non-consensual third party releases in favor of a prepetition creditor that had made a critical cash contribution where the creditor would not have done so but-for the release and the only alternative would have been to convert the cases to a chapter 7 liquidation).

102.    The *Spansion* factors are meant to serve as guidance and are not an exhaustive or conjunctive list of requirements that must be met before a court may authorize a non-consensual third party release.  *See*, *e.g.*, *Hr'g Tr. 67:8-13*, *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) Bankr. D. Del. Dec. 3, 2015) [Docket No. 7255] ("The Delaware courts that have ruled on [non-consensual third party releases] have looked at, among other things, whether (a) the release[e] has provided a critical contribution to the Debtors' plan; and (b) . . . whether the non-consenting creditors were compensated for their contributions."); *In*

*re 710 Long Ridge Rd. Operating Co., II*, No. 13-13653 (DGHS), 2014 WL 886433, *1, *14-15 (Bankr. D.N.J. Mar. 5, 2014).  For the reasons set forth below, the Non-consensual Third Party Releases are fair, necessary to the Debtors' reorganization, and supported by ample evidence demonstrating the same.

103.    First, the Nonconsensual Released Parties have made substantial contributions to the chapter 11 cases and Amended Plan.  Vital to the successful outcome of the Global Settlement was the participation by the Consenting Creditors, which they did on a purely voluntary basis—the Court-approved mediation procedures did not require participation by the Consenting Creditors.[20]   In fact, prior to the Consenting Creditors joining the mediation, the other Global Settlement Parties were at an impasse, largely due to the lack of cash resources available to the Debtors.

104.    The substantial contributions by the Non-consensual Released Parties to the Global Settlement and the Amended Plan include:

    i.    funding of the $12.5 million in aggregate Global Settlement Payments by the Transferred Entities and Consenting Creditors, which has since increased to $18.5 million following the settlement with the PBGC;

    ii.    consent by the Consenting Creditors to the use of cash collateral and a significant portion of the debtor-in-possession financing capital from certain of the Consenting Creditors, millions of dollars of which were used to fund, among other things, the Subcommittee investigation and the Creditors' Committee investigation, each of which scrutinized prepetition transactions involving the Consenting Creditors—said differently, the Consenting Creditors funded millions of dollars for investigations ***into potential actions against themselves***;

    iii.    the agreement of the Consenting Creditors to purchase the Debtors' Europe/ROW business that had no other qualified bidders, in exchange for forgiveness of a significant amount of secured debt, which would otherwise come before any unsecured claims in priority of distribution;

---

[20]    *See Order Governing Settlement Procedures With Governmental Agencies Relating to Non-Performing Properties* [Docket No. 242] (the "**Settlement Procedures Order**").

iv.  waivers by the Consenting Creditors of any deficiency claims and the Transferred Entities of any prepetition Intercompany Claims which will increase distributions to general unsecured creditors;

v.  voluntary agreement by the Consenting Creditors to release their liens on the Non-Performing Properties and the proceeds thereof, including adequate protection liens, to facilitate the Global Settlement and provide incremental value to the Settling Governmental Authorities; and

vi.  cancellation of the Debtors' guarantee of $155.9 million of principal obligations under the Superpriority Notes Indenture, plus all accrued and unpaid interest.

105.    Without these significant contributions by the Non-consensual Released Parties, the Debtors would not be before the Court with an Amended Plan that has the support of virtually every single creditor and fiduciary of the Debtors.  *See In re W.R. Grace & Co.*, 446 B.R. 96, 138 (Bankr. D. Del. 2011) (finding that parties involved in settlement with debtor made substantial contribution where, absent the release, settling parties would not have contributed a significant sum which was necessary for the reorganization), *aff'd,* 475 B.R. 34 (D. Del. 2012), *aff'd*, 729 F.3d 311, 729 F.3d 332, 532 F. App'x 264 (3d Cir. 2013); Hr'g Tr. 74:14–75:5, *In re PNG Ventures, Inc.*, Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) [Docket No. 368] (explaining that a contribution is substantial when there is a fair exchange for the release of the creditors' claims and finding that lenders, by compromising their claims and providing financing so that unsecured creditors received distributions they would not otherwise have received, made such a contribution).

106.    In addition, the Debtors' use of cash collateral of the Consenting Creditors and their support of the Debtors during these chapter 11 cases has enabled the Debtors and their estates to realize multiple other benefits that could not have been achieved in a chapter 7 or foreclosure proceeding without the support of the Consenting Creditors, including:

i.  a going concern sale of the Americas Assets, which preserved over 2,000 jobs for the Debtors, as well as valuable customers, and

                allowed the Debtors to satisfy their ABL Loan Obligations and
DIP Loan in full;

      ii.      funding of retiree health benefits during the chapter 11 cases and
through December 31, 2020 pursuant to the recent settlement
achieved with various represents of the Debtors' retirees;

      iii.     funding of severance and other payments to the Debtors'
employees who must be terminated as a result of the Debtors'
liquidation;

      iv.     adequate funding of administrative expense obligations throughout
the pendency of these chapter 11 cases and avoiding an abrupt and
irrevocable interruption of the Debtors' business operations during
the sale process; and

      v.      preventing immediate liquidation at fire sale prices and termination
of thousands of employees during the global COVID-19 pandemic.

107.    Second, in exchange for their many critical contributions described above,
the Non-consensual Released Parties have required, and are entitled to, certainty of no further
litigation with the Debtors or their estates and creditors. No reasonable actor would proceed
otherwise. If the Non-consensual Third Party Releases are not approved as to the California
Enforcement Agencies, approximately $2.6 million of the Global Settlement Payments will not
be provided for the benefit of the Vernon Non-Performing Property. Accordingly, this *Spansion*
factor weighs in favor of approval of the Non-consensual Third Party Releases.

108.    In its objection, California DTSC refers to the Transferred Entities'
contributions as "*de minimis*." Docket No. 917, ¶ 123. While California DTSC—unlike every
other Settling Governmental Authority that accepted the Global Settlement and recognizes the
extraordinary undertaking by the Transferred Entities that, as described above, is vital to the
Amended Plan's success—is apparently disenchanted by these contributions, the adequacy of
these contributions is not a question of quantum but rather one of necessity. *See Spansion*, 426
B.R. at 145 (analyzing whether released parties' "contributions rise to the level of the *critical*

financial contribution contemplated in *Continental* and *Genesis* that is needed to obtain approval of non-consensual releases.") (emphasis added) (internal citations omitted).  Because each of the Non-consensual Released Parties has provided a critical and substantial contribution, this factor weighs in favor of approval of the Non-consensual Third Party Releases.

109.    Third, the Released Parties' contributions are necessary to make the Debtors' Plan feasible.  Without the Consenting Creditors' funding of these chapter 11 cases and the Global Settlement Payments through their loan to the Transferred Entities, the Debtors would not be in a position to propose the Amended Plan.  Absent the Global Settlement, the Debtors would be forced to abandon all of the now-settled Non-Performing Properties, which would have resulted in costly and time-consuming litigation with numerous environmental regulators and likely rendered confirmation of a plan—including paying all administrative and priority claims in full—impossible.  Thus, the Consenting Creditors' contributions are critical to the Amended Plan's feasibility.  Therefore, this factor also weighs in favor of approval of the Non-consensual Third Party Releases.

110.    Finally, other creditors, including California DTSC, will receive reasonable compensation in exchange for the Nonconsensual Third Party Releases.  As noted above, absent the Non-consensual Released Parties' contributions to the chapter 11 cases, the Amended Plan would not have come to fruition and Debtors would be forced to liquidate their remaining assets and abandon the Non-Performing Properties.  Messing Confirmation Decl. at ¶ 33.  Through the Non-consensual Released Parties' efforts, the holders of General Unsecured Claims and the California Environmental Agencies that are subject to the Non-consensual Third Party Releases are receiving adequate consideration on account of such claims, especially given that litigation against the Consenting Creditors on any claims would be very difficult to succeed

57

on.  *See In re Hercules Offshore, Inc.*, 565 B.R. 732, 760 (Bankr. D. Del. 2016) (approving third party lender releases and considering the "viability of such claims" against the lenders as a relevant factor).

111.    The Global Settlement Payments will provide funding to promote the safe and orderly transition of the Non-Performing Properties and also provide the only realistic and guaranteed option for any recovery to general unsecured creditors.  *See*, *e.g.*, *In re United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (indicating releases should be "given in exchange for fair consideration") (citing *Continental*, 203 F.3d at 214–15); S*ee also Opt-Out Lenders v. Millennium Lab Holdings II, LLC (Millennium Lab Holdings II, LLC),* 591 B.R. at 586 (affirming bankruptcy court's finding that that non-consensual releases were appropriate where payments and distributions made under the plan "dwarfed any recoveries . . . in a wipeout liquidation"); *In re W.R. Grace*, 446 B.R. at 138–39 (approving non-consensual third-party release provision in plan of reorganization where, absent the release and settlement, substantial expenses would be incurred by the estate and where creditors' recovery after litigation was uncertain but recovery under the plan would be certain and significant); Hr'g Tr. 74:8–75:17, *In re PNG Ventures, Inc.*, Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) [Docket No. 368] (approving non-consensual third-party release where, absent such release and settlement, unsecured creditors—who otherwise would be "out of the money"—would receive a distribution under the plan).

112.    Accordingly, the Non-consensual Third Party Releases are appropriate and permissible pursuant to *Continental*.

              *ii.*    *The Court Should Also Approve the Consensual Third Party Releases.*

113.     Section 10.6 of the Amended Plan also contains consensual releases by the following parties (collectively, the "**Releasing Parties**") against the Released Parties for liability relating to the Debtors and these chapter 11 cases (the "**Consensual Third Party Releases**"):

    i.    the Consenting Creditors;

    ii.    the Creditors' Committee and each of its members in their capacity as such;

    iii.    all holders of Claims who vote to accept the Plan;

    iv.    all holders who are deemed to accept the Plan;

    v.    all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan but, in either case, do not opt out of granting the releases set forth in Section 10.6 of the Plan; and

    vi.    with respect to any Person or Entity in the foregoing clauses (i) through (vi), such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Persons or Entities solely with respect to the matters for which the Releasing Parties are providing releases to the extent such Person or Entity would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (i) through (vi).

114.     The Consensual Third Party Releases do ***not*** apply to rejecting or abstaining creditors that have opted out of the Consensual Third Party Releases on the Ballot. As such, the Consensual Third Party Releases are limited in scope and only affect the stakeholders that have consented to such treatment by voting in favor of the Amended Plan or failed to opt out or object to such release.

115.     In this district, a release is consensual where, as here, the parties have consented to the release because they either voted to accept the plan (or were deemed to accept the Amended Plan as a result of their Unimpaired treatment) or were given notice of the opportunity to opt out of or object to the releases but did not do so.  *See In re Indianapolis*

59

*Downs*, 486 B.R. 286, 286 (Bankr. D. Del. 2013) (collecting cases); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) (finding that voting in favor of a plan with third-party releases binds the voting party thereto); *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (same); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (finding that unimpaired creditors deemed to accept the plan could be bound to third-party release therein because such creditors had not objected to the release, were being paid in full, and had received adequate consideration for the release); *In re New Gulf Res., LLC*, Case No. 15-12566 (BLS) (Bankr. D. Del. Apr. 20, 2016) [Docket No. 514] (confirming plan and binding creditors who abstained or rejected the plan and did not opt out of third-party releases); *In re Insys Therapeutics, Inc.*, Case No.19-11292 (JTD) (Bankr. D. Del. Jan. 16, 2020) [Docket No. 1115] (confirming plan and binding creditors who were deemed to reject and did not opt out of third-party releases); *In re Gen. Wireless Operations, Inc.*, Case No. 17-10506 (BLS) (Bankr. D. Del. Oct. 26, 2017) [Docket No. 1117] (same).  Here, the Solicitation Package provided clear notice of, among other things, the Consensual Third Party Releases and provided release opt-out instructions for those holders of Claims that were entitled to vote on the Amended Plan. Accordingly, the Debtors submit that the Consensual Third Party Releases discussed above should be approved.

116.    In addition, as described above, the Released Parties have provided important and substantial contributions to the chapter 11 cases and confirmation of the Amended Plan.

> **d.      The Exculpation Provision is Appropriate and Should be Approved.**

117.    Section 10.7 of the Amended Plan also contains a customary exculpation for certain Exculpated Parties for claims arising out of or related to, among other things, the

administration of these chapter 11 cases, the negotiation, formulation, preparation, and pursuit of the Disclosure Statement, the RSA, the Europe/ROW Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan (the "**Exculpation Provision**"). Importantly, following receipt of informal comments from the U.S. Trustee, the Amended Plan has been modified to limit the Exculpated Partiesto estate fiduciaries.[21]   In addition, the Exculpation Provision carves out acts or omissions that are determined by a Final Order to have constituted fraud or willful misconduct and applies only to fiduciaries of the Debtors' Estates.

118.    Each of the Exculpated Parties has participated in the Debtors' chapter 11 cases in good faith.  Without the support of the Exculpated Parties, the Debtors would not have been able to execute their chapter 11 strategy, commence these chapter 11 cases, and propose a plan supported by virtually all creditors.  The Exculpation Provision is necessary to protect fiduciaries of the Debtors' Estates that have made substantial contributions to the chapter 11 cases from collateral attacks related to good faith acts or omissions related to the Debtors' chapter 11 cases.

119.    Further, the scope of the Exculpation Provision is appropriately tailored to cover only actions taken in connection with the negotiation of the Amended Plan and Definitive Documents and will not affect any liability that arises from fraud, gross negligence, or willful misconduct, as determined by final order.  Courts in this and other districts have approved similar exculpation provisions in chapter 11 plans of similarly-situated debtors. *In re Superior Air Charter, LLC*, Case No. 20-11007 (CSS) (Bankr. D. Del. Sept. 4, 2020) [Docket No. 212]; *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) [Docket No. 839];

---

[21]    As defined in Section 1.100 of the Amended Plan, "**Exculpated Parties**" now means "collectively the: (a) Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) Creditors' Committee and each of its members in their capacity as such, (e) the GUC Trust, (f) the GUC Trustee, and (g) with respect to each of the foregoing Persons or Entities in clauses (a) through (f), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided herein."

*In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [Docket No. 238]; *In re Model Reorg Acquisition, LLC*, Case No. 17-11794 (CSS) (Bankr. D. Del. Oct. 6, 2017) [Docket No. 222]; *In re Maxus Energy Corp.*, Case No. 16-11501 (CSS) (Bankr. D. Del. May 22, 2017) [Docket No. 1460].

120. Based upon the foregoing, the Amended Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code. Therefore, the Amended Plan satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### e. The Injunction Provision is Appropriate and Should be Approved.

121. California DTSC argues that the Injunction Provision (i) operates as an impermissible *de facto* discharge of the liquidating Debtors, in contravention of section 1141(d)(3) of the Bankruptcy Code, (ii) impermissibly extends the proposed injunction to certain third-parties including the Wind-Down Estates, the Trustees, Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, and (iii) assuming the Injunction Provision is a *de facto* discharge, such discharge would be improper under section 1141(d)(1) of the Bankruptcy Code as a discharge may only extend to debts arising before the date of confirmation of the Plan, and the Injunction Provision extends to Claims and Causes of Action arising prior to the Effective Date. *See* California DTSC Objection ¶¶ 135-40. These arguments fail as the Injunction Provision is an appropriate and necessary component of the Plan and is not a discharge under section 1141 of the Bankruptcy Code.

122. As an initial matter, this Court recently overruled an objection asserting that certain third-party releases and an injunction provision set forth in a chapter 11 plan of liquidation worked in concert to provide a *de facto* discharge for the debtors, such that no entity

could continue to enforce a claim against the debtors.  *See In re JRV Group USA L.P.,* 19-11095

(CSS) (Bankr. D. Del. 2019) ("**JRV Group**").  Specifically, this Court held:

> [although there] is no discharge under [1141]…there are independent provisions that, when taken in concert, arguably provided for a *de facto* discharge…but the important point is that [the express releases, third-party releases, and injunctions] stand…on their own as appropriate and authorized by the Code.  So if you have three independent factors, all of which are appropriate, all of which are supported by the evidence, and all of which are authorized by the Code, and the *de facto* effect is that they give a de facto discharge, I really don't think that undoes what you were otherwise allowed to do…my belief in ruling is that the fact that the elements that result in the *de facto* discharge are all appropriate, supported by the evidence, supported by the law, supported by the Code, and the fact that, when you combine and you end up with a *de facto* discharge -- which you obviously can't have a *per se* discharge in the plan -- I think is of no moment.

*See* June 19, 2020, Hr'g Tr. 23:10–24:14, *In re JRV Group USA L.P.,* 19-11095 (CSS) (Bankr.

D. Del. 2019).[22]

123.    Accordingly, even if the Injunction Provision did operate as a *de facto*

discharge, it would be of no consequence as to whether or not the Injunction Provision should be

approved.  Indeed, Courts have routinely approved injunctions in chapter 11 liquidating plans.

*See In re Optim Energy, LLC, et al.*, Case No. 14-10262 (BLS) [Docket No. 1159] (Bankr. D.

Del. July 30, 2015); *In re Refco Public Commodity Pool, L.P. f/k/a S&P Managed Futures Index

Fund, LP*, Case No. 14-11216 (BLS) [Docket No. 217] (Bankr. D. Del. Sept. 9, 2014); *In re

Coldwater Creek Inc. et al.*, Case No. 14-10867 (BLS) [Docket No. 981] (Bankr. D. Del. Sept.

17, 2014); *In re GSE Envtl., Inc., et al.*, Case No. 14-11126 (MFW) [Docket No. 340] (Bankr. D.

Del. July 24, 2014); *In re THQ Inc., et al.*, Case No. 12-13398 (MFW) [Docket No. 929] (Bankr.

D. Del. July 17, 2013); *In re B456 Systems, Inc., et al.*, Case No. 12-12859 (KJC) [Docket No.

1675] (Bankr. D. Del. May 20, 2013); *In re Food Processing Liquidation Holdings, LLC, et al.*,

Case No. 11-13139 (KG) [Docket No. 698] (Bankr. D. Del. April 26, 2012); *In re UBI*

---

[22] The transcript of the hearing on confirmation of the debtors' chapter 11 plan in *JRV Group* is annexed hereto as **Exhibit C**.

*Liquidating Corp., et al.*, Case No. 10-13005 (KJC) [Docket No. 1447] (Bankr. D. Del. Oct. 19, 2011).

124.    Consistent with the weight of authority on this issue, the Injunction Provision contained in Section 10.3 of the Plan is customary and merely seeks to assure that parties do not interfere with the consummation and implementation of the Plan and all the transactions contemplated thereby.  The Injunction Provision implements the Debtor Releases, Third Party Release, and the Exculpation Provision embodied in the Plan, in part, by permanently enjoining all persons and entities from, among other things, commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions. There is nothing unusual or inappropriate about the Injunction Provision.  Without the Injunction Provision, the carefully crafted and intensely negotiated structure and purpose of the Plan and Global Settlement could be contravened.

125.    The Injunction Provision is also necessary to the distribution scheme in the Amended Plan. This is a liquidating plan.  In order for assets to de distributed pursuant to the Plan, the assets of the Debtors' estates must be protected against an attempt by a creditor to obtain more than its entitlement under the Plan. Such prohibited actions would, obviously, disrupt the Global Settlement and proposed distribution structure incorporated in the Amended Plan.

126.    Accordingly, the proposed Injunction Provision should be approved as it is critical to accomplishing the Plan's overall objectives and is consistent with section 1123(b)(6) of the Bankruptcy Code.

5.    **Europe/ROW Sale Transaction Maximizes Stakeholder Recoveries and is a Sound Exercise of the Debtors' Business Judgment.**

127.    In addition to the Global Settlement, the Amended Plan seeks approval for a going concern and value-maximizing sale of the Debtors' Europe/ROW operations to the Europe/ROW Purchaser in exchange for a credit bid by the Consenting Creditors. As the Court record shows, and as is set forth more fully herein, the Debtors attempted to address their liquidity challenges and balance sheet maturities through prior chapter 11 cases, an out-of-court recapitalization transaction, and a prepetition marketing and sale process—in each instance, the Debtors' efforts ultimately proved unsuccessful. With the assistance of their advisors, the Debtors subsequently pursued a Court-approved, public and transparent postpetition sale process, pursuant to which the Debtors cast a wide net, marketed their assets, and sought a value-maximizing sale transaction. The Europe/ROW Sale Transaction effectuated through the Amended Plan is the outcome of those immense efforts. As the record clearly demonstrates, there were no other qualified purchasers of the Debtors' Europe/ROW business.

128.    The Europe/ROW Sale Transaction permits the Debtors to, among other things, achieve the following benefits for all of their constituents:

i.    transition the Debtors' Europe/ROW business as a going concern;

ii.    minimize disruption to the Debtors' creditors through an orderly transition plan that involves a post-Effective Date shared services relationship with the Debtors' Americas business;

iii.    ensure the possibility of a successful Global Settlement by securing the support of the Consenting Creditors and by providing new financing to the Europe/ROW business in the amount of at least $36 million through the issuance bridge financing notes, a portion of the proceeds of which will be used by the Transferred Entities to fund the approximately $12.5 million Global Settlement Payments and the $6.0 settlement payment to the PBGC; and

iv.    preserve jobs for over 5,000 employees of the Debtors' Europe/ROW business.

65

129.    Pursuant to section 1123(b)(4) of the Bankruptcy Code, a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4).  As permitted by section 1123(b)(4) of the Bankruptcy Code, the Amended Plan provides for the consummation of the Europe/ROW Sale Transaction pursuant to the Europe/ROW Purchase Agreement, which will effect a going-concern sale of substantially all of the Debtors' Europe/ROW businesses.

130.    As described more fully in the Peluchiwski Declaration, following an approximately four-month, extensive prepetition and postpetition marketing process for the sale of the Debtors' assets or equity interests, the Debtors, with the approval of the Special Committee, determined that the bid submitted by the Europe/ROW Purchaser was the highest or otherwise best offer available in the market and would generate the most value for the Debtors' stakeholders.    Peluchiwski Decl. ¶¶ 18, 20.    Accordingly, the Debtors entered into the Europe/ROW Purchase Agreement.  *Id.* ¶ 19.  The Europe/ROW Sale Transaction provides for the going-concern sale of the Debtors' Europe/ROW businesses and was the product of extensive, arms'-length, good-faith negotiations between the parties.  *Id.* ¶ 21.

131.    By market testing the Europe/ROW Purchase Agreement through a Court-approved sale process, the Debtors used their best efforts to obtain the highest or otherwise best bid for the Debtors' assets or equity interests.  Accordingly, the Europe/ROW Sale Transaction constitutes a sound and reasonable exercise of the Debtors' business judgment, is reasonable and appropriate under the circumstances, and is in the best interests of the Debtors and their Estates, creditors, and other parties in interest.

132.    Based upon the foregoing, the Amended Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Therefore, the Amended Plan satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**E.      Amended Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code.**

133.    Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, at 412 (1977), *as reprinted in*  1978 U.S.C.C.A.N. 5963 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re PWS Holding Corp.*, 228 F.3d at 248;  *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).  As demonstrated below, the Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding disclosure and plan solicitation, as well as the Disclosure Statement Order regarding disclosure and solicitation of the Amended Plan.

**1.      Postpetition Disclosure and Solicitation.**

134.    Under section 1125 of the Bankruptcy Code, prior to the solicitation of votes on a plan of reorganization, a debtor must disclose information that is adequate to permit an informed judgment by creditors and shareholders entitled to vote on the plan.  Pursuant to the Disclosure Statement Order, the Court approved the Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment regarding whether to accept or reject the Amended Plan.  As set forth in the

Voting Certification, each holder of a Claim in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) was sent the Solicitation Package required by the Disclosure Statement Order. The Solicitation Package was transmitted in connection with the solicitation of votes to accept the Amended Plan in compliance with section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Debtors did not solicit acceptances of the Amended Plan from any creditor prior to the transmission of the Disclosure Statement.

## 2.    Acceptance or Rejection of the Amended Plan.

135.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of the Amended Plan. Under section 1126, only holders of Allowed Claims in Impaired Classes of Claims and Interests that will receive or retain property under the Amended Plan on account of such Claims or Interests may vote to accept or reject the Amended Plan. In accordance with Sections 3 and 4 of the Amended Plan and section 1126 of the Bankruptcy Code, with respect to each Debtor, the Debtors solicited acceptances of the Amended Plan from the holders of Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) that are entitled to vote to accept or reject the Amended Plan. In accordance with Sections 3 and 4 of the Amended Plan, the Disclosure Statement Order, and sections 1126(f) and (g) of the Bankruptcy Code, the Debtors did not solicit acceptances from the holders of Claims or Interests in (i) Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (ABL Claims), as the holders of such Claims and Interests are not impaired under the Amended Plan and thus are presumed to accept the Amended Plan, or (ii) Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims), as the holders of such Claims and Interests will not receive any distribution or property, other than as

provided pursuant to the Global Settlement, on account of their Claims and Interests and thus are deemed to reject the Amended Plan.

136.    In addition, the Debtors did not solicit votes from holders of Claims in Class 7 (General Unsecured Claims) and Class 8 (Environmental NPP Claims).  Bankruptcy courts in this and other jurisdictions have approved chapter 11 plans where the debtors did not solicit holders of general unsecured claims or equity interests that were deemed to reject the chapter 11 plan but were receiving some consideration.  *See, e.g.*, *In re Pyxus Int'l, Inc*., Case No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020) (Docket No. 355) (confirming plan where existing equity class that was deemed to reject the plan received distributions in the form of *pro rata* share of a cash distribution); *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [Docket No. 238] (same); *In re Nuverra Envtl. Sols., Inc.*, Case No. 17-10949 (KJC) (Bankr. D. Del. July 25, 2017) [Docket No. 366] (confirming plan where impaired general unsecured class that was deemed to reject the plan received distribution in the form of equity and/or warrants); *In re Tidewater Inc.*, Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017) [Docket No. 378] (confirming plan where impaired equity class that was deemed to reject the plan received distribution in the form of equity and/or warrants).

137.    As the Amended Plan provides that holders of General Unsecured Claims and Environmental NPP Claims are entitled to receive a recovery in the form of the Global Settlement Payments, as a gift from the Consenting Creditors through the Transferred Entities in connection with the Global Settlement (rather than receiving a distribution on account of their prepetition Claims), holders of such Claims are properly deemed to have rejected the Amended Plan pursuant to section 1126(g) of the Bankruptcy Code and did not need to be solicited.  *See* Disclosure Statement Order, ¶ D.

138.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject a plan of reorganization.  As evidenced by the Voting Certification, as to each Debtor, as applicable, the Amended Plan has been accepted by creditors holding Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims).

F.    **Amended Plan Has Been Proposed in Good Faith in Compliance with Section 1129(a)(3) of the Bankruptcy Code.**

139.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Third Circuit has defined the good faith standard as requiring a showing that "there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *PPI Enters.*, 228 B.R. at 347 (quoting *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)), *aff'd*, 324 F.3d 197 (3d Cir. 2003); *see also PWS Holding Corp.*, 228 F.3d at 242 ("[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (alteration in original) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)). "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'" *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). The court is given "considerable discretion in finding good faith." *W.R. Grace*, 475 B.R. at 87 (quoting *Coram Healthcare*, 271 B.R. at 234).

70

140.    As discussed above, from the outset of these chapter 11 cases, the Debtors have proceeded in a constructive and cooperative manner to achieve consensus whenever possible and avoid expending scarce resources on disputes and litigation in order to maximize recoveries to creditors.  No one—not even California DTSC—can seriously question the open and collaborative process undertaken by the Debtors to garner support for a consensual resolution of these chapter 11 cases—precisely in the manner prescribed by the Bankruptcy Code.  Indeed, California DTSC has participated in every single step of the process to advance these chapter 11 cases until it abruptly pulled out of the Global Settlement ten (10) days before the Confirmation Hearing was originally scheduled to occur.

141.    Moreover, the framework of the Amended Plan (including all documents necessary to effectuate the Global Settlement and the Europe/ROW Sale Transaction embodied therein) is premised on the Mediators' Proposal and is the result of months of negotiations, including mediation, among the Debtors, the Consenting Creditors, the Creditors' Committee, PBGC, and the Settling Governmental Authorities (and even California DTSC).  Not a single party, other than California DTSC through its self-serving objection, has questioned the Debtors' good faith in pursuing the Amended Plan.

142.    For the reasons stated herein, the Debtors submit that the Amended Plan unequivocally furthers the objectives and purposes of the Bankruptcy Code.

**G.    Amended Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.**

143.    Section 1129(a)(4) of the Bankruptcy Code requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments of professional fees which are

made from estate assets be subject to review and approval as to their reasonableness by the court. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *accord Lisanti v. Lubektin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007).

144.    All payments for services provided to the Debtors during these chapter 11 cases must be approved by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.  Specifically, Section 2.2 of the Amended Plan provides that all Fee Claims must be approved by the Court pursuant to final fee applications as reasonable.  Finally, the Amended Plan provides that the Court shall retain jurisdiction to "hear and determine all proceedings, if any, to approve Fee Claims, Restructuring Expenses, and Trustees Fees."  *See* Amended Plan, § 11.1(h).  Therefore, the Amended Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code with respect to the Debtors' professionals.

**H.    Debtors Have Complied With the Requirements of Section 1129(a)(5) of the Bankruptcy Code.**

145.    Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a successor to a debtor under the plan and that such appointment be consistent with the interests of creditors and equity security holders and with public policy.  In addition, to the extent there are any insiders that will be retained or employed by the reorganized

debtors, section 1129(a)(5)(B) requires that the plan proponent disclose the identity and nature of any compensation of any such insiders.  *See* 11 U.S.C. § 1129(a)(5).

146.    Contemporaneously herewith, the Debtors have filed a notice announcing the Plan Administrator and the New Board in compliance with section 1129(a)(5).  As set forth in the notice, the Plan Administrator shall be Scott Rinaldi of Ankura and the sole member of the New Board shall be William Transier, who is currently a member of the Special Committee.  Mr. Rinaldi will be compensated at $30,000 per month for its role as Plan Administrator.  In addition, Mr. Rinadli will have access to a small team of Ankura professionals to assist with the wind down, for which Ankura will charge the wind down estates an hourly fee.  Mr. Transier will be compensated $25,000 per month for his services, which is the same as he is compensated for his current role as a member of the Special Committee.

147.    In their respective capacities as fiduciaries of the Debtors' Estates, the Plan Administrator and members of the New Board are immune from liability under federal and state environmental laws, including the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), with respect to any contamination of real property previously owned, leased or operated by the Debtors prior to the Effective Date, including the Non-Performing Properties and the Canada Non-Performing Property.  This is because, generally speaking, most Environmental Laws, including CERCLA, impose liability for remediating environmental contamination on (1) the party that caused the contamination, (2) the current owner or operator of the contaminated real property, or (3) the owner or operator of the contaminated property at the time the contamination occurred.  See, e.g., 42 U.S.C. § 9607(a) and Cal. Health & Safety Code § 25323.5.  Neither the Plan Administrator nor the New Board falls into any of these categories:  (1) they did not, and could not, have caused contamination at

Debtor sites that were sold, abandoned or otherwise transferred before their involvement with the Debtors' Estates, which shall begin with their appointment on the Effective Date, and (2) they have never owned or operated, in any capacity, any of the Debtors current or former sites. Furthermore, with respect to any CERCLA liability on or after the Effective Date, the Plan Administrator and the New Board are being appointed to oversee the Wind-Down Estates and Holdings, respectively. The Non-Performing Properties, on the other hand, will not be an asset or a liability of either of those entities on and after the Effective Date—they will either be transferred to a trust pursuant to the Environmental Settlement Documents or otherwise abandoned. As such, the Plan Administrator and the New Board will not have any oversight over, or any authority to operate or control any of the Non-Performing Properties and thus should not be subject to CERCLA liability with respect to the same.

148.    Simply put, neither the Plan Administrator nor the New Board had any connection whatsoever to properties that were sold, abandoned or otherwise transferred before or during their involvement with the Debtors' Estates and therefore cannot be held liable under Environmental Laws for any contamination that may exist on such sites.

## I.    Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor.

149.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity interest holders in the Debtors—commonly referred to as the "best interests" test. The best interests test focuses on potential individual dissenting creditors rather than classes of claims. *See 203 N. LaSalle St.,* 526 U.S. at 441 n.13. It requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount

such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

150.    Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation." *Adelphia Commc'ns*, 368 B.R. at 252.  The Court must evaluate the liquidation analysis cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *Affiliated Foods*, 249 B.R. at 788; *W.R. Grace*, 475 B.R. at 142 ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record.  It is not necessary to itemize or specifically determine precise values during this estimation procedure.  Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation").  As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests.  *See Drexel Burnham Lambert Grp.*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

151.    The best interests test does not apply to the holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (ABL Claims), because each holder in such Classes is Unimpaired under the Amended Plan, presumed to accept the Amended Plan, and will either receive payment in full, in Cash, be reinstated and paid in the ordinary course, or otherwise its legal, equitable, or contractual rights will not be altered.  Accordingly, the holders of such Claims or Interests are receiving or retaining under the

Amended Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery under chapter 7.

152.    As set forth in the Liquidation Analysis and the Messing Declaration, the best interests test is satisfied as to <u>every single holder</u> of a Claim in Classes 4, 5, 6, 7, 8, 9, and 12 and Interests in Classes 10 and 11.  Messing Confirmation Decl. ¶ 35. Specifically, the Liquidation Analysis demonstrates that all Classes of Claims or Interests will recover value equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation.  *See* Disclosure Statement, Ex. D (Liquidation Analysis).

153.    The Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, such as (i) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals, (ii) the delay and erosion of value that would be caused to the Debtors' assets due to the need of the newly appointed chapter 7 trustee and its professionals to familiarize themselves with the assets and liabilities of the Debtors, (iii) the reduced recoveries caused by an accelerated sale or disposition of the Debtors' assets by the chapter 7 trustee, and (iv) the additional General Unsecured Claims that would likely arise as a result of the rejection of certain executory contracts and unexpired leases, and other potential claims that may arise in a chapter 7 liquidation.

154.    The estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis are based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11 proceedings.  As such, the Debtors' Liquidation Analysis should be afforded deference.  *See Charter Commc'ns*, 419 B.R. at 261-62 (discrediting creditors' objection to liquidation analysis

because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize").  Accordingly, the Amended Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

155.    California DTSC's objections that the Amended Plan does not satisfy section 1129(a)(7) of the Bankruptcy Code are addressed below.

**J.    Amended Plan Has Been Accepted by or Is Presumed to Have Been Accepted by All Impaired Classes Entitled to Vote on Amended Plan.**

156.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accepts the plan, as follows:  "With respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8).  As set forth above, holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (ABL Claims) are not impaired under the Amended Plan and are, therefore, conclusively presumed to have accepted the Amended Plan pursuant to section 1126(f) of the Bankruptcy Code.  Additionally, as evidenced by the Voting Certification, the Amended Plan has been accepted by 100% of voting creditors in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) entitled to vote and who voted on the Amended Plan.  Thus, as to such Classes, the requirements of section 1129(a)(8) of the Bankruptcy Code have been satisfied.

157.    Holders of Claims or Interests in Class 7 (General Unsecured Claims), Class 8 (Environmental NPP Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims) are deemed to have rejected the Amended Plan pursuant to section 1126(g) of the Bankruptcy

Code.  As to these Classes, the Amended Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

**K.    Amended Plan Provides for Payment in Full of All Allowed Priority Claims.**

158.    Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under the plan.  Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must provide. 11 U.S.C. § 1129(a)(9).

159.    The Amended Plan complies with section 1129(a)(9) of the Bankruptcy Code.  The Amended Plan provides that, unless a holder agrees to less favorable treatment, holders of allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code will be paid in full, in Cash, on the later of the Effective Date and the first business day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes Allowed.  *See* Amended Plan, § 2.1.

160.    Moreover, the Amended Plan provides that, unless a holder agrees to less favorable treatment, holders of Allowed Priority Non-Tax Claims under section 507(a) of the Bankruptcy Code (excluding Priority Tax Claims under section 507(a)(8), as described herein) will (i) be paid in full, in Cash on or as soon as practicable after the Effective Date, or (ii) receive such other treatment so as to render such holder's Claim Unimpaired.  *See* Amended Plan, § 4.1. The Amended Plan, therefore, satisfies the requirements of section 1129(a)(9)(A) and (B).

161.    The Amended Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code with respect to the treatment of Priority Tax Claims under section 507(a)(8).  Pursuant to Section 2.3 of the Amended Plan, unless holders agree to less favorable treatment, holders of Allowed Priority Tax Claims (i) will be paid Cash in an amount

78

equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is Allowed on the Effective Date, (b) the first business day after the date that is forty-five (45) calendar days after the date such Claim becomes Allowed, and (c) the date such Claim is due and payable in the ordinary course as such obligation becomes due; or (ii) will receive equal annual Cash payments in an aggregate amount equal to the amount of such Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date. *See* Amended Plan, § 2.3. Accordingly, the Amended Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

### L. Amended Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code.

162. Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Amended Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). Here, all Classes entitled to vote on the Amended Plan—Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims)—are impaired and have voted to accept the Amended Plan, without including the acceptance of the Amended Plan by any insiders in such Class.

163. California DTSC objects to the Amended Plan on the basis of their misstatement of the Bankruptcy Code and their incorrect assertion that the votes of the Consenting Creditors cannot be relied upon to confirm the Amended Plan. The Debtors address this objection below in <u>Part II</u> of this Memorandum.

164. Accordingly, the Amended Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### M.    Amended Plan Is Feasible.

165.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that the Amended Plan is feasible as a condition precedent to confirmation.  Specifically, it requires that confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is proposed in the plan.  11 U.S.C. § 1129(a)(11).  The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Amended Plan may be implemented and has a reasonable likelihood of success.  *See Energy Res.*, 495 U.S. at 549; *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

166.    Section 1129(a)(11) "does not require a plan's success to be guaranteed." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012).  Rather, "[t]he key element of feasibility is whether there is a ***reasonable probability*** the provisions of the plan can be performed."  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 142 (3d Cir. 2012) (emphasis added) (quoting *In re TCI 2 Holdings, LLC,* 428 B.R. 117, 148 (Bankr. D.N.J. 2010)); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012) ("[T]he bankruptcy court need not require a guarantee of success, but rather only must find that the plan present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success." (internal quotations omitted)), *aff'd*, 729 F.3d 332 (3d Cir. 2013), and *aff'd,* 532 F. App'x 264 (3d Cir. 2013), and *aff'd,* 729 F.3d 311 (3d Cir. 2013), and *aff'd*, 729 F.3d 332 (3d Cir. 2013).  "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."  *Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985).  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.  *See In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd sub*

*nom. Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581 (6th Cir. 1986).

167.    Feasibility is a "low threshold."  *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *15 (Bankr. D. Del. Dec. 5, 2019); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011) ("[I]t is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement." (quoting *In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1166 (5th Cir.1993))), *aff'd*, 587 B.R. 606 (D. Del. 2018), *aff'd*, 972 F.3d 228 (3d Cir. 2020), and *aff'd in part*, 587 B.R. 606 (D. Del. 2018), and *aff'd*, 972 F.3d 228 (3d Cir. 2020). Bankruptcy courts have found that feasibility is established where a debtor has "sufficient resources" to meet its obligations under the plan, including its "obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases." *In re Finlay Enterprises, Inc.*, No. 09-14873 JMP, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010); *accord In re Nailite Int'l*, No. 09-10526 (MFW), 2009 Bankr. LEXIS 4878, at *12-13 (Bankr. D. Del. Dec. 8, 2009) (finding that plan was "feasible" and "satisfie[d] the requirements of section 1129(a)(11)" because it was "a plan of liquidation" that provided for "the means for implementing the [plan] and demonstrate[d] the Debtor's ability to make the payments anticipated" under the plan).  For the reasons set forth below, the Amended Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

168.    The Debtors have demonstrated that there is a reasonable probability that they will have sufficient funds to meet their post-Confirmation Date obligations to pay for the ongoing costs of administering and consummating the Amended Plan and ultimately closing these chapter 11 cases.  As established in the Messing Declaration, the Amended Plan embodies a rational plan for the orderly wind down of the Debtors' estates and the delivery of distributions

to holders of Allowed Claims following the consummation of the Global Settlement and the value-maximizing Europe/ROW Sale Transaction. Messing Confirmation Decl. ¶ 40. Specifically, the Amended Plan sets forth certain Cash payments that the Debtors and/or the Plan Administrator will make on or after the Effective Date. *Id.* Such payments include, among others, payments to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. *Id.* In accordance with the Global Settlement and the GUC Trust Agreement, the Amended Plan also provides for the establishment of the GUC Trust for the benefit of holders of Allowed General Unsecured Claims, to which the Debtors will transfer the GUC Trust Assets. *Id.*

169.    Further, the Debtors will be able to meet their obligations under the Amended Plan. Roy Messing and his team at Ankura have estimated the Debtors' anticipated sources and uses of funds following confirmation. The Debtors retained Ankura to assist with their financial and operational restructuring on April 8, 2020, and Mr. Messing was appointed as the Debtors' Chief Restructuring Officer on May 18, 2020. *Id.* ¶ 7 n.3. Since then, Mr. Messing and the Ankura team have been responsible for the Debtors' books and records. *Id.* ¶ 40. They have carefully reviewed filed Claims and assets, consulted with the Debtors' counsel and other advisors, and received input from the Debtors' management and employees who have extensive knowledge of the Debtors' assets and liabilities. *Id.* Based on this experience and their deep understanding of the business, the Ankura team was able to prepare estimates of the Debtors' anticipated sources and uses of funds that are reasonable and well-founded.

170.    As detailed in the Messing Declaration, the value of the Debtors' remaining assets is approximately $36.6 million as of October 9, 2020. *Id.* ¶ 42. These assets include:

| Estimated Sources | Amount |
|---|---|
| Cash Balance as of October 9, 2020 | $23.5 million |
| Insurance Cash Collateral | $10.5 million |
| Utility Adequate Assurance | $1.5 million |
| Other Receipts | $1.1 million |
| TOTAL SOURCES: | $36.6 million |

171.    The Debtors project that they will have wind-down expenses of approximately $6.9 million, *id.* ¶ 43, including:

| Estimated Uses of Funds | Amount |
|---|---|
| Operating Expenses | $1.1 million |
| Restructuring Professionals | $2.3 million |
| Post-Effective Wind-Down Expenses | $3.5 million |
| TOTAL USES: | $6.9 million |

172.    The Debtors estimate that the total amount of outstanding claims that must be paid prior to any distributions to the Exchange Priority Notes Claims will be approximately $15 million, *id.* ¶ 45, consisting of the following:

| Estimated Outstanding Claims | Amount |
|---|---|
| Administrative Expense Claims[23] | $8.7 million (of which approximately $4.0 million are |

---

[23]    As reflected in the amendment to the Europe/ROW Purchase Agreement, filed contemporaneously herewith (the "**Amended Europe/ROW Purchase Agreement**"), the Debtors will pay certain investment banking fees in connection with the Europe/ROW Sale Transaction, provided that, to the extent the payment of such investment banking fees result in a shortfall in the Debtors ability to pay Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, the Transferred Entities (or their designee) will reimburse the Debtors the portion of any paid investment banking fees to the extent required to make up for such a shortfall.  Accordingly, such fees have not been included in the estate of claims required to be satisfied by the Debtors.  *See* Amended Europe/ROW Purchase Agreement § 4.16.

|                          | 503(b)(9) Claims) |
| ------------------------ | ----------------- |
| **Priority Tax Claims**  | $4.3 million      |
| **Other Secured Claims** | $2.0 million      |
| **TOTAL CLAIMS:**        | **$15 million**   |

173.    After these disbursements, the Debtors expect to have a surplus of approximately $14.8 million, which will be more than sufficient to satisfy any contingencies that may arise, including any potential working capital claim asserted by the Americas Buyer (as defined below), which is addressed further below in <u>Part III</u> of this Memorandum. *Id.* ¶ 46.  As with any projections, there is a possibility that there may be some variance in the wind-down budget and expenses.  The Debtors believe that the surplus could range from $11.3 million to $20.3 million, but they expect that the surplus will still be sufficient to cover any contingencies in either of those scenarios. *Id.*  Accordingly, the Debtors satisfy the standard for feasibility under section 1129(a)(11) of the Bankruptcy Code.

174.    The Americas Buyer (as defined below) objects to the Amended Plan on the basis that the Debtors must reserve a sufficient amount of cash to pay the Post-Closing Adjustment (as defined below).  The Debtors address this objection below in <u>Part II</u> of this Memorandum.

175.    Accordingly, the Amended Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

## N.    Amended Plan Complies with Section 1129(a)(12) of the Bankruptcy Code.

176.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]"  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code

provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(2). In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.1 of the Amended Plan provides for the payment of such fees, together with interest (if any) pursuant to section 3717 of title 31 of the United States Code on the Effective Date and thereafter as may be required.

### O.    Amended Plan Satisfies Section 1129(a)(13) of the Bankruptcy Code.

177.    Section 1129(a)(13) requires that:

> The plan provides for the continuation after its effective date of payment of all retiree benefits . . . at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).

178.    On August 13, 2020, the Debtors filed the *Debtors' Motion for an Order Authorizing the United States Trustee to Appoint an Official Committee of Retired Employees* (Docket No. 726) (the "**Retiree Motion**"), which requested that the Court authorize and direct the U.S. Trustee to appoint an official committee to represent the Non-Union Retirees (a "**Retiree Committee**") to engage in negotiations with the Debtors to modify retiree benefits. The United Auto Workers Union and the Allentown Teamsters Union (together, the "**Union Representatives**") had already agreed to represent the Debtors' unionized employees, the UAW Retirees and the Allentown Retirees, respectively, pursuant to Section 1114(b) and 1114(c). On August 14, 2020, the Court entered the *Order Appointing an Official Committee of Retired Employees* (Docket No. 740) (the "**Retiree Order**").

179.    Immediately upon the appointment of the Non-Union Representatives, the Debtors made a proposal to the Union Representatives and the Non-Union Representatives regarding the terms for modification of the health, dental and life insurance benefits provided by

the Debtors to approximately 220 Retirees.  After considerable deliberation and negotiation, and in view of the Debtors' financial condition, the Debtors, the Union Representatives and the Non-Union Representatives agreed to the terms pursuant to which benefits under the Retiree Plan will be terminated pursuant to section 1114 of the Bankruptcy Code.

180.    The Debtors, the Union Representatives and the Non-Union Representatives have agreed on the following settlement ("**Retiree Settlement**"): (i) all healthcare benefits to the retirees shall be terminated as of the Effective Date; (ii) notwithstanding this termination, the Debtors shall directly pay or otherwise reimburse all retirees who opt in to COBRA healthcare coverage for the costs of such coverage for the period through December 31, 2020; (iii) in order to be eligible for such reimbursement, the Retiree must opt in to COBRA coverage on or before December 1, 2020; (iv) the Debtors will not subsidize or provide reimbursement for any COBRA healthcare expenses after December 31, 2020; (v) the Debtors shall continue to pay all life insurance premiums due on behalf of retirees entitled to life insurance benefits through December 31, 2020; (vi) the Debtors will not pay premiums for life insurance benefits after December 31, 2020 and such life insurance benefits will be terminated; and (vii) the Debtors will send a notice to retirees summarizing the settlement described above.

181.    The Debtors intend to file a stipulation and agreement seeking an order authorizing the Debtors to terminate the retiree benefits under the terms of the Retiree Settlement pursuant to section 1114 of the Bankruptcy Code and anticipate that the Creditors' Committee, the Ad Hoc Group and the United States Trustee will not object to such stipulation and agreement.

182.    As provided by section 1129(a)(13), the Amended Plan provides for the continuation of all existing retiree benefits after the Effective Date at the level established under the terms of the Retiree Settlement pursuant section 1114(e)(1)(B) of the Bankruptcy Code.

**P.    Amended Plan Satisfies "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes.**

183.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

184.    The only classes entitled to vote on the Amended Plan—Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims)—voted to accept the Amended Plan, therefore, "cram down" is only relevant to those Classes of Claims and Interests that are deemed to have rejected the Amended Plan (*i.e.*, Class 7 (General Unsecured Claims), Class 8 (Environmental NPP Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims)).  The Amended Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

**1.    Amended Plan Does Not Discriminate Unfairly.**

185.    Section 1129(b)(1) does not prohibit discrimination between classes. Rather, it prohibits discrimination that is unfair.  Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a

reasonable basis for the disparate treatment.  *See Armstrong World Indus.*, 348 B.R. at 121 (noting that the "hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination" (quoting *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003)); *accord In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003); *Johns-Manville,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1998). As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g., Drexel Burnham Lambert Grp.*, 138 B.R. at 715 (separate classification and treatment was rational where members of each class "possess[ed] different legal rights"), *aff'd sub nom. Lambert Brussels Assocs., L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992).

186.    The Amended Plan does not discriminate unfairly with respect to Class 7 (General Unsecured Claims), Class 8 (Environmental NPP Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims).  California DTSC objects to the Amended Plan on the basis that Class 8 (Environmental NPP Claims) is unfairly discriminated against in comparison to Class 7 (General Unsecured Claims).  The Debtors address this objection below in Part II of this Memorandum.  Holders of Claims and Interests in each of the remaining Classes are properly

classified in separate classes because they hold different legal rights as set forth in the following

table:

| Class | Rationale For Separate Classification |
|---|---|
| Class 9 (Intercompany Claims) | ▪ Composed of claims by Debtors or non-Debtor affiliates against the Debtors |
| Class 10 (Intercompany Interests) | ▪ Composed of holders of Interests in the Debtors, other than Holdings Equity Interests |
| Class 11 (Holdings Equity Interests) | ▪ Composed of holders of Interests in Exide Holdings, Inc. |
| Class 12 (Subordinated Securities Claims) | ▪ Composed of holders of Claims subject to subordination under Section 510(b) of the Bankruptcy Code |

187.    As demonstrated herein, the Debtors have sound bases for classifying Claims or

Interests in Classes 9, 10, 11, and 12 differently.  Accordingly, the Amended Plan does not "discriminate

unfairly" with respect to such impaired Classes of Claims or Interests.

### 2.    Amended Plan Is Fair and Equitable.

188.    To be "fair and equitable" as to holders of unsecured claims, section

1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either (i) that each holder of the

nonaccepting class will receive or retain on account of such claim property of a value equal to

the allowed amount of such claim, or (ii) that a holder of a claim or interest that is junior to the

claims of the nonaccepting class will not receive or retain any property under the plan.  *See* 11

U.S.C. § 1129(b)(2)(B).

189.    To be "fair and equitable" as to holders of interests, section 1129(b)(2)(C)

of the Bankruptcy Code requires a plan to provide either (i) that each holder of an equity interest

will receive or retain under the plan property of a value equal to the greatest of the fixed

liquidation preference to which such holder is entitled, the fixed redemption price to which such

holder is entitled or the value of the interest, or (ii) that a holder of an interest that is junior to the

nonaccepting class will not receive or retain any property under the plan.  *See* 11 U.S.C. § 1129(b)(2)(C).

190.    The "fair and equitable" rule is satisfied as to the holders of Claims in Classes 7, 8, 9, and 12, and Interests in Classes 10 and 11, as no Claims or Interests junior to each such class, as applicable, will receive or retain any property under the Amended Plan on account of such junior Claims or Interests.  *See In re Finlay Enters. Inc.*, No. 09-14873 (JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (holding that the fair and equitable test was satisfied where no interest junior to the interests of the rejecting class received any property under the plan).  Moreover, no senior creditor will receive in excess of the full value of its Claim under the Amended Plan.  As such, the Amended Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to Class 7 (General Unsecured Claims), Class 8 (Environmental NPP Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims) and may be confirmed despite the rejection by such Classes.

## II.    THE OBJECTIONS TO THE AMENDED PLAN SHOULD BE OVERRULED AND AMENDED PLAN CONFIRMED.

### A.    Objection by California DTSC Should be Overruled.

#### 1.    Abandonment of the Vernon Non-Performing Property, if Required Pursuant to the Amended Plan, Should Be Approved.

191.    California DTSC objects to the alternative of abandonment of the Vernon Non-Performing Property provided in the Amended Plan.  The Debtors address this objection in the Abandonment Memorandum, filed contemporaneously herewith.

## 2.    Amended Plan Satisfies Section 1129 of the Bankruptcy Code.

### a.    California DTSC's Treatment Under the Amended Plan.

192.    Under the Amended Plan, California DTSC is classified in Class 8 along with each other holder of Environmental NPP Claims against the Debtors.  The treatment that creditors in Class 8 will receive pursuant the Amended Plan is determined by whether such holder voluntary accepts the Global Settlement or rejects it, which only California DTSC has done.

i.    If California DTSC becomes a Global Settlement Party, as it had intended prior to its abrupt election not to participate in the Global Settlement, it would receive (i) Vernon Environmental Trust Beneficial Interests in the Vernon Environmental Response Trust that will receive $2,587,523 and title to the Vernon Non-Performing Property free and clear of all claims and encumbrances, (ii) its Pro Rata share of the GUC Trust Beneficial B Interests (the "**Class 8 GUC Interests**"), and (iii) its Pro Rata share of Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied, as described in further detail in the Amended Plan (the "**Class 8 Net Cash Proceeds**" and, together with the Class 8 GUC Interests, the "**Universal Class 8 Recovery**").  *See* Amended Plan, § 4.8(b).

ii.    If California DTSC does not become a Global Settlement Party but the Payment Condition and the Vernon Trust Condition are satisfied—meaning the Bankruptcy Court approves the release by the California state governmental agencies, including California DTSC, in favor of the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors and the Vernon Environmental Trustee and California DTSC reach an agreement providing covenants substantively identical to those being granted by the Settling Governmental Authorities—then California DTSC will receive, through the newly created Vernon Environmental Response Trust, the same distribution that it would if it were a Global Settlement Party, outlined above.  *See* Amended Plan, §§ 4.8(b), 5.2(e)(i).

iii.    If the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied, California DTSC will receive, in addition to the Universal Class 8 Recovery, the benefit of a $2,587,523 cash distribution from the Transferred Entities to the Vernon Standby Trust—a trust in which it already holds a

beneficial interest pursuant to transactions entered into prior the Commencement Date—though it will receive no beneficial interest in the Vernon NPP, which will be abandoned by the Debtors pursuant to the Amended Plan. *See* Amended Plan, §§ 4.8(b), 5.2(e)(ii).

iv.    Finally, if the Payment Condition is not satisfied, the Vernon Non-Performing Property will be abandoned and California DTSC will receive, in lieu of the cash payment discussed in the foregoing, a first priority Lien against the Vernon Non-Performing Property to secure its Environmental NPP Claim in addition to receiving the Universal Class 8 Recovery. *See* Amended Plan §§ 4.8(b), 5.2(e)(iii). The value of this lien is estimated at $29.6 million, if remediated, based on third-party bids.

193.    For the avoidance of doubt, these potential recoveries are similarly available to all members of Class 8 and, to the extent actual recoveries differ among holders of Environmental NPP Claims, such disparate recovery is due solely to each creditor's decision to participate in or abstain from the Global Settlement.

**b.    The Treatment of California DTSC Under the Amended Plan is Not Less Favorable Than That of the Other Members of Class 8 and Complies with Section 1123(a)(4) of the Bankruptcy Code.**

194.    California DTSC argues that the Amended Plan provides disparate treatment to different Environmental NPP Claims classified in Class 8 because: (i) treatment depends on whether a claimholder is a Global Settlement Party; (ii) the economic treatment of California DTSC's claims is different from that of the other claims in Class 8; and (iii) California DTSC is subject to more onerous releases than are the Global Settlement Parties. These objections are all without merit and should be overruled.

195.    First and foremost, under the applicable legal test, it is the opportunity for recovery, not the distribution ultimately received, that must be equal among members of the same class. This is entirely consistent with Third Circuit law. This court has held that "[p]roviding different treatment to a creditor who agrees to settle instead of litigating is permitted

by section 1123(a)(4) . . . What is important is that each claimant within a class have the same opportunity to receive equal treatment." *In re Washington Mutual, Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) (*citing to In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008)); *Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." (*quoting In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)), *aff'd*, 648 F. App'x 277 (3d Cir. 2016). Under the Amended Plan, California DTSC is afforded the same opportunity for recovery as every other holder of Environmental NPP Claims, but has chosen on its own volition to pursue different treatment.

196.    Additionally, as explained above, California DTSC has misunderstood and misstated the non-consensual release it will be subject to under the Amended Plan, if approved. As explained in greater detail in paragraph 76 herein, the Settling Governmental Authorities are providing covenants not to sue to the Debtors, officers and directors and other related parties of the Debtors and Consenting Creditors that the California Environmental Agencies are not being required to release in order to realize the benefits of the Global Settlement. *See* Exhibit B (California DTSC Plan Releases).

i.    *California has been Offered the Same Opportunity as all Other Class 8 Creditors.*

197.    In its objection, California DTSC ignores completely the opportunity it has been afforded to enter into the Global Settlement. California DTSC asserts, "DTSC receives its most favorable treatment only if both the (i) Payment Condition and (ii) the Vernon Trust Condition [sic] are met." *See* California DTSC Objection ¶ 58. Not so. In reality, California

DTSC receives its most favorable recovery by opting, as each other holder of Environmental NPP Claims has, into the Global Settlement.  Under the Amended Plan, each member of Class 8 is entitled to identical treatment; to the extent California DTSC ultimately receives different recovery than any other member of Class 8, that results entirely from its decision to opt out of the Global Settlement, an opportunity that California DTSC has been equally afforded and had accepted prior to a recent reversal in its decision.

198.    Even if the recovery California DTSC ultimately receives pursuant to the Amended Plan were found to be materially less favorable than that of the other members of Class 8, which the Debtors assert cannot be the case under any of the options available to it as explained below, California DTSC agreed to such treatment by opting for it in lieu of participating in the Global Settlement.  *In re WR Grace & Co.*, 729 F.3d at 346 (holding that by filing a proof of claim a creditor had agreed to the less favorable treatment of binding itself to litigating its claim in the Bankruptcy Court.).  Otherwise stated, every holder of an Environmental NPP Claim is offered the same opportunity: accept the Global Settlement and its benefits or reject it and the Debtors will seek to abandon the applicable NPP location.  Only California has chosen not to settle and reject.  California has the right to reject the Global Settlement treatment that is being offered equally to all holders of Environmental NPP Claims, but it must live with the consequences.  California's rejection and resulting recovery does not, however, violate section 1123(a)(4) of the Bankruptcy Code or render the Amended Plan unconfirmable.

ii.    *California is Receiving Equal Treatment if Both Conditions are Satisfied.*

199.    California DTSC further argues that even if both Payment Conditions are satisfied, the economic treatment it would receive (i.e., an allocation of approximately $2.6 million in the form of the Vernon Global Settlement Payment) differs among claims in Class 8 because that amount is less than California's pro rata share of the entire $10 million settlement payment based upon California's estimated damages.  *See* California DTSC Objection ¶ 60.  In addition, California argues that other states have access to residual value from other Non-Performing Properties, which is not offered to California.  *See id.*

200.    Such objection is without merit and should be overruled.  First, California ignores that if both Payment Conditions are satisfied, the Vernon Non-Performing Property will be transferred to the Vernon Trust in which California DTSC will receive a beneficial interest.  So California DTSC is not just receiving a beneficial interest in approximately $2.6 million.  Moreover, the Amended Plan's allocation of $10 million settlement being provided by the Consenting Creditors and Transferred Entities among the Non-Performing Properties overseen by the agencies holding Environmental NPP Claims is not intended to (nor is it legally required to) reflect a pro rata recovery based on the size of each Environmental NPP Claim against the Debtors.  Such payment is not coming from the Debtors at all, but instead is being made as a settlement payment (or in this scenario, a substantial contribution) by the Consenting Creditors and Transferred Entities.  There is no requirement under the Bankruptcy Code that a settlement payment or substantial contribution made by a third party to resolve a unique dispute be offered in equal or pro-rated amounts for similarly situated creditors.

201.    Moreover, the allocation of the $10 million settlement payment was negotiated among the Participating Governmental Agencies, including California DTSC.  The Debtors understand that the determination of these allocations began with the estimated costs of

95

future cleanup and then took into account for each of the Non-Performing Properties, including the Vernon Non-Performing Property: (1) the availability of financial assurance, (2) the value of the property that may be used to support cleanup, and (3) the degree of litigation risk for the NPP as to whether various tasks underlying the estimated cleanup would meet the test under *Midlantic*.

202.    Similarly, California DTSC's objection that it cannot share in the residual value of the other Non-Performing Properties is of no merit.  Residual value from other properties will not be allocated or required to be shared pursuant to the Amended Plan; rather, if it is to be distributed and shared, such sharing is only occurring pursuant to an agreement among the holders of Environmental NPP Claims who are voluntarily entering into the Global Settlement—something California declined to do.  It is not surprising that the Settling Governmental Authorities are not willing to share any excess residual proceeds of their NPP with California given its actions.  As any course that the members of Class 8 choose to take with respect to their property is entirely independent of the operation of the Amended Plan, such voluntary creditor agreements cannot serve as the basis of a charge of disparate treatment within Class 8.

### iii.        Releases are Not Broader.

203.    California DTSC argues that the releases imposed on it by the Amended Plan are broader than those granted by the Global Settlement Parties.  *See* Objection ¶ 63.  Again, California fails to recognize that it is only entitled to the same opportunity as other creditors in Class 8.  The ultimate treatment of California, including the releases it is required to provide, is of its own making.

204.    Moreover, contrary to California DTSC's assertions, under any of the potential scenarios under the Amended Plan, California DTSC would only grant the releases contained in section 10.6(f) of the Amended Plan, which describes releases substantively identical to those granted by the Settling Government Agencies, as confirmed by the new language added to the Amended Plan and to a narrower set of parties. *See supra* ¶ 76; Exhibit B.

205.    Moreover, the fact that the releases are to be granted by all California regulatory agencies with authority to enforce Environmental Laws, as opposed to just California DTSC, is essential to the efficacy of the releases and the operation of the Amended Plan.  The State of California, unlike the other states involved in the Global Settlement, is unique in that environmental authority is more widely dispersed across multiple state agencies.  If California DTSC were the only agency in the state of California to grant the releases, then another agency with similar or overlapping jurisdiction could bring the very actions that the releases aimed to prohibit.  The Nonconsensual Released Parties have no comfort that California will not seek to pursue them or find a loophole in contravention of the intent of the release, especially given California's abrupt withdrawal from the Global Settlement and fierce opposition to the Amended Plan.  On the contrary, the Nonconsensual Released Parties do have that comfort from the Settling Government Agencies.  Specifically, the Amended Plan now includes acknowledgments from each state Settling Governmental Authority that such authority is the primary state governmental agency in its State with responsibility for enforcing Environmental Laws applicable to Non-Performing Properties located within its jurisdiction, specifically to address this very risk.  See Amended Plan § 5.2(j)(v).

c.    **The Amended Plan Does Not Unfairly Discriminate Against Class 8.**

206.    California DTSC further objects to its treatment under the Amended Plan on the basis that it may unfairly discriminate between General Unsecured Claims and Environmental NPP Claims, though the Objection notably falls short of alleging that such discrimination *does* exist.  In support of this objection, California DTSC offers only that the General Unsecured Claims in Class 7 receive different treatment than the Environmental NPP Claims in Class 8.  This objection fails because it both misinterprets the recovery available to these respective creditors and misapplies the law with respect to unfair discrimination under section 1129(b)(1) of the Bankruptcy Code.

207.    Section 1129(b)(1) does not prohibit discrimination between classes. Rather, it prohibits discrimination that is unfair.  When courts assess unfair discrimination under section 1129(b) of the Bankruptcy Code, "[t]he hallmarks of the various tests have been whether there is a reasonable basis for the discrimination and whether the debtor can confirm and consummate a plan without the proposed discrimination."  *Greate Bay Hotel & Casino*, 251 B.R. at 228.  There are several tests courts have employed to determine whether a proposed plan discriminates unfairly, though the Third Circuit recently affirmed this court's application of the rebuttable presumption test in *In re Tribune Company*, Case No. 18-2909, 2020 WL 5035797, at *9-11 (3d Cir. Aug. 26, 2020) (summarizing the various standards applied to unfair discrimination and affirming under de novo review the Delaware Bankruptcy Court's application of the rebuttable presumption test); *Hargreaves v. Nuverra Env'tl Sols, Inc. (In re Nuverra Env'tl Sols., Inc.)*, 590 B.R. 75, 90 (D. Del. 2018) (adopting and applying the rebuttable presumption test).  Under this test, "a rebuttable presumption of unfair discrimination arises when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's

treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *Tribune Co.*, 972 F.3d at 241 (citing to Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227, 228, 249 (1998).).  This rebuttable presumption may be overcome "if the court finds that a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization." *Id*.  However, the District Court for the District of Delaware has noted that the above is not an exhaustive list of circumstances that may rebut the presumption. *Nuverra Env'tl. Sols.*, 590 B.R. at 93.

208.    California DTSC asserts, incorrectly, that "[b]ecause the Plan provides different recoveries for similarly situated classes, a rebuttable presumption exists as to unfair discrimination." *See* California DTSC Objection ¶ 98.  As discussed above, under the rebuttable presumption test, different treatment only yields a presumption of discrimination if it results in a materially lower percentage recovery for the dissenting class or a materially greater allocation of risk. *Tribune Co.*, 2020 WL 5035797. at *9.  In this case, there is no need to rebut a presumption of discrimination because, applying the foregoing test to the Amended Plan, no such presumption can be applied in the first place.  California DTSC, as a member of Class 8, is neither receiving a lower percentage recovery nor accepting a greater allocation of risk in connection with the proposed distribution than are holders of General Unsecured Claims classified in Class 7.

99

209.    Of the myriad options available to California DTSC under the Amended Plan, none involves it receiving less than it would if classified with General Unsecured Claims. If it were a member of Class 7, California DTSC would receive its Pro Rata share of the $2,400,000 GUC Global Settlement Payment, among the other GUC Trust Assets, to be distributed by the GUC Trust.  Under the treatment provided to Class 8, however, it is <u>only not</u> receiving a Pro Rata share of the $2,400,000 GUC Global Settlement Payment.  If there is any excess amounts distributed by the GUC Trust, holders of Class 7 Claims and Class 8 Claims, including California, share in such excess distributions ratably.  *See* Amended Plan § 4.8(b)(1).

210.    In all scenarios, California DTSC will receive in excess of a Pro Rata share of $2,400,000.  California DTSC will receive one of the following:

i.    a beneficial interest in the Vernon Response Trust, which would be the recipient of the $2,587,523 cash distribution and title to the Vernon Non-Performing Property, if California DTSC consents to participation as a Global Settlement Party or if the Payment Conditions are both satisfied;

ii.    a beneficial interest in the cash distribution of $2,587,523 if the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied; or

iii.    if neither of the Payment Conditions are satisfied and the Debtors are permitted to abandon the Vernon property as proposed, California will still receive a first prior lien against the Vernon Non-Performing Property worth substantially in excess of $2,400,000.  Messing Confirmation Decl. ¶ 49.

211.    Under arguably its least beneficial recovery—*i.e.*, abandonment of the Vernon property—California DTSC ignores that it would still receive a first priority lien against the Vernon Non-Performing Property.  This lien has significant value (and certainly more than a Pro Rata share of $2,400,000), as evidenced by a robust marketing and sale process in which the Debtors received six bids for the Vernon Non-Performing Property, ranging up to $29,600,000. *See* Messing Confirmation Decl. ¶ 50

212.    Even if the treatment ultimately received by California DTSC were less favorable than that of General Unsecured Claims in Class 7, that would not be the proper metric by which to assess unfair discrimination, which is instead concerned with the treatment offered to a class as a whole.  The Third Circuit made clear in *Tribune* that "the cramdown provision's text also makes plain that unfair discrimination applies only to classes of creditors (not the individual creditors that comprise them), and then only to classes that dissent."  *Tribune Co.*, 2020 WL 5035797, at *10.  That is to say, the treatment of the class as a whole must be unfairly unfavorable in comparison to the treatment of the allegedly preferred class as a whole.  In other words, not only must the treatment chosen and received by California DTSC be unfavorable to that received by General Unsecured Creditors for its objection to have any merit, but so must be the entire scheme arranged for the benefit of holders of Environmental NPP Claims under the Amended Plan.  This recovery scheme, which addresses the unique rights and privileges of holders of Environmental NPP Claims by providing them with the option to receive recovery significantly in excess of $2,400,000 provided exclusively to General Unsecured Claims in Class 7, and a beneficial interest in the property underlying their Environmental NPP Claim or otherwise receive a first priority lien against such property, in no way discriminates against Class 8.

213.    California DTSC also objects, improperly, that the Amended Plan discriminates among Environmental NPP Claims in Class 8 arguing that the alternative treatment provided to holders of claims in Class 8 *de facto* creates two sub-classes.  California cites no case to support its argument, which is unsurprising.  The Amended Plan does not create two subclasses within Class 8.  As stated above, all creditors in Class 8 are offered the same opportunity—participate in the Global Settlement or receive an alternative treatment.  The choice

is California's.  If California's theory of subclasses were correct, no plan could ever offer an opportunity to a class of creditors, which is not the case.  *See Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." (*quoting In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)), *aff'd*, 648 F. App'x 277 (3d Cir. 2016).

214.    Moreover, California's theory, if accepted, would be contrary to the long standing case law and deference given to debtor to establish classes of claims under its Plan.  *See In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("the grouping of similar claims in different classes is permitted so long as the classification is reasonable") (internal citations omitted); *see also In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

215.    Accordingly, the treatment of California DTSC under the Amended Plan satisfies the requirements of the Bankruptcy Code and the Amended Plan may be confirmed.

> **d.    The Amended Plan Contains Adequate Means for Implementation Pursuant to Section 1129(a)(1) of the Bankruptcy Code.**

216.    In its objection, California DTSC incorrectly argues that the Debtors cannot abandon the Vernon Non-Performing Property and thus, the Amended Plan lacks adequate means for implementation.  The Debtors address their ability to abandon the Vernon Non-Performing Property in the Abandonment Memorandum, filed contemporaneously herewith.

**e.      The Debtors Have Proposed the Amended Plan in Good Faith, as Required by Section 1129(a)(3) of the Bankruptcy Code.**

217.    California DTSC argues that the Amended Plan was not proposed in good faith and therefore does not comply with section 1129(a)(3) of the Bankruptcy Code.  *See* California DTSC Objection ¶¶ 76-84.  California DTSC, however, offers no independent reason to attack the good faith nature of the Amended Plan.  Rather, California DTSC alleges that the Amended Plan lacks good faith because it unfairly discriminates against California DTSC and seeks to abandon the Vernon Non-Performing Property, a fact that this Court acknowledges was a possibility early in these Chapter 11 Cases.  As explained above and in the accompany Abandonment Memorandum, the Amended Plan does not discriminate unfairly or violate applicable law in connection with abandonment.  Accordingly, California DTSC's "boot-strap" objection to good faith must be dismissed.

218.    California DTSC's principal arguments against the Amended Plan stem from their decision to withdraw from the Global Settlement.  However, even California DTSC acknowledges in their objection that the Settling Governmental Authorities and California DTSC itself agreed to recommend the terms of a settlement.  *See* California DTSC Objection ¶ 78. Therefore, the Debtors stood on a firm belief that the Amended Plan would, in reasonable likelihood, not only achieve results consistent with the Bankruptcy Code, but also fulfill the needs of key stakeholders, including California DTSC.  Thus, the fact that the Debtors proposed a plan which trusted in California DTSC's and other parties' representations and confidence in a unified resolution does not constitute evidence of bad faith.

219.    Moreover, out of all interested stakeholders and key constituencies, California DTSC is the *only* party alleging bad faith by the Debtors in proposal of the Amended Plan.  The Debtors, the other Global Settlement Parties, and each of the their respective members

103

and advisors, and all other parties in interest have worked diligently and with the honest purpose to maximize the value of the Debtors' Estates for the benefit of all creditors and to achieve the Debtors' goals entering these chapter 11 cases, including the orderly transition of the Debtors' Non-Performing Properties.  As discussed further herein, the Amended Plan's classification, indemnification, exculpation, release, and injunction provisions have been negotiated in good faith  and at arms' length, are consistent with the Bankruptcy Code, and each are integral to the Amended Plan and supported by valuable consideration.

220.    In addition, California DTSC's passing allegation that the Amended Plan seeks to strip value from the Debtors' Estates and divert them to the Consenting Creditors can be easily dismissed.  As explained, at all relevant times, the Debtors have operated under the guidance and direction of the independent Special Committee.  In addition, the Debtors marketed the Europe/ROW Assets in accordance with the Court-approved Bidding Procedures.  No party placed a qualified bid on such assets other than the Consenting Creditors' credit bid.  The terms of the credit bid and related agreements have been on file for months and fully evaluated by the Debtors, the Creditors' Committee, and other parties in interest.  The Europe/ROW Sale Transaction is not, by any stretch, an improper diversion of value.

221.    Accordingly, California DTSC's claim that the Amended Plan was not proposed in good faith is unfounded and must be dismissed.

> **f.      Debtors Have Identified the Plan Administrator and the New Board in Compliance with Section 1129(a)(5) of the Bankruptcy Code.**

222.    As discussed above, the Debtors have filed a notice announcing the identities of the Plan Administrator and the sole member of the New Board.  Furthermore, Part I of this Memorandum addresses the inaccurate suggestion by California DTSC that the Plan Administrator and the New Board may be subject to CERCLA liability.

g.    **Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor.**

223.    In its objection, California DTSC argues that that Amended Plan fails to satisfy Section 1129(a)(7) of the Bankruptcy Code.  California DTSC contends that a chapter 7 liquidation would provide "at least as favorable a return to the DTSC"[24] as under the Amended Plan, since under the Amended Plan the Vernon Non-Performing Property "could receive a minimum of nothing and a maximum of $2.6 million and would lose any right to pursue those parties responsible for the Debtors' past acts," whereas in a chapter 7 liquidation "the [Vernon Non-Performing Property] might not receive an allocation of $2.6 million, but DTSC would retain claims against all parties and the [Vernon Non-Performing Property] would not be immediately abandoned."  California DTSC further contends that in evaluating whether the Amended Plan meets the "best interests" test, the Liquidation Analysis is not useful, since it was filed in connection with the *Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors*, dated August 11, 2020 (Docket No. 706) (the "**Initial Plan**").

i.    *California DSTC Fares No Better in a Hypothetical Liquidation of the Amended Plan Than It Did Under the Initial Plan.*

224.    First, although the filing of the Liquidation Analysis predated the filing of the Amended Plan, California DTSC is projected to receive the same $0 recovery in a hypothetical liquidation under *both* the Initial Plan and the Amended Plan.  Per the Liquidation Analysis, in a hypothetical liquidation under the Initial Plan, holders of Claims in Class 7

---

[24]    California appears to misunderstand the "best interests" test.  If California receives "at least as favorable a result" under the Amended Plan as it does under a hypothetical liquidation, the best interests test will be satisfied as to California.  The Amended Plan fails the best interests test only if California would recover more in a hypothetical chapter 7 liquidation than under the Amended Plan.  *See* 11 U.S.C. 1129(a)(7)(A)(ii) ("each holder of a claim or interest of such class…(ii) will receive or retain under the plan on account of such claim or interest property of a value…that is ***not less than the amount such holder would so receive or retain*** [in a hypothetical chapter 7 liquidation]." (emphasis added).

(general unsecured claims) (including California DTSC), were not projected to receive *any* recovery on account of their Claims. Under the Amended Plan, California DTSC's Claims fall into Class 8 (Environmental NPP Claims), which is another class of unsecured claims that are subordinate to senior secured claims, which will not be satisfied in full in a hypothetical chapter 7 liquidation.

225.    As stated in the Messing Declaration at ¶ 37, California DSTC fares no better in a hypothetical liquidation of the Amended Plan than it did under the Initial Plan, and confirmation of the Amended Plan will provide non-accepting holders of impaired claims or equity interests with a recovery that is not less than what they would otherwise receive (if any) in connection with a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  As previously stated herein, the estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis were based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11 proceedings.  As such, the Debtors' Liquidation Analysis should be afforded deference. *See In re Charter Commc'ns*, 419 B.R. 221, 261-62 (Bankr. S.D.N.Y. 2009) (finding that Debtors' liquidation analysis "appear[ed] to have relied on reasonable assumptions.").

> ii.    *Potential Recovery on Claims Against Third Parties Does Not Constitute Property Received or Retained From a Chapter 7 Trustee, and Therefore Are Irrelevant to a Liquidation Analysis.*

226.    The recovery California DTSC alleges pursuant to the Non-consensual Third Party Releases is irrelevant to the analysis under a hypothetical chapter 7 liquidation and must be disregarded in any liquidation analysis.   Section 1129(a)(7)(A)(ii) only considers recoveries ***from the debtor***, and does not take into account any recovery from third parties.  This is clear from the language of the statute, which considers only recoveries received or retained "if

the debtor were liquidated." *Id.* Section 1129(a)(7)(A)(ii) also only refers to "*claims*." *See id.* ("(7) With respect to each impaired class of *claims or interests*"; "(A) each holder of a *claim or interests* of such class. . . (2) will receive or retain under the plan *on account of such claim or interest*…") (emphasis added). Bankruptcy claims are classified against debtors only, not against third parties. *See In re Chateaugay Corp.*, 53 F.3d 478, 496 (2d Cir. 1995) ("Claim" as defined in Bankruptcy Code Section 101(5), was intended by Congress to be broadly interpreted so that "all legal obligations of the debtor. . . will be able to be dealt with in a bankruptcy case."). Therefore, the plain language of Section 1129(a)(7)(A)(ii) only requires courts to weigh claims classified against debtors when considering the best interests of creditors.

227.    In accordance with the statute's plain terms, courts look at the dividend the creditor would receive from the chapter 7 trustee, and only that amount, for comparison with the dividend available under a debtor's chapter 11 plan. *In re Dow Corning Corp.*, 237 B.R. 380, 411 (Bankr. E.D. Mich. 1999) (holding that the best interest of creditors test does not require payment of post-petition interest at the same rate in a hypothetical chapter 7 as would apply outside of bankruptcy because courts look only at the dividend the creditor would receive from the chapter 7 trustee); *see also* 7 *Collier on Bankruptcy* ¶ 1129.03[7][b]. Essentially, courts consider only liquidation of property of the estate. *In re Gen. Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719, 734 (Bankr. N.D. Cal. 1998) (holding that only assets should be included in the debtor's liquidation analysis "because they are property of Debtor's estate"). Based on the foregoing, claims against non-debtor third parties should be excluded from the "best interests" analysis. *See In re Plant Insulation Co.*, 469 B.R. 843, 886 (Bankr. N.D. Cal.), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), and *aff'd*, 544 F. App'x 669 (9th Cir. 2013) (holding that the claims of creditors against

107

non-debtor third parties could not be considered in a liquidation analysis even when those claims would otherwise remain in a chapter 7 case and be discharged pursuant to Section 524(g) in a chapter 11 case).  The outcome of such claims will <u>not</u> directly affect the bankruptcy res, because the debtor is not a party to those claims. See *Worldview Entm't Holdings Inc. v. Woodrow*, 611 B.R. 10, 15-16 (S.D.N.Y. 2019) quoting *In re Falchi*, No. 97 B 43080, 1998 WL 274679, at *7 (Bankr. S.D.N.Y. May 27, 1998)  ("Likewise, if Yashiro succeeds against the Non-Debtor defendants on its breach of contract and fraud claims, its recovery will not affect debtor's estate because it will be payable to Yashiro, and Yashiro does not allege or demonstrate otherwise. Non-Debtor Defendants are correct that because Yashiro's claims against them will not impact Falchi's estate, they are not "related to" his chapter 11 case and must be dismissed[.]").

228.    Although some courts have come to different conclusions, they are distinguishable. *See In re Quigley Co., Inc.*, 437 B.R. 102 (S.D.N.Y. 2010) or *In re Ditech Holding Corporation*, 606 B.R. 544 (Bankr. S.D.N.Y. 2019).  *In Quigley*, the court permitted claims against the parent entity of the debtor to be factored into the liquidation analysis. However, as further explained in *Plant Insulation Co.*, the *Quigley* decision did not actually weigh claims against "third parties," as are in dispute in the present case; rather, *Quigley* concerned derivative claims against a co-obligor of the Debtor.  *In re Plant Insulation Co.*, 469 B.R. at 888, *citing to In re Quigley*, 437 B.R. at 145-46.  Derivative claims are property of the estate, and, therefore, any recoveries by creditors on such claims would flow directly from the debtor.[25]  Accordingly, *Quigley* is consistent with the authority cited above because such claims were property of the estate.

---

[25]    It is well settled that a bankrupt entity becomes the owner of any derivative claims which may be asserted by stockholders on its behalf.  It is equally well established that "[i]f the cause of action belongs to the estate, the trustee has exclusive standing to assert it . . . and consequently the automatic stay prevents creditors or shareholders from asserting the claim . . . ."  *In re Granite Partners, L.P.*, 194 B.R. 318, 324–25 (Bankr.

229.    In *Ditech*, the objecting parties argued that the Plan failed to meet the "best interests" test under Section 1129(a)(7) on account of the Debtors' intention to transfer assets pursuant to a plan free and clear of applicable consumer claims and defenses. Among their arguments, objectors contended that in a hypothetical chapter 7 liquidation, any asset sales would be subject to Section 363(o) such that consumer creditors would retain successor liability claims against the purchasers of the assets.    The decision in *Ditech* was rooted in an analysis of the interplay between Sections 363 and 1123, and in direct reference to Section 363(o), which expressly prohibited the sales free and clear of consumer borrower claims in Section 363 sales. In that context and that context alone, the Court found that the debtors' chapter 11 plan did not meet the "best interest" test.    The Court's finding in *Ditech* is confined to Section 363(o) and the protections afforded thereunder, and cannot supplant the principle that a creditor's recovery against a third party on a direct claim that is not property of the estate and should be excluded from the "best interests" analysis.

iii.    *The Best Interests Test Cannot Consider Recoveries on the Claims against the Nonconsensual Releases Parties Because They Are At Best Speculative and Hypothetical.*

230.    Next, California DTSC's statement that under the Amended Plan the Vernon Non-Performing Property "would lose any right to pursue those parties responsible for the Debtors' past acts," is a blatant mischaracterization of the Non-Consensual Releases. Again, such releases <u>only</u> release the Europe/ROW Purchaser, the Transferred Entities, the Consenting Creditors, and the Trustees, and do not purport to release any other party.    Second, as explained

---

S.D.N.Y. 1996) (emphasis added);  *see also In re Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) (holding that both plaintiff's and tort victims' rights were "derivative" of those of debtor; thus, claims were the exclusive property of the estate); *see also Seward v. Devine*, 888 F.2d 957, 963 (2d Cir. 1989) (holding that "[t]he bankruptcy estate encompasses 'all legal or equitable interests of the debtor in property as of the commencement of the case,' including any causes of action possessed by the debtor") (citations omitted); *see also In re WorldCom, Inc.*, 323 B.R. 844, 849 (Bankr. S.D.N.Y. 2005) ("[Plaintiff] does not dispute that derivative claims are property of the estate").

below, the best interest test only evaluates recovery from the Debtors in a hypothetical chapter 7 liquidation – not claims against, or potential recoveries from, third parties.  Third, as the record demonstrates, any recovery on the basis of claims against such Nonconsensual Released Parties is speculative at best. *See In re Charter Commc'ns*, 419 B.R. at 261-62 (discrediting creditors' objection to liquidation analysis because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize").  As described in more detail at ¶ 86 herein, the Subcommittee investigated the viability of potential claims that could be subject to the Debtor Releases, and approved the Debtor Releases in conjunction with the Global Settlement upon concluding that the Debtor Releases would not extinguish any claims with sufficient likelihood of success and prospect of recovery that would warrant the costs, expenses, and litigation risks of pursuing those claims.

231.    As for any direct Claims of the California Environmental Agencies against the Nonconsensual Released Parties, such claims are also highly speculative.  First, the Consenting Creditors are not liable for the Debtors' obligations to remediate environmental contamination at the Non-Performing Properties and there are no viable legal theories that could be asserted to compel the Consenting Creditors to fund such obligations.

232.    The Consenting Creditors are both lenders to, and (as a result of June 2019 Financing and the Optimization) certain Consenting Creditors are owners of equity in, the Debtors.  In neither capacity do the Consenting Creditors have liability for contamination at Debtor-owned property.    This is because, generally speaking, most state and federal environmental laws impose liability for remediating environmental contamination on (1) the party that caused the contamination, (2) the current owner or operator of the contaminated real

property, or (3) the owner or operator of the contaminated property at the time the contamination occurred.  *See*, e.g., 42 U.S.C. § 9601)(a) and Cal. Health & Safety Code § 25323.5.  The Consenting Creditors do not fall into any of these categories.

233.    Moreover, CERCLA includes a specific exemption that shields lenders from liability with respect to contamination on real property collateral, provided that the lender does not "participate in the management" of the facility in question.  42 U.S.C. § 9601(20)(F). CERCLA provides that a lender "participates in management" only if it (A) undertakes decision-making control or responsibility for the facility's hazardous substances handling or disposal practices, or (B) exercises managerial control over day-to-day decision making with respect to environmental matters or over substantially all of the "operational functions" of the facility.  42 U.S.C. § 9601(20)(G)(ii).  There simply is no evidence that any of the Consenting Creditors undertook decision-making control over any of the Debtors' operations.  In addition, CERCLA makes it clear that typical lender behavior, such as "providing financial or other advice or counseling in an effort to mitigate, prevent, or cure default or diminution in the value" of a facility, does not constitute "participation in management."  42 U.S.C. § 9601(20)(G)(iv).

234.    The Consenting Creditors similarly have no liability in their capacity as holders of equity in the Debtors.  Under traditional corporate law principles, a corporation is recognized as a legal entity distinct from its owners. *See, e.g., N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp*., 515 F. App'x 176, 179 (3d Cir. 2013) (finding that it is a fundamental proposition that a corporation is a separate entity from its shareholders). Consequently, shareholders are ordinarily insulated from liability for the corporation's action, beyond the amount of their equity investment.  The United States Supreme Court has made it clear that a shareholder will only be held derivatively liable for the environmental obligations of

a corporate entity in which the shareholder holds a security interest if that shareholder has disregarded or violated traditional corporate principles in relation to that corporate entity, as to permit a court to pierce the corporate veil.  *United States v. Bestfoods*, 524 U.S. 51 (1998).

235.    While piercing the corporate veil involves a fact-specific analysis, the general rule may be stated as follows: Where the parent or shareholder exercises such a high degree of control over the corporation that the latter can be viewed as a "mere instrumentality" or "alter ego" of the parent, courts will pierce the corporate veil to prevent fraud, injustice, or circumvention of a statute or public policy.  *See, e.g.*, *RRX Indus., Inc., v. Lab-Con, Inc.*, 772 F.2d 543, 545 (9th Cir. 1985).  *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)).  Indeed, "A plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces a 'difficult task.'"  *Fletcher v. Atex, Inc*, 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV.A. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)).  There is no evidence that the Consenting Creditors, in their capacity as equityholders or otherwise, exercised such a high degree of control over the Debtors that would permit piercing the corporate veil.

236.    Even if such evidence existed, which is denied, California DTSC would lack standing to pursue such these claims since under applicable law, the right to bring an action to pierce the corporate veil is the exclusive property of the estate in bankruptcy. *See In re Enron Corp.*, No. 01 B 16034( ), 2003 WL 1889040, at *3 (Bank. S.D.N.Y. Apr. 17, 2003) (noting that, "Delaware law allows a subsidiary to maintain an action against a corporate parent, courts have found that a Delaware court would permit a debtor corporation to assert a claim to pierce its own corporate veil […] Thus, the trustee or debtor-in-possession would have exclusive standing to maintain a Delaware corporation's alter ego claim of a general nature.")

237.    In stark contrast to the speculative claims purported to be released pursuant to the Nonconsensual Releases, the Amended Plan provides California DTSC with the opportunity to share in a fixed and tangible recovery.  And contrary to California DTSC's assertion, the Plan does not only offer $2.6 million to California DTSC.  California DTSC will also receive a beneficial interest free and clear of all liens or a first priority lien on the Vernon Non-Performing Property.  This recovery is much greater than the speculative claims California DTSC would retain in a hypothetical chapter 7 liquidation.

        *iv.*        *Vernon Non-Performing Property Would Be Promptly Abandoned in a Hypothetical Liquidation*

238.    Finally, there is absolutely no basis for California DTSC's contention that the Vernon Non-Performing Property "would not be immediately abandoned" in a hypothetical liquidation.  California DTSC does not even attempt to provide any factual or legal basis as to why a chapter 7 trustee would not promptly abandon the Vernon Non-Performing Property— because there is no basis for such a conclusion.  Upon conversion to a chapter 7 liquidation, California DTSC should expect the accelerated disposition of the Vernon Non-Performing Property due to pressure on the chapter 7 trustee(s) to expedite creditor recoveries and avoid ongoing administration costs. See *Yadkin Valley Bank & Trust v. Linda McGee, Trustee (n re Hutchinson),* 5 F.3d 750, 753 (4th Cir.1993) ("the duty to close the estate expeditiously is the trustee's "main duty," 4 *Collier on Bankruptcy, supra,* ¶ 704.01(3), at 704–5, and "overriding responsibility," *Estes & Hoyt v. Crake (In re Riverside–Linden Inv. Co.),* 925 F.2d 320, 324 (9th Cir.1991).) By contrast, the Debtors' liquidation analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, and should be accorded deference.

239.    In light of the foregoing, the Plan complies with section 1129(a)(7) of the Bankruptcy Code and should be approved over the objection of California DTSC.

**h.    California DTSC Does Not, and Will Not, Hold any Priority Claims Against the Debtors.**

240.    California DTSC argues that the Amended Plan fails for specifically targeting California DTSC's ability to assert Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims, or an Other Secured Claims (for purposes of the California DTSC Objection only, collectively "**Priority Claims**").  *See* California DTSC Objection ¶¶ 103-05.  However, this argument fails to recognize that (i) all other holders of Class 8 (Environmental NPP Claims) are identically treated, including with respect to bar of Priority Claims, (ii) California DTSC does not actually hold Priority Claims because the Debtors are fulfilling their obligations as they come due during the pendency of these chapter 11 cases, and (iii) any post-Effective Date claims accruing against the Wind-Down Estates to the benefit of California DTSC are not permitted to be Priority Claims according to law.

241.    First, California DTSC incorrectly claims, "[o]ther holders of Claims are free to compromise Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims, or an Other Secured Claims" while the Amended Plan seeks to disallow only those Priority Claims held by California DTSC.  *See* California DTSC Objection ¶¶ 103-05.  However, Section 5 of the Amended Plan clearly applies the same treatment to *all* holders of Environmental NPP Claims in Class 8, not just the Vernon NPP Claims or California DTSC.  *See* Amended Plan, §§ 5.2(e)(i), 5.2(g)(i).

242.    Additionally, California DTSC does not assert, nor hold, any Priority Claims.  In order to maintain a working, negotiating relationship with the parties, Debtors have maintained good standing, complied with, and remedied all environmental obligations in the

ordinary course as such obligation have come due and payable during the course of these chapter 11 cases. Moreover, courts have regularly held that environmental agencies will not be able to obtain administrative expense priority for future contingent remediation costs. *See In re Rock & Republic Enters.*, No. 10-11728 (AJG), 2011 WL 4756571 at *5 (Bankr. S.D.N.Y. Oct. 7, 2011) ("Although a claim may be contingent, only 'actual' administrative expenses, not contingent expenses, are entitled to priority under § 503."); *see also In re Oldco M Corp.*, 438 B.R. 775 (Bankr. S.D.N.Y. 2010) (denying future remediation costs at the debtor's former facility). California DTSC has not demonstrated it has expended any money on remediation of the Vernon Non-Performing Property since the Commencement Date that would entitle it to asset Priority Claims, nor has it proven that it will be required to do so in the future. Thus, California DTSC cannot argue particular Priority Claims hold priority based upon a particularized determination. *Id*. at 786; *see also In re Microfab, Inc.*, 105 B.R. 161, 166 (Bankr. D. Mass. 1989) (denying the state's request for administrative expense priority as premature where the state had not yet expended any funds to clean up the site and the court "cannot speculate as to what amounts might eventually be allowable as actual and necessary expenses of the estate") (internal citations omitted); *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1010 (2d Cir. 1991) ("The District Court has ruled that response costs for post-petition remedial action qualify as administrative expenses; whether any particular item of cost is entitled to priority requires a *particularized* determination.").

243.    Ultimately, California DTSC fails to see their situation is not unique, the Debtors have maintained compliance with their environmental obligations at the Vernon Non-Performing Property through the pendency of the chapter 11 cases, and, like all other holders of Environmental NPP Claims, California DTSC does not have and, in the interest of avoiding

costly litigation that would waste the assets of the Estates to the detriment of all of the Debtors'

stakeholders, should not be permitted to assert a Priority Claim.

> **i.      Each Class of Impaired Claims Has Voted to Accept the Amended Plan in Satisfaction of Section 1129(a)(10) of the Bankruptcy Code.**

244.    California DTSC argues that because the Consenting Creditors hold, in the

aggregate, a supermajority of the equity interest of Exide Holdings, regardless of their individual

holdings, all of the Consenting Creditors are thus "insiders" and their votes to accept the

Amended Plan should not be counted for purposes of satisfying section 1129(a)(10).  *See*

California DTSC Objection ¶¶ 106-116.  This is a gross misreading of the Bankruptcy Code as

the Consenting Creditors cannot be considered insiders as a group and even if certain individual

Consenting Creditors are deemed statutory insiders, the approval of the Amended Plan by all

remaining claimholders in Class 4, Class 5 and Class 6 is sufficient to satisfy section 1129(a)(10)

of the Bankruptcy Code.

245.    Courts have recognized that there are two types of "insiders" under the

Code: statutory insiders set forth in section 101(31) of the Bankruptcy Code and non-statutory

insiders as defined in *In re Winstar Commc'ns, Inc.*, 554 F.3d 382 (3d Cir. 2009).  The

distinction between these two types of "insiders" turns on whether the creditor's close

relationship to the debtor suggests that any transactions were not conducted at arm's length.

*Winstar*, 554 F.3d at 397 (quoting S.Rep. No. 95–989, at 24 (1978), as reprinted in 1978

U.S.C.C.A.N. 5787, 5810).

246.    Section 101(31) of the Bankruptcy Code provides the statutory definition

of the term "insider".  In the case of a debtor that is a corporation, section 101(B)(iv) states that a

"person in control of the debtor" is an insider, and "actual control (or its close equivalent) is

necessary for a person or entity to constitute an insider of section 101(31)'s 'person in control'

language." *Winstar*, 554 F.3d at 396.   Non-statutory insiders, however, "need not have control

over a debtor; rather, courts will analyze (i) whether there is a close relationship between the

debtor and creditor, and (ii) whether there is some evidence, other than the relationship,

suggesting that any transactions were not conducted at arm's length." *Stanziale v. Khan (In re*

*Evergreen Energy, Inc.)*, 546 B.R. 549, 563-66 (Bankr. D. Del. 2016).

247.    California DTSC attempts to make a claim that the Consenting Creditors

are insiders.  *See* California DTSC Objection ¶ 115.  DTSC incorrectly claims the Consenting

Creditors, together, are a "person in control of the debtor".  Section 101(41) of the Bankruptcy

Code defines the term "person" to include an "individual, partnership, and corporation" and not a

group of individuals, partnerships or corporations.  If any holder of claims in a class is an insider,

their claims would rightfully be excluded from a class for the purposes of voting for the

Amended Plan, but a group of holders cannot be deemed as insiders collectively simply due their

collaboration as an ad hoc group of stakeholders.  The Consenting Creditors are an ad hoc group

of noteholders that have voluntarily and unofficially organized on an at-will basis in order to

protect each of their individual interests and are not bound to each other in any legally

enforceable manner.  *See Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491

B.R. 335, 351-52 (S.D.N.Y. 2013) (rejecting argument that defendant lenders were non-statutory

insiders based, *inter alia*, on lack of sufficient allegations to support veil-piercing necessary to

link defendant lenders to sister corporate subsidiaries alleged to have close relationship with

debtors); *but see Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit*

*Suisse (In re Champion Enters., Inc.)*, Adv. No. 10–50514 (KG), 2010 WL 3522132, at *6-8

(Banker. D. Del. Sept. 1, 2010) (considering whether group of prepetition lenders and Credit

Suisse could qualify as insiders, where prepetition lenders and Credit Suisse were linked by

prepetition credit agreement); *Exide Techs.*, 299 B.R. at 742-43 (finding that plaintiffs had sufficiently alleged facts to survive motion to dismiss claim that prepetition lender group, who had allegedly exercised control over the debtors via a common prepetition credit facility, were insiders).

248.    Additionally, California DTSC fails to provide any evidentiary support that the negotiations and agreements between the Debtors and the Consenting Creditors that led to the Amended Plan (with many of such negotiations including other parties in interest) were conducted other than in an arm's-length manner.  Indeed, prior to the Commencement Date, the Board of Directors of Exide Holdings formed the Special Committee comprised solely of its four (4) independent directors to direct and oversee all aspects of the Debtors' restructuring process, in part to maintain arm's-length negotiations with the Consenting Creditors.  The Special Committee has had full control of the Debtors and these chapter 11 cases since their commencement.  None of the Consenting Creditors are members of the Special Committee, has attended Special Committee meetings, or had any involvement in the authorization of the Amended Plan or its related filings from the perspective of the Debtors.

249.    Furthermore, all members of Class 4, Class 5, and Class 6 that submitted ballots voted to approve the Plan.  While it is true that one (1) member of the Consenting Creditors may be considered a statutory insider due to owning more than 20% of the voting securities of Exide Holdings, and another member of the Consenting Creditors may be considered a statutory insider due to the fact that its managing partner serves on the board of directors of Exide Holdings, Inc., even if the claims of these two Consenting Creditors were disregarded for the purposes of voting for the Amended Plan, the fact that all of the remaining holders of claims in Class 4, Class 5 and Class 6 (approximately 20% of which are not

118

Consenting Creditors) voted to accept the Amended Plan means that the Amended Plan has satisfied the criteria under section 1129(a)(10).  Accordingly, the Court should overrule the California DTSC objection that the Debtors have not satisfied their burden under Section 1129(a)(10).

### 3. The Injunction, Releases, and Exculpation Provided for in the Amended Plan are Appropriate and Should be Approved.

#### a. Plan Releases and Injunction.

250.    The Debtors make their affirmative case for the Plan Releases and Injunction in <u>Part I</u> of this Memorandum and appropriately dispel the objections of California DTSC.

#### b. Exculpation.

251.    California DTSC objects to the Amended Plan on the basis that the exculpation provision contained in section 10.7 of the Amended Plan is impermissibly broad because of the inclusion of non-fiduciaries as Exculpated Parties.  This objection is without merit, as the Third Amended Plan has addressed this issue by removing from the definition of Exculpated Parties: (i) the DIP Lenders and DIP Agents and (ii) the Consenting Creditors. Accordingly, the Amended Plan does not provide for exculpation of any non-fiduciaries and California DTSC's objection must be overruled.

### 4. All Other Objections by California DTSC Should be Overruled.

#### a. Amended Plan is a Proper Amendment of the Initial Plan.

252.    California DTSC argues that the Amended Plan cannot be confirmed because it is an improper amendment of the Initial Plan (as defined in the California DTSC Objection).  California DTSC recognizes that Section 12.4 of the Initial Plan expressly reserved the Debtors' right to amend or modify the Initial Plan prior to the entry of the Confirmation

Order.  Notwithstanding this, California DTSC suggests that some amendments are only permissible with the consent of certain parties.  California DTSC contends that the Amended Plan is invalid because, contrary to Section 12.4(a) of the Initial Plan, the definition of Settling Governmental Authorities was modified without the consent of California DTCS.

253.    This argument is outrageous.  California DTSC cannot seriously contend that certain rights it was given to consent to amendments to the Initial Plan when it was a party to the Global Settlement should continue to apply after it withdrew from the Global Settlement and bar the Debtors from modifying the Initial Plan to address California DTSC's withdrawal.

254.    This argument also lacks foundation as a matter of law, which is clear that the chapter 11 plan belongs to the debtor. This is reflected in Section 12.4 of the Initial Plan (and the Amended Plan), which expressly reserves the right of the Debtors to amend or modify the Amended Plan prior to the entry of the Confirmation Order.  The Bankruptcy Code supports this more generally. Section 1121(b) of the Bankruptcy Code provides that the debtor has the exclusive right to file a plan until 120 days after the date of order for relief. Section 1127(a) of the Bankruptcy Code provides that the proponent of the plan or the reorganized debtor may modify the plan at any time before confirmation of the plan. *See Indu Craft, Inc. v. Bank of Baroda (In re Indu Craft Inc.)*, No. 11 Civ. 5996 (JMF), 2012 WL 3070387 (S.D.N.Y. July 27, 2012); *In re W. Mgmt., Inc.*, 6 B.R. 438 (Bankr. W.D. Ky. Aug. 1, 1980).  Section 1127(a) of the Bankruptcy provides that, so long as the amended plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, "[a]fter the proponent of the plan files a modification of such plan with the court, the plan as modified becomes the plan."  Taken together, these provisions demonstrate that California DTSC's position that modifications to the plan were impermissible without California DTSC's consent is incorrect—and for good reason.

Rather, the terms of the Initial Plan and any subsequent modifications or amendments are the purview of the Debtors.  Per Section 1126(a) of the Bankruptcy Code, California DTSC is entitled to accept or reject the Amended Plan, as amended or modified, as it sees fit.  However, California DTSC is not entitled to invalidate or prevent prosecution of the Amended Plan because of amendments or modifications made without its consent.

### b.    Disclosure Statement Satisfies the Requirements of Section 1125 of the Bankruptcy Code.

255.    In its objection, California DTSC demonstrates its lack of understanding of the purpose of the Disclosure Statement according to the Bankruptcy Code.  The Debtors address their affirmative case for approval of the Disclosure Statement in <u>Part III</u> of this Memorandum.

### B.    The Americas Buyer's Objection Should Be Overruled.

256.    The buyer in the Americas Sale Transaction, ACR III Edison Holdings LLC (f/k/a Battery BidCo LLC) (the "**Americas Buyer**"), asserts that that the Amended Plan should not be confirmed unless the Debtors establish a cash reserve sufficient to pay the Post-Closing Adjustment under the *Stock and Asset Purchase Agreement* by and among Debtor Exide Technologies, LLC, as seller, the Americas Buyer, as buyer, and Atlas Capital Resources III LP, as guarantor (the "**Americas Purchase Agreement**").  Americas Buyer Obj. ¶ 17 [Docket No. 924].  According to the Americas Buyer, the Debtors have not demonstrated that they can pay the Post-Closing Adjustment in full and thus will not be able to satisfy the requirements of sections 1129(a)(1), 1129(a)(9), and 1129(a)(11) of the Bankruptcy Code.  *Id.*  As detailed below, however, the Debtors already have determined that many of the amounts the Americas Buyer alleges the Debtors owe are either unsubstantiated or wrong, and the Debtors expect to

have more than enough cash to satisfy any amount that ultimately will be owed to the Americas

Buyer (if anything) in connection with the Post-Closing Adjustment.

> 1.    **The Americas Purchase Agreement Sets Forth Clear Transaction Accounting Principles for the Working Capital Adjustment.**

257.    Under the Americas Purchase Agreement, the aggregate consideration

paid for the Americas Assets must be adjusted to account for the difference between $210

million (the "**Target Working Capital**") and the Net Working Capital (as defined in the

Americas Purchase Agreement) of the Americas business as of the Effective Time of the

transaction (the "**Final Working Capital**").  *See* Americas Purchase Agreement § 3.01, Ex. A,

Ex. E.   If the Target Working Capital exceeds the Final Working Capital, the Base Purchase

Price of $178.6 million must be adjusted downward to account for that decrease in working

capital, and to the extent the decrease is not offset by an increase in cash, the Debtors must make

an additional payment to the Americas Buyer (the "**Post-Closing Adjustment**").  *See* Americas

Purchase Agreement §§ 3.01, 3.06.

258.    To effectuate this Post-Closing Adjustment, the Debtors were required to

prepare a written statement at least two business days before the Closing setting forth their good

faith estimate of the Americas business's Net Working Capital as of the Effective Time (the

"**Estimated Working Capital**") and the amount of any working capital adjustment that would

need to be made in connection with the Closing.  *See* Americas Purchase Agreement § 3.04, Ex.

A.   Within 30 days of the Closing, the Americas Buyer was required to provide a written

statement setting forth the Americas Buyer's own good faith, proposed final calculation of the

Net Working Capital as of the Effective Time (the "**Proposed Final Working Capital**") and a

description of any proposed changes to the Estimated Working Capital, "attaching supporting

schedules, working papers and all other relevant documents and details to enable a review

thereof by [the Debtors]." *See* Americas Purchase Agreement § 3.05(a).  In other words, the clear terms of the Americas Purchase Agreement place the burden of proving any proposed changes to the Estimated Working Capital on the Americas Buyer.

259.    The Debtors then have 60 days to review the Proposed Final Working Capital and underlying documentation, make inquiries of relevant employees or representatives of the Americas Buyer, its affiliates, and its accountants, and assess whether to dispute any items in the Proposed Final Working Capital.  *See* Americas Purchase Agreement § 3.05(b)-(c).  If the Debtors dispute any items in the Proposed Final Working Capital, the Debtors and the Americas Buyer must negotiate in good faith and either revise the Net Working Capital calculations to reflect their agreement or bring unresolved issues to this Court for resolution.  *See* Americas Purchase Agreement § 3.05(c)-(d).

260.    The Americas Purchase Agreement clearly dictates that all calculations of Net Working Capital must be done in accordance with "the accounting principles, practices, methodologies and policies, regardless of materiality, that were employed by [Exide Technologies, LLC], on and for the year ended March 31, 2020, to prepare its consolidated financial statements" (the "**Transaction Accounting Principles**").  *See* Americas Purchase Agreement § 3.05(f), Ex. E.   Furthermore, current assets and current liabilities must be "calculated only using the applicable general ledger accounts specified" in the Americas Purchase Agreement. *See* Americas Purchase Agreement Ex. E.

## 2.    The Debtors Will Be Able to Pay Any Amounts Owed in Connection with the Post-Closing Adjustment.

261.    In accordance with the procedures established in the Americas Purchase Agreement, at Closing, the Debtors credited the Americas Buyer approximately $10 million to address the difference between the Target Working Capital and the Estimated Working Capital

delivered at the Closing.    Robinson Decl. ¶ 8.    In its Proposed Final Working Capital calculations, the Americas Buyer claims that the Final Working Capital is lower than what the Debtors calculated, and that it therefore is entitled to an additional Post-Closing Adjustment of approximately $19.7 million to account for that alleged shortfall.    Americas Buyer Obj. ¶ 12. According to the Americas Buyer, "[t]he inability of [the Debtors] to pay the Post-Closing Adjustment . . . means that the [Amended] Plan is not feasible under section 1129(a)(11)."    *Id.* ¶ 25.    But the Americas Buyer's objection is without merit.

262.    When calculating the Target Working Capital and the Estimated Working Capital, the Debtors complied with the Transaction Accounting Principles—*i.e.*, the accounting principles, practices, methodologies, and policies that were used historically in preparing Exide Technologies, LLC's consolidated financial statements.    Robinson Decl. ¶ 8.    Under the Americas Purchase Agreement, the Americas Buyer was required to use those same Transaction Accounting Principles to determine the Proposed Final Working Capital so that all of the Net Working Capital calculations would be determined from the same baseline.    *See* Americas Purchase Agreement § 3.05(f), Ex. E.    The Americas Buyer was also required to provide the Debtors with supporting schedules, working papers, and all other relevant documents and details to enable the Debtors to review the Proposed Final Working Capital.    *See* Americas Purchase Agreement § 3.05(a).

263.    But the Americas Buyer appears to have repeatedly departed from the Transaction Accounting Principles in its calculations of the Proposed Final Working Capital and failed to provide required documentation in support of many of its calculations.    *See* Robinson Decl. ¶ 9.    As further detailed in the Robinson Declaration, the Debtors already have determined that approximately $14.6 million of the alleged shortfall in Net Working Capital either appears

inconsistent with the Transaction Accounting Principles or is not currently substantiated by the facts and information provided.  Robinson Decl. ¶ 9.  For example:

    i.    The Americas Buyer's calculation does not appropriately reflect the reserves already taken in the business's books and records that are specifically related to accounts receivable that are more than 60 days past due ("**Non-Performing Accounts Receivable**"), Robinson Decl. ¶ 12;

    ii.    The Americas Buyer improperly included invoices that have been delayed due to a governmental administrative process in the calculation of Non-Performing Accounts Receivable, *id.* ¶ 14;

    iii.    The balance for in-transit inventory appears inconsistent with prior periods, and the Americas Buyer has not shown that its accounting for those in-transit inventory balances was consistent with historical practices, *id.* ¶ 18;

    iv.    The Americas Buyer has failed to substantiate its calculation of an accounting adjustment used to account for the difference between actual production cost incurred and the standard cost assumption, *id.* ¶ 21;

    v.    The Americas Buyer appears to have overstated freight and logistics accruals, benefits accruals, deferred rent liabilities, and employee liabilities, *id.* ¶¶ 23-26; and

    vi.    The Americas Buyer improperly recognized a rebate accrual in the current period for a marketing event that is not scheduled to occur until 2021, *id.* ¶ 27.

264.    The Debtors and their advisors' review of the Proposed Final Working Capital is ongoing and may well uncover additional discrepancies between the Americas Buyer's calculations and the Transaction Accounting Principles or other calculations that are not adequately supported by the information provided.  Robinson Decl. ¶ 28.

265.    At this stage, however, the Court does not need to determine the full extent to which the Americas Buyer has overstated the Proposed Final Working Capital.  As discussed above, the feasibility determination is a low threshold that only requires the Court to determine that there is a reasonable probability that the provisions of the plan can be performed.

*In re Heritage Highgate, Inc.*, 679 F.3d at 142; *In re Emerge Energy Servs. LP*, 2019 WL 7634308, at *15; *In re W.R. Grace & Co.*, 475 B.R. at 115; *In re Tribune Co.*, 464 B.R. at 185.

266.    After correcting the errors in the Americas Buyer's calculations, the remaining asserted claim by the Americas Buyer is $5.1 million, which the Debtors are continuing to review and which will be more than covered by the $15.8 million surplus that the Debtors expect to have even if all of the $5.1 million (or more) is valid.  Moreover, even if the Americas Buyer is able to provide additional information that justifies some of the calculations that appear to diverge from the Transaction Accounting Principles and calculations that are currently unsubstantiated, the Debtors and their advisors anticipate that the final amount of the Post-Closing Adjustment will still be below the projected surplus.  *See* Robinson Decl. ¶ 10.   In all events, the Debtors should reasonably be able to satisfy any further Post-Closing Adjustment that is necessary when Final Working Capital is ultimately determined.  Accordingly, there is a reasonable probability that the Amended Plan can be performed and that the Debtors will have sufficient resources to pay the costs of administering and fully consummating the Amended Plan and closing these chapter 11 cases.

267.    The Americas Buyer also contends that confirmation of the Amended Plan would violate sections 1129(a)(1) and (a)(9) because the Debtors "cannot pay the Post-Closing Adjustment on the Effective Date."  Americas Obj. ¶¶ 21, 24.  But the Bankruptcy Code does not require the Debtors to pay the Post-Closing Adjustment on the Effective Date.   Section 1129(a)(9) provides that, as of the effective date, a holder of an administrative claim is only entitled to a payment "equal to the ***allowed amount*** of such claim."  11 U.S.C. § 1129(a)(9)(A) (emphasis added).  Because the Americas Buyer's claim has not yet been determined to be an "allowed amount" under the Bankruptcy Code, the Debtors have no obligation to pay the full

amount of that claim on the Effective Date.  Indeed, the Americas Purchase Agreement gives the Debtors 60 days to review the Americas Buyer's claim and file a Dispute Notice, which does not even expire until November 23, 2020.  *See* Americas Purchase Agreement § 3.05(b).

268.    Finally, the Americas Buyer argues that the Amended Plan should not be confirmed because the Debtors are "required to reserve the entire amount of Buyer's Administrative Expense Claim under the terms of the [Amended] Plan."  Americas Buyer Obj. ¶ 24.  The Americas Buyer misunderstands the Amended Plan.  The Amended Plan and the Proposed Confirmation Order establish an adequate and customary process for resolving Disputed Administrative Expense Claims—a process that does not require the Debtors to reserve the full amount of the Americas Buyer's claim at this time.

269.    The Amended Plan states that "[t]he Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Claims."  Amended Plan, § 6.3(b)(i).  In the latest version of the Amended Plan, the Debtors clarified that this amount will be reserved "[p]rior to any distributions of Net Cash Proceeds" as intended.  *Id.*  There is nothing in the Amended Plan stating that all Cash must be distributed or reserved on the Effective Date. To the contrary, the express terms of the Amended Plan clearly contemplate a customary claims reconciliation process pursuant to which the Plan Administrator will evaluate Administrative Expense Claims prior to making distributions, and will only make distributions once such claims have been appropriately allowed or reserved for.  Further, the Administrative Claims Bar Date set forth in the Proposed Confirmation Order is 35 days *after* entry of the Proposed Confirmation Order.  No distribution will be made before that date.  *See* Proposed Confirmation Order ¶ 49.

270.    In short, nothing in the Bankruptcy Code or the Amended Plan allows a buyer in a liquidation to inflate a working capital adjustment by ignoring contractually agreed-

upon accounting methods and failing to provide contractually required documentation and then hold up the entire bankruptcy by asserting that its erroneous and unsupported calculations are administrative claims against the estate that must be reserved for in cash before any distributions are even made.  For these reasons, the Americas Buyer's objection should be overruled.

## III.    DISCLOSURE STATEMENT, SOLICITATION PROCEDURES, AND VOTING PROCEDURES SHOULD BE APPROVED ON A FINAL BASIS.

### A.    The Disclosure Statement Contains Adequate Information.

271.    On August 14, 2020, the Court entered the Conditional Disclosure Statement Order approving the Disclosure Statement as conditionally containing adequate information and authorizing the Debtors to solicit votes on the Plan based upon the adequacy of the information contained in the Disclosure Statement.  The Debtors submit that the Disclosure Statement contains adequate information necessary to enable all parties in interest entitled to vote on the Amended Plan to make an informed judgment with respect to the Amended Plan, as required by the Bankruptcy Code and the Bankruptcy Rules.

272.    The Debtors received only one objection to the approval of the Disclosure Statement on a final basis, from California DTSC.  In its objection, California DTSC contends that the Disclosure Statement fails to satisfy section 1125 of the Bankruptcy Code because it does not contain adequate information related to the abandonment of Non-Performing Properties, the treatment of Environmental NPP Claims, or the means for the implementation of the Plan, and should not be approved.

273.    Under section 1125 of the Bankruptcy Code, a plan proponent must provide holders of impaired claims and interests with "adequate information" regarding a debtor's proposed plan, which is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's

128

books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

274.    As an initial matter, California DTSC lacks standing to object to the adequacy of the Disclosure Statement.  The primary purpose of a disclosure statement is to provide sufficient information to allow parties <u>entitled to vote on a proposed plan</u> to make an informed decision about whether to vote to accept or reject the plan.  *See, e.g.*, *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Phx. Petroleum, Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan.").

275.    Consistent with the solicitation procedures set forth in the Conditional Disclosure Statement Order, the only parties entitled to vote to accept or reject the Plan are holders of Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) (collectively, the "**Notes Claims**" or the "**Voting Classes**").  As such, the Court must only determine whether the holders of the Claims in the Voting Classes have received adequate information.  *See, e.g., In re Ferretti*, 128 B.R. 16, 18–20 (Bankr. D.N.H. 1991) (holding that the purpose of a disclosure statement is to give parties in interest, whose votes are being solicited, adequate information about the plan *In re Zenith Elecs. Corp.*, 241 B.R. 92, 99–100 (Bankr. D. Del. 1999)) ("In considering the adequacy of a

disclosure statement, it is important to keep in mind the audience.  Here, those entitled to vote on

the Plan are sophisticated, institutional investors. Given the sophistication of the parties, the

wealth of information contained in the Disclosure Statement and publicly available elsewhere,

the approval by the SEC and the lack of objection by any party entitled to vote on the Plan, we

readily conclude that the Disclosure Statement contains adequate information and the votes

solicited by it are valid.")

276.    The Disclosure Statement is extensive and contains adequate information

to enable holders of Claims in the Voting Classes to make an informed judgment about the Plan.

Holders of the Notes Claims are sophisticated, institutional investors.  Approximately 95% of the

Notes Claims holders are signatories to the RSA, and have been actively represented by

competent counsel and continually updated and informed throughout these chapter 11 cases.  The

Debtors received no other objections regarding the Disclosure Statement, the Solicitation

Procedures, and/or the Voting Procedures, either during the solicitation period or in conjunction

with confirmation of the Amended Plan, and an overwhelming majority of the holders of Claims

in the Voting Classes have voted to accept the Plan.[26]

277.    Further, any objection as to the sufficiency of information received by

California DTSC is unfounded.  California DTSC has been party to ample information in these

chapter 11 cases, both through its participation in the mediation that culminated in the Global

Settlement, and in response to its various discovery requests in connection with its objections to

the Amended Plan, pursuant to which the Debtors produced approximately 20,000 responsive

documents. Indeed, California DTSC possessed sufficient information to produce a 60-page

objection to the Amended Plan.

---

[26]    *See* Voting Certification at ¶ 9.

278.        In light of the foregoing and the reasons articulated in the Disclosure Statement Motion,[27] the Disclosure Statement, which was conditionally approved pursuant to the Disclosure Statement Motion, satisfies the requirements of section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

## IV.    CAUSE EXISTS TO WAIVE STAY OF PROPOSED CONFIRMATION ORDER.

279.        The Debtors respectfully request that the Court direct that the Proposed Confirmation Order shall be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).  Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  As such, and as the Advisory Committee Notes to Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately."  Fed. R. Bankr. P. 3020(e) advisory committee's note to 1999 amendment.

280.        Under the circumstances, it is appropriate for the Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Amended Plan and commence its implementation as soon as possible following entry of the Proposed Confirmation Order.  The Debtors' prompt emergence from chapter 11 will enable the orderly wind down of the Debtors' estates following consummation of the Sale Transactions.  Furthermore, each day that the Debtors remain in chapter 11 they incur additional administrative and professional costs.  For these reasons, the Debtors, their advisors, and other

---

[27]    "**Disclosure Statement Motion**" means *Debtors' Motion for an Order (I) Approving Disclosure Statement; (II) Establishing Notice and Objection Procedures for Confirmation of the Plan; (III) Approving Solicitation Packages and Procedures for Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan; and (V) Granting Related Relief* (Docket No. 539).

key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions necessary to effectuate the Amended Plan so that the Effective Date may occur as soon as possible after the entry of the Proposed Confirmation Order.  Based on the foregoing, the requested waiver of the 14-day stay is in the best interests of the Debtors' estates and creditors and will not prejudice any parties in interest.

## CONCLUSION

281.  The Amended Plan complies with all of the requirements of section 1129

of the Bankruptcy Code and should be confirmed.

Dated:  October 12, 2020
        Wilmington, Delaware

/s/ Zachary I. Shapiro
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*