**Exhibit C**

*JRV Group* **Confirmation Hearing Transcript**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 11 |
|  | . |
|  | . Case No. 19-11095(CSS) |
| JRV GROUP USA L.P., | . |
|  | . |
|  | . 824 Market Street |
|  | . Wilmington, Delaware 19801 |
| Debtor. | . |
| . . . . . . . . . . . . . . . . | . Friday, June 19, 2020 |

TRANSCRIPT OF TELEPHONIC HEARING RE:  CONFIRMATION
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

For the Debtor:            Jeffrey W. Dulberg, Esq.
                           Robert M. Saunders, Esq.
                           Colin R. Robinson, Esq.
                           PACHULSKI, STANG, ZIEHL
                            & JONES, LLP

For the U.S. Trustee:      Linda J. Casey, Esq.
                           OFFICE OF THE U.S. TRUSTEE

For the Official Committee
of Unsecured Creditors:    Ericka Johnson, Esq.
                           Matthew P. Ward, Esq.
                           WOMBLE BOND DICKINSON US, LLP

(Appearances Continued)

Audio Operator:            Electronically Recorded
                           by CourtSmart
                           and Leslie Murin, ECRO

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:    (Continued)

For Corner Flag, LLC:          Paul Heath, Esq.
                               Zachary Shapiro, Esq.
                               RICHARDS, LAYTON & FINGER, PA

                               Alexander Gerten, Esq.
                               CRAVATH, SWAINE & MOORE, LLP

                               Annerose Tashiro, Esq.
                               SCHULTZE & BRAUN

For RV World, Inc.:            Matthew B. Harvey, Esq.
                               MORRIS, NICHOLS, ARSHT
                                & TUNNELL, LLP

For the U.S.A.                 Ellen W. Slights, Esq.
                               U.S. DEPARTMENT OF JUSTICE

Also Appearing:                Andrew De Camara
                               SHERWOOD PARTNERS, INC.

                               Henry Cruz
                               AMERICAN FASTBACKS

                               James Gansman
                               Michael Hayes
                               ROCK CREEK PARTNERS, LLC

                               Mark Gottlieb
                               BXV PARTNERS

INDEX

|                                                      | Page |
|------------------------------------------------------|------|
| PRESENTMENT/ARGUMENT BY MR. ROBINSON                 | 5    |
|     Gerzeny Settlement           | 6    |
|     Objection of the United States | 15 |
|     Objections of the United States Trustee | 16 |
| COMMENTS BY MR. WARD                                 | 25   |
| COMMENTS BY MR. HARVEY                               | 28   |
| COURT DECISION                                       | 28   |

| EXHIBIT                  | IDENT. | EVID. |
|--------------------------|--------|-------|
| Kahn Declaration         |        | 15    |
| Cruz Declaration         |        | 15    |
| Kaltenmark Declaration   |        | 15    |
| Gansman Declaration      |        | 15    |
| De Camara Declaration    |        | 15    |
| Daniels Declaration      |        | 15    |

1          (Proceedings commence at 10:05 a.m.)

2          THE COURT:  Good morning, everybody.  This is Judge

3     Sontchi.  We are here in the JRV Group case, 19-11095.

4          We are obviously proceeding remotely, which means

5     that all audio is through CourtCall.  There is no audio

6     through Zoom.  If you want to be heard or hear what's going

7     on, you need to be on CourtCall.

8          Also, with CourtCall, it's always very important to

9     please mute your phones, unless you are speaking.  That's

10    particularly true if you're on a cell phone, a speaker phone,

11    or even ear buds.  We get a lot of background noise.  And

12    identify yourself as often as possible.  And I am actually

13    getting some background noise right now, so there may be

14    someone who has not muted his or her phone.

15         Thank you for appearing by Zoom.  That's very

16    helpful for the Court, especially if we have any dialogue as

17    to substance.  But again, no video -- or excuse me-- no audio

18    on Zoom; it's only video.

19         I don't anticipate any problems, but if there are

20    any disruptions with Zoom bombers, et cetera, we have some

21    strategies in place to deal with that.  That's, for example,

22    why you were in the -- excuse me.  That, for example, is why

23    you were in the waiting room to utilize that to take care of

24    people who are disrupting the matter.  If worse comes to

25    worst, and I can't get it under control, we will simply

1  terminate the Zoom portion of the call and continue on

2  CourtCall.

3      Just so everyone knows, also, because of security,

4  I will not be admitting anyone to Zoom after the first ten

5  minutes of the hearing.  If you fall off for any reason and I

6  recognize your name -- which I probably will, since there's a

7  few -- not that many of you on the phone today or on Zoom

8  today -- I will let you back in.  But if any new people show

9  up or anybody with a strange ID, they will not be admitted

10  after the first ten minutes of the call.

11      So those are the dos and don'ts.  I'll turn it over

12  to the debtor.

13      MR. ROBINSON:  Good morning, Your Honor.  Colin

14  Robinson, Pachulski, Stang, Ziehl & Jones, on behalf of JRV

15  Group, the debtor.

16      Your Honor, I'm joined today by my colleagues Jeff

17  Dulberg, Rob Saunders, and Steve Kahn.  Also with us is

18  Andrew De Camara, the CRO of the debtor.  And Your Honor, we

19  have co-counsel from Barnes & Thornburg, Mr. Kaltenmark, and

20  Mr. Cruz, also with the debtor.

21      Your Honor, we really just have one item on the

22  agenda today, that's confirmation of the joint plan of

23  liquidation filed by the debtor and the committee.  Just from

24  the standpoint of the agenda, Your Honor, we resolved all

25  objections, minus a couple open issues with Ms. Casey's

1    office.  We resolved the objections with language in the

2    order with the United States with Ms. Slights.  And what I'll

3    call the "Gerzeny objection" has also been resolved.  I'm

4    going to have some bullet points to read into the record in a

5    little bit.

6             So, unless Your Honor has any questions --

7             THE COURT:  I don't know what -- the what

8    objection?

9             MR. ROBINSON:  I'm sorry, Your Honor.

10            THE COURT:  What are you calling it?

11            MR. ROBINSON:  Gerzeny --

12            THE COURT:  I don't see that on the agenda.  Are

13   you talking about RV World?

14            MR. ROBINSON:  Yeah, sorry.  RV World, yes, RV

15   World.

16            THE COURT:  Okay.

17            MR. ROBINSON:  We've resolved the RV World

18   objection and we'll have some -- a settlement to provide on

19   the record to Your Honor that will then be documented down

20   the road.

21            THE COURT:  So I assume that also -- I assume that

22   also resolves their motion?

23            MR. ROBINSON:  Yes, their motion and the objection

24   --

25            THE COURT:  For their claims.

1          MR. ROBINSON:  -- the objection -- correct, Your

2     Honor, yes.  Yes.

3          THE COURT:  Okay.

4          MR. ROBINSON:  It resolves -- and frankly, a

5     pending adversary proceeding, as well.

6          THE COURT:  Okay.

7          MR. ROBINSON:  Okay.  So, Your Honor, for good

8     reason, we haven't been before Your Honor on this case for a

9     long time.  I think I looked back and we -- it may have been

10    September of last year for the sale hearing.  And we're

11    before you today for good reason, and we've been working hard

12    behind the scenes to get to a consensual confirmed joint plan

13    of liquidation between the committee and the debtor's secured

14    lender.

15         The plan was the result of a global settlement that

16    we brought before Your Honor back in November of last year

17    and which was approved.  And following that, all the parties

18    worked hard to come up with a joint plan of liquidation.

19         And as Your Honor may recall how this case started

20    out, the number one reason for this -- filing this case was

21    safety.  The asset at issue was -- is the debtor's outfitted

22    Jeeps, which ran into some NHTSA issues, in terms of the

23    weight.  And the owners of the company wanted to address

24    those safety issues through the Chapter 11 process.  And when

25    the case initially started, the idea was Chapter 11 was going

1    to be used to dismantle these Jeeps, get them off the road,

2    sell the parts.

3            And then we had a fortuitous turn of events, we had

4    a committee appointed.  And we were able to move and pivot to

5    a sale process, a very successful sale process that brought

6    in a significant amount of proceeds into the estate that

7    initially hadn't been thought that we would be able to get.

8    And those proceeds, thanks to the cooperation and consents --

9    consensus with the committee and the DIP lender, led to the

10   global settlement, so that we were able to provide for a

11   return to general unsecured creditors, and at the same time

12   able to accomplish the ultimate goal, which was to remove the

13   Jeeps off the road and get them to a purchaser that was able

14   to kind refit them, so they're safe.  And we've accomplished

15   that, and that's why we're before Your Honor today.  And it

16   really -- I can't stress enough, it really was a cooperative

17   effort between the committee, the debtor, and the debtors'

18   lenders.

19           So, Your Honor, with that, the first thing I wanted

20   to do was actually read into the record the proposed

21   settlement with Gerzeny -- if you don't mind, we can just

22   call them "Gerzeny" -- to start that off, Your Honor.

23           THE COURT:  Okay.  And for the record, Gerzeny is

24   G-e-r-z-e-n-y, for the transcript.

25           You may.

1          MR. ROBINSON:  Thank you, Your Honor.

2          And I believe, Your Honor, Mr. Harvey, their

3      counsel, is on the phone, so ...

4          Your Honor, the debtors and the creditors'

5      committee have agreed to a settlement with RV World of

6      Nokomis, a/k/a Gerzeny, under which Gerzeny has agreed to

7      drop its objection for the combined plan and disclosure

8      statement, and the releases it contains and under which the

9      debtor will propose -- drop its opposition to the allowance

10     of Gerzeny's claim for voting purposes.

11         To reach this settlement, the debtors agree to make

12     a cash payment of $32,500 to Gerzeny on the effective date of

13     the plan, to dismiss with prejudice the adversary proceeding

14     that it's brought against Gerzeny, and provide Gerzeny the

15     release of certain claims related to modified Jeeps that have

16     been sold, consigned, or delivered to Gerzeny, including any

17     claims for turnover.

18         Under the settlement, Gerzeny shall be permitted to

19     sell the three modified Jeeps that are still in its

20     possession, subject to the obligation to remediate those

21     vehicles to comply with NHTSA -- N-H-T-S-A -- regulations and

22     to indemnify the secured lenders and their owners,

23     affiliates, and certain of their personnel in connection with

24     any damages such parties suffer in connection with Gerzeny

25     sales of these vehicles, including reasonable legal fees up

1    to a cap of $150,000.

2         Additionally Gerzeny shall retain its unsecured

3    claim as reduced by the thirty-two-thousand-five-hundred-

4    dollar cash payment it shall receive and any further

5    mitigation of its claim it undertakes.  However, it shall

6    waive the first $8,125 of recovery it would otherwise be

7    entitled to receive in respect of its unsecured claim.

8         Memorialization of this settlement shall be

9    submitted to the Court, and the parties thereto shall submit

10   an order to the Court under certification of counsel

11   approving the settlement.  And that concludes the recitation

12   of the proposed -- of the settlement, Your Honor.

13        THE COURT:  Mr. Harvey, any comment?

14        MR. HARVEY:  Your Honor, just I wanted to echo

15   that, you know, that generally that was a correct recitation.

16   It remains subject to documentation, particularly where we're

17   going to engage in good faith negotiations here over the

18   scope of the releases being provided under the settlement

19   agreement.

20        THE COURT:  Thank you.

21        Mr. Ward, any comment?

22        MR. WARD:  Thanks, Your Honor.  We do want to speak

23   generally in favor of the plan, but no comments with respect

24   to the Gerzeny settlement.

25        THE COURT:  Okay.  Very good.  Thank you.

1          Anyone else on the Gerzeny issues?

2      (No verbal response)

3          THE COURT:  All right.  Thank you, Mr. Robinson.

4  You may continue.

5          MR. ROBINSON:  Thank you, Your Honor.  Your Honor,

6  if you may recall, Ms. Slights' office filed an objection on

7  behalf of the U.S. Government.  We have resolved that

8  objection.  We worked out agreed language with Ms. Slights

9  that is part of the revised confirmation order; I believe

10  it's Paragraph 39.  And I don't see Ms. Slights on the Zoom,

11  I don't know if she's on the phone.  But I can report we are

12  resolved with Ms. Slights.

13          MS. SLIGHTS:  Yes, Your Honor.  This is Ellen

14  Slights representing the IRS.  And Mr. Robinson is correct,

15  the language that we've negotiated does resolve the

16  objection.

17          THE COURT:  All right.  Very good.  It's nice to

18  hear your voice.

19          MS. SLIGHTS:  Thank you.

20          THE COURT:  That's good to hear, that you were able

21  to resolve.

22          MS. SLIGHTS:  Thanks.

23          MR. ROBINSON:  And Your Honor, I'd be remiss if we

24  -- Ms. Johnson and I worked with Ms. Slights to get there,

25  and we do appreciate her cooperation and she was quite

1    responsive, so we're grateful for that, as always.

2           Your Honor, that just leaves the United States

3    Trustee's objections, which we've resolved the vast majority

4    of, and there's just a couple of issues.  Before I got there,

5    I just wanted to take care of the housekeeping in terms of

6    the declarations for admission.

7           THE COURT:  Okay.

8           MR. ROBINSON:  Okay.  Your Honor, initially, in

9    response to the United States' objection, we filed three

10   declarations that they're now moot, but I'd still like to

11   move them in evidence.  The first is the declaration of

12   Steven Kahn, that's at Docket Number 432.

13          THE COURT:  Uh-huh.

14          MR. ROBINSON:  Do you want to do them all together,

15   Your Honor, or one at a time?

16          THE COURT:  Yeah, let's do them all together.

17          MR. ROBINSON:  Okay.  Thank you, Your Honor.

18          The second is the declaration of Mr. Henry Cruz,

19   that is at Docket Number 433.  The third is the declaration

20   of Randy J. Kaltenmark at Docket 434.  In support of -- those

21   were addressing the I-R -- or the U.S. objection, Your Honor.

22          Your Honor, in terms of confirmation, we have the

23   declaration from James Gansman of Rock Creek Advisors, the

24   committee's financial advisor; that's at Docket 435.

25          THE COURT:  Okay.

1          MR. ROBINSON:  Your Honor, there's also the

2     declaration of the debtors' CRO, Andrew De Camara, at Docket

3     436.

4          THE COURT:  Okay.

5          MR. ROBINSON:  And Your Honor, I want to --

6     numerically, out of order, but last, but not least, is the

7     declaration of our -- Mr. Brad Daniels, our balloting agent,

8     with BMC, and that's at Docket Number 430.

9          THE COURT:  Okay.  I think I see Mr. Kahn and Mr.

10    Cruz.  I'm not sure if I see Mr. Kaltenmark.  There he is, I

11    see Mr. Kaltenmark.  And Mr. Gansman, I think I saw you, as

12    well.  Is Mr. Gansman on the video?

13         MR. GANSMAN:  Your Honor, I am -- I'm on CourtCall;

14    I could not get in through Zoom.

15         THE COURT:  Okay.  I'm sorry to hear that, I

16    apologize.  That may have been on our side.

17         And do we have the balloting agent on the phone?

18       (No verbal response)

19         THE COURT:  Mr. Robinson?

20         MR. ROBINSON:  I understood he was, Your Honor.  I

21    don't hear him.

22         THE COURT:  You might be on mute, sir, if you're --

23    if I'm not hearing you.

24         THE OPERATOR:  And Your Honor, this is CourtCall.

25    I do show Mr. Robinson connected with a live line.

1          (Pause in proceedings)

2                THE OPERATOR:  Would you like me to check his line,

3     Your Honor?

4                THE COURT:  Well, I have Colin Robinson on my list.

5     Is the -- what's the name of the balloting agent, Mr.

6     Robinson?

7                MR. ROBINSON:  Brad Daniel with BMC, Your Honor.

8                THE COURT:  Do you have a Brad Daniel, Cynthia?

9                THE OPERATOR:  I do not, Your Honor.

10               THE COURT:  Okay.

11               MR. ROBINSON:  Your Honor, we'll --

12               THE COURT:  All right.

13               MR. ROBINSON:  Sorry, Your Honor.

14               THE COURT:  Well, that's okay.  It's just the

15    balloting agent.  So, Ms. Casey, do you have any -- since you

16    have the only pending objection, do you have any objection to

17    the Court allowing the balloting agent's declaration, even

18    though he is not present for cross-examination?

19               MS. CASEY:  No objection, Your Honor.

20               THE COURT:  Okay.  All right.  Well, we'll allow

21    that.

22          Any objection to the admission of any of the

23    declarations that were just identified on the record?

24          (No verbal response)

25               THE COURT:  Okay.  I hear none.  They're admitted

1   without objection.

2    (Kahn Declaration received in evidence)

3    (Cruz Declaration received in evidence)

4    (Kaltenmark Declaration received in evidence)

5    (Gansman Declaration received in evidence)

6    (De Camara Declaration received in evidence)

7    (Daniels Declaration received in evidence)

8    THE COURT:  Does anyone wish to cross-examine any

9   of the witnesses, other than the balloting agent, who's not

10  here?

11   (No verbal response)

12   THE COURT:  Okay.  I don't hear any; I have no

13  questions, so that takes care of that.

14   Should we turn to Ms. Casey's objection?

15   MR. ROBINSON:  Yes, Your Honor.  I'll let -- I'll

16  turn it over to Ms. Casey.  I -- and she'll correct me if I'm

17  wrong.  I believe the remaining issues as to Ms. Casey's

18  objection have to do with the proposed third-party release in

19  the plan and the objection as to that there's a de facto

20  discharge being provided under the plan.  And I'll let Ms.

21  Casey set out her position, and if -- and I'll just respond,

22  Your Honor.

23   THE COURT:  That's fine.

24   Ms. Casey, you may proceed.

25   MS. CASEY:  Good morning, Your Honor.  Linda Casey

1    on behalf of the United States Trustee.

2         Your Honor, we -- that is the two remaining issues.

3    The first issue is that the debtor here is a liquidating

4    corporate entity as an LLC and is not entitled to a discharge

5    under the Bankruptcy Code.  While the plan itself doesn't

6    provide the express word "discharge," it does include

7    provisions that would result in the equivalent of a

8    discharge.

9         First and primarily would be Section 17.3, which

10   provides that the payments under the plan are in full

11   satisfaction of all of the claims and interests of the

12   debtors.  And then you also add the releases, both the

13   express releases and the third-party releases that release

14   all claims against the debtors, and the injunction that

15   enjoins those released claims and the claims that are

16   satisfied.  And what you end up with a debtor who is not

17   entitled to a discharge, having no claims that are not being

18   paid through the plan enforceable against the debtor, which

19   is the functional equivalent of a discharge.

20        The plan payments are not, in fact, in settlement

21   of the claims.  They may be in settlement of the obligations

22   under the plan to make disbursements, but they are not in

23   settlement of the underlying claims.  Creditors here are not

24   receiving full payment, creditors here are not consenting to

25   a reduction of their claims.  They are consulting solely to -

1   - or those who have voted for it have voted to accept a plan

2   that is providing treatment that is less than full payment.

3   But they are not, in fact -- there is no accord in

4   satisfaction or agreement that the plan distribution somehow

5   reduces their claim and discharges the remaining portion of

6   it.

7           So, individually and combined, these provisions,

8   the releases, the injunctions, and 17.3 that says that the

9   plan payments are in satisfaction of the claim all work to

10  provide that no entity can continue to enforce a claim

11  against the debtors.  And in fact, that would be the

12  functional equivalent of a discharge, which is not

13  permissible.

14          Certainly, there's nothing in the plan -- our

15  objection is not to say that the injunction cannot protect

16  the estate or the liquidating trust from claims, but the --

17  their corporate entity is not entitled to a discharge.  And

18  therefore, as to the debtor, these provisions are

19  inappropriate.

20          We also object to the third-party releases.  Your

21  Honor is very familiar with our arguments, we have made them

22  before, so I'll be very brief.  But in this plan, you have

23  unimpaired creditors and fully impaired creditors have to

24  file an objection to opt out of the releases.  And creditors

25  in voting classes have to either reject the plan and mark off

1    that they are opting out; or, if they do not wish to vote, so

2    they're abstaining creditors, opt out.  And it is the U.S.

3    Trustee's position and has been in these cases that the

4    consent cannot be deemed from non-action.  You actually have

5    to take an affirmative action to indicate that you are

6    consenting to a claim.  And we object to deeming consent

7    where we don't have an affirmative action.

8         Again, we've made this argument before, so I'm

9    willing to truncate my oral argument on that point.  If Your

10   Honor doesn't have any questions, that's our objection.

11        THE COURT:  Thank you very much.  I appreciate it.

12   No, no questions.

13        Mr. Robinson --

14        MS. CASEY:  Thank you.

15        THE COURT:  -- do you wish to be heard?

16        MR. ROBINSON:  Yes, Your Honor, just briefly.  I

17   will note -- and I should have said this at the beginning,

18   Your Honor -- we did appreciate -- Ms. Casey did give us

19   several comments in the run-up to here that we were able to

20   work through, so we're just happy to have these two remaining

21   issues today.  We appreciated her efforts on that.

22        Your Honor, I'll take the second one -- I'll take

23   the second one, first, in terms of the release.  Your Honor,

24   we think this Court is (indiscernible) the type of third-

25   party releases that are being sought here today are

1   appropriate.  We provided the appropriate notice, in terms of

2   the balance and the opt-in/opt-out and the notice to the

3   parties.

4         Your Honor, as set forth in the declaration, both

5   from Mr. De Camara and Mr. Gansman, these releases are an

6   integral part of the plan.  They're something that were

7   bargained for in good faith amongst all the parties and the

8   debtor is seeking the releases.  And the released parties

9   made significant -- or they're the crux of the case,

10  contributions to get here to, not only the global settlement,

11  the committee settlement that we got approved in November,

12  but also the combined plan and disclosure statement.  The

13  debtor doesn't believe there's any material claims that were

14  worth pursuing or retaining, and that's why the debtor

15  supports the release.

16        And then all of the parties-in-interest are going

17  to benefit from these transactions.  Again, without the

18  cooperation of all the parties seeking the third-party

19  release, we wouldn't be here today with a plan that provides

20  a distribution to general unsecured creditors.  And we think

21  it's fair and reasonable.  And Your Honor, I'll just -- from

22  a voting perspective, all three voting classes approved the

23  plan.

24        On the discharge part of it, Your Honor, I think

25  that -- I understand Ms. Casey's point.  But I think, when

1    you -- we're not asking for a discharge, there's no specific

2    language.  And what's being asked for, in terms of the

3    releases for the debtor, the third-party releases, is

4    reasonable.  And the claims are being released, but that's

5    part of the negotiation and agreement of a plan.  And I'm a

6    little -- it's -- that's really all I have to say about that,

7    just --

8            THE COURT:  Okay.  Sorry, I forgot to un-mute my

9    phone.

10           Anyone else wish to heard?

11           MR. WARD:  Your Honor, at some point, the committee

12   would like to speak in favor of the plan, at the appropriate

13   time.

14           THE COURT:  No comment on the specific objection of

15   Ms. Casey, though?

16           MR. WARD:  And with respect to Ms. Casey's

17   objections, yes, we also have a couple of observations, Your

18   Honor.

19           THE COURT:  All right.  Well, let's hear them.

20           MR. WARD:  First, Your Honor, it's -- we think that

21   the releases were consensual.  As Your Honor knows, the

22   determination of whether a third-party release is consensual

23   is (indiscernible) circumstances of each case.  And we cited

24   a number of cases in our brief that talk about affirmative

25   consent; in other words, opting into a third-party release is

1    not required in order for it to be consensual.  Here, all of

2    the creditors had the opportunity to opt out of the release,

3    either through checking the box or objecting to the plan.

4    There as no death trap in the plan, you know, for failure to

5    agree to the release.  It didn't impact their recoveries.

6        And I would just point Your Honor to the

7    Indianapolis Downs cases, as well as Your Honor's Molycorp

8    case, which we cited in our brief, for the proposition that a

9    third-party release is consensual against even abstaining

10   parties, so long as they have the opportunity to opt out and

11   fail to do so.

12       And that's what we had here, Your Honor.  We had

13   two classes, Classes 7 and 8, which were deemed to reject the

14   plan, but they were given the option to opt out, Your Honor.

15   And just with respect to the circumstances of this particular

16   case, as you drill down on those classes, those fully

17   impaired creditors are all affiliates or controlled by Corner

18   Flag, the DIP lender.  So there's really no prejudice to

19   those two classes.

20       Corner Flag -- and I'll talk about this in closing,

21   as we talk about the plan as a whole -- was instrumental in

22   getting us to this deal.  And it's also a beneficiary of the

23   third-party releases.  But you know, as I'll explain, it is

24   deferring payment even on its DIP, in order to get us to this

25   plan.

1            So, if you look at Class 7, Class 7 was

2    intercompany claims.  That consists of the claims held by

3    EHG&A, that's the Canada affiliate, which, as we noted in our

4    brief, that's owned by Corner Flag.  And Class 8 is -- that

5    consists of the equity interests, the ownership of the

6    debtor.  That was 1 percent ownership held by JRV Group USA

7    Management Corp., and 99 percent held by JRV Group Holding

8    USA, LP.  Both of those entities are also directly or

9    indirectly owned by Corner Flag.

10           So deeming to reject didn't cause anybody any

11   prejudice with respect to Classes 7 and 8.  And again, all of

12   the creditors were given the option to opt out under the

13   plan.  And under those circumstances, coupled with Corner

14   Flag's support of the plan, we think that the releases are

15   consensual and the plan should be approved.

16           THE COURT:  All right.  Thank you.

17           Anyone else before I rule?

18       (No verbal response)

19           THE COURT:  Okay.  Well, we'll take the second

20   point first.  And as Ms. Casey acknowledges, I've ruled on

21   this on numerous occasions, and they continue to raise it,

22   which is fine.  I understand their position, and certainly

23   reasonable minds can disagree, and you never know when I'm

24   going to change my mind.  So keep plugging away.

25           But I noticed some inconsistency on the Court with

regard to this, but I do view a -- I do view giving people a

release that then goes out on reasonable notice that says, if

you don't want to give it, you have to either opt out, vote

no, et cetera, is constructive consent.  And I think these

releases are consensual.  People have been given reasonable

notice, consistent with due process; an opportunity to object

or opt out, they've chosen not to do so.  I believe that's

constructive consent.  So I'll overrule that objection.

With regard to the de facto discharge point, that's

an interesting point and very creative.  Clearly, they're not

entitled to a discharge under 1141 -- I believe is the magic

number, but I may be wrong -- and there is no discharge here

under that provision.  However, there are independent

provisions that, when taken in concert, arguably provide for

a de facto discharge.  And now Ms. Casey went through that

very well and clearly, and I think it's a fair point.  I

think it's a fair point to say that there is a de facto

discharge here.

But the important point is that all three

provisions that she discussed stand, I believe, on their own

as appropriate and authorized by the Code.  So, if you have

three independent factors, all of which are appropriate, all

of which are supported by the evidence, and all of which are

authorized under the Code, and the de facto effect is that

they give a de facto discharge, I really don't think that

24

1    undoes what you were otherwise allowed to do.  That may be

2    the de facto effect.

3            But we often, in the law, have sort of knock-on

4    effects like this, where we have authorized activities that

5    might have a knock-on effect of providing some de facto

6    relief, especially when done in combination with other

7    factors, other elements, that you wouldn't otherwise be

8    authorized to get.  So I'm not saying it's not a good point,

9    but my belief in ruling is that the fact that the elements

10   that result in the de factor discharge are all appropriate,

11   supported by the evidence, supported by the law, supported by

12   the Code, and the fact that, when you combine and you end up

13   with a de facto discharge -- which you obviously can't have a

14   per se discharge in the plan -- I think is of no moment.  So

15   I am going to overrule that objection, as well.

16           Now no more objections, Mr. Robinson?

17           MR. ROBINSON:  No, Your Honor, no -- there are no -

18   -

19           THE COURT:  Okay.

20           MR. ROBINSON:  -- remaining objections.

21           THE COURT:  I got the revised order right before

22   the hearing.

23           MR. ROBINSON:  I apologize, Your Honor.

24           THE COURT:  That's okay, that happens.

25           And it looks like what was printed out,

1  unfortunately for me, was the clean and not the blackline.

2  So, before we turn to the order, is there anything anyone

3  would like to say in connection with confirmation?  I guess

4  this is your chance, Mr. Ward --

5           MR. WARD:  Your Honor --

6           THE COURT:  -- to make the speak you want to make.

7           MR. WARD:  Well, Your Honor, I do want to echo Mr.

8  Robinson's comments at the beginning of the case, that -- and

9  just reiterate how collaboratively the parties worked

10 together here.  Your Honor may recall, on day one of the

11 case, the debtors told the Court that this case was doomed

12 for conversion to Chapter 7.  And really, Your Honor, at the

13 time, the future of this case did look pretty bleak because

14 the biggest asset, really the only asset of the debtors, were

15 these vehicles that were overweight and they were unable to

16 be sold.

17           So, recognizing that safety was the main concern of

18 all the parties, at that point, what the debtor proposed to

19 do was simply disassemble the Jeeps and sell off the parts

20 and convert the case to Chapter 7.  And in one of our

21 preliminary meetings with the debtor's professionals, the

22 committee suggested -- really, it was the committee's

23 financial advisor, Jim Gansman at Rock Creek Advisors, who

24 suggested that we disassemble a limited number of the Jeeps

25 and compare the price that we would get through that

1   disassembly with the price that we could get through

2   modifying the Jeeps, in order to make them compliant with

3   NHTSA, so that they could be sold.  So the debtors agreed

4   with that approach, that was a big concession on the debtor's

5   part, and that was documented in the Court's first sale

6   order.

7         So the parties ultimately determined that that was,

8   in fact, the better approach to maximize value, while also

9   maintaining safety.  So we, as the creditors' committee, we

10  worked with the debtors to consummate a sale for all of the

11  Jeeps in a way that complied with NHTSA and continued to

12  ensure safety.  And in that respect, it was extremely

13  helpful, Your Honor, to have one of our committee members,

14  Deaver Motors, which is a car dealer and was intimately

15  familiar with selling vehicles, and especially with the NHTSA

16  regulations.

17        Concurrent with the sales, Your Honor, the

18  committee also worked with the debtors to negotiate with

19  Corner Flag to allocate sufficient funds to allow us -- to

20  allow the debtor to operate during the sale process, and then

21  eventually to cover administrative and priority claims

22  necessary to allow a plan to be confirmed, as well as

23  additional professional fees that would arise because this

24  case was going to be prolonged, in order to get to

25  confirmation.  And I'll just say, Your Honor, after intense

1    negotiations by all the parties -- and that included in-

2    person meetings, both in Delaware, as well as in New York --

3    we were able to get to that resolution.  And after that

4    settlement, the committee's professionals, especially my

5    partner Ericka Johnson -- who is on the video call -- took

6    the laboring oar on preparing a joint plan and a disclosure

7    statement that's before Your Honor.

8         I want to emphasize, Your Honor, that the plan

9    calls for significant concessions by Corner Flag, including

10   deferring even amounts that are payable to Corner Flag under

11   the DIP.  And that would be to cover operating costs to get

12   us to where we are today, as well as administrative costs,

13   administrative expenses, priority claims, professional fees,

14   and even a carveout for general unsecured creditors.  It also

15   allows for the establishment of a litigation trust to pursue

16   what we believe to be valuable causes of action.

17        Your Honor, none of this would have been possible

18   without Corner Flag's support and the collaborative effort of

19   all of the professionals.  So this really is, truly, a good

20   result for everybody.  Value was maximized, safety was

21   ensured, and all constituents get a recovery.  And that just

22   simply wouldn't have been possible without everybody working

23   together.

24        THE COURT:  Thank you very much.

25        Anyone else?

1          MR. HARVEY:  Your Honor, this is Matthew Harvey

2     from Morris, Nichols, Arsht & Tunnell, on behalf of Gerzeny's

3     RV World.

4          I neglected to say earlier my comments that, you

5     know, obviously, this is a confirmation hearing, and we had

6     an objection to confirmation; we had a voting objection.  Our

7     settlement is not yet fully documented.  I think the terms

8     read in were consistent with it.  The issue we're dealing

9     with is the scope and extent of the release and I think we'll

10    get there.  I just wanted to note that, to the extent we

11    don't get there, I'm -- my client's rights regarding its

12    claim and the priority of its claim that we asserted in our

13    papers are reserved.  That's all I have, Your Honor.  Thank

14    you.

15         THE COURT:  Do you need to make any changes to the

16    confirmation order, Mr. Harvey?

17         MR. HARVEY:  I have not reviewed the latest

18    confirmation order that came through this morning, Your

19    Honor.

20         THE COURT:  Okay.  Anyone else?

21       (No verbal response)

22         THE COURT:  All right.  So let's do this.  I'm

23    going to confirm the plan.  I'm going to approve the

24    disclosure statement.  Obviously, all the 1129 factors have

25    been met.  There was adequate information under 1125.  All

1    objections are either resolved or overruled.

2            What I would propose, Mr. Robinson, is that you

3    touch base with Mr. Harvey and anyone else on the latest form

4    of order that you submitted this morning and I have not read

5    because we literally got it minutes before the hearing.  I

6    will read that, as well.  But after you have had a discussion

7    with everybody, if you could submit the proposed order under

8    certification of counsel with a blackline and upload the

9    clean.  And assuming everybody is on board with the order and

10   I have -- don't have any problems with it, I'll get it signed

11   as soon as possible.  If there are any issues, I'll let you

12   know.  And if anybody has any issues, I'll either deal with

13   it or we might have to have a call, but I doubt that will be

14   the case.  Is that acceptable?

15           MR. ROBINSON:  Yes, that is, Your Honor.  Yes, Your

16   Honor, that is, and we'll follow that instruction.

17           THE COURT:  Okay.

18           MR. ROBINSON:  And Your Honor, just for the record,

19   Mr. Daniel did join.  I apologize.  I think I might have

20   crossed him up on the new start time of the hearing, so he

21   did join the hearing and --

22           THE COURT:  Okay.

23           MR. ROBINSON:  So just to let you know that.

24           THE COURT:  So -- well, we won't cross-examine him

25   now and publish him for being late.

1      (Laughter)

2              THE COURT:  All right.  And thank you -- well, that

3      was my request --

4              MR. ROBINSON:  No problem.

5              THE COURT:  -- to move the hearing, so I appreciate

6      everyone's flexibility.  There's a -- as you can tell,

7      probably, I'm -- this is not what my house looks like, I'm in

8      court.  I find it much more useful to be in chambers.  So

9      there are some protests planned outside the courthouse this

10     afternoon, so I wanted to get everything done, if at all

11     possible, and allow everyone to get home prior to that, just

12     as -- not that I expect anything to happen, but you know, you

13     need to be cautious.  So I appreciate you agreeing to the

14     continuance -- or excuse me -- to the earlier time frame.

15             So I'll just await the order.  It probably won't

16     get done this afternoon.  Like I said, we're going to be out

17     of chambers, but we'll certainly get it done either over the

18     weekend or first thing Monday, depending on when you submit

19     it.  Okay?

20             MR. ROBINSON:  Thank you, Your Honor.

21             THE COURT:  All right.  Well, I'm glad --

22             MR. ROBINSON:  We appreciate you taking the time

23     today.

24             THE COURT:  I'm certainly glad this case worked out

25     so well, to say the least.  It did not look so good when it

1    came in.  As a former Jeep owner and somewhat of a Jeep

2    enthusiast, I'm glad these cars are -- these SUV/cars are

3    still on the road.  I'm tempted to buy one, but I think that

4    would be inappropriate.  And I would certainly have trouble

5    with the Missus if I came home with yet another --

6        (Recorded proceedings concluded at 10:41 a.m.)

7                          * * * * *

32

1                    CERTIFICATION

2           I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10

11   _____    June 23, 2020

12   Coleen Rand, AAERT Cert. No. 341

13   Certified Court Transcriptionist

14   For Reliable