## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x
                                             :

In re                          :          **Chapter 11**

                                             :

**EXIDE HOLDINGS, INC.,** *et al.*,     :      **Case No. 20–11157 (CSS)**

                                             :

                **Debtors.**[1]          :      **(Jointly Administered)**

                                             :

---------------------------------------------------------- x

## DECLARATION OF ROY MESSING IN SUPPORT OF
## CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11
## PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

I, Roy Messing, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer of Exide Holdings, Inc. ("**Holdings**") and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and, together with their non-Debtor affiliates, "**Exide**," or the "**Company**"). I am also a Senior Managing Director at Ankura Consulting Group, LLC ("**Ankura**"), the Debtors' financial advisors. Prior to my involvement with Exide, I served as chief restructuring officer, interim CEO, liquidating trustee, turnaround advisor, and strategic consultant to numerous companies across various industries, including manufacturing and distribution, chemicals, energy, building materials, commercial real estate, financial services, professional services, medical devices and services, pharmaceuticals, technology, media, telecom, and entertainment. For a further discussion of my credentials, see the *Declaration of Roy Messing Pursuant In Support of Debtors' Chapter*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

*11 Petitions and First Day Relief* dated May 19, 2020 (ECF No. 14) (the "**First Day Declaration**").

2.    I submit this declaration (the "**Declaration**") in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* filed contemporaneously herewith (as may be amended, modified, supplemented, or restated, the "**Amended Plan**"),[2] including the Amended Plan Supplement, dated September 12, 2020 (ECF No. 821) and the Second Plan Supplement filed September 12, 2020 (Docket No. 825) (as may be further amended, modified, restated, or supplemented, the "**Plan Supplements**"). I have reviewed, and I am generally familiar with, the provisions of the Amended Plan, the documents comprising the Plan Supplements, the Disclosure Statement (defined below), and the requirements for confirmation of the Amended Plan under section 1129 of the Bankruptcy Code. I was personally involved in the development of, and negotiations regarding, the Amended Plan, including the Global Settlement and the Europe/ROW Purchase Agreement, and its related documents. I, along with the employees of Ankura who report to me, prepared the liquidation analysis (the "**Liquidation Analysis**") annexed as Exhibit D to the Disclosure Statement.

3.    In my capacity as CRO, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and these chapter 11 cases. Except as otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents and other information, including relevant historical records, as part of my duties and responsibilities as CRO for the Debtors, or my opinion based upon my familiarity with the Debtors' business, operations, and

---

[2]    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Disclosure Statement, or the Memorandum, as applicable.

financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

### The Debtors' Objectives

4.      The Debtors commenced these chapter 11 cases with a clear strategy and objectives:

- conduct a value maximizing marketing and sale process to sell substantially all of the Debtors' assets on a going concern basis and preserve as many jobs as possible;

- effectuate the safe and orderly transition of the Debtors' Non-Performing Properties and do so consensually, where possible;

- maximize recoveries to creditors; and

- conduct a responsible wind down of the Debtors' remaining assets and complete an organized liquidation of the Debtors.

5.      The Debtors recognized that achieving these objectives would not be easy and would require consensus of the Debtors' stakeholders.  The Debtors have had limited liquidity during these chapter 11 cases and commenced these cases shortly after the global pandemic outbreak which caused significant uncertainty regarding the Debtors' businesses and sale process. The Debtors also recognized that to achieve consensus of their stakeholders, they would have to approach these chapter 11 cases in an open, transparent and collaborative manner.  For this reason, for example, the Sub-Committee welcomed the participation of the Creditors' Committee in its investigation of prepetition transactions and coordinated such investigation to minimize expense. Similarly, rather than simply file a motion to abandon all of their Non-Performing Properties immediately at the outset of these cases, the Debtors instead first proposed settlement procedures, including mediation, which were consensually agreed to by the Debtors' environmental regulators and ultimately proved successful.  The Debtors' simply could not afford the cost of massive

3

litigation at any point during the case, which would deplete their limited resources and all but guarantee an extended, expensive and value-destroying endeavor, with no certainty of the outcome.

6.    In addition to transparency, another fundamental goal of the Debtors has been independence to the process.  The Debtors recognized that no party would accept the Debtors' representations or genuinely engage with the Debtors (let alone settle) if there was even an appearance that the Debtors lacked independence.  Accordingly, prior to the Commencement Date, in anticipation of the need to file these chapter 11 cases, the Debtors' Board of Directors (the "**Board**") formed a special committee (the "**Special Committee**"), composed solely of its four (4) independent directors—Mark G. Barberio, Alan Carr, William Transier and Harvey Tepner—to direct and oversee all aspects of the Debtors' restructuring process and chapter 11 cases.

7.    The Special Committee was charged with, among other things: (a) considering, evaluating and, if it deemed it to be in the best interests of the Debtors, recommending to the Board that the Debtors enter into potential transactions; (b) overseeing the production of confidential information by or on behalf of the Debtors and its subsidiaries to third parties under cover of an appropriate confidentiality arrangement; (c) overseeing discussions and negotiations with the Debtors' stakeholders with respect to a restructuring transaction and the implementation and execution of such a transaction; (d) overseeing my work as CRO;[3] and (e) such other actions considered by the Special Committee to be necessary or desirable to carry out

---

[3]    On April 8, 2020, the Debtors retained Ankura to assist them with their financial and operational restructuring. Since that time, I have been overseeing the Ankura team engaged by the Debtors.  Subsequently, on May 18, 2020, I was appointed as the Debtors' CRO. *See Order Authorizing Debtors to Retain Ankura Consulting Group, LLC TO Provide a Chief Restructuring Officer and Certain Additional Personnel for Debtors Nunc Pro Tunc to Commencement Date*, entered on June 25, 2020 (Docket No. 375).

4

its mandate, subject, as appropriate (where not exclusively delegated to the Subcommittee), to the approval of the Board.

8.    In addition, the Special Committee also established an independent subcommittee of the Special Committee (the "**Subcommittee**"), with Mr. Tepner as the sole member, to investigate, evaluate and control the disposition or resolution of any claims associated with certain prepetition affiliate transactions, including the June 2019 Financing and the Optimization (each as defined in the First Day Declaration). For further information regarding the Subcommittee's role related to the June 2019 Financing and the Optimization, See the *Declaration of Harvey Tepner In Support of Confirmation of Debtors' Plan*, filed contemporaneously herewith.

9.    At all times since its formation, the Special Committee has been and remains actively engaged with the Debtors' advisors to preserve and maximize the value of the Debtors' estates for the benefit of all creditors.  Since the Special Committee was officially formed, it formally met telephonically no less than forty-four (44) times: (a) nine (9) times during the month of April; (b) seven (7) times in May; (c) ten (10) times in June; (d) eight (8) times in July (e) four (4) times in August; (f) four (4) times in September, and (g) two (2) times in October so far.  In addition, there were numerous informal meetings and countless hours spent on conference calls discussing issues related to these chapter 11 cases.

10.    In all aspects of these cases, the Special Committee has relied on the advice of the Debtors' advisors, including Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), the investment banker to the Debtors, Weil, and Ankura.  Throughout the process, the Special Committee actively engaged in discussions, provided instruction and direction to the Debtors' advisors and management, and asked and received answers to questions posed to the Debtors' advisors.  As is described in more detail in the *Declaration of William G. Peluchiwski in Support*

5

*of the Europe/Row Sale Transaction and Confirmation of the Third Amended Joint Chapter 11 Plan Of Exide Holdings, Inc. and Its Affiliated Debtors* (the "**Peluchiwski Declaration**"), the Special Committee oversaw the development of the competitive Bidding Procedures, which were expressly designed to market test the value of the Debtors' assets (rather than just implement a foreclosure as suggested by California DTSC), and attain the highest or best value for the Debtors' assets.

11.     Throughout these chapter 11 cases, the Special Committee was provided with a variety of materials and presentations—often at its request—related to the these chapter 11 cases, including, but not limited to, presentations concerning the proposed bidding procedures and auction process, the Europe/ROW Stalking Horse Credit Bid, including Houlihan's parallel efforts to solicit other bids for the Europe/ROW Assets in advance of the bid deadline set forth in the Bidding Procedures, the Debtors' environmental liabilities associated with the Non-Performing Properties, the terms of the Global Settlement, the Debtors' liquidity and risks and alternatives to all of the foregoing—namely, a liquidation of the Debtors' assets and businesses.  The Special Committee regularly made inquiries to the Debtors' advisors and myself as CRO regarding the information provided to the Special Committee and the related analyses.

12.     In my view, the Special Committee is fully knowledgeable and familiar with the Debtors' business and financial affairs and all of the key issues and objectives at stake in these chapter 11 cases, and have acted independently at all times.

## THE AMENDED PLAN

13.     The Amended Plan represents the final step in the Debtors' chapter 11 cases. The Amended Plan is the product of extensive good faith, arm's-length negotiations between the Debtors and their major stakeholder constituencies, and incorporates (i) the Europe/ROW Sale

Transaction, (ii) a global settlement by and among the Debtors, the Creditors' Committee, Department of Justice ("**DOJ**"), certain federal and state environmental agencies identified on Schedule 1 of the Amended Plan (the "**Settling Governmental Authorities**"), the City of Frisco, Texas (together with the U.S. Environmental Protection Agency and the Texas Commission on Environmental Quality, both of which are also Settling Governmental Authorities, the "**Frisco Governmental Authorities**"), Westchester Fire Insurance Company ("**Westchester**"), Aspen American Insurance Company and Aspen Special Insurance Company (together, "**Aspen**" and collectively with Westchester, the "**Environmental Sureties**"), the Creditors' Committee, and the Ad Hoc Group (collectively, the "**Global Settlement Parties**") (the "**Global Settlement**"), and (iii) a settlement with the PBGC. The Global Settlement was re-negotiated in the aftermath of the California Department of Toxic Substances Control (the "**California DTSC**") withdrawing its support for a prior version of the Global Settlement to which California DTSC was a party.

14.    The Amended Plan, including the Global Settlement and the Europe/ROW Sale Transaction, achieves all of the objectives of the Special Committee set at the outset of these cases. Specifically, with the exception of California DTSC, it is a fully consensual plan that maximizes value, retains jobs, minimizes disruption to customers and other constituents, and provides for the orderly transition of the Debtors' Non-Performing Properties.

15.    Confirmation of the Amended Plan represents the best available path to conclude these chapter 11 cases, maximize creditor recoveries and orderly transition the Debtors' Non-Performing Properties. The alternative is almost certainly a liquidation filled with litigation of all of the issues that the Global Settlement and Amended Plan resolve. The Debtors simply do not have the financial or human resources to pivot to anything but a chapter 7 liquidation if the Amended Plan is not confirmed.

16.     As detailed below, the Amended Plan satisfies the statutory requirements for confirmation and is supported by 100% of the Debtors' secured noteholders, the Creditors' Committee, the PBGC, and all but one of the Debtors' fourteen (14) environmental regulators. Accordingly, the Amended Plan is in the best interests of the Debtors and all of their stakeholders and the Court should confirm the Amended Plan.

## **BANKRUPTCY CODE REQUIREMENTS FOR CONFIRMATION**

17.     Based on my understanding of the Amended Plan, the events that have occurred prior to and during the Debtors' chapter 11 cases, and discussions I have had with the Debtors' legal advisors regarding the requirements of the Bankruptcy Code, I believe that the Amended Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and should therefore be confirmed.  I have set forth below my understanding of the facts and circumstances applicable to certain requirements of Section 1129 of the Bankruptcy Code that have been called into question by objecting parties or require factual support.

18.     Section 1129(a)(1).  Based on discussions with the Debtors' legal advisors, it is my understanding that the Amended Plan satisfies section 1129(a)(1) of the Bankruptcy Code because it complies with sections 1122 and 1123 of the Bankruptcy Code.

19.     Section 1122.  In designing the Amended Plan, the Debtors separately classified Claims against and Interests in the Debtors based upon the difference in legal nature and/or priority of such Claims and Interests and to implement the terms of the Global Settlement. There has never been an intention or even a discussion of classifying or treating claims under the Amended Plan for any other purpose, such as manipulation of voting.  I also understand that

8

General Unsecured Claims (Class 7) and Environmental NPP Claims (Class 8) do not vote and are deemed to reject the Amended Plan.

20.    Section 1123(a)(4).    It is my understanding that the Amended Plan also complies with section 1123(a)(4) of the Bankruptcy Code, which requires that the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class (except as otherwise agreed to by a holder of a particular Claim or Interest). As stated, in developing the Amended Plan, the Debtors' primary objective was to achieve maximum consensus.  Indeed, until California DTSC withdrew from the Global Settlement, the Debtors believed that they had accomplished unanimous consent for a chapter 11 plan. Unfortunately, California DTSC withdrew from the Global Settlement on September 15, 2020. Following such withdrawal, I along with the Debtors other advisors, with oversight from the Special Committee and in coordination with the Ad Hoc Group, focused on giving California DTSC and all other environmental regulators the same opportunity to settle rather abandon the Global Settlement altogether or penalize California DTSC.  But, the Special Committee and the Debtors' advisors also recognized and had to address the practical reality that the Debtors do not have the liquidity or resources to continue to negotiate or renegotiate the terms of the Global Settlement with California DTSC and all of the Global Settlement Parties.  For this reason, the Amended Plan seeks to abandon the Vernon Non-Performing Property as an alternative way to secure approval for the Amended Plan on the existing timeline.

21.    Section 1123(a)(5).    The Amended Plan provides for the following means of implementation of the Amended Plan: (a) the Global Settlement, (b) the provisions governing distributions under the Amended Plan, (c) the Europe/ROW Sale Transaction, (d) the creation and governance of the GUC Trust, the Environmental Response Trust, and the Vernon Environmental

Response Trust, (e) the provisions governing the Canada Non-Performing Property, (f) the composition of the New Board, (g) the wind down and dissolution of the Debtors in accordance with the Amended Plan, (h) the vesting of all of the property of the Debtors' Estates in accordance with Section 10.1 of the Amended Plan, (i) the appointment of and authority granted to a Plan Administrator, and (j) authorization for all actions contemplated by the Amended Plan, in each case, in accordance with and subject to the terms of the Amended Plan.

22.     Section 1123(b)(3)(A).     The Amended Plan incorporates the Global Settlement.  I am very familiar with the terms of the Global Settlement because I was personally involved in the negotiation (and then re-negotiation) of the Global Settlement.  I believe that the Global Settlement represents a fair and rational compromise and settlement of Claims among the Debtors and the Global Settlement Parties, and is in the best interests of the Debtors, their Estates, and holders of Claims and Interests, and is fair, equitable and reasonable.  As detailed herein and in the Memorandum, the Global Settlement resolves significant and contentious issues regarding the Non-Performing Properties and the Debtors' prepetition attempts to recapitalize and reorganize its businesses through the June 2019 Financing and the Optimization, and provides value for unsecured creditors that otherwise likely would not receive any distributions under the Amended Plan (or in a liquidation), at least not without significant litigation.

23.     In June 2020, following the appointment of the Creditors' Committee and the entry of the Settlement Procedures Order, and concurrently with the Debtors' postpetition marketing process, the Debtors commenced good-faith, arm's-length negotiations with key stakeholders in an effort to resolve complex environmental issues consensually and without the need for lengthy, value-destructive litigation. When these initial negotiations were not making meaningful progress, the Debtors and the Settling Governmental Agencies consensually agreed to

10

proceed to the second stage of the Settlement Procedures with the voluntary participation of the Consenting Creditors, and thereafter engaged in the global mediation process. As is described in more detail in the Memorandum, the global mediation process culminated in an agreement in principle with California DTSC and the Global Settlement Parties as of July 28, 2020, which was subject to the negotiation of final documentation and the approval of the necessary authorities acting for the Settling Governmental Authorities.  On September 15, 2020, the Governor of California rejected the Global Settlement, causing California DTSC to withdraw its support for the Global Settlement.

24.    In the aftermath of California DTSC's withdrawal from the Global Settlement, the Debtors and their key stakeholders worked tirelessly to preserve the consensus achieved through the global mediation and to preserve the fundamental terms and objectives of the Global Settlement.  Following these efforts, on September 23, 2020, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* (Docket No. 871).

25.    Each aspect of the Global Settlement is interdependent and relied upon by creditors who have each made material concessions to enable the expeditious confirmation of the Amended Plan.  If the Global Settlement is not implemented under the Amended Plan, I expect that the Debtors would incur significant delay and expense engaging in lengthy and protracted litigation regarding the claims resolved by the Global Settlement. Such litigation would unnecessarily prolong these chapter 11 cases (and likely require a conversion to chapter 7) and substantially delay, if not thwart entirely, the Debtors' ability to successfully consummate the Global Settlement and the Europe/ROW Sale Transaction, including the transfer of the Non-

11

Performing Properties and the Acquired Assets, resulting in massive value degradation of the Debtors' assets.

26.     Accordingly, I believe that the Global Settlement is in the best interests of the Debtors' estates and their creditors and provides a much-needed resolution to these chapter 11 cases. The Global Settlement is fair and reasonable and offers benefits, including the recoveries to environmental creditors and General Unsecured Creditors that would not be available in the absence of the proposed Global Settlement without significant and uncertain litigation.

27.     Further, to implement the Global Settlement, the Amended Plan also includes certain release and exculpation provisions that (i) are integral components of the Amended Plan and Global Settlement, (ii) are appropriate and necessary under the circumstances, (iii) being provided in exchange for valuable consideration, (iv) are consistent with the Bankruptcy Code, and (v) comply with applicable law.

A.     **Plan Releases**

28.     The Amended Plan, Europe/ROW Purchase Agreement, Environmental Settlement Agreement, and Frisco Settlement Agreement provide for four (4) categories of releases:

> i.     claims held by the Debtors and their Estates, including those that the Creditors' Committee could seek to assert, against the Released Parties and their Related Parties,[4] (the "**Estate Releases**"), *see* Amended Plan § 10.5;

---

[4]     As defined in Section 1.137 of the Amended Plan, "**Released Parties**" means "collectively: (a) the Debtors, (b) each of the Consenting Creditors, (c) the Trustees, (d) the Europe/ROW Purchaser, (e) the Transferred Entities, (f) each of the DIP Lenders and the DIP Agent, (g) the Creditors' Committee and each of its members in their capacity as such, and with respect to each of the foregoing entities in clauses (a) through (g), such Entities' respective Related Parties."

As defined in Section 1.167 of the Amended Plan, "**Related Parties**" means "with respect to any Exculpated Party or Released Party: (a) such Entities' successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (b) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to

12

ii.   consensual releases of the Released Parties by the holders of Claims who (i) are deemed to have accepted the Amended Plan, (ii) were entitled to vote and either (a) accepted the Amended Plan or (b) rejected the Amended Plan or abstained from voting but did not opt out of the release (the "**Consensual Third Party Releases**"), *see* Amended Plan § 10.6; and

iii.   non-consensual releases by holders of General Unsecured Claims and California state environmental agencies, including the California DTSC (as the only government agency that has not executed the Environmental Settlement Agreement) (collectively, the "**California Environmental Agencies**") solely against the Europe/ROW Purchaser, the Transferred Entities, the Consenting Creditors and the Trustees (the "**Non-Consensual Third Party Releases**", together with the Non-GUC/NPP Third Party Releases, the "**Third Party Releases**", and both together with the Debtor Releases, the "**Plan Releases**"), *see* Amended Plan § 10.6; and

iv.   consensual releases and covenants not to sue among the parties to the Environmental Settlement Agreements.   *See* Environmental Settlement Agreement, Art. IX; Frisco Settlement Agreement, Art. VIII.

**i.     Debtor Releases**

29.   The Debtor Releases—which were approved by the Special Committee in conjunction with the Global Settlement and which also have the support of the Creditors' Committee and the Global Settlement Parties as part of their endorsement of the Amended Plan— are an integral component of the Amended Plan, constitute a sound exercise of the Debtors' business judgment and meet the applicable legal standard.  The description of the Subcommittee's investigation into the potential value of the estate claims and causes of action that are released by the Amended Plan are described in the Tepner Declaration.  I do not address those issues.  Instead, I address below the necessity of the releases for the Amended Plan and Global Settlement and the consideration provided by the Released Parties to the Debtors and their Estates in exchange for such releases.

---

the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which exculpation or releases are provided in the Plan, and (c) such persons' respective heirs, executors, estates, servants and nominees; provided, that the Former Officers and Directors of the Debtors shall not be "Related Parties."

13

30.     The Released Parties provided critical support and significant value to the Debtors'
Estates throughout the chapter 11 process and enabled the Debtors to secure valuable consideration
provided under the Global Settlement and Amended Plan for the benefit of all constituents, which
I do not believe would have been possible absent the Debtor Releases.   The Debtors, Consenting
Creditors, and Creditors' Committee are all parties to the Global Settlement encompassed in the
Amended Plan, which resulted in a consensual outcome to these chapter 11 cases that avoids
potentially costly and protracted litigation and provides for the establishment of the Environmental
Response Trust and General GUC Trust for the benefit of multiple constituencies.  Further, the
Debtors' advisors and directors guided the Debtors through these challenging times and were
crucial in negotiating the terms of the Global Settlement.  At all times during these chapter 11
cases, the Consenting Creditors have made clear that their support for the Debtors and these chapter
11 cases would be conditioned on comprehensive releases to provide finality and certainty.  While
that was clearly important to the Consenting Creditors, they recognized that the Debtors and
Creditors Committee would have to evaluate the claims proposed to be released, which the
Consenting Creditors permitted to be done with use of their cash collateral or DIP proceeds without
any limitations.  In ultimately agreeing to the releases contained in the Amended Plan and related
agreements, the Special Committee considered the value of the claims proposed to be released
against the Consenting Creditors (which the Sub-Committee unilaterally investigated and advised
were de-minimis at best and would require extended and expensive litigation to prosecute) against
the benefits of the Amended Plan, Global Settlement and Europe/ROW Transaction to the Debtors
and their Estates.

RLF1 24139321v.1

31.     In my opinion, the Special Committee properly concluded that the value of any affirmative claims released by the Debtors is not greater than (or even close to) the significant value and benefits provided by the Amended Plan and the Global Settlement.

## ii.              The Non-consensual Third Party Releases

32.     As is described in more detail in the Memorandum, the Non-consensual Third Party Releases extend solely to the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser and the Trustees, and are necessary to the confirmation of the Amended Plan and are justified on account of the critical and substantial contributions the Non-consensual Released Parties have made to the Amended Plan.  The substantial contributions by the Non-consensual Released Parties to the Global Settlement and the Amended Plan include:

    i.      funding of the $12.5 million in aggregate Global Settlement Payments by the Transferred Entities and Consenting Creditors, which has since increased to $18.5 million following the settlement with the PBGC;

    ii.      consent by the Consenting Creditors to the use of cash collateral and a significant portion of the debtor-in-possession financing capital from certain of the Consenting Creditors, the proceeds of which were used to fund , among other things, the Subcommittee investigation and the Creditors' Committee investigation, each of which scrutinized prepetition transactions involving the Consenting Creditors—said differently, the Consenting Creditors funded millions of dollars for investigations *into potential actions against themselves*;

    iii.      the agreement of the Consenting Creditors to purchase the Debtors' Europe/ROW business that had no other qualified bidders, in exchange for forgiveness of a significant amount of secured debt, which would otherwise come before any unsecured claims in priority of distribution;

    iv.      waivers by the Consenting Creditors of any deficiency claims and the Transferred Entities of any prepetition Intercompany Claims which will increase distributions to general unsecured creditors;

    v.      voluntary agreement by the Consenting Creditors to release their liens on the Non-Performing Properties and the proceeds thereof, including adequate protection liens, to facilitate the Global Settlement and provide incremental value to the Settling Governmental Agencies; and

vi.   cancellation of the Debtors' guarantee of $155.9 million of principal obligations under the Superpriority Notes Indenture, plus all accrued and unpaid interest.

33.    Based on my knowledge of the Debtors' negotiations with the Non-consensual Released Parties throughout these chapter 11 cases, I do not believe that the Debtors would have been able to secure all of the valuable consideration provided by the Amended Plan or consummate a value-maximizing transaction for the benefit of all stakeholders without the Non-consensual Third Party Releases.

34.    <u>Section 1129(a)(3).</u>  I understand that section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law.  As explained above, throughout these cases, the Debtors, led by the Special Committee, have upheld their fiduciary duties to stakeholders and protected the interests of all constituents, with the objective of achieving consensus wherever possible.  The Debtors developed the Amended Plan in close consultation with their primary stakeholders following diligence and negotiation.  The Amended Plan framework was negotiated in connection with the Global Settlement in order to pave the way for a swift confirmation process and resolution of these chapter 11 cases; not to penalize any party in interest.  The Global Settlement was achieved through extensive and hard-fought negotiations by and among the Debtors, the Creditors' Committee, and the Global Settlement Parties, and provides for the orderly transfer of the Non-Performing Properties in an efficient manner that minimized the risk of harm to public health and safety and a guaranteed recovery for the holders of General Unsecured Claims in the form of the GUC Global Settlement Payment, which is funded by the Transferred Entities and Consenting Creditors.  I believe that the overwhelming acceptance of the Amended Plan and the Creditors' Committee's support of the Amended Plan reflects the Amended Plan's fairness and the good faith efforts of the parties to achieve the objectives of chapter 11.  The Debtors have acted in good faith and with the best

16

intentions for creditors in proposing the Amended Plan in satisfaction of section 1129(a)(3) of the Bankruptcy Code.

35.    <u>Section 1129(a)(7).</u>  It is my understanding, based on discussions with the Debtors' legal advisors, that the Bankruptcy Code requires that, with respect to each impaired Class of Claims and Interests, each holder of such Claim or Interest must either (a) accept the Amended Plan or (b) receive or retain under the Amended Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. As set forth in the Liquidation Analysis, the best interests test is satisfied as to <u>every single holder</u> of a Claim in Classes and Interest.   Specifically, the Liquidation Analysis demonstrates that all Classes of Claims or Interests will recover value equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation, which, for all prepetition creditors other than holders of Superpriority Notes Guarantee Claims, is $0.

36.    Together with other members of the Ankura team, I developed the assumptions and estimates regarding the Debtors' assets and claims based upon input from the Debtors' other advisors. In preparing the assumptions, the Ankura team relied on its knowledge and familiarity of the Debtors' assets and liabilities as well as the projected liquidity and risks to the Debtors.

37.    I understand that California DTSC has questioned the liquidation analysis because it does not specifically reflect treatment of Class 8 in a hypothetical liquidation. Notwithstanding that the Liquidation Analysis was developed in conjunction with the Initial Plan, I believe that projected recoveries to holders of general unsecured claims, including Environmental NPP Claims, in a hypothetical liquidation remains $0, for the same reasons as set forth in the

Liquidation Analysis.  Simply stated, recovery in a hypothetical liquidation is not projected to clear the Superpriority Notes Guarantee Claims in Class 4.

38.    Section 1129(a)(10).  The Classes entitled to vote on the Amended Plan— Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), Class 6 (First Lien Notes Claims), are impaired and have each accepted the Amended Plan, without including the acceptance of the Amended Plan by any insiders in such Class.   None of the Consenting Creditors, including any Consenting Creditor that may be considered a "statutory insider" as discussed in the Memorandum, are members of the Special Committee, has attended Special Committee meetings, or had any involvement in the authorization of the Amended Plan or its related filings from the perspective of the Debtors. At all times, the Debtors and their advisors have conducted themselves independently and at an arm's length from the Consenting Creditors.  Accordingly, it is my understanding that the Amended Plan satisfies section 1129(a)(10) of the Bankruptcy Code

39.    Section 1129(a)(11).  I understand, based on discussions with the Debtors' legal advisors, that Section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed if it is feasible, *i.e.*, it is not likely to be followed by liquidation (unless such liquidation is proposed in the plan) or the need for further financial reorganization, and in the case of a liquidating plan, that the Debtors can timely perform all obligations described in the plan.

40.    Throughout these chapter 11 cases, Ankura, under my guidance, has been responsible for the Debtors' books and records, and has carefully reviewed filed Claims and assets, consulted with the Debtors' counsel and other advisors, and received input from the Debtors' management and employees who have extensive knowledge of the Debtors' assets and liabilities. I expect that the Debtors will be able to timely perform all obligations described in the Amended

18

Plan and that the Amended Plan is not a visionary scheme.  The Amended Plan embodies a rational plan for the orderly wind down of the Debtors' estates and the delivery of distributions to holders of Allowed Claims following the Effective Date.  Specifically, the Amended Plan sets forth certain Cash payments that the Debtors and/or the Plan Administrator will make on or after the Effective Date.  Such payments include, among others, payments to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims.   In accordance with the Global Settlement and the GUC Trust Agreement, the Amended Plan also provides for the establishment of the GUC Trust for the benefit of holders of Allowed General Unsecured Claims, to which the Debtors will transfer the GUC Trust Assets.  As described in further detail herein, I expect that the Debtors will be able to meet their obligations under the Amended Plan.

### A.    Estimated Sources of Funds

41.    As set forth below, the Debtors expect to have sufficient funds to administer and consummate the Amended Plan, including funding all payments required under the Amended Plan, and proceeding with an orderly wind down of these chapter 11 cases.

### i.    Estimated Remaining Assets

42.    As of October 9, 2020, the value of the Debtors' assets is approximately $36.6 million, including $23.5 million in current cash on hand:

| ESTIMATED SOURCES | AMOUNT |
|---|---|
| Cash Balance as of October 9, 2020 | $23.5 million |
| Insurance Cash Collateral | $10.5 million |
| Utility Adequate Assurance | $1.5 million |
| Other Receipts | $1.1 million |
| TOTAL SOURCES: | $36.6 million |

### B.    Estimated Uses of Funds

#### i.    Uses of Funds

43.    The Debtors project wind-down expenses of approximately $6.9 million, including remaining pre-Effective Date operating expenses and restructuring professionals' fees and post-Effective Date wind-down expenses.

| ESTIMATED USES OF FUNDS | AMOUNT |
|---|---|
| Operating Expenses | $1.1 million |
| Restructuring Professionals | $2.3 million |
| Post-Effective Wind-Down Expenses | $3.5 million |
| TOTAL USES: | $6.9 million |

#### ii.    Estimated Outstanding Claims

44.    Throughout these chapter 11 cases, the Debtors, with the assistance of their financial advisors, have been tracking and estimating unpaid Outstanding Claims (defined below). The Outstanding Claims amounts are estimated based on Claims received by the General Bar

20

Date,[5] the Debtors' books and records, Ankura's analysis of the estimated Claims as of the

Effective Date, and discussions with members of the Debtors' management team and advisors.[6]

45.    The Debtors estimate that the total amount of Outstanding Claims (as

defined below) that must be paid prior to any distributions to Exchange Priority Notes Claims will

be approximately $15 million, consisting of the following:

| ESTIMATED OUTSTANDING CLAIMS | AMOUNT |
|---|---|
| **Administrative Expense Claims**[7] | $8.7 million (of which approximately $4.0 million are 503(b)(9) Claims) |
| **Priority Tax Claims** | $4.3 million |
| **Other Secured Claims** | $2.0 million |
| **TOTAL CLAIMS:** | **$15 million** |

46.    This leaves the Debtors' estates with approximately $14.8 million (due to

rounding), which is more than sufficient to satisfy the Debtors' obligations under the Amended

Plan and any other contingencies that may arise.  As with any projections, there is a possibility

that there may be some variance in the wind-down budget and expenses.  I believe that the surplus

---

[5] Pursuant to the *Notice of Deadlines to File Proofs of Claim*, the deadline to file claims against the Debtors, including secured claims, priority claims, unsecured non-priority claims, and claims arising under section 503(b)(9) was July 31, 2020 at 5:00 p.m. (Prevailing Eastern Time) (the "**General Bar Date**").

[6] As provided in the Proposed Confirmation Order, following entry of the Proposed Confirmation Order, all other Administrative Expense Claimants will have thirty-five (35) days to file and serve their Administrative Expense Claims (the "**Administrative Expense Claims Bar Date**").  Following the Administrative Expense Claims Bar Date, the Debtors and their advisors will continue to reconcile and make determinations as to allowance of requests for payment of Administrative Expense Claims.

[7] While the Debtors will pay certain investment banking fees in connection with the Europe/ROW Sale Transaction, the Europe/ROW Purchase Agreement provides that, to the extent the payment of such investment banking fees result in a shortfall in the Debtors ability to pay Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, the Transferred Entities (or their designee) will reimburse the Debtors the portion of any paid investment banking fees to the extent required to make up for such shortfall.  Accordingly, such fees have not been included in the estate of claims required to be satisfied by the Debtors.

could be as low as $11.3 million or as high as $20.3 million, but expect that the surplus will still be sufficient to cover any contingencies in either of those scenarios, including any working capital claim by the Americas Buyer.

47.    Section 1129(a)(13).  As required by section 1129(a)(13), the Amended Plan provides for the continuation of existing retiree benefits after the Effective Date. The Debtors have consensually resolve obligations with respect to retiree benefits pursuant to the Retiree Settlement.  Accordingly, as further discussed in the Memorandum, the Amended Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

48.    Section 1129(b). It is my understanding that, pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or interests so long as the plan is "fair and equitable" and it does not discriminate unfairly as to such non-accepting class.

49.    Contrary to California DTSC's objection, as a member of Class 8, California DTSC is neither receiving a lower percentage recovery nor accepting a greater allocation of risk in connection with the proposed distribution than are holders of General Unsecured Claims classified in Class 7.   In all scenarios under the Amended Plan, California DTSC will receive in excess of a Pro Rata share of $2,400,000.  Under arguably its *least* beneficial recovery—i.e., abandonment of the Vernon property—California DTSC would still receive a first priority lien against the Vernon Non-Performing Property, which was worth almost $30 million following remediation of the property.

50.    This lien has significant value.   During these chapter 11 cases, the Debtors retained Hilco Real Estate, LLC ("**Hilco**") to market the Vernon NPP to various potential buyers.   Following a robust marketing and sale process in which the property was marketed to

over 100 buyers, Hilco ultimately received indications of interest from six potential buyers interested in the property, with purchase prices ranging up to $29,600,000, though each of these indications of interest was conditioned upon either the Debtors retaining various environmental liabilities and obligations or being absolved of these liabilities by the DTSC.

51.     Although the Debtors cannot afford to remediate the site, if California DTSC incurs damages as a result of the costs incurred by it to remediate the site, under the Amended Plan, California DTSC will be able to recover a portion of such costs up to the value of the first priority lien it is granted.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 12, 2020

*/s/ Roy Messing*
Name: Roy Messing
Title: Chief Restructuring Officer

RLF1 24139321v.1