**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
In re                                    :
                                         :      Chapter 11
EXIDE HOLDINGS, INC. et al.,             :      Case No. 20-11157 (CSS)
                                         :
            Debtors.¹                    :      (Jointly Administered)
-------------------------------------------------------------x
```

**DECLARATION OF HARVEY L. TEPNER IN SUPPORT OF**
**THE DEBTOR RELEASES AND CONFIRMATION OF THE AMENDED PLAN**

I, Harvey L. Tepner, make this declaration under 28 U.S.C. § 1746:

1.      I am an independent director of Exide Holdings, Inc. (collectively and separately with its current and former subsidiaries and affiliates, "**Exide**" or the "**Company**"). In that capacity, I serve on a special restructuring committee (the "**Special Committee**") and an independent subcommittee of the Special Committee (the "**Subcommittee**") of the board of directors (the "**Board**").[2]

2.      I submit this declaration ("**Declaration**") in support of the Debtor Releases and Confirmation of the Amended Plan. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) information provided to me by the Debtors' former and/or current employees, board members, board observers, and/or legal and financial advisors; and (iii) my knowledge and experience as an independent director of the Board, a member of the Special Committee, and the sole member of the Subcommittee. If I were called to testify as a witness in this matter, I would testify to the facts set forth herein.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]     Capitalized terms not defined herein shall have the meaning ascribed to them in the Confirmation Brief, as applicable.

## Professional Background

3.      I am a qualified and experienced independent director, who has served as an independent director, restructuring expert, strategic advisor, and private investor in a variety of situations.

4.      In addition to sitting on the Board, I am currently a director on the boards of Core-Mark Holding Company (NASDAQ: CORE), one of the largest consumer merchandise distributors in North America, Village Roadshow Entertainment Group (BVI) Limited, a producer and co-financier of film and TV entertainment, and another private company.  I am also a former director of other public and private companies, including: Alpha Natural Resources Holdings; Clear Channel Outdoor Holdings (NYSE: CCO); Contura Energy, Inc. (NYSE: CTRA); Global Aero Logistics (former ATA Airlines); Horsehead Holding LLC and Zochem Inc. (Canadian Subsidiary); International Textile Group; Nine West Holdings; OCM India Ltd. (India); Plascar Participacoes Industrias (Brazil); and Vision Group Holdings/LVI Intermediate Holdings, Inc.

5.      From 2008 to 2015, I was a senior executive of WL Ross & Co. LLC, an alternative asset manager and private equity firm.  From 2002 to 2008, I was a Partner at Compass Advisers, LLP, in charge of its investment banking restructuring practice.  From 1995 to 2002, I was a Managing Director of Loeb Partners Corporation.  Prior my time at Loeb, I served as an officer in the corporate finance departments of Dillon, Read & Co. Inc. and Rothschild Inc.  I began my career with Price Waterhouse in Canada and am a Chartered Accountant and Chartered Professional Accountant (Canada).

## Formation of and Purpose of Subcommittee

6.      In early April 2020, Ray Schrock and Sunny Singh of Weil, Gotshal & Manges LLP, then recently retained and currently counsel to the Debtors, contacted me about possibly

joining the Board as an independent director.  Prior to joining the Board, I had no business or personal relationship with Exide or its management.  I had met some of the Consenting Creditors through the years on other occasions in meetings with large groups of creditors for companies in which I was involved or at conferences or restructuring social events.

7.    On April 3, 2020—the same day that I joined the Board—the Board formed the Special Committee consisting of independent and disinterested directors Alan Carr, Mark Barberio, William Transier, and myself to direct and to oversee all aspects of the Company's restructuring process and chapter 11 case, including analyzing options related to all potential liability management transactions and other strategic alternatives that may be available to the Company and its subsidiaries.

8.    Messrs. Carr, Barberio, and Transier had been members of the Board prior to the formation of the Special Committee and were involved in approving certain prepetition related-party transactions with the Ad Hoc Group.  For that reason, on April 3, 2020, the Subcommittee also was formed, and I was appointed as its sole member.  The Subcommittee was created to investigate, evaluate, and control the disposition or resolution of any claims associated with prepetition affiliate transactions including the June 2019 Financing and the Optimization (the "**Prepetition Transactions**").

### The Subcommittee Investigation and its Coordination with the Creditors' Committee

9.    Before the investigation began, I analyzed whether there were any conflicts of interest with respect to the engagements of Weil, Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), and Ankura Consulting Group, LLC ("**Ankura**"), and determined there were none.  Weil did not represent the Company in connection with any of the Prepetition Transactions.  Houlihan Lokey was able to assist with the evaluation of the Optimization since it did not serve as the

3

financial advisor on that transaction.  For purposes of evaluating the June 2019 Financing (which Houlihan Lokey had worked on), Ankura was used to analyze that transaction utilizing a team that was separate from Chief Restructuring Officer Roy Messing and his team.  Ankura did not serve as the financial advisor on either the June 2019 Financing or the Optimization.

10.    The Subcommittee oversaw the investigation and engaged and directed Weil to lead the investigation in evaluating the viability of any potential claims and causes of action related to the Prepetition Transactions.  The Subcommittee's investigation took place over approximately four months (from April through July 2020) and included extensive factual and legal analysis.  On behalf of the Subcommittee, Weil first requested and received pertinent information and documents from the Company and its legal and financial advisors, and subsequently reviewed thousands of documents.  Weil next conducted interviews necessary to understand the Prepetition Transactions and to evaluate potential claims in connection with them.  Weil conducted twenty-four (24) interviews in total.  Interviewees included all board members at the time the Prepetition Transactions were approved, relevant current and former management of the Company, the Company's legal and financial advisors in connection with the Prepetition Transactions, and the Company's third party auditor.  The Subcommittee also engaged independent financial advisors Ankura and Houlihan Lokey to assist with the investigation of the June 2019 Financing and Optimization, respectively.

11.    In conjunction with Weil, I established the scope of the investigation, the work to be done, and a process to report preliminary findings of the investigation with the Special Committee, the Creditors' Committee, other creditors and their representatives, and other interested parties.  I directly participated in certain interviews and received summaries of all of the other interviews conducted.  I also reviewed key documents, including the materials presented to

4

the board when approving the Transactions. Additionally, I had access to, and accessed, a dataroom which included all relevant documents in connection with the investigation. During the course of the investigation, I communicated with Weil on at least a weekly basis regarding the status of the investigation to oversee the process and to offer guidance, and with independent financial advisors Ankura and Houlihan Lokey on several occasions regarding their analyses of the June 2019 Financing and the Optimization, respectively.

12.     The Subcommittee conducted its investigation in close coordination with the Creditors' Committee, which conducted its own contemporaneous investigation of the Prepetition Transactions. As a result, the Subcommittee's investigation was fully transparent to counsel for the Creditors' Committee Lowenstein Sandler LLP ("**Lowenstein**"). Thousands of documents were shared with the Creditors' Committee's advisors pursuant to a Confidentiality Agreement as well as a Common Interest Agreement.

13.     Lowenstein and its financial advisor, AlixPartners LLP, actively participated in most of the interviews and were provided with detailed verbal summaries and updates of interviews that preceded their involvement or were with the Company's legal advisors at the time of the Prepetition Transactions.

14.     Weil, on behalf of the Subcommittee, and Lowenstein, on behalf of the Creditors' Committee, also engaged in periodic and open discussions in connection with the investigation of the Prepetition Transactions.

15.     Towards the end of their respective investigations, Weil, on behalf of the Subcommittee, and Lowenstein, on behalf of the Creditors' Committee, exchanged their preliminary conclusions, which were consistent in all material respects.

## Subcommittee's Investigation Conclusions

16.     After its nearly four month investigation, the Subcommittee did not identify any valuable, colorable claims or causes of action belonging to the Debtors related to the Prepetition Transactions or to the conduct of the Company's directors and officers in connection with the Prepetition Transactions.  The Subcommittee's investigation analyzed the viability of potential claims including for actual fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary duty, and equitable subordination with respect to the June 2019 Financing, as well as for actual fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary duty, and unlawful distribution with respect to the Optimization.  The Subcommittee determined that the Debtors' unsecured creditors, including environmental creditors, suffered no damages as a result of the Prepetition Transactions Moreover, as to any potential claims for breach of fiduciary duty with respect to the Prepetition Transactions, the Subcommittee determined that the business judgment standard would apply and was satisfied..

17.     The Subcommittee concluded that the time and expense associated with pursuing any claims or causes of action likely would exceed any potential value that could be recovered from such claims or causes of action and that the value of any potential recovery also did not exceed the benefits of the Global Settlement and the sale of the Europe/ROW Assets.

## Subcommittee's Consideration of the Global Settlement

18.     In recommending that the Special Committee approve the Global Settlement, including the Debtor Releases, the Subcommittee considered the value of the potential claims and causes of action being released, which the Subcommittee determined to have little likelihood of success, in relation to the value provided to the Debtors pursuant to the Global Settlement, including: (i) settlement of claims by the Settling Governmental Authorities, Creditors'

Committee, and Environmental Sureties, (ii) the number of employee jobs that would be preserved as a result of the Europe/ROW Sale, and (iii) avoiding a free fall insolvency in Europe, which could have involved the Debtors in protracted litigation.

19.      The Subcommittee also considered the fact that its conclusions regarding the strength and value of the potential claims being released (or the lack thereof) were consistent with the conclusions of the Creditors' Committee and that the Creditors' Committee was supportive of the Global Settlement.

20.      The Subcommittee determined that, in its business judgment, the Debtor Releases were appropriate and recommended that the Special Committee approve the Global Settlement, which provided significant value to all stakeholders.

21.      The Debtor Releases are essential to the success of the Amended Plan.  It is my understanding that the Debtor Seller Parties Releases contained in the Europe/ROW Purchase Agreement served as a crucial inducement for the Europe/ROW Purchaser to participate in the Europe/ROW Sale, and the Global Settlement Release encompasses the releases that were exchanged among the Global Settlement Parties as part of the Global Settlement.  Acceptance of the Global Settlement, including the releases therein, allowed the Debtors to move forward with the consensual Amended Plan and avoid lengthy, complex, and value-destructive litigation with creditors.  Had the Debtor Releases not been provided, that would have destroyed the Debtors' ability to secure the valuable consideration provided under the Global Settlement and Amended Plan.

//

//

//

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this October 12, 2020

*/s/ Harvey L. Tepner*
Harvey L. Tepner
Independent Director
Exide Holdings, Inc.

RLF1 24139328V.1