**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
:
In re                                            :    Chapter 11
:
**EXIDE HOLDINGS, INC.,** *et al.*,              :    Case No. 20–11157 (CSS)
:
Debtors.[1]                                      :    (Jointly Administered)
:
---------------------------------------------------------------- x

### DECLARATION OF ROY MESSING IN
### SUPPORT OF ABANDONMENT OF THE VERNON NON-PERFORMING
### PROPERTY PURSUANT TO THE AMENDED PLAN

I, Roy Messing, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer of Exide Holdings, Inc. ("**Holdings**") and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and, together with their non-Debtor affiliates, "**Exide**," or the "**Company**"). I am also a Senior Managing Director at Ankura Consulting Group, LLC ("**Ankura**"), the Debtors' financial advisors.

2. I submit this declaration (the "**Declaration**") in support of abandonment of the Vernon Non-Performing Property (the "**Vernon NPP**") pursuant to the *Third Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* (as may be amended, modified, supplemented, or restated, the "**Amended Plan**").[2] I have separately submitted a declaration, filed

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the Disclosure Statement, the Confirmation Brief, or the Abandonment Brief, filed contemporaneously herewith, as applicable.

contemporaneously herewith, in support of confirmation of the Amended Plan including the Amended Plan Supplement, dated September 12, 2020 (ECF No. 821) and the Second Plan Supplement filed September 12, 2020 (Docket No. 825) (as may be further amended, modified, restated, or supplemented, the "**Plan Supplements**").

3.  In my capacity as CRO, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. For a further discussion of my credentials, see the *Declaration of Roy Messing Pursuant In Support of Debtors' Chapter 11 Petitions and First Day Relief* dated May 19, 2020 (ECF No. 14) (the "**First Day Declaration**").

4.  Except as otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents and other information, including relevant historical records, as part of my duties and responsibilities as CRO for the Debtors, or my opinion based upon my familiarity with the Debtors' business, operations, and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## HISTORY OF THE VERNON NPP

9.  The Vernon NPP is a former lead-acid battery recycling facility located at 2700 South Indiana Street, Vernon, California, which I understand originally commenced operations in 1922, and was modernized and expanded in 1982.

10. In 1981, pursuant to the Resource Conservation and Recovery Act ("**RCRA**"), the facility was granted "interim status," allowing for continued operations pending the DTSC's review and final determination on RCRA permitting.

11. In September 2000, Exide acquired the Vernon NPP and conducted recycling operations on site.

12. In 2002, Exide was simultaneously operating under "interim status" and implementing corrective action activities for lead and arsenic contamination pursuant to a 2002 Corrective Action Consent Order with the DTSC (the "**CACO**"), which, *inter alia,* grants the DTSC the right to access the property and conduct any work "it deems necessary to protect human health or the environment." A true and correct copy of the CACO is attached hereto as **Exhibit 1**.

13. In early 2014, Exide submitted a revised RCRA Hazardous Waste Facility Permit application to the DTSC.

14. In March 2014, Exide ceased operations at the Vernon NPP.

15. In November 2014, during Exide's 2013 Chapter 11 Case, Exide and the DTSC entered into the 2014 Stipulation and Order (the "**2014 Order**"), which resolved disputes concerning Exide's on- and off-site corrective action obligations under the CACO, its permit application and corresponding closure and post closure plan requirements, and funding of financial assurances for the closure and post closure plan. A true and correct copy of the 2014 Order is attached hereto as **Exhibit 2**.

16. In February 2015, the DTSC informed Exide of its intent to deny the Company's RCRA Hazardous Waste Facility Permit application.

17. In March 2015, Exide entered into a non-prosecution agreement with the U.S. Department of Justice and the DTSC (the "**NPA**"), in which Exide agreed to withdraw its RCRA permit application and permanently close the Vernon NPP facility through implementation of a DTSC-approved closure plan. A true and correct copy of the NPA is attached hereto as **Exhibit 3**.

18. In March 2015, concurrent with the NPA, Exide and the DTSC entered into the 2015 Amended Stipulation and Order (the "**2015 Amended Order**"), which required Exide to submit a closure plan to describe procedures for remediation, deconstruction, and closure of the

Vernon NPP. A true and correct copy of the 2015 Amended Order is attached hereto as **Exhibit 4**.

19. In April 2016, Exide and the DTSC entered into the 2016 Second Amended Stipulation and Order (the "**2016 Amended Order**"), which resolved a dispute over off-site corrective action expenditures. A true and correct copy of the 2016 Amended Order is attached hereto as **Exhibit 5**.

20. On December 8, 2016, the DTSC approved Exide's final closure plan for the Vernon NPP (the "**Closure Plan**" and in combination with the CACO, 2014 Order, NPA, 2015 Amended Order, and 2016 Amended Order, the "**DTSC Requirements**"), which proposed a phased approach for decontamination, deconstruction, and disposal of hazardous waste management equipment and structures at the Vernon NPP. A true and correct copy of the Closure Plan is attached hereto as **Exhibit 6**.

### EXIDE'S COMMUNICATIONS WITH THE DTSC DURING THE COVID-19 PANDEMIC

21. Exide's closure efforts continued until March 21, 2020 when, due to the COVID-19 pandemic and stay-at-home orders issued by the State of California, Los Angeles County, and the City of Vernon, Exide informed the DTSC by letter of its declaration of a *force majeure* with respect to closure activities at the Vernon NPP. A true and correct copy of Exide's March 21 letter is attached hereto as **Exhibit 7**.

22. On April 20 2020, the DTSC responded to Exide's letter and disputed Exide's declaration of a *force majeure* and interpretation of the stay-at-home orders. A true and correct copy of the DTSC's April 20 letter is attached hereto as **Exhibit 8**.

23. On April 22, 2020, Exide replied by letter on April 22, 2020, in which it further explained the basis of its position on the *force majeure* and stay-at-home orders. A true and correct copy of Exide's April 22 letter is attached hereto as **Exhibit 9**.

24. On July 3, 2020, the DTSC replied to Exide's April 22 correspondence, reiterating its position on the *force majeure* declaration and the stay-at-home orders, and referencing a corresponding order issued by DSTC proposing work measures at the Vernon NPP to abate what the DTSC described as "a substantial amount of unsecured lead-contaminated dust outside of the FEU" (the "**Interim Measures Order**"). In its July 3 letter, the DTSC asserted that abatement of this dust, as well as addressing the FEU tent's service life, was "time-critical work" that should be completed immediately. The DTSC further asserted in its letter that the FEU's "multiple tears since closure began" and its "finite service period" required immediate attention. A true and correct copy of the DTSC's July 3 letter is attached hereto as **Exhibit 10**. A true and correct copy of Interim Measures Order is attached hereto as **Exhibit 11**.

25. On July 8, 2020, through its counsel, Exide replied to the DTSC's July 3 letter and Interim Measures Order, further disputing the DTSC's interpretation of the stay-at-home orders and Exide's *force majeure* declaration. Exide also noted its disagreement with the DTSC's claim that this was "time critical" work because (i) the FEU tent recently had been repaired and solidified and no ambient air samples revealed any elevated, non-permissible levels of lead or arsenic even when there were tears in the FEU; and (ii) the purportedly contaminated dust samples were collected by the DTSC in November 2019 but were not identified by the DTSC as an alleged hazard requiring Exide's immediate attention until some eight months later. A true and correct copy of Exide's July 8 letter is attached hereto as **Exhibit 12**.

26.     The DTSC has not responded to Exide's July 8 letter, nor has the DTSC taken any additional enforcement action to require any immediate action at the site.  Accordingly, activity at the Vernon NPP remains focused on preventing lead or other contaminants from escaping the property, rather than abatement – are ongoing.

## EXPENDITURES AT THE VERNON NPP

27.     Since the implementation of the Closure Plan in 2017, Exide spent more than $75 million implementing the plan and complying with the DTSC Requirements.

28.     Debtors currently spend approximately $750,000 per month to maintain and secure the Vernon NPP.  This includes payroll and benefits, utilities, and third-party vendors.

29.     The Debtors do not have the unencumbered assets or authority to use cash collateral necessary to continue maintaining and securing the Vernon NPP site in perpetuity and have no other funds to resume and complete the remediation pursuant to the DTSC Requirements.

30.     In the event that the Vernon NPP is abandoned, however, over $26 million would be made available to DTSC to continue maintenance efforts and restart the remediation efforts at the site.  Specifically, DTSC would have access to $11,158,854 through a surety bond with Westchester Fire Insurance Company, $3,000,000 through the Residential Off-Site Corrective Action Trust Fund, and $15,325,140.39 through the Closure Financial Assurance Trust Fund, all of which may be used by DTSC to finance onsite or offsite remediation efforts.  A true and correct copy of the most recent trust fund account statement is attached hereto as **Exhibit 13**.  A true and correct copy of the Westchester Fire Insurance Company surety bond is attached hereto as **Exhibit 14**.

31.     In their sound business judgment, the Debtors have determined that the Vernon NPP is of inconsequential value and burdensome to the Debtors' estate because in the absence of

a sale or abandonment of the Vernon NPP, the Debtors' estate would be required to make significant expenditures in connection with ongoing decommissioning and remediation obligations, including those imposed upon the Debtors pursuant to the DTSC Requirements, which would deplete the estate's limited resources while providing no benefit to the estate or its constituents.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 12, 2020

/s/ *Roy Messing*
Name: Roy Messing
Title: Chief Restructuring Officer
