# EXHIBIT 12

| | |
|---|---|
| From: | Goslin, Thomas |
| To: | Margarita Padilla; Anthony Austin; Kevin.Shipp@dtsc.ca.gov; Peter.Ruttan@dtsc.ca.gov; Grant.Cope@dtsc.ca.gov; Peter.Thyberg@dtsc.ca.gov; Daniel.Gamon@dtsc.ca.gov |
| Cc: | Keith SCOTT; YEH, Grace; SIEGLAFF, Jully (jully.sieglaff@exide.com); CHITWOOD, Lacey; Connolly, Annemargaret (annemargaret.connolly@weil.com); Praitis, Judith M.; Nagelberg, Michael |
| Subject: | Exide - Vernon |
| Date: | Wednesday, July 8, 2020 5:21:55 PM |
| Attachments: | image001.jpg<br>RML ur.pdf |

Dear all,

Apologies in advance for the very long email, but we wanted to respond to a number of items related to the Vernon site in hopes of progressing our settlement discussions and keeping everyone in the loop. Included below is our response to the following three DTSC letters addressed to Grace Yeh regarding the Vernon facility: (1) May 15, 2020 Corrective Action Order to Comply with DTSC's June 19, 2019 Request for Information (the "**Information Request**"); (2) July 3, 2020 Notification of Requirement to Perform Interim Measures (the "**IM Request**"); and (3) July 3, 2020 DTSC Response to Exide's Force Majeure Declaration (the "**FM Response**" and together with the "Information Request" and the "IM Request" the "**Three Letters**"). While the Three Letters on their face cover three different topics, we are combining our initial response because all issues raised therein will need to be addressed as part of our settlements discussions under the procedures approved by the bankruptcy court.

Before we get to the Three Letters, though, we wanted to provide you with some information responsive to questions that came up in our discussions last week:

1. AIS agreed to remove the lien on the Vernon property. The mechanics lien release (attached) was executed and transmitted last month; however, due to COVID, we understand that the LA County Recorder is running significantly behind schedule.

2. Re the amounts budgeted for environmental obligations at the NPPs, we have confirmed that there are not segregated accounts for each of the NPP sites. Any monies not used in one month are rolled forward for use as part of the overall operating budget, which doesn't preclude use for NPP sites in the future.

3. The PLL policy will be extended until September 30.

4. With respect to the request for a tolling agreement, we would like to discuss that matter with you further on our next settlement call to better understand the nature of the claims that would be preserved and whether a formal tolling arrangement may be necessary to resolve any such claims.

As we have discussed, Exide's goal is to manage the Vernon site to continue to conserve the safety, security and stability of the facility and thereby protect human health and safety and the environment, as it has done throughout the entire force majeure period, which continues without interruption. We hope to work cooperatively with you, as we know our interests are aligned on this ultimate goal. Going forward, we respectfully request that you raise any concerns with us before taking formal administrative action so that we can be efficient and effective in addressing any issues.

We recognize that this is a challenging situation and we are doing our best to maintain safety, stability and security at the Vernon site with very limited resources. Addressing any issues efficiently allows us to preserve more resources for onsite work.

That said, below is Exide's response to the Three Letters. We look forward to discussing any concerns with you in the near future as part of the court-approved settlement process.

1. The Information Request. Exide incorporates by reference all of the prior correspondence on this topic.

>   a. The Information Request as issued to Exide does not conform with the requirements of H & S Code 25185.6, which allows DTSC to tender information requests only for specific purposes. DTSC has not shown that it sent the Information Request for an authorized purpose. Namely, DTSC cannot demand Exide produce records to document there has been a release of hazardous substances (or hazardous waste or hazardous constituents) when DTSC already has formally determined there is such a release. (See, e.g., CACO Section 2.2 and 2.3, wherein DTSC declares releases have occurred and may be migrating in the environment). An authorized purpose to tender an information request is to determine a person's ability to pay for response actions. Both the 2002 CACO and the 2014 Stipulated Order, as amended, include findings of releases, financial assurance mechanisms based on estimated response costs, extensive reporting obligations and many more obligations. DTSC has no legal authority to use a statutory information gathering mechanism when it already has the information the statute allows it to gather.
>
>   b. DTSC's information request was overly broad, seeking essentially every business record spanning nearly a century.
>
>   c. DTSC arguably already has the information it has requested in its own files or, at a minimum, DTSC has failed to demonstrate just what it is missing.
>
>   d. As you know, Exide voluntarily produced certain information but DTSC refuses to explain why it is not sufficient. As for DTSC's assertion that "DTSC does not know what it does not know," that merely constitutes an admission that DTSC does not have a legitimate specific inquiry, where Exide might be able to assist but, rather, is aiming to require Exide to find, organize, and supply potentially millions of data points for an unspecified purpose which, in any event, the statute provides can only be used to demonstrate facts already known to DTSC (i.e., there has been a releases of hazardous substances and Exide established financial assurance historically to pay for response actions).
>
>   e. Section 15185.6 clearly states DTSC may gather "existing information." We do not believe that DTSC has the authority to compel written responses to specific questions, to Bates stamped documents, to a specific document format (electronic or paper), or a specific database, or any specific organizational format for any requested records. Section 25185.6 does not allow DTSC to dictate such matters which require far more than production of "existing information."
>
>   f. Finally, Exide disagrees with DTSC's characterization of the history of the parties' prior

meet and confer efforts. Exide's position has been consistent. Exide has responded to each DTSC assertion over time. If DTSC had been specific, and did not already have access to certain (non-privileged/confidential or trade secret) information, Exide would have attempted to provide it. DTSC never did explain just what it wanted that it did not already have and could not obtain itself and how such information was authorized to be gathered under Section 25185.6.

2. The IM Request. We do not believe that DTSC's requirement is properly supported. DTSC alleges an "immediate" threat to human health or the environment; however, the facts DTSC provides do not support such a determination or that there is a proper justification for Exide to submit an IM Workplan.

    a. It appears that 6 of the 7 sampling locations are indoors. Indoor dust in a closed facility, with limited ongoing work, does not represent an uncontrolled release situation. Moreover, ongoing activities are not disturbing these interior conditions such that dust would be escaping structures. Finally, we note that the seventh sample was very near the rail spur, and thus it is quite likely impacted by ongoing rail traffic, not onsite Exide activities which are extremely limited to none in that particular area due to the need to avoid trains.

    b. Exide believes DTSC would find it difficult to convince a court that there is any urgency in this situation when DTSC (a) collected samples on November 21, 2019, (b) the lab analyzed them in mid-March, 2020; (c) issued a report dated April 16, 2020; and (d) then DTSC held these results for nearly 2.5 months before it issued a notice for an IM Workplan on July 3, 2020.

    c. The IM Request also is unwarranted on the merits. The Vernon facility is in an idled mode, so dust is not being released from intact, unoccupied and unused buildings or parking lots. We note DTSC's sampling was in November, before force majeure was declared and when the site was active; thus the parking lot test result arguably is not representative of current conditions. Also, since November 21, 2019 there have been several heavy rainfall events that would have flushed the parking lot surface, with all stormwater onsite captured routed to the Industrial Waste Water Treatment system, and thus treated prior to discharge. The CAP and MMRP address dust control, so an IM Workplan would be redundant. Relatedly, DTSC cannot deploy the IM concept to circumvent Exide's force majeure declaration for the CAP and MMRP.

    d. CACO Section 5.4 provides: "If DTSC identifies an immediate or potential threat to human health and/or the environment, discovers new releases of HW and/or HW constituents, or discovers new solid waste management units not previously identified, DTSC will notify Respondent in writing." While this is relatively broad text, the same section later provides that the IM Workplan must "mitigate the threat." In this circumstance, any IM Workplan would be duplicative of existing plans and thus not "mitigate the threat," if there were any such threat.

    e. There is no such threat that DTSC has documented in the IM Request. Fundamentally, DTSC apparently has identified metals in dust, but failed to document why there is an

"immediate" threat that some new workplan can abate. There is no evidence we have seen documenting there are any ongoing releases of such dust beyond facility boundaries. We note that the perimeter lead and arsenic monitors SCAQMD requires have not recorded an exceedance of SCAQMD standards.

3. The FM Letter. Again, Exide incorporates by reference all prior correspondence on the topic of force majeure. We appreciate that DTSC attempted to consider all three reasons Exide cited in support of its FM declarations, as updated and renewed. We have previously addressed each of DTSC's points, but summarily note the following below.

   a. On the State Order, DTSC cites "Hazardous materials response and cleanup" as being permitted. They are, but this refers to emergency response, where control or response is necessary to abate an imminent or acute human health or environmental hazard, which is not the case for a non-time critical remedial action. While Exide historically may have conducted prior emergency removal and response actions, its current work is a non-time critical remedial action. DTSC cites no authority to the contrary. We understand DTSC itself idled its field staff and suspended field work for some time in response to the COVID-19 pandemic, but such persons presumably remained available for emergency release response work.

   b. DTSC can cite only two examples which allegedly somehow convert Exide's non-time critical remedial action into a "time critical response action." Both examples prove Exide's point and thus rebut DTSC's arguments to the contrary. The FEU has suffered delamination, but Exide prioritized replacement using the very limited funds available for site safety and security purposes. The replacement work to reinforce the FEU was completed last month. As for the allegations of NOVs, those have not been resolved. Exide disputes any NOV lawfully issued in respect of a delamination event. Finally, the delamination events did not lead to exceedances of SCAQMD standards in the air monitors around the Vernon facility.

   c. The second example DTSC cites to support its assertion that there is a need for imminent work is related to DTSC's IM Request. That assertion is fully rebutted in the prior section.

   d. In short, there is no condition of imminent and substantial endangerment at the Exide Vernon facility. Rather, Exide has managed the FM event to conserve safety, security and functionality, just as it advised the Bankruptcy Court it aimed to do.

   e. We previously have responded to DTSC's current positions that non-time critical remedial work is "Essential Infrastructure." It is not. DTSC strains to find some "hook," and "public health operations and solid waste collection" is not even remotely descriptive of the work Exide conducted prior to its declarations of force majeure. Nor is the 2002 CACO or the 2014 Stipulated Order "an order of law enforcement." The police did not issue either order. Again, DTSC strains but cannot "fit" the onsite work into a category of Essential Activity or Essential Infrastructure, nor any other permitted activity. Activities that are not permitted are prohibited under the LA County orders. This position was affirmed again with the most recent July 1, 2020 LA County Order (revised on July 4th).

   f. If DTSC has a written interpretation of various orders from the Los Angeles County

Counsel's office, kindly provide it. We will evaluate such written determination.

g. Regarding the pandemic itself, with a recent rebound and confusion and concern over how to manage business reopenings, Exide remains committed to its force majeure declaration (as amended). Exide is monitoring LA County information but, respectfully, does not believe it can prepare a "reopening plan" by July 13, 2020, given the evolving situation. If DTSC believes such a plan can be prepared, then we ask DTSC to send us examples of plans from other similar remedial action sites which DTSC has approved. Exide will review such DTSC-approved examples. If there are no such examples, then DTSC might deploy its expertise to guide the regulated community state-wide and develop a template for such plans for remedial action sites.

h. Exide notes that if the parties reach an impasse on the continuation of Exide's force majeure declarations, the 2014 Order provides for Exide to invoke dispute resolution.

In providing this initial response, Exide does not waive any rights, defenses, or entitlements. All rights and defenses are expressly reserved. This is an initial response which constitutes an effort to constrain legal entanglement, so that limited company resources can be deployed for site work (consistent with the force majeure declaration and the evolving Bankruptcy Court settlement process). Should submittals or a hearing before the Bankruptcy Court or any other venue be necessary, Exide reserves the right to supplement, modify or alter the initial responses set forth herein, which are in summary form for reasons of economy. Pragmatism compels this effort: if DTSC has particular, time-sensitive concerns, we can consider accommodation within the current context, which is a resource-constrained one. If DTSC wishes to pursue legal proceedings, then of course Exide will respond fulsomely and vigorously, but litigation is not our preferred option for resolving disputes between the parties.



**Thomas D. Goslin**
Weil, Gotshal & Manges LLP
2001 M Street NW, Suite 600
Washington, DC 20036
+1 202 682 7508 Direct
+1 202 857 0940 Fax