## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------- x

In re:

EXIDE HOLDINGS, INC., *et al.*,

Debtors.[1]

--------------------------------------------------------------- x

: Chapter 11

: Case No. 20-11157 (CSS)

: (Jointly Administered)

: Re: Docket Nos. 869 and 941

## NOTICE OF THE UNITED STATES IN SUPPORT OF APPROVAL OF THE PROPOSED CONSENT DECREE AND SETTLEMENT AGREEMENT REGARDING THE NON-PERFORMING PROPERTIES

The United States of America, on behalf of the Environmental Protection Agency ("EPA"), hereby files this Notice in support of the proposed Consent Decree and Settlement Agreement Regarding the Non-Performing Properties ("Agreement") incorporated into Debtors' proposed Third Amended Joint Chapter 11 Plan. The Agreement is between Debtors, the United States on behalf of EPA, ten State Environmental Agencies,[2] Westchester Fire Insurance Company ("Westchester"), the Environmental Response Trustee, the Vernon Environmental Response Trustee, the Consenting Creditors, the Transferred Entities, and the Europe/ROW

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Florida Department of Environmental Protection, Georgia Environmental Protection Division of the Department of Natural Resources, Illinois Environmental Protection Agency, the State of Indiana, on behalf of the Indiana Department of Environmental Management, Louisiana Department of Environmental Quality, Mississippi Department of Environmental Quality, Commonwealth of Pennsylvania Department of Environmental Protection, South Carolina Department of Health & Environmental Control, Tennessee Department of Environment and Conservation, and the Texas Commission on Environmental Quality.

Purchaser. The United States lodged the Agreement with the Court on September 22, 2020. *See* Dk. No. 869.[3] In support of the Agreement, the United States asserts as follows:[4]

## INTRODUCTION

1.        The Agreement establishes an Environmental Response Trust ("ERT") for sixteen so-called Non-Performing Properties (the "Included NPPs") in ten States that Exide Holdings, Inc. and four of its affiliates (collectively "Exide" or "Debtors") would otherwise seek to abandon through a contested abandonment process.[5] Funding for the ERT will come from approximately $24 million in surety bond or other financial assurance proceeds, a contribution at the direction of the Consenting Creditors in the amount of $7,412,477, and the value of the Included NPPs. The Agreement provides for an Environmental Response Trust (the "Vernon ERT") for a seventeenth site, the Vernon, CA NPP site, if the Vernon Conditions Precedent are met.

2.        A key purpose of the Agreement is to reduce the risk of a chaotic and harmful abandonment of the Included NPPs and the Vernon, CA NPP by these liquidating Debtors.[6] If the Agreement is not approved, the risk of abandonment of the Included NPPs and Vernon, CA NPP is significantly increased and cleanup funding may be reduced or delayed.

---

[3]  All capitalized terms used but otherwise not defined herein shall have the same meanings given to them in the Agreement or Debtors' *Third Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* (the "Plan"). Dk. No. 941.

[4]  The Court gave the United States permission to file this Notice on October 14 at a court conference held on October 9. Dk. No. 928.

[5]  The Included NPPs are listed in paragraph 16 below and Appendix A to the Agreement.

[6]  In prior pleadings, reference to the NPPs included twenty-three non-performing properties located in the United States and one property located in Canada. The Debtors obtained permission to market the NPPs for sale to third parties. *See* Dk. No. 586. Through the marketing process, the Debtors sold five of the NPPs. A settlement between the City of Frisco, the Debtors, and Aspen Insurance Company will govern the transfer of the Frisco site. The site located in Vernon, California is also not an Included NPP but could be transferred to the Vernon ERT as set forth in the Agreement and the Plan. The property located in Canada is not part of the Agreement and, for the avoidance of doubt, will not be transferred to the ERT as an Included NPP.

3.      The Agreement resolves disputes among the parties about whether the Included NPPs and the Vernon, CA NPP can be abandoned under *Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986), and the treatment of Debtors' liability to clean up the Included NPPs and the Vernon, CA NPP given Debtors' financial distress. The Agreement also resolves potential challenges to the pre-petition security interest of the Consenting Creditors and any causes of action against the Consenting Creditors, Transferred Entities, and Europe/ROW Purchaser relating to any allegations of fraudulent transfers, equitable subordination, and debt recharacterization.

4.      The Agreement provides a path for the orderly handling of the Included NPPs and the Vernon, CA NPP through environmental response trusts, avoids contested abandonment hearings, obtains important contributions toward cleanup given Debtors' limited ability to comply with cleanup requirements, and allows Debtors to move forward with consummation of their Plan.

5.      The Agreement requires two approvals. First, Debtors' entry into the Agreement which is incorporated into its proposed Plan needs to be approved under bankruptcy law. Second, the proposed Agreement needs approval under environmental law after a public comment process. *See* 42 U.S.C. § 6973. On September 25, 2020, the United States published notice of the proposed Agreement in the *Federal Register*, 85 Fed. Reg. 60491-92 (Sept. 25, 2020), and solicited public comments on the Agreement with a deadline for receipt of public comments of October 6, 2020. On October 13, 2020, the United States also held a public meeting through conference call to hear public reaction to the proposed Agreement. *See* 42 U.S.C. § 6973.

6.      For the reasons explained below, and after serious consideration of the public comments received and statements at the public meeting described below, the United States believes that the Agreement is a fair and reasonable compromise of the disputed contentions of the parties under environmental law and bankruptcy law based on the unique facts and circumstances of this case.

## BACKGROUND

7.      Exide began operations in 1888. *See* Declaration of Roy Messing in Support of Debtors' Chapter 11 Petitions and First Day Relief (Dk. No. 14. at ¶ 21). As it grew to be one of the world's largest producers and recyclers of lead-acid batteries, so did its environmental contamination and regulatory obligations. Exide produces batteries that power "cars, boats, heavy duty vehicles, golf carts, powersports, and lawn and garden applications." *Id*. at ¶ 21. Exide previously operated smelters at various locations across the country, including at various Included NPPs. Lead battery recycling requires spent lead-acid batteries to be broken apart and the lead separated from the plastic and acid. The inherent risks in this process include the crushing and break-down of used batteries, the storage of acids, lead, and other hazardous waste, and the eventual smelting of the lead removed from the used batteries. Each of these steps has the potential to create waste contaminated with lead and other pollutants. The Debtors have substantial environmental liabilities. *See* Declaration of Roy Messing in Support of Debtors' Chapter 11 Petitions and First Day Relief (Dk. No. 14 at ¶ 72).

8.      On May 19, 2020 (the "Petition Date"), the Debtors filed petitions for relief under Chapter 11 of the United States Bankruptcy Code. This is the third bankruptcy filed in this Court by Debtors. *See In re Exide Technologies*, Case No. 13-11482 (MWF) (Bankr. D. Del.), and *In re Exide Technologies,* Case No. 02-11125 (KJC) (Bankr. D. Del.).

9.      On the Petition Date, Debtors filed a *Motion for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, If Necessary. See* Dk. No. 37.  After substantial negotiations between the Debtors, EPA, and various State environmental agencies, including the California Department of Toxic Substances Control ("California DTSC") (collectively the "Governments"), the parties agreed to engage in voluntary, non-binding mediation relating to the NPPs. *See* Order Governing Settlement Procedures With Governmental Agencies Relating to Non-Performing Properties (the "Settlement Procedures Order") (Dk. No. 242).

10.     During the month of July, the parties, including California DTSC, engaged in multiple mediation sessions.  These sessions resulted in the mediators submitting a proposal to the participants that contained a term sheet outlining a near global resolution of the case (the "Mediators' Proposal").

11.     While the mediation efforts were ongoing, the Debtors sought and obtained authorization to sell all of their assets. *See* Dk. Nos. 63 and 344.  The Debtors filed a Notice of Europe/Row Stalking Horse Agreement ("Europe/ROW Bid") on June 18, 2020 (Dk. No. 324) designating a stalking horse bid submitted by an entity formed by the Ad Hoc Group.  The purchase price for the assets being sold through the Europe/ROW Bid will not generate any proceeds for the Debtors' estates.[7]

12.     The Debtors also filed a Notice of Qualified Bids and Designation of Baseline Bid with Respect to the Americas Assets (Dk. No. 589) designating the bid of Battery BidCo, LLC, (the "Americas Bid") as the baseline bid for the Americas Assets.  The Americas Bid did not include the purchase of any of the Included NPPs or the Vernon, CA NPP that are the subject of

---

[7]  As part of the Mediators' Proposal, Debtors and the Consenting Creditors agreed to seek approval of the Europe/ROW Bid as part of the confirmation of the Debtors' Plan.

the Agreement. After satisfying the ABL Credit Agreement and the DIP obligations, the Debtors represent that the cash proceeds of the Americas Bid are needed to pay the administrative and priority costs of the Bankruptcy Cases leaving little for other obligations or creditors.[8]

13.    Subject to the reservation of certain rights by the Governments and the Prepetition ABL Lenders, the Americas Sale was approved on August 6, 2020.  *See* Dk. No. 690.  The sale of the Americas Assets closed on August 25, 2020.

14.    On July 28, 2020, the Mediators filed their Final Certificate[9] confirming that all participants either accepted or, in the case of the Governments, would recommend acceptance of the Mediators' Proposal to officials with authority.[10]   *See* Dk. Nos. 622 and 636.  The parties then engaged in constructive and, at times, challenging negotiations to memorialize the Mediators' Proposal and obtain the necessary approvals from those with authority.  The resulting agreement was to have been lodged with the Court on September 15, 2020.

15.    On September 15, 2020, after all other parties had signed, the California DTSC informed the other parties that it was unable to obtain approval from those with authority for authorization to sign an Agreement implementing the Mediators' Proposal.  Following the notification from California DTSC, the Debtors, Consenting Creditors and remaining Governments worked to salvage the negotiations both leading up to and following the Mediators' Proposal.  The Agreement maintains all of the critical elements of the Mediators' Proposal and

---

[8]    The Americas Bid contained a base purchase price of $178,600,000.  *See* Americas Bid, Article III, Section 3.01, Dk. No. 589-1.  As of the petition date, the ABL Credit Agreement had an outstanding principal balance of $101,200,000.  *See* Dk. No. 14 at ¶ 39.  The Debtors' DIP obligations have an aggregate principal balance of $40,000,000.  *See* Dk. No. 350.  The Americas Stalking Horse Bidder was paid a Break-Up Fee of $5,100,000 and Expenses Reimbursement of $2,500,000.  *See* Dk. No. 500.

[9]    The Mediators filed a clarification to the Final Certificate on July 29, 2020.  *See* Dk. Nos. 622 and 636. Collectively, the Final Certificate and the clarification will be referred to as the "Final Certificate".

[10]   Consistent with the Settlement Procedures Order (Dk. No. 242 at 10-11, ¶ H), the Mediators' Proposal confirmed that the Governments only needed to make a recommendation of counsel to the necessary approving official or legislative body.

the following negotiations, including: (1) avoiding abandonment of the Included NPPs[11] through the establishment of an ERT; (2) maintaining the same allocation of the Environmental Global Settlement Payment from the Consenting Creditors to each of the Included NPPs; and (3) maintaining the agreement by Westchester to fulfill its obligation to pay the penal sum of the bonds posted as financial assurance for use at the Included NPPs. The Agreement also provides for the possibility of the establishment of a separate environmental response trust for the Vernon, California NPP site if the Vernon Conditions Precedent are met and for significant value for cleanup even if they are not met.

16.    As noted above, the Agreement was lodged with the Court on September 22, 2020. The public comment period on the Agreement ran from September 25, 2020 through October 6, 2020. A public meeting on the Agreement was held on October 13, 2020 by conference call.

## THE PROPOSED SETTLEMENT AGREEMENT

17.    The Agreement provides that the ERT will receive the Environmental Response Trust Assets, which consist of the following: (1) approximately $24 million from existing surety bonds and other financial assurances; (2) a contribution at the direction of the Consenting Creditors in the amount of $7,412,477 in return for a covenant not to sue; and (3) the Included NPPs, free and clear of any liens, and any remaining equipment or other personal property.

18.    The sixteen Included NPPs being placed in the ERT are: (a) the Tampa Designated Site in Tampa, Florida; (b) the Columbus Designated Site in Columbus, Georgia; (c) the Kankakee Designated Site in Kankakee, Illinois; (d) the Logansport Designated Site in Logansport, Indiana; (e) the Frankfort Designated Site in Frankfort, Indiana; (f) the Baton Rouge

---

[11] The Plan and Agreement use different terminology in referring to the NPPs to be placed into the ERT. The Agreement refers to them as Included NPPs. The Plan refers to them as Transferred Non-Performing Properties.

Designated Site in Baton Rouge, Louisiana; (g) the Heflin Designated Site in Heflin, Louisiana; (h) the Florence Former Battery Plant Designated Site in Florence, Mississippi; (i) the Florence Former Smelter and Vacant Land Designated Site; (j) the Hamburg Designated Site in Hamburg, Pennsylvania; (k) the Oley Designated Site in Oley, Pennsylvania; (l) the Reading Battery and Residential Designated Site in Reading, Pennsylvania; (m) the Greer Smelter and Residential Designated Site in Greer, South Carolina; (n) the Memphis Smelter and Memphis Residential Designated Site in Memphis, Tennessee; (o) the Bristol Designated Site in Bristol, Tennessee; and (p) the Dallas Designated Site in Dallas, Texas.

19.     The ERT will administer and manage the Included NPPs and conduct, manage, and fund cleanup of the Included NPPs with the ultimate goal of putting these NPPs back into productive use. *See* Agreement ¶ 13. The signatory Governments and Westchester are the beneficiaries of the ERT. Westchester alleges that it has certain subrogation and indemnification rights against the Debtors. To avoid litigation over the extent of Westchester's rights and defenses, and to secure uncontested payment of the full penal sum of the surety bonds, the Governments and Westchester agreed that the establishment of the ERT was mutually beneficial and the best way to promote public health and safety given the situation. The penal sum of each of the surety bonds is set forth in Appendix H to the Agreement.

20.     The Agreement allocates the $7,412,477 contribution to be made at the direction of the Consenting Creditors among the Included NPPs by taking into account estimates of total cleanup costs, litigation risks regarding the *Midlantic* standard for abandonment, the availability of financial assurance, and the estimated value of each Included NPP.

21.     As cleanups move toward conclusion, if the Lead and Non-Lead Agencies for an Included NPP determine that it has excess funding (including if the sale of the Included NPP

results in net proceeds), such excess funding will be reallocated to cover certain unreimbursed Lead Agency costs, costs at other Included NPPs, and/or reimbursement of Westchester as provided in paragraph 30 of the Agreement. *See* Agreement ¶ 30.

22.    The proposed Environmental Response Trustee for the ERT is Exide Environmental Response Corporation established by Roberto Puga of PathForward Consulting, Inc., who has served as trustee for other environmental response trusts.

23.    The Agreement contains covenants not to sue under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, and similar state laws. *See* Agreement ¶¶ 45(a), 45(b)(ii). The Agreement provides a covenant not to sue to the Consenting Creditors, Transferred Entities, Europe/ROW Purchaser, and Trustees relating to the Debtors', the Debtors' estates, or a list of particular financial transactions prior to the bankruptcy. *See* Agreement ¶¶ 45(b)(i).

24.    The Agreement also provides for the possibility of the establishment of a separate environmental response trust for the site in Vernon, CA NPP if the Vernon Conditions Precedent are met. *See* Agreement ¶¶ 56-90. The Vernon Conditions precedent are: (1) that the Court has approved the Plan's release of California DTSC claims against certain non-debtors who are making contributions in support of the Plan and Agreement, and (2) that California has provided customary covenants to the Vernon Environmental Response Trustee. *See* Agreement ¶ 56. EPA will be the initial Lead Agency for the Vernon ERT but California DTSC will be able to become the Lead Agency if it wishes. *See* Agreement ¶ 62. The Vernon ERT would have the following assets: (1) $2,587,523 directed to the trust by the Consenting Creditors, (2) the value of the property free and clear of liens, and (3) potentially approximately $15 million in financial

assurance funds in the existing RCRA standby trust for the Vernon, CA NPP, plus an additional approximately $11 million to be paid by Westchester into that standby trust, for which California DTSC is the beneficiary. *See* Agreement ¶¶ 58-59; Vernon Trust Agreement § 2. 2.2. The United States on behalf of EPA agrees that the California DTSC release is appropriate under the unique circumstances of this case including the mediation and the Mediators' Proposal, the contributions toward cleanup, the litigation risks, and the preference for the resulting stability of an ERT over chaotic abandonment. *See* Agreement ¶ 96. If the Court determines that the release is not appropriate, the Consenting Creditors will not direct the $2,587,523 payment to be made and the Vernon, CA NPP would have to be abandoned rather than placed into an ERT. However, even under this circumstance, the California DTSC will still have the benefit of the approximately $26.5 million in financial assurance as well as a lien on the value of the Vernon property -- which will be significant when cleaned-up. *See* Agreement ¶ 96.

## STANDARD OF REVIEW

25.     The Third Circuit has "explicitly recognized with approval" the "strong presumption in favor of voluntary settlement agreements." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010) (citing *Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 79-80 (3d Cir. 1982)). "Settlement agreements are to be encouraged because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts." *Id.* at 595 (citing *D.R. by M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997)). *See also McDermott, Inc. v. AmClyde*, 511 U.S. 202, 213–15 (1994) ("Public policy wisely encourages settlements."). "In addition to the conservation of judicial resources, the parties may also gain significantly from avoiding the costs and risks of a lengthy and complex trial." *Ehrheart*, 609 F.3d at 595.

26.     A court "should approve a proposed consent decree if it is fair, reasonable, and consistent with [the statute]'s goals." *United States v. Southeast Pa. Transp. Auth. ("SEPTA")*, 235 F.3d 817, 823 (3d Cir. 2000). *See also In re: Tutu Water Wells CERCLA Litig. ("Tutu")*, 326 F.3d 201 (3d Cir. 2003). This standard is applied in consideration of the "law's policy of encouraging settlement," and the deference that courts owe to the administrative agency's expertise. *SEPTA*, 235 F.3d at 822.  In reviewing a consent decree the court does not inquire "whether the settlement is one which the court itself might have fashioned, or considers as ideal . . . ." *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1036 (D. Mass. 1989) (citations omitted), *aff'd*, 899 F.2d 79, 84 (1st Cir. 1990), or seek to determine whether the proposed settlement provides for "every benefit that might someday be obtained in contested litigation." *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 850 (5th Cir. 1975).  Rather, the Court should approve the settlement if it determines that the settlement is fair and reasonable, and resolves the controversy in a manner consistent with the public interest. *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983).

27.     The presumption in favor of settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991). Where the United States is a party to a consent decree, the balance of competing interests affected by a proposed settlement "must be left, in the first instance, to the discretion of the Attorney General." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981). *See also United States v. Assoc. Milk Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976) (The Attorney General retains "considerable

discretion in controlling government litigation and in determining what is in the public interest.").[12]

## Public Comments

28.    After execution, the Agreement was lodged with this Court (Dk. No. 869), and, in accordance with Paragraphs 93-94 of the Agreement, notice of the Agreement was published in the *Federal Register* on September 25, 2020.  *See* 85 Fed. Reg. 60491-92 (Sept. 25, 2020). The Agreement and notice required that public comments be received by the Department of Justice by October 6, 2020 to be considered.

29.    Through the October 6, 2020 deadline the United States received approximately 1000 comments concerning the Agreement.[13] In addition to comments from many private citizens, the United States received written comments from California DTSC; the South Coast Air Quality Management District ("SC AQMD");[14] 22 members of Congress; seven members of the California Legislature; Kevin De Leon, President Pro Tempore Emeritus; Ms. Hilda L. Solis, Supervisor and Chair Pro Tem of the First District of Los Angeles County Board of Supervisors; mayors, officials, or attorneys from the Cities of Vernon, Bell, Huntington Park, Commerce, and

---

[12] The United States enters into the Agreement here under the Attorney General's inherent authority to compromise cases involving the United States or its agencies. *See Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928); s*ee, e.g., United States v. Hercules, Inc.,* 961 F.2d 796, 798 (8th Cir. 1992); *Tosco Corp. v. Hodel*, 804 F.2d 590, 591 (10th Cir. 1986); *Applegate v. United States*, 52 Fed. Cl. 751, 757-58 (Fed. Cl. 2002); *United States v. Asarco, Inc.*, 814 F. Supp. 951, 957 (D. Colo. 1993); *Halbach v. Markham*, 106 F. Supp. 475, 479-80 (D.N.J. 1952), *aff'd*, 207 F.2d 503 (3d Cir. 1953). "Courts have upheld the United States entry into numerous environmental bankruptcy settlements under the Attorney General's inherent authority that have obtained important benefits for the public. . . ." *In re ASARCO LLC*, 2009 WL 8176641 (Bankr. S.D. Tex. June 5, 2009) (citing *In re Cuyahoga Equip. Corp.*, 980 F.2d at 112–13, 119–20; *In re Eagle–Picher Indus., Inc.*, 197 B.R. 260 (Bankr. S.D. Ohio 1996), *aff'd*, 1997 U.S. Dist. LEXIS 15436 at *46 (July 14, 1997 S.D. Ohio); *In re Energy Coop., Inc.*, 173 B.R. 363, 372 (N.D. Ill.1994).

[13] To the best of our knowledge, less than ten additional comments have been received after the deadline. These comments did not raise additional or unique issues.

[14] SC AQMD does specifically comment that DOJ should have notified it earlier of the settlement negotiations regarding the Included NPPs and the Vernon, CA NPP. However, State of California agencies are represented in the bankruptcy by the California Attorney General's Office and/or private counsel, not DOJ. California DTSC was a party to the mediation. California attorneys and/or California DTSC could have notified SC AQMD at any time during those three months that settlement negotiations were underway.

Bell Gardens; the County of Los Angeles Department of Public Health; the UCLA

Environmental Law Clinic; Climate Resolve; the California Environmental Justice Alliance;

Azul; California Communities Against Toxics; California State University Northridge –

Department of Environmental and Occupational Health; Church of the Resurrection; From Lot to

Spot; Los Angeles Neighborhood Land Trust; Youth Organize California; Western Center on

Law & Poverty; Communities for a Better Environment; Environmental Defense Fund; Promesa

Boyle Heights; East Yard Communities for Environmental Justice; Amalgamated Transit Union,

Local 1277; and the Natural Resources Defense Council. These additional comments were

consistent with those received from private citizens. Copies of the comments are attached in

Appendix A.[15]

30.    Many commenters requested a public meeting regarding the provisions of the

Agreement related to the Vernon, CA NPP, as provided for in RCRA § 7003(d), 42 U.S.C. §

6973(d). The meeting was held by conference call on October 13, 2020 because State and local

public health authorities have forbidden large gatherings in California generally and Los Angeles

County specifically due to the COVID-19 pandemic.[16] As many as 659 individuals called in,

and approximately 125 provided statements of their views on the Agreement. The public

meeting gave the United States the opportunity to hear firsthand the community's views or

concerns about the Agreement.

---

[15] Approximately 610 form comments were received from various members of the community containing the exact same content. An example of the form comment can be found at EXI_PUBCOM0000070 located in Appendix A. Each form comment is not being reproduced for the Court. E-mail addresses, phone numbers, and home addresses have been redacted in Appendix A.

[16] *See* CA Dept. of Public Health updates of March 16, 2020 and Sept. 12, 2020 (available at https://www.cdph.ca.gov/Programs/CID/DCDC/ Pages/COVID-19/Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings.aspx); *see also* Los Angeles County Dept. of Public Health update of Sept. 13, 2020 (available at http://www.ph.lacounty.gov/media/Coronavirus/docs/HOO/FAQ-SaferatWorkandCommunityOrder.pdf). Gatherings, defined as "meetings or other events that bring together people from different households at the same time in a single space, or place" are prohibited except for certain specific authorizations, none of which apply here.

31.     The commenters and statements at the public meeting were universally and strenuously and sometimes emotionally opposed to approval of the Agreement. Generally speaking, the commenters urged that: (1) the Vernon, CA NPP should not be abandoned; (2) Debtors or related non-debtors should be held accountable and provide additional funding for cleanup including as a matter of environmental justice; (3) those responsible for lead contamination or injury to the community should be subject to criminal sanction; and (4) the public comment period should be extended. Responses to the comments are provided below. *See* ¶¶ 39-52 *infra*.

### The Proposed Agreement is a Fair and Reasonable Compromise of the Disputed Contentions of the Parties under Environmental Law and Bankruptcy Law Based on the Unique Facts and Circumstances of this Case

#### A. The Proposed Agreement is Procedurally and Substantively Fair

32.     The proposed Agreement is procedurally and substantively fair. *Tutu*, 326 F.3d at 207. The parties agreed to engage in voluntary, non-binding mediation early in this case. After nearly a month of mediation sessions, five distinguished mediators, including four former federal judges, submitted the Mediators' Proposal for the parties' consideration. The Mediators' Proposal bridged the gap between the positions of the parties and provided a framework for the Agreement. The Mediators' Proposal was the result of multiple mediation sessions in which all parties had an opportunity to present their positions. The parties engaged in arm's length negotiations in the two months following the submission of the Mediators' Proposal to finalize the Agreement. These negotiations were conducted by experienced and sophisticated counsel and technical staff. The negotiations bore the hallmarks of procedural fairness, including evaluations of the merits of various legal arguments and back-and-forth negotiations on language and material terms of the Agreement.

33.     The Agreement reflects a substantively fair resolution of the competing positions of the parties and full and fair evaluation of litigation risks given Debtors' bankruptcy and precarious financial condition.   The Agreement avoids the outright abandonment of the Included NPPs and potentially the Vernon, CA NPP upon Debtors' inevitable liquidation as well as litigation over abandonment, the Plan, and any litigation with the Consenting Creditors and related parties.   The establishment of the ERT and potentially the Vernon ERT through the Agreement fairly presents the opportunity for a stable outcome superior to the chaos of abandonment.   The Agreement obtains important contributions toward the cost of cleanup that takes into account Debtors' financial circumstances and the litigation risks.   These contributions include the cash payments, bond proceeds payments, and significant value of properties (when cleaned up) through transfers free and clear as described above.[17]   The covenant not to sue certain non-debtors is fair under the unique circumstances of this case including the mediation and the Mediators' Proposal, the contributions toward cleanup, the litigation risks, and the preference for the resulting stability of an ERT over chaotic abandonment.   In the absence of this Agreement, the parties risk prolonged and resource intensive litigation over the Debtors' right to abandon the Included NPPs and the Vernon, CA NPP and the other issues.

34.     The Agreement's allocation of the payments to be made at the direction of the Consenting Creditors is also substantively fair.  *See* Agreement ¶¶ 6, 23, 58.  The determination of these allocated amounts began with the estimated costs of future cleanup and then took into account for each of the Included NPPs and the Vernon, CA NPP: (1) the availability of financial assurance, (2) the value of the property that may be used to support cleanup, and (3) the degree

---

[17] In the event that the Court does not approve the non-consensual release of certain non-Debtors from liability to California DTSC, the Westchester bond payment would be made to the already existing Vernon Standby Trust and California DTSC would be granted a lien to capture the free and clear value of the Vernon, CA NPP.

of litigation risk for such NPP as to whether various tasks underlying the estimated cleanup would meet the test under *Midlantic* as required to be dealt with prior to abandonment. These factors were appropriate and fair because they reflect the respective needs for cleanup funding and the litigation risks in the case. California DTSC has contended, *see* Objection at ¶ 61 (Dk. No. 917), that the allocation is not proportional to total cleanup estimates. Even if that were true, the Agreement's approach based on consideration of the above factors, is more substantively fair than a rigid calculation based solely on asserted cleanup cost estimates.

### B.  The Proposed Settlement Agreement is Reasonable

35.     The Agreement is reasonable because it avoids a chaotic abandonment of the Included NPPs and promotes environmental compliance given the limited resources available and avoids potential conversion to Chapter 7. *See Cannons Eng'g Corp.*, 899 F.2d at 89-90. The Agreement marshals available assets in the ERT and potentially the Vernon ERT without threatening the sale of Debtors' assets or confirmation of the Plan and is a reasonable bankruptcy settlement based on Debtors' limited ability to pay for cleanups of the NPPs.

36.     The Agreement is also reasonable because it accounts for the parties' litigation positions and risks. *Cannons Eng'g Corp.*, 899 F.2d at 90. The United States believes it has a strong argument that the Included NPPs cannot be abandoned without the Debtors taking steps to protect public health or safety as required by *Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986) and *Pennsylvania Department of Environmental Resources v. Conroy,* 24 F.3d 568, 569 (3d Cir. 1994).  *See Midlantic*, 474 U.S. at 506-07 (a bankruptcy court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety.).  However, in litigation Debtors will note that the Governments are the beneficiaries of substantial financial assurance for many of the Included

NPPs and contend that these proceeds are sufficient to meet the requirements of *Midlantic*. Debtors may strongly disagree as to the kinds of cleanup required. Exactly what cleanup the Court would require prior to abandonment is in substantial doubt. Fact intensive and resource consuming litigation would otherwise ensue without approval of this Agreement and the public would face a risk of chaotic abandonment when Debtors run out of funding.

37.     Likewise, with respect to the Vernon, CA NPP, the Agreement reasonably preserves the possibility of a beneficial Vernon ERT, while allowing California DTSC to make its best arguments to the Court as to why it may think the Agreement does not reflect the litigation risks presented. It should be noted that California DTSC is the beneficiary of approximately $26.5 million in financial assurance that can be used to protect public health and safety. *Debtors' Memorandum of Law in Support of Abandonment of the Vernon Non-Performing Property Pursuant to the Amended Plan* at ¶7 (Dk. No. 949). Even in the event that the Vernon ERT is not established, California DTSC will receive substantial value as a result of the Agreement.

> C.  *The Proposed Agreement is a Fair and Reasonable Compromise of the Disputed Contentions of the Parties Under Environmental Law and Bankruptcy Law Based On The Unique Facts and Circumstances of This Case*

38.     The proposed Agreement is fair, reasonable and consistent with the objectives of the environmental statues at issue (RCRA and CERCLA) because it provides the stability of continued and on-going compliance at the Included NPPs and potentially the Vernon, CA NPP, obtains important additional contributions toward cleanup, and prevents the chaotic abandonment of these properties. The ERT has the opportunity to further market the Included NPPs for sale to a buyer that may assume certain environmental liability going forward, as does the potential Vernon ERT with respect to the Vernon, CA NPP. The Agreement takes into

account the limited funding available in this bankruptcy case and litigation risks involved and thus appropriately harmonizes environmental and bankruptcy law under the unique circumstances of this case.

### Responses to Public Comments

*Comment: The Vernon site should not be abandoned.*

39.　　Many commenters urged the United States to object to and/or prevent abandonment of the Vernon CA, NPP. Most of these commenters added that abandonment would "orphan" the site, leaving it with no functional entity responsible for cleanup.

40.　　The United States agrees with the concerns expressed about the potential abandonment of any of the Included NPPs, and the Vernon, CA NPP. These concerns, which are shared by the United States, are actually noted in the Agreement. *See* Agreement ¶ I ("The Environmental Agencies contend that the Debtors are obligated to comply with the Environmental Laws and that under applicable law the Debtors should not be permitted to abandon the Non-Performing Properties."); *see* also ¶ 96 (Agreement's provisions relating to the Vernon, CA NPP are justified "in order to avoid abandonment of the Vernon, CA NPP.") Contrary to the commenters' suggestions, the proposed Agreement actually seeks to avoid abandonment if at all possible and provides a pathway for achieving that result. The Agreement thus provides a preferred alternative to abandonment, through the creation and funding of the Vernon ERT. If the Vernon Conditions Precedent are met, then the Vernon ERT will be a responsible owner charged with cleaning up the site, funded with approximately $2.5 million initially and with potential access to a total of approximately $26.5 million in financial assurance and the value of the Vernon, CA NPP itself to fund cleanup efforts.

41.    To be sure, the United States does not have within its sole control whether the Included NPPs or Vernon, CA NPP are abandoned or placed into ERTs. The United States does not own these properties. Debtors and other parties in interest in this case have threatened to seek their abandonment in the absence of a settlement. That is why the matter was sent to mediation and an Agreement was designed to maximize the chances of avoiding abandonment. Compromise is the essence of settlement. By agreeing that, under very limited and hopefully unlikely circumstances, the Vernon, CA NPP might have to be abandoned, the United States maximized the likelihood that the Included NPPs and Vernon, CA NPP would end up not being abandoned. *See* Agreement ¶ 96. It should be noted that the limited circumstances in which the Vernon, CA NPP would be abandoned under the Agreement (*i.e.*, if the Vernon Conditions Precedent are not met) are very much within the control of California DTSC. Whether the Vernon, CA NPP ends up being abandoned will thus ultimately be determined by California DTSC and the Court. The United States supports the creation of the ERTs, and abandonment is only a bad alternative of last resort.

42.    Moreover, many of the commenters expressing this valid concern do not account for the fact that Debtors are in the process of running out of all funding and liquidating. It is just a matter of time before the companies no longer exists and/or is dissolved. When this time arrives, for all practical purposes the properties will have been abandoned as they will not have a viable owner with funding to protect public health and safety. The Agreement thus seeks to salvage a bad situation and avoid the chaos of abandonment by providing for the possibility of ERTs to own the Included NPPs and Vernon, CA NPP. The ERTs will be able to administer the properties and continue operation of treatment systems and cleanup efforts that will mitigate risks to the public. A dissolved Debtor would not be able to undertake these tasks. The

commenters may want to urge California DTSC to cooperate with this approach either in lieu of its objection to the Agreement or if its objection is overruled.

43.     Finally, it should be emphasized that the United States' very limited non-opposition to abandonment is triggered only where the Vernon Conditions Precedent are not met. Even in the unlikely event that this were to happen, the provision of the Agreement that provides the value of the Vernon, CA NPP to California DTSC in the form of a first-position lien could be a significant aid to cleanup. In the absence of the Agreement, this value would be subject to the liens of other creditors. Thus, even under this less desirable outcome, the Agreement will make this result more palatable.

44.     In sum, the overall settlement embodied in the Agreement is a reasonable resolution of the litigation risks involved in litigating the Debtors' proposed abandonment under the *Midlantic* standard. *See supra* ¶ 35. To be clear, the United States does not agree with Debtors' legal analysis of the standard for abandonment set forth at Dk. No. 949. However, based on the unique circumstances of the case, including a seemingly successful mediation that risked failure at the last minute and over $26.5 million in available financial assurance and the value of the property to address threats to public health and safety, the United States will not oppose the abandonment of the Vernon, CA NPP if the Vernon Conditions Precedent are not met, provided that the abandonment order contains 1) appropriate access provisions for the performance of Vernon Environmental Actions at the Vernon, CA NPP, and 2) a first-position lien in favor of California DTSC on the Vernon, CA NPP. Moreover, the Debtors contend that, whatever their liability under that standard might ultimately be (and they assert they have none), they have no available funds to satisfy it and are in the process of liquidation. The Agreement is a reasonable compromise that maximizes the chances to avoid abandonment and provides for the

opportunity of a safe landing spot through the ERTs. The concerns expressed in opposition to abandonment thus militate in favor of approval of the Agreement.

*Comment: Debtors or related non-debtors should be held accountable for their actions and provide additional funding as a matter of environmental justice*

45.    Many commenters urge that Debtors should be held accountable for their contribution to pollution at the Vernon, CA NPP and in surrounding predominantly low-income and multiracial communities. Many of these comments view this as the flip side of allowing the abandonment of the Vernon, CA NPP. As noted earlier, that description ignores that the Agreement provides a preferred alternative to abandonment via the creation and funding of the Vernon ERT. If the necessary and achievable conditions are satisfied, the Vernon, CA NPP will be transferred to a responsible environmental trust with significant funding to continue operation of treatment systems and cleanup efforts that will mitigate risks to the public. While funding may not be sufficient to perform a full cleanup, Debtors are being held accountable taking into account their perilous financial situation and the litigation risks under bankruptcy law.

46.    Comments urging that Debtors be held accountable also often urge that Debtors either be required to retain the Vernon, CA NPP or provide additional funding to clean it up. However, the practical reality is that Debtors have filed a plan of liquidation, not reorganization, so there is no way to force them to retain the site as they are going out of existence.[18] Moreover, they do not have the financial wherewithal to fully clean up these sites. Thus, these comments urge an outcome that, while optimal, is simply not attainable. In contrast, the Agreement secures

---

[18] Some statements or comments suggested that Debtors should not be permitted to file for bankruptcy due to harm caused to the community. However, Article I, Section 8, Clause 4 of the Constitution and Title 11 of the United States Code permit bankruptcy filings. Other statements or comments expressed concern that other polluters would try to use bankruptcy and the Agreement to evade their environmental obligations. The facts and circumstances in this case are quite unique and are unlikely to re-occur in other distinguishable cases.

funding for the site from non-Debtors, access to financial assurance totaling more than $26 million, and the unimpaired value of the property that can help pay for cleanup.

47.     In addition, these comments fail to take into account the litigation risks involved as to whether (and to what extent) the Bankruptcy Court will find that *Midlantic* requires additional cleanup beyond that which can be accomplished through the significant financial assurance that would be available. They also do not take into account the litigation risks under bankruptcy law when a company is in as precarious a financial condition as are these Debtors.

48.     Some commenters also specifically urge that Debtors should be required to pay funds for offsite cleanup of the residential areas around the Vernon, CA NPP, which, according to these commenters, has already cost the State of California more than $176 million and will likely cost hundreds of millions more. These comments are already addressed to some extent in the Agreement because it specifically reserves the Governments' general unsecured claims under Environmental Law for offsite liability. *See* CD ¶¶ 45(a)(ii); 48(a). While general unsecured claims in this case may have very limited value, that is a function of the Debtors' financial condition and bankruptcy law. The Bankruptcy Code requires the payment of claims based on a priority payment scheme under which secured claims and certain defined priority claims are paid ahead of general unsecured claims. *See* 11 U.S.C. §507. In this case, monetary claims for off-site costs are general unsecured claims and receive distributions consistent with 11 U.S.C. §507. These provisions of law are binding and could only be changed by new legislation. These comments therefore are not a basis for losing the beneficial aspects of the Agreement.

49.     Many comments and statements raised environmental justice concerns focusing on the adverse impact that lead contamination from the Vernon, CA NPP has had on the surrounding predominantly low-income and multiracial communities. Many told heart-breaking

stories of illnesses and deaths caused by lead contamination they attributed to Debtors' operations. Everyone involved empathizes with these wrenching circumstances. The Agreement though does not purport to deal with personal injury issues or affect anyone's rights in this regard. The Agreement seeks to avoid further adverse environmental impacts on the communities surrounding the Vernon, CA NPP by creating the Vernon ERT which can use potentially approximately $29 million for additional on-site remediation and the prevention of future discharges of hazardous substances into the communities surrounding the Vernon, CA NPP. The creation of the Vernon ERT would allow for the continuation of monitoring systems meant to protect neighboring communities going forward and avoid the potentially chaotic transition that may occur if the Vernon, CA NPP is abandoned.

50.     It should be noted that the proposed Trustee for the Vernon ERT, if established, is a corporation created by Roberto Puga, President of PathForward Consulting, Inc. Mr. Puga has significant experience serving as a trustee for other environmental response trusts, including one in El Paso, Texas near neighboring communities with significant environmental justice concerns. Mr. Puga is a native of the Boyle Heights neighborhood in Los Angeles.

51.     Other commenters state that non-debtors related to Debtors such as shareholders or noteholders should provide additional funding for cleanup. Unfortunately, there would be significant litigation risk in trying to hold shareholders and secured creditors liable. Debtors' Confirmation Brief sets forth some of the significant argument that would be asserted and would have to be overcome. *See, e.g.,* Dk. No. 917 at 44-47, 51-58, 109-13. The Unsecured Creditors' Committee, which shared an interest in some of the same issues, conducted an intensive investigation and determined that the litigation risks justified settlement. *See* Dk. No. 960. Even California's confirmation objection makes little headway in establishing such a case. *See* Dk.

No. 917.  In sum, the value obtained through the Agreement is a reasonable resolution of the litigation risks presented.

*Comment: Debtors Should be Subject to Criminal Sanction*

52.    Some commenters also specifically urge that Debtors be held accountable under criminal law for alleged violations of criminal law and the March 11, 2015 Non-Prosecution Agreement between the United States Attorney's Office for the Central District of California and Exide Technologies (the "Non-Prosecution Agreement").  The Consent Decree and Settlement Agreement resolves only civil liability, and specifically reserves criminal liability.  *See* CD ¶ 48(a)(ii) and 49(b)(ii).  The Non-Prosecution Agreement required Exide Technologies to comply with a 2002 Corrective Action Consent Order and 2013 and 2014 Stipulations and Orders with California DTSC.  Debtors' attorneys represent that the Debtors have spent approximately $166,000,000 necessary to decontaminate and deconstruct the site since the Non-Prosecution Agreement mandated that the facility be closed.  Debtors and California DTSC were involved in litigation in Debtors' prior bankruptcy case relating to compliance with the 2014 Stipulation and Order.  *See In re Exide Technologies, LLC*, No. 13-11482 (MWF) (Bankr. D. Del.)(Dk. No. 5207).  On August 26, 2019, the Bankruptcy Court stayed any deadlines under the Stipulation and Order.  *See* Dk. No. 5213.  The United States Attorney's Office had been awaiting the Bankruptcy Court's resolution of the hotly contested contentions of the parties in that litigation to help determine whether or not Debtors have been in full compliance with the Non-Prosecution Agreement or whether it has been breached.  The Agreement does not in any way compromise any rights or obligations under criminal law.

*Comment:  The public comment period should be extended*

53.    Many commenters urged the United States to extend the public comment period, which ran from September 25 to October 6, 2020.  While the United States would have liked to have had a longer public comment period, the confirmation hearing is scheduled for October 15, 2020, and the Court indicated at a conference on October 9, 2020 that it will not postpone it.  In addition, Debtors contend that they are running out of funding.  An expedited public comment period therefore was necessary.  Had the comment period been extended by sixty days as requested by many commenters, the Court might have ruled on the Plan or permitted abandonment without the benefit of receiving comments.  In any event, the United States has considered a handful of comments received after October 6 (which did not raise unique issues) as well as the statements made at the public meeting on October 13.

## CONCLUSION

For all the above reasons, the United States respectfully requests that the Court approve the Agreement as fair and reasonable under environmental law.

Dated: October 14, 2020                             Respectfully submitted,

FOR UNITED STATES ON BEHALF OF
U.S. ENVIRONMENTAL PROTECTION
AGENCY:

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Email: alan.tenenbaum@usdoj.gov
Telephone: (202) 514-5409

ERIC D. ALBERT
Senior Attorney
Email: eric.albert@usdoj.gov
Telephone: (202) 514-2800

By: /s/Matthew C. Indrisano
MATTHEW C. INDRISANO
Trial Attorney
Email: matthew.indrisano@usdoj.gov
Telephone: (202) 514-1398
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044

JAMES D. FREEMAN
Senior Attorney
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1489
Email: James.Freeman2@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 14, 2020, I electronically filed the foregoing

*Notice In Support Of The Proposed Consent Decree And Settlement Agreement Regarding The*

*Non-Performing Properties* with the Clerk of the Court by using the CM/ECF system, which will

send a notice of electronic filing to all CM/ECF participants.

/s/Matthew C. Indrisano
Matthew C. Indrisano
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice