## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x

                   :

**In re**                    :       **Chapter 11**

                   :

**EXIDE HOLDINGS, INC.,** *et al.*,   :       **Case No. 20–11157 (CSS)**

                   :

          **Debtors.**[1]    :       **(Jointly Administered)**

                   :

                   :       **Re: Docket No. 977**

---------------------------------------------------------- x

## ORDER CONFIRMING FOURTH AMENDED JOINT CHAPTER 11 PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

Upon the filing by Exide Holdings, Inc. and its affiliated debtors (collectively, the "**Debtors**") in the above captioned chapter 11 cases ("**Chapter 11 Cases**"), as "proponents of the plan" within the meaning of section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), of the *Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors*, dated October 14, 2020 (Docket No. 977) (as amended, modified, or supplemented in accordance with its terms, the "**Plan**"), which is attached hereto as **Exhibit A**;[2] and the Court having approved the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors*, dated August 14, 2020 (Docket No. 743) (the "**Disclosure Statement**") on a conditional basis and the solicitation procedures related to the Plan, and the Debtors having complied with the solicitation and notice requirements of the *Order (I) Conditionally Approving the Disclosure Statement, (II)*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311).  The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]    Capitalized terms used in this order (the "**Order**") but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (as defined below) or as the context otherwise requires.

*Establishing Solicitation, Voting, and Tabulation Procedures, (III) Scheduling a Combined Hearing, (IV) Establishing Notice and Objection Procedures for Final Approval of Disclosure Statement and Confirmation of Plan, and (V) Granting Related Relief* (Docket No. 745) (the "**Disclosure Statement Order**"), *see Affidavit/Declaration of Mailing of Craig Johnson Regarding Solicitation Materials of Service* (Docket No. 793); and the Court having considered the record in these Chapter 11 Cases, the compromises and settlements and transactions embodied in and contemplated by the Plan, the briefs and arguments regarding confirmation of the Plan, the evidence in support of the Plan adduced at the Confirmation Hearing (defined below), and a hearing on confirmation of the Plan having been held on October 15, 2020 and October 16, 2020 (the "**Confirmation Hearing**"); and the Court having issued a bench ruling at the conclusion of the Confirmation Hearing; and after due deliberation; for the reasons stated by the Court at the Confirmation Hearing,

## IT IS HEREBY FOUND AND DETERMINED THAT:

A.     **Jurisdiction and Venue.**  This Court has jurisdiction over the Chapter 11 Cases, the sale of Acquired Assets owned by the Debtors (the "**Europe/ROW Assets**"), and the Assumed Liabilities of the Debtors, in accordance with the Europe/ROW Purchase Agreement (the "**Europe/ROW Sale Transaction**"), as well as over the transfer of Environmental Trust Assets, the Vernon Environmental Trust Assets, the GUC Trust Assets and the Frisco Assets, pursuant to 28 U.S.C. §§ 157 and 1334.

B.     **Core Proceedings.** This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

C.     **Burden of Proof.** The Plan satisfies the requirements for confirmation of section 1129 of the Bankruptcy Code by a preponderance of evidence.

D.      **Adequacy of Disclosure Statement.**    The Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code and is approved on a final basis.

E.      **Solicitation.** The Plan was solicited in good faith and in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Order.  The Debtors participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Order, in the solicitation, offer, issuance, sale, and/or purchase of the assets and securities offered under the Plan, and therefore are entitled to the protections of section 1125(e) of the Bankruptcy Code.

F.      **Good Faith.** The Plan has been proposed in good faith and not by any means forbidden by law.  In so finding, the Court has considered the totality of the circumstances of the Chapter 11 Cases.  The Plan is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies.

G.      **The Trustees**.  Based upon a review of the record, each of the Superpriority Notes Trustee and the Exchange Priority and First Lien Notes Trustee diligently and in good faith, discharged its duties and obligations pursuant to the Superpriority Notes Indenture and Exchange Priority and First Lien Notes Indenture and all ancillary and related documents and otherwise conducted itself with respect to all matters in any way related to the claims of the holders of the Superpriority Notes, Exchange Priority Notes and First Lien Notes with the same degree of care and skill that a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs. Accordingly, the Superpriority Notes Trustee and the Exchange Priority and First Lien Notes Trustee have each discharged its duties fully in

accordance with the Superpriority Notes Indenture and Exchange Priority and First Lien Notes Indenture, as applicable and all ancillary and related documents.

H.    **Section 1129(b).** The Plan does not "unfairly discriminate" and is "fair and equitable" with respect to the Classes that are Impaired and are deemed to reject the Plan in accordance with section 1129(b) of the Bankruptcy Code.

I.    **Releases**.

(i)    The releases contained in Section 10.5 of the Plan (the "**Debtor Release**") are an essential component of the Plan and appropriate.  Good and valid justification has been demonstrated in support of the Debtor Release.  The Subcommittee was appointed by the Special Committee to, among other things, independently evaluate any claims arising out of certain prepetition affiliate transactions of the Debtors that are proposed to be released under the Plan. The Subcommittee has properly concluded that the Debtor Release is appropriate and supported by adequate consideration provided by the Consenting Creditors and the Transferred Entities, as applicable, in exchange for such releases.  The Subcommittee coordinated with the Creditors' Committee during the course of their investigation, and the Creditors' Committee independently came to similar conclusions as the Subcommittee with regards to those certain prepetition affiliate transactions.  Further, the Debtors provided information regarding the Subcommittee's investigation to the Global Settlement Parties and, after agreeing to carve the Global Settlement Parties from the releases under Section 10.6 of the Plan, none of the Global Settlement Parties, nor any other party in interest, other than the California DTSC, has opposed the Debtor Release. Accordingly, the releases contained in Section 10.5 of the Plan: (a) are in exchange for the good and valuable consideration provided by the Released Parties; (b) are a good faith settlement and compromise of the Claims released by the Debtors pursuant to Section 10.5 of the Plan; (c) are in

the best interests of the Debtors and all holders of Claims and Interests; (d) are fair, equitable, and reasonable; (e) were given and made after due notice and opportunity for a hearing; (f) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code; and (g) confer substantial benefits on the Debtors' Estates.  Moreover, the failure to implement the Debtor Release would seriously jeopardize the Debtors' ability to confirm and implement the Plan, including consummation of the Global Settlement.

(ii)    The releases contained in Section 10.6 of the Plan (the "**Third Party Release**") are appropriate.  Parties subject to the Third Party Release were duly informed of the Third Party Release and given the opportunity to opt out or object.  The Confirmation Notice (as defined below) sent to all holders of Claims and Interests expressly included in bold and capitalized font the terms of the Third Party Release, as set forth in Section 10.6 of the Plan.  The Ballots sent to all holders of Claims entitled to vote on the Plan included the Third Party Release in the same manner as the Confirmation Notice and set forth the procedures for opting out of the Third Party Release if such holders did not want to be bound thereby. The Third Party Release was emphasized with bold and capitalized font in the Plan, the Disclosure Statement, the Ballots, and the Confirmation Notice.

(iii)    The Third Party Release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third Party Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release, except as otherwise set

forth in the Plan.  The Third Party Release was a core negotiation point in connection with the Restructuring Support Agreement and the Consenting Creditors would not have agreed to support the Plan without the Third Party Release.  As such, the Third Party Release is an integral part of the Plan and was critical in incentivizing the Debtors' and the Debtors' stakeholders to negotiate a Plan that maximizes value for the Debtors' stakeholders and resolves complex and substantial liabilities.  The Third Party Release is appropriately tailored under the facts and circumstances of these Chapter 11 Cases.

(iv)    Moreover, the Released Parties – including the Consenting Creditors and the Transferred Entities – have made a substantial contribution in exchange for the Third Party Release.  Among other things: (i) the Consenting Creditors negotiated a Restructuring Support Agreement with the Debtors under which the Consenting Creditors submitted a credit bid for the Europe/ROW Assets and participated in a robust bidding process pursuant to the Bidding Procedures, and, upon being selected as the successful bidder, agreed to enter into the Europe/ROW Purchase Agreement and consummate the Sale Transactions, (ii) the Plan has been unanimously accepted and approved by holders of Superpriority Notes Guarantee Claims, Exchange Priority Notes Claims, and First Lien Notes Claims, (iii) the Transferred Entities, at the direction of, and pursuant to a loan made by, the Consenting Creditors and in accordance with the Global Settlement, contributed (v) the Environmental Global Settlement Payment to the Environmental Response Trust; (w) if applicable, the Vernon Global Settlement Payment to the Vernon Environmental Response Trust; (x) the Frisco Global Settlement Payment to TCEQ, and (y) the GUC Global Settlement Payment to the GUC Trust, and (z) the PBGC Settlement Payment to the PBGC, (iv) the Consenting Creditors have agreed, pursuant to the Plan and upon the occurrence of the Effective Date, to waive (x) all of their Liens on or against the Non-

Performing Properties and (y) any Claims, Interests, or Causes of Action against the GUC Trust or the GUC Trust Assets, including any Notes Deficiency Claims or any other General Unsecured Claims, and (v) certain of the Consenting Creditors, in their capacities as DIP Lenders, extended a portion of the critical and necessary postpetition financing to the Debtors' businesses during the Chapter 11 Cases by funding the DIP Facility.

(v)     The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the releases provided for in Sections 10.5 and 10.6 of the Plan. Accordingly, based upon the record of the Chapter 11 Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or presented at the Confirmation Hearing, the releases set forth in Article X of the Plan are consistent with the Bankruptcy Code and applicable law and are approved.

J.      **Exculpation.**   The exculpation provided by Section 10.7 of the Plan for the benefit of the Exculpated Parties is appropriately tailored to the circumstances of these Chapter 11 Cases.   Notwithstanding the provisions of Section 10.7 of the Plan, Related Parties of Exculpated Parties are only exculpated under Section 10.7 of the Plan to the extent such Related Party is a fiduciary.

K.      **Notice and Opportunity to Object.**   As evidenced by the affidavits and certificates of service and publication notice previously filed with the Court, due, proper, timely, adequate, and sufficient notice of the Plan, the Confirmation Hearing, the Global Settlement, including the Environmental Settlement Agreement and the Frisco Settlement Agreement, the Europe/ROW Sale Transaction, and the Europe/ROW Purchase Agreement, has been provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and Bidding Procedures Order to all interested Persons and entities.

L.     **Business Justification.**     The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes and justifications for this Court to approve (i) the credit bid made by the Exchange Priority and First Lien Notes Trustee and assigned to the Buyer pursuant to the Europe/ROW Purchase Agreement, (ii) the transfer to the Buyer of the Acquired Assets owned by the Debtors and the assumption by the Buyer (or its designee) of the Assumed Liabilities of the Debtors in accordance with the Europe/ROW Purchase Agreement and the related Transaction Agreements, (iii) the actions contemplated by the Alternative Acquisition Structure, and (iv) the transfer of the Environmental Trust Assets, the Vernon Environmental Trust Assets (if applicable), the GUC Trust Assets and the Frisco Assets owned by the Debtors to the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust and the Frisco CDC, respectively, pursuant to sections 1123(a)(5), 1123(b) and 1141(c) of the Bankruptcy Code.  The Debtors' entry into and performance under the Europe/ROW Purchase Agreement and the Global Settlement Documents: (x) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (y) provide value to, and are beneficial to, the Debtors' Estates, and are in the best interests of the Debtors and their Estates, creditors and other parties in interest; and (z) are reasonable and appropriate under the circumstances.

M.     **Opportunity to Object.**     In compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and the Bidding Procedures Order, a fair and reasonable opportunity to object or be heard with respect to the Plan, the Global Settlement, the Global Settlement Documents, the Europe/ROW Sale Transaction, and the Europe/ROW Purchase Agreement, has been afforded to all interested Persons.

N.    **Best Interests.**  The actions represented to have been taken, or to be taken, by the Debtors, the Global Settlement Parties, the Trustees and the Buyer are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their Estates, creditors, and other parties in interest.  Approval of the Global Settlement, the Global Settlement Documents, the Europe/ROW Purchase Agreement, the Alternative Transaction Structure, the Europe/ROW Sale Transaction and all other features of the Plan, including the Releases, are in the best interests of the Debtors, their creditors, their Estates and all other parties in interest.

O.    **Prompt Consummation.**    The Europe/ROW Purchase Agreement, the Europe/ROW Sale Transaction, the Global Settlement, the Global Settlement Documents, and all other features of the Plan must be approved and, subject to paragraph 45 of this Order, consummated as promptly as practicable in order to preserve the value of the Europe/ROW Assets and the viability of the business to which the Europe/ROW Assets relate as a going concern, the orderly administration of the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), and the GUC Trust, and to minimize administrative expenses of the Debtors and maximize recoveries to the Debtors' creditors.

P.    **Corporate Authority.**  Each applicable Debtor (i) has full organizational power and authority to execute the Europe/ROW Purchase Agreement, the related Transaction Agreements, the Global Settlement Documents, and all other documents contemplated thereby, and the Europe/ROW Sale Transaction, the Global Settlement, and all other features of the Plan, as applicable, have been duly and validly authorized by all necessary organizational action of each applicable Debtor, (ii) has all of the organizational power and authority necessary to consummate the transactions contemplated by the Europe/ROW Purchase Agreement, the related

Transaction Agreements, the Global Settlement Documents, and all other documents contemplated thereby, (iii) has taken all organizational action necessary to authorize and approve the Europe/ROW Purchase Agreement, the related Transaction Agreements, the Global Settlement Documents, and all other documents contemplated thereby and the consummation by the Debtors of the Europe/ROW Sale Transaction and the Global Settlement, and (iv) needs no consents or approvals, other than those expressly provided for in the Europe/ROW Purchase Agreement, the related Transaction Agreements, or the Global Settlement Documents, from any other person to consummate the Europe/ROW Sale Transaction and the terms of the Global Settlement.

### Global Settlement Agreement

Q.    **Good-Faith Settlement Negotiations.** Following the appointment of the Creditors' Committee and the entry of the *Order Governing Settlement Procedures with Governmental Agencies Relating to Non-Performing Properties* (Docket No. 242), and concurrently with the Debtors' postpetition marketing process, the Debtors engaged in good-faith and arm's-length negotiations with the Global Settlement Parties that culminated in the acceptance of the Mediators' Proposal by the Debtors, the Ad Hoc Group, the Creditors' Committee, and the Environmental Sureties, and attorneys representing the Settling Governmental Authorities, and California Department of Toxic Substances Control participated in the mediation. The attorneys for the California Department of Toxic Substances Control, agreed to recommend to their client that it accept the Mediators' Proposal.  The California Department of Toxic Substances Control did not accept or become a party to the Global Settlement.

RLF1 24168773v.1

R.      **Resolution of Disputes.** The Global Settlement resolves all issues and disputes relating to: (i) the abandonment of the Debtors' Non-Performing Properties (other than the Vernon Non-Performing Property); (ii) the Europe/ROW Sale Transaction; (iii) the Americas Sale Transaction and use of proceeds realized therefrom; (iv) claims related to the prepetition transactions that were the subject of the investigation by the Subcommittee and concurrently evaluated by the Creditors' Committee and certain other Global Settlement Parties; and (v) certain other issues and disputes.  The terms of the Global Settlement are incorporated in the Plan.

S.      **Global Settlement is Fair and Equitable.** The Global Settlement, including the Environmental Settlement Agreement and the Frisco Settlement Agreement, was negotiated in good faith and at arm's length and is an essential element of the Plan.  The Global Settlement is fair, equitable, and in the best interest of the Debtors, the Debtors' Estates, the Debtors' creditors, and all parties in interest, and satisfies the standards for approval under Bankruptcy Rule 9019.  The Environmental Settlement Agreement is fair, reasonable, and consistent with environmental law as harmonized with bankruptcy law.

### Sale and/or Transfer of Assets of the Debtors

T.      **Title to the Europe/ROW Assets**.  The Europe/ROW Assets owned by the Debtors, including, for the avoidance of doubt, the Transferred Equity Interests owned by Exide Technologies, LLC, which will be transferred prior to the Europe/ROW Closing in accordance with the Alternative Transaction Structure, constitute property of Debtors' Estates and good title is presently vested with the Debtors' within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owner of the Europe/ROW Assets owned by the

11

Debtors, with all rights, title and interests to such Europe/ROW Assets, and no other person has any ownership right, title, or interests therein.

U.    **Title to the Environmental Trust Assets**.  The Environmental Trust Assets owned by the Debtors constitute property of Debtors' Estates and good title is presently vested with the Debtors within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owner of the Environmental Trust Assets owned by the Debtors, with all rights, title and interests to such Environmental Trust Assets, and except as otherwise provided in the Environmental Settlement Agreement, no other person has any ownership right, title, or interests therein.

V.    **Title to the Frisco Assets**.  The Frisco Assets owned by the Debtors constitute property of Debtors' Estates and good title is presently vested with the Debtors within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owner of the Frisco Assets owned by the Debtors, with all rights, title and interests to such Frisco Assets, and except as otherwise provided in the Frisco Settlement Agreement, no other person has any ownership right, title, or interests therein.

W.    **Title to the Vernon Environmental Trust Assets**.  The Vernon Environmental Trust Assets owned by the Debtors constitute property of Debtors' Estates and good title is presently vested with the Debtors' within the meaning of section 541(a) of the Bankruptcy Code. The Debtors are the sole and rightful owner of the Vernon Environmental Trust Assets owned by the Debtors, with all rights, title and interests to such Vernon Environmental Trust Assets, and no other person has any ownership right, title, or interests therein.

X.    **Extensive Efforts by Debtors.**  As of the Commencement Date and for a period of more than 16 months preceding the Commencement Date, the Debtors, with the assistance of

their counsel and other advisors, evaluated strategic alternatives including extensive marketing efforts for both the Americas Assets and the Europe/ROW Assets.  The Debtors have presented credible evidence that they explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a possible sale of all or substantially all of the Debtors' assets.  The Europe/ROW Sale Transaction is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' Estates for the benefit of creditors.

Y.    **Compliance with Bidding Procedures.**    The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders.  The Bidding Procedures afforded adequate notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Europe/ROW Assets.  The Debtors, the Buyer and their respective advisors have complied with the Bidding Procedures and the Bidding Procedures Order in all respects.

Z.    **Adequate Marketing; Highest or Best Offer.**    Other than the Europe/ROW Purchase Agreement, no Qualified Bids for the Europe/ROW Assets were received by the Debtors before the Bid Deadline.  The Debtors cancelled the Auction for the Europe/ROW Assets owned by the Debtors in accordance with the Bidding Procedures Order and, on July 23, 2020, caused the *Notice of Successful Bidders for Americas Assets and Europe/ROW Assets* (Docket No. 591) to be filed with the Court identifying the Buyer as the Successful Bidder of the Europe/ROW Assets owned by the Debtors in accordance with the Bidding Procedures.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Confirmation Hearing, and (ii) the representations of counsel made on the record at the Confirmation Hearing, (a) the Debtors and their advisors have adequately marketed the Europe/ROW Assets owned by

RLF1 24168773v.1

the Debtors and conducted the sale process in compliance with the Bidding Procedures and Bidding Procedures Order; (b) a full, fair, and reasonable opportunity was given to all Persons to make a higher or better offer to purchase the Europe/ROW Assets; (c) no Person, other than the Buyer, timely submitted a Qualified Bid in accordance with the Bidding Procedures Order; (d) the Buyer submitted the highest and best bid for the Europe/ROW Assets owned by the Debtors and was designated as the Successful Bidder; (e) the consideration provided by the Buyer under the Europe/ROW Purchase Agreement constitutes the highest and best offer for the Europe/ROW Assets owned by the Debtors; (f) the consideration provided by the Buyer for the Europe/ROW Assets owned by the Debtors under the Europe/ROW Purchase Agreement is fair and reasonable consideration for the Europe/ROW Assets owned by the Debtors and constitutes reasonably equivalent value under the Bankruptcy Code, (g) the consideration provided by the Buyer for the Europe/ROW Assets owned by the Debtors under the Europe/ROW Purchase Agreement provides reasonably equivalent value and constitutes fair consideration under the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and the Uniform Voidable Transactions Act, (h)  taking into consideration all relevant factors and circumstances, the Europe/ROW Sale Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practically available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (i) no other Person has offered to purchase the Europe/ROW Assets owned by the Debtors for greater economic or non-economic value to the Debtors or their Estates; and (j) the Debtors' determination that the Europe/ROW Sale Transaction and the Europe/ROW Purchase Agreement constitutes the highest and best offer for the Europe/ROW Assets owned by the Debtors constitutes a valid, sound and reasonable exercise of the Debtors' independent business judgment.

AA.    **Good Faith; No Collusion**.    The Europe/ROW Purchase Agreement and all aspects of the Europe/ROW Sale Transaction and the Alternative Transaction Structure were negotiated, proposed, and entered into by the Debtors and the Buyer and each of their management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers, equity holders and representatives, in good faith, without collusion or fraud, and from arms'-length bargaining positions.    The Buyer has proceeded in good faith in all respects in that, among other things: (i) the Buyer has recognized that the Debtors were free to deal with any Person in connection with the marketing and sale of the Europe/ROW Assets; (ii) the Buyer has complied with the applicable provisions of the Bidding Procedures Order in all respects; (iii) the Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Buyer under the Europe/ROW Purchase Agreement, the related Transaction Agreements, and all other material agreements or arrangements entered into by the Buyer and the Debtors in connection with the Europe/ROW Sale Transaction have been disclosed and are reasonable and appropriate.    Neither the Debtors nor the Buyer, nor any affiliate of the Buyer, have engaged in collusion or fraud. Specifically, the Buyer has not acted in a collusive manner with any Person or entity.    The Trustees have acted in good faith in all respects.

BB.    **Free and Clear Transfers.**    Except as expressly provided for in the Plan, the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement, or the Frisco Settlement Agreement, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code (i) all property of the Debtors' Estates constituting the Europe/ROW Assets under the Europe/ROW Purchase Agreement (which, for the avoidance of doubt, includes the Transferred Equity Interests provided under Schedule A of the Europe/ROW Purchase

Agreement) shall vest free and clear in the Buyer (whether transferred directly or indirectly by the Debtors to the Buyer in accordance with the Alternative Transaction Structure), *provided*, that the foregoing shall not impair or otherwise affect any defensive rights of recoupment under applicable nonbankruptcy law; (ii) all property of the Debtors' Estates constituting the GUC Trust Assets shall vest free and clear in the GUC Trust; (iii) all property of the Debtors' Estates constituting Environmental Trust Assets shall vest free and clear in the Environmental Response Trust; (iv) if transferred in accordance with the Plan, all property of the Debtors' Estates constituting Vernon Environmental Trust Assets shall vest free and clear in the Vernon Environmental Response Trust; (v) all property of the Debtors' Estates constituting Frisco Assets shall vest free and clear in the Frisco CDC pursuant to the Frisco Settlement Agreement; and (vi) all remaining property of the Debtors' Estates shall vest free and clear in the Wind-Down Estates (such transferred and vested property, the "**Transferred Debtor Property**").  The term "free and clear" shall mean that such Transferred Debtor Property is transferred and shall vest free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other claims or interests of any kind or nature whatsoever against the Transferred Debtor Property, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions,

obligations, demands, guaranties, rights, contractual commitments, restrictions (including, but

not limited to, the deed restrictions described and set forth in the Frisco Settlement Agreement),

product liability claims, environmental liabilities, employment or labor law claims or liabilities,

employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or

life insurance claims or claims for taxes of or against any of the Debtors, and any derivative,

vicarious, transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights

or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the

United States, any state, territory, or possession thereof or the District of Columbia), whether

arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known

or unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or

unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed

or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material

statutory or non-statutory, legal or equitable, and whether imposed by agreement, understanding,

law, equity or otherwise arising under or out of, in connection with, or in any way related to any

of the Debtors, any of the Debtors' interests in the Transferred Debtor Property, or the operation

of any of the Debtors' businesses before the Effective Date (collectively, the "**Claims**"),

*provided, however,* Transferred Debtor Property that is real property located in the United States

shall not transfer free and clear of any existing *in rem* obligations that do not secure the payment

of Claims (such as easements or deed restrictions), and as to any Transferred Debtor Property in

which a governmental unit holds an interest that is subject to regulatory requirements under a

governmental grant or award, including but not limited to, 10 C.F.R. 600.321, such Transferred

Debtor Property (which, for the avoidance of doubt, shall not include the Europe/ROW Assets)

shall not transfer free and clear of such governmental unit interest, except as set forth in the Frisco Settlement Agreement.

CC.    All Persons having Claims of any kind or nature whatsoever against the Debtors or the Transferred Debtor Property shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against the Transferred Debtor Property, the Buyer, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, the Frisco Governmental Authorities, or any of their respective Affiliates or any of their respective property, successors or assigns, as an alleged successor or on any other ground, except as permitted by the Plan.

DD.    **Necessity of Free and Clear Transfer.** (i) The Buyer would not have entered into the Europe/ROW Purchase Agreement and would not consummate the value maximizing transaction contemplated thereby, and (ii) the Global Settlement Parties would not have entered into the Global Settlement, if the Claims against the Debtors or the Transferred Debtor Property were not discharged or, if the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco Governmental Authorities, would, or in the future could be, liable for any such Claims, that are not expressly assumed.

EE.    **Necessity of Order.**  The Buyer would not have entered into the Europe/ROW Purchase Agreement, and the Buyer and Trustees would not consummate the Europe/ROW Sale Transaction and the Global Settlement Parties would not have entered into the Global Settlement and consummate the Global Settlement, without all of the relief provided for in this Order, including that the transfer of the Transferred Debtor Property free and clear of all Claims,

Interests, Liens, and encumbrances, including rights or Claims based upon successor or transferee liability.

**Treatment of Assumed Contracts**

FF.    **Notice and Opportunity to Object to Cure Costs.**    As evidenced by the affidavits and certificates of service and publication notice previously filed with the Court, due, proper, timely, adequate, and sufficient notice of the *Notice of Cure Costs and Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* (Docket No. 353); *Second Notice of Cure Costs and Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* (Docket No. 647); and the Revised Assumption Schedule for the Europe/ROW Transaction and the Assumption Schedule for the Environmental Response Trust, attached as Exhibit A-1 to the *Notice of Filing of Second Plan Supplement* (Docket No. 825) and Exhibit A-1 to the *Notice of Filing of Third Plan Supplement* (Docket No. 939)(collectively, the "**Cure and Assumption Notices**"), have been provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and Bidding Procedures Order to all interested Persons and entities.

GG.    **Cure Notice**.    As evidenced by the affidavits of service filed with the Court, the Debtors have served, prior to the Confirmation Hearing, the Cure and Assumption Notices on each non-Debtor counterparty to the Assumed Contracts (each, a "**Counterparty**" and collectively, the "**Counterparties**"), which provided notice of the Debtors' intent to potentially assign such Assumed Contracts (to the extent the Assumed Contract is an executory contract or lease) and notice of the related proposed Cure Costs upon each respective Counterparty.  The service of the Cure and Assumption Notices were timely, good, sufficient and appropriate under

the circumstances and no further notice need be given with respect to the Cure Costs for the assumption of the Assumed Contracts.  All Counterparties to the Assumed Contracts have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Cure Notice and to the assumption of the Assumed Contracts in accordance with the Bidding Procedures Order.

HH.    **Assignment of Assumed Contracts.**  It is an exercise of the Debtors' reasonable and sound business judgment to assign the assumed contracts in connection with the consummation of the Europe/ROW Sale Transaction and the Global Settlement (the "**Assumed Contracts**"), and the assignment of the Assumed Contracts is in the best interests of the Debtors and their Estates.

II.    **Cure/Adequate Assurance.**  **T**he Debtors, the Buyer, the Environmental Response Trust, and/or the Frisco Governmental Authorities (except TCEQ) have cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Effective Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.  Unless otherwise agreed to by the parties, the Cure Costs set forth in the Cure Notice are deemed the amounts necessary to "cure" within the meaning of section 365(b)(1) of the Bankruptcy Code all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under such Assumed Contracts.  The Buyer's, the Environmental Response Trust's, or the Frisco Governmental Authorities' (except TCEQ) promise to perform the obligations under the Assumed Contracts, as applicable, after the Effective Date shall constitute adequate assurance of future performance of, and under, the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  All Counterparties who did not timely file an objection to the assumption of the Assumed Contracts in accordance with the Plan, the Plan Supplement, and the Cure and Assumption Notices are deemed to consent to

the assumption by the Buyer, the Environmental Response Trust, or the Frisco Governmental Authorities (except TCEQ), of their respective Assumed Contract. The Court finds that with respect to all such Assumed Contracts the payment of the Cure Costs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 1123(b)(2) and 365(b) of the Bankruptcy Code have been satisfied for the assumption by the Debtors of each of the Assumed Contracts.

JJ.    **Valid and Binding Contract.** The Europe/ROW Purchase Agreement, the related Transaction Agreements and the Global Settlement Documents are valid and binding contracts among the Debtors, the Buyer, the Trustees, and the Global Settlement Parties, as applicable, and shall be enforceable pursuant to their respective terms. The Europe/ROW Purchase Agreement, the related Transaction Agreements, and the Global Settlement Documents were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia. None of the Debtors, the Buyer, the Trustees, nor any of the Global Settlement Parties is, or will be, entering into the Europe/ROW Purchase Agreement or the Global Settlement, and transactions contemplated therein, as applicable, fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose. The Europe/ROW Purchase Agreement, the Europe/ROW Sale Transaction, the Global Settlement and the Global Settlement Documents, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and

any chapter 7 or chapter 11 trustee appointed in the Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

KK.   **Unenforceability of Anti-Assignment Provisions.**   Anti-assignment provisions in any Assumed Contract assumed by the Buyer, the Environmental Response Trust, or the Frisco Governmental Authorities (except TCEQ), as applicable—including any provisions requiring rating agency confirmation, "no downgrade" letters, any other third party consent, or of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code—shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

LL.   **Abandonment of Vernon Non-Performing Property.** The findings of fact and conclusions of law set forth on **Schedule 1** to this Order as to the abandonment of the Vernon Non-Performing Property are incorporated herein by reference in their entirety. Such findings and conclusions shall govern the abandonment of the Vernon Non-Performing Property to the extent Vernon Non-Performing is abandoned in accordance with the terms of the Plan and this Order.

MM.   **PBGC Settlement.**   The PBGC Settlement Payment has been negotiated in good faith and is fair and reasonable.

NN.   **Final Order.**   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

**FURTHER, IT IS HEREBY ORDERED THAT:**

**<u>Final Approval of Disclosure Statement</u>**

1.      The Disclosure Statement: (i) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (ii) is approved on a final basis.

**<u>Confirmation of the Plan</u>**

2.      The Plan is confirmed as set forth herein.

3.      The findings of fact and conclusions of law listed above, as well as any additional findings of fact and conclusions of law announced by this Court at the Confirmation Hearing, are hereby incorporated into this Confirmation Order.

4.      Any and all objections to the approval and entry of this Order, the approval of the Plan, the Global Settlement, the Europe/ROW Sale Transaction, including any objections to Cure Amounts or adequate assurance of future performance, the assumption and/or assumption and assignment of executory contracts and unexpired leases, or any terms of the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement or the Frisco Settlement Agreement that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

5.      The documents contained in the Plan Supplement, including the final Environmental Settlement Agreement, final Frisco Settlement Agreement, and the final Europe/ROW Purchase Agreement are integral to the Plan and <u>are approved in their entirety</u>. The Debtors, the Plan Administrator, the GUC Trustee, the Environmental Trustee, the Vernon Environmental Trustee, the Buyer, the Trustees, and each Global Settlement Party (as applicable)

are authorized to take all actions required under the Plan, the Plan Supplement, and the Europe/ROW Purchase Agreement, including the Alternative Transaction Structure, to effectuate the Plan, the Global Settlement embodied therein, and the transactions contemplated therein.

6.      The terms and provisions of the Plan, including the terms of the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement and the Frisco Settlement Agreement, and the exhibits thereto, are incorporated herein by reference and are an integral part of this Order.  The terms of the Plan, the documents contained in the Plan Supplement, including the Environmental Settlement Agreement and the Frisco Settlement Agreement, the Europe/ROW Purchase Agreement, and all exhibits and other relevant and necessary documents related thereto or contemplated thereby shall, on and after the Effective Date, be binding in all respects upon, and shall inure to the benefit of, the Debtors, their Estates and their creditors, the Transferred Entities, any affected third parties, all holders of equity interests in the Debtors, all holders of any Claims, whether known or unknown, against the Debtors, any holders of Claims against, or on all or any portion of the Acquired Assets owned by the Debtors, including, but not limited to, all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and each of their respective affiliates, successors and assigns.

7.      **Cancellation of Superpriority Notes and Discharge of Debtor Guarantee Claims.**  Prior to the Europe/ROW Closing, the Consenting Creditors shall contribute the Superpriority Notes, together with all of the outstanding Claims arising thereunder and under the Superpriority Notes Indenture to the Europe/ROW Purchaser in exchange for preferred equity

interests of the Europe/ROW Purchaser.  After the Europe/ROW Closing, the Europe/ROW

Purchaser and the Superpriority Noteholders shall deliver, or be deemed to deliver, all of the

Superpriority Notes to Exide International for cancellation and the Superpriority Notes shall be

cancelled.  At the Europe/ROW Closing, and without limiting the above, and without any further

action by the Consenting Creditors, the Europe/ROW Purchaser or any other party or person or

further order of the Bankruptcy Court: (i) the Superpriority Notes Guarantee Claims against the

Debtors shall be deemed fully satisfied, and the Guarantees granted by the Debtors shall be

released, and discharged, (ii) any liens or security interests granted by the Debtors under the

Superpriority Notes Indenture and the Superpriority Security Documents shall be deemed

terminated, released, discharged and without further effect, and (iii) all existing defaults by the

Debtors under the Superpriority Notes Indenture shall be waived.  The Superpriority Notes

Indenture and Superpriority Security Documents and all outstanding Claims arising under the

Superpriority Notes Indenture shall be cancelled and terminated and the Superpriority Notes

Indenture Trustee shall be released and discharged of all obligations thereunder in accordance

with a supplemental indenture and executed by Exide International, Exide Holdings, and the

Superpriority Notes Trustee in accordance with the Superpriority Notes Indenture.  For the

avoidance of doubt, and in accordance with the Superpriority Notes Indenture, Exide

International shall immediately deliver, or be deemed to deliver and surrender, all of the

Superpriority Notes upon receipt thereof to the Superpriority Notes Trustee for cancellation.

     8.    **<u>Cancellation of Existing Securities and Agreements</u>**.  Except for the purpose of

evidencing a right to a distribution under the Plan, effectuating the Europe/ROW Sale

Transaction and except as otherwise set forth in the Plan, all notes, instruments, other securities,

and other evidence of debt issued, including, but not limited to, the Exchange Priority and First

Lien Notes Indenture and the Legacy Notes Indentures and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors and all guarantors thereunder, shall be deemed fully satisfied, released, and discharged. For the avoidance of doubt, but subject to Section 5.16(b) of the Plan, on the Effective Date, the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall be deemed terminated and cancelled and the Exchange Priority and First Lien Notes Trustee and Legacy Notes Trustee shall be discharged and released without any further action, and the Debtors' Estates will have no further claims against any non-Debtors on account of any guarantee obligations under the Exchange Priority and First Lien Notes Indenture.

9.     The Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall continue in effect to the extent necessary to: (i) allow the Plan Administrator, Exchange Priority and First Lien Notes Trustee, or Legacy Notes Trustee, as applicable, to make distributions under the Plan; (ii) allow the Exchange Priority and First Lien Trustee to effectuate the Europe/ROW Sale Transaction; (iii) permit the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to assert the applicable Exchange Priority Trustee Charging Lien, First Lien Trustee Charging Lien, and Legacy Notes Charging Lien, as applicable; (iv) allow the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Exchange Priority and First Lien Notes Indenture or the Legacy Notes Indentures, as applicable; (v) allow the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to exercise their rights and obligations at the direction of the Requisite Noteholders relating to the interests of its holders under the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures, as applicable; (vi) permit the

Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to perform any functions that are necessary to effectuate the powers outlined in section 5.16 of the Plan.  For the avoidance of doubt, all indemnification obligations and expense reimbursement obligations of the Debtors arising under the Exchange Priority and First Lien Notes Indenture in favor of the Exchange Priority and First Lien Notes Trustee, or its directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Plan Administrator on and after the Effective Date, and shall be enforceable through, among other things, the exercise of the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien.  Subsequent to the performance by the Exchange Priority and First Lien Notes Trustee of its obligations pursuant to the Plan, the Exchange Priority and First Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Exchange Priority and First Lien Notes Indenture and shall be discharged.

10.     Any failure of this Order to specifically include or refer to any particular article, section, or provision of the Plan, the documents contained in the Plan Supplement, including the Environmental Settlement Agreement and the Frisco Settlement Agreement, the Europe/ROW Purchase Agreement, the Alternative Transaction Structure, the GUC Trust Agreement, or any exhibit or document related thereto, or contemplated thereby, does not, and shall not be, deemed to diminish or impair the effectiveness or enforceability of such article, section, or provision; it being the intention of the Court that all such documents are approved in their entirety.

11.     Subject to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept for filing and/or recording any and all documents, mortgages and

instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan, the Global Settlement embodied therein, and this Order.

12.     Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and will be effective immediately on the Effective Date without further order or action by the Court or any other Entity: (a) Releases by the Debtors (Section 10.5); (b) Releases by Holders of Claims and Interests (Section 10.6)); (c) Exculpation (Section 10.7); and (d) Injunction (Section 10.3).  Additionally, (i) the Mutual Releases under Section 12.22 of the Europe/ROW Purchase Agreement, and (ii) the Covenants Not to Sue and Reservation of Rights contained in Article IX of the Environmental Settlement Agreement and Article VIII of the Frisco Settlement Agreement are heavily negotiated and integral conditions of the Global Settlement and are hereby approved and will be effective immediately on the Effective Date without further order or action by the Court or any of the parties to such release or covenant not to sue.

13.     The Debtors shall cause to be served a notice (the "**Confirmation Notice**") of the entry of this Order and the Administrative Expense Claims Bar Date (as defined herein) upon: (a) all parties listed in the creditor matrix maintained by Prime Clerk LLC (the "**Claims and Noticing Agent**"), and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the entry of this Order, or as soon as practicable thereafter.  The Debtors shall cause the Confirmation Notice to be published in the national editions of *The New York Times* and *USA Today* no later than five (5) business days after the entry of this Order, or as soon as practicable thereafter.

## The Global Settlement

14.     The compromises and settlements set forth in the Plan, including, but not limited to, the Global Settlement, are approved and will be effective immediately and binding on all parties in interest on the Effective Date.  The following changes are made to the Environmental Settlement Agreement by agreement of the parties thereto:

a.   Westchester shall make its required contributions under Paragraphs 9 and 60 not later than ten business days after the Effective Date.

b.   The Environmental Trustee and Vernon Environmental Trustee shall be the entities appointed by this Order in Paragraphs 15 and 19 hereof.

c.   The provisions regarding "Vernon Net Excess Funding" in paragraph 78 are modified to read as follows: ". . . The Vernon Environmental Trustee shall distribute the Vernon Net Excess Funding in the following manner and order: First, the Vernon Environmental Trustee shall retain from such Net Excess Funding an amount equal to the Vernon Settlement Payment or other payments that were initially transferred to the Vernon Environmental Trust Account pursuant to Paragraph 58. Then, second, the Vernon Environmental Trustee shall transfer any remaining Net Excess Funding to Westchester until Westchester has received the full penal sum of the Vernon Bond.  Then, finally, the Vernon Environmental Trustee shall, as instructed in writing by CADTSC, transfer any remaining Vernon Net Excess Funding to the California Toxic Substances Control Account."

15.     **Environmental Response Trust.**     The formation, rights, powers, duties, structure, obligations and other matters pertaining to the Environmental Response Trust shall be governed by the Plan, the Environmental Settlement Agreement and the Environmental Trust

Agreement.  Exide Environmental Response Corporation is appointed as the Environmental Trustee of the Environmental Response Trust.

16.    On the Effective Date, the Environmental Trust Assets shall be transferred by the Debtors or the Transferred Entities, as applicable (and deemed transferred), to the Environmental Response Trust free and clear (as defined in paragraph BB hereto) of all Claims, Interests, Liens, and encumbrances, including rights or Claims based upon successor or transferee liability, without the need for any Entity to take any further action or obtain approval.  Thereupon, the Debtors shall have no interest in the Environmental Trust Assets or the Environmental Response Trust.

17.    Westchester shall make all required contributions to the Environmental Response Trust or for the Reading Battery and Reading Residential, PA Designated Site to the Commonwealth of Pennsylvania, for deposit into the Pennsylvania Solid Waste Abatement Fund, in accordance with the Environmental Settlement Documents, provided that notwithstanding anything in the Environmental Settlement Documents, such contribution shall be made not later than ten business days after the Effective Date.

18.    For the avoidance of doubt, except to the extent that a holder of an Allowed Environmental NPP Claim agrees to less favorable treatment of such Claim or otherwise, in full and final satisfaction and release of, and exchange for, such Allowed Environmental NPP Claim, each holder of an Allowed Environmental NPP Claim shall receive and be subject to the treatment as provided under Section 4.8(b) of the Plan; provided, that the foregoing shall not affect any defensive rights of set-off or recoupment of any of the Settling Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, the GUC Trust, or GUC Trustee.

RLF1 24168773v.1

19.    **Vernon Environmental Response Trust.**  If the Vernon Trust Condition and the Payment Condition set forth in the Plan have been satisfied, the Vernon Environmental Response Trust will be created and the formation, rights, powers, duties, structure, obligations and other matters pertaining to the Vernon Environmental Response Trust shall be governed by the Plan, the Environmental Settlement Agreement and the Vernon Environmental Trust Agreement, and the Vernon Environmental Response Corporation is appointed as the Vernon Environmental Trustee of the Vernon Environmental Response Trust..

20.    On the Effective Date, to the extent provided for in the Plan, and subject to paragraph 50 below, the Vernon Environmental Trust Assets shall be transferred by the Debtors or the Transferred Entities, as applicable (and deemed transferred), to the Vernon Environmental Response Trust free and clear of all Claims, without the need for any Entity to take any further action or obtain approval and Westchester shall make all required contributions to the existing standby trust for the Vernon, CA NPP, in accordance with the Environmental Settlement Documents, provided that notwithstanding anything in the Environmental Settlement Documents such contributions shall be made not later than ten business days after the Effective Date. Thereupon, the Debtors shall have no interest in the Vernon Environmental Trust Assets or the Vernon Environmental Response Trust.

21.    **GUC Trust.**  The formation, rights, powers, duties, structure, obligations and other matters pertaining to the GUC Trust shall be governed by the Plan and the GUC Trust Agreement.  For the avoidance of doubt, the GUC Trustee is entitled to rely upon the accuracy and validity of the Debtors Books and Records (as defined in the GUC Trust Agreement) in connection with all GUC Trust activity.

22.     On the Effective Date, the GUC Trust Assets shall be transferred by the Debtors or the Transferred Entities, as applicable (and deemed transferred), to the GUC Trust free and clear (as defined in paragraph BB) of all Claims, Interests, Liens, and encumbrances, including rights or claims based upon successor liability, without the need for any Entity to take any further action or obtain approval.  Thereupon, the Debtors shall have no interest in the GUC Trust Assets or the GUC Trust.

23.     Upon the Effective Date, the GUC Trust is authorized and empowered, without further approval of this Court or any other party, to take such actions and to perform such acts as may be necessary, desirable or appropriate to implement the issuance of each class of GUC Trust Beneficial Interests in accordance with the Plan and the GUC Trust Agreement, and to execute and deliver all agreements, documents, securities, instruments and certificates relating thereto. All GUC Trust Beneficial Interests issued by the GUC Trust pursuant to the provisions of the Plan and the GUC Trust Agreement shall be deemed to be duly authorized, validly issued, fully paid and non-assessable.

24.     To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to or by the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), or the Frisco Governmental Authorities), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate

transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### The Sale or Transfer of Transferred Debtor Property

25.    **Fair Purchase Price**.  The consideration provided by the Buyer pursuant to the credit bid submitted by the Exchange Priority and First Lien Trustee and assigned to the Buyer under the Europe/ROW Purchase Agreement and the Global Settlement Parties under the Global Settlement is fair and reasonable and constitutes: (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act and the Uniform Voidable Transactions Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

26.    **Consummation of the Europe/ROW Sale Transaction and the Global Settlement.**  The Debtors, their affiliates and their respective officers, employees and agents, are authorized to: (a) execute and deliver, and empowered to perform under, consummate, and implement, the Europe/ROW Purchase Agreement, the related Transaction Agreements, the Alternative Transaction Structure, the Global Settlement, the Global Settlement Documents, and all additional instruments and documents that the Debtors, the Buyer, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco Governmental Authorities, as applicable, deem necessary or

appropriate to implement the Europe/ROW Purchase Agreement, the related Transaction Agreements, the Alternative Transaction Structure, the Global Settlement, or the Global Settlement Documents, (b) effectuate the sale and/or transfer of the Transferred Debtor Property, and (c) take all further actions as may be reasonably required for the purpose of issuing, assigning, transferring, granting, and conveying to, and conferring on (as applicable), the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust or the Frisco CDC, the Transferred Debtor Property, as applicable, and assumption of the Assumed Liabilities of the Debtors by the Buyer, or otherwise in accordance with the Alternative Acquisition Structure, or as may be necessary or appropriate or consistent with the performance of the parties' obligations under the Europe/ROW Purchase Agreement, related Transaction Agreements, the Alternative Transaction Structure, the Global Settlement, the Global Settlement Documents, the Plan, and this Order.  All instruments and documents entered into in connection therewith shall be deemed authorized without further order of the Court.  The Trustees are authorized, empowered and directed to take all actions necessary and required to implement and consummate the Plan and Europe/ROW Purchase Agreement, the related Transaction Agreements, the Alternative Transaction Structure, the Global Settlement and the Global Settlement Documents.

27.    **Debtors' Cooperation**.  To the extent required by the Europe/ROW Purchase Agreement or the Global Settlement, the Debtors agree to exercise commercially reasonable efforts to assist the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, and the Frisco CDC, in assuring that all Persons that are presently, or on the Effective Date may be, in possession of some or all of the Europe/ROW Assets, the Environmental Trust Assets, the Vernon Environmental Trust Assets

(if applicable), the GUC Trust Assets or the Frisco Assets, as applicable, will surrender possession of such assets to either (i) the Debtors before the Effective Date or (ii) the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco CDC, as applicable, on or after the Effective Date.  In the event any Person, on or after the Effective Date, is in possession of some or all of the Transferred Debtor Property that is to be transferred to the Buyer (or its designee), the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust or the Frisco CDC, as applicable, and such parties have not received or taken possession of such assets, then the Buyer (or its designee), the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust or the Frisco CDC, as applicable, may seek to compel the turnover or transfer of the assets pursuant to an adversary proceeding.

28.    **Direction to Release Liens.**  As of the Effective Date, any creditors and any holder of a Lien, including rights or Claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien on or against the Transferred Debtor Property, if any, as such Lien may have been recorded or may otherwise exist.  If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens or Claims against the Transferred Debtor Property shall not have delivered to the Debtors prior to the Effective Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Liens and Claims (collectively, the "**Release Documents**") the Person has with respect to the Debtors or the Transferred Debtor Property: (i) the Debtors, the Buyer or the applicable Transferred Entity, the Environmental Response Trust, the Vernon Environmental Response

Trust (if applicable), the GUC Trust, and the Frisco CDC, as applicable, are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the Transferred Debtor Property; (ii) the Buyer or the Transferred Entity, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco CDC, as applicable, is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims and Liens against the Transferred Debtor Property; and (iii) the Buyer, the Environmental Trustee, the Vernon Environmental Trustee (if applicable), the GUC Trustee or the Frisco CDC may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Liens and Claims with respect to the Transferred Debtor Property, other than liabilities expressly assumed under the Europe/ROW Purchase Agreement or the Global Settlement Documents; provided that, notwithstanding anything in this Order, the Europe/ROW Purchase Agreement or the Global Settlement Documents to the contrary, the provisions of this Order shall be self-executing, and the Debtors, the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco Governmental Authorities shall not be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

29.   **Direction to Government Agencies.**  This Order is, and shall be, binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrar of patents, trademarks, or other intellectual property, administrative agencies, governmental departments,

secretaries of state, federal, state, county and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "**Recording Officers**").  Each and every Recording Officer is authorized, from and after the Effective Date, to strike all recorded Claims, Interests, Liens, or other encumbrances in, on or against the Transferred Debtor Property, as applicable, from their records, official or otherwise without further order of the Court or act of any party.  A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Claims recorded prior to the date of this Order.  All Recording Officers are hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Europe/ROW Purchase Agreement and the Global Settlement, and to accept and rely on this Order as the sole and sufficient evidence of the transfer of the Europe/ROW Assets to, and the assumption of the Assumed Liabilities of the Debtors by, the Buyer, and the transfer of the Environmental Trust Assets, the Vernon Environmental Trust Assets (if applicable), the GUC Trust Assets, and the Frisco Assets (and any related assumed contracts assumed by any of the foregoing) to the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, and the Frisco CDC, respectively.

30.    **No Discriminatory Treatment.**  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of any of the Europe/ROW Assets, the Environmental Trust Assets, the Vernon Environmental Trust Assets, the GUC Trust Assets, and the Frisco Assets on account of the filing or pendency of the Chapter 11 Cases or the

consummation of the transactions contemplated by the Europe/ROW Purchase Agreement and the Global Settlement Documents.

31.    **Transfer of Transferred Debtor Property Free and Clear**.  Pursuant to section 1141(c) of the Bankruptcy Code, all Persons are forever prohibited and enjoined from taking any action against the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, or the Frisco CDC (or any of their respective property, Affiliates, successors and assigns) based on any Claims, Interests, Liens, and other encumbrances (other than Assumed Liabilities of the Debtor) to the extent such Claims are released or prohibited pursuant to the terms of the Plan or this Order; provided that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

32.    **No Successor or Other Derivative Liability**.  The Buyer, the Trustees, the Consenting Creditors, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, and the Frisco Governmental Authorities, and each of their respective successors and assigns, shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their Estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective Estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and such entities shall not have assumed, nor are in any way responsible for, any liability or obligation of the Debtors or the Debtors' Estates, except as expressly provided for in the Europe/ROW Purchase Agreement or the Global Settlement Documents.  Except as expressly set forth in the Europe/ROW Purchase

Agreement or the Global Settlement Documents, the Buyer, the Consenting Creditors, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, the GUC Trustee, and the Frisco Governmental Authorities, and each of their respective successors and assigns, shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Europe/ROW Assets, the Environmental Trust Assets, the Vernon Environmental Trust Assets, the GUC Trust Assets, or the Frisco Assets prior to the Effective Date.

33.    Except as expressly set forth herein or in the Europe/ROW Purchase Agreement and the Global Settlement Documents, the Buyer, the Consenting Creditors, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, the GUC Trustee, and the Frisco Governmental Authorities, and each of their respective successors, Affiliates, and assigns shall have no liability for any Claim against the Debtors, including Claims arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of, or related to, any of the Debtors or any of the Debtors' affiliates or predecessors, or any current or former employees of any of the foregoing, including, without limitation, the Employee Plans and

any participation or other agreements related to the Employee Plans, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to:  (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) any bulk sales or similar laws; (S) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (T) any common law doctrine of

*de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of, or related to, successor liability.

34.     Except as expressly set forth herein or in the Plan, the Plan Administrator and New Board, and each of their respective successors and assigns, shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their Estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective Estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and such entities have not assumed nor are in any way responsible for any liability or obligation of the Debtors or the Debtors' Estates, including any obligations of the Debtors or the Debtors' Estates arising out of, or related to, the Non-Performing Properties or the Canada Non-Performing Property.  For the avoidance of doubt, the Plan Administrator and the New Board shall have no liability under federal, state and provincial environmental laws, including the federal Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"), with respect to any of the Non-Performing Properties or the Canada Non-Performing Property for liabilities or obligations of the Debtors or the Debtors' Estates arising prior to the Effective Date.

35.     On the Effective Date, the Debtors will transfer USD $1,500,000.00 as the Canada NPP Risk Management Measures Funds to a segregated account that shall be available for the exclusive purpose of the environmental risk management of the Canada Non-Performing Property.

36.    **Assumption of Assumed Contracts.**  Pursuant to sections 1123(b)(2) and 365 of the Bankruptcy Code and subject to, and conditioned upon the confirmation of the Plan, the Debtors are hereby authorized to assign the Assumed Contracts to the Buyer (or otherwise in accordance with the Alternative Acquisition Structure) and the Environmental Response Trust, as set forth in the Cure and Assumption Notices.  With respect to each of the Assumed Contracts, in accordance with the provisions of the Plan, the Europe/ROW Purchase Agreement and the Global Settlement Documents, the Debtors, the Buyer, the Environmental Response Trust, or the Frisco Governmental Authorities (except TCEQ), as applicable, has cured or will cure before the Effective Date, or have provided adequate assurance of the prompt cure after the Effective Date of, any monetary default required to be cured with respect to the Assumed Contracts under sections 1123(b)(2) and  365(b)(1) of the Bankruptcy Code, and the Buyer, the Environmental Response Trust, or the Frisco Governmental Authorities (except TCEQ), as applicable, has provided adequate assurance of future performance under the Assumed Contracts in satisfaction of sections 1123(b)(2), 365(b), and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparty to such Assumed Contracts.

37.    The Debtors served all Counterparties to the Assumed Contracts with the Cure Notices and the deadline to object to the Cure Costs and adequate assurance of future performance has passed.  Accordingly, unless an objection to the proposed Cure Costs or adequate assurance information was filed and served before the applicable deadline, each Counterparty to an Assumed Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors, the Buyer, the Environmental Response Trust, the Frisco Governmental Authorities (except TCEQ), each of their respective successors or assigns, or the

property of any of them, any default existing as of the date of the Confirmation Hearing if such default was not raised or asserted prior to, or at, the Confirmation Hearing.

38.     All of the requirements of sections 1123(b)(2), 365(b), and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption of the Assumed Contracts.

39.     To the extent a Counterparty to an Assumed Contract failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the Cure and Assumption Notices and any such Counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates (subject to adjustment for subsequent payment or invoices coming due after the date of the Assumption Notice).

40.     Except as otherwise specifically provided for by order of this Court, upon the assumption of the Assumed Contracts under the provisions of this Order, no default shall exist under any Assumed Contracts, and no Counterparty to any Assumed Contracts shall be permitted to declare a default by any Debtor, the Transferred Entities, the Environmental Response Trust, the GUC Trust, the Frisco Governmental Authorities (except TCEQ), or the Buyer or otherwise take action against such parties (or any of their respective property, successors and assigns) as a result of any of the Debtors' financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract. The failure of the Debtors, the Transferred Entities, the Buyer, the Environmental Response Trust, the GUC Trust, or the Frisco Governmental Authorities (except TCEQ) to enforce at any time one or more terms or conditions of any Assumed Contract, as applicable, shall not be a waiver of such terms or conditions, or of

the Debtors', the Transferred Entities', the Buyer's, the Environmental Response Trust's, the GUC Trust's, or the Frisco Governmental Authorities' (except TCEQ) rights to enforce every term and condition of the Assumed Contract.

41.     **Rejection of Executory Contracts and Unexpired Leases**.    All executory contracts and unexpired leases of real property of the Debtors that are not Assumed Contracts as of the Effective Date are rejected, *provided, that,* the Debtors' contract with American Integrated Services, Inc. ("**AIS**") shall be rejected on October 30, 2020 and the Debtors shall make all payments thereunder for services rendered by AIS through October 30, 2020.

42.     **No Avoidance of Europe/ROW Purchase Agreement or Global Settlement Documents.**    Neither the Debtors, the Buyer, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, the GUC Trustee, nor the Frisco Governmental Authorities have engaged in any conduct that would cause or permit the Europe/ROW Purchase Agreement or the Global Settlement Documents, as applicable, to be avoided or costs or damages to be imposed.    Accordingly, the Europe/ROW Purchase Agreement, the Europe/ROW Sale Transaction, the Alternative Transaction Structure, the Global Settlement and the Global Settlement Documents shall not be avoidable under chapter 5 of the Bankruptcy Code or any similar or related state or federal statutes and common law, and no party shall be entitled to any damages or other recovery under the Bankruptcy Code with respect to the Europe/ROW Purchase Agreement, the Europe/ROW Sale Transaction, the Alternative Acquisition Structure, the Global Settlement or the Global Settlement Documents.

43.     **Modification of Europe/ROW Purchase Agreement or Global Settlement**. The Europe/ROW Purchase Agreement, the related Transaction Agreements, the Global Settlement Documents, and documents or other instruments executed in connection therewith,

may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided, that other than such changes as are required to effect the Alternative Acquisition Structure, any such modification, amendment or supplement does not materially change the terms of the Europe/ROW Purchase Agreement, related Transaction Agreements, Global Settlement Documents, and documents or other instruments or have any adverse effect on the Debtors' Estates, provided, further that advance notice and consent of the parties to such amended documents, consistent with the terms of such documents, shall be properly obtained.

44.    To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, and the Global Settlement embodied therein, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to, or by, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

45.    **No Stay of Order.**  This Order shall be effective immediately on October 23, 2020, and the Debtors, the Buyer, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, the GUC Trustee, and the Frisco Governmental Authorities are authorized to close the Europe/ROW Sale Transaction and Global Settlement, as applicable, immediately upon the effectiveness of this Order.  Time is of the essence in closing the Europe/ROW Sale Transaction and the Global Settlement in accordance with the terms of the Europe/ROW Purchase Agreement, the Alternative Transaction Structure, and the Global Settlement Documents, and the Debtors, the Buyer, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, and the Frisco Governmental Authorities intend to close the Europe/ROW Sale Transaction and Global Settlement, as applicable, as soon as practicable, subject to the terms of this Order.

### Canada Non-Performing Property

46.    On or before the Effective Date, the Debtors shall (i) deposit Cash in an amount equal to the Canada NPP Risk Management Measures Funds into an escrow account, and (ii) engage in negotiations with the Canada MOE with respect to the abandonment of the Canada Non-Performing Property; provided, that to the extent the parties cannot agree, the Debtors may seek a determination by the Bankruptcy Court of the appropriate amount necessary to implement environmental risk management measures and/or abandonment of the Canada Non-Performing Property. The Debtors are authorized to transfer title to, or proceeds from, the Canada Non-Performing Property to the Canada MOE or its designee.  For the avoidance of doubt, the aggregate amount of Allowed Canada NPP Claims shall be reduced by the amount of Canada NPP Risk Management Measures Funds deposited for use by the Canada MOE.

RLF1 24168773v.1

47.    Upon the implementation of environmental risk management measures, any excess Canada NPP Risk Management Measures Funds shall revert to the Wind-Down Estates and shall be available for distribution by the Plan Administrator in accordance with the Plan.

48.    In the event the Canada NPP Risk Management Measures Funds are not sufficient to cover the cost of implementing the environmental risk management measures at the Canada Non-Performing Property, any remaining Canada NPP Claims shall be treated as General Unsecured Claims in accordance with the Plan.

## Columbus Non-Performing Property

49.    As required by the Environmental Settlement Agreement, and pursuant to sections 105(a), 365 and 554(a) of the Bankruptcy Code, on the Effective Date, in accordance with the Columbus NPP Termination Documents and subject to the satisfaction or waiver of all applicable closing conditions under the Columbus NPP Termination Documents: (A) Exide Technologies' lease and the bond purchase agreement related to the Columbus Non-Performing Property, including any security documentation related thereto, shall terminate; (B) Exide Technologies shall be deemed to have abandoned the revenue bonds issued in connection with the development of the Columbus Non-Performing Property and no further payments shall be due thereunder; (C) the Columbus Development Authority shall quitclaim its interest in the Columbus Non-Performing Property to Exide Technologies; and (D) the Debtors and the Columbus Development Authority shall take all other actions necessary to consummate the transactions contemplated by the Columbus NPP Termination Documents.

## Abandonment of the Vernon Non-Performing Property

50.    The findings of fact and conclusions of law set forth on **Schedule 1** to this Order as to the abandonment of the Vernon Non-Performing Property are incorporated herein by reference in their entirety. Such findings and conclusions shall govern the abandonment of the

Vernon Non-Performing Property to the extent Vernon Non-Performing is abandoned in accordance with the terms of the Plan and this Order.

### PBGC Settlement and Westchester Resolution

51.     The settlement with the PBGC, the Westchester resolution and Westchester Catch-up Payments incorporated in the Plan and described at the Confirmation Hearing are approved.

### Payment of Administrative Expense Claims and Priority Claims

52.     The Plan Administrator and Wind Down Estates shall not pay any Administrative Expense Claims, Priority Tax Claims or Priority Non-Tax Claims other than Permitted Claims (as defined below) (a) unless and until (a) the Plan Administrator establishes a reserve sufficient to pay all Allowed Administrative Expense Claims and all Disputed Administrative Expense Claims should such Disputed Administrative Expense Claims become Allowed or (b) with Court approval subject to hearing and at least 30 days' notice to all affected creditors.  Following the Effective Date, to the extent the assets of the Wind Down Estates are insufficient to pay all Allowed Administrative Claims in full, the Consenting Creditors, Transferred Entities and Battery BidCo, LLC agree to share ratably with all other Allowed Administrative Expense Claims in the remaining assets of the Wind Down Estates; provided that the rights of all other parties in interest shall be fully preserved.  The Plan Administrator and Wind Down Estates will provide regular updates and reporting to the GUC Trust, GUC Trustee, Consenting Creditors, Transferred Entities and Battery BidCo, LLC, regarding the status, amount, and allocation of Disputed Administrative Expense Claims.  "Permitted Claims" means: (i) amounts necessary for the Debtors to consummate the Plan and fulfill their obligations under the Global Settlement Agreement in an aggregate amount not to exceed $4.0 million (of the estimated $15 million of

the "Total Claims" identified by the Debtors in paragraph 45 of the Declaration of Roy Messing, the Debtors' Chief Restructuring Officer, in Support of Confirmation of the Amended Plan); (ii) any operating expenses estimated to be approximately $1.1 million by the Debtors through October 23, 2020; (iii) professional fees and expenses of the Debtors' estates or of the Consenting Creditors or other secured creditors required to be paid in accordance with the Final DIP Order, which are estimated by the Debtors to be approximately $2.3 million through October 23, 2020; (iv) post-Effective Date wind down expenses of the Plan Administrator and Wind Down Estates, which are estimated by the Debtors to be $3.5 million for a 6-month period; and (v) any success fees of Houlihan Lokey or CMD in the estimated amount of $5.2 million in the aggregate that are required to be paid by the Debtors on the Effective Date pursuant to the Europe/ROW Purchase Agreement, but are subject to reimbursement pursuant to the Europe/ROW Purchase Agreement by the Transferred Entities (or their designee) to the extent the payment of such investment banking fees result in a shortfall in the Debtors' ability to pay Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims up to the total amount of such banking fees.  Any amounts required to be reimbursed by the Transferred Entities pursuant to clause (v) of the foregoing shall not be subject to any offset, setoff or reduction.  For the avoidance of doubt, the estimated amounts set forth in clauses (ii), (iii) and (iv) shall not constitute caps or maximum amounts permitted to be paid by the Debtors or the Wind Down Estates.

### Administrative Expense Claims Bar Date

53.    Except as otherwise provided for in the *Final Order (I) Authorizing the debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (Docket No. 350) (the "**DIP Order**"), the orders approving the bar date (Docket

No. 373) or the Plan, requests for payment of Administrative Expense Claims (other than Fee Claims and DIP Claims, or claims of ordinary course professionals under the *Order Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business* (Docket No. 385), must be filed with the Bankruptcy Court, and served on the Debtors or Plan Administrator (as the case may be), and the GUC Trustee, the Claims and Noticing Agent, and the U.S. Trustee within thirty-five (35) days from the date of service of notice of the entry of this Order (the "**Administrative Expense Claims Bar Date**").  Such proof of Administrative Expense Claim must include at a minimum:  (a) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (b) the name of the holder of the Administrative Expense Claim; (c) the asserted amount of the Administrative Expense Claim; (d) the basis of the Administrative Expense Claim; and (e) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF, FOR ANY REASON, ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

### Release and Exculpation Provisions

54.    All injunctions, releases, and exculpation provisions set forth in the Plan, including but not limited to those contained in Sections 10.3, 10.5, 10.6 and 10.7 of the Plan, are approved and shall be effective and binding on all persons and entities, to the extent provided therein, and as if fully set forth herein.

RLF1 24168773v.1

**Miscellaneous**

55.    Nothing in the Plan or this Confirmation Order shall override any rights or protections provided under the DIP Order to the DIP Agent or DIP Lenders (each as defined in the DIP Order).

56.    Notwithstanding any provisions to the contrary in the Plan, the Definitive Documents or this Order, all setoff and recoupment rights of MDSA, LLC ("**Mighty**") under the Spent Battery Sales – Lead Purchase Agreement dated September 1, 2019 between Mighty and Debtor Exide Technologies, LLC are fully preserved.

57.    Notwithstanding anything to the contrary in this Order, no contract between the Debtors and Oracle America, Inc., successor in interest to Hyperion Solutions Corporation, J.D. Edwards and PeopleSoft, Inc., ("**Oracle**") will be assumed and/or assigned without (1) Oracle's prior written consent; and (2) cure of any default under such contract provided, however, that the Debtors' and Oracles' rights to seek determination by this Court as to whether Oracle's consent is required to assign any such contract is fully preserved. Oracle's consent to any such assumption and assignment may be conditioned, upon other things, on the execution by the Debtors (or a successor) and the assignee of mutually agreeable assignment documentation. In addition, no provision of this Order or any transition services agreement authorized thereby shall authorize: (1) the transfer of any Oracle license agreement to a third party; or (2) use of any Oracle license agreement that is inconsistent with the relevant license grant including, but not limited to, exceeding the number of authorized users, shared use or license splitting, absent either: (i) Oracle's express prior written consent or (ii) a determination by this Court that Oracle's consent is not required.

58.    Contracts between the Debtors and Oracle shall remain outstanding and in place between the Debtors and Oracle for a period of no less than three months subsequent to the

Effective Date, or until such earlier date at which the Debtors assign such contracts, with Oracle's consent, and any and all cure costs are paid.

59.    The Plan, including, without limitation, Section 10.6, shall not release, waive, nor discharge the Buyer and the Transferred Entities from any right, Claim, or Cause of Action in favor of Daramic, LLC, based on, or relating to, or in any manner arising from, in whole or in part, prepetition amounts or obligations not to exceed $100,000 in the aggregate, or postpetition amounts or obligations owed to Daramic, LLC by Exide Holding Europe S.A.S.; Exide International Holding Netherlands B.V.; Exide Technologies GmbH; Exide Technologies S.A.S.; Exide Technologies Operations GmbH & Co. KG; Exide Technologies S.r.l.; Exide Technologies Limited; Exide Technologies S.A.; Exide Technologies, Lda; Exide Technologies S.L.U., under that certain Amended and Restated Supply Agreement, dated January 1, 2015, by and between Exide Technologies LLC and its Affiliates, on the one hand, and Daramic, LLC and its Affiliates, on the other (or any subsequent supply agreement among such Transferred Entities and Daramic, LLC); including, but not limited to, amounts or obligations such Transferred Entities owe Daramic, LLC for goods sold, ordered, or to be ordered. For the avoidance of doubt, nothing in the Plan shall enjoin or be deemed to enjoin Daramic, LLC from prosecuting any of the foregoing Claims or Causes of Action against the Transferred Entities.

60.    Notwithstanding anything in the Plan or this Order to the contrary: (i) the Mississippi Department of Revenue's (the "**MDOR**") setoff rights under section 553 of the Bankruptcy Code and recoupment rights are preserved; (ii) the MDOR shall not be required to file any proofs of claims or requests for payment in the Chapter 11 Cases for any Administrative Claims for the liabilities described in section 503(b)(1)(B) and (C) of the Bankruptcy Code, (iii) the Debtors or the Plan Administrator, as applicable, shall timely submit returns and remit

payment, including penalties and interest, for all taxes due or coming, as required under applicable Mississippi state law,  and, should the Debtors, or Plan Administrator, as applicable, fail to so timely file and pay, MDOR may proceed with Mississippi state law remedies for collection of any amounts due and/or seek such relief as may be available from the Court; (iv) to the extent the MDOR's Priority Tax Claims, if any, are not paid in full in cash on the Effective Date, such Priority Tax Claims shall, at a minimum, be paid by regular, quarterly installment payments in cash over a period not to exceed five years after the date of the order for relief under section 301 of the Bankruptcy Code, all as required section 1129(a)(9)(C) of the Bankruptcy Code, along with non-bankruptcy interest in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code and Mississippi state law, as applicable; (v) the Chapter 11 Cases shall have no effect on the MDOR's rights as to non-Debtor third parties; (vi) the statutorily mandated treatment of MDOR's Allowed Priority Tax Claims and/or any liabilities to MDOR described in section 503(b)(1)(B) and (C) of the Bankruptcy Code shall not be considered a settlement or compromise; (vii) the MDOR may timely amend any Proof of Claim against any Debtor after the Effective Date or the Bar Date, whichever is later, with respect to (a) a pending audit, or (b) an audit that may be performed, with respect to any pre or post-petition tax return; and (c) following the filing of a tax return, and (viii) in the event of a default in payment of Priority Tax Claims of the MDOR, the MDOR shall send written notice of default to the Debtors or the Plan Administrator, as applicable, to the following mailing addresses: (i) Ankura Consulting Group, 2000 K Street NW, 12th Floor, Washington, D.C., 20006, Attention: Scott A. Rinaldi, with a copy to (ii) 14231 Riverdowns South Drive, Midlothian, VA, 23113, Attention: Scott A. Rinaldi. If such default is not cured within 10 business days after such notice of default is mailed, the

MDOR may (a) proceed with Mississippi state law remedies for collection of any amounts due and/or (b) seek such relief as may be available from the Court.

61.     Notwithstanding anything contained in the Plan or this Order to the contrary, neither the Plan nor this Order releases any of the Debtors' current or former directors and officers from direct claims brought by Victor Koelsch or bars such claims in any way, subject to all defenses or counterclaims that the Debtors' officers and directors may have.  Any claims brought by Victor Koelsch against the Debtors' current or former directors and officers must be independent from, and not included in, the GUC Trust Causes of Action.  Without limiting or expanding the foregoing, and for the sake of clarification, direct claims by Victor Koelsch against current or former officers and directors of Debtors, arising from or related to the acts, omissions, facts, or circumstances at issue in JAMS Arbitration No. 1440006167, are independent from, and not included in, the GUC Trust Causes of Action.

62.     Notwithstanding anything contrary in this Order or the Plan, nothing in this Order or the Plan impairs or otherwise affects the defensive setoff or recoupment rights and defenses of Robert Bosch LLC in connection with the timely filed objection preserving such rights or defenses (Docket No. 632), and Robert Bosch LLC retains all such setoff and recoupment rights and defenses following the Effective Date.

63.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, AIS shall not be bound by the releases set forth in Section 10.6 of the Plan, nor shall AIS be bound by any similar or equivalent third party release set forth in this Confirmation Order.  In addition, nothing in Section 10.7 of the Plan or any similar or equivalent provision of this Confirmation Order shall diminish, limit, impair or affect any AIS Administrative Expense Claim under Section 2.1 of the Plan.  Nothing in the Plan, the Confirmation Order or the Plan

Supplement shall convey any property of AIS that is located at the Vernon Non-Performing Property or elsewhere, and all property of AIS shall remain property of AIS.

64.    The License Agreement dated as of October 20, 2000, between Exide Technologies, LLC, and Infor (US), Inc. ("**Infor**"), as successor to Future Three, Inc., as amended from time to time, for the AutoRelease AutoScan software (the "**Infor Software**") shall be deemed rejected as of the date of entry of this Order.  Within five (5) days of the date of entry of this Order, the Debtors shall (i) remove all copies of the Infor Software and any portions thereof from assets of the Debtors and cease accessing and using any hosted Infor Software; (ii) destroy all copies of the Infor Software contained in the Debtors' assets and related documentation and delete all access codes; and (iii) certify to Infor in writing that the Debtors have complied with the foregoing subparagraphs (i) and (ii).  Any claim of Infor seeking payment with respect to the License Agreement or the Infor Software shall be filed within thirty (30) days of the date of entry of this Order. Infor shall be deemed to have opted out of the granting of any releases under section 10.6 of the Plan.  Notwithstanding anything to the contrary contained in this Order, in the Plan or in any document filed or prepared in connection therewith, Infor shall retain all rights against all non-Debtors and third parties.

65.    Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Order will be effective and enforceable immediately on October 23, 2020.

66.    Subject to the occurrence of the Effective Date, on and after the entry of this Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holders' respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder has accepted the Plan.

67.    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto, and any waivers and consents thereunder.

**Dated: October 16th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

RLF1 24168773v.1