**<u>Exhibit A</u>**

**Plan**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x
                        :

In re                         :        **Chapter 11**
                        :

**EXIDE HOLDINGS, INC.,** *et al.,*    :        **Case No. 20–11157 (CSS)**
                        :

**Debtors.**[1]                :        **(Jointly Administered)**
                        :

------------------------------------------------------------ x

## FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
## EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi
Zachary I. Shapiro
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: October 14, 2020
      Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

# TABLE OF CONTENTS

SECTION 1.    DEFINITIONS AND INTERPRETATION. ...................................................................1

SECTION 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS....................................21

    2.1.    Administrative Expense Claims...........................................................................21
    2.2.    Fee Claims. .........................................................................................................21
    2.3.    Priority Tax Claims.............................................................................................21
    2.4.    DIP Claims..........................................................................................................22
    2.5.    Restructuring Expenses.......................................................................................22
    2.6.    Trustees Fees.......................................................................................................22

SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS. ..........................................23

    3.1.    Classification in General.....................................................................................23
    3.2.    Grouping of Debtors for Convenience Only........................................................23
    3.3.    Summary of Classification..................................................................................23
    3.4.    Special Provision Governing Unimpaired Claims. ..............................................24
    3.5.    Elimination of Vacant Classes. ..........................................................................24
    3.6.    Voting Classes; Presumed Acceptance by Non-Voting Classes...........................24
    3.7.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ...................................................................................................................24

SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS. ..........................................25

    4.1.    Priority Non-Tax Claims (Class 1). ....................................................................25
    4.2.    Other Secured Claims (Class 2)..........................................................................25
    4.3.    ABL Claims (Class 3).........................................................................................25
    4.4.    Superpriority Notes Guarantee Claims (Class 4)................................................26
    4.5.    Exchange Priority Notes Claims (Class 5)...........................................................27
    4.6.    First Lien Notes Claims (Class 6).......................................................................27
    4.7.    General Unsecured Claims (Class 7). ..................................................................28
    4.8.    Environmental NPP Claims (Class 8)..................................................................28
    4.9.    Intercompany Claims (Class 9)...........................................................................29
    4.10.    Intercompany Interests (Class 10). .....................................................................29
    4.11.    Holdings Equity Interests (Class 11). ..................................................................30
    4.12.    Subordinated Securities Claims (Class 12)..........................................................30

SECTION 5.    MEANS FOR IMPLEMENTATION. ...................................................................31

    5.1.    Europe/ROW Sale Transaction...........................................................................31
    5.2.    Compromise and Settlement of Claims, Interests, and Controversies ...............................31
    5.3.    Settlement with PBGC........................................................................................37
    5.4.    The GUC Trust. ..................................................................................................37
    5.5.    The Environmental Response Trust. ....................................................................39
    5.6.    The Vernon Environmental Response Trust.........................................................40
    5.7.    Canada Non-Performing Property. ......................................................................40
    5.8.    Plan Administrator..............................................................................................41
    5.9.    Corporate Action.................................................................................................43
    5.10.    Withholding and Reporting Requirements. ..........................................................43
    5.11.    Exemption From Certain Transfer Taxes. ...........................................................44
    5.12.    Effectuating Documents; Further Transactions. ..................................................44
    5.13.    Preservation of Rights of Action.........................................................................45

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| 5.14. | Certificate of Incorporation and By-Laws. | 46 |
| 5.15. | Stock Trading Restrictions. | 46 |
| 5.16. | Cancellation of Superpriority Notes and Release and Discharge of Debtor Guarantee Claims. | 46 |
| 5.17. | Cancellation of Existing Securities and Agreements | 46 |
| 5.18. | Subordinated Claims. | 47 |
| 5.19. | Nonconsensual Confirmation. | 47 |
| 5.20. | Closing of Chapter 11 Cases. | 47 |
| 5.21. | Notice of Effective Date. | 47 |
| 5.22. | Corporate Form. | 48 |
| 5.23. | Separability. | 48 |

**SECTION 6.    DISTRIBUTIONS. ....... 48**

| | | |
|---|---|---|
| 6.1. | Distributions Generally. | 48 |
| 6.2. | Distribution Record Date. | 48 |
| 6.3. | Date of Distributions. | 48 |
| 6.4. | Disbursing Agent. | 49 |
| 6.5. | Rights and Powers of Disbursing Agent. | 49 |
| 6.6. | Expenses of Disbursing Agent. | 49 |
| 6.7. | No Postpetition Interest on Claims. | 50 |
| 6.8. | Delivery of Distributions. | 50 |
| 6.9. | Distributions after Effective Date. | 51 |
| 6.10. | Unclaimed Property. | 51 |
| 6.11. | Time Bar to Cash Payments. | 51 |
| 6.12. | Manner of Payment under Plan. | 51 |
| 6.13. | Satisfaction of Claims. | 51 |
| 6.14. | Minimum Cash Distributions. | 51 |
| 6.15. | Setoffs and Recoupments. | 52 |
| 6.16. | Allocation of Distributions between Principal and Interest. | 52 |
| 6.17. | No Distribution in Excess of Amount of Allowed Claim. | 52 |

**SECTION 7.    PROCEDURES FOR DISPUTED CLAIMS. ....... 52**

| | | |
|---|---|---|
| 7.1. | Objections to Claims. | 52 |
| 7.2. | Resolution of Disputed Claims. | 52 |
| 7.3. | Payments and Distributions with Respect to Disputed Claims. | 53 |
| 7.4. | Distributions after Allowance. | 53 |
| 7.5. | Estimation of Claims. | 53 |
| 7.6. | No Distributions Pending Allowance. | 53 |
| 7.7. | Claim Resolution Procedures Cumulative. | 53 |
| 7.8. | Interest. | 54 |
| 7.9. | Insured Claims. | 54 |

**SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ....... 54**

| | | |
|---|---|---|
| 8.1. | Rejection of Executory Contracts and Unexpired Leases. | 54 |
| 8.2. | Determination of Assumption Disputes and Deemed Consent. | 54 |
| 8.3. | Rejection Damages Claims. | 56 |
| 8.4. | Insurance Policies. | 56 |
| 8.5. | Intellectual Property Licenses and Agreements. | 57 |
| 8.6. | Tax Agreements. | 57 |
| 8.7. | Standby Environmental Trust Agreement. | 57 |
| 8.8. | Assignment. | 58 |

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 8.9. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 58 |
| 8.10. | Reservation of Rights. | 58 |
| **SECTION 9.** | **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.** | 59 |
| 9.1. | Conditions Precedent to the Effective Date. | 59 |
| 9.2. | Waiver of Conditions Precedent. | 60 |
| 9.3. | Effect of Failure of Conditions to Effective Date. | 60 |
| **SECTION 10.** | **EFFECT OF CONFIRMATION.** | 61 |
| 10.1. | Vesting of Assets. | 61 |
| 10.2. | Term of Injunctions or Stays. | 61 |
| 10.3. | Injunction. | 62 |
| 10.4. | Binding Effect. | 63 |
| 10.5. | Releases by the Debtors. | 63 |
| 10.6. | Releases By Holders of Claims and Interests. | 63 |
| 10.7. | Exculpation. | 65 |
| 10.8. | Waiver of Statutory Limitation on Releases. | 65 |
| 10.9. | Solicitation of the Plan. | 66 |
| 10.10. | Corporate Action. | 66 |
| **SECTION 11.** | **RETENTION OF JURISDICTION.** | 66 |
| 11.1. | Retention of Jurisdiction. | 66 |
| 11.2. | Courts of Competent Jurisdiction. | 68 |
| **SECTION 12.** | **MISCELLANEOUS PROVISIONS.** | 68 |
| 12.1. | Payment of Statutory Fees. | 68 |
| 12.2. | Substantial Consummation. | 68 |
| 12.3. | Dissolution of Creditors' Committee. | 68 |
| 12.4. | Amendments. | 69 |
| 12.5. | Revocation or Withdrawal of the Plan. | 69 |
| 12.6. | Severability of Plan Provisions upon Confirmation. | 69 |
| 12.7. | Governing Law. | 70 |
| 12.8. | Time. | 70 |
| 12.9. | Additional Documents | 70 |
| 12.10. | Immediate Binding Effect. | 70 |
| 12.11. | Successors and Assigns. | 70 |
| 12.12. | Entire Agreement. | 70 |
| 12.13. | Notices. | 71 |

**Schedule 1**:    Settling Governmental Authorities
**Schedule 2**:    Non-Performing Properties
**Schedule 3**:    Transferred Entities

Each of the Debtors proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.A.

SECTION 1.    **DEFINITIONS AND INTERPRETATION.**

A. **Definitions.**

1.1    ***2020 Legacy First Lien Notes Indenture*** means that certain indenture, by and between Exide Technologies, as issuer, and U.S. Bank National Association, as trustee, dated as of April 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.2    ***2022 Legacy First Lien Notes Indenture*** means that certain indenture, by and between Holdings, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee, dated as of May 24, 2017, as amended, supplemented or otherwise modified from time to time.

1.3    ***ABL Agents*** means Bank of America, N.A., as administrative agent, and Bank of America, N.A., PNC Bank, National Association, and Bank of Montreal, as co-collateral agents, under the ABL Credit Agreement, and their permitted successors and assigns.

1.4    ***ABL Claim*** means a Claim arising under the ABL Credit Agreement.

1.5    ***ABL Credit Agreement*** means that certain ABL Credit Agreement by and among, inter alia, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, Exide Holding Netherlands B.V., the ABL Agents, and the ABL Lenders, dated as of April 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.6    ***ABL Lenders*** means "Lenders" as defined in the ABL Credit Agreement.

1.7    ***Acquired Assets*** means, collectively, the Transferred Equity Interests and the Transferred Assets.

1.8    ***Administrative Expense Claim*** means any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Restructuring Expenses; (c) Trustees Fees; and (d) any Claim Allowed under section 503(b)(9) of the Bankruptcy Code.

1.9    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.10    ***Allowed*** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is not identified in the Schedules as contingent, unliquidated, or disputed; (c) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors, GUC Trustee or Plan Administrator, as applicable; (d) as to which the liability of the Debtors or GUC Trust, as applicable, and

the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (e) expressly allowed hereunder; *provided, however*, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to, and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Plan Administrator and the GUC Trustee shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan.

1.11    ***Alternative Transaction Structure*** means the implementation steps necessary to consummate the Europe/ROW Sale Transaction pursuant to the Europe/ROW Purchaser's election under Section 2.08 of the Europe/ROW Purchase Agreement. The Europe/ROW Purchaser made such election in accordance with the Europe/ROW Purchase Agreement and the Debtors filed the Alternative Transaction Structure, which may be amended in accordance with the Europe/ROW Purchase Agreement, with the Plan Supplement at Docket No. 821.

1.12    ***Americas Closing*** means "Closing" as defined in the Americas Purchase Agreement.

1.13    ***Americas Purchase Agreement*** means that certain Stock and Asset Purchase Agreement by and among Exide Technologies, Battery BidCo LLC, and Atlas Capital Resources III LP, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.

1.14    ***Americas Sale Order*** means the *Order (I) Approving the Purchase Agreement Among Debtors and Buyer, (II) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* entered by the Bankruptcy Court in the Chapter 11 Cases on August 6, 2020 (Docket No. 690).

1.15    ***Americas Sale Transaction*** means the transaction to be effectuated pursuant to the Americas Purchase Agreement.

1.16    ***Aspen*** means, collectively, Aspen American Insurance Company, and Aspen Specialty Insurance Company, solely in their capacity as providers of surety insurance to the Debtors pursuant the Aspen Surety Bond Agreements.

1.17    ***Aspen Surety Bond Agreements*** means the applicable agreements governing the surety bond obligations of Aspen to the Debtors with respect to the Frisco Non-Performing Property.

1.18    ***Asset*** means all of the rights, title, and interests of a Debtor in, and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property.

1.19    ***Assumed Liabilities*** means "Assumed Liabilities" as defined in the Europe/ROW Purchase Agreement.

1.20    ***Assumption Dispute*** means a pending objection relating to assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.21    ***Assumption Schedule*** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Europe/ROW Purchaser, the Environmental

2

Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities, as applicable, pursuant to the Plan and included in the Plan Supplement at Docket No. 821 and Docket No. 939, as may be amended, modified, or supplemented from time to time.

1.22    ***Avoidance Actions*** means any action commenced or that may be commenced by or on behalf of the Debtors pursuant to sections 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

1.23    ***Ballot*** means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

1.24    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.25    ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.26    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.27    ***Bidding Procedures*** means the procedures governing the auction and sale process relating to any potential Sale Transaction, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

1.28    ***Bidding Procedures Order*** means that certain *Order (I) Approving (A) Bidding Procedures for Sales of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auction for and Hearing to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief*, entered by the Bankruptcy Court in the Chapter 11 Cases on June 19, 2020 (Docket No. 344).

1.29    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.30    ***California DTSC*** means the California Department of Toxic Substances Control.

1.31    ***Canada MOE*** means the Ontario Ministry of the Environment, Conservation and Parks.

1.32    ***Canada Non-Performing Property*** means the Debtors' non-performing property located in Fort Erie, Ontario, Canada. For the purposes of the Plan, such property shall not be deemed to be a "Non-Performing Property" as such term is used herein.

3

1.33     ***Canada NPP Claim*** means any civil Claim or Cause of Action by the Canada MOE against the Debtors under Environmental Laws (including Environmental Laws of Canada) with respect to the Canada Non-Performing Property.

1.34     ***Canada NPP Risk Management Measures Funds*** means the Cash deposit, in an amount to be determined by the Debtors in consultation with the Requisite Noteholders, to be made by the Debtors for the environmental risk management of the Canada Non-Performing Property.

1.35     ***Cash*** means legal tender of the United States of America.

1.36     ***Cause of Action*** means any action, Claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or any other Avoidance Actions, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any claims under any state law or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.37     ***Challenge Deadline*** means "Challenge Deadline" as defined in the DIP Order.

1.38     ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on May 19, 2020, and styled *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS).

1.39     ***City of Frisco*** means the City of Frisco, Texas.

1.40     ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.41     ***Class*** means any group of Claims or Interests classified as set forth in <u>Section 3</u> of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.42     ***Columbus Development Authority*** means the Development Authority of Columbus, Georgia.

1.43     ***Columbus Non-Performing Property*** means the Non-Performing Property located at 3639 Joy Road, Columbus, Georgia.

1.44     ***Columbus NPP Termination Documents*** means that certain Agreement Regarding Termination Documents, by and between Exide Technologies and the Columbus Development Authority, dated as of September 9, 2020, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.  The Columbus NPP Termination Documents were filed with the Plan Supplement at Docket No. 821.

1.45    ***Commencement Date*** means the date on which the Debtors commenced the Chapter 11 Cases.

1.46    ***Confirmation*** means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.47    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.48    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.49    ***Confirmation Order*** means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.50    ***Consenting Creditors*** means each of the holders of Superpriority Notes, Exchange Priority Notes, or First Lien Notes that are party to the RSA together with their respective successors and permitted assigns and any subsequent holders of Superpriority Notes, Exchange Priority Notes, or First Lien Notes that become party to the RSA in accordance with the terms of the RSA.

1.51    ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.52    ***Cure Amount*** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtors to assume such executory contract or unexpired lease.

1.53    ***D&O Policy*** means any insurance policy that covers, among others, current or former directors, members, trustees, managers, and officers liability issued at any time to or providing coverage to the Debtors and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

1.54    ***Debtors*** means Exide Holdings, Inc.; Exide Technologies, LLC; Exide Delaware LLC; Dixie Metals Company; and Refined Metals Corporation.

1.55    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.56    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Europe/ROW Sale Transaction and the Global Settlement, including, but not limited to: (a) the Plan; (b) the Disclosure Statement; (c) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (d) each of the documents comprising the Plan Supplement; (e) the Confirmation Order; (f) the GUC Trust Agreement; and (g) the Environmental Settlement Documents.

1.57    ***DIP Agent*** means "DIP Agent" as defined in the DIP Order.

1.58    ***DIP Claim*** means any Claim of the DIP Lenders or DIP Agent arising under the DIP Loan Documents or the DIP Order.  For the avoidance of doubt, DIP Claims includes all DIP Obligations.

1.59    ***DIP Facility*** means "DIP Facility" as defined in the DIP Order.

1.60    ***DIP Lenders*** means "DIP Lenders" as defined in the DIP Order.

1.61    ***DIP Loan Documents*** means "DIP Loan Documents" as defined in the DIP Order.

1.62    ***DIP Motion*** means the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief* (Docket No.26).

1.63    ***DIP Obligations*** means "DIP Obligations" as defined in the DIP Order.

1.64    ***DIP Order*** means the final order approving the DIP Motion (Docket No. 350).

1.65    ***Disallowed*** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.66    ***Disbursing Agent*** means the Plan Administrator; *provided*, that with respect to distributions to holders of Allowed General Unsecured Claims, the GUC Trustee shall be the "Disbursing Agent" and distribute the GUC Trust Assets as and when provided for in the GUC Trust Agreement.

1.67    ***Disclosure Statement*** means the disclosure statement filed by the Debtors in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (as may be amended, supplemented, or modified from time to time).

1.68    ***Disputed*** means with respect to a Claim or Interest, that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) the Debtors or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtors, or any parties in interest, dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors, or any parties in interest, do not dispute, and Disputed as to the balance of such Claim.

1.69    ***Distribution*** means payment or distribution of consideration to holders of Allowed Claims pursuant to this Plan.

1.70    ***Distribution Date*** means a date or dates as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.71    ***Distribution Record Date*** means the Effective Date of the Plan or such other date as determined by (a) the GUC Trustee with respect to General Unsecured Claims, (b) the Plan Administrator with the consent of the Requisite Noteholders and applicable Trustee with respect to the Superpriority Notes, Exchange Priority Notes, and First Lien Notes, or (c) the Plan Administrator with respect to all other Allowed Claims.  For the avoidance of doubt, the Distribution Record Date shall not apply to holders of public securities.

1.72    ***DTC*** means the Depositary Trust Company or any successor securities clearing agency.

1.73    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.74    ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.75    ***Environmental Global Settlement Payment*** means the $7,412,477 Cash payment to be made to the Environmental Response Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement with respect to the Transferred Non-Performing Properties.

1.76    ***Environmental Laws*** means any federal, state, or local laws, including ordinances, statutes, common law, codes, rules, regulations, orders, or decrees, now or hereinafter in effect, relating to (a) pollution, (b) the protection or regulation of human health, natural resources, or the environment, (c) the management of hazardous materials, or (d) the release of hazardous materials into the environment.

1.77    ***Environmental NPP Claim*** means any Transferred NPP Claim, Vernon NPP Claim, or Frisco NPP Claim.  For the avoidance of doubt, all Environmental NPP Claims are unsecured Claims against a Debtor and are not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.78    ***Environmental Response Trust*** means the trust established pursuant to the Environmental Trust Agreements and the Environmental Settlement Agreement with respect to the Transferred Non-Performing Properties.

1.79    ***Environmental Settlement Agreement*** means that certain Consent Decree and Settlement Agreement Regarding the Non-Performing Properties, among the Debtors, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, each of the Settling Governmental Authorities, and Westchester relating to the Non-Performing Properties, substantially in the form of the version dated September 22, 2020 and filed at Docket No. 869, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.80    ***Environmental Settlement Documents*** means the Environmental Settlement Agreement, the Environmental Trust Agreements, the Vernon Environmental Trust Agreement, and any other documents or instruments required by such documents.

1.81    ***Environmental Sureties*** means, collectively, Westchester and Aspen.

1.82    ***Environmental Trust Agreements*** means one or more trust agreements by and among the Debtors, the Settling Governmental Authorities, the Transferred Entities, and the Environmental Trustee, in form and substance as agreed to by such parties and filed with the Court and consistent with the Environmental Settlement Agreement and Section 5 of the Plan.

1.83    ***Environmental Trust Assets*** shall, pursuant to the Global Settlement, consist of (a) the Environmental Global Settlement Payment, (b) the contributions by Westchester in accordance with the terms of the Environmental Trust Agreements with respect to the Transferred Non-Performing Properties, (c) the Transferred Non-Performing Properties or any proceeds thereof to the extent a Transferred Non-Performing Property is sold prior to the Effective Date, and (d) the Environmental Trust Causes of Action.

1.84    ***Environmental Trust Beneficial Interests*** means the beneficial interests in the Environmental Response Trust.

1.85    ***Environmental Trust Cause of Action*** means any Claim, debt, right or Cause of Action of the Debtors against any Person or Entity that is not a Released Party or an Exculpated Party, including an insurer, relating to any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under Environmental Laws with respect to any Transferred Non-Performing Property.

1.86    ***Environmental Trustee*** means the Person or Entity approved by the Bankruptcy Court to serve as the trustee of the Environmental Response Trust, and any successor thereto in accordance with the Environmental Trust Agreements.

1.87    ***ERISA*** means the Employee Retirement Income Security Act of 1974, title 29 of the United States Code.

1.88    ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.89    ***Europe/ROW Closing*** means "Closing" as defined in the Europe/ROW Purchase Agreement.

1.90    ***Europe/ROW Purchase Agreement*** means that certain Stock and Asset Purchase Agreement, by and between Exide Holdings, Inc., the other seller parties, and the Europe/ROW Purchaser, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.

1.91    ***Europe/ROW Purchaser*** means Energy Technologies Holdings LLC.

1.92    ***Europe/ROW Sale Transaction*** means the sale of the Acquired Assets to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement.

1.93    ***European Bridge Notes*** means the notes issued pursuant to the European Bridge Notes Indenture.

1.94    ***European Bridge Notes Indenture*** means that certain indenture, to be entered into by and between non-Debtor Exide International Holdings LP, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent, documenting the terms of an interim financing facility in accordance with the Europe/ROW Purchase Agreement, the proceeds of which may be used to fund, among other things, the Global Settlement Payments by the Transferred Entities.

1.95    ***Exchange Priority and First Lien Notes Indenture*** means that certain indenture, by and among Exide Technologies, as issuer, the guarantor parties thereto, and the Exchange Priority and First Lien Notes Trustee, dated as of June 25, 2019, as amended, supplemented or otherwise modified from time to time.

1.96    ***Exchange Priority and First Lien Notes Trustee*** means U.S. Bank National Association, in its capacity as trustee and collateral agent under the Exchange Priority and First Lien Notes Indenture.

1.97    ***Exchange Priority Notes*** means the 11% Exchange Priority Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture.

1.98    ***Exchange Priority Notes Charging Lien*** means any Lien or other priority in payment to which the Exchange Priority and First Lien Notes Trustee is entitled, pursuant to the Exchange Priority and First Lien Notes Indenture, against distributions to be made to the holders of the Exchange Priority Notes under this Plan or otherwise, for payment of any Exchange Priority Notes Indenture Trustee Fees.

1.99    ***Exchange Priority Notes Claim*** means a Claim arising under the Exchange Priority and First Lien Notes Indenture relating to the Exchange Priority Notes issued thereunder.

1.100    ***Exchange Priority Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Exchange Priority and First Lien Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Exchange Priority and First Lien Notes Indenture with respect to the Exchange Priority Notes.

1.101    ***Exculpated Parties*** means collectively: (a) the Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) the Creditors' Committee and each of its members in their capacity as such, (e) the GUC Trust, (f) the GUC Trustee, (g) the Trustees, and (h) with respect to each of the foregoing Persons or Entities in clauses (a) through (h), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided herein.

1.102    ***Exide International*** means non-Debtor Exide International Holdings, LP.

1.103    ***Exide Technologies*** means Exide Technologies, LLC.

1.104    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors or the Creditors' Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.105    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and is in full force and effect, which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.106    ***First Lien Notes*** means the 11% First Lien Senior Secured Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture.

1.107    ***First Lien Notes Charging Lien*** means any Lien or other priority in payment to which the Exchange Priority and First Lien Notes Trustee is entitled, pursuant to the Exchange Priority and

First Lien Notes Indenture, against distributions to be made to the holders of the First Lien Notes under this Plan or otherwise, for payment of any First Lien Notes Indenture Trustee Fees.

1.108    **First Lien Notes Claim** means a Claim arising under the Exchange Priority and First Lien Notes Indenture relating to the First Lien Notes issued thereunder.

1.109    **First Lien Notes Indenture Trustee Fees** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Exchange Priority and First Lien Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Exchange Priority and First Lien Notes Indenture with respect to the First Lien Notes.

1.110    **Former Officers and Directors** means any Person that served in a capacity as an officer or director of any of the Debtors, other than those (a) Persons that were officers or directors of the Debtors immediately prior to the Americas Closing or (b) Persons that are officers or directors of the Debtors immediately prior to the Effective Date.

1.111    **Frisco Assets** shall, pursuant to the Global Settlement, consist of:  (a) the Frisco Global Settlement Payment, (b) the contributions by Aspen in accordance with the Frisco Settlement Agreement, and (c) the Frisco Non-Performing Property.

1.112    **Frisco CDC** means the Frisco Community Development Corporation.

1.113    **Frisco Global Settlement Payment** means the $100,000 Cash payment to be made to TCEQ by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.114    **Frisco Governmental Authority** means each of (a) TCEQ, (b) the City of Frisco, and (c) the Frisco CDC.

1.115    **Frisco Non-Performing Property** means the Non-Performing Property located at 7471 South Fifth Street, Frisco, Texas.

1.116    **Frisco NPP Claim** means any civil Claim or Cause of Action by the Frisco Governmental Authorities against the Debtors under Environmental Laws with respect to or arising out of the Frisco Non-Performing Property.

1.117    **Frisco Settlement Agreement** means that certain Consent Decree and Settlement Agreement Regarding the Non-Performing Exide Frisco Site, by and among the Debtors, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Frisco Governmental Authorities, and Aspen relating to the Frisco Non-Performing Property, substantially in the form of the version dated September 10, 2020 and filed with the Plan Supplement at Docket No. 821, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.118    **General Unsecured Claim** means any unsecured Claim against any Debtor, other than an Intercompany Claim or an Environmental NPP Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.  The Legacy Notes Claims shall constitute General Unsecured Claims against Holdings.  For the avoidance of doubt, Environmental NPP Claims shall not constitute General Unsecured Claims.

1.119   ***Global Settlement*** shall have the meaning ascribed to such term in <u>Section 5.2(a)</u> of the Plan.

1.120   ***Global Settlement Documents*** means the Plan, the Definitive Documents contained in the Plan Supplement comprising the Global Settlement, and the Environmental Settlement Documents, each of which shall be acceptable in form and substance to each of the Global Settlement Parties.  For the avoidance of doubt, the Global Settlement Parties acknowledge and agree that the Plan is acceptable, subject to any consent rights contained in <u>Section 12.4</u> hereof.

1.121   ***Global Settlement Party*** means each of the Debtors, the Consenting Creditors, the Creditors' Committee, the Settling Governmental Authorities, and the Environmental Sureties.

1.122   ***Global Settlement Payments*** means, collectively, the Environmental Global Settlement Payment, the Vernon Global Settlement Payment (subject to the satisfaction of the Payment Condition), the Frisco Global Settlement Payment, and the GUC Global Settlement Payment.

1.123   ***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code; *provided*, that for the avoidance of doubt, the term "Governmental Unit" shall not include the PBGC.

1.124   ***GUC Global Settlement Payment*** means the $2,400,000 Cash payment to be made to the GUC Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.125   ***GUC Trust*** means the trust established under the Plan in accordance with the GUC Trust Agreement.

1.126   ***GUC Trust Agreement*** means that certain General Unsecured Creditors' Trust Agreement to be entered into by the Debtors, the GUC Trustee, the Requisite Noteholders, and the Creditors' Committee, substantially in the form of the version dated September 10, 2020 and filed with the Plan Supplement at Docket No. 821, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.127   ***GUC Trust Assets*** shall, pursuant to the Global Settlement, consist of: (a) the GUC Global Settlement Payment, and (b) the GUC Trust Causes of Action.

1.128   ***GUC Trust Beneficial A Interests*** means beneficial interests in the GUC Trust entitling the respective holder to its Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement.

1.129   ***GUC Trust Beneficial B Interests*** means beneficial interests in the GUC Trust entitling the respective holder to its Pro Rata share of the GUC Trust Assets after the GUC Trust has distributed Cash to holders of Allowed General Unsecured Claims in an aggregate amount equal to the GUC Global Settlement Payment.

1.130   ***GUC Trust Causes of Action*** means (a) all Avoidance Actions, (b) Causes of Action of the Debtors against Former Officers and Directors, and (c) Causes of Action of the Debtors arising under commercial tort law; *provided*, that GUC Trust Causes of Action shall exclude (a) all Avoidance Actions or Causes of Action against any Released Party, Exculpated Party, ABL Lender, or ABL Agent, (b) the Environmental Trust Causes of Action, (c) the Vernon Environmental Trust Causes of Action, (d) any Causes of Action settled pursuant to the Global Settlement, and (e) any other Causes of Actions of the Debtors, including those arising under sections 542 or 549 of the Bankruptcy Code.

1.131   ***GUC Trustee*** means the Person or Entity selected by the Creditors' Committee to serve as the trustee of the GUC Trust, and any successor thereto in accordance with the GUC Trust Agreement.

1.132   ***Holdings*** means Exide Holdings, Inc.

1.133   ***Holdings Equity Interests*** means all Interests in Holdings, including Holdings Stock and any options, warrants or rights to acquire any such Interests.

1.134   ***Holdings Stock*** means all common stock and preferred stock in Holdings.

1.135   ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.136   ***Insured Claim*** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

1.137   ***Intercompany Claim*** means a Claim against any Debtor by another Debtor or non-Debtor Affiliate of such other Debtor.

1.138   ***Intercompany Interest*** means an Interest in a Debtor other than a Holdings Equity Interest.

1.139   ***Intercreditor Agreement*** means that certain Amended and Restated Intercreditor Agreement, by and between the ABL Agents and U.S. Bank, in its separate capacities as trustee and collateral agent under each of the Superpriority Notes Indenture, the Exchange Priority and First Lien Notes Indenture, and the 2020 Legacy First Lien Notes Indenture, dated June 17, 2019, as amended, supplemented or otherwise modified from time to time.

1.140   ***Interest*** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date.

1.141   ***June 2019 Financing*** means the new money investment and debt exchange of existing debt by the Debtors' lender group completed in June 2019, as described in Article III of the Disclosure Statement.

1.142   ***Legacy Notes*** means the 3.79% Second Lien Deferred Payment Notes due 2022, the 11% First Lien Senior Secured Notes due 2020, and the 11% First Lien Senior Secured Notes due 2022 issued pursuant to the Legacy Notes Indentures.

1.143   ***Legacy Notes Charging Lien*** means any Lien or other priority in payment to which the Legacy Notes Trustee is entitled, pursuant to the Legacy Notes Indentures, against distributions to be made to the holders of the Legacy Notes Claims under this Plan or otherwise, for payment of any Legacy Notes Indenture Trustee Fees.

1.144 ***Legacy Notes Indentures*** means, collectively, the (a) Legacy Second Lien Notes Indenture, (b) the 2020 Legacy First Lien Notes Indenture, and (c) the 2022 Legacy First Lien Notes Indenture.

1.145 ***Legacy Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Legacy Notes Trustee, whether prior to or after the Commencement Date, and whether prior to or after the consummation of the Plan, under the Legacy Notes Indentures.

1.146 ***Legacy Notes Trustee*** means Delaware Trust Company, in its capacity as successor trustee and collateral agent under the Legacy Notes Indentures.

1.147 ***Legacy Second Lien Notes Indenture*** means that certain indenture, by and between Holdings, as issuer, and U.S. Bank National Association, as trustee, dated as of June 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.148 ***Legacy Notes Claims*** means Claims arising under any of the Legacy Notes Indentures.

1.149 ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.150 ***Net Cash Proceeds*** means (a) all Cash of the Debtors realized from their business or Wind-Down operations or the Sale Transaction Proceeds *less* (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Fee Claims, Restructuring Expenses, Trustees Fees, Priority Tax Claims, DIP Claims, ABL Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) estimated and reserved by the Debtors or the Plan Administrator with the reasonable consent of the Requisite Noteholders to adequately fund the Wind-Down; (iii) necessary to satisfy any Statutory Fees required to be paid in accordance with the Bankruptcy Code, the Bankruptcy Rules or any order of the Bankruptcy Court; and (iv) necessary to satisfy the Debtors' obligations under the Europe/ROW Purchase Agreement and the Global Settlement (including the turnover to the Environmental Response Trust or the Vernon Environmental Response Trust of any sale proceeds of the Transferred Non-Performing Properties or the Vernon Non-Performing Property, as applicable, received prior to the Effective Date or the Global Settlement Payments, to the extent received by the Debtors from the Transferred Entities pursuant to Section 5.2(h) hereof).

1.151 ***New Board*** means the new board of directors of Holdings on and after the Effective Date.

1.152 ***Non-Performing Properties*** means the properties set forth on Schedule 2 attached hereto.

1.153 ***Notes Deficiency Claims*** means the deficiency Claims on account of indebtedness under the Superpriority Notes Indenture or the Exchange Priority and First Lien Notes Indenture under section 506(a) of the Bankruptcy Code.

1.154 ***Optimization*** means the internal reorganization of the Debtors completed in December 2019, as described in Article III of the Disclosure Statement, that was the subject of the investigation by the sub-committee of the special committee of the Debtors' board of directors.

1.155   ***Other Secured Claim*** means a Secured Claim, other than (a) the ABL Claims, (b) the Superpriority Notes Guarantee Claims, (c) the Exchange Priority Notes Claims, (d) the First Lien Notes Claims, and (e) the DIP Claims.

1.156   ***Payment Condition*** means the approval by the Bankruptcy Court of the release by the California state governmental agencies, including the California DTSC, set forth in Section 10.6 in favor of the Europe ROW Purchaser, the Transferred Entities, and the Consenting Creditors.

1.157   ***PBGC*** means the Pension Benefit Guaranty Corporation.

1.158   ***PBGC Claims*** means all Claims of the PBGC, including any UBL Claim or any Claim for plan termination premiums under section 4006 of ERISA, against Holdings or Exide Technologies or any member of each entity's "controlled group" as that term is defined in ERISA section 4001(a)(14) based upon or relating to the Pension Plan or any agreements relating thereto.

1.159   ***PBGC Settlement Payment*** means the $6,000,000 Cash payment to be made to the PBGC by the Transferred Entities on the Effective Date pursuant to Section 5.3 of the Plan.

1.160   ***Pension Plan*** means the following Pension Plan as to which Holdings was the plan sponsor, as such term is defined in ERISA Section 3(16)(B):  Exide Technologies Retirement Plan.

1.161   ***Permitted Liens*** means "Permitted Liens" as defined in the Europe/ROW Purchase Agreement.

1.162   ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other Entity.

1.163   ***Plan*** means this joint chapter 11 plan, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with Section 12.4 herein.

1.164   ***Plan Administrator*** means the person or entity selected by the Debtors charged with overseeing the tasks outlined in Section 5.8 of this Plan, or any successor appointed by the New Board. The identity of the Plan Administrator shall be filed with the Bankruptcy Court prior to the Confirmation Hearing.

1.165   ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms or term sheets of applicable documents, schedules and exhibits to the Plan to be filed with the Court, including, but not limited to, the following: (a) Assumption Schedule, (b) GUC Trust Agreement, (c) Environmental Settlement Agreement, (d) Environmental Trust Agreements, (e) Frisco Settlement Agreement, (f) Vernon Environmental Trust Agreement, and (g) Columbus NPP Termination Documents.  The first Plan Supplement was filed at least seven (7) days prior to the deadline to objection to confirmation of the Plan; *provided*, that through the Effective Date, the Debtors shall have the right to amend any documents contained in, and exhibits to, any Plan Supplement subject to the requirements of Section 12.4 of the Plan and except that the Debtors shall not have the right to amend any Environmental Settlement Document without the consent of the Settling Governmental Authorities.

1.166   ***Postpetition Accounts Payable*** means any postpetition Cure Amount due or accrued on account of any executory contract or unexpired lease designated for assignment and assumption to the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco

14

Governmental Authorities (other than TCEQ) pursuant to the Environmental Settlement Documents or the Frisco Settlement Agreement, as applicable.

1.167   ***Prerequisite Condition*** has the meaning set forth in <u>Section 9.1(k)</u> hereof.

1.168   ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.169   ***Priority Tax Claim*** means any secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.170   ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.171   ***Professional Fee Escrow Account*** means "Professional Fee Escrow Account" as defined in the DIP Order.

1.172   ***Proof of Claim*** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.173   ***Related Parties*** means with respect to any Exculpated Party or Released Party: (a) such Entities' successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (b) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which exculpation or releases are provided in the Plan, and (c) such persons' respective heirs, executors, estates, servants and nominees; *provided*, that the Former Officers and Directors of the Debtors shall not be "Related Parties."

1.174   ***Released Parties*** means collectively: (a) the Debtors, (b) each of the Consenting Creditors, (c) the Trustees, (d) the Europe/ROW Purchaser, (e) the Transferred Entities, (f) each of the DIP Lenders and the DIP Agent, (g) the Creditors' Committee and each of its members in their capacity as such, and with respect to each of the foregoing entities in clauses (a) through (g), such Entities' respective Related Parties.

1.175   ***Releasing Parties*** has the meaning set forth in <u>Section 10.6</u> hereof.

1.176   ***Requisite Noteholders*** means, collectively, as of date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of each of (a) the Exchange Priority Notes held by all Consenting Creditors at such time, (b) the First Lien Notes held by all Consenting Creditors at such time, and (c) the Superpriority Notes held by all Consenting Creditors at such time.  For the avoidance of doubt, the term "Requisite Noteholders" as used herein shall not hold the same meaning as the same or similar terms contained in the Exchange Priority and First Lien Notes Indenture or the Superpriority Notes Indenture.

1.177   ***Restructuring Expenses*** means the reasonable and documented fees, costs, and expenses of (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) Young Conaway Stargatt & Taylor LLP, and (c) CMD Global Advisors, LLC.

1.178   ***RSA*** means that certain Restructuring Support Agreement, dated as of May 18, 2020, by and among the Debtors and the Consenting Creditors, as the same may be amended, supplemented, or modified from time to time in accordance with its terms.

1.179   ***Sale Transaction*** means any transaction or series of transactions pursuant to one or more of (a) the Americas Sale Transaction, (b) the Europe/ROW Sale Transaction, (c) the Wind-Down, or (d) any other sale of Assets (other than the sale of any Non-Performing Property) of any of the Debtors prior to the Effective Date.

1.180   ***Sale Transaction Proceeds*** means the net cash proceeds received by the Debtors, the Plan Administrator, or the Wind-Down Estates, as applicable, pursuant one or more of the Sale Transactions.

1.181   ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.182   ***Secured Claim*** means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in this Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

1.183   ***Settling Governmental Authorities*** means the Persons and Entities listed on Schedule 1 attached hereto, and each of their respective successors.

1.184   ***Single Share*** has the meaning set forth in Section 4.11(b) hereof.

1.185   ***Standby Environmental Trust Agreement*** means those certain Trust Agreements between certain of the Debtors, as grantor, U.S. Bank National Association, as trustee, and the applicable regulatory agency pursuant to which an environmental standby trust was established to provide financial assurances that funds will be available when needed for closure, post closure, or corrective action of the facility.

1.186   ***Standby Environmental Trust Trustee*** means U.S. Bank National Association, as trustee under each of the Standby Environmental Trust Agreement.

1.187   ***Statutory Fees*** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

1.188   ***Subordinated Securities Claim*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

1.189   ***Subsequent Condition*** has the meaning set forth in Section 9.1(k) hereof.

1.190   ***Successful Bid*** has the meaning set forth in the Bidding Procedures Order.

1.191   ***Superpriority Note Documents*** means "Note Documents" as defined in the Superpriority Notes Indenture.

1.192   ***Superpriority Notes*** means the 10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to the Superpriority Notes Indenture.

1.193   ***Superpriority Notes Charging Lien*** means any Lien or other priority in payment to which the Superpriority Notes Trustee is entitled, pursuant to the Superpriority Notes Indenture, against distributions to be made to the holders of the Superpriority Notes under this Plan or otherwise, for payment of any Superpriority Notes Indenture Trustee Fees.

1.194   ***Superpriority Notes Guarantee Claim*** means a Secured Claim arising under the Superpriority Notes Indenture against Debtors Holdings and Exide Technologies, as guarantors.

1.195   ***Superpriority Notes Indenture*** means that certain indenture, by and among Exide International, as issuer, the guarantor parties thereto, and the Superpriority Notes Trustee, dated as of June 17, 2019, as amended, supplemented or otherwise modified from time to time.

1.196   ***Superpriority Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Superpriority Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Superpriority Notes Indenture with respect to the Superpriority Notes.

1.197   ***Superpriority Notes Trustee*** means U.S. Bank National Association, in its capacity as trustee and collateral agent under the Superpriority Notes Indenture.

1.198   ***Superpriority Security Documents*** means "Security Documents" as defined in the Superpriority Notes Indenture.

1.199   ***Tax Code*** means the Internal Revenue Code of 1986, as amended,

1.200   ***TCEQ means*** the Texas Commission on Environmental Quality.

1.201   ***Transferred Assets*** has the meaning set forth in the Europe/ROW Purchase Agreement.

1.202   ***Transferred Entities*** means "Transferred Entities" as defined in the Europe/ROW Purchase Agreement and listed on <u>Schedule 3</u> hereto, including their respective successors and assigns.

1.203   ***Transferred Equity Interests*** means "Transferred Equity Interests" as defined in the Europe/ROW Purchase Agreement.

1.204   ***Transferred Non-Performing Properties*** means (a) the Non-Performing Properties (other than the Vernon Non-Performing Property and the Frisco Non-Performing Property) and (b) the related personal property and equipment transferred to the Environmental Response Trust on the Effective Date pursuant to the Environmental Settlement Agreement.

1.205    ***Transferred NPP Claim*** means any civil Claim or Cause of Action by the Settling Governmental Authorities against the Debtors under Environmental Laws with respect to, or arising out of, the Transferred Non-Performing Properties.

1.206    ***Treasury Regulation*** means the final, temporary and proposed regulations promulgated under the Tax Code.

1.207    ***Trustees*** means, collectively, (a) the Superpriority Notes Trustee, and (b) the Exchange Priority and First Lien Notes Trustee.

1.208    ***Trustees Charging Liens*** means, collectively, (a) the Superpriority Notes Charging Lien (b) the Exchange Priority Notes Charging Lien, (c) the First Lien Notes Charging Lien, and (d) the Legacy Notes Charging Lien.

1.209    ***Trustees Fees*** means, collectively, (a) the Superpriority Notes Indenture Trustee Fees, (b) the Exchange Priority Notes Indenture Trustee Fees, and (c) the First Lien Notes Indenture Trustee Fees.

1.210    ***UBL Claim*** means any and all Claims of the PBGC for the "unfunded benefit liabilities" together with interest of the Pension Plan under ERISA Section 4062(b)(1)(A) against Holdings or Exide Technologies or any member of each entity's "controlled group" as that term is defined in ERISA section 4001(a)(14).

1.211    ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.212    ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.213    ***Vernon Environmental Response Trust*** means the trust established pursuant to the Vernon Environmental Trust Agreement and the Environmental Settlement Agreement with respect to the Vernon Non-Performing Property, in accordance with the Environmental Settlement Agreement.

1.214    ***Vernon Environmental Trust Agreement*** means the trust agreement by and among the Debtors, the United States on behalf of the U.S. Environmental Protection Agency, the Transferred Entities, and the Vernon Environmental Trustee, in form and substance as agreed to by such parties and filed with the Court and consistent with the Environmental Settlement Agreement and Section 5 of the Plan.

1.215    ***Vernon Environmental Trust Assets*** shall, pursuant to the Global Settlement and Section 5.2(e) hereof, consist of (a) the Vernon Global Settlement Payment, (b) the Vernon Non-Performing Property or any proceeds thereof to the extent the Vernon Non-Performing Property is sold prior to the Effective Date, and (c) the Vernon Environmental Trust Causes of Action.

1.216    ***Vernon Environmental Trust Beneficial Interests*** means the beneficial interests in the Vernon Environmental Response Trust.

1.217    ***Vernon Environmental Trust Cause of Action*** means any Claim, debt, right or Cause of Action of the Debtors against any Person or Entity that is not a Released Party or an Exculpated Party, including an insurer, relating to any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed

restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under Environmental Laws with respect to the Vernon Non-Performing Property.

1.218   **Vernon Environmental Trustee** means the Person or Entity approved by the Bankruptcy Court to serve as the trustee of the Vernon Environmental Response Trust, and any successor thereto in accordance with the Vernon Environmental Trust Agreement.

1.219   **Vernon Global Settlement Payment** means the $2,587,523 Cash payment to be made to the Vernon Environmental Response Trust or the Vernon Standby Trust in accordance with the Environmental Settlement Agreement, by the Transferred Entities on the Effective Date pursuant to the Global Settlement if the Payment Condition is satisfied.

1.220   **Vernon Non-Performing Property** means the Debtors' non-performing property located at 2700 S. Indian Street, Los Angeles, California and the related personal property and equipment transferred to the Vernon Environmental Response Trust on the Effective Date pursuant to the Environmental Settlement Agreement.

1.221   **Vernon NPP Claim** means any civil Claim or Cause of Action against the Debtors under Environmental Laws with respect to or arising out of the Vernon Non-Performing Property.

1.222   **Vernon Standby Trust** means the Closure/Postclosure Trust established by the Debtors in 2013 for the benefit of the California DTSC relating to remediation of the Vernon Non-Performing Property.

1.223   **Vernon Trust Condition** means that the Vernon Environmental Trustee and the California DTSC reach a mutual, written agreement on or before the Effective Date that provides covenants not to sue or equivalent protections for the parties to the Vernon Environmental Trust Agreement from the California DTSC that are substantively identical to the covenants not to sue set forth in Paragraph 45.c.i of the Environmental Settlement Agreement being granted by the Settling Governmental Authorities (other than the Frisco Governmental Authorities) to the parties to the Environmental Trust Agreements.

1.224   **Voting Deadline** means the deadline established by an Order of the Bankruptcy Court for voting to accept or reject the Plan.

1.225   **Westchester** means Westchester Fire Insurance Company, in its capacity as provider of surety insurance pursuant the Westchester Surety Bond Agreements.

1.226   **Westchester Catch-up Payments** means the distributions that would have been made to Westchester on account of its Allowed General Unsecured Claim had it received GUC Trust Beneficial A Interests, which shall instead be made by reallocating the first dollars of distribution, if any, to be made to PBGC on account of PBGC's GUC Trust Beneficial A Interests after the GUC Trust has distributed Cash to holders of Allowed General Unsecured Claims in an aggregate amount equal to the GUC Global Settlement Payment.

1.227   **Westchester Surety Bond Agreements** means the applicable agreements governing the surety bond obligations of Westchester to the Debtors with respect to the Non-Performing Properties.

1.228   **Wind-Down** means, following the Effective Date, the process to sell, abandon, wind down, dissolve, liquidate or distribute any remaining assets of the Debtors' Estates in accordance with the Plan.

19

1.229   ***Wind-Down Budget*** means an amount to be agreed between the Debtors and the Requisite Noteholders for the purpose of effectuating the Wind-Down.

1.230   ***Wind-Down Estates*** means the Debtors, or any successor thereto, by merger, consolidation or otherwise, pursuant to and under the Plan on or after the Effective Date; *provided*, that Wind-Down Estates shall not include the Environmental Response Trust, the Vernon Environmental Response Trust, or the GUC Trust.

B.  **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.  **Controlling Document.**

In the event of an inconsistency between the Plan and any other document, the terms of the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

D.  **Certain Consent Rights.**

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Requisite Noteholders as set forth in the RSA with respect to the form and substance of the Plan, the Plan Supplement, and any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section 1 hereof) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

SECTION 2.   **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1.   *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator agree to different treatment, the Debtors (or the Plan Administrator, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on (a) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (b) on such other date or terms as may be mutually agreed upon between the holder of such an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator, as applicable.

2.2.   *Fee Claims.*

(a)   All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Plan Administrator, as applicable.  The Plan Administrator and the GUC Trustee are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)   On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or the Plan Administrator, as applicable, shall separately escrow such estimated amounts in the Professional Fee Escrow Account (less any amounts already reserved for such professional in the Professional Fee Escrow Account) for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Wind-Down Estates and the Plan Administrator without any further action or order of the Bankruptcy Court.

(c)   For the avoidance of doubt, paragraph 23 of the DIP Order shall continue to apply to the Professional Fee Escrow Account and Fee Claims.

2.3.   *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed

Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided*, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

### 2.4.    *DIP Claims*

Unless indefeasibly paid in full in Cash prior to the Effective Date, the DIP Claims shall be deemed Allowed in the full amount of the DIP Obligations, and each holder of a DIP Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such DIP Claim, Cash in an amount equal to such Claim on the Effective Date. Upon the indefeasible payment in full in Cash of all DIP Claims, all Liens and security interests granted pursuant to the DIP Loan Documents shall be deemed cancelled and shall be of no further force and effect, and each DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised.

### 2.5.    *Restructuring Expenses*

During the period commencing on the Commencement Date through the Effective Date, the Debtors have, and will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Plan Administrator shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval. For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

### 2.6.    *Trustees Fees*

On the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan, including the closing of the Europe/ROW Sale Transaction), the Debtors or Plan Administrator shall pay in Cash all reasonable unpaid documented Trustees Fees without application or approval of the Bankruptcy Court and without a reduction to recoveries of the holders of the Superpriority Notes, Exchange Priority Notes or First Lien Notes, as applicable. For the avoidance of doubt, nothing herein affects each Trustees' right to exercise its Trustees Charging Lien against distributions to the holders of the Superpriority Notes, Exchange Priority Notes, or First Lien Notes, as applicable. Any Trustees Fees invoiced after the Effective Date shall be paid promptly by the Plan Administrator, but no later than ten (10) business days after receiving an invoice.

The Trustees shall provide the Debtors, the Consenting Creditors, and the Creditors' Committee with an estimate of the Trustees Fees no later than five (5) business days prior to the Effective Date. If the Debtors dispute any requested Trustee Fees, the Debtors or Plan Administer shall (i) pay the undisputed portion of Trustees Fees, and (ii) notify the applicable Trustee of such dispute within two (2) days after presentment of the invoices by the Trustees. Upon such notification, the applicable Trustee may assert its Trustees Charging Lien to pay the disputed portion of its Trustees Fees or submit such dispute for resolution by the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the applicable indenture. Nothing herein shall be deemed to impair, waive, discharge or negatively impact any Trustees Charging Lien.

SECTION 3.    **CLASSIFICATION OF CLAIMS AND INTERESTS.**

    3.1.    ***Classification in General.***

    A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

    3.2.    ***Grouping of Debtors for Convenience Only.***

    This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under this Plan.  Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes.  To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  Except as provided in Section 5 of this Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

    3.3.    ***Summary of Classification.***

    The following table designates the Classes of Claims against, and Interests in, each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.5.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | ABL Claims | Unimpaired | No (Presumed to accept) |
| 4 | Superpriority Notes Guarantee Claims | Impaired | Yes |
| 5 | Exchange Priority Notes Claims | Impaired | Yes |
| 6 | First Lien Notes Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 8 | Environmental NPP Claims | Impaired | No (Deemed to reject) |
| 9 | Intercompany Claims | Impaired | No (Deemed to reject) |
| 10 | Intercompany Interests | Impaired | No (Deemed to reject) |
| 11 | Holdings Equity Interests | Impaired | No (Deemed to reject) |
| 12 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

3.4.    ***Special Provision Governing Unimpaired Claims.***

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.    ***Elimination of Vacant Classes.***

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.6.    ***Voting Classes; Presumed Acceptance by Non-Voting Classes***

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

3.7.    ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code***

The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with Section 12 hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

SECTION 4.    **TREATMENT OF CLAIMS AND INTERESTS.**

    4.1.    ***Priority Non-Tax Claims (Class 1).***

        (a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims against the Debtors.

        (b)    *Treatment*:  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

        (c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

    4.2.    ***Other Secured Claims (Class 2).***

        (a)    *Classification*:  Class 2 consists of the Other Secured Claims against the Debtors.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

        (b)    *Treatment*:

            (i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

            (ii)    Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator.

        (c)    *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

    4.3.    ***ABL Claims (Class 3)***

        (a)    *Classification*:  Class 3 consists of the ABL Claims.

(b)    *Allowance*:  The ABL Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $101,939,274.01 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the ABL Credit Agreement.

(c)    *Treatment*:

(i)    In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed ABL Claim, each holder thereof shall receive Cash until all holders of Allowed ABL Claims are satisfied in full, taking into account any amounts paid to the holders of Allowed ABL Claims pursuant to the Americas Sale Order.

(ii)    The Challenge Deadline relating to the ABL Credit Agreement and ABL Agent shall be deemed irrevocably expired (A) with respect to the Creditors' Committee as of the date of the entry of the Americas Sale Order, (B) with respect to the Settling Governmental Authorities, on the Effective Date, and (C) with respect to all other Persons and Entities, on August 27, 2020.  For the avoidance of doubt, any reservation of rights relating to the ABL Credit Agreement and the ABL Agent, including paragraphs 37 to 41 of the Americas Sale Order, shall be deemed expired on the foregoing dates with respect to the foregoing parties, as applicable.

(d)    *Voting*:  Class 3 is Unimpaired, and the holders of ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of ABL Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such ABL Claims.

4.4.    ***Superpriority Notes Guarantee Claims (Class 4).***

(a)    *Classification*: Class 4 consists of Superpriority Notes Guarantee Claims against the Debtors.

(b)    *Allowance*:  The Superpriority Notes Guarantee Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $152,512,500 (plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Superpriority Notes Indenture) and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)    *Treatment*:  Following the Europe/ROW Closing, the Superpriority Notes and all of the outstanding Claims arising thereunder (including, for the avoidance of doubt, the Superpriority Notes Guarantee Claims) shall be contributed by the Consenting Creditors to the Europe/ROW Purchaser in accordance with the Europe/ROW Purchase Agreement.  At the Europe/ROW Closing, the Europe/ROW Purchaser shall contribute the Superpriority Notes to Exide International and the Superpriority Notes shall be cancelled.  At the Europe/ROW Closing and without limiting the above, and without any further action by the Consenting Creditors, the Europe/ROW Purchaser or any other party or person or further order of the Bankruptcy Court, (i) the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied, released, and discharged, and (ii) any liens or security interests granted by the Debtors under the Superpriority Notes Indenture and the Superpriority Security Documents shall be deemed terminated, released, discharged and without further effect.

(d)    *Voting*:  Class 4 is Impaired, and the holders of the Superpriority Notes Guarantee Claims are entitled to vote to accept or reject the Plan.

26

4.5.    ***Exchange Priority Notes Claims (Class 5).***

(a)    *Classification*: Class 5 consists of Exchange Priority Notes Claims against the Debtors.

(b)    *Allowance*:  The Exchange Priority Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $390,000,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)    *Treatment*:  Except to the extent that a holder of an Allowed Exchange Priority Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for Allowed Exchange Priority Notes Claims, each holder thereof shall receive (i) at the Europe/ROW Closing, its Pro Rata share of the consideration contemplated by <u>Section 5.1(a)</u> of the Plan in exchange for an aggregate amount of $70,000,000 of Exchange Priority Notes Claims, and (ii) for all remaining Allowed Exchange Priority Notes Claims, Net Cash Proceeds after all Allowed ABL Claims are satisfied in full in Cash, until all Allowed Exchange Priority Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)    *Voting*:  Class 5 is Impaired, and the holders of the Exchange Priority Notes Claims are entitled to vote to accept or reject the Plan.

4.6.    ***First Lien Notes Claims (Class 6).***

(a)    *Classification*:  Class 6 consists of First Lien Notes Claims against the Debtors.

(b)    *Allowance*:  The First Lien Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $161,023,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)    *Treatment*:  Except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed First Lien Notes Claim, each holder thereof shall receive its Pro Rata share of Net Cash Proceeds after all Allowed ABL Claims and Allowed Exchange Priority Notes Claims are satisfied in full in accordance with the Plan, until all Allowed First Lien Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)    *Voting*:  Class 6 is Impaired, and the holders of the First Lien Notes Claims are entitled to vote to accept or reject the Plan.

4.7.    ***General Unsecured Claims (Class 7).***

(a)    *Classification*:  Class 7 consists of General Unsecured Claims against the Debtors.

(b)    *Treatment*:

(i)    Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction and release of, and in exchange for, such Allowed General Unsecured Claim, each holder thereof shall receive its Pro Rata share of (A) the GUC Trust Beneficial A Interests, and (B) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, which shall be shared on a Pro Rata basis with the holders of Allowed Environmental NPP Claims, until all Allowed General Unsecured Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(ii)    All Notes Deficiency Claims shall not receive distributions in accordance with this <u>Section 4.7(b)</u> and such Claims are waived for all purposes, including for voting and for distributions pursuant to and in accordance with this <u>Section 4.7(b)</u>.

(iii)    In lieu of the treatment provided in <u>Section 4.7(b)(i)</u>, Westchester shall receive, in full and final satisfaction and release of, and in exchange for, all of its Allowed General Unsecured Claims (which shall be in a fixed amount of $30,000,000) (A) its Pro Rata share of (1) GUC Trust Beneficial B Interests, and (2) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, which beneficial interests shall be shared on a Pro Rata basis with the holders of Allowed Environmental NPP Claims in accordance with <u>Section 4.8(b)(ii)</u>, until all such Allowed General Unsecured Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted, and (B) the Westchester Catch-up Payments.

(c)    *Voting*:  Class 7 is Impaired, and the holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.8.    ***Environmental NPP Claims (Class 8).***

(a)    *Classification*:  Class 8 consists of Environmental NPP Claims against the Debtors.

(b)    *Treatment*:    Except to the extent that a holder of an Allowed Environmental NPP Claim agrees to less favorable treatment of such Claim or otherwise, in full and final satisfaction and release of, and in exchange for, such Allowed Environmental NPP Claim, each holder of an Allowed Environmental NPP Claim shall receive:

(i)    (A) if such holder is a Global Settlement Party, then such holder shall be a beneficiary of the Environmental Trust Beneficial Interests and/or the Vernon Environmental Trust Beneficial Interests, as applicable under the Environmental Settlement Documents; (B) if such holder is not a Global Settlement Party and the Payment Condition is satisfied as to such holder but the Vernon Trust Condition is not satisfied, then the Non-Performing Property relating to such holder's Environmental NPP Claim shall be abandoned, and the relevant Global Settlement Payment shall be made, in each case in accordance with <u>Section 5.2(e)(ii)</u> of the Plan; (C) if such holder is not a Global Settlement Party and the

28

Payment Condition is not satisfied as to such holder, the Non-Performing Property relating to such holder's Environmental NPP Claim shall be abandoned in accordance with Section 5.2(e)(iii) of the Plan, and such holder shall receive a first priority Lien against such Non-Performing Property to secure its Environmental NPP Claim; or (D) if such holder is not a Global Settlement Party and the Payment Condition is satisfied as to such holder and the Vernon Trust Condition is satisfied, then such holder shall be a beneficiary of the Vernon Environmental Trust Beneficial Interests in accordance with the Environmental Settlement Documents;

(ii)      its Pro Rata share of GUC Trust Beneficial B Interests;

(iii)      Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, which shall be shared on a Pro Rata basis with holders of Allowed General Unsecured Claims, until all Allowed Environmental NPP Claim are satisfied in full in Cash or such Net Cash Proceeds are exhausted; and

(iv)      Notwithstanding anything to the contrary, the foregoing shall not affect any defensive rights of set-off or recoupment of any holder of an Environmental NPP Claim against any Claims asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee, as applicable.

(c)      *Voting*:  Class 8 is Impaired, and the holders of Environmental NPP Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Environmental NPP Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Environmental NPP Claims.

4.9.      ***Intercompany Claims (Class 9).***

(a)      *Classification*:  Class 9 consists of Intercompany Claims against the Debtors.

(b)      *Treatment*:  On or after the Effective Date, all Intercompany Claims will be cancelled and not entitled to distribution or any recovery under the Plan.

(c)      *Voting*:  Class 9 is Impaired, and the holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

4.10.      ***Intercompany Interests (Class 10).***

(a)      *Classification*:  Class 10 consists of Intercompany Interests in the Debtors.

(b)      *Treatment*:  All Intercompany Interests in a subsidiary Debtor shall be cancelled if and when such Debtor is dissolved in accordance with Section 5.8(f) of the Plan.  Each holder of an Intercompany Interest in a subsidiary Debtor shall neither receive nor retain any property of the estate or direct interest in property of the estate of such Debtor on account of such Intercompany Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in such Debtor may receive its Pro Rata Share of any remaining assets in the Debtor.

(c)     *Voting*:  Class 10 is Impaired, and the holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

4.11.    ***Holdings Equity Interests (Class 11).***

(a)     *Classification*: Class 11 consists of Holdings Equity Interests.

(b)     *Treatment*:  Except to the extent that a holder of Holdings Equity Interests agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for Holdings Equity Interests, each such holder thereof shall receive the following treatment: (i) on the Effective Date, all Holdings Equity Interests shall be cancelled and one share of Holdings common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Holdings Stock consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of a Holdings Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Holdings Stock; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Holdings Stock may receive its share of any remaining assets of Holdings consistent with such holder's rights of payment existing immediately prior to the Commencement Date unless otherwise determined by the Plan Administrator, on the date that Holdings' Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; and (iii) the continuing rights of former holders of Holdings Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(c)     *Voting*:  Class 11 is Impaired, and the holders of Holdings Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Holdings Equity Interests are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Holdings Equity Interests.

4.12.    ***Subordinated Securities Claims (Class 12).***

(a)     *Classification*:  Class 12 consists of Subordinated Securities Claims against the Debtors.

(b)     *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims. On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)     *Voting*:  Class 12 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Subordinated Securities Claims.

SECTION 5.    **MEANS FOR IMPLEMENTATION.**

5.1.    *Europe/ROW Sale Transaction.*

(a)    *Europe/ROW Sale Transaction.*  On or prior to the Effective Date, in accordance with the Europe/ROW Purchase Agreement, the following will occur, subject to the satisfaction or waiver of all applicable closing conditions under the Europe/ROW Purchase Agreement:

(i)    pursuant to sections 1123, 1141(b) and 1141(c) of the Bankruptcy Code, all Acquired Assets shall be transferred to, and the Acquired Assets owned by the Debtors shall vest free and clear of all Liens (other than Permitted Liens), Claims, charges, interests, or other encumbrances, in the Europe/ROW Purchaser or such other entity as set forth in the Europe/ROW Purchase Agreement, and all Assumed Liabilities shall be assumed by the Europe/ROW Purchaser or such other entity designated by the Europe/ROW Purchaser in accordance with the terms of the Europe/ROW Purchase Agreement;

(ii)    all other transactions as are necessary to consummate the Europe/ROW Sale Transaction in accordance with the Alternative Transaction Structure; and

(iii)    the releases provided for in Section 12.22 of the Europe/ROW Purchase Agreement shall become effective and binding on the parties thereto.

(b)    *Sources of Consideration for Plan Distribution.*

The Debtors and the Plan Administrator, as applicable, shall fund Distributions under this Plan with the aggregate consideration comprised of (i) the Sale Transaction Proceeds, (ii) Cash on hand, and (iii) the Global Settlement Payments.

5.2.    *Compromise and Settlement of Claims, Interests, and Controversies*

(a)    The provisions of the Plan, including treatment provided for hereunder for General Unsecured Claims and Environmental NPP Claims, and the Global Settlement Documents incorporate and reflect a proposed compromise and settlement of various issues and disputes related to the Debtors (the "***Global Settlement***").  Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, the Global Settlement, and any documents related to the Europe/ROW Sale Transaction, shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of an Environmental NPP Claim  may have with respect to any such Claim or any Distribution to be made on account of any such Claim and are also in consideration of the significant value provided to the Estates by the Consenting Creditors, the Europe/ROW Purchaser and the Transferred Entities.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)    The terms of the Global Settlement shall become effective and binding upon all parties, including the Global Settlement Parties and the Transferred Entities, automatically upon the Effective Date without the need for any further action or Bankruptcy Court approval.

(c)    *GUC Trust.*  The GUC Trust shall be established in accordance with the GUC Trust Agreement and the GUC Trust Assets shall be deemed to have been contributed to the GUC Trust free and clear of all Liens, charges, encumbrances, and Interests for the benefit of the holders of

31

Allowed General Unsecured Claims and Allowed Environmental NPP Claims. Solely for purposes of distributions from the GUC Trust: (i) all GUC Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all unsecured guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim or Environmental NPP Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors and the GUC Trust; and (iii) each and every General Unsecured Claim and Environmental NPP Claim filed or to be filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim or Environmental NPP Claims, as applicable, against and obligation of the consolidated Debtors and the GUC Trust. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Wind-Down Estates or modify or affect the requirements of section 553 of the Bankruptcy Code for purposes of effectuating a setoff against the Debtors, the Wind-Down Estates or the GUC Trust, as applicable. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or Environmental NPP Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim or Environmental NPP Claim subordinated in accordance with any contractual rights or equitable principles.

(d)     *Environmental Response Trust.*

(i)     The Environmental Response Trust shall be established in accordance with the Environmental Settlement Documents and the Environmental Trust Assets shall be transferred to the Environmental Response Trust free and clear of all Liens, charges, encumbrances, and Interests. The Environmental Global Settlement Payment shall be paid by the Transferred Entities to the Environmental Response Trust in accordance with the terms of the Environmental Settlement Agreement and shall not be subject to satisfaction of the Payment Condition. The Environmental Settlement Agreement contains covenants not to sue and releases which are incorporated herein. For the avoidance of doubt, the Settling Governmental Authorities shall not assert any Transferred NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. All Transferred NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan.

(ii)     Prior to the Effective Date, the Debtors shall not sell or transfer any of the Transferred Non-Performing Properties without the prior written consent of the Settling Governmental Authorities with jurisdiction or oversight over such Transferred Non-Performing Property; *provided*, that in the event the Debtors sell or otherwise transfer a Transferred Non-Performing Property with the consent of the Settling Governmental Authorities with jurisdiction or oversight of such Transferred Non-Performing Property, all proceeds of such sale shall be contributed to the Environmental Response Trust on the Effective Date in lieu of such Transferred Non-Performing Property. For the avoidance of doubt, the sale of a Transferred Non-Performing Property pursuant to this Section 5.2(d)(ii) shall not affect the respective rights of the Settling Governmental Authorities or the Environmental Sureties relating to such Transferred Non-Performing Property.

(iii)     Westchester shall make all required contributions to the Environmental Response Trust in accordance with the Environmental Settlement Documents.

(e)     *Vernon Environmental Response Trust.*

(i)     If the Payment Condition and the Vernon Trust Condition are satisfied:

(A)     the Vernon Environmental Response Trust shall be established in accordance with the Environmental Settlement Documents and the Vernon Environmental Trust Assets shall be transferred to the Vernon Environmental Response Trust free and clear of all Liens, charges, encumbrances, and Interests. The Environmental Settlement Agreement contains covenants not to sue and releases which are incorporated herein. For the avoidance of doubt, any Vernon NPP Claims against the Debtors shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. All Vernon NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan;

(B)     the Vernon Global Settlement Payment shall be paid by the Transferred Entities to the Vernon Environmental Response Trust in accordance with the terms of the Environmental Settlement Agreement;

(C)     prior to the Effective Date, the Debtors shall not sell or transfer the Vernon Non-Performing Property without the prior written consent of the Settling Governmental Authorities with jurisdiction or oversight over the Vernon Non-Performing Property; *provided*, that in the event the Debtors sell or otherwise transfer the Vernon Non-Performing Property with the consent of the Settling Governmental Authorities with jurisdiction or oversight of the Vernon Non-Performing Property, all proceeds of such sale shall be contributed to the Vernon Environmental Response Trust on the Effective Date in lieu of the Vernon Non-Performing Property. For the avoidance of doubt, the sale of the Vernon Non-Performing Property pursuant to this Section 5.2(e)(i)(C) shall not affect the respective rights of the Settling Governmental Authorities with jurisdiction over the Vernon Non-Performing Property or the Environmental Sureties relating to the Vernon Non-Performing Property; and

(D)     Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents.

(ii)     If the Payment Condition is satisfied, but the Vernon Trust Condition is *not* satisfied:

(A)     pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the Vernon Non-Performing Property shall be deemed abandoned to Exide Technologies, LLC on the Effective Date, free and clear of all Liens;

(B)     the Vernon Environmental Trust Assets shall not be transferred to the Vernon Environmental Response Trust;

(C)     the Vernon Global Settlement Payment shall be paid by the Transferred Entities to the Vernon Standby Trust in accordance with the terms of the Environmental Settlement Agreement;

(D)     the Debtors, the Wind-Down Estates, and the GUC Trust shall have no further payment obligations whatsoever with regards to the Vernon Non-Performing Property, except to the extent that a Vernon NPP Claim is

33

Allowed as an Environmental NPP Claim.  For the avoidance of doubt, any Vernon NPP Claim shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, following the abandonment of the Vernon Non-Performing Property; and

(E)    Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents.

(iii)    If the Payment Condition is *not* satisfied:

(A)    pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the Vernon Non-Performing Property shall be deemed abandoned to Exide Technologies, LLC on the Effective Date, free and clear of all Liens, other than any Liens granted pursuant to Section 4.8(b) of the Plan;

(B)    the Vernon Environmental Trust Assets shall not be transferred to the Vernon Environmental Response Trust;

(C)    the Vernon Global Settlement Payment shall not be payable by the Transferred Entities;

(D)    Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents; and

(E)    the Debtors, the Wind-Down Estates, and the GUC Trust shall have no further payment obligations whatsoever with regards to the Vernon Non-Performing Property except to the extent a Vernon NPP Claim is Allowed as an Environmental NPP Claim.  For the avoidance of doubt, any Vernon NPP Claim shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, following the abandonment of the Vernon Non-Performing Property.

(f)    *Frisco Settlement Agreement.*

(i)    The Frisco Assets shall be transferred to the Frisco Governmental Authorities pursuant to the terms of the Frisco Settlement Agreement and free and clear of all Liens.  The Frisco Settlement Agreement contains covenants not to sue and releases which are incorporated herein.  For the avoidance of doubt, the Frisco Governmental Authorities shall not assert any Frisco NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, an Other Secured Claim, or a General Unsecured Claim; *provided*, that the foregoing shall not affect any defensive rights set-off or recoupment of any of the Frisco Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee.  All Frisco NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan.

(ii)    The Frisco Governmental Authorities (other than TCEQ) shall make all required payments to Aspen in accordance with the Frisco Settlement Agreement.

(iii)    Aspen shall make all required payments to TCEQ in accordance with the Frisco Settlement Agreement.

34

(g)     *Consenting Creditors*.

(i)     Certain Consenting Creditors shall purchase the European Bridge Notes issued pursuant to the terms of the European Bridge Notes Indenture in an aggregate amount equal to at least $12,500,000.

(ii)     On the Effective Date, the Exchange Priority and First Lien Notes Trustee, at the direction of the Requisite Noteholders, shall be deemed to have waived (A) all Liens on or against the Non-Performing Properties, including with respect to any proceeds of the sale of any Non-Performing Properties and (B) any Claims, Interests or Causes of Action against the GUC Trust or the GUC Trust Assets, including any Notes Deficiency Claims or any other General Unsecured Claims.

(iii)     The Trustees and Consenting Creditors shall take all actions required or necessary under the Superpriority Notes Indentures and the Exchange Priority and First Lien Notes Indenture to effectuate the Europe/ROW Sale Transaction in accordance with the terms of the Plan and the Europe/ROW Purchase Agreement.

(h)     *Transferred Entities*.  On the Effective Date, the Transferred Entities shall pay (i) the GUC Global Settlement Payment to the GUC Trust, (ii) the Environmental Global Settlement Payment to the Environmental Response Trust (which, for the avoidance of doubt, shall not be subject to satisfaction of the Payment Condition), (iii) the Frisco Global Settlement Payment to TCEQ, and (iv) subject to the satisfaction of the Payment Condition, the Vernon Global Settlement Payment to the Vernon Environmental Response Trust in accordance with the Environmental Settlement Agreement; *provided*, that for each of the contributions contemplated in the foregoing clauses (i) through (iv), the Transferred Entities may instead, at their election, transfer Cash in an amount equal to the amount of such contribution to the Debtors in partial satisfaction of outstanding intercompany payables owed by the Transferred Entities to the Debtors and, following such Cash payment, on the Effective Date, the Debtors shall make the contributions to the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust (only if the Payment Condition is satisfied), or TCEQ, as applicable.

(i)     *Environmental Sureties*.

(i)     On the Effective Date, the Environmental Sureties shall be deemed to waive all Claims (including Administrative Expense Claims, Priority Non-Tax Claims, or General Unsecured Claims), Interests, or Causes of Action against the Debtors, the Wind-Down Estates, the Plan Administrator, the GUC Trust or the GUC Trust Assets other than (A) any Other Secured Claims that Westchester may hold on account of cash collateral in the amount of $5,000,000 (plus any accrued interest or dividends thereon) posted by the Debtors with respect to the Westchester Surety Bond Agreements, and (B) the General Unsecured Claim of Westchester in the fixed amount of $30,000,000, which shall be treated in accordance with Section 4.7(b)(iii) of the Plan.

(ii)     Upon the sale of any Non-Performing Property that is covered by the Westchester Surety Bond Agreement, Westchester's rights under the Westchester Surety Bond Agreements shall be governed by the Environmental Settlement Documents.

(j)     *Other Provisions of the Global Settlement*.

(i)     As a condition precedent to consummation of the Global Settlement, (A) the Global Settlement Parties (other than the Settling Governmental Authorities) shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede approval of the Disclosure Statement, the confirmation or consummation

of the Plan or approval of the Global Settlement, and (B) the Settling Governmental Authorities shall not oppose any term or provision of the Plan, Disclosure Statement, or Global Settlement, in each case, subject to the rights of the Global Settlement Parties, including the Settling Governmental Authorities, with respect to amendments to the Plan as set forth in Section 12.4 of the Plan.

(ii)     The Global Settlement Parties agree to exchange releases or covenants not to sue as set forth in Section 10 of the Plan or as provided in the Environmental Settlement Agreement or the Frisco Settlement Agreement.

(iii)    The Debtors shall not designate any additional properties as Non-Performing Properties, without the prior written consent of the Settling Governmental Authorities.

(iv)    The terms of the Global Settlement (A) shall not affect any rights the Settling Governmental Authorities or the Frisco Governmental Authorities may have against any purchaser of any of the Debtors' Assets that is not a Global Settlement Party, and (B) are without prejudice to any (x) Claims other than Transferred NPP Claims held by the Settling Governmental Authorities or Frisco NPP Claims held by the Frisco Governmental Authorities, as applicable, and (y) any Claim, Interest, or Cause of Action of any Governmental Unit that is not a Settling Governmental Authority or Frisco Governmental Authority.

(v)     Each of the state Settling Governmental Authorities has acknowledged that it is the primary state governmental agency in its state with responsibility for enforcing Environmental Laws applicable to the Non-Performing Properties located within its jurisdiction. The U.S. Environmental Protection Agency has acknowledged that it is the primary federal governmental agency with responsibility for enforcing federal Environmental Laws applicable to the Non-Performing Properties.

(vi)    All pending or potential discovery and litigation by any Global Settlement Party against any other Global Settlement Party related to the Chapter 11 Cases or any of the transactions related thereto shall be subject to a standstill and shall be deemed withdrawn upon the Effective Date.

(vii)   The GUC Trust Agreement, the Environmental Settlement Documents, the Frisco Settlement Agreement, and any other documentation required to effectuate the Global Settlement shall be solely for the benefit of the Global Settlement Parties and, for the avoidance of doubt, no third-parties shall be beneficiaries of the Global Settlement or any such documents.

(viii)  The Superpriority Notes Indenture and the Exchange Priority and First Lien Notes Indenture shall be deemed amended and modified to the extent necessary to allow, permit and effectuate the transactions contemplated by the Plan and the Europe/ROW Sale Transaction.

(k)     *Columbus Non-Performing Property Transaction.*

(i)     To facilitate the transfer of the Columbus Non-Performing Property to the Environmental Response Trust, as required by the Environmental Settlement Agreement, and pursuant to sections 105(a), 365 and 554(a) of the Bankruptcy Code, on the Effective Date, in accordance with the Columbus NPP Termination Documents and subject to the satisfaction or waiver of all applicable closing conditions under the Columbus NPP Termination Documents:

(A)    Exide Technologies' lease and the bond purchase agreement related to the Columbus Non-Performing Property, including any security documentation related thereto, shall terminate;

36

(B)    Exide Technologies shall be deemed to have abandoned the revenue bonds issued in connection with the development of the Columbus Non-Performing Property and no further payments shall be due thereunder;

(C)    the Columbus Development Authority shall quitclaim its interest in the parcel located at the Columbus Non-Performing Property to Exide Technologies; and

(D)    the Debtors and the Columbus Development Authority shall take all other actions necessary to consummate the transactions contemplated by the Columbus NPP Termination Documents.

5.3.    ***Settlement with PBGC.***

(a)    On the Effective Date:

(i)    the Transferred Entities shall pay the PBGC Settlement Payment to the PBGC; *provided*, that the Transferred Entities may instead, at their election, transfer Cash in an amount equal to the amount of such contribution to the Debtors, which the Debtors shall thereafter transfer to PBGC.  For the avoidance of doubt, receipt of the PBGC Settlement Payment shall not preclude PBGC from being treated as a holder of a General Unsecured Claim (Class 7) pursuant to <u>Section 4.7</u> of the Plan; and

(ii)    PBGC consents to the releases contained in <u>Section 10.6</u> of the Plan in favor of the parties identified in <u>Section 10.6(f)</u> of the Plan.

(b)    PBGC shall not assert any PBGC Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim.  To the extent Allowed, all PBGC Claims shall be treated as General Unsecured Claims in Class 7 of the Plan.

(c)    PBGC expressly consents to <u>Section 4.7(b)(iii)</u> of the Plan and the Westchester Catch-up Payments incorporated therein.

(d)    Notwithstanding any provision to the contrary in the Plan, the Disclosure Statement, the Confirmation Order, or any other document filed in these Chapter 11 Cases, nothing shall in any way be construed to discharge, release, limit, or relieve any person or entity from any liability or responsibility under sections 401-414 of ERISA with respect to the Pension Plan.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, the Disclosure Statement, the Confirmation Order, or any other document filed in these Chapter 11 Cases.

5.4.    ***The GUC Trust.***

(a)    *Execution of GUC Trust Agreement.* On the Effective Date, the GUC Trust Agreement, in a form acceptable to the Debtors, the Creditors' Committee, the Requisite Noteholders, and the GUC Trustee, shall be executed, and all other necessary steps shall be taken to establish the GUC Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims.  This <u>Section 5.4</u> sets forth certain of the rights, duties, and obligations of the GUC Trustee.  In the event of any conflict between the terms of this <u>Section 5.3</u> and the terms of the GUC Trust Agreement, the terms of the Plan shall govern.

(b) *Purpose of GUC Trust*. The GUC Trust shall be established to administer certain post-Effective Date responsibilities under the Plan with respect to the GUC Trust Assets, General Unsecured Claims, and Environmental NPP Claims, including, but not limited to, resolving outstanding Disputed General Unsecured Claims and Disputed Environmental NPP Claims and making distributions to holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims in accordance with the Plan.

(c) *GUC Trust Assets*. The GUC Trust shall consist of the GUC Trust Assets.

(d) *GUC Trustee*. The GUC Trustee shall be responsible to manage the day-to-day operations of the GUC Trust.

(e) *Role of GUC Trustee*. In furtherance of, and consistent with, the purposes of the GUC Trust and the Plan, the GUC Trustee shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims the GUC Trust Assets, (ii) hold the GUC Trust Assets for the benefit of the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims, (iii) have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its power and authority, (iv) have the power and authority to prosecute and resolve objections to Disputed General Unsecured Claims and Disputed Environmental NPP Claims, and (v) have the power and authority to perform such other functions as are provided for in the Plan and the GUC Trust Agreement. In all circumstances, the GUC Trustee shall act in the best interests of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement and not in its own best interest as a creditor. The investment powers of the GUC Trustee are limited to powers to invest in demand and time deposits in banks or savings institutions, or temporary investment such as short-term certificates of deposit or U.S. Treasury bills.

(f) *Preservation of Privilege*. The Debtors and the GUC Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Trust Assets. The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications. The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, and the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, retain the right to waive their own privileges.

(g) *Transferability of GUC Trust Beneficial Interests*. GUC Trust Beneficial Interests shall not be certificated and shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law, or as and to the extent determined by the GUC Trustee.

(h) *Costs and Expenses of GUC Trustee*. The costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trustee and its retained professionals, shall be paid exclusively from the GUC Trust Assets.

(i) *Retention of Professionals by GUC Trustee*. The GUC Trustee may retain and reasonably compensate counsel and other professionals, which may include, but is not limited to, Creditors' Committee professionals, to assist in their duties as GUC Trustee on such terms as the GUC Trustee deems appropriate without Bankruptcy Court approval.

(j) *U.S. Federal Income Tax Treatment of GUC Trust*. In furtherance of this Section 5.3 of the Plan, (i) the GUC Trust shall be structured to qualify as a "liquidating trust" within the

38

meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims and Environmental NPP Claims, consistent with the terms of the Plan; (ii) the holders of General Unsecured Claims and Environmental NPP Claims shall be treated as the beneficiaries and grantors of the GUC Trust; (iii) the sole purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims and Environmental NPP Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtors and the Estates, holders of General Unsecured Claims, holders of and Environmental NPP Claims, and the GUC Trustee) shall report consistently with such treatment (including the deemed receipt of the GUC Trust Assets, subject to applicable liabilities and obligations, by the holders of General Unsecured Claims and Environmental NPP Claims, followed by the deemed transfer of such GUC Trust Assets to the GUC Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (vi) the GUC Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); (vii) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; (viii) all items of income, deductions, and credit loss of the GUC Trust shall be allocated for federal income tax purposes to the holders of General Unsecured Claims and Environmental NPP Claims based on their respective interests in the GUC Trust, including the holders of General Unsecured Claims and Environmental NPP Claims holding Disputed Claims, in such manner as the GUC Trustee deems reasonable and appropriate; and (viii) subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (x) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made for all or any portion of the GUC Trust, all impacted parties (including the Debtors and the Estates, and, to the extent applicable, holders of General Unsecured Claims and Environmental NPP Claims, and the GUC Trustee), and solely with respect to the impacts assets, shall report for United States federal, state, and local income tax purposes consistently with such election.

(k)     *Expedited Determination*.  The GUC Trustee may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(l)     *Dissolution*.  The GUC Trustee and the GUC Trust shall be discharged or dissolved, as applicable, upon completion of their duties as set forth in the GUC Trust Agreement, including when (i) all Disputed General Unsecured Claims and Disputed Environmental NPP Claims have been resolved, (ii) all GUC Trust Assets have been liquidated, and (iii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Agreement have been made, but in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date or such shorter or longer period authorized by the Bankruptcy Court in order to resolve all Disputed General Unsecured Claims and Disputed Environmental NPP Claims.

5.5.     ***The Environmental Response Trust.***

(a)     *Execution of Environmental Trust Agreements*.  On or before the Effective Date, the Environmental Trust Agreements, substantially in the form attached to the Environmental

Settlement Agreement, shall be executed, and all other necessary steps to be taken to establish the Environmental Response Trust and the Environmental Trust Beneficial Interests shall be authorized.

(b)    *Environmental Trust Assets*.  The Environmental Response Trust shall consist of the Environmental Trust Assets.  On or before the Effective Date, the Environmental Trustee shall create, and the Global Settlement Parties shall make contributions to, accounts held by or within the Environmental Response Trust as specified and in the amounts provided in the Environmental Settlement Documents.

(c)    *Cancellation of Liens*.  All Liens except Liens of Settling Governmental Authorities, if any, against a Non-Performing Property shall be irrevocably cancelled on the Effective Date. Any person holding a Lien against a Non-Performing Property shall take any action reasonably requested by the Environmental Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be reasonably requested by the Environmental Trustee.

5.6.    ***The Vernon Environmental Response Trust.***

Subject to the satisfaction of the Payment Condition and the Vernon Trust Condition:

(a)    *Execution of Vernon Environmental Trust Agreement*.  On or before the Effective Date, the Vernon Environmental Trust Agreement, substantially in the form attached to the Environmental Settlement Agreement, shall be executed, and all other necessary steps to be taken to establish the Vernon Environmental Response Trust and the Vernon Environmental Trust Beneficial Interests shall be authorized.

(b)    *Vernon Environmental Trust Assets*.  The Vernon Environmental Response Trust shall consist of the Vernon Environmental Trust Assets.  On or before the Effective Date, the Vernon Environmental Trustee shall create, and the Global Settlement Parties shall make contributions to, accounts held by or within the Vernon Environmental Response Trust as specified and in the amounts provided in the Plan and the Environmental Settlement Documents.

(c)    *Cancellation of Liens*.  All Liens except Liens of Settling Governmental Authorities, if any, against the Vernon Non-Performing Property shall be irrevocably cancelled on the Effective Date.  Any person holding a Lien against the Vernon Non-Performing Property shall take any action reasonably requested by the Vernon Environmental Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be reasonably requested by the Vernon Environmental Trustee.

5.7.    ***Canada Non-Performing Property.***

(a)    On or before the Effective Date, the Debtors shall (i) deposit Cash in an amount equal to the Canada NPP Risk Management Measures Funds into an escrow account, and (ii) engage in negotiations with the Canada MOE with respect to the abandonment of the Canada Non-Performing Property; *provided*, that to the extent the parties cannot agree, the Debtors may seek a determination by the Bankruptcy Court of the appropriate amount necessary to implement environmental risk management measures and/or abandonment of the Canada Non-Performing Property.  The Debtors are authorized to transfer title to or proceeds from the Canada Non-Performing Property to the Canada MOE or its designee. For the avoidance of doubt, the aggregate amount of Allowed Canada NPP Claims shall be reduced by the amount of Canada NPP Risk Management Measures Funds deposited for use by the Canada MOE.

(b)     Upon the implementation of environmental risk management measures, any excess Canada NPP Risk Management Measures Funds shall revert to the Wind-Down Estates and shall be available for distribution by the Plan Administrator in accordance with the Plan.

(c)     In the event the Canada NPP Risk Management Measures Funds are not sufficient to cover the cost of implementing the environmental risk management measures at the Canada Non-Performing Property, any remaining Canada NPP Claims shall be treated as General Unsecured Claims in accordance with the Plan.

5.8.    ***Plan Administrator.***

(a)     *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause (as defined below); or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with the Plan.

(b)     *Authority*.  Subject to Section 5.8(c) of this Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)     subject to Section 7 of the Plan, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims and Environmental NPP Claims (for the avoidance of doubt, the GUC Trustee shall be responsible for objecting to, reconciling, or settling General Unsecured Claims and Environmental NPP Claims asserted against the GUC Trust);

(ii)     make Distributions to holders of Allowed Claims in accordance with this Plan, other than with respect to Allowed General Unsecured Claims;

(iii)     exercise its reasonable business judgment to direct and control the Wind-Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)     prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(v)     other than GUC Trust Causes of Action, the Environmental Trust Causes of Action, the Vernon Environmental Trust Causes of Action, or any Causes of Action released by the Debtors pursuant to the Plan or otherwise, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates, other than with respect to the GUC Trust Assets;

(vi)     retain professionals to assist in performing its duties under the Plan;

(vii)     maintain the books and records and accounts of the Debtors;

41

(viii)    incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(ix)    following the Effective Date, pay all Restructuring Expenses in Cash in accordance with Section 2.5 of this Plan;

(x)    following the Effective Date, pay all Trustees Fees in Cash in accordance with Section 2.6 of the Plan.

(xi)    administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xii)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xiii)    pay statutory fees in accordance with Section 12.1 of the Plan;

(xiv)    perform other duties and functions that are consistent with the implementation of the Plan; and

(xv)    close the Chapter 11 Cases, subject to the reasonable consent of the GUC Trustee.

(c)    *Boards of Directors and Officers*.

(i)    The officers and directors of the Debtors existing prior to the Effective Date shall be relieved of any and all duties with the respect to the Debtors as of the Effective Date.

(ii)    Upon the Effective Date, the New Board shall consist of one or more directors selected by the Debtors and the Requisite Noteholders, which shall be announced by notice filed with the Bankruptcy Court prior to the Confirmation Hearing.

(iii)    Upon the Effective Date, the new governance structure of Holdings will be set forth in the Amended Organizational Documents.

(iv)    The New Board shall, among other things, oversee and direct the Plan Administrator (solely in its capacity as the Plan Administrator and not in his capacity as the custodian of the Single Share) and the administration of the Wind-Down Estates in accordance with the Plan.  On the Effective Date, or as soon as is reasonably practicable thereafter, the New Board shall establish, in consultation with the Requisite Noteholders and the Plan Administrator, such procedures and protocols as it deems necessary to carry out its duties and as are otherwise acceptable to the Requisite Noteholders.

(d)    *Wind-Down*.  After the Effective Date, pursuant to the Plan, the Plan Administrator shall effectuate the Wind-Down according to the Wind-Down Budget without any further

approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Wind-Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

(e)     *Indemnification*.  Each of the Wind-Down Estates shall indemnify and hold harmless the New Board and the Plan Administrator solely in their capacities as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or the New Board's bad faith, gross negligence, willful misconduct or criminal conduct.

(f)     *Dissolution*.  After the Effective Date, the Plan Administrator shall, subject to applicable non-bankruptcy law and consistent with the implementation of this Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Debtor (including the cancellation of all Interests in a Wind-Down Estate) and complete the winding up of such Wind-Down Estate as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Wind-Down Estate or its shareholders or members, as applicable, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Wind-Down Estate.  The Plan Administrator may, to the extent required by applicable non-bankruptcy law, maintain a Wind-Down Estate as a corporate entity in good standing until such time as such Wind-Down Estate is dissolved or merged out of existence in accordance with the Plan.

5.9.    ***Corporate Action.***

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Debtors or the Estates.

5.10.   ***Withholding and Reporting Requirements.***

(a)     *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b)     *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator, Wind-Down Estates, GUC Trustee or such other Person designated by the Plan Administrator, Wind-Down Estates or GUC Trustee (which entity shall subsequently deliver to the Plan Administrator any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Plan Administrator.  If such request is made by the Plan Administrator, Wind-Down Estates, or such other Person designated by the Plan Administrator or Wind-Down Estates and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Wind-Down Estate and any Claim in respect of such distribution shall be forever barred from assertion against any Debtor, the applicable Wind-Down Estate and their  respective property.  If such request is made by the GUC Trustee or such other Entity designated by the GUC Trustee and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Trust and any Claim in respect of such distribution shall be forever barred from assertion against the GUC Trustee or the GUC Trust, or the property of each of them.

### 5.11.    *Exemption From Certain Transfer Taxes.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to or by the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 5.12.    *Effectuating Documents; Further Transactions.*

(a)     On or as soon as practicable after the Effective Date, the Plan Administrator shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the Plan without the need for any approvals, authorizations, actions, or consents; and (vi) all other actions that the applicable Entities determine to be necessary or appropriate.

(b)      Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Plan Administrator, if applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of, the Wind-Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, or the Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)      The Debtors shall be authorized to implement the Sale Transactions and the Global Settlement (including the creation of the GUC Trust, the Environmental Response Trust, and, if necessary, the Vernon Environmental Response Trust) in the manner most tax efficient to the Wind-Down Estates, the Environmental Response Trust, and the Vernon Environmental Response Trust, and consistent with the Environmental Settlement Documents.

(d)      All matters provided for herein involving the corporate structure of the Debtors or the Wind-Down Estates, to the extent applicable, or any corporate or related action required by the Debtors or the Wind-Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or the Wind-Down Estates.

### 5.13.    *Preservation of Rights of Action.*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, transferred or settled pursuant to this Plan (including pursuant to the Global Settlement, Environmental Settlement Documents, and the Frisco Settlement Agreement), the Confirmation Order, or by another Bankruptcy Court order (including the Americas Sale Order) or transferred to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement or the Americas Sale Transaction, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Plan Administrator, or the GUC Trustee, will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion, subject to this Plan, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Plan Administrator or the GUC Trustee, as applicable, may determine is in the best interest of the Debtors and their Estates, without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of this Plan itself shall be resolved only by Confirmation of this Plan itself.

5.14. *Certificate of Incorporation and By-Laws.*

As of the Effective Date, the certificate of incorporation and by-laws, or other organizational documents, as applicable, of the Debtors shall be amended to the extent necessary to carry out the provisions of this Plan. Such amended organizational documents (if any) shall be filed with the Bankruptcy Court in advance of the Effective Date.

5.15. *Stock Trading Restrictions*

The restrictions imposed by the *Interim Order Establishing Notification Procedures And Approving Restrictions On Certain Transfers Of Interests In The Debtors* (Docket No. 113), as the same may be amended from time to time, shall remain effective and binding through the closing of the Chapter 11 Cases.

5.16. *Cancellation of Superpriority Notes and Release and Discharge of Debtor Guarantee Claims.*

Prior to the Europe/ROW Closing, the Consenting Creditors shall contribute the Superpriority Notes, together with all of the outstanding Claims arising thereunder and under the Superpriority Notes Indenture to the Europe/ROW Purchaser in exchange for preferred equity interests of the Europe/ROW Purchaser. After the Europe/ROW Closing, the Europe/ROW Purchaser shall deliver, or be deemed to deliver, all of the Superpriority Notes to Exide International for cancellation and the Superpriority Notes shall be cancelled. At the Europe/ROW Closing and without limiting the above, and without any further action by the Consenting Creditors, the Europe/ROW Purchaser or any other party or person or further order of the Bankruptcy Court, (i) the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied and the Guarantees granted by the Debtors shall be released and discharged, (ii) any liens or security interests granted by the Debtors under the Superpriority Notes Indenture and the Superpriority Security Documents shall be deemed terminated, released, discharged and without further effect, and (iii) all existing defaults by the Debtors under the Superpriority Notes Indenture shall be waived.

The Superpriority Notes Indenture and Superpriority Security Documents and all outstanding Claims arising under the Superpriority Notes Indenture shall be cancelled and terminated and the Superpriority Notes Indenture Trustee shall be released and discharged of all obligations thereunder un accordance with a supplemental indenture executed by Exide International, Exide Holdings, and the Superpriority Notes Trustee in accordance with the Superpriority Notes Indenture. For the avoidance of doubt, and in in accordance with the Superpriority Notes Indenture, Exide International shall immediately deliver or be deemed to deliver and surrender all of the Superpriority Notes upon receipt thereof to the Superpriority Notes Trustee for cancellation.

5.17. *Cancellation of Existing Securities and Agreements*

(a)    Except for the purpose of evidencing a right to a distribution under the Plan, effectuating the Europe/ROW Sale Transaction and except as otherwise set forth in the Plan, all notes, instruments, other securities, and other evidence of debt issued, including, but not limited to, the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged. For the avoidance of doubt, but subject to Section 5.17(b) below, on the Effective Date, the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall be deemed terminated and cancelled and the Exchange

Priority and First Lien Notes Trustee and Legacy Notes Trustee shall be discharged and released without any further action.

(b)    The Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall continue in effect to the extent necessary to (i) allow the Plan Administrator, Exchange Priority and First Lien Notes Trustee, or Legacy Notes Trustee, as applicable, to make distributions under the Plan, (ii) allow the Exchange Priority and First Lien Trustee to effectuate the Europe/ROW Sale Transaction (iii) permit the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to assert the applicable Exchange Priority Trustee Charging Lien, First Lien Trustee Charging Lien, and Legacy Notes Charging Lien, as applicable; (iv) allow the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Exchange Priority and First Lien Notes Indenture or the Legacy Notes Indentures, as applicable; (v) to exercise its rights and obligations at the direction of the Requisite Noteholders relating to the interests of its holders under the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures, as applicable; (vi) permit the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to perform any functions that are necessary to effectuate the powers outlined in this <u>Section 5.17</u>.  For the avoidance of doubt, all indemnification obligations and expense reimbursement obligations of the Debtors arising under the Exchange Priority and First Lien Notes Indenture in favor of the Exchange Priority and First Lien Notes Trustee, or its directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Plan Administrator on and after the Effective Date and shall be enforceable through, among other things, the exercise of the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien.

5.18.    ***Subordinated Claims.***

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator or the GUC Trustee, as applicable, to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

5.19.    ***Nonconsensual Confirmation.***

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject, or are deemed to reject, the Plan.

5.20.    ***Closing of Chapter 11 Cases.***

After an Estate has been fully administered, the applicable Wind-Down Estate or Plan Administrator shall, subject to the reasonable consent of the GUC Trustee, seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

5.21.    ***Notice of Effective Date.***

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

5.22. *Corporate Form*

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator in accordance with the terms of this Plan and applicable law.

5.23. *Separability.*

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

SECTION 6.    **DISTRIBUTIONS**.

6.1. *Distributions Generally.*

Except as otherwise provided in the Plan and the GUC Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2. *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests. The Debtors, the Plan Administrator or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. The Distribution Record Date shall not apply to the DIP Claims and the ABL Claims, the holders of which shall receive a distribution in accordance with Section 2 or Section 4 of the Plan, respectively, to the extent not previously satisfied.

6.3. *Date of Distributions.*

(a)    Except as otherwise provided in the Plan and in the GUC Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on or about the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Section 4 of the Plan; *provided*, that the Plan Administrator or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)    (i) Prior to any distributions of Net Cash Proceeds, the Plan Administrator, shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims, Disputed Secured Claims, Disputed Priority Non-Tax Claims, and Disputed Priority Tax Claims, and (ii) prior to any distributions by the GUC Trust to the holders of either GUC Trust Beneficial A Interests or GUC Trust

48

Beneficial B Interests, the GUC Trustee shall reserve an amount sufficient to pay holders of Disputed General Unsecured Claims and Disputed Environmental NPP Claims, as applicable, in each case, the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims.  After the resolution of a Disputed Administrative Expense Claim, Disputed Secured Claim, Disputed Priority Non-Tax Claim, and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved on account of such Disputed Claim that is Disallowed or does not become an Allowed Claim as Net Cash Proceeds.

### 6.4.    *Disbursing Agent.*

Other than as contemplated in <u>Section 6.2</u> of the Plan, all distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the books and records of the Debtors or the Wind Down Estates, as applicable,.  The Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent to comply with the reporting and withholding requirements outlined in <u>Section 5.7</u> of the Plan.

### 6.5.    *Rights and Powers of Disbursing Agent.*

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against, and Interests in, the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.  No holder of a Claim or Interest, or other party in interest, shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b)    A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.6.    *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; *provided*, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Trust Assets in accordance with the GUC Trust Agreement.

6.7.    *No Postpetition Interest on Claims.*

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; *provided*, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

6.8.    *Delivery of Distributions.*

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 5.7 of the Plan.

(b)    Notwithstanding the foregoing, the following shall apply to holders of Exchange Priority Notes Claims, First Lien Notes Claims,  Legacy Notes Claims, and DIP Claims, respectively:

(i)    all distributions of Cash on account of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims, if any, shall be deposited with the Exchange Priority and First Lien Notes Trustee and Legacy Notes Trustee, as applicable, for distribution to holders of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims in accordance with the terms of the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures, as applicable.  All distributions other than of Cash on account of Exchange Priority Notes Claims, First Lien Notes Claims, or Legacy Notes Claims, if any, may, with the consent of the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee, as applicable, be made by the Disbursing Agent directly to holders of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims in accordance with the terms of the Plan, the Exchange Priority and First Lien Notes Indenture, and the Legacy Notes Indentures; *provided*, that until such distributions are made, the Trustees Charging Liens shall attach to the property to be distributed in the same manner as if such distributions were made through the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee, as applicable.  To the extent the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee, as applicable, shall be deemed a "Disbursing Agent" for purposes of the Plan.  As to any holder of an Exchange Priority Notes Claim, First Lien Notes Claim, or Legacy Notes Claim that is held in the name of or by a nominee of DTC, the Disbursing Agent shall seek the cooperation of DTC so that such distribution shall be made through the facilities of DTC on or as soon as practicable after the Effective Date.

(ii)    All distributions on account of DIP Claims, if any, shall be deposited with the DIP Agent for distribution to holders of DIP Claims in accordance with the terms of the

DIP Loan Documents.  To the extent the DIP Agent effectuates, or is requested to effectuate, any distributions hereunder, the DIP Agent shall be deemed a "Disbursing Agent" for purposes of the Plan.

### 6.9. *Distributions after Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 6.10. *Unclaimed Property.*

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors, Wind-Down Estates or the GUC Trust, as applicable, until such time as a distribution becomes deliverable or the holder accepts the distribution, or such distribution reverts back to the Debtors, Wind-Down Estates or GUC Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to the Wind-Down Estates or GUC Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 6.11. *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Wind Down Estates (or GUC Trust in the case of checks issued by the GUC Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 6.12. *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Plan Administrator or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer, or ACH transfer, or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.13. *Satisfaction of Claims.*

Except as otherwise specifically provided for in the Plan and to the extent permitted by law, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction  of, and exchange for, such Allowed Claims.

### 6.14. *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.15.    *Setoffs and Recoupments.*

The Debtors, Wind-Down Estates, or GUC Trust, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Wind-Down Estates, or GUC Trust, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or its successor or assign may possess against the holder of such Claim.

6.16.    *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Wind-Down Estates or the GUC Trust, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.17.    *No Distribution in Excess of Amount of Allowed Claim.*

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

SECTION 7.    **PROCEDURES FOR DISPUTED CLAIMS.**

7.1.    *Objections to Claims.*

The Plan Administrator, on behalf of each of the Wind-Down Estates, shall exclusively be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims.  The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive authority to object to all General Unsecured Claims.  After the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Any objections to proofs of Claim shall be served and filed on or before the later of (a) one hundred eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.

7.2.    *Resolution of Disputed Claims.*

On and after the Effective Date, (a) the Plan Administrator, on behalf of each of the Wind-Down Estates, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims and Environmental NPP Claims without approval of the Bankruptcy Court.  The Debtors, Wind-Down Estates, Plan Administrator and GUC Trustee, as applicable, shall cooperate with respect to any objections to Claims that seek to convert a type of Claim to another type of Claim as to which a different party or parties may compromise, settle, otherwise resolve, or withdraw objections, and, in each case, the rights and defenses of the Debtors, Wind-Down Estates, Plan Administrator or the GUC Trustee, as applicable, to any such objections are fully preserved.

7.3.    ***Payments and Distributions with Respect to Disputed Claims.***

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.4.    ***Distributions after Allowance.***

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan or the GUC Trust Agreement, as applicable, without interest, as provided in Section 7.8 of the Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

7.5.    ***Estimation of Claims.***

The (a) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), as applicable, may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims; and (b) GUC Trustee may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed General Unsecured Claims or Disputed Environmental NPP Claims. The (I) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), with respect to the Claims set forth in clause (a) of this Section 7.5; and (II) GUC Trustee, with respect to General Unsecured Claims or Environmental NPP Claims, in each case, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for distribution purposes, regardless of whether such, or any, Person had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors, Plan Administrator or GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

7.6.    ***No Distributions Pending Allowance.***

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.7.    ***Claim Resolution Procedures Cumulative.***

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 7.8.    *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### 7.9.    *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies; *provided*, that this requirement shall not apply to Settling Governmental Authorities.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such satisfaction, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

## SECTION 8.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.

### 8.1.    *Rejection of Executory Contracts and Unexpired Leases.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Section 8.4 of the Plan; or (v) is identified for assumption on the Assumption Schedule included in the Plan Supplement.  The Debtors shall confer with the Settling Governmental Authorities, the Environmental Trustee, or the Frisco Governmental Authorities, as applicable, and exchange information and reasonably cooperate to determine the appropriate disposition of any contracts or unexpired leases that relate to the Non-Performing Properties and take appropriate action relating thereto.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Europe/ROW Purchaser or Wind-Down Estates, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Europe/ROW Purchaser or Wind-Down Estates, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 8.2.    *Determination of Assumption Disputes and Deemed Consent.*

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date in accordance with the terms of the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement, or the Frisco Settlement Agreement, as applicable, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)     The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule.  At least ten (10) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Wind-Down Estate, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Wind-Down Estates, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this <u>Section 8.2(b)</u>, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)     If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided*, that the Debtors or Wind-Down Estates, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that the Transferred Entities shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party; *provided*, *further*, that solely with respect to executory contracts and unexpired leases designated to be assumed and assigned to the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ), the Debtors shall be responsible to pay the Postpetition Accounts Payable.  The Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ), as applicable, may agree to be responsible for all other Cure Amounts, in each case in an amount as is determined to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party; *provided*, that in the absence of such agreement, the executory contract or unexpired lease relating to such Cure Amounts shall be deemed rejected under the Plan.  The Debtors or Wind-Down Estates, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)     To the extent an Assumption Dispute relates solely to the Postpetition Accounts Payable, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that pursuant to the Environmental Settlement Agreement or the Frisco Settlement Agreement, as applicable, the Debtors shall

be responsible to pay the determined amount of such Postpetition Accounts Payable to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party.  The Debtors or Wind-Down Estates, as applicable, may settle any dispute regarding the Postpetition Accounts Payable or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court

(f)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

8.3.    ***Rejection Damages Claims.***

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 7 (General Unsecured Claims).  A proof of such Claim must be filed with the Bankruptcy Court and served upon counsel for the Debtors, Wind-Down Estates, or the GUC Trust, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.**

8.4.    ***Insurance Policies.***

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court, on the Effective Date: (i) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and Wind-Down Estates, or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and

in accordance with the terms of the insurance policies; and (d) holders of Allowed Claims to pursue insurance recovery to the extent allowed or required by Section 7.9 of this Plan.

8.5.    ***Intellectual Property Licenses and Agreements.***

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed assumed by the Debtors and the Wind-Down Estates and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Wind-Down Estates and the Europe/ROW Purchaser, as applicable, and the Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.6.    ***Tax Agreements.***

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, be assumed by the Debtors, Wind-Down Estates, and Europe/ROW Purchaser, as applicable and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Wind-Down Estates or Europe/ROW Purchaser, as applicable, and Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.7.    ***Standby Environmental Trust Agreement.***

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, each Standby Environmental Trust Agreement and underlying trust shall be reinstated and in full force and effect in accordance with its terms.  As soon as practicable after the Effective Date, the Debtors or Plan Administrator, as applicable, shall reimburse and pay each Standby Environmental Trust Trustee any outstanding fees, costs, expenses, and charges, including attorney and professional fees and expenses due and owing under or as provided under such Standby Environmental Trust Agreement; provided, that such reimbursement or payment shall not exceed $50,000 in the aggregate for fees of the Standby Environmental Trust Trustee and $100,000 in the aggregate for attorney and professional fees.

Notwithstanding the foregoing, nothing in the Plan shall waive impede or effect the right of the Standby Environmental Trust Trustee to seek payment, reimbursement or indemnification from the assets and properties of the relevant environmental standby trust as provided under the applicable Standby Environmental Trust Agreement.

8.8.    *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

8.9.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.10.    *Reservation of Rights.*

(a)    The Debtors may amend the Assumption Schedule and any cure notice until five (5) Business Days immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment and/or (ii) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, or Wind-Down Estates, or their respective affiliates have any liability thereunder.

(c)    Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and Wind Down Estates, under any executory or non-executory contract or any unexpired or expired lease.

(d)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Wind-Down Estates, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

58

SECTION 9.    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

    9.1.    ***Conditions Precedent to the Effective Date.***

    The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

    (a)    the Definitive Documents shall be consistent with the RSA and otherwise approved by the Requisite Noteholders consistent with their respective consent and approval rights as set forth in Section 4 of the RSA;

    (b)    the RSA shall not have been terminated and shall remain in full force and effect in accordance with its terms;

    (c)    the Definitive Documents shall be consistent with the Global Settlement and, to the extent the terms of a Definitive Document adversely affect the Global Settlement or treatment of the Settling Governmental Authorities thereunder, are otherwise approved by the Settling Governmental Authorities;

    (d)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

    (e)    the Debtors shall not have (i) filed, supported or consented to any motion, application, adversary proceeding, or cause of action (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Exchange Priority Notes Claims, the First Lien Notes Claims, the Superpriority Notes Guarantee Claims, or the DIP Claims, (B) otherwise seeking to impose liability upon or enjoin the Consenting Creditors, the Transferred Entities or the DIP Lenders; or (ii) supported any third party seeking standing to bring such application, adversary proceeding or cause of action;

    (f)    the Debtors shall have paid or caused to be paid in Cash all Restructuring Expenses and Trustees Fees invoiced no later than one Business Day prior to the Effective Date;

    (g)    all governmental approvals, including Bankruptcy Court approval, necessary to consummate the Plan and the transactions contemplated hereby shall have been obtained or otherwise waived;

    (h)    (i) the Debtors (or any Person or Entity on behalf of the Debtors or their Estates with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (A) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims, or (B) limiting the Europe/ROW Purchaser's or the Trustees' right to implement the Europe/ROW Sale Transaction, or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) shall not have entered a Final Order providing relief against the interests of the Consenting Creditors or the Trustees with respect to any of the foregoing Causes of Action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims or (y) limiting the Consenting Creditors' or the Trustees' right to implement the Europe/ROW Sale Transaction;

(i)    (A) all agreements necessary to implement the Plan, including the Europe/ROW Sale Transaction, the Global Settlement, the Environmental Settlement Documents, the Frisco Settlement Agreement, and the Columbus NPP Termination Documents shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; *provided*, that approval of the Environmental Settlement Documents may not be waived without the consent of each of the Settling Governmental Authorities party thereto, and (B) the Debtors, the Consenting Creditors, and the Transferred Entities shall have complied with all of their respective obligations under the Environmental Settlement Documents except to the extent such obligations are expressly provided in the Environmental Settlement Documents to occur after the Effective Date;

(j)    all releases or covenants not to sue contained in the Environmental Settlement Agreement and the Frisco Settlement Agreement shall be in form and substance acceptable to the Requisite Noteholders;

(k)    notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; *provided*, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.2.    *Waiver of Conditions Precedent.*

(a)    Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 of the Plan other than the conditions set forth in Sections 9.1(c) and (i) may be waived in writing by the Debtors with the prior written consent of the Requisite Noteholders (and the Creditors' Committee with respect to the terms of the Global Settlement) without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.19 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement (including those set forth in Sections 9.1(c) and (i)) shall not be waived without the prior written consent of each of the Global Settlement Parties.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.3.    *Effect of Failure of Conditions to Effective Date.*

Unless otherwise extended by the Debtors, if the Effective Date does not occur on or before the date that is one hundred and eighty (180) days after the date on which the Confirmation Order is entered or if the Confirmation Order is vacated, (a) no distributions under the Plan shall be made, (b) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained

herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

SECTION 10.   **EFFECT OF CONFIRMATION.**

    10.1.   *Vesting of Assets.*

    On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all property of the Debtors' Estates acquired by the Europe/ROW Purchaser under the Europe/ROW Purchase Agreement shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Europe/ROW Purchaser; (ii) all property of the Debtors' Estates constituting GUC Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the GUC Trust; (iii) all property of the Debtors' Estates constituting Environmental Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Environmental Response Trust; (iv) subject to Section 5.2(e), all property of the Debtors' Estates constituting Vernon Environmental Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Vernon Environmental Response Trust; (v) all property of the Debtors' Estates constituting Frisco Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Frisco CDC pursuant to the Frisco Settlement Agreement; and (vi) all remaining property of the Debtors' Estates shall vest in the Wind-Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other Interests, subject to treatment of Other Secured Claims under the Plan.   Notwithstanding any provisions in the Plan, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC shall take the Transferred Non-Performing Properties, the Vernon Non-Performing Property (unless abandoned pursuant to Section 5.2(e)), and the Frisco Non-Performing Property, as applicable, subject to the obligations set forth in the Environmental Settlement Documents and the Frisco Settlement Agreement, as applicable.   On and after the Effective Date, the Wind-Down Estates may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.   Without limiting the foregoing, the Wind-Down Estates may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.   Notwithstanding the foregoing, vesting of property in which any governmental unit holds an interest, and for which title vests in the Debtors subject to regulatory requirements under a governmental grant or award, including but not limited to, the requirements of 10 C.F.R. 600.321, shall be limited to the extent of the Debtors' interest in such property; and the Wind-Down Estates may only take action, including but not limited to the use, acquisition, sale, lease, and disposition of such property, in accordance with applicable non-bankruptcy law.

    10.2.   *Term of Injunctions or Stays.*

    Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.3.    *Injunction.*

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)    **Except as expressly provided in the Plan, the Definitive Documents, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are treated by the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the Frisco CDC, as applicable, or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, and the Transferred Entities; or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind-Down Estates, and the GUC Trust or the property of any of the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable, or against property or interests in property of any of the Debtors, the Wind-Down Estates, and the GUC Trust except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

(c)    **By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this <u>Section 10.3</u>.**

(d)    **The injunctions in this <u>Section 10.3</u> shall extend to any successors of the Debtors, including the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable, and their respective property and interests in property.**

(e)      **Notwithstanding the foregoing, nothing in this <u>Section 10.3</u> shall enjoin the assertion of a defensive right of recoupment.**

10.4.    *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

10.5.    *Releases by the Debtors.*

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Estates, and the Wind-Down Estates, in each case, on behalf of themselves and their respective successors (including the Frisco CDC, the Environmental Response Trust, the Vernon Environmental Response Trust, and the GUC Trust, as applicable), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Estates, or the Wind-Down Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the Pension Plan, the European Bridge Notes, the Optimization, the June 2019 Financing, any Environmental Law, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, the Definitive Documents, the Europe/ROW Sale Transaction or the Global Settlement.**

10.6.    *Releases By Holders of Claims and Interests.*

**As of the Effective Date, except (A) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date and (B) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective**

Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following (each such Person or Entity, a "*Releasing Party*" and, collectively, the "*Releasing Parties*"):

        (a)      the Consenting Creditors;

        (b)      the Creditors' Committee and each of its members in their capacity as such,

        (c)      all holders of Claims who vote to accept the Plan;

        (d)      all holders of Claims who are deemed to accept the Plan;

        (e)      all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan but, in either case, do not opt out of granting the releases set forth in this <u>Section 10.6</u>;

        (f)      solely with respect to (i) the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors, all holders of General Unsecured Claims and Environmental NPP Claims, and (ii) the Trustees, all California state governmental agencies, including the California DTSC, that have jurisdiction regarding the enforcement of Environmental Laws; and

        (g)      with respect to any Person or Entity in the foregoing clauses (a) through (f), such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Persons or Entities solely with respect to the matters for which the Releasing Parties are providing releases to the extent such Person or Entity would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (f);

        in each case, from any and all Claims and Causes of Action (including, without limitation, any PBGC Claims and Canada NPP Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law, equity, or otherwise, that entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the European Bridge Notes, the Pension Plan, the Optimization, the June 2019 Financing, any Environmental Law, the Global Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including any Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to

implement the Plan, the Europe/ROW Sale Transaction, or the Global Settlement.  Except as otherwise set forth in subsection (g) of this **Section 10.6**, the Persons and Entities in (a) through (h) of this **Section 10.6** shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this **Section 10.6** against each of the Released Parties.

Notwithstanding anything to the contrary in this **Section 10.6**, Governmental Units (other than any California state governmental agency, including the California DTSC, that has jurisdiction regarding the enforcement of Environmental Laws) are not Releasing Parties under the Plan and are not providing a release or covenant not to sue except as provided in the Environmental Settlement Documents or other separate settlement document with a Governmental Unit.

For the avoidance of doubt,  the scope of any releases by provided by any California state governmental agency that has jurisdiction regarding the enforcement of Environmental Laws, including the California DTSC, pursuant to this **Section 10.6** of the Plan shall not be construed or deemed to be any broader than the scope of the covenants not to sue set forth in paragraph 45(b) of the Environmental Settlement Agreement provided by the Settling Governmental Agencies.

10.7.    *Exculpation.*

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim arising between the Commencement Date and the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Europe/ROW Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Loan Documents; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for fraud, gross negligence, or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not bar the obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

10.8.    *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER SECTION 10 OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF

KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN <u>SECTION 10</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 10.9.  *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have previously solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under this Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any securities under this Plan.

### 10.10.  *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Estates.

## SECTION 11.  **RETENTION OF JURISDICTION.**

### 11.1.  *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)  to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)  to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)  to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or

Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

      (d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

      (e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

      (f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

      (g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

      (h)    to hear and determine all proceedings, if any, to approve Fee Claims, Restructuring Expenses, and Trustees Fees;

      (i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, Europe/ROW Sale Transaction, any other Sale Transactions, the Global Settlement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

      (j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

      (k)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

      (l)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

      (m)    to hear, adjudicate, decide, or resolve any and all matters related to Section 10 of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

      (n)    to resolve disputes concerning Disputed Claims or the administration thereof;

      (o)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

      (p)    to enter one or more final decrees closing the Chapter 11 Cases;

      (q)    to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

(r)　　　to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)　　　to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities relating to the Frisco Non-Performing Property, pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)　　　to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 11.2.　*Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## SECTION 12.　**MISCELLANEOUS PROVISIONS.**

### 12.1.　*Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Debtors or the Plan Administrator, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.  The obligations under this Section 12.1 shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

### 12.2.　*Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.　*Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order.

12.4.    *Amendments.*

(a)    *Plan Modifications.*  Subject to (i) the terms of the RSA and all consent rights contained therein, and (ii) the consent of the Global Settlement Parties with respect to any amendment to the Global Settlement, including the Environmental Settlement Documents, or other provisions of the Plan or Definitive Documents that impact the Global Settlement (including any amendment to the definition of Settling Governmental Authorities or Schedule 1 to this Plan), (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Noteholders (and the Global Settlement Parties, solely as it pertains to the Global Settlement), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    *Other Amendments.*  Subject to the terms of the RSA and, solely with respect to the terms of the Global Settlement, subject to the consent of the Global Settlement Parties, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that any change to the Environmental Settlement Documents may not be made without the written consent of the parties thereto.

12.5.    *Revocation or Withdrawal of the Plan.*

Subject to the terms of the RSA, the Global Settlement, the Environmental Settlement Documents and the Europe/ROW Purchase Agreement, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw this Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, in each case with respect to a Debtor, then, with respect to such Debtor: (a) this Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any other Entity.

12.6.    *Severability of Plan Provisions upon Confirmation.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Requisite Noteholders (and the Global Settlement Parties with respect to the Global Settlement), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected,

impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Wind-Down Estate (as the case may be); and (3) nonseverable and mutually dependent.

### 12.7. *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

### 12.8. *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.9. *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Debtors and all holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest are authorized to prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### 12.10. *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Wind-Down Estates, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

### 12.11. *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

### 12.12. *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13.  *Notices.*

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Debtors or the Plan Administrator:

Exide Holdings, Inc.
13000 Deerfield Parkway
Building 200
Milton, GA 30004
Attention: Roy Messing, Chief Restructuring Officer
Telephone: (678) 566-9000

- and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:    Ray C. Schrock, P.C.
         Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(ii) if to the Requisite Noteholders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:    Alice Belisle Eaton, Esq.
         Robert Britton, Esq.
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

(iii) if to the Creditors' Committee:

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attn:    Robert Hirsh, Esq.
         Eric Chafetz, Esq.
         Michael Kaplan, Esq.
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized

to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:  October 14, 2020

By:      */s/ Roy Messing*
               Name: Roy Messing
               Title: Chief Restructuring Officer

**EXIDE HOLDINGS, INC.**
**EXIDE TECHNOLOGIES, LLC**
**EXIDE DELAWARE LLC**
**DIXIE METALS COMPANY**
**REFINED METALS COMPANY**

## **Schedule 1**

**Settling Governmental Authorities**

1. U.S. Environmental Protection Agency
2. State of Florida Department of Environmental Protection
3. Georgia Environmental Protection Division of the Department of Natural Resources
4. Indiana Department of Environmental Management
5. Commonwealth of Pennsylvania Department of Environmental Protection
6. South Carolina Department of Health and Environmental Control
7. Tennessee Attorney General & Reporter
8. Texas Commission on Environmental Quality
9. City of Frisco, Texas
10. Frisco Community Development Corporation
11. Illinois Environmental Protection Agency
12. Louisiana Department of Environmental Quality
13. Mississippi Department of Environmental Quality

**Schedule 2**

**Non-Performing Properties**

1. Baton Rouge Smelter
   2400 Brooklawn Drive
   Baton Rouge, Louisiana 70807

2. Bristol Former Battery Plant
   364 Exide Drive
   Bristol, Tennessee 30094

3. Columbus Battery Plant & Smelter
   3639 Joy Road
   Columbus, Georgia 31906

4. Dallas Smelter (Dixie Metals)
   3030 McGowan Street
   Dallas, Texas 75203

5. Florence Battery
   250 Ellis Street
   Florence, Mississippi 39073

6. Florence Surplus Property
   Olivia Slimon Drive
   Florence, Mississippi 39073

7. Florence (Expander)
   407 Briarhill Road
   Florence, Mississippi 39073

8. Frankfort Battery Plant
   555 Hoke Avenue
   Frankfort, Indiana 46041

9. Frisco Smelter
   7471 Old 5th Street
   Frisco, Texas 75034

10. Greer Surplus Lots
    101 Bent Creek Drive
    103 Bent Creek Drive
    100 Bowers Circle
    110 Bowers Circle
    112 Bowers Circle
    210 Bent Creek Drive
    212 Bent Creek Drive
    106 Sylvan Drive
    108 Sylvan Drive

207 Bent Creek Drive
209 Bent Creek Drive
110 Sylvan Drive
101 Bowers Circle
107 Bowers Circle
111 Bowers Circle
203 Bent Creek Drive
107 Bent Creek Drive
105 Bent Creek Drive
208 Bent Creek Drive
Greer, South Carolina 29650

11. Greer Battery Plant
109 Chick Springs Road
Greer, South Carolina 29650

12. Hamburg Battery Plant
280 Grand Street
Hamburg, Pennsylvania 19526

13. Heflin Smelter
6952 SR-531
Heflin, Louisiana 71039

14. Kankakee Battery Plant
2475 West Station Street
Kankakee, Illinois 60901

15. Logansport Battery Plant
303 Water Street
Logansport, Indiana 46947

16. Memphis Surplus Lots (17)
Mallory and Castex Avenues
Memphis, Tennessee 38109

17. Memphis Smelter
257 W. Mallory Avenue
Memphis, Tennessee 38109

18. Oley Property
Bull Road
Oley, Pennsylvania 19560

19. Reading Residential/Vacant Property
145-147 Spring Valley Rd
143 Spring Valley Rd
127 Spring Valley Rd
129 Spring Valley Rd
131 Spring Valley Rd
258 Spring Valley Rd

260 Spring Valley Rd
Vacant Land - Isabelle Ct & Josephine Drive
Reading, Pennsylvania 19605

20. Reading Recycling Plant
3000 Montrose Avenue
Reading, Pennsylvania 19605

21. Tampa  Smelter
3507 S. 50th Street
Tampa, Florida 33619

22. Vernon Smelter
2700 S. Indiana Street
Los Angeles, California 90023

## Schedule 3

### Transferred Entities

1. Exide International Holdings LP
2. Exide International Holdings GP LLC
3. Exide Holding Europe S.A.S.
4. Exide Technologies (Shanghai) Company Limited
5. Exide Australia Pty Limited Australia
6. Exide Technologies GmbH
7. Exide Technologies BVBA
8. Exide Technologies A/S
9. Exide Technologies Oy
10. Exide Technologies S.A.S.
11. Exide Technologies GmbH (includes a Switzerland branch)
12. Exide Technologies Operations GmbH & Co. KG
13. HAGEN Batterie AG
14. GNB Technologies (China) Limited
15. GNB Technologies (India) Private Limited
16. Tudor India Private Limited
17. Exide Technologies S.r.l.
18. Coöperatie Exide Europe U.A.
19. Exide Global Holding Netherlands C.V.
20. Exide Holding Netherlands B.V.
21. Exide Technologies B.V.
22. Exide Technologies Limited
23. Exide Technologies AS
24. Exide Technologies S.A.
25. Exide Technologies SSC sp. z o.o.
26. Exide Technologies, Lda.
27. Exide Technologies Recycling II, Lda.
28. G.V.B. – Gestão e Valorização de Baterias, Lda.
29. Exide Technologies LLC
30. Exide Singapore Pte Limited
31. Exide Holding Asia Pte Limited
32. Exide Technologies Recycling S.L.U.
33. Exide Technologies S.L.U.
34. Exide Transportation Holding Europe S.L.U.
35. Exide Technologies AB
36. GNB Batteries Trading MEA LLC
37. CMP Batteries Pension Limited
38. Euro Exide Corporation Limited
39. Exide Technologies (Transportation) Limited
40. GNB Industrial Power (UK) Limited
41. EH International, LLC
42. Exide International Holding Netherlands B.V.